**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRCT OF NEW YORK**

| | |
|---|---|
| SAN ANTONIO FIRE AND POLICE PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br><br> Plaintiff, <br><br> v. <br><br> DENTSPLY SIRONA INC., DONALD M. CASEY, JR., and JORGE GOMEZ, <br><br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff San Antonio Fire and Police Pension Fund ("San Antonio FPPF" or "Plaintiff"), by and through its counsel, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.  Plaintiff's information and belief is based on, among other things, the independent investigation of counsel.  This investigation includes, but is not limited to, a review and analysis of: (i) public filings by Dentsply Sirona Inc. ("Dentsply" or the "Company") with the Securities and Exchange Commission ("SEC"); (ii) transcripts of Dentsply conferences with investors and analysts; (iii) press releases and media reports concerning the Company; (iv) analyst reports concerning Dentsply; and (v) other public information and data regarding the Company.

**<u>NATURE OF THE ACTION AND OVERVIEW</u>**

1.      Plaintiff brings this securities class action on behalf of all persons and entities that purchased or acquired Dentsply stock between June 9, 2021 and May 9, 2022, inclusive (the "Class Period").

2.     The claims Plaintiff asserts herein are alleged against: (i) Dentsply; (ii) the Company's former Chief Executive Officer ("CEO") and Director Donald M. Casey Jr. ("Casey"); (iii) the Company's former Chief Financial Officer ("CFO") and Executive Vice President Jorge Gomez ("Gomez") (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

3.     Dentsply is the world's largest manufacturer of professional dental products.  It produces a wide range of goods including artificial teeth, anesthetics, and plaque and gum disease prevention treatments.  The Company sells roughly two-thirds of its products through third-party distributors such as Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Co.

4.     In response to the disruption to the dental industry caused by COVID-19, Dentsply bifurcated its existing executive compensation plans into two six-month periods with the goal of more forcefully incentivizing Dentsply executives to respond to the pandemic's pressures.  The 2021 First Half Annual Incentive Plan and the 2021 Second Half Annual Incentive Plan each provided for incentive payments to Casey, Gomez, and other executives when certain performance criteria were met during the first and second halves of 2021, respectively.  Moreover, the total funding levels for each plan depended on Dentsply's financial performance for the applicable half of 2021.  Importantly, 89% of Casey's, and 74% of Gomez's, annual compensation was awarded based on these performance-based compensation plans.

5.     In the first half of 2021, Defendants Casey and Gomez were each awarded the maximum compensation under the 2021 First Half Annual Incentive Plan after Dentsply met the plan's applicable financial performance targets.

6.     When announcing to investors Dentsply's earnings in the first half of 2021, Gomez stated on June 9, 2021 that the Company's financial results and the accompanying compensation

for executives stemmed from a "faster recovery" to the start of 2021. Gomez, however, cautioned investors that "second half ramp is going to be a little bit less than what we thought initially when we modeled 2021."

7.    After achieving full compensation under the 2021 First Half Annual Incentive Plan, and in the face of a looming slow second half of 2021, Defendants orchestrated a scheme to inflate Company revenue and earnings by manipulating Dentsply's revenue recognition practices and certain distributor rebate and incentive programs.

8.    The Class Period begins on June 9, 2021, when Gomez stated at the Goldman Sachs Global Healthcare Conference that Dentsply's recent financial success was due, in part, to its improved "go-to-market strategy" which included "more sophisticated and strategic incentive plans." Gomez touted that Dentsply was "bringing together all of [its] capabilities into one cohesive offering with the right commercial approach from an incentives perspective." Gomez expressly attributed these improvements to then-CEO Casey.

9.    Throughout the Class Period the Company also asserted in each quarterly and annual report filed with the SEC that Dentsply complied with Generally Accepted Accounting Principles ("GAAP") and that the Company's internal controls "were effective." Dentsply also continued to attribute the sources of its recent financial success to legitimate business factors such as price increases, and stated that the Company's inventory levels remained stable. And when distributor inventory levels increased, the Company falsely stated that the increase was simply due to lower-than expected sales.

10.    These statements were materially false and misleading. In truth, Defendants Casey and Gomez had orchestrated a scheme to improperly recognize revenue in violation of GAAP and for Casey and Gomez to achieve their 2021 incentive-based compensation. As a result of the

foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

11.     On April 11, 2022, Dentsply announced that Defendant Gomez had "resigned" as CFO and would be assuming a CFO role at another company (later identified to be Moderna Inc.). Dentsply assured investors that Gomez's departure was "not the result of any dispute or disagreement with the Company, the Company's management or the Board of Directors of the Company on any matter relating to the Company's operations, policies or practices."

12.     One week later, on April 19, 2022, Dentsply announced the sudden termination of Defendant Casey as CEO and Director.  Attempting to mitigate the damage, Dentsply falsely assured analysts that the termination was due to performance-related issues.  The disclosure of Casey's termination caused Dentsply's stock price to decline by $6.52 per share, or over 13%, from $48.72 per share on April 18, 2022 to $42.20 per share on April 19, 2022.

13.     Finally, on May 10, 2022, Dentsply announced that the Audit Committee of its Board of Directors had commenced an internal investigation regarding "certain financial reporting matters submitted by current and former employees of the Company."  Specifically, Dentsply announced that the Audit Committee was investigating "the Company's use of incentives to sell products to distributors in the third and fourth quarter of 2021" and "whether those incentives were appropriately accounted for" in the Company's financial statements filed with the SEC.  The Audit Committee also stated that it was investigating allegations that "certain former and current members of senior management directed the Company's use of these incentives and other actions to achieve executive compensation targets in 2021."  Dentsply explained that it had advised the SEC that an internal investigation is underway and that the Audit Committee would provide

additional information to the SEC as the investigation proceeded.  As a result, Dentsply was unable to file its quarterly report for the quarter ended March 31, 2022.

14.    On this news, the price of Dentsply stock fell $2.87 per share, or over 7%, from $39.25 per share on May 9, 2022 to $36.38 per share on May 10, 2022, on unusually heavy trading volume.

15.    The very next day, on May 11, Moderna Inc. announced that it terminated Defendant Gomez as CFO "effective immediately," after having joined just two days prior.

16.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Dentsply common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because the acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District.  Dentsply's common stock trades on the NASDAQ, which is headquartered in this District.

20.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

21.     Plaintiff San Antonio FPPF was established in 1919 and provides comprehensive retirement, death and disability benefits for the City of San Antonio's approximately 6,939 police officers, firefighters, retirees, beneficiaries and disabled.  It has roughly $3.7 billion in total assets as of December 31, 2020.  As detailed in the Certification submitted herewith, Plaintiff purchased Dentsply common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the securities laws alleged herein.

22.     Defendant Dentsply is a Delaware corporation with its corporate headquarters in Charlotte, North Carolina.  Dentsply's common stock trades on NASDAQ under the ticker symbol "XRAY."

23.     Defendant Casey served as Dentsply's CEO and Director from February 2018 until April 19, 2022.

24.     Defendant Gomez served as Dentsply's CFO and Executive Vice President from August 2019 until April 11, 2022.

25.     Defendants Casey and Gomez are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

26.     The Individual Defendants were provided with copies of the Company's presentations and SEC filings alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

27.     Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

28.     Dentsply is the world's largest manufacturer of professional dental products.  It produces a wide range of goods including artificial teeth, anesthetics, and plaque and gum disease prevention treatments.  The Company sells roughly two-thirds of its products through third-party distributors such as Patterson Companies, Inc. ("Patterson"), Henry Schein, Inc., and Benco Dental Supply Co.

29.     Historically, Dentsply's agreement with Patterson was exclusive, which helped Dentsply maintain its dominant position in the U.S. dental products market.  This exclusive agreement—unknown to investors at the time—required Patterson to regularly make large minimum purchases of products regardless of demand.  Because these minimum purchase requirements substantially exceeded end-user demand, Dentsply generated a temporary boost to earnings by "stuffing the channel" with products that could not reasonably be sold.  In 2016, Patterson refused to renew the agreement because it had to "destock" excess inventory.  Still, Dentsply assured investors that it would not experience a decline in earnings because it replaced Patterson with a new distributor.

30.     In September 2020, the SEC issued an "Order Instituting Cease-and-Desist Proceedings . . . and Making Findings" that Dentsply "failed to make required disclosure of known

trends and uncertainties in its periodic filings for the first three quarters of 2016" with respect to its exclusive agreement with Patterson and channel stuffing. The SEC found that Dentsply "sold more of its dental technology equipment to its exclusive distributor for the United States [] than the distributor could sell to retail purchasers. [Dentsply] knew during the Relevant Period that retail demand for certain of its technology products was not keeping pace with the exclusive purchases and that inventory levels at the Exclusive Distributor were at an all-time high. . . [Dentsply] did not disclose these known trends and uncertainties to investors."

31.    With the SEC attuned to Dentsply's illicit attempts to boost earnings, the Company needed to tweak its scheme, especially because of the business challenges posed by the ongoing COVID-19 pandemic and the resulting slowdown in sales.

**Defendants' Compensation Plans and the Start of the Scheme**

32.    Defendants Casey and Gomez were financially motivated to defraud investors due to the structure of their executive compensation packages: a massive portion of the annual compensation for the Individual Defendants was linked to Dentsply's ability to meet certain financial performance milestones.

33.    In response to the disruption to the dental industry caused by COVID-19, Dentsply bifurcated its existing executive compensation plans into two six-month periods with the goal of more forcefully incentivizing Dentsply executives to respond to the pandemic's pressures. The 2021 First Half Annual Incentive Plan and the 2021 Second Half Annual Incentive Plan each provided for incentive payments to Casey, Gomez, and other executives when certain performance criteria were met during the first and second halves of 2021, respectively. Moreover, the total funding levels for each plan depended on Dentsply's financial performance for the applicable half of 2021. Importantly, 89% of Casey's, and 74% of Gomez's, annual compensation was awarded

based on Dentsply's financial performance, as depicted in the below graphic from Dentsply's Proxy Statement for 2022.





34.     In the first half of 2021, Defendants Casey and Gomez were each awarded the maximum compensation under the 2021 First Half Annual Incentive Plan after Dentsply met the plan's applicable financial performance targets.

35.     When announcing to investors Dentsply's financial results in the first half of 2021, Gomez stated on June 9, 2021 that the Company's financial results and the accompanying compensation for executives stemmed from a "faster recovery" to the start of 2021.  Gomez, however, cautioned investors that "second half ramp is going to be a little bit less than what we thought initially when we modeled 2021."

**Dentsply's GAAP and Disclosure Requirements**

36.     As a U.S. publicly traded company, Dentsply is required to prepare its financial statements in accordance with Generally Accepted Accounting Principles ("GAAP").  GAAP is a common set of accounting principles, standards, and procedures issued by the Financial Accounting Standards Board to define and reflect accepted accounting practices at a particular

time.  The SEC considers financial statements to be misleading or inaccurate if they are not prepared according to GAAP.

37.     As relevant to this case, GAAP requires companies such as Dentsply to meet certain criteria prior to recognizing revenue.  And when recognizing that revenue, GAAP requires publicly traded firms to consider the impact of rebates and incentives (known as "variable consideration") on the transaction price, which can come in the form of volume discounts, free goods, or tag-along services.  More specifically, under Account Standards Codification ("ASC") 606-10, revenue is recognized when the performance obligations under the terms of a contract with the customer are satisfied, which occurs with the transfer of control of products and services to customers.  What's more, ASC 606 only allows variable consideration to be included in the transaction price if it is probable that there will not be a reversal of revenue.  ASC 606-10-32-12 specifically states that a company must consider whether the entity has a practice of offering a broad range of price concessions or changing the payment terms and conditions of similar contracts in similar circumstances when determining the probability of a revenue reversal.  ASC 606-10-32-14 further requires companies to update the estimated transaction price to represent faithfully the circumstances present at the end of the reporting period.

38.     Companies are also required to design and implement two kinds of control systems to ensure that their representations to investors—both financial and non-financial—are accurate and complete: (1) internal controls over financial reporting ("ICFR"); and (2) disclosure controls and procedures ("DCP").  ICFR is a process designed by a company to provide reasonable assurance regarding the reliability of a company's financial reporting in accordance with GAAP. DCP ensure that information required to be disclosed is communicated to management sufficiently in advance to allow management ample time to consider it and disclose it to investors.

**Materially False and Misleading Statements Issued During the Class Period**

39.     Throughout the Class Period and in every quarterly and annual report Dentsply filed with the SEC, Dentsply falsely assured investors that it complied with GAAP and that its internal controls "were effective."   Dentsply further attributed the sources of its success to legitimate business factors such as price increases, and stated that the Company's inventory levels remained stable.   And when distributor inventory levels increased, the Company falsely stated that the increase was simply due to lower-than expected sales.

40.     The Class Period begins on June 9, 2021, when Gomez stated at the Goldman Sachs Global Healthcare Conference that Dentsply's recent financial success was due, in part, to its improved "go-to-market strategy" which included "more sophisticated and strategic incentive plans."   Gomez touted that Dentsply was "bringing together all of [its] capabilities into one cohesive offering with the right commercial approach from an incentives perspective."   Moreover, Gomez expressly attributed these improvements to then-CEO Casey.

41.     On November 4, 2021, Dentsply announced earnings for the quarter ended September 30, 2021 and reported net revenue of nearly $1.1 billion and diluted earnings per share of $0.47.   Casey attributed the Company's financial results to the "continued recovery in the dental market and robust demand from our recent product launches," as well as Dentsply's "commendable job navigating supply chain bottlenecks to deliver products to our customers."

42.     Given the ongoing impact of COVID 19, analysts were focused on Dentsply's inventory and supply chain, as well as the inventory in the Company's distributor channel.   For example, an analyst from JPMorgan Chase & Co. asked Gomez, "I'm just curious what you're seeing in the channel in terms of inventory levels, are dealers starting to stockpile?   Are you

running [] new shortages?  Are you able to pass on higher shipping costs?"  Gomez responded by assuring investors that:

> [W]ith respect to what we're seeing in the inventory pipeline or channel, we haven't seen any major disruptions.  Any changes really of material significance at this point. . . . But so far, we -- our financials are not -- have not been impacted by the supply chain issues in a material way other than some elevated costs that we have been able to offset or in some cases, for example, we did a price increase.

43.     When an analyst from H.C. Wainwright & Co, LLC asked Gomez, "[d]o you expect your inventory levels to increase in the coming quarters?"  Gomez responded:

> I don't think so.  No, we watch our inventory very closely, our internal inventory, inventory in the channel.  And our objective at all times is to ensure that our manufacturing process is smooth.  And the worst thing that you can do for any manufacturing process is to move inventory levels too drastically from period to period.  So our goal, at all times, is to keep inventory levels relatively stable.  And our actually long-term goal is frankly to decrease days of inventory, and that's a key internal goal that we track and measure very closely.

44.     More specifically, a Goldman Sachs Group Inc. analyst asked Gomez on November 4, 2021 whether "you feel like inventory levels at all -- have changed at all with your distribution partners."  Gomez again responded in the negative: "We don't think so.  We track that closely and we manage our inventory levels in a disciplined way.  And so we are not seeing that at this point."

45.     On February 28, 2022, Dentsply announced earnings for the fourth quarter and full year 2021.  For the fourth quarter, the Company reported net revenue of nearly $1.1 billion and diluted earnings per share of $0.47.  For the full year, Dentsply announced net revenue of $4.25 billion and diluted earnings per share of $1.91.  According to Casey, the Company's "strong results" were driven by "the resilience of the dental market, the strength of our global portfolio, and our team's ability to execute well in an environment still impacted by the pandemic."

46.     The next day, on March 1, 2022, Dentsply filed its Annual Report on Form 10-K with the SEC and identified that "[a]s of December 31, 2021, certain dealers' inventory of the Company's [] products was higher than at the end of the prior year, by approximately $50 million. These higher levels of dealer inventory are due to lower-than-expected retail sales in the fourth quarter." The Form 10-K assured investors that the Company's financial statements were prepared consistent with GAAP and that Dentsply's internal controls were effective.

47.     The above statements identified in ¶¶ 39-46 were materially false and/or misleading when made. In truth, Dentsply's financial statements violated GAAP and the Company's internal controls suffered from a material weakness because Dentsply apparently improperly recognized revenue tied to certain dealer incentive or rebate programs to allow Casey and Gomez to meet certain incentive-based compensation targets. The Company misrepresented and concealed that its earnings were substantially driven by these illicit rebates as opposed to benign business factors such as the "resilience of the dental market" and misrepresented that the Company's inventory levels were stable and that the apparent $50 million increase identified in Dentsply's annual report was due to "lower-than-expected retail sales" as opposed to channel-stuffing.

**The Truth Emerges**

48.     On April 11, 2022, Dentsply announced that Defendant Gomez had "resigned" as CFO to assume a CFO role at another company (later identified to be Moderna Inc.) and assured investors that his departure was "not the result of any dispute or disagreement with the Company, the Company's management or the Board of Directors of the Company on any matter relating to the Company's operations, policies or practices."

49.     Wall Street analysts reacted accordingly. For example, an analyst with Bank of America explained that "[m]anagement departures can happen for a number of reasons, and this

reason seems to be quite simply that Gomez is moving on to a larger company."  As such, the price of Dentsply stock continued to trade at artificially inflated levels.

50.     One week later, on April 19, 2022, Dentsply announced the sudden "terminat[ion]" of Defendant Casey as CEO and Director.  In an attempt to mitigate the damage, Dentsply falsely assured analysts that the termination was due to performance-related issues.

51.     Analysts were surprised by this unexpected development.  For example, Evercore ISI issued a report on April 19 that stated "[t]oday's news is a bit of a shock to most in the investor community," but buying-in to Dentsply's narrative, stated that the termination was simply "performance-related."  Likewise, an analyst from JPMorgan issued a report on April 19 stating that Dentsply "announced that CEO Don Casey was terminated and will no longer serve as CEO or as a member of the Board effective immediately, which the company said stemmed from underperformance vs. peers."  The disclosure of Casey's termination caused Dentsply's stock price to decline by $6.52 per share, or over 13%, from $48.72 per share on April 18, 2022 to $42.20 per share on April 19, 2022.

52.     Then, on May 10, 2022, Dentsply announced that the Audit Committee of its Board of Directors had commenced an internal investigation regarding "certain financial reporting matters submitted by current and former employees of the Company."  Specifically, Dentsply announced that the Audit Committee was investigating "the Company's use of incentives to sell products to distributors in the third and fourth quarter of 2021" and "whether those incentives were appropriately accounted for" in the Company's financial statements filed with the SEC.  The Audit Committee also stated that it was investigating allegations that "certain former and current members of senior management directed the Company's use of these incentives and other actions to achieve executive compensation targets in 2021."  Dentsply explained that it had advised the

SEC that an internal investigation is underway and that the Audit Committee would provide additional information to the SEC as the investigation proceeded.  As a result, Dentsply was unable to file its quarterly report for the quarter ended March 31, 2022.

53.     Despite being unable to timely file its quarterly report, Dentsply still announced earnings for the first quarter of 2022 on May 10, 2022.  On the earnings call, several analysts asked management for more details regarding the nature of the internal investigation and the future impact it might have on the Company's earnings and financial statements.   While generally refusing to comment because the investigation was pending, Dentsply's Interim CFO told investors that the Company's sales in the U.S. had declined 13.5% in the first quarter and "the majority of that decline was related to burning of inventory . . . at the dealers" and connected that burning of inventory to the "$50 million of excess [] inventory at the end of the year."

54.     Analysts were shocked by news of the investigation and excess inventory, and immediately drew a connection to CEO Casey's termination as well as Dentsply's prior channel stuffing misconduct.  According to a report issued by William Blair on May 10, 2022 "the company further surprised investors [] by disclosing it was unable to file its 10-Q on time due to an ongoing forensic accounting investigation" and that "[t]his additional disclosure sheds further light on the surprising moves last month to dismiss the company's former CEO and appoint an interim CEO. . . and the ongoing forensic accounting investigation suggests write-downs are possible in the coming months."

55.     Critically, William Blair explained that Dentsply's "exclusive relationship with Patterson ended because of unrealistic placement minimums.  And today's disclosures about the use of incentives in the third and fourth quarters imply a similar problem [] might still be in place, with $50 million in excess product sitting in the channel at year-end."

56.     Likewise, Morgan Stanley stated in a report dated May 10, 2022 that "[w]hile the immediate termination of its CEO . . . had already set a negative tone . . . , the latest disclosure indicating an investigation into distributor incentives is discouraging."

57.     These disclosures caused Dentsply's stock price to decline by $2.87 per share, or over 7%, from $39.25 per share on May 9, 2022 to $36.38 per share on May 10, 2022.

58.     The very next day, on May 11, Moderna announced that it terminated Defendant Gomez as CFO "effective immediately," who had joined Moderna just two days ago.  All told, the disclosures of Dentsply's misconduct erased over $2 billion in shareholder value.

## LOSS CAUSATION

59.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Dentsply stock and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on April 19, 2022 and May 10, 2022, as alleged herein, the price of Dentsply stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Dentsply stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Dentsply publicly traded stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Dentsply and their families and affiliates.

61.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of February 21, 2022, there were approximately 217 million shares of Dentsply common stock outstanding, owned by at least thousands of investors.

62.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.  Whether Defendants violated the Exchange Act;

B.  Whether Defendants omitted and/or misrepresented material facts;

C.  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.  Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.  Whether the price of Dentsply stock was artificially inflated;

F.  Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.  The extent of damage sustained by Class members and the appropriate measure of damages.

63.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

64.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

66.     Dentsply's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective and inapplicable and cannot shield the statements at issue from liability.

67.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was made by or authorized and/or approved by an executive officer of Dentsply who knew that the statement was false.

## PRESUMPTION OF RELIANCE

68.     At all relevant times, the market for Dentsply stock was an efficient market for the following reasons, among others:

A. Dentsply shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

B. As a regulated issuer, Dentsply filed periodic public reports with the SEC;

C. Dentsply regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other

wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D. Dentsply was followed by many securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

69. As a result of the foregoing, the market for Dentsply common stock promptly digested current information regarding Dentsply from all publicly available sources and reflected such information in the price. Under these circumstances, all purchasers of Dentsply stock during the Class Period suffered similar injury through their purchase of Dentsply stock at artificially inflated prices and the presumption of reliance applies.

70. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

71. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

72. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Dentsply stock at artificially inflated prices.

73.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain artificially high market prices for Dentsply stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the source of Dentsply's recent financial success, as specified herein.

75.     During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose of concealing Dentsply's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock.

77.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Dentsply stock.  Plaintiff and the Class would not have purchased Dentsply stock at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

78.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock during the Class Period.

79.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

80.     Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

81.     Defendants Casey and Gomez acted as controlling persons of Dentsply within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Dentsply, the Individual Defendants had the power and ability to control the actions of Dentsply and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

82.     **WHEREFORE**, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result

of Defendants' wrongdoing, in an amount to be proven at trial, including interest

thereon;

C.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including attorneys' fees and expert fees; and

D.   Awarding such equitable/injunctive or other further relief as the Court may deem

just and proper.

## JURY DEMAND

83.   Plaintiff demands a jury trial.

Dated: July 26, 2022                    Respectfully submitted,

                              */s/ Javier Bleichmar*
                              Javier Bleichmar
                              Nancy A. Kulesa
                              Ross Shikowitz
                              **BLEICHMAR FONTI & AULD LLP**
                              7 Times Square, 27th Floor
                              New York, New York 10036
                              Telephone: (212) 789-1340
                              Facsimile: (212) 205-3960
                              jbleichmar@bfalaw.com
                              nkulesa@bfalaw.com
                              rshikowitz@bfalaw.com

                              *Counsel for Plaintiff*

## CERTIFICATION

I, Warren J. Schott, on behalf of San Antonio Fire & Police Pension Fund ("SAFPPF"), as Executive Director of SAFPPF, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of SAFPPF.

2.      I have reviewed the Complaint against Dentsply Sirona Inc. ("Dentsply"), Donald M. Casey Jr., and Jorge Gomez alleging violations of the federal securities laws and have authorized its filing.

3.      SAFPPF did not purchase or sell securities of Dentsply at the direction of counsel in order to participate in any private action under the federal securities laws.

4.      SAFPPF is willing to serve as a representative party on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

5.      SAFPPF's transactions in Dentsply securities that are the subject of the Complaint during the Class Period specified in the Complaint (June 9, 2021 to May 9, 2022, inclusive) are reflected in Schedule A, attached hereto.

6.      SAFPPF has sought to serve as a lead plaintiff and representative party in a class action filed under the federal securities laws during the last three years, and was appointed, in the following:

- *McLeod v. InnovAge Holding Corp.*, No. 1:21-cv-02770 (D. Colo.)

7.      SAFPPF has also sought to serve as a lead plaintiff and representative party, and was appointed, in the following pending class action filed under the federal securities laws:

- *Vaitkueviene v. Syneos Health, Inc.*, No. 5:18-cv-00029 (E.D.N.C.)

8.      Beyond its *pro rata* share of any recovery, SAFPPF will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _21st_ day of July, 2022.

Warren J. Schott
Executive Director
*San Antonio Fire & Police Pension Fund*

**SCHEDULE A**
TRANSACTIONS IN
DENTSPLY SIRONA INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 07/19/2021 | 3,800.00 | 60.41 | ($229,560.28) |
| Purchase | 07/19/2021 | 8,000.00 | 60.41 | ($483,284.80) |
| Purchase | 07/21/2021 | 900.00 | 63.67 | ($57,300.39) |
| Purchase | 07/21/2021 | 1,950.00 | 63.67 | ($124,150.85) |
| Purchase | 07/22/2021 | 800.00 | 63.17 | ($50,538.64) |
| Purchase | 07/22/2021 | 1,600.00 | 63.17 | ($101,077.28) |
| Purchase | 07/23/2021 | 100.00 | 63.43 | ($6,343.00) |
| Purchase | 07/23/2021 | 200.00 | 63.43 | ($12,686.00) |
| Purchase | 07/23/2021 | 600.00 | 63.42 | ($38,050.38) |
| Purchase | 07/23/2021 | 760.00 | 63.58 | ($48,318.67) |
| Purchase | 07/23/2021 | 1,100.00 | 63.42 | ($69,759.03) |
| Purchase | 07/23/2021 | 1,600.00 | 63.58 | ($101,723.52) |
| Purchase | 07/26/2021 | 1,550.00 | 63.50 | ($98,417.25) |
| Purchase | 07/26/2021 | 3,280.00 | 63.50 | ($208,263.60) |
| Purchase | 07/27/2021 | 10.00 | 63.77 | ($637.66) |
| Purchase | 07/27/2021 | 20.00 | 63.77 | ($1,275.33) |
| Purchase | 07/28/2021 | 1,200.00 | 64.79 | ($77,742.72) |
| Purchase | 07/28/2021 | 2,550.00 | 64.79 | ($165,203.28) |
| Purchase | 07/29/2021 | 400.00 | 65.16 | ($26,063.00) |
| Purchase | 07/29/2021 | 800.00 | 65.16 | ($52,126.00) |
| Purchase | 07/29/2021 | 1,480.00 | 65.33 | ($96,694.76) |
| Purchase | 07/29/2021 | 3,200.00 | 65.33 | ($209,069.76) |
| Purchase | 07/30/2021 | 900.00 | 66.25 | ($59,627.79) |
| Purchase | 07/30/2021 | 1,700.00 | 66.25 | ($112,630.27) |
| Purchase | 08/03/2021 | 2,200.00 | 65.19 | ($143,410.30) |
| Purchase | 08/03/2021 | 4,600.00 | 65.19 | ($299,857.90) |
| Purchase | 08/04/2021 | 2,550.00 | 64.23 | ($163,778.60) |
| Purchase | 08/04/2021 | 5,150.00 | 64.23 | ($330,768.54) |
| Purchase | 08/05/2021 | 4,700.00 | 59.27 | ($278,556.31) |
| Purchase | 08/05/2021 | 9,700.00 | 59.27 | ($574,892.81) |
| Purchase | 08/12/2021 | 770.00 | 58.99 | ($45,418.53) |
| Purchase | 08/12/2021 | 1,680.00 | 58.99 | ($99,094.97) |
| Purchase | 08/13/2021 | 940.00 | 58.58 | ($55,069.24) |
| Purchase | 08/13/2021 | 2,050.00 | 58.58 | ($120,097.82) |
| Purchase | 08/16/2021 | 40.00 | 58.91 | ($2,356.46) |
| Purchase | 08/16/2021 | 80.00 | 58.91 | ($4,712.91) |
| Purchase | 10/14/2021 | 1,320.00 | 56.90 | ($75,109.19) |
| Purchase | 10/14/2021 | 2,140.00 | 56.90 | ($121,767.93) |
| Purchase | 10/15/2021 | 2,030.00 | 57.65 | ($117,020.97) |

**SCHEDULE A**

TRANSACTIONS IN

DENTSPLY SIRONA INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 10/15/2021 | 3,280.00 | 57.65 | ($189,078.22) |
| Purchase | 10/18/2021 | 200.00 | 56.40 | ($11,279.00) |
| Purchase | 10/18/2021 | 300.00 | 56.40 | ($16,918.50) |
| Purchase | 10/18/2021 | 2,190.00 | 56.46 | ($123,642.36) |
| Purchase | 10/18/2021 | 3,580.00 | 56.46 | ($202,118.57) |
| Purchase | 11/11/2021 | 2,000.00 | 54.55 | ($109,100.00) |
| Purchase | 11/11/2021 | 6,300.00 | 54.55 | ($343,665.00) |
| Purchase | 03/18/2022 | 1,050.00 | 48.59 | ($51,024.33) |
| Purchase | 03/18/2022 | 8,100.00 | 48.59 | ($393,616.26) |