UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

SAN ANTONIO FIRE AND POLICE             :    Civil Action No. 1:22-cv-06339-JPC
PENSION FUND, CITY OF BIRMINGHAM        :    (Consolidated)
RETIREMENT AND RELIEF SYSTEM, EL        :
PASO FIREMEN & POLICEMEN'S              :    CLASS ACTION
PENSION FUND, and WAYNE COUNTY          :
EMPLOYEES' RETIREMENT SYSTEM,           :
Individually and on Behalf of All Others :   AMENDED COMPLAINT FOR
Similarly Situated,                     :    VIOLATIONS OF THE FEDERAL
                                        :    SECURITIES LAWS
                        Plaintiffs,     :
                                        :
            vs.                         :
                                        :
DENTSPLY SIRONA INC., DONALD M.         :
CASEY, JR., JORGE GOMEZ, and RANJIT     :
S. CHADHA,                              :
                                        :
                        Defendants.     :
—————————————————————— x    DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

**Page**

I.      SUMMARY OF THE CASE ......................................................................................1

II.     JURISDICTION AND VENUE ..............................................................................9

III.    PARTIES ...............................................................................................................10

      A.      Plaintiffs .....................................................................................................10

      B.      Defendants ..................................................................................................11

IV.     DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF BUSINESS...............14

      A.      The Company ..............................................................................................14

      B.      Product Defects and Supply Chain Constraints Lead to Lagging
          Sales of Capital Equipment.........................................................................18

      C.      Defendants Engage in Channel stuffing and Accounting Fraud to
          Cover Up the Ongoing Supply Chain Issues and Product Problems
          and Meet Market Expectations in 3Q21 .....................................................22

      D.      Defendants' Scheme Continues in 4Q21 ....................................................27

      E.      Defendants' Scheme Begins to Unravel .....................................................29

      F.      Dentsply Announces the Internal Investigation and Delays Filing
          1Q22 Financial Results................................................................................33

      G.      Dentsply Restates Financials, Admits Inadequate Internal Controls
          over Financial Reporting, Unethical Conduct, and Intentional
          Wrongdoing .................................................................................................34

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
      AND OMISSIONS IN FURTHERANCE OF THE SCHEME .........................................39

      A.      Materially False and Misleading Statements Regarding Supply
          Chain Disruptions .......................................................................................39

      B.      Materially False and Misleading Statements Regarding the Success
          and Drivers of Dentsply's Digital Sales.....................................................45

      C.      Materially False and Misleading Statements Regarding Dealer
          Inventory Levels .........................................................................................49

**Page**

D.    Materially False and Misleading Statements Regarding the Company's Success in the Third Quarter of 2021 ....................................53

E.    Materially False and Misleading Statements Regarding the Company's Results for the Fourth Quarter and Full Year 2021 ...............56

F.    Materially False and Misleading Statements Regarding Dentsply's Growth Positioning .......................................................................................59

G.    Materially False and Misleading Statements Regarding Dentsply's Governance Policies and Ethics....................................................................63

H.    Materially False and Misleading Financial Reporting and Non-Compliance with GAAP .......................................................................68

       1.    Dentsply's SEC Filings Contained Materially False and Misrepresentative Financial Results. ...............................................68

       2.    Dentsply's Accounting During the Restatement Periods Violated GAAP ...................................................................................75

I.    Defendants Violated Item 303 of Regulation S-K and ASC 606-10-50 Disclosure Requirements ........................................................................78

J.    Defendants Materially Misled Investors Regarding the Effectiveness of Dentsply's Internal Controls over Financial Reporting and Disclosure..............................................................................81

       1.    Defendants Established an Improper Tone at the Top..................84

       2.    Dentsply's Material Weaknesses Surrounding Revenue Recognition ...................................................................................86

       3.    Dentsply's Admissions Demonstrate How Significant the Material Weaknesses in Its ICFR Were During the Class Period .........................................................................................87

K.    Casey and Gomez Signed and Caused Materially False Sarbanes-Oxley Certifications to Be Filed with the SEC .........................................88

VI.    ADDITIONAL SCIENTER ALLEGATIONS.................................................91

A.    The Individual Defendants Had Financial Motive to Inflate Dentsply's Revenues.................................................................................91

- ii -

Page

       1.     The Individual Defendants Stood to Earn More than 125% of Their Annual Salaries in Cash Bonuses ...................................92

       2.     The Individual Defendants' Equity Compensation Was Highly Dependent on Dentsply Achieving Performance Metrics at the End of 2021 .............................................................94

             a.     The 2019-2021 PRSU Plan .................................94

             b.     One-Time 2019 Operating Margin Transformation Incentive Plan .....................................................95

B.    Defendants Knowingly or Recklessly Signed False Sarbanes-Oxley Certifications Attesting that They Personally Maintained and Promoted Effective Controls over Financial Reporting...........................98

C.    Executive Departures Support a Strong Inference of Scienter .................99

D.    The Fraud Involved Dentsply's Core Operations, About Which Defendants Held Themselves out as Knowledgeable ..............................102

E.    Analysts and Investors Frequently Asked Questions About, and Defendants Frequently Evinced Personal Knowledge by Commenting on, Distributor Inventory Levels and Supply Chain ..........105

F.    Defendants' History of and Warnings Concerning Similar Misconduct Support a Strong Inference of Scienter ...............................108

VII.    LOSS CAUSATION/ECONOMIC LOSS ....................................................111

VIII.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE ....................................................120

IX.    NO SAFE HARBOR ....................................................................................121

X.    CLASS ACTION ALLEGATIONS .............................................................122

XI.    CLAIMS FOR RELIEF ...............................................................................124

4891-2258-9554.v1

Lead Plaintiffs City of Birmingham Retirement and Relief System, El Paso Firemen & Policemen's Pension Fund, and Wayne County Employees' Retirement System (together, "Plaintiffs") allege the following against Dentsply Sirona Inc. ("Dentsply" or the "Company"), Donald M. Casey, Jr. ("Casey"), Jorge Gomez ("Gomez"), and Ranjit S. Chadha ("Chadha") (together, "Defendants"), by and through their counsel Robbins Geller Rudman & Dowd LLP, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.[1]

## I.    SUMMARY OF THE CASE

1.    Plaintiffs bring this federal securities class action for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), on behalf of themselves and all other similarly situated persons or entities (the "Class") who purchased or otherwise acquired the publicly traded common stock of Dentsply between June 9, 2021 and November 13, 2022, inclusive (the "Class Period"), and were damaged thereby.

2.    This case is based on misconduct that Dentsply has admitted. As detailed below, the misconduct alleged herein sparked an internal investigation that led to, among other things, a

---

[1]    Plaintiffs' information and belief is based on, among other things, the independent investigation of counsel, which includes, but is not limited to: (a) review and analysis of public filings made by Dentsply with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning Defendants; (e) accounts of former Dentsply employees; and (f) filings and court orders in other litigation against one or more defendant, including *Dentsply Sirona Inc.*, File No. 3-20170 (SEC Admin. Proc.), *In re Dentsply Sirona, Inc. Sec. Litig.*, No. 1:18-cv-07253-NG-PK (E.D.N.Y.), and *Louisiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc., et al.*, No. 2:19-cv-03347 (S.D. Ohio). Many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

restatement of Dentsply's financials, admissions that numerous of Defendants' public statements were false and omitted material facts, and a revelation that defendants Casey and Gomez had cultivated a culture of fear and non-compliance with ethical and regulatory requirements. It also led to an investigation by the SEC, which is ongoing.

3.      Dentsply is the largest manufacturer of professional dental products in the world, ranging from high-tech capital equipment such as CAD/CAM and imaging technology (*e.g.*, x-ray machines) to single-use products such as drills. Like many other industries, the dental product industry suffered significantly in 2020, when the COVID-19 pandemic shut down dental offices across the globe and the demand for new dental products sharply decreased. Thus, in the months leading up to the Class Period, Dentsply's Chief Executive Officer ("CEO") Casey and its Chief Financial Officer ("CFO") Gomez, were eager to assure the market of the resilience of demand for the Company's products and that supply chain problems – the bane of many companies following the pandemic – were not impacting Dentsply's ability to fill orders.

4.      But the truth was, in summer 2021, supply chain problems *were* impacting the Company's ability to deliver its high-margin imaging products to customers, including its best-selling product, Orthophos, leading to a significant decrease in revenues. Aggravating matters further, the Company was plagued by undisclosed product defects and quality issues with some of its most highly touted technology products, Primemill, a machine that creates crowns, bridges, and other restorations by milling them from larger blocks of ceramic and other materials, and Axeos, a cone-beam X-ray machine. Not only was the Company having to pay for repeated service calls and losing sales from angry customers, but the product problems were dampening demand from distributors and prospective new customers as well.

4891-2258-9554.v1

5.      Heading into the second half of 2021 ("2H21"), with millions of dollars of potential bonus compensation on the line if they achieved certain Company performance metrics, Defendants knew that they had a lot of ground to make up if they were going to meet internal and Wall Street financial expectations in the third and fourth quarters of 2021.  They needed to persuade Dentsply's distributor partners, through whom they sold all of their Technology & Equipment ("T&E") segment products, to purchase more inventory – and in particular, high-margin products not impacted by supply chain shortages that could be shipped during the third quarter, such as CAD/CAM products Primescan and Primemill.

6.      The problem was, Dentsply's North American technology and equipment distributors, Patterson and Henry Schein, didn't *want* to take on additional inventory beyond what they could sell on to customers – particularly with products like capital equipment, which would only depreciate in value and drive up carrying costs as they sat in their warehouses.  The distributors' reluctance to receive additional inventory was exacerbated by the Primemill quality defects, which had caused the distributors and end-users to lose confidence in the product and demand for Dentsply's CAD/CAM products to decrease.  So, in the third quarter of 2021 ("3Q21"), senior Company executives, under extreme pressure from Casey, negotiated with the distributors, offering them extraordinary incentives if they would just purchase more CAD/CAM: direct cash payments, cash back rebates at as much as double normal promotional rates, and extended payment terms so that the distributors could record the purchases on their own books at times favorable for their financial results.  The incentives did the trick.  Dentsply was able to sell tens of millions of dollars of additional product into the distribution channel.

7.      Defendants' actions – known on Wall Street as "channel stuffing" – had successfully increased sales in the short term.  But, as Casey, Gomez, and Chief Accounting

- 3 -

Officer ("CAO") Chadha, knew, Dentsply wouldn't be able to get the full benefit of those additional sales revenues if the millions of dollars of incentives offered to generate the sales were also recorded as liabilities on the Company's balance sheet. Properly recorded, moreover, the incentive-related expenses would have created a huge red flag for analysts and investors and threatened to expose the scam. Accordingly, Dentsply simply ignored the incentives when presenting the Company's 3Q21 and fourth quarter of 2021 ("4Q21") financial results – a move Defendants would later admit violated Generally Accepted Accounting Principles ("GAAP").

8.      Meanwhile, in the Company's China sales operations, headed by Vice President, Asia-Pacific ("APAC") Regional Commercial Organization ("RCO") Henning Müller ("Müller"), employees were selling product with off-book arrangements for extended returns and exchanges that were outside of the standard contracts with the distributors. As a result of these side agreements – which the Company later admitted Gomez and Müller wrongfully hid from the local accounting staff – the Company prematurely recognized an additional $4 million in revenue in 3Q21.

9.      When Dentsply announced its 3Q21 results on November 4, 2021, it had not only beaten the market's (non-GAAP) earnings per share ("EPS") consensus by $0.03, but the Company's T&E segment reported that net sales were up 24.8% year-over-year. More, the Company went so far as to *increase* its estimates for full-year 2021 financial results, announcing expectations that revenues would be in the $4.25-$4.3 billion range based on "our strong performance year-to-date," and "good momentum leading into the future."

10.     On the Company's 3Q21 earnings call that day, Defendants were careful to conceal the Company's ongoing operational problems, channel stuffing, and accounting fraud from investors while highlighting the quarter's general success. Casey, for example, directly attributed

- 4 -

the positive financial results to "our team's disciplined performance against our operational goals." When asked what the Company was "seeing on the supply chain side," Gomez falsely assured investors that the Company "ha[d] not been impacted in terms of our ability to manufacture products or to supply our distributors [and it] is something that we are monitoring very closely." Asked by another analyst whether inventory levels had "changed at all with your distribution partners," Gomez lied again: "We track that very closely and we manage our inventory levels in a disciplined way.  And so we are not seeing that at this point."

11.    While their channel stuffing scheme had given Defendants a reprieve from disappointing revenues in 3Q21, it only exacerbated the shortfall they faced in 4Q21.  Not only was end-user demand insufficient to meet Dentsply's internal sales quotas in the best case, but their distributors now had *$80 million* of excess product to burn through before the Company could sell more.  Defendants had borrowed against 4Q21's sales in a way that they simply couldn't make up through present organic demand.

12.    In order to even *possibly* meet 4Q21 and fiscal-year 2021 ("FY21") financial goals, Defendants knew that Dentsply was once again going to have to stuff its distribution channels with CAD/CAM products.  For the second straight quarter, the Company offered North American distributors unprecedented financial incentives to purchase unnecessary product.  But this time, with excess inventory *already* in the channel from 3Q21, they also needed to gin up end-user demand.  To that end, throughout 4Q21, Dentsply also offered end-users – dental offices and dental service corporations – enhanced incentives to purchase CAD/CAM and other high-margin equipment.  In all, the fourth quarter's incentives again drove tens of millions of dollars in sales – but at a cost of millions of dollars in rebates owed to customers and distributors.

- 5 -

13.    Defendants couldn't allow those incentives to count against Dentsply's 4Q21 revenues; that would defeat the point.  So, despite promising that rebate checks would be delivered to customers six to eight weeks after their orders were placed, Defendants delayed issuing rebate checks until January 2022, after the 4Q21 books were closed.  And, once again, the accounting group largely ignored the incentives for purposes of recording the Company's accrued liabilities in violation of GAAP.

14.    As a result of Defendants' actions, Dentsply's CAD/CAM inventory levels were ***$50 million*** higher at the beginning of 2022 than they had been the prior year, and Defendants knew that future quarters' sales would take a massive hit.  Still, Dentsply's 2021 Form 10-K filed with the SEC on March 1, 2022 made no mention of the incentives used to gin up sales in the second half of 2021, another violation of SEC disclosure rules.  In the Company's February 28, 2022 press release announcing Dentsply's 4Q21 and FY21 financial results, Casey attributed the Company's 2021 success to "'the resilience of the dental market, the strength of our global portfolio, and our team's ability to execute well in an environment still impacted by the pandemic.'"  Discussing why the Company's first half of 2022 earnings were expected to be lower than the market had anticipated, Gomez didn't mention the decreased demand caused by Defendants' desperate promotions in 3Q21 and 4Q21; instead, he stated that it was simply due to "revenue cadence," new "supply chain constraints and inflationary pressures."

15.    Soon after, on April 11, 2022, the Company announced that Gomez had resigned as CFO effective May 6, 2022, to join another public company.  When, just a few days later, on April 19, 2022, the Company announced with no warning that Casey had been terminated as CEO, effective immediately, the market grew suspect.  Dentsply's share price dropped 13% that day. The true nature of Casey's "performance"-related firing was further clarified a few weeks later.

On May 10, 2022, the Company announced that it could not timely file its first quarter of 2022 ("1Q22") Form 10-Q with the SEC due to an ongoing internal investigation by the Audit and Finance Committee of Dentsply's Board of Directors (the "Board") that begun in March 2022 (the "Internal Investigation"). Current and former Dentsply employees had complained that Dentsply executives had directed the improper use of customer incentives and improper accounting for those incentives in 3Q21 and 4Q21, and that this had been done to secure Defendants' bonus compensation. The Company also disclosed that the SEC had been informed of the ongoing investigation.

16.     Along with this unsettling news, the Company also pre-announced disappointing 1Q22 earnings. On the Company's earnings call held that day, Gomez's replacement as CFO, Interim CFO Barbara Bodem ("Bodem"), told investors that sales in the United States had declined 13.5% in the first quarter, and explained that about ***80% of that decline*** was because the distributor channel (as a result of Defendants' misconduct) needed to burn through excess inventory. As a result of the May 10, 2022 disclosures, Dentsply's stock price declined a further 7.5%, to close at $36.38.

17.     Over the next several months, the Internal Investigation continued and Dentsply further delayed reporting any financial results for 1Q22 or the second quarter of ("2Q22") with the SEC. Meanwhile, Dentsply's high-level personnel continued to rapidly turn over. Senior Vice President of the North America RCO, Eric Bruno ("Bruno"), was replaced in March 2022. Defendant Chadha "mutually separated," from Dentsply on August 4, 2022, and Chief Commercial Officer ("CCO") Walter Petersohn ("Petersohn") followed on September 1, 2022. Müller was replaced soon after.

18.     Finally, on November 1, 2022, the Company announced the damning findings of the Audit and Finance Committee's completed Internal Investigation.  The Company admitted that in North America, promotional incentives offered in 3Q21 and 4Q21 had not been properly accounted for and had resulted in the Company falsely reporting inflated revenues.  Had Dentsply correctly accounted for the incentives, it would have failed to meet internal sales goals and Wall Street expectations in 3Q21 (and the Individual Defendants (defined below) would have lost millions in bonus compensation).  Additionally, Dentsply had incorrectly reserved for warranty expenses, product return provisions, and other variable consideration, to the tune of tens of millions of dollars.  In China, revenue had also been overstated in 3Q21 through improper accounting for rights of return.  In total, 3Q21 revenue had been overstated by $29 million, operating income by $27 million, net income by $19 million (23%), and diluted EPS by $0.09 (24%).  FY21 revenues were overstated by $20 million, and net income by $10 million, while accrued liabilities were understated in 3Q21 and 4Q21 by *$84 million* (13%) and *$81 million* (12%), respectively.  More, the investigation acknowledged that Dentsply's public disclosures during these periods contained "potential omissions" "regarding the use of these incentives or their potential future impacts."

19.     Unsurprisingly, given these facts, the Internal Investigation also determined that the Company did not have effective internal controls over financial reporting ("ICFR").  Casey and Gomez had not only violated the Company's Code of Ethics and Business Conduct by their conduct in North America, and Gomez in connection with the improper accounting in China as well, but they had also set an "inappropriate tone at the top," and had "created a culture where employees did not feel comfortable raising concerns without fear of retaliation."  Gomez and Müller violated the Company's Code of Ethics and Business Conduct and/or committed "intentional wrongdoing" by, among other things, "failing to provide [necessary] information to"

- 8 -

and "obstructing the work of the accounting team" and "lacking truthfulness in providing information to the Company and to the Audit and Finance Committee as part of the China Investigation."

20.     With respect to defendant Chadha's accounting group, the Internal Investigation concluded that the Company had used incorrect accounting and assumptions in the determination of estimates related to its sales returns provisions, warranty reserve provisions, and variable consideration, among other significant deficiencies, through multiple financial reporting periods.

21.     As a result of the Company having materially misstated financial results and the effectiveness of its internal controls during the 3Q21, 4Q21, and FY21 financial periods, the Company would be restating its financials.

22.     As analysts and the market digested this complex news, Dentsply's share price fell from a closing price of $30.82 on October 31, 2022, to $26.83 on November 3, 2022.

23.     The last of the artificial inflation caused by Defendants' fraud left the stock price on November 14, 2022, when Dentsply announced its third quarter 2022 ("3Q22") financial results and fourth quarter 2022 ("4Q22") guidance lower than market expectations.  The Company attributed the lackluster results in significant part to weaker distributor demand for CAD/CAM products due to the leftover inventory build (a direct result of Defendants' channel stuffing), as well as ongoing supply chain issues.  As a result of this news, Dentsply's stock price declined $1.70 per share, or over 5%, to close at $30.35 per share.

## II.    JURISDICTION AND VENUE

24.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.  This

Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

25.     Venue is proper in this District pursuant to §27 of the Exchange Act because certain of the acts and practices complained of herein occurred in this District, including the dissemination of false and misleading statements into this District, and the securities that are the subject of this action are traded on The Nasdaq Stock Market LLC (the "Nasdaq") in this District.

26.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## III.    PARTIES

### A.    Plaintiffs

27.     City of Birmingham Retirement and Relief System is a public pension fund for over 7,000 current and former employees of the City of Birmingham, Alabama with over $1 billion assets under management.  City of Birmingham Retirement and Relief System purchased shares of Dentsply common stock during the Class Period at artificially inflated prices and was damaged thereby.  *See* Certification, attached hereto.

28.     El Paso Firemen & Policemen's Pension Fund is a public pension fund organized and operated for the benefit of firefighters and police officers in El Paso, Texas.  El Paso Firemen & Policemen's Pension Fund manages over $1.5 billion in assets for the benefit of over 3,500 active and retired members.  El Paso Firemen & Policemen's Pension Fund purchased shares of Dentsply common stock during the Class Period at artificially inflated prices and was damaged thereby.  *See* Certification, attached hereto.

29.     Wayne County Employees' Retirement System is a public pension fund providing retirement and related benefits for over 6,000 current and former public employees of Wayne County, Michigan, managing approximately $1 billion in assets.  Wayne County Employees' Retirement System purchased shares of Dentsply common stock during the Class Period at artificially inflated prices and was damaged thereby.  *See* Certification, attached hereto.

**B.     Defendants**

30.     Dentsply is the world's largest manufacturer of professional dental products and technologies.  Headquartered in Charlotte, North Carolina, and incorporated in Delaware, Dentsply has offices and manufacturing and distribution facilities across the globe.  Dentsply common stock trades on the Nasdaq under the ticker symbol "XRAY."

31.     Donald M. Casey was the CEO and a member of Dentsply's Board from February 2018 until he was terminated by the Company on April 19, 2022.  Prior to joining Dentsply, Casey was the CEO of Cardinal Health's Medical segment from April 2012 to February 2018, with defendant Gomez serving as his CFO from July 2015 to December 2017.  Casey also spent 25 years employed in various executive roles at Johnson & Johnson and its subsidiaries.  As CEO of Dentsply, Casey was the senior-most officer of the Company, with ultimate responsibility for Dentsply's performance and operations and for communicating with the Board.  Casey also had approval over and was a signatory to Dentsply's SEC reporting, submitted certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") certifications affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.

32.    Jorge Gomez served as Executive Vice President and CFO at Dentsply from August 2019 through May 6, 2022, when he left Dentsply to become the CFO of Moderna – a tenure that lasted just a single day before the Internal Investigation was announced and Moderna terminated Gomez's employment.  Prior to joining Dentsply, Gomez was employed as the CFO of Cardinal Health from January 2018 to August 2019, having previously served as the CFO of various segments at the company, as well as Cardinal Health's treasurer and corporate controller, during his tenure.  While CFO of Cardinal Health's Medical segment from July 2015 to December 2017, Gomez worked directly with defendant Casey, the Medical segment's CEO.  As Dentsply's CFO, Gomez was the Company's senior-most financial officer, responsible for overseeing, *e.g.*, its Finance, Financial Planning & Analysis ("FP&A"), Investor Relations, Audit, Treasury, Tax, and Accounting groups and the development and implementation of internal financial controls.  Gomez also signed Dentsply's SEC reporting, submitted SOX certifications affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.

33.    Ranjit S. Chadha served as CAO and Principal Accounting Officer of the Company from August 31, 2020 through August 4, 2022, when his employment was terminated amid the Internal Investigation.  Chadha is a Certified Public Accountant and a Chartered Accountant, with 17 years' experience at PricewaterhouseCoopers ("PwC") and 10 years' experience in senior finance and accounting roles in the defense industry.  As the CAO of Dentsply, Chadha was the senior-most accounting officer at the Company with responsibility for ensuring compliance with applicable accounting regulations and internal controls over accounting, as well as SEC reporting. Chadha signed the Company's Forms 10-K filed with the SEC.

34.     Defendants Casey, Gomez, and Chadha are collectively referred to herein as the "Individual Defendants."

35.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Dentsply's quarterly reports, shareholder letters, releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's financial reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Throughout 2021 and until their respective resignations or terminations from Dentsply in 2022, the Individual Defendants, as senior executive officers of Dentsply and as further detailed herein, were privy to confidential and proprietary information concerning Dentsply.  The Individual Defendants had access to non-public information about the Company's business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings, and via reports and other information provided to them in connection therewith.  Because of their positions with the Company and their access to material nonpublic information available to them but not to the public, the Individual Defendants knew of and participated in the fraudulent scheme alleged herein, knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and knew and/or recklessly disregarded that the affirmative representations being made were then materially false and misleading.

4891-2258-9554.v1

**IV.    DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF BUSINESS**

**A.    The Company**

36.    Dentsply is the world's largest manufacturer of professional dental products, and its business focuses on developing, manufacturing, and selling dental equipment.  Dentsply's operations are based in the United States, and approximately 34% of its business comes from North America.  Dentsply also conducts business in over 150 countries and has a "significant presence" in the APAC region.

37.    During the Class Period, Dentsply operated two business segments: (1) Consumables; and (2) T&E.  Dentsply's Consumables segment included sales of small, single-use products such as drills and filers, and represented about 40% of the Company's business at the end of 2020.  Dentsply's T&E segment represented about 60% of the Company's business at the end of 2020 and was by far the most important business segment for the Company.  Indeed, the entire purpose of the Company's extravagant, yearly "Dentsply Sirona World" sales event in Las Vegas was to sell Dentsply's digital equipment.

38.    Dentsply's T&E products included, among other things, basic and high-tech dental equipment, imaging systems, and CAD/CAM equipment, many of which were among the Company's flagship products.  CAD/CAM technology allows dentists to complete certain dental procedures more efficiently by digitizing various aspects of the procedures.  Dentsply's CAD/CAM products included, among other things, Primescan, which is an intraoral scanner that creates permanent digital oral models without the need for conventional, physical impressions, and Primemill, which is a machine that creates crowns, bridges, and other restorations by milling them from larger blocks of ceramic and other materials.  Dentsply's CAD/CAM products were sold both individually or with other CAD/CAM products as part of a larger CEREC (chair-side economical

- 14 -

restoration of esthetic ceramic) system. Dentsply's imaging equipment included extra-oral imaging units such as its Axeos and Orthophos products. Dentsply's imaging, CAD/CAM, and other capital equipment products were generally high-margin products for the Company.

39. Throughout the Class Period, Dentsply sold all of its digital equipment (including its CAD/CAM products) through two third-party distribution partners, Patterson and Henry Schein. In 2021, Dentsply sold roughly two-thirds of all its products through distributors. Each of the Patterson and Henry Schein accounts were managed by a Director of National Accounts, who led the distributor sales teams. During the Class Period, the Director of National Accounts for Patterson was Ken Ciulla. The Director of National Accounts for Henry Schein was Tony Jacketti during the 3Q21 and Scott Shepard during 4Q21. During the Class Period, the Directors of National Accounts reported to the Senior Vice President, North America RCO, Bruno, who reported directly to defendant Casey and was responsible for overseeing all sales operations in North America.

40. Throughout each quarter, Dentsply negotiated with its distributors to determine the amount of product the distributors would purchase. Then, after Dentsply and the distributors agreed upon the number of units that the dealer would purchase, Dentsply would ship the equipment directly from its overseas manufacturers to the distributors' warehouses in the United States. (Dentsply did not maintain an inventory of its capital equipment on-hand in the United States.) At that point, Dentsply would recognize the revenue from the sale, and the equipment would remain in the distributors' warehouses until the distributors sold the equipment to the end customer. Because capital equipment was a depreciating asset, and because excess inventory led to significant carrying costs, the distributors did not want to maintain inventory in excess of end-user demand on their books; accordingly, Dentsply and its distributors closely monitored end-user

- 15 -

(*e.g.*, dental office) demand, including the timing of wholesale orders received by the distributors and the quantity of each product sold to end-users.

41.    In theory, then, Dentsply would be able to increase its sales to distributors only if end-user demand also increased.  The majority of Dentsply's sales representatives were therefore partnered with distributor representatives to sell the capital equipment the dealers had purchased from Dentsply to end-user customers like dental offices.  Dentsply's sales representative would make a "pitch" to the potential end-user and perform product demonstrations; the representative from the distributor would finalize the sale, including determining the pricing, financing, and conduct invoicing.  Dentsply's sales and distribution channel team members were trained that if the Company focused on increasing end-user demand for their products, distributor demand would take care of itself.

42.    However, Dentsply had a prior history of violating this tenet, and rather than focusing on end-user demand, engaged in what is known as channel stuffing – convincing distributors to purchase more inventory than is actually needed in order to artificially increase sales revenue and create the appearance of greater end-user demand than actually exists.  In 2016, Dentsply had put approximately seven to nine months of inventory into the channel beyond what end-user demand actually called for, which meant that its future seven to nine months of sales would be correspondingly lower.  Dentsply did not disclose this known adverse trend to investors, as required under SEC Regulation S-K Item 303, 17 C.F.R. §229.303 ("Item 303"), and filed interim financial reports with the SEC on Forms 10-Q that were materially misleading and violated §13(a) of the Exchange Act.  Following a years-long SEC investigation, the Company received a cease-and-desist order from the SEC on December 21, 2020, requiring it to pay a civil fine and

"cease and desist from committing" future violations of §13(a) and Rules 12b-20 and 13a-13 thereunder.

43.    It was in this atmosphere of past securities violations and disappointing operational results that Casey and Gomez took over leadership of the Company.  In November 2018, seeking to restore investor confidence, Casey announced a three-year restructuring plan ("Restructuring Plan") that was intended to turn the Company around and allow it to reach its "full potential."  The Restructuring Plan focused on growth, margin expansion, and simplifying the organization. Specifically, the Company sought to sustainably deliver a 3%-4% growth rate, expand operating margins to 22% by 2022, and simplify the organization through headcount reductions and other cost-saving initiatives.  Leading up to and throughout the Class Period, the Company increased its growth target to 4%-5%, and insisted that it would deliver a 22% margin by 2022.  Achieving these goals became Dentsply management's primary objective over the next several years.

44.    With new management and aggressive restructuring goals also came a new corporate culture.  Former Dentsply employees recalled that, before 2018, they enjoyed going to work, and they felt that Dentsply had a positive corporate culture.  Things changed when Casey and Gomez took the helm.  As the former employees recalled – and as Dentsply later admitted – Casey and Gomez created a toxic corporate culture where employees were under extreme pressure to hit unrealistic sales targets, and where they felt uncomfortable speaking up without fear of retaliation.  Former employees described Casey as a "bully," "total tyrant," "terrible to people," and "disconnected from what was feasible."  They also recalled that it was "Don's [Casey's] way or the highway," and noted he fired people that didn't agree with him.  They described Gomez as "rude," "ignorant," and "not uplifting," and they recalled that he "belittled" and "intimidat[ed]" Dentsply employees.

**B.     Product Defects and Supply Chain Constraints Lead to Lagging Sales
of Capital Equipment**

45.     The dental technology industry was hard-hit by the COVID-19 pandemic in 2020,

which shut down dental offices worldwide and crippled end-user demand for new product.  At the

beginning of 2021, with the brunt of the pandemic seeming to have passed in much of the world,

investors were cautiously optimistic about demand normalizing to pre-2020 levels.  Speaking at

the JPMorgan Healthcare Conference on January 13, 2021, Casey was eager to reassure the market

that the pandemic had not curtailed the Company's Restructuring Plan.  He emphasized that:

> We've seen some good resilience coming out of the pandemic. . . .  [W]e've been
> marching to a restructuring plan that we introduced in November of 2018, focusing
> on growing revenues and whether that's through innovation, organic or inorganic,
> improving our demand creation capabilities through things like marketing
> effectiveness and sales force effectiveness, we believe that **we can grow revenues**.

He touted the launch of new capital equipment Primescan, Primemill, and the Axeos cone-beam

X-ray machines during the pandemic, and highlighted the strength and efficiency of the

Company's single global integrated supply chain.

46.     But Dentsply was suffering from undisclosed product quality defects that worsened

throughout the first half of 2021 ("1H21"), and supply chain disruptions that snowballed week-by-

week from summer 2021 onward.  These problems challenged Dentsply's ability to achieve

internal capital equipment sales quotas beginning in 3Q21.

47.     *First*, Dentsply suffered from severe quality problems with some of the very

products Casey had so proudly highlighted to investors, including Axeos and Dentsply's highly

touted dental milling and grinding product, Primemill.  Primemill first debuted in January 2020,

just prior to the COVID-19 pandemic, as the latest-and-greatest in in-office milling technology for

dental restorations, and then was relaunched in the first quarter of 2021 ("1Q21").  The quality

defects with Primemill and Axeos were pervasive throughout 2021, continued through at least 3Q22, and had a "tremendous" impact on Dentsply's ability to sell capital equipment.

48.     While the first generation of Primemill product had received positive reviews from Dentsply's dentist consultants and key opinion leaders ("KOLs"), the relaunched product did not. Dentsply had elected to manufacture the second generation Primemill with cheaper materials (in particular, cheaper wires and computer boards) in order to increase Dentsply's margins on the product, which proved to be a miscalculation: fully *half* of the machines produced with the cheaper materials were defective.  This led to angry customers, unhappy distributors, and waning demand for Primemill.  Worse still, because Patterson preferred to sell Primemill as a packaged system with Primescan, declines in Primemill demand also led to decreased sales of Primescan.

49.     Dentsply's product quality issues so permeated its business that in April 2021, it created a full-time product quality group Vice President role to manage and resolve quality issues. The individual placed in the role, Ben Loop, and his Vice President, Shadwa Ibrahim, spent 2H21 simply trying to get the Primemill quality problems under control.

50.     Dentsply and its executives did not want to allow returns of the defective Primemills, as that would take revenue off Dentsply's books.  Instead, the Company paid its distributors, Patterson and Henry Schein, to perform service calls on the non-working Primemills, requiring that the equipment be serviced three times with the problems still unresolved before becoming eligible for a return.  Often, Primemill would continue to fail after three service calls. Even then, Primemill returns were not accepted unless expressly authorized by Casey or Gomez. Complaints from customers about the product defects strained the relationship between Dentsply and its distributors.  During this time Casey even showed up unannounced at a dinner that Patterson's then-Vice President of Marketing, Josh Killian ("Killian"), was attending in Charlotte

with Bruno, to confront Killian and Bruno about the U.S. market purportedly making too much of the ongoing quality issues – according to Casey, the rest of the RCOs were not receiving nearly as many complaints about Primemill – and Patterson's unwillingness to purchase greater quantities of Primemill. Of course, as Casey knew, 80% of the relaunched Primemill units had been delivered to the U.S. market; it was only logical that the majority of product defect complaints came from U.S. customers.

51.     Beyond Primemill and Primescan, there were also extensive product failures with Dentsply's Axeos and Orthophos cone-beam X-ray machines. When dealers installed these machines – which Dentsply sold for between $60,000-$100,000 – the equipment was often dead on arrival, either because of product defects or damage during shipping, leading to furious customers. While customers could exchange the equipment when this occurred, it was not uncommon for the second cone-beam machine a customer received – or even the third – to fail as well. Teams across the Company from manufacturing, sales, marketing, finance, and the Company's new product services employees were set to solving these product defects and the resultant fallout, while publicly, the Company and its management concealed the problems, pretending there was nothing wrong.

52.     Dentsply's product quality issues were so severe that they made their way to Casey's doorstep, as angry customers often called Casey to discuss the product failures. Casey also occasionally attended meetings where Dentsply employees discussed how to address the product failures. The product quality issues also caused overall demand to decrease, as customers and dealers lost confidence in Dentsply's products.

53.     **Second**, despite Casey's public assurance that the Company's supply chain was strong and efficient, by summer 2021, the Company was supply constrained with respect to its

- 20 -

high-margin imaging products, including Axeos and Orthophos, and the supply problems continued to get worse throughout the year. The shortages were so severe that in 3Q21, the distribution sales team was having inventory calls every other week, and by September 2021, they were having inventory calls every week. Typically, during periods where Dentsply was not suffering from supply constraints with its imaging products, there was a six to eight week lead time between when an order for equipment was placed and when it would ship from the manufacturer (and thus, when Dentsply could recognize the revenue for that sale). But by 4Q21, the shortages were so extreme, distribution team leaders were having "shouting matches" about the limited supply. By then, distributors were waiting up to ***nine months*** for backordered imaging equipment like Dentsply's best-selling Orthophos extraoral imaging units due to an ongoing shortage of electronic components. The supply constraints caused Dentsply employees to worry about the Company's ability to manufacture orders that were placed at Dentsply Sirona World in September 2021, and ultimately, some Dentsply Sirona World orders were not shipped because of the supply constraints. Not only did the shortage reduce Dentsply's revenues directly – it could not recognize revenue on backlogged orders that had not shipped – but this shortage combined with the ongoing product defect issues created another problem: each extra unit needed to replace a defective imaging unit was one that could not be sold and so, was lost revenue to Dentsply.

54.    Despite Dentsply's ever-growing supply chain issues, Defendants repeatedly assured investors that Dentsply's superior supply chain management allowed the Company to fulfill customer orders with minimal delay. For example, during the September 23, 2021 Investment Community Session at Dentsply Sirona World 2021, Casey stated, during a discussion about supply chain management, "we're going to be able to deliver what our customers need."

During the same presentation, Gomez assured investors that "clearly from a supply disruption perspective, we are fine."

C.    **Defendants Engage in Channel stuffing and Accounting Fraud to Cover Up the Ongoing Supply Chain Issues and Product Problems and Meet Market Expectations in 3Q21**

55.    By the end of the second quarter of 2021 ("2Q21"), it was clear to Dentsply management that the Company would have to make up significant ground in high-margin capital equipment sales in each of the third and fourth quarters if it was going to meet internal financial goals and Wall Street's financial expectations.  Accordingly, at the start of 3Q21, under extreme pressure from Casey and Gomez to achieve internal and external sales targets, Bruno held a meeting with the distributor sales team and informed them that there was a large "gap in wholesale."  Specifically, in order to meet internal sales quotas set by Casey, additional sales to distributors Patterson and Henry Schein beyond what demand forecasts called for were required. Bruno told the distributor team that to bridge the gap, they not only needed to sell additional high-margin capital equipment, but since they needed to ship it by the end of the quarter to book the revenue within 3Q21, they needed to sell something that the manufacturers could produce and ship quickly.  With imaging equipment backlogged for months, that meant CAD/CAM.  Having himself received sales quotas from the C-Suite, Bruno directed the team on exactly how many units of a particular product they were to convince each distributor to take, and reiterated that they "had to do it."

56.    The distributor sales team directors knew that asking the dealers to purchase excess inventory was a bad idea.  First, it was contrary to how Dentsply's sales and distribution teams had always been trained to focus on the end-user demand – the nature of their industry was that if the retail (end-user) demand existed, then the wholesale (distributor) demand would follow.

- 22 -

Management's instructions demanded that axiom be turned completely on its head – that the sales team force however much inventory into the wholesale channel Dentsply needed to meet its sales targets, even though wholesales greatly outpaced end-user demand.

57.     Second, the distributor sales team knew Dentsply management was asking for too much: they had weekly calls with representatives of the distributors to go over updated end-user demand forecasts and distributor inventory needs, and the detailed spreadsheets provided by the distributors to Dentsply tracking orders received by end-users conclusively showed that in 3Q21, the demand for the amount and types of product that management wanted to sell was simply not there.  Pushing the distributors to take on more inventory to benefit Dentsply's quarter would only further strain the relationships between Dentsply and the distributors.

58.     Finally, even if Dentsply could persuade the distributors to purchase more inventory than they needed so that Dentsply could increase its quarterly sales numbers, they knew doing so would essentially be borrowing against future quarters' sales to the distributors, who would want to work through the excess inventory before ordering even more.  This meant that either the Company would have to keep stuffing the channels to achieve "sales" in future quarters or accept a massive sales shortfall in some future quarter as the inventory levels in the channel normalized.  Company management nonetheless aggressively pushed the distributor sales team to meet its short-term quarterly quota without regard for whether it would negatively impact Dentsply's ability to sell to dealers in future quarters.

59.     Still, the distributor sales team felt that their jobs were on the line if they refused to comply with Bruno's demands, and understood that Bruno's demands were coming from Casey, who was "bullying" Bruno and putting extreme pressure on him.  When one senior member of the distributor sales team voiced disapproval at a meeting with Bruno at being asked to do these things,

- 23 -

Bruno "lost it" and made a point of humiliating him in front of the senior member's colleagues. After that incident, the employee never spoke out against Bruno's directions again; if Bruno asked him to do something, he did it.  The day after the incident, Dentsply's Vice President of Human Resources called the employee and stated that the Company was aware of Bruno's behavior and was working to improve the negative tone and culture issues at the Company.

60.     To convince Patterson and Henry Schein to take on excess inventory, Dentsply's marketing team, including Chris Little ("Little"), Vice President of Marketing – North America, and Mark Trimmer ("Trimmer"), a Director of Marketing, put together marketing materials called "Reasons to Believe" for the distribution team to use.  The materials promoted end-user demand forecasts so obviously exaggerated that the distribution team directors were embarrassed to have to present them and said that they failed the "red face test."  In mid-3Q21, Patterson was asked to take on tens of millions of dollars' worth of product above what was actually needed, which strained Dentsply's relationship with Patterson.  Patterson said it understood where the request was coming from (*i.e.*, the C-Suite), but refused.

61.     When Patterson's response was communicated to Bruno and Finance Director Todd Mack ("Mack"), Bruno stepped in to address the matter directly with Killian.  Bruno and Killian negotiated the number of units, agreed on the "incentives" to be given to induce the purchases, and documented the agreements via email.  The incentives included a combination of guaranteed direct payments to Patterson for taking the inventory, back-end rebates, promised future payments if Patterson increased end-user demand over pre-set targets, and extended payment terms – *i.e.*, making payment due in 60 or 90 days instead of the standard 30 days, so that Patterson could record the cost of purchasing the inventory into its following financial quarter.  While Dentsply's

typical practice was not to offer "cash back" incentives with capital equipment, in 3Q21, the cash back incentives offered to distributors for capital equipment were millions of dollars.

62.    The same types of excessive incentives were being offered to Henry Schein to get the incremental sales Dentsply needed in 3Q21.  The distribution teams for Patterson and Henry Schein regularly attended joint calls with Bruno, Trimmer, Mack, Little, and Vice President, CFO-North America Jerry Asamoah, the finance leader for the North America RCO until November 2021.  On the calls, Bruno and the other executives communicated to the distribution teams exactly what they needed from each distributor.  As he did with respect to Patterson, Bruno negotiated the incentives with Henry Schein's representative directly.   The incentives required to get the distributors to take on the massive amount of additional inventory Dentsply needed to meet its quarterly numbers were so large that even Bruno, head of North American sales, did not have the authority to approve the incentives.  Instead, Bruno needed to get approval from Ivan Zeljkovic ("Zeljkovic"), Dentsply's Vice President of Commercial Finance.  Zeljkovic reported directly to defendant Gomez, who would have been aware of and/or involved in approving the deals given his role and the size of the incentives offered.

63.    Ultimately, Defendants' scheme to stuff Dentsply's distributor channels with excess capital equipment inventory resulted in tens of millions of dollars in additional sales in 3Q21 that would not otherwise have been made.  To assure they would get the full benefit of the additional sales revenue and to hide the massive incentives given to the distributors, which would have undercut Defendants' public assurances of strong end-user demand, Defendants also had to engage in accounting fraud.  Under GAAP, the incentives should have been accounted for as reductions of revenue on the income statement and accrued liabilities on the Company's balance sheet – a fact that defendants Gomez, as head of Dentsply's finance organization and former

4891-2258-9554.v1

corporate controller of a public company, and Chadha, the senior-most accountant at the Company, knew or should have known.  Instead, the incentives were largely or entirely not accounted for on the financial statements *at all*, inflating the Company's reported revenues and understating its liabilities.

64.    The incentives and improper accounting allowed Dentsply to deliver positive financial results despite supply chain disruptions and product quality issues.  When Dentsply announced its 3Q21 results on November 4, 2021, it beat market EPS consensus by $0.03.  On the earnings call that same day, Casey and Gomez highlighted Dentsply's "strong growth" in sales, even compared to pre-COVID 2019 sales, and revenue 4% above market expectations.  In particular, T&E net sales were $629 million, up 24.8% versus prior year, and up 25.3% on an organic basis.  Gomez emphasized that digital devices such as Primescan and imaging equipment such as Axeos and Orthophos were in high demand, and that overall, digital dentistry equipment had been a primary growth driver in 3Q21.  As Defendants would later admit, by the end of 3Q21, dealer inventory for the Company's CAD/CAM products was *$80 million* higher than it was at the beginning of the year.  However, when asked directly by an analyst with JPMorgan Chase & Co. ("JPMorgan"), "what you're seeing in the channel in terms of inventory levels," Gomez pointedly concealed that the Company had jammed tens of millions of dollars of excess inventory into the channel, falsely stating that "with respect to what we're seeing in the inventory pipeline or channel, we haven't seen any major disruptions [or] [a]ny changes really of material significance at this point."

65.    The Company even raised its FY21 earnings guidance and tightened its revenue projections to the top of the range announced in March 2021 "[b]ased on the results of the third quarter."    In response to questions about expected 4Q21 T&E performance, Gomez set

expectations high, informing the market that with Dentsply Sirona World sales coming that quarter, as well as strong demand overall, "in our guidance for the fourth quarter, we are including pretty substantial growth for CAD/CAM, for imaging in general . . . that part of the business continues to be strong."

### D.    Defendants' Scheme Continues in 4Q21

66.    With high market expectations for T&E sales and far more inventory than was needed in the distributor pipeline (due to the 3Q21 channel stuffing), Dentsply's only plausible means of meeting sales expectations was even more channel stuffing in 4Q21.  Bruno was once again facing extreme pressure from Casey to meet the internal wholesale sales expectations with respect to T&E.  A director of national distributor accounts recalled walking with Bruno between events at the Cosmopolitan and Caesar's Palace hotels during the Company's Dentsply Sirona World Conference in Las Vegas on September 23-25, 2021, and Bruno confessing not only the extreme pressure being placed on him by those he reported to (Casey), but also that he didn't think demand was sufficient to meet Dentsply's objectives.  Bruno also spoke specifically about supply chain challenges and the pressure he was getting from the C-Suite related to those challenges. Bruno was also fighting the Chief Supply Chain Officer, Dan Key ("Key"), and COO Petersohn, to get enough T&E product for the North America RCO to meet the imposed internal quotas.  Key and Petersohn determined together how to allocate the supply-constrained products to Dentsply's various global RCOs, and if Bruno could not get more CAD/CAM and imaging equipment for delivery in 4Q21, revenue numbers would inevitably fall short of C-Suite demands.

67.    Under exceptional pressure from Casey, Bruno once again demanded that the distributor team obtain sales above actual inventory needs, then negotiated massive incentives to get Patterson and Henry Schein to make the orders.  If Dentsply had not offered the above

incentives to the distributors and so persuaded them to take on even more excess inventory, Dentsply would have fallen short of forecasted CAD/CAM sales to Patterson in 4Q21 by more than 500 units – an amount equaling approximately $45 to $50 million. That same quarter, the amount of total incentives given to Patterson in guaranteed rebates was about 10% of the value of the incremental orders Dentsply negotiated.

68.    But the distributors were *not* the only parties being offered enhanced incentives to buy Dentsply capital equipment in 4Q21. At the Company's three-day Dentsply Sirona World conference in Las Vegas on September 23-25, 2021, and continuing through the end of 4Q21, Dentsply offered 10% and 20% cash back rebates to end-users when they purchased certain capital equipment. Customers could receive up to 20% back when they purchased a combination of CAD/CAM equipment such as an intraoral scanner and a piece of imaging equipment, or a 10% rebate if they purchased just one type of equipment. Dentsply had not previously offered significant rebates like this for capital equipment directly to end users, and their size was practically unprecedented in the industry. The rebate checks to retail customers from this period were for tens of thousands of dollars per purchase, and could cover as much as the first *nine months of payments* that the customers had to make for the equipment.

69.    The rebates made it near-irresistible for customers to purchase equipment that was eligible for the rebates, and materially increased the number of units the sales force was able to sell. Although Dentsply's retail sales representatives did not understand why management would offer such massive incentives, they did not mind, since it helped them move more equipment and their commissions were based on the original order amount, not the order value net of rebates. In just one of Dentsply's 30-40 sales territories, the rebates to end-users during these promotions totaled at least $500,000.

70.    However, while customers were promised under the terms of the rebate that they would receive their rebate checks within six to eight weeks of their purchases, customers did not actually receive those checks until after January 1, 2022.  Customers who should have received their checks before the end of 2021 repeatedly asked sales representatives where their rebate payments were, and were told that the company processing the checks was behind.  Behind the scenes, sales representatives suspected that the Company was waiting until 1Q22 to issue the checks so that the significant rebate costs wouldn't impact 4Q21 or FY21 financial results.

71.    Ultimately, the incentives led to the addition of tens of millions of dollars of sales in 4Q21.  The incentives were once again left off the Company's balance sheet and consolidated financial statements, misleadingly inflating reported revenues for CAD/CAM products and helping to hide the unprecedented levels of incentives given to manufacture the additional sales.

### E.    Defendants' Scheme Begins to Unravel

72.    On February 28, 2022, Dentsply filed a Form 8-K announcing its 4Q21 and FY21 financial results.  Despite Dentsply's extensive efforts to stuff distributor inventory channels with high-margin capital equipment in 4Q21, Dentsply still fell short of the market's FY21 financial expectations.  FY21 revenues of $1.08 billion fell 4% short of the market consensus $1.13 billion, while FY21 EPS of $0.76 fell $0.03 short of market consensus.  Indeed, as reported by market analyst Evercore, the ***only*** area of market consensus that Dentsply even came close to meeting in FY21 was in T&E revenues, which, of course, were inflated due to Defendants' undisclosed channel stuffing scheme:

**Headline Results:**

| | Result | Actual | Consensus | EVR ISIe | Δ vs. Cons |
|---|---|---|---|---|---|
| Revenue | MISS | $1,088 MM | $1,129 MM | $1,150 MM | (4%) |
| Technology & Equipment Revenue | IN-LINE | $676 MM | $679 MM | $695 MM | (0%) |
| Consumables Revenue | MISS | $412 MM | $450 MM | $455 MM | (8%) |
| Organic Growth | MISS | 1.8% | 3.5% | 8.5% | (168 bps) |
| Operating Margin | MISS | 20.0% | 21.4% | 21.3% | (142 bps |
| EPS | MISS | $0.76 | $0.79 | $0.79 | ($0.03) |

In addition to the disappointing 4Q21 and FY21 financial results, the market was surprised by Dentsply's guided $4.3-$4.4 billion revenue range, which was 3% lower than market consensus; its anticipated 4%-5% internal sales growth, which was a full 10% lower than market consensus had expected; and its fiscal-year 2022 ("FY22") adjusted EPS guidance, which was $0.06 lower than market consensus had anticipated.

73.     During the Company's earnings call that day, Casey and Gomez acknowledged, for the first time, that the Company was facing supply chain constraints around imaging and other equipment requiring certain electronic components.  However, they maintained that these problems only began impacting sales in 4Q21, continuing to conceal that supply chain problems had caused significant problems for the Company through the entire FY21.

74.     Casey and Gomez also attempted to attribute Dentsply's lower than anticipated financial guidance for FY22 largely to the electronic component shortage.  In reality, Defendants knew that the negative consequences of their channel stuffing were coming home to roost.  Having "borrowed" sales in 2H21 from future quarters, Dentsply's sales numbers were going to fall until current end-user demand could no longer be satisfied by the distributors' inventory and channel levels normalized.  This was a process that, given lagging end-user demand, the massive quantities of inventory Patterson and Henry Schein had been persuaded to take on, and the attractive promotions that had just been offered to induce customers who *were* interested in that same equipment to purchase in 4Q21, would take several quarters.

- 30 -

75.     By the time the market closed on February 28, 2022, Dentsply's share price had taken a significant hit, closing at $54.14 per share from a prior day closing price of $58.69 – an approximate 7.7% decrease.

76.     On March 1, 2022, Dentsply filed its Form 10-K for 2021 with the SEC.  In it, Dentsply disclosed that, "[a]s of December 31, 2021, certain dealers' inventory of the Company's CAD/CAM products was higher than at the end of the prior year, by approximately $50 million," but falsely represented that "[t]hese higher levels of dealer inventory are due to lower-than-expected retail sales in the fourth quarter and *may* pose headwinds to the Company's net sales for these products in 2022."  As Dentsply would later admit, this language was misleading.  In the Company's Form 10-K/A, filed on November 7, 2022, Dentsply corrected the language to read: "These higher levels of dealer inventory are due to lower-than-expected retail sales in the fourth quarter, *as well as timing-related purchases by dealers due primarily to incremental pricing incentives in the second half of the year*, and *are likely to* pose headwinds to the Company's net sales for these products in 2022."

77.     Then, on April 6, 2022, Dentsply announced that John Groetelaars ("Groetelaars"), former CEO of the medical technology company Hillrom, was being immediately appointed to the Company's Board.  This timing was unusual, as a new Board slate of 11 director nominees (many of whom were current directors) was set to be voted on at the Company's May 25, 2022 annual meeting.

78.     Just five days after Groetelaars joined Dentsply, on April 11, 2022, Dentsply announced via a Form 8-K that defendant Gomez had resigned as CFO effective May 6, 2022 to become the CFO of another public company.  The Company assured the market that "Mr. Gomez's decision to resign is not the result of any dispute or disagreement with the Company, the

Company's management or the Board of Directors of the Company on any matter relating to the Company's operations, policies or practices."

79.     On April 19, 2022, the Company filed a Form 8-K with the SEC announcing certain disappointing preliminary financial results for 1Q22, including revenue 5% below market consensus, sales growth 2.75% below consensus, and adjusted EPS of $0.16, or approximately 24%, below market consensus.  Dentsply attributed the shortfalls to "weaker sales performance in the U.S., global supply chain challenges, and foreign exchange headwinds."

80.     In the same filing, Dentsply announced that – less than one week after his re-nomination as a Board member in Dentsply's April 13, 2022 Proxy Statement – defendant Casey had been terminated as Dentsply's CEO and as a member of the Board.  Casey was conveniently replaced by brand-new Board member Groetelaars as Interim CEO the same day, while Groetelaars' former CFO at Hillrom, Bodem, was appointed Interim CFO.  Shocking the market, these announcements caused Dentsply's stock price to drop approximately *13%* in a single day, from a closing price of $48.62 on April 18, 2022 to just $42.20 at close of market on April 19, 2022.

81.     Of course, these announcements represented only a partial disclosure of the concealed truth.  Investors still did not know that the North America sales shortfalls in 1Q22 that Dentsply stated were the cause of the disappointing quarterly earnings were actually a direct result of Defendants' concealed channel stuffing during 2H21 that would continue to negatively impact Dentsply's financial results in the coming quarters.  More, although Dentsply would later reveal that the Audit and Finance Committee had begun its Internal Investigation in March 2022, the Company concealed the investigation and provided limited information regarding Casey's termination, attributing it solely to Dentsply's performance during his tenure.

**F.    Dentsply Announces the Internal Investigation and Delays Filing 1Q22 Financial Results**

82.    On May 10, 2022, Dentsply filed a Form 12b-25 Notification of Late Filing with the SEC, announcing that it was unable to file its 1Q22 Form 10-Q on a timely basis due to an ongoing internal investigation "regarding certain financial reporting matters" that had been initiated in March 2022 by the Audit and Finance Committee of the Company's Board following reports of potential misconduct from current and former employees of the Company.  Specifically, the Form 12b-25 disclosed that the Internal Investigation "is focused on the Company's ***use of incentives to sell products to distributors in the third and fourth quarters of 2021 and whether those incentives were appropriately accounted for and the impact of those sales was adequately disclosed*** in the Company's periodic reports filed with" the SEC.  More, the Audit and Finance Committee was also investigating "allegations that certain former and current members of senior management directed the Company's use of these incentives and other actions to achieve executive compensation targets in 2021."  Offering additional color on the Company's 1Q22 earnings call later that day, Interim CEO Groetelaars stated that the Internal Investigation's focus concerned whether the incentives at issue "were directed by executives of the company, both former executives [Casey and Gomez] as well as potentially executives who are still here."  The Company also disclosed that it had voluntarily notified the SEC of the Internal Investigation.

83.    Dentsply also filed a Form 8-K that day summarizing the Form 12b-25, announcing disappointing 1Q22 results in-line with the Company's pre-announcement from April 19, 2022, and lowering FY22 guidance.  On the Company's earnings call later that day, Groetelaars and Interim CFO Bodem affirmed that a key driver of the disappointing 1Q22 results was weaker sales performance in the United States.  Notably, Bodem disclosed that ***approximately 80%*** of the U.S. sales decline was a direct result of the dealer inventory buildup from the 2H21, primarily

- 33 -

CAD/CAM – in fact, there was so much excess inventory that management did not expect inventory levels to normalize until 3Q22 at the earliest.

84.    Analysts commenting on the news noted their concern about the Internal Investigation and the increased risk it posed to the Company and its operations, but acknowledged that the full picture was not yet clear.  Piper Sandler, for example, noted that "at the least[,] these allegations increase the operational risk for a business that we believe already had an elevated risk profile.  In our follow-up call with management, no other details are being provided on this topic, including potential timing of resolution or related financial/legal costs."  William Blair stated that it was "very surprised to see the deterioration at Dentsply Sirona.  Clearly the company is in the midst of significant leadership changes, and the ongoing forensic accounting investigations suggests write-downs are possible in the coming months," however it maintained its "Market Perform" rating on the stock as it "wait[ed] for more clarity on what happened and what the true outlook is for the business."

85.    Following news of the Internal Investigation, on May 11, 2022, defendant Gomez was terminated as Moderna's new CFO – just one day into his new role.

**G.    Dentsply Restates Financials, Admits Inadequate Internal Controls over Financial Reporting, Unethical Conduct, and Intentional Wrongdoing**

86.    The Internal Investigation continued into 3Q22, with Dentsply delaying any interim financial reporting with the SEC.  Dentsply announced the completion of the Internal Investigation on November 1, 2022, informing the public that the investigation's original focus on the propriety of incentives used in 2H21 had been expanded to include a "China Investigation" and "Accounting Review."  As would later be disclosed in the Company's 2022 Form 10-K, Forms 10-Q for 2Q22 and 3Q22, and Form 10-Q for the first quarter of 2023 ("1Q23"), between the legal and forensic

- 34 -

accounting fees associated with the Internal Investigation itself, subsequent remediation efforts and costs of severance and retention related to remedial personnel actions, Defendants' scheme cost the Company at least *$68 million* dollars: approximately $25 million in 2Q22, $20 million in 3Q22, $16 million in 4Q22, and $7 million in 1Q23.

87.     The November 1, 2022 Form 8-K disclosed that, based on Internal Investigation findings, the Audit and Finance Committee had determined to restate Dentsply's financial statements for the three and nine months ended September 30, 2021 and for FY21 (the "Restatement").  The announcement, provided in a Form 8-K filed with the SEC, disclosed that the Company had determined the Restatement was necessary due to material misstatements in the prior financial reports that were deemed "to be material when considered together with certain qualitative and quantitative considerations such as the fact that the misstatements masked a failure to meet internal financial targets and external financial analyst expectations for the three months ended September 30, 2021 and due to the material weaknesses identified through the course of the Audit and Finance Committee's investigation."   The Form 8-K described each branch of the investigation and its findings as follows.

88.     With respect to the Internal Investigation, which was commenced in March 2022 as a result of current and former employee concerns regarding "certain financial reporting matters," the Company disclosed that the investigation was focused on the Company's use of incentives to sell products to certain distributors in North America in 3Q21 and 4Q21, whether those incentives were appropriately accounted for, and whether the impact of the sales to which they were applied were adequately disclosed in the Company's periodic reports filed with the SEC. The Audit and Finance Committee also investigated allegations that certain former members of

4891-2258-9554.v1

senior management may have directed the Company's use of these incentives and other actions to achieve executive compensation targets in 2021.

89.    The Company found that "certain former members of senior management, including the Company's former Chief Executive Officer [Casey] and former Chief Financial Officer [Gomez], violated provisions of the Company's Code of Ethics and Business Conduct." More, "these former members of senior management did not maintain and promote an appropriate control environment focused on compliance in areas of the Company's business, nor did they sufficiently promote, monitor or enforce adherence to the Code of Ethics and Business Conduct." Instead, "certain former members of senior management, including [Casey] and [Gomez] created a culture where employees did not feel comfortable raising concerns without fear of retaliation . . . [and] substantiated certain allegations regarding inappropriate tone at the top by [Casey] and [Gomez]."

90.    Specifically, the North America investigation

identified instances in which the Company's distributors in North America were offered incremental incentives, including extended payment terms, to purchase products *in order for the Company to attempt to meet certain internal sales targets in the third and fourth quarters of 2021*.   These incentives were offered in conjunction with net sales transactions amounting to approximately $38 million and $70 million in the third and fourth quarters of 2021, respectively, which in turn contributed to higher levels of distributor inventory at the end of such periods, and lower sales to these distributors in the first and second quarters of 2022. . . . *[T]hese incremental incentives and the sales to which they applied contributed to the Company's ability to meet external financial analyst expectations in the third quarter of 2021*. . . .   The . . . Investigation *noted potential omissions in public disclosures made by the Company regarding the use of these incentives or their potential future impacts in the third and fourth quarters of 2021*.

91.    Importantly, not only had Dentsply misstated its accounting for the massive incentives it offered to manufacture sales, but the Internal Investigation also determined that the Company had also inflated revenues by "utiliz[ing] incorrect accounting and assumptions in the

determination of estimates related to its sales returns provisions, warranty reserve provisions and variable consideration." These were significant issues, particularly given the Company's ongoing (undisclosed) product defect issues and the increased service and replacement costs the Company had experienced in 2021. In fact, the Company's warranty expense increased by approximately 63% in 2021 to $44 million from $27 million in 2020 and the warranty accrual increased 56% to $28 million from $18 million in 2020.

92.     The China investigation began in June 2022, when the Company's Corporate Audit department informed the Audit and Finance Committee that "the Company had identified higher returns of products from distributors in China during the fourth quarter of 2021." The China investigation found that the Company had improperly "processed returns and/or exchanges that were not in accordance with the return and/or exchange provisions contained in existing distributor agreements and sales contracts in China." The failure to properly account for these side agreements allowed the Company to "pull through," or prematurely recognize, revenue for approximately $4 million in net sales that should have been booked the following quarter.

93.     More, the China investigation uncovered that Müller, and other members of the Company's local commercial team in China had

> ***committed intentional wrongdoing*** by failing to provide requested information to the Company's local accounting organization, by obstructing the work of the accounting team, and by lacking truthfulness in providing information to the Company and to the Audit and Finance Committee as part of the China Investigation.

94.     The China investigation also concluded that Gomez and Müller had violated the Company's Code of Ethics and Business Conduct and had failed to maintain or promote an appropriate control environment with respect to compliance. Finally, the China investigation identified "concerns regarding control deficiencies" resulting in a "heightened risk of incomplete

- 37 -

or insufficient information required to maintain accurate books and records related to incentive provisions, specifically concerning expanded concessions regarding the return or exchange of products from distributors."

95.    Finally, the investigation into Dentsply's accounting identified more pervasive problems than contemplated by the initial scope of the Internal Investigation.  Defendants Casey and Gomez's SOX certifications, which attested to the sufficiency of the Company's ICFR and its disclosure controls and procedures, were false.  The Internal Investigation concluded that those controls were "not effective due to the identification of one or more material weaknesses" as of September 30, 2021 and December 31, 2021, and that the control weaknesses were still currently unresolved.  The Company's accounting group had also utilized incorrect accounting and assumptions in the determination of estimates related to sales returns provisions, warranty reserve provisions, and variable consideration.  More, the firm's independent auditor, PwC, had not been informed of the incentives Dentsply had given distributors during 3Q21 and 4Q21 in conjunction with its 2021 audit of Dentsply's consolidated financial statements – despite management having an obligation under professional auditing standards to provide PwC with all material information necessary to offer a fair audit opinion for investors.[2]

96.    Over the next two days, as the market digested Dentsply's numerous disclosures and what they would mean for the Company's ongoing operations, Dentsply's stock price fell from a closing price of $31.00 on November 1, 2022, to $26.83 on November 3, 2022, a decline of more than 13%.

---

[2]    Public Company Accounting Oversight Board ("PCAOB") Auditing Standard ("AS") 2805.06.

97.     On November 14, 2022, the Company announced 3Q22 financial results and lowered 4Q22 guidance below market expectations.  In its Form 10-Q for 3Q22, the Company reported that in the United States, "[t]he decrease in organic sales was driven primarily by soft demand for Consumables products, and lower wholesale volumes for CAD/CAM products relative to prior year," the latter of which was a direct result of Defendants' scheme.  As a result of the November 14, 2022 news, Dentsply's stock price declined $1.70 per share, or over 5%, from $32.05 per share on November 11, 2022 to $30.35 per share on November 14, 2022, as the remaining artificial inflation introduced by Defendants' scheme left Dentsply's share price.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN FURTHERANCE OF THE SCHEME

98.     In addition to the fraudulent financial reporting and GAAP violations discussed in §V.G. below, Defendants also made material misrepresentations in furtherance of their scheme, including statements and omissions concerning: (1) the supply chain disruptions in 2H21; (2) the success and drivers of Dentsply's digital product sales; (3) dealer inventory levels; (4) the Company's success in 3Q21 and its results for 4Q21 and FY21; (5) the Company's "sustainable" growth profile based on "strong underlying fundamentals"; and (6) Dentsply's governance policies and ethics.

### A.    Materially False and Misleading Statements Regarding Supply Chain Disruptions

99.     Throughout 2H21, Defendants repeatedly assured investors that, while supply chain disruptions proliferated across the globe, Dentsply's superior supply chain management allowed the Company to continue fulfilling distributor orders without (or with only minimal) delay, and that the impact to the Company from any supply chain challenges was limited to increased costs.  These statements (described in ¶¶100-108) were materially false and misleading

- 39 -

when made.    As Defendants knew or recklessly disregarded, supply chain disruptions and electronic component shortages had hindered Dentsply's ability to fulfill orders for its imaging equipment during 2H21, which in turn weighed on the Company's ability to hit its sales targets in 2021.  *See* §IV.B.  Supply chain shortages began hindering Dentsply's ability to manufacture and ship imaging products early in 3Q21 and grew worse each week such that by 4Q21, there was a **nine-month delay** between when distributors ordered imaging equipment and when that equipment shipped.  *See* §IV.B.

100.    On August 5, 2021, Dentsply held a conference call with analysts and investors to discuss the Company's results for 2Q21.  On the call, an analyst directly asked Defendants about supply chain issues and their anticipated effects on 2H21.  Gomez responded:

> Yes.  Nathan.  ***And just to clarify, we, financially, we have been able to manage the challenges really well***.  The supply chain team has done an outstanding job of managing situations like, for example, we talked last quarter about ***some risks of supply disruption relative to certain electronic components, right?  And the team has done a great job doing that***.  We are seeing inflationary pressures on the shipping cost side.  And the team has handled those well.
>
> And overall, with COVID, there's always concerns about – there are certain suppliers and certain parts of the economy that are not back to normal levels from a production standpoint.  And so those are things that we are watching closely.  ***And all of our projections, the guidance include the risk as we see it.  And – but again, for the most part, the team so far has done a great job of managing those things***.  But we think it was – we thought it was worthwhile mentioning because it's happening across the board.

101.    On September 23, 2021, Dentsply held its Investment Community Session at Dentsply Sirona World 2021, where Casey and Gomez repeatedly quelled analyst concerns about supply chain disruptions.  For example, Casey represented that, while supply chain management was requiring more effort, supply chain issues were not interfering with Dentsply's ability to deliver orders to its customers:

The reason Dan [Key] actually has no hair anymore is, in fact, because the supply chain is a challenge.  There are pieces and chunks that remain to be – we're working through it, chips, among other things.  ***And we're very comfortable that we're going to be able to deliver what our customers need***, but it's certainly taking a lot more effort.

102.    Later during the presentation, an analyst asked Defendants whether certain business lines were affected more severely by supply chain issues than other business lines.  Rather than disclose that Dentsply's imaging sales had been impacted by the supply chain disruptions, Casey stated:

The businesses we worry the most about right now are chip-related.  ***We feel very good that we have adequate supply***.  But where we might have been holding 180 days, we're now trying to hold more just because we keep hearing from the car industry and other stuff that there's going to be chip challenges.

Medical grade plastic is something that we see a little bit of a push on.  But again, one of the reasons I actually wanted to have our supply chain people is because it comes up, and I think they've done a heck of a job.  ***Right now, we don't have anything that's blinking yellow or red***.

In response to the same question, Gomez added: "Jason, just to add some flavor to your question.  ***I think, so clearly from a supply disruption perspective, we are fine***.  But it is clear that there is inflation in some places.  Costs are going up."

103.    On November 4, 2021, Dentsply held a conference call with analysts and investors to discuss the Company's results for 3Q21.  On the call, Defendants continued to falsely assure investors that supply chain disruptions had not limited their ability to supply their distributors.  For example, in response to an analyst's request for a "walk-through on what you're seeing on the supply chain side right now," Gomez responded:

Yes, as I indicated in my remarks, there are challenges.  So far, I also said this so far for us, ***we have not been impacted in terms of our ability to manufacture products or to supply our distributors is something that we are monitoring very closely***.  The supply chain team is doing a great job because the reality is, it is harder now to find certain components.

- 41 -

It is more expensive in some cases to procure certain materials. *We have managed all of that so far. So with respect to what we're seeing in the inventory pipeline or channel, we haven't seen any major disruptions. Any changes really of material significance at this point*. But as you know, this is a global situation, and it's something that is hard to predict at this point. *But so far, we – our financials are not –have not been impacted by the supply chain issues in a material way other than some elevated costs that we have been able to offset or in some cases, for example, we did a price increase*.

104. Later during the same call, an analyst asked Defendants how long they expected supply chain disruptions to continue. Gomez responded: "And the – as I said before, the supply chain team is doing a great job. And that's why, *so far, we have not impacted our ability to manufacture products*."

105. Casey continued this false narrative halfway through 4Q21, stating at a November 11, 2021 Credit Suisse Healthcare Conference:

*As we go into the fourth quarter, we're optimistic that things get closer and closer to normal*. Obviously, the supply chain is impacting all of us. When you talk about – in our case, it's – we look at distribution costs are accelerating. To date, we've been able to manage through a lot of that. And as we look out, we have a few key products that there's obviously going to be constraints around we're a heavily chip-oriented business. *To date, we've been able to make everything we need to make*. But as we jump out 6, 8, 12 months, we expect to see pressure on that.

*We have a terrific supply chain*. One of the advantages of the structure we put in place over the last 2 years is a centralized supply chain with a pretty sophisticated procurement group, and that's helped us through it. But we're also – we took price in the – at the very end of the third quarter, with the idea that we want to get in front of inflation.

106. And two-thirds of the way through 4Q21, on December 1, 2021, when the Company presented at Evercore ISI HealthCONX Conference, Casey again repeated:

Yes. So the supply chain, I break it out into 2 things, Elizabeth, distribution and logistics. *We're not seeing huge delays. We're seeing increased costs associated with that*. And that's obviously a headwind as we go forward. The second issue is *are we having problems getting anything, we're basically – what we're learning is we can get stuff*. It just takes a lot more effort because it might not be as easy to get.

- 42 -

107.    Finally, when the Company held its conference call on February 28, 2022 to discuss its results for 4Q21 and FY21, Defendants continued to downplay their ongoing supply chain issues, even as they began to admit that supply chain disruptions had constrained growth in 4Q21. For example, in his prepared remarks, Gomez finally conceded that supply chain issues had inhibited Dentsply's 4Q21 growth, but indicated that they would resolve within the next one to two quarters:

> In the quarter, we also experienced more acute supply chain and COVID-related constraints, which we estimate to have suppressed our total company organic growth by approximately 2 to 3 points.  We view this as a ***temporary headwind*** but anticipate that our supply chain will be – will remain challenging for at least ***1 or 2 quarters in 2022***.

108.    On the same call, Gomez also repeated the narrative that supply chain disruptions had caused increased costs, but had not interfered with the Company's ability to fulfill customer orders until 4Q21:

> ***Up until the third quarter, the majority of our supply chain challenges were cost related due to inflationary pressures.  In the fourth quarter, we started to face significant component shortages impacting the production of imaging equipment*** and treatment centers.  We estimate this impact to have reduced the T&E segment growth rate by at least 4 points.
>
> We ended the quarter with a higher-than-normal backlog in imaging, and our team will continue to manage the supply chain situation as effectively as possible over the next few quarters.  Similar to many other industries, the availability of electronic components in dental is inconsistent at the moment.
>
>      *    *    *
>
> ***One thing that we had been experiencing before this quarter, and I mentioned this a couple of times, we were able to have access to all the components we needed albeit at a higher price.  So the impact had been only from a cost perspective***.

109.    The statements detailed above (¶¶100-108) were materially false and misleading when made.  As Defendants knew or recklessly disregarded:

- 43 -

(a)    Contrary to Defendants' statement in ¶100, Dentsply's supply chain issues were not limited to increased component costs. In 3Q21, far from having "some risks" and "manag[ing]" supply chain "challenges really well," when Defendants spoke on August 5, 2021, Dentsply was already experiencing manufacturing disruptions due to component shortages, particularly with respect to its best-selling imaging equipment (*see* §IV.B.).

(b)    Contrary to Defendants' statements in ¶¶100-102, throughout 3Q21, the supply chain issues worsened by the week and inhibited Dentsply's ability to fulfill dealers' orders such that Dentsply was not "able to deliver what [its] customers need[ed]," did not "have adequate supply," and was far from "fine" from a "supply disruption perspective" (*see* §IV.B.). At the time these statements were made, the supply chain issues had impacted Dentsply so much that the Company's RCOs had engaged in "shouting matches" over which region would receive the limited supply of imaging equipment (*see* §IV.B.).

(c)    Contrary to Defendants' statements in ¶¶103-106, by 4Q21, the supply chain disruptions had caused a nine-month delay between when dealers had placed orders for imaging equipment and when those orders actually shipped (*see* §IV.B.). Thus, Dentsply had in fact "been impacted in terms of [its] ability to manufacture products" and "supply [its] distributors" (*see* §§IV.B., IV.E.). Further, contrary to Defendants' representations, the Company was already experiencing "major disruptions" in the "inventory pipeline" and "channel" well before 4Q21 (*see* §IV.B.). It was also "seeing huge delays," "having problems getting" imaging supply, and was unable to "make everything [it] need[ed] to make" (*see* §§IV.B., IV.E.). In addition, the supply chain issues had "impacted" Dentsply's financials "in a material way" (*see* §§IV.B., IV.E.).

(d)     Contrary to Defendants' statement in ¶107, given that the supply chain disruptions had caused a nine-month backlog by 4Q21, they were not a "temporary headwind" and were likely to persist well beyond "1 or 2 quarters in 2022" (*see* §§IV.B., VII).

(e)     Contrary to Defendants' statement in ¶108, the delayed order fulfillment caused by the supply chain disruptions was damaging Dentsply's ability to hit its sales targets throughout 2H21 and thus the impact from the supply chain disruptions was not "only from a cost perspective" prior to 4Q21 (*see* §IV.B.);

(f)     Contrary to Defendants' statement in ¶100, Dentsply had not accounted for supply chain disruptions in its projections; Dentsply had engaged in the incentive and accounting schemes to cover up the sales shortfalls caused by the supply chain disruptions (*see* §§IV.C., IV.G.).

(g)     In connection with each of the statements made by Defendants in ¶¶100-108, Defendants had an affirmative duty to disclose the material supply chain problems and product quality problems impacting Dentsply's digital products in order to make those statements not misleading.

## B.    Materially False and Misleading Statements Regarding the Success and Drivers of Dentsply's Digital Sales

110.    While their channel stuffing and accounting scheme remained undisclosed, Defendants touted Dentsply's digital technology sales – specifically its CAD/CAM and imaging sales – and assured investors that "digital" sales would continue to grow.  These statements (described in ¶¶111-116) were materially false and misleading when made.  As Defendants knew or recklessly disregarded, supply chain disruptions and product quality issues in Primemill, Axeos, and Orthophos had materially restricted Dentsply's ability to sell digital equipment during 2021.  As a result, during 2H21, Defendants engaged in a scheme to artificially increase digital sales by:

- 45 -

(1) incentivizing dealers to purchase excess CAD/CAM inventory; and (2) improperly accounting for the incentives.  The scheme not only materially inflated Dentsply's sales in 2H21, but because Dentsply was pulling sales into 2H21 from future quarters, Defendants knew the Company's sales numbers would fall until current end-user demand could no longer be satisfied by the distributors' inventory and channel levels normalized.

111.    On June 9, 2021, Dentsply presented to investors at the Goldman Sachs Global Healthcare Conference.  During the presentation, Gomez assured investors that Dentsply's digital sales – specifically its CAD/CAM sales – were performing well and quickly recovering after the pandemic:

> Specifically for us, ***we have seen a good rebound of our sales in CAD/CAM in general*** and is happening pretty much across all of the categories within equipment. ***I think we're seeing great recovery*** and imaging across the board, ***CAD/CAM***.  And we feel frankly, in some places, we are probably gaining share.  ***At a minimum, we are tracking with a fast market growth rate***. . . .
>
> . . . ***So across that entire ecosystem, we've seen good recovery, good progress.  And so both short-term rebound is good.  And then long-term trend***, this is part of a good trend, and we're excited about that business.  And I think the potential is there for us and for all.

112.    On September 15, 2021, at a Robert W. Baird Global Healthcare Conference, Gomez continued to hype the Company's digital business, assuring investors that it "continue[d] to be strong" and was experiencing continued momentum:

> [W]e have a few key objectives with this year.  One of them is continued momentum with our digital dentistry and the [end-user] promotions that you talk about.  ***Primescan continues to do well.  Selling cameras alone is doing really well.  CEREC is also doing well.  So that – the momentum in that business has continued***. . . .
>
> ***And so I think our digital business – digital dentistry business continues to be strong and we have more things coming down the pike***.

113.    Later in the Class Period, during Dentsply's November 4, 2021 earnings call regarding the Company's results for 3Q21, Gomez represented to investors that "[t]here continues

- 46 -

to be a strong momentum on increasing digital capabilities within dental offices.  ***Demand is high for digital devices such as Primescan*** and imaging equipment such as our new Axeos unit."

During the question-and-answer portion of the call, in response to an analyst's question about the T&E segment's potential going into the fourth quarter, Gomez stated:

> Yes, what we're seeing for T&E going into the fourth quarter is along the lines of what we said in our prepared remarks, which is, ***we have great momentum.  There is great demand for Primescan***, great demand for Axeos and imaging in general.  The timing of sales relative to DS World, most of those sales actually happened in the fourth quarter.  We – there was a lot of great excitement.
>
> ***And so in our guidance for the fourth quarter, we are including pretty substantial growth for CAD/CAM, for imaging in general.  So the performance in that business – that part of the business continues to be strong***.

114.    Casey continued the false narrative during a January 12, 2022 JPMorgan Healthcare Conference, where he highlighted the Company's CAD/CAM business:

> ***[W]e've been really happy with CAD/CAM.  Our CAD/CAM business is***, if you look, we've kind of evolved with that, just in terms of – we used to be just full chairside.  And now with the – as we have a DI product ***and introducing things like mill, we've been very happy with that***.

115.    Finally, during Defendants' February 28, 2022 conference call with investors regarding Dentsply's results for 4Q21 and FY21, Casey and Gomez repeatedly touted the Company's success selling its CAD/CAM equipment during 4Q21 and FY21:

> [Gomez:] Our clear aligners, implants and ***CAD/CAM businesses posted a strong growth in the quarter***.
>
> *       *       *
>
> T&E segment organic sales expansion was led by ***double-digit growth*** in clear aligners, ***CAD/CAM*** and implants.  The T&E segment posted a strong growth despite difficult supply chain conditions.
>
> *       *       *
>
> [Casey:]  ***There was strong progress within the CEREC franchise during 2021***.  In addition to a record number of DI cameras sold, we were able to launch major software innovations with CEREC 5.2 and SureSmile 7.6.  ***There is also good***

- 47 -

***progress on Primemill***.  Our higher-end CACTI imaging systems also saw robust demand.  ***This stems from dentists looking to add more sophisticated diagnostic tools*** that will allow them to incorporate more complex procedures like implants and clear aligners to the practices.

116.    On the same call, Gomez stated:

> ***The retail demand for Primemill is solid, and our dealer partners in the U.S. have sufficient inventory to meet that demand.  In the short term, this trade-off will reduce our wholesale volume of Primemills but is the right thing to do for our customers***.

117.    The statements detailed above (¶¶111-116) were materially false and misleading when made.  As Defendants knew or recklessly disregarded:

(a)    Contrary to Defendants' statements in ¶¶111-115 that Primemill, Primescan, and CEREC sales were "doing well," that the products were in "great" or "solid" demand and providing "strong progress," and "strong growth," Primemill quality defects had dampened CAD/CAM demand and challenged Dentsply's ability to sell CAD/CAM products throughout 2021 (*see* §IV.B.).  The strong CAD/CAM sales referenced by Defendants were actually the product of their channel stuffing scheme and fraudulent accounting (*see* §§IV.B.-C., IV.G., V.G.).

(b)    Contrary to Defendants' statement in ¶111 that CAD/CAM sales had "rebound[ed]" well after COVID, CAD/CAM demand had decreased due to pervasive Primemill quality defects (*see* §IV.B.).

(c)    To cover up the sales disruptions caused by supply chain problems and Primemill quality defects, Defendants had engaged in a scheme to: (1) incentivize dealers to purchase more CAD/CAM equipment than they needed; and (2) improperly account for the incentives, which materially increased Defendants' digital sales during 2021 (*see* §§IV.C.-D., IV.G., V.G.).

(d)    Contrary to Defendants' statements in ¶¶112-113, Dentsply's CAD/CAM business was not "strong."    Indeed, far from there being "great momentum" in Dentsply's CAD/CAM business, Defendants' incentive scheme had caused dealer CAD/CAM inventory levels to far exceed what was needed to meet end-user demand, which would inevitably harm sales to dealers in the future (*see* §§IV.C.-D., IV.F.).  Further, Defendants' statement that fourth quarter guidance included "pretty substantial growth for CAD/CAM" was materially misleading because it failed to disclose that CAD/CAM growth in the fourth quarter was being driven by Defendants' channel stuffing scheme (*see* §§IV.D., IV.G.).

(e)    Contrary to Defendants' statements in ¶¶113, 116, retail demand for Primemill was not "solid" due to pervasive Primemill product defects that had deteriorated distributor and prospective customer confidence in the product (*see* §IV.B.).  Further, Defendants' reference to "sufficient inventory" concealed that dealer inventory far exceeded that which was required to meet end-user demand (*see* §§IV.C.-D.).  Defendants' statement that inventory buildup would impact only "short term" wholesales further concealed the severity of the inventory build and lack of end-user demand (*see* §§IV.B.-D., VII).

(f)    In connection with each of the statements made by Defendants in ¶¶111-116, Defendants had an affirmative duty to disclose the material supply chain problems and product quality problems impacting Dentsply's digital products in order to make those statements not misleading.

## C.    Materially False and Misleading Statements Regarding Dealer Inventory Levels

118.    As Defendants' scheme progressed and caused distributor inventory levels to soar, Defendants concealed the scheme by repeatedly assuring investors and analysts that they closely watched distributor inventory levels and insisting that distributor inventory levels had not changed.

- 49 -

These statements (described in ¶¶119-124) were materially false and misleading when made. As Defendants knew or recklessly disregarded, their incentive scheme had caused distributor inventory levels to materially increase: by September 30, 2021, distributor inventory for the Company's CAD/CAM products was *$80 million higher* than it was at the beginning of the year, and by December 31, 2021, distributor inventory of Dentsply's CAD/CAM products in the United States was *$50 million higher* than at the end of 2020. Further, the increased channel inventory well exceeded the inventory required for distributors to meet end-user demand, and so would impede future sales to distributors.

119.    On June 9, 2021, Dentsply presented at the Goldman Sachs Global Healthcare Conference. There, Gomez represented that:

> We have thrown in more sophisticated and strategic incentive plans. We went from doing a lot of incentives with our dealer partners, and we have redirected those dollars mostly to the end customer. *And so trying to match end-customer demand with our sales. That is a very important thing*.

120.    During Dentsply's August 5, 2021 earnings call to discuss the Company's results for 2Q21, an analyst asked about what the Company was hearing from "dealers as you think about inventory levels and kind of caseloads going back up." Casey responded:

> In terms of dealer inventory, first, *we've been super happy with our dealer partners, I mean, both the large and small*. They've done a really good job, in our opinion, on helping us buffer some pretty radical supply chain swing – not supply chain swings, demand swings. . . .
>
> . . . *I would tell you, they've been challenged to maintain inventory*.

121.    On that same call, an analyst directly asked Defendants: "Do you feel like inventory levels at all – have changed at all with your distribution partners?" Gomez responded: "*We don't think so. We track that very closely and we manage our inventory levels in a disciplined way. And so we are not seeing that at this point*."

4891-2258-9554.v1

122.    Another analyst asked Defendants, "[d]o you expect your inventory level to increase in the coming quarters?"  Gomez again responded:

> *I don't think so.  No, we watch inventory very closely, our internal inventory, inventory in the channel*.  And our objective at all times is to ensure that our manufacturing process is smooth.  And the worst thing that you can do for any manufacturing process is to move inventory levels too drastically from period to period.
>
> So our goal, at all times, is to keep inventory levels relatively stable.  And our actually long-term goal is frankly to decrease days of inventory, and that's a key internal goal that we track and measure very closely.

123.    Also on November 4, 2021, the Company filed its Form 10-Q for 3Q21.  In the Form 10-Q, the Company discussed the reasons for the increase in organic sales, but failed to disclose that the increase was driven by the incentive scheme:

> The increase in organic sales was attributable to both the Technologies & Equipment and the Consumables segments and resulted from the overall higher volumes during the three months ended September 30, 2021 due to the recovery in demand from the COVID-19 pandemic, sales attributed to recent product launches, and an increase in sales to dealers in the third quarter ahead of annual price increases which previously occurred in the fourth quarter of 2020.

124.    On March 1, 2022, Dentsply filed its 2021 annual report on Form 10-K.  In the Form 10-K, the Company disclosed that there was currently $50 million of CAD/CAM inventory in its distributor channel, but falsely represented the cause of the inventory level and its effect on future quarters:

> As of December 31, 2021, certain dealers' inventory of the Company's CAD/CAM products was higher than at the end of the prior year, by approximately $50 million. *These higher levels of dealer inventory are due to lower-than-expected retail sales in the fourth quarter and may pose headwinds to the Company's net sales for these products in 2022*.

125.    The statements detailed above (¶¶119-124) were materially false and misleading when made.  As Defendants knew or recklessly disregarded:

(a)    Contrary to Defendants' statements in ¶¶120-122, that distributors had "been challenged to maintain inventory" and that distributor inventory levels had not changed, Defendants' incentive scheme had caused dealer inventory levels to materially increase to levels that far exceeded inventory needed to meet end-user demand, which would inevitably harm future sales.  Distributor inventory levels had been increasing sharply throughout 2H21.  By September 30, 2021, dealer inventory for the Company's CAD/CAM products was $80 million higher than it was at the beginning of the year; and by December 31, 2021, dealer inventory of Dentsply's CAD/CAM products in the United States was $50 million higher than at the end of 2020 (*see* §§IV.C.-D.);

(b)    Contrary to Defendants' statement in ¶119, rather than focusing on increasing end-user demand, Defendants' corporate strategy was reliant on pressuring and incentivizing dealers to purchase more inventory than was needed to meet end-user demand (*see* §IV.C.).

(c)    Dentsply's 3Q21 Form 10-Q omitted language required to make the statement in ¶123 not misleading,  as the Company later admitted when it filed its Form 10-Q/A for 3Q21, which amended the statement to include the following (newly added language in ***bold***):

> The increase in organic sales was attributable to both the Technologies & Equipment and the Consumables segments and resulted from the overall higher volumes during the three months ended September 30, 2021 due to the recovery in demand from the COVID-19 pandemic, sales attributed to recent product launches, and a ***timing-related*** increase in sales to dealers in the third quarter.  ***These increases in sales to dealers were due to incremental pricing incentives, as well as purchases*** ahead of annual price increases which previously occurred in the fourth quarter of 2020.  ***The overall increase in sales to dealers during the period contributed to dealer inventory for the Company's CAD/CAM products at September 30, 2021 being higher than at the start of the year by approximately $80 million***.

(d)    Defendants' statement in Dentsply's 2021 Form 10-K (¶124) was materially false and misleading, as the Company later admitted when it filed its 2021 Form 10-K/A, which amended the statement to include the following (newly added language in ***bold***):

> As of December 31, 2021, certain dealers' inventory of the Company's CAD/CAM products in the United States was higher than at the end of the prior year, by approximately $50 million. These higher levels of dealer inventory are due to lower-than-expected retail sales in the fourth quarter, ***as well as timing-related purchases by dealers due primarily to incremental pricing incentives in the second half of the year***, and ***are likely to*** pose headwinds to the Company's net sales for these products in 2022.

Further, in revising Defendants' statement that bloated CAD/CAM inventory levels at the end of 2021 "may pose headwinds to the Company's net sales or these products in 2022" to "are likely to pose headwinds," Defendants admitted that they knew as of March 1, 2022 that they had borrowed against future quarters' sales and that end-user demand was insufficient to support the excess channel inventory without significantly decreasing future sales as well.

(e)    In connection with each of the statements made by Defendants in ¶¶119-124, Defendants had an affirmative duty to disclose the material supply chain problems and product quality problems impacting Dentsply's digital products in order to make those statements not misleading.

### D.    Materially False and Misleading Statements Regarding the Company's Success in the Third Quarter of 2021

126.    When discussing Dentsply's results for 3Q21, Defendants touted the Company's success and attributed it to, among other things, the "underlying resilienc[y] of the dental market" and "progress against our key initiatives."   These statements (described in ¶¶127-129) were materially false and misleading when made.  As Defendants knew or recklessly disregarded, the Company's success in 3Q21 was driven by Defendants' scheme to: (1) incentivize dealers to purchase excess CAD/CAM inventory; and (2) improperly account for the incentives.  Further, the

- 53 -

scheme masked Dentsply's failure to meet internal financial targets and external financial analyst expectations for 3Q21.

127.    In the November 4, 2021 press release announcing Dentsply's results for 3Q21, Casey touted the Company's success and discussed the reasons for its "strong results":

> "In the third quarter *we delivered strong results* in an environment still impacted by the pandemic.  Organic sales grew over 21%, *driven by continued recovery in the dental market and robust demand from our recent product launches*.  Our teams have also done a commendable job navigating supply chain bottlenecks to deliver products to our customers . . . ."

128.    Also on November 4, 2021, Dentsply filed its Form 10-Q for 3Q21, which discussed the reasons for the increase in Dentsply's organic sales, organic sales within the T&E segment, and organic sales within the T&E segment in the United States:

> *The increase in organic sales was attributable to increased volumes in both the Technologies & Equipment and Consumables segments due to a recovery in demand from the impact of the COVID-19 pandemic, sales attributed to recent product launches, and an increase of sales to dealers in the third quarter* ahead of annual price increases, which previously occurred in the fourth quarter of 2020.

> *    *    *

> [Technologies & Equipment:] *The increase in organic sales occurred across all dental businesses and resulted from overall higher volumes during the three months ended September 30, 2021 due to a recovery in demand from the COVID-19 pandemic, timing of sales to dealers, and sales attributed to recent product launches*.

> *    *    *

> [United States:] *The increase in organic sales was attributable to both the Technologies & Equipment and the Consumables segments and resulted from the overall higher volumes during the three months ended September 30, 2021 due to the recovery in demand from the COVID-19 pandemic, sales attributed to recent product launches, and an increase in sales to dealers in the third quarter* ahead of annual price increases which previously occurred in the fourth quarter of 2020.

129.    On the November 4, 2021 3Q21 earnings call, Casey continued to tout the Company's success and discussed the reasons for that success: "To summarize, our **strong performance year-to-date** gives us confidence going forward for the remainder of 2021.  We have good momentum leading into the future.  **Our results reflect the underlying resilience of the dental market and our team's disciplined performance against our operational goals and progress against our key strategic priorities**."

130.    The statements detailed above (¶¶127-129) were materially false and misleading when made.  As Defendants knew or recklessly disregarded:

(a)    Contrary to Defendants' statements in ¶¶127, 129, Dentsply's success in the 3Q21 was driven by Defendants' scheme to: (1) incentivize dealers to purchase excess CAD/CAM inventory; and (2) improperly account for the incentives (*see* §§IV.C., IV.G., V.G.).  Further, Defendants' incentive and accounting schemes masked Dentsply's failure to meet internal financial targets and external financial analyst expectations for 3Q21 (*see* §§IV.C., IV.G.).  The incentive and accounting schemes also concealed that supply chain disruptions and Primemill and Axios quality defects were materially limiting Dentsply's ability to sell its digital equipment in 3Q21 (*see* §§IV.B.-C., V.G.);

(b)    Defendants' 3Q21 Form 10-Q omitted language required to make the statements in ¶128 not misleading,  as the Company later admitted when it filed its Form 10-Q/A for 3Q21, which amended the statements to include the following (newly added language in **bold**):

> The increase in organic sales was attributable to increased volumes in both the Technologies & Equipment and Consumables segments due to a recovery in demand from the impact of the COVID-19 pandemic, sales attributed to recent product launches, and a **timing-related** increase of sales to dealers **in the United States** in the third quarter.  **These increases in sales to dealers were due to incremental pricing incentives, as well as purchases** ahead of annual price increases, which previously occurred in the fourth quarter of 2020.

- 55 -

\*　　\*　　\*

[Technologies & Equipment:]  The increase in organic sales occurred across all dental businesses and resulted from overall higher volumes during the three months ended September 30, 2021 due to a recovery in demand from the COVID-19 pandemic, timing of sales to dealers **in the United States affected by incremental pricing initiatives during the period**, and sales attributed to recent product launches.

\*　　\*　　\*

[United States:]  The increase in organic sales was attributable to both the Technologies & Equipment and the Consumables segments and resulted from the overall higher volumes during the three months ended September 30, 2021 due to the recovery in demand from the COVID-19 pandemic, sales attributed to recent product launches, and a **timing-related** increase in sales to dealers in the third quarter.  **These increases in sales to dealers were due to incremental pricing incentives, as well as purchases** ahead of annual price increases which previously occurred in the fourth quarter of 2020.  **The overall increase in sales to dealers during the period contributed to dealer inventory for the Company's CAD/CAM products at September 30, 2021 being higher than at the start of the year by approximately $80 million**.

(c)    In connection with each of the statements made by Defendants in ¶¶127-129, Defendants had an affirmative duty to disclose the material supply chain problems and product quality problems impacting Dentsply's digital products in order to make those statements not misleading.

**E.    Materially False and Misleading Statements Regarding the Company's Results for the Fourth Quarter and Full Year 2021**

131.    When discussing Dentsply's results for 4Q21 and FY21, Defendants highlighted Dentsply's "strong results" and attributed them to, among other things, dental market resiliency, normalizing demand, and recent product launches.  These statements (described in ¶¶132-134) were materially false and misleading when made.  As Defendants knew or recklessly disregarded, that the Company's sales for 4Q21 and FY21 were artificially increased by Defendants' scheme to: (1) incentivize dealers to purchase excess CAD/CAM inventory; and (2) improperly account for the incentives.

- 56 -

132.    In the February 28, 2022 press release announcing Dentsply's 4Q21 and FY21 results, Casey was quoted discussing the Company's 2021 success, the reasons for that success, and the Company's optimism for the future:

> "*Our 2021 performance reflects the resilience of the dental market, the strength of our global portfolio, and our team's ability to execute well in an environment still impacted by the pandemic*.  We delivered strong results with *organic sales growth of nearly 25%, double-digit EPS growth, and solid cash flow generation*.  We made meaningful progress on the commitments we set three years ago to strengthen the foundation of the business and position it for long-term sustainable growth . . . .  We are optimistic about our future.  We have a healthy innovation pipeline, *a well-positioned portfolio*, and new strategic partnerships to accelerate our growth."

133.    During the Company's February 28, 2022 earnings call regarding Dentsply's results for 4Q21 and FY21, Gomez misrepresented the two main constraints the Company was facing from a demand and volume perspective:

> *The last week or 2 in December became more complicated for dental practices in many markets primarily as a result of staffing shortages*, and as a result, volume tended to go down a little bit again in the last couple of weeks in December in a lot of markets.

> *We had also situations like China where many provinces still have the zero COVID policy* and, as a result, are in major lockdowns, which restricts substantially patient traffic.  *So those are probably the 2 main constraints we were facing from a volume – from a demand perspective*.

134.    On March 1, 2022, the Company filed its 2021 Form 10-K, where Dentsply discussed the reasons for the Company's increased sales in the United States during FY21:

> *The increase in organic sales was attributable to both the Technologies & Equipment and the Consumables segments and was primarily due to overall higher volumes during the year ended December 31, 2021, following periods of lower demand resulting from the COVID-19 pandemic.  In addition to the overall increases due to more normalized demand across the product lines, the Company achieved additional topline growth domestically as a result of successful product launches in the Implants, Orthodontics, and Endodontic & Restorative Consumables businesses, partly offset by delays in shipments of some products late in the year due to supply chain constraints*.

135.    The statements detailed above (¶¶132-134) were materially false and misleading when made.  As Defendants knew or recklessly disregarded:

(a)    Contrary to Defendants' statement in ¶132, Dentsply's financial performance in 4Q21 and FY21 was inflated by Defendants' scheme to: (1) incentivize dealers to purchase excess CAD/CAM inventory; and (2) improperly account for the incentives (*see* §§IV.D., IV.G., V.G.).  The incentive and accounting schemes also concealed that supply chain disruptions and Primemill and Axeos quality issues were materially limiting Dentsply's ability to sell its digital equipment in 2H21 (*see* §§IV.B., IV.D.).

(b)    Contrary to Defendants' statement in ¶133, the primary demand and volume constraints Dentsply faced in 4Q21 were product problems with Primemill and Axeos, bloated dealer inventory resulting from Defendants' 3Q21 channel stuffing scheme, and a nine-month production backlog for imaging equipment (*see* §§IV.B.-D.).

(c)    Contrary to Defendants' statement in ¶132, as a result of Defendants' channel stuffing scheme, Dentsply's portfolio was far from "well-positioned" given the distribution channel's staggeringly high inventory levels and a continuing lack of end-user demand for Dentsply's CAD/CAM products (*see* §§IV.B.-D.).  In addition, Dentsply continued to suffer from defect issues in digital products and long-term supply constraints for its imaging products (*see* §§IV.B., IV.E.).

(d)    Defendants' FY21 Form 10-K omitted language required to make the statement in ¶134 not misleading,  as the Company later admitted when it filed its Form 10-K/A for FY21, which amended the statement to include the following (newly added language in ***bold***):

> The increase in organic sales was attributable to both the Technologies & Equipment and the Consumables segments and was primarily due to overall higher volumes during the year ended December 31, 2021, following periods of lower demand resulting from the COVID-19 pandemic.  In addition to the overall

- 58 -

increases due to more normalized demand across the product lines, the Company achieved additional topline growth domestically as a result of successful product launches in the Implants, Orthodontics, and Endodontic & Restorative Consumables businesses. ***Sales were also affected by a build in dealer inventory during the year, partly as a result of incremental pricing incentives in the second half of the year. These incentives were*** partly offset by delays in shipments of some products late in the year due to supply chain constraints.

(e)     In connection with each of the statements made by Defendants in ¶¶132-134, Defendants had an affirmative duty to disclose the material supply chain problems and product quality problems impacting Dentsply's digital products in order to make those statements not misleading.

### F.     Materially False and Misleading Statements Regarding Dentsply's Growth Positioning

136.     Defendants also represented to investors during the Class Period that Dentsply was well-positioned to deliver sustainable growth, given the Company's "strong underlying fundamentals" and "operational excellence." Defendants also used Dentsply's quarterly success as evidence that the Company was well-positioned for future growth. These statements (described in ¶¶137-144) were materially false and misleading when made. As Defendants knew or recklessly disregarded, far from being well-positioned for sustainable growth, Dentsply had product problems and supply chain issues and Defendants were actively engaged in a scheme to incentivize dealers to buy more product than they needed, which would harm sales growth in future quarters.

137.     On August 5, 2021, Dentsply issued a press release discussing the Company's 2Q21 results. In the release, Casey was quoted as stating:

> "Our financial results reflect the resilience of the dental market and demonstrate our team's ability to execute operationally and financially. As we turn our attention to investing for future growth, ***we are confident that the underlying fundamentals of our business are strong and that we are well positioned***. Additionally, we remain committed to completing our restructuring goals on time and on budget."

138.    Also on August 5, 2021, Dentsply convened a conference call with analysts and investors to discuss the Company's results for 2Q21.  In his prepared remarks, Casey reiterated the Company's 2021 outlook and assured investors that Dentsply was "well positioned" to deliver "sustainable growth":

> We are reaffirming our 2021 outlook.  The dental market continues to show resilience as well as strong underlying fundamentals.  ***We believe that Dentsply Sirona is well positioned to deliver sustainable growth in the future***.

139.    Later in the Class Period, Dentsply presented at the September 15, 2021 Robert W. Baird Global Healthcare Conference, where an analyst asked Gomez whether he believed the Company could achieve a 4%-5% growth target in the next one to two years, Gomez unequivocally confirmed:

> ***Yes***.  We think we have the levers.  ***I think the market is healthy in many areas where we have exposure***.  We are making investments in areas where we are under indexed.  ***And so we think we have a very good shot at being able to deliver that type of growth rate sustainably***, which is something that the company has not done in many, many years.

140.    On November 4, 2021, Defendants issued a press release announcing Dentsply's financial results for 3Q21.  The release discussed Dentsply's increased FY21 guidance, which was based on the Company's strong 3Q21 results:

> ***Based on the results of the third quarter and the continued gradual recovery of the global dental market, we are raising our fiscal year 2021 earnings outlook and tightening our revenue outlook to the top of the previous range***.  We expect revenues to be in the $4.25 billion to $4.3 billion range, up approximately 27-30% on a reported basis and 22-25% on an organic basis.  Our Non-GAAP EPS outlook for FY2021 is now $2.87 to $2.92.

141.    During the November 4, 2021 conference call regarding Dentsply's results for the 3Q21, Casey continued to assure investors that Dentsply was well-positioned to continue delivering positive results:

Overall, we continue to be pleased with the recovery in the dental market, how we are operating and our prospects for growth in the future.

\*        \*        \*

***To summarize, our strong performance year-to-date gives us confidence going forward for the remainder of 2021.  We have good momentum leading into the future***.  Our results reflect the underlying resilience of the dental market and ***our team's disciplined performance against our operational goals*** and progress against our key strategic priorities.  Based on this, as Jorge said, we are raising our '21 earnings outlook.  Going beyond the quarter-to-quarter discussion, we also believe that ***Dentsply Sirona is well positioned to transform dentistry and deliver sustainable growth going forward***.

142.    On the same call, Gomez discussed the Company's increased FY21 guidance and strong potential for future growth:

Now let me provide an update on our financial expectations for 2021.  ***Based on the solid performance of our business year-to-date and the current market trends, we are increasing our estimates for 2021 as follows***.  We are tightening our revenue outlook by increasing the bottom of our range.  We now expect revenues to be in the $4.25 billion to $4.3 billion range.

With respect to EPS, we are increasing and narrowing our estimates for fiscal year 2021.  The new EPS outlook range is now $2.87 to $2.92.  This range is based on a new assumption for the euro to USD rate of 1.16.  This is lower than the fiscal year '21 budget assumption of 1.22 and lower than last quarter's assumption for the second half of the year of 1.18.

. . . Overall, we are very pleased with the current momentum in our business and our new 2021 outlook for revenue and earnings reflects that confidence.

143.    On November 11, 2021, Casey attended the Credit Suisse Healthcare Conference, where he touted the Company's 3Q21 results and represented that the Company's success was sustainable:

If you look at the growth number coming off '19 versus '18 and how we feel coming out of the pandemic, ***we said we think we can raise that long-term target to 4% to 5%.  And as we sit here today, we're pretty optimistic that our growth prospects are good and that 4% to 5% is definitely attainable***.

\*        \*        \*

- 61 -

So in aggregate, ***we had a very, very strong third quarter. We think that business going forward is sustainable*** as we bring these new products in.

144. Defendants continued their false narrative during Dentsply's February 28, 2022 conference call regarding the Company's 4Q21 and FY21 results:

[Gomez:] Now let me provide an overview of our financial expectations for fiscal 2022. ***We expect organic sales to be in the 4% to 5% range***. This equates to a net sales range of $4.3 billion to $4.4 billion. . . .

From a revenue perspective, market demand remains strong despite COVID variant challenges in certain markets. . . . ***We expect strong contributions to growth from*** clear aligners, ***CAD/CAM***, implants and imaging.

\*      \*      \*

***Overall, we are confident that the progress we are making in key growth areas***, combined with the resilience of the dental market***, will allow us to continue to expand revenue and earnings over time***. Additionally, the strength of our EBITDA generation enable the funding of our investment priorities and the funding of a very competitive cash flow yield to our shareholders.

\*      \*      \*

[Casey:] In late 2018, we had outlined a program to accelerate growth, improve margin and to simplify the organization. Despite challenges, ***we have largely achieved the targets that we had laid out***. Just as important, our team has also sharpened our strategy while improving our innovation capabilities. As Jorge said, ***going forward, we expect to build on those capabilities to deliver reliable 4% to 5% growth in revenue, continuous improvement in our margins and double-digit earnings growth***. We believe our strategy of delivering superior integrated workflows in critical procedures will allow Dentsply Sirona to become the indispensable digital partner to the dentist.

145. The statements detailed above (¶¶137-144) were materially false and misleading when made. As Defendants knew or recklessly disregarded:

(a)      Contrary to Defendants' statements in ¶¶137-139, Dentsply was not "well positioned" to "deliver sustainable growth," since at the time the statements were made in 3Q21, worsening supply chain constraints and ongoing Primemill and Axeos product quality issues were inhibiting Dentsply's ability to sell its digital equipment (*see* §IV.B.). Further, Defendants were

- 62 -

engaged in a scheme to incentivize dealers to purchase digital inventory at a rate that far exceeded end-user demand, which was not sustainable (*see* §§IV.C., IV.G.).

(b)     Defendants' statements in ¶¶140-143, citing 3Q21 performance as a basis for raising 2021 earnings and revenue outlook, were materially misleading because they omitted the fact that Dentsply's 3Q21 results were driven by Defendants' channel stuffing and accounting schemes (*see* §§IV.C., IV.G., V.G.).   Further, in light of Defendants' channel stuffing and accounting schemes, Dentsply did not have "good momentum" and was not "well positioned" to "deliver sustainable growth going forward" (*see* §§IV.C., IV.F., IV.G.);

(c)     Contrary to Defendants' statement in ¶144, sales of CAD/CAM would not strongly contribute to organic sales growth due to the severity of the inventory build resulting from Defendants' channel stuffing scheme and lack of end-user demand (*see* §§IV.B.-D.).   Further, Defendants had not "largely achieved the targets [they] had laid out" but instead inflated growth through the channel stuffing and accounting scheme (*see* §§IV.D., IV.G.).

(d)     In connection with each of the statements made by Defendants in ¶¶137-144, Defendants had an affirmative duty to disclose the material supply chain problems and product quality problems impacting Dentsply's digital products in order to make those statements not misleading.

### G.     Materially False and Misleading Statements Regarding Dentsply's Governance Policies and Ethics

146.    Throughout the Class Period, Defendants also made false and misleading statements in Dentsply's Code of Ethics and Business Conduct, and they falsely assured investors that Dentsply maintained strong governance policies.  These statements (described in ¶¶147-150) were materially false and misleading when made.  As Defendants knew or recklessly disregarded – and as the Company later admitted – during the Class Period, members of senior management,

including Casey and Gomez: (1) violated provisions of the Company's Code of Ethics and Business Conduct; (2) did not maintain and promote an appropriate control environment focused on compliance in areas of the Company's business; (3) did not sufficiently promote, monitor, or enforce adherence to the Code of Ethics and Business Conduct; (4) created a culture where employees did not feel comfortable raising concerns without fear of retaliation; and (5) maintained an inappropriate tone at the top.  As the Company also later admitted, Müller, Gomez, and other members of the Company's local commercial team in China: (1) did not maintain and promote an appropriate control environment in certain areas of the Company's business focused on compliance; and (2) failed to sufficiently promote, monitor, or enforce adherence to the Company's Code of Ethics and Business Conduct.

147.    On June 17, 2021, Gomez presented at the Robert W. Baird ESG Symposium – an event designed to highlight the importance of strong environmental, social, and governance ("ESG") policies.  There, Gomez represented that "all of our employees are embracing ESG" which would make complying with regulations easier:

> The most interesting thing about ESG for me so far has been the fact that, **across the company, across the globe, all of our employees are embracing ESG**.

> \*       \*       \*

> The last point I would say is **one of the key aspects of ESG is managing risks.  And it ties perfectly into our enterprise risk management process, which, from a governance perspective, as you know, is extremely important**.  So all of these things are coming together really nicely . . . .

148.    On March 1, 2022, Dentsply filed with the SEC its annual report for FY21 on Form 10-K, which was signed by Casey, Gomez, and Chadha.  The 2021 Form 10-K listed as one of the Company's "five key operating principles": "***Think and act with positive intent and the highest integrity: Execute the business in a way that empowers our people, respects the communities in***

- 64 -

***which we do business, and establishes trust with our partners and stakeholders***." The 2021 Form 10-K also represented that "[t]he Company believes it is in substantial compliance with the laws and regulations that regulate its business."

149. The 2021 Form 10-K also directed investors to Dentsply's Code of Ethics and Business Conduct:

> The Company has a Code of Ethics and Business Conduct that applies to the Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and the Board of Directors and substantially all of the Company's management level employees. A copy of the Code of Ethics and Business Conduct is available in the Investor Relations section of the Company's website at www.dentsplysirona.com.

150. Dentsply's Code of Ethics and Business Conduct, which was available on Dentsply's website throughout the Class Period, assured investors that, among other things:

(a) "Dentsply Sirona demonstrates an unwavering commitment to performance with integrity."

(b) "We ask that all members of the Dentsply Sirona community – employees, officers, directors and business partners - comply not only with these policies, but also use good judgment and integrity in all situations that may not be specifically addressed in the Dentsply Sirona Code."

(c) "Our Dentsply Sirona business leaders are responsible for their own actions and for fostering a culture consistent with our Code of Ethics and Business Conduct, policies and applicable laws. Leaders are expected to address employees' concerns about appropriate conduct promptly and with care and respect."

(d) "We think and act with positive intent and the highest integrity."

(e) "It is Dentsply Sirona's policy and must also be every employee's commitment to comply with the law everywhere we do business."

- 65 -

(f)     "The tone from the top is important in creating a foundation for a culture of integrity but then leaders at all levels must live those values and demonstrate unwavering integrity in everything we do."

(g)     "All managers must": "Implement control measures, such as appropriate financial controls to identify and prevent fraud and other violations[;] . . . Encourage employees to speak up and report integrity or compliance issues[; and] Promptly implement corrective action to fix identified compliance weaknesses."

(h)     "Retaliation Violates Our Policy[:] Dentsply Sirona absolutely prohibits retaliation against anyone who in good faith raises or helps to address an ethics, integrity or a compliance concern.  Retaliation is grounds for discipline up to and including dismissal."

(i)     "Internal Controls and Accurate Record Keeping[:] Dentsply Sirona maintains internal controls to comply with legal, accounting, tax, and other regulatory requirements.  Keeping accurate records instills trust in Dentsply Sirona by its employees, customers, patients, investors, and business partners.  Accurate recordkeeping allows us to make strategic, commercial, and operational decisions.  It is critically important that our books, records, accounts, and financial statements be maintained in reasonable detail.  'Off the books' accounts, transactions, and assets are prohibited."

151.    The statements detailed above (¶¶147-150) were materially false and misleading when made.  As Defendants knew or recklessly disregarded – and as Dentsply later admitted:

(a)     During the Class Period, members of senior management, including Casey and Gomez: (1) violated the Company's Code of Ethics and Business Conduct; (2) did not maintain and promote an appropriate control environment focused on compliance in areas of the Company's business; (3) did not sufficiently promote, monitor, or enforce adherence to the Code of Ethics and

- 66 -

Business Conduct; (4) "created a culture where employees did not feel comfortable raising concerns without fear of retaliation"; and (5) maintained an inappropriate tone at the top (*see* §§IV.G., V.I.).

(b)     The Company had "inadequate processes for maintaining or providing copies of agreements or arrangements with distributors to the accounting department" and "there were inadequate processes in place for approval of these incentives" (*see* §§IV.G., V.I.).

(c)     Müller, Gomez, and other members of the Company's local commercial team in China: (1) "did not maintain and promote an appropriate control environment in certain areas of the Company's business focused on compliance"; and (2) failed to "sufficiently promote, monitor or enforce adherence to the Company's Code of Ethics and Business Conduct" (*see* §§IV.G., V.I.).

(d)     The Company's Chinese organization operated with "control deficiencies, including ineffective communication among the China commercial operations, financial planning & analysis and accounting teams, resulting in a heightened risk of incomplete or insufficient information required to maintain accurate books and records related to incentive provisions, specifically concerning expanded concessions regarding the return or exchange of products from distributors" (*see* §§IV.G., V.I.).

(e)     Dentsply was actively violating GAAP (*see* §§IV.C.-D, IV.G., V.G.).

(f)     As a result of Dentsply's governance deficiencies and inadequate risk management, the enterprise was exposed to significant undisclosed regulatory, legal, and reputational risk (*see* §§IV.G., V.I.).

**H.    Materially False and Misleading Financial Reporting and Non-Compliance with GAAP**

152.    Defendants could not have successfully executed their channel stuffing and improper revenue recognition scheme without the Company also committing material violations of GAAP, SEC reporting rules, and SOX – all of which Defendants falsely represented Dentsply complied with during the Class Period.

**1.    Dentsply's SEC Filings Contained Materially False and Misrepresentative Financial Results.**

153.    During the Class Period, Dentsply's quarterly and annual financial results were reported on Forms 10-Q and 10-K.  Specifically:

- On August 5, 2021, Dentsply issued its Form 10-Q for 2Q21, which was signed by Casey and Gomez;

- On November 4, 2021, Dentsply issued its Form 10-Q for 3Q21, which was signed by Casey and Gomez; and

- On March 1, 2022, Dentsply issued its Form 10-K for 2021, which was signed by Casey, Gomez, and Chadha.

Dentsply's 2Q21 and 3Q21 Forms 10-Q falsely represented that the financial statements contained therein "have been prepared in accordance with accounting principles generally accepted in the United States of America" and "the rules of the [SEC],"[3] while its 2021 Form 10-K falsely

---

[3]    GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued the Statement of Financial Accounting Standards No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162*.  FASB Accounting Standards Codification ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.  The ASC did not change GAAP.

represented "[t]he preparation of the Company's consolidated financial statements in conformity with . . . GAAP."

154.    Dentsply also reported its quarterly and annual financial earnings in press releases to the public, filed on Form 8-K with the SEC.

155.    On August 5, 2021, Defendants issued a press release announcing Dentsply's financial results for 2Q21.  The release reported:

> Second quarter net sales of $1,067 million increased 117.3%, compared to $491 million in the second quarter of 2020.  Net income for the second quarter of 2021 was $99 million, or $0.45 per diluted share, compared to a net loss of ($95) million, or ($0.44) per diluted share in the second quarter of 2020.  Non-GAAP net earnings per diluted share increased to $0.71 compared to ($0.18) in the second quarter of 2020.

156.    On November 4, 2021, Defendants issued a press release announcing Dentsply's financial results for 3Q21.  The release reported:

> Third quarter net sales of $1,069 million increased 19.4%, compared to $895 million in the third quarter of 2020.  Net income for the third quarter of 2021 was $103 million, or $0.47 per diluted share, compared to $53 million, or $0.25 per diluted share in the third quarter of 2020.  Non-GAAP net earnings per diluted share increased to $0.68 compared to $0.67 in the third quarter of 2020.

157.    On February 28, 2022, Defendants issued a press release announcing Dentsply's financial results for 4Q21 and FY21, which reported:

> Fourth quarter 2021 net sales of $1,088 million increased 0.6%, compared to $1,082 million in the fourth quarter of 2020.  Net income was $102 million, or $0.47 per diluted share, compared to $99 million, or $0.45 per diluted share in the fourth quarter of 2020.  Adjusted earnings per diluted share decreased to $0.76 compared to $0.87 in the fourth quarter of 2020.

It also reported the following results for FY21:

> Full year 2021 net sales of $4,251 million increased 27.2%, compared to $3,342 million for the full year of 2020. Net income was $421 million, or $1.91 per diluted share, compared to a loss of ($83) million, or ($0.38) per diluted share for the full year of 2020. Adjusted earnings per diluted share grew to $2.87 compared to $1.79 in 2020.

158.    As admitted by the Restatement, these representations, as well as the financial results contained in the 2Q21 and 3Q21 Forms 10-Q and 2021 Form 10-K, were materially false and misleading: the financial results were ***not*** a fair statement of Dentsply's actual financial results and were not prepared according to GAAP.

159.    On November 7, 2022, Defendants filed an amended Form 10-Q/A for 3Q21, which included restated financial results for the three months and nine months ended September 30, 2021, as well as an admission of the multiple material weaknesses present in Dentsply's ineffective ICFR.

160.    The same day, Dentsply also filed an amended Form 10-K/A, which included restated financial results for FY21.  The 2021 Form 10-K/A also included corresponding restated and revised financial statements for each of the quarterly periods of 2020 and 2021 due to the Company's erroneous accounting.[4]

161.    Dentsply's restatements to its original, falsely reported financial results on the Company's income statements and balance sheets were as follows:

**Dentsply Sirona**
**Income Statement Restatement for 2021**

$ in millions except EPS

| | Three Months Ended March 31, 2021 | | | Three Months Ended June 30, 2021 | | | Three Months Ended September 30, 2021 | | | Three Months Ended December 31, 2021 | | | The Year Ended December 31, 2021 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | As Previously Issued | Adjustment | As Revised | As Previously Issued | Adjustment | As Revised | As Previously Issued | Adjustment | As Restated | As Previously Issued | Adjustment | As Restated | As Previously Issued | Adjustment | As Restated |
| Net Sales | $ 1,027 | $ (1) | $ 1,026 | $ 1,067 | $ (5) | $ 1,062 | $ 1,069 | $ (29) | $ 1,040 | $ 1,088 | $ 15 | $ 1,103 | $ 4,251 | $ (20) | $ 4,231 |
| Cost of products sold | $ 448 | $ (1) | $ 447 | $ 469 | $ (2) | $ 467 | $ 478 | $ (7) | $ 471 | $ 495 | $ 4 | $ 499 | $ 1,890 | $ (6) | $ 1,884 |
| Gross Profit | $ 579 | $ - | $ 579 | $ 598 | $ (3) | $ 595 | $ 591 | $ (22) | $ 569 | $ 593 | $ 11 | $ 604 | $ 2,361 | $ (14) | $ 2,347 |
| Selling, general and administrative expenses | $ 385 | $ 1 | $ 386 | $ 398 | $ (5) | $ 393 | $ 394 | $ 1 | $ 395 | $ 374 | $ 3 | $ 377 | $ 1,551 | $ - | $ 1,551 |
| Research and Development expenses | $ 37 | $ 3 | $ 40 | $ 40 | $ 3 | $ 43 | $ 35 | $ 4 | $ 39 | $ 59 | $ (10) | $ 49 | $ 171 | $ - | $ 171 |
| Restructuring and other costs | $ 3 | $ - | $ 3 | $ 5 | $ - | $ 5 | $ 3 | $ - | $ 3 | $ 6 | $ - | $ 6 | $ 17 | $ - | $ 17 |
| Operating Income (loss) | $ 154 | $ (4) | $ 150 | $ 155 | $ (1) | $ 154 | $ 159 | $ (27) | $ 132 | $ 154 | $ 18 | $ 172 | $ 622 | $ (14) | $ 608 |
| Interest Expense | $ 14 | $ - | $ 14 | $ 16 | $ (1) | $ 15 | $ 13 | $ 1 | $ 14 | $ 12 | $ - | $ 12 | $ 55 | $ - | $ 55 |
| Other expense (income) | $ (9) | $ - | $ (9) | $ 5 | $ 3 | $ 8 | $ 8 | $ (3) | $ 5 | $ 5 | $ - | $ 4 | $ 8 | $ - | $ 8 |
| Income (loss) before taxes | $ 149 | $ (4) | $ 145 | $ 134 | $ (3) | $ 131 | $ 138 | $ (25) | $ 113 | $ 138 | $ 18 | $ 156 | $ 559 | $ (14) | $ 545 |
| Provision (benefit) for taxes | $ 32 | $ 1 | $ 33 | $ 35 | $ - | $ 35 | $ 35 | $ (6) | $ 29 | $ 36 | $ 1 | $ 37 | $ 138 | $ (4) | $ 134 |
| Net income (loss) | $ 117 | $ (5) | $ 112 | $ 99 | $ (3) | $ 96 | $ 103 | $ (19) | $ 84 | $ 102 | $ 17 | $ 119 | $ 421 | $ (10) | $ 411 |
| Basic EPS | $ 0.53 | $ (0.02) | $ 0.51 | $ 0.45 | $ (0.01) | $ 0.44 | $ 0.47 | $ (0.08) | $ 0.39 | $ 0.47 | $ 0.08 | $ 0.55 | $ 1.93 | $ (0.05) | $ 1.88 |
| Diluted EPS | $ 0.53 | $ (0.02) | $ 0.51 | $ 0.45 | $ (0.02) | $ 0.43 | $ 0.47 | $ (0.09) | $ 0.38 | $ 0.47 | $ 0.07 | $ 0.54 | $ 1.91 | $ (0.04) | $ 1.87 |

---

[4]    In addition, correction of accounting errors pertaining to periods prior to 2019 required an adjustment to opening retained earnings at January 1, 2019 of $38 million, as reflected in the Consolidated Statements of Equity.

**Dentsply Sirona**

**Balance Sheet Restatement**

| | September 30, 2021 | | | December 31, 2021 | | |
|---|---|---|---|---|---|---|
| $ in millions | As Previously Issued | Adjustment | As Restated | As Previously Issued | Adjustment | As Restated |
| Accounts and notes receivable-trade, net | $ 748 | $ (16) | $ 732 | $ 747 | $ 3 | $ 750 |
| Inventories, net | $ 532 | $ 16 | $ 548 | $ 504 | $ 11 | $ 515 |
| Prepaid expenses and other current assets | $ 243 | $ 1 | $ 244 | $ 247 | $ 1 | $ 248 |
| Total Current Assets | $ 1,804 | $ 1 | $ 1,805 | $ 1,837 | $ 15 | $ 1,852 |
| Operating lease right-of-use assets, net | $ - | $ - | $ - | $ 193 | $ 5 | $ 198 |
| Other noncurrent assets | $ 128 | $ - | $ 128 | $ 122 | $ (1) | $ 121 |
| Total Assets | $ 9,288 | $ 1 | $ 9,289 | $ 9,220 | $ 19 | $ 9,239 |
| Accounts payable | $ 276 | $ (5) | $ 271 | $ 268 | $ (6) | $ 262 |
| Accrued liabilities | $ 641 | $ 84 | $ 725 | $ 679 | $ 81 | $ 760 |
| Income taxes payable | $ 58 | $ (6) | $ 52 | $ 57 | $ - | $ 57 |
| Total Current Liabilities | $ 1,126 | $ 73 | $ 1,199 | $ 1,186 | $ 75 | $ 1,261 |
| Operating lease liabilities | $ 413 | $ (12) | $ 401 | $ 145 | $ 4 | $ 149 |
| Deferred income taxes | $ 560 | $ 2 | $ 562 | $ 408 | $ (17) | $ 391 |
| Total Liabilities | $ 4,163 | $ 63 | $ 4,226 | $ 4,177 | $ 65 | $ 4,242 |
| Retained earnings | $ 1,481 | $ (62) | $ 1,419 | $ 1,560 | $ (46) | $ 1,514 |
| Total Dentsply Sirona Equity | $ 5,122 | $ (62) | $ 5,060 | $ 5,042 | $ (46) | $ 4,996 |
| Total Equity | $ 5,125 | $ (62) | $ 5,063 | $ 5,043 | $ (46) | $ 4,997 |
| Total Liabilities and Equity | $ 9,288 | $ 1 | $ 9,289 | $ 9,220 | $ 19 | $ 9,239 |

162.    As seen above, the Restatement adjusted ***nearly every financial account*** on Dentsply's income statements and balance sheets.  For example, Dentsply overstated revenue by $29 million (3%), operating income by $27 million (20%), and net income by $19 million (23%), and diluted EPS by $0.09 (24%) for the three months ended September 30, 2021 (3Q21).  The Company also understated accrued liabilities in 3Q21 and 4Q21 by $84 million (13%) and $81 million (12%), respectively.  In addition, the Company disclosed in its 2021 Form 10-K/A and 3Q21 Form 10-Q/A that material weaknesses in the Company's internal controls "resulted in adjustments to ***substantially all of our accounts and disclosures*** for the interim and annual periods related to 2019, 2020, and 2021."

163.    Not only were the financial statements during these financial periods false, they were ***materially*** false.  The type of restatement and revisions undertaken by Dentsply are only

- 71 -

undertaken to correct for material errors in previously reported financial results.[5]  GAAP defines an "error in previously issued financial statements" as:

> An error in recognition, measurement, presentation or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or *oversight or misuse of facts that existed at the time the financial statements were prepared*.[6]

164.    In other words, restatements are not the result of hindsight, changed facts, and circumstances or accounting judgment.  They result from an "oversight or misuse of facts that existed at the time the financial statements were prepared."  Accordingly, Dentsply's restatement amounts to an admission that Dentsply's previously issued financial results, and Defendants' public statements regarding those results, were materially false and misleading.

165.    Further, the misstated financial results are material under ASC 250-10-S99, which sets forth the generally accepted methods for accountants to evaluate materiality as it relates to the financial statements of SEC registrants:

> The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.[7]

166.    ASC 250-10-S99 also stresses that materiality requires *qualitative*, as well as quantitative, considerations: "[T]here are numerous circumstances in which misstatements below 5% could well be material.  Qualitative factors may cause misstatements of quantitatively small

---

[5]    *See*, *e.g.*, ASC 250, *Accounting Changes and Error Corrections* and SEC Staff Accounting Bulletin Topic 1-N, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*.

[6]    ASC 250-10-20.

[7]    Importantly, ASC 250-10-S99 explicitly recognizes that the concept of materiality "in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws."

amounts to be material . . . ."  FASB "has long emphasized that materiality cannot be reduced to a numerical formula."

167.    Defendants admitted their misstatements were material from both a quantitative and qualitative perspective.  As stated in Dentsply's restated 2021 Form 10-K/A:

> Management identified misstatements for the three and nine months ended September 30, 2021 and for the fiscal year ended December 31, 2021, in each case, that *the Company deemed to be material when considered together with certain quantitative and qualitative considerations* such as the fact that the misstatements masked a failure to meet internal financial targets and external financial analyst expectations for the three months ended September 30, 2021 and due to the material weaknesses identified through the course of the Audit and Finance Committee's investigation.[8]

168.    Dentsply's Restatement resulted in material misstatements to key financial metrics including revenues, net income, EPS, and accrued liabilities.  For example, in 3Q21, Dentsply overstated net income by 23%, EPS by 24%, and revenues by 3%.  Further, Dentsply understated accrued liabilities in 3Q21 and 4Q21 by 13% and 12%, respectively.  The majority of the Company's understatement of accrued liabilities occurred in the sales and marketing program, which was understated in 4Q21 and the fourth quarter of 2020 ("4Q20") by $46 million (*230%*) and $35 million (*167%*), respectively.  Notably, the accrued liabilities the Company recorded each quarter for its sales and marketing program included accruals for "discounts, rebates and free

---

[8]    ASC 250-10-S99 states a misstatement may be material if it "hides a failure to meet analysts' consensus expectations for the enterprise."  For 3Q21, Dentsply falsely reported having made $0.68 in adjusted EPS (non-GAAP) thereby beating consensus of $0.65.  In fact, Dentsply should have reported adjusted EPS (non-GAAP) of $0.60, which would have missed 3Q21 consensus by $0.05.  Similarly, ASC 250-10-S99 acknowledges that "where management has intentionally misstated items in the financial statements to 'manage' reported earnings . . . it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements."

- 73 -

goods" – the types of sales incentives that Defendants materially misstated during the Class Period,

resulting in the Restatement.[9]

169.     Dentsply's misstatements were also qualitatively material: ASC 250-10-S99 notes

that misstatements may be material if management has intentionally violated GAAP – regardless

of their quantitative size.  Here, Dentsply's internal investigation determined as part of the China

investigation that certain employees had "committed intentional wrongdoing," as explained in

Dentsply's November 1, 2022 Form 8-K:

> The China Investigation also found that members of the Company's local
> commercial team in China failed to provide information requested by the
> Company's local accounting organization in connection with the return and/or
> exchange of products in China during the fourth quarter of 2021.  The China
> Investigation concluded that these employees, as well as the head of the Company's
> Asia-Pacific commercial organization, **committed intentional wrongdoing** by
> failing to provide requested information to the Company's local accounting
> organization, by obstructing the work of the accounting team, and by lacking
> truthfulness in providing information to the Company and to the Audit and Finance
> Committee as part of the China Investigation.  **The China Investigation also
> determined that these actions by certain members of the Company's local
> commercial team in China, as well as the former Chief Financial Officer and the
> head of the Company's Asia-Pacific commercial organization, violated the
> Company's Code of Ethics and Business Conduct**.

170.     Further, ASC 250-10-S99 also identifies "whether a misstatement has the effect of

increasing management's compensation – for example, by satisfying requirements for the award

of bonuses or other forms of incentive compensation" as an indication of a misstatement's

materiality.  Defendants' improper accounting during the Class Period had the effect of increasing

the Individual Defendants' annual compensation, making them eligible to receive millions of

---

[9]     "The amount of consideration received and revenue recognized varies with changes in
marketing incentives (*e.g.* discounts, rebates, free goods) and returns offered to customers and
their customers."

dollars of incentive compensation based on inflated Company performance metrics such as adjusted EPS and adjusted operating income.

### 2. Dentsply's Accounting During the Restatement Periods Violated GAAP

171.    In Dentsply's 2021 Form 10-K, the Company disclosed its significant accounting policy for revenue recognition, which falsely stated that "[r]evenue is measured as the amount of consideration the Company expects to receive in exchange for transferring goods or services in accordance with ASC 606-10, *Revenues from Contracts with Customers*." Dentsply also represented in its 2021 Form 10-K that, with respect to its accounting for revenues:

> The Company exercises judgment in estimating variable consideration, which primarily includes volume discounts, sales rebates, and product returns. The Company adjusts the estimate of revenue at the earlier of when the most likely amount of consideration can be estimated, the amount expected to be received changes, or when the consideration becomes fixed. The Company estimates volume discounts by evaluating specific inputs and assumptions, including the individual customer's historical and estimated future product purchases. Discounts are deducted from revenue at the time of sale or when the discount is offered, whichever is later. In estimating sales rebates, the Company evaluates inputs such as customer-specific trends, terms of the customers' contracted rebate program, historical experience, and the forecasted performance of a customer and their expected level of achievement within the rebate programs. The accruals for these rebate programs are updated as actual results and updated forecasts impact the estimated achievement for customers within the rebate programs. When the Company gives customers the right to return eligible products and receive credit, returns are estimated based on an analysis of historical experience. However, returns of products, excluding warranty-related returns, are not material. To the extent the transaction price includes variable consideration, the Company applies judgment in constraining the estimated variable consideration due to factors that may cause reversal of revenue recognized. The Company evaluates constraints based on its historical and projected experience with similar customer contracts.

172.    These statements were false and misleading when made, as Dentsply has admitted through the Restatement that it did not comply with the stated policies in recognizing revenue during the Class Period, including in estimating variable consideration.

173.    Under ASC 606, there are five steps to recognizing revenue:

- 75 -

- Step 1: Identify the contract(s) with the customer;

- Step 2: Identify the performance obligations in the contract;

- Step 3: Determine the transaction price;

- Step 4: Allocate the transaction price to the performance obligation in the contract; and

- Step 5: Recognize revenue when (or as) the reporting entity satisfies a performance obligation.

174.    Defendants failed to comply with Step 3 identified above (determine the transaction price), which caused the Company to fail to properly account for revenues (and other financial accounts) during the interim and annual periods of 2021.

175.    First, in determining the transaction price of each sale to a customer under ASC 606, Dentsply was required to consider, among other items, "variable consideration" – things such as discounts, rebates, refunds, credits, price concessions, incentives, performance bonuses, penalties, and other similar items associated with a given deal.[10]  Dentsply's revenue recognition accounting policy as disclosed in its 2021 Form 10-K stated that the relevant variable consideration Dentsply considered "primarily include[d] volume discounts, sales rebates, and product returns."

176.    ASC 606 requires that companies estimate the amount of variable consideration for a given deal as a deduction from the transaction price, using either the "expected value" or the "most likely amount" method.[11]  Dentsply told investors in its 2021 Form 10-K that it adjusted its "estimate of revenue at the earlier of when the most likely amount of consideration can be estimated, the amount expected to be received changes, or when the consideration becomes fixed." Under ASC 606, Dentsply was required to update its estimates of revenue quarterly, including any

---

[10]    ASC 606-10-32-3; ASC 606-10-32-6.

[11]    ASC 606-10-32-8.

- 76 -

changes to an overall transaction price from the amount of variable consideration offered in connection with the sale, in order "to represent faithfully the circumstances present at the end of the reporting period and the changes in circumstances during the reported period."[12] Dentsply did not follow this principle during the Restatement periods.

177.    For example, in its November 7, 2022 Form 10-Q/A for 3Q21, Defendants admitted that Dentsply's Class Period financial statements failed to comply with the relevant GAAP addressing customer incentives (*i.e.*, variable consideration):[13]

> Subsequent to the issuance of the Company's consolidated financial statements as of September 30, 2021 and for each of the three and nine months periods ended therein, and also the consolidated financial statements as of December 31, 2021 and 2020 and for each of the three fiscal years in the period ended December 31, 2021 (collectively, the "previously issued financial statements"), management identified errors related to certain customer incentive programs. It was also determined that the Company ***utilized incorrect accounting and assumptions in the determination of certain estimates related to its sales return provisions, warranty reserve provisions and variable consideration***.

178.    The restated 3Q21 Form 10-Q/A also admitted that Dentsply violated ASC 606 with respect to sales made in China during 3Q21. Specifically, it disclosed that there had been an increased level of returned product in China in 4Q21 but that the returns processed did not follow the terms of the return provisions in the applicable distributor agreements and/or sales contracts. This failure to properly account for returns in accordance with ASC 606-10-32-10 resulted in a premature recognition in 3Q21 of approximately $4 million in net sales that ***should*** have been recorded in 4Q21.[14]

---

[12]    ASC 605-10-32-14 ("[a]t the end of each reporting period, an entity shall update the estimated transaction price (including updating its assessment of whether an estimate of variable consideration is constrained)").

[13]    *See* ASC 606-10-32-5-ASC 606-10-32-14.

[14]    *See* ASC 606-10-55-22-ASC-606-55-29.

179.    Finally, by failing to properly account for the massive customer incentives they offered in 3Q21 and 4Q21, Dentsply materially understated its accrued liabilities reported during the Class Period by more than **$80 million** in both 3Q21 and 4Q21.

**I.    Defendants Violated Item 303 of Regulation S-K and ASC 606-10-50 Disclosure Requirements**

180.    In addition to misstating Dentsply's 2Q21, 3Q21, 4Q21, and FY21 revenues, Defendants also violated GAAP and SEC disclosure rules with respect to Dentsply's SEC filings during those periods.    In particular, Defendants were required to inform investors that the substantial sales incentives employed in the 2H21 would, and did, result in excess distributor channel inventory, and how that fact would negatively impact their sales in 1H22.

181.    Specifically, SEC disclosure rules require that every Form 10-K and Form 10-Q contain a section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" (the "MD&A").    A content framework for required MD&A disclosures is set forth in Item 303 and subsequent SEC guidance.    The MD&A is required, for example, to include discussion and analysis of "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."[15]    Companies are also required to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."[16]

---

[15]    17 C.F.R. §229.303(a).

[16]    17 C.F.R. §229.303(b)(2)(ii).

182.    In accordance with these disclosure rules, Defendants were required, but failed, to inform investors that their sales figures in 3Q21 and 4Q21 were inflated by their use of massive customer incentives to persuade distributors to take on more inventory than they actually needed. After all, Defendants' scheme not only led to materially misleading revenue being reported in 3Q21 and 4Q21, but it created a reasonable likelihood that those revenues would not be repeated in following quarters, and in fact, that the excess ***$50 million*** in dealer inventory would result in materially decreased revenues in FY22 as the distributors burned through existing product rather than submitting new orders.  Dentsply admitted as much in its restated 3Q21 Form 10-Q/A and 2021 Form 10-K/A, acknowledging that "[t]he North America Investigation noted potential ***omissions in public disclosures made by the Company regarding the use of these incentives or their potential future impacts in the third and fourth quarters of 2021***."

183.    In failing to inform investors about the Company's trend of increasing channel inventory in 2H21 that would negatively impact sales in 2022, Defendants violated Item 303.

184.    Separately, Dentsply's 2Q21 and 3Q21 Forms 10-Q violated the GAAP disclosure requirements under ASC 606-10-50.  This was demonstrated when, in December 2021, the Company received an SEC comment letter addressed to defendant Gomez identifying the Company's failure to include necessary disclosures about its revenues in its 2020 Form 10-K, as required by ASC 606-10-50.  The December 13, 2021 SEC comment letter directed Dentsply to:

> Please revise future filings to include all of the disclosures required by ASC 606-10-50, as applicable.  For example, provide the qualitative and quantitative disclosure about the significant judgments and changes in judgments, including inputs and assumptions, related to your accounting for returns, rebates and discounts, as set forth in ASC 606-10-50-1(b), 50-17, and 50-20, a description of the payment terms under 50-12, and disaggregated revenue under 50-5.

185.    Dentsply's response to the SEC comment letter on January 12, 2022 (signed by Gomez) conceded the merits of the SEC's comment, and agreed to "revise future filings to include

- 79 -

additional disclosures in accordance with ASC 606-10-50, as applicable, including further disaggregation of revenue beyond the information previously provided in footnotes 1 and 5 to the consolidated financial statements."

186.    However, prior to receiving the December 13, 2021 SEC comment letter, Dentsply had filed its 2Q21 Form 10-Q on August 5, 2021, and its 3Q21 Form 10-Q on November 4, 2021. Neither contained the required disclosures under ASC 606-10-50, including disclosures concerning the Company's judgments around accounting for returns, rebates, and discounts – the very same sales incentive areas that were later identified as materially misstated during the Class Period and led to the Restatement.  Accordingly, the 2Q21 and 3Q21 Forms 10-Q were materially false and misleading in this manner as well.

187.    Finally, after receiving the SEC comment letter, the Company for the first time provided a new "REVENUE" note in its 2021 Form 10-K (filed March 1, 2022), which disclosed Dentsply's net sales disaggregated by product category, as required by ASC 606-10-50-5.  Neither the 2Q21 nor 3Q21 Forms 10-Q contained this disclosure, and violated GAAP for this additional reason.

188.    In addition, by violating GAAP and failing to disclose the Company's net sales disaggregated by product category until after receiving the SEC comment letter, Defendants were able to hide the impact of their channel stuffing practices in 2H21 on the CAD/CAM product line. For example, the following trend of quarterly CAD/CAM sales were hidden from investors until November 2022:

| $ in millions | 1Q21 | 2Q21 | 3Q21 | 4Q21 | FY21 | 1Q22 | 2Q22 | 3Q22 | 4Q22 | FY22 | 1Q23 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CAD/CAM SALES | $ 129 | $ 127 | $ 147 | $ 171 | $ 574 | $ 106 | $ 129 | $ 116 | $ 152 | $ 503 | $ 105 |

189.    As seen in the chart above, Defendants hid from investors how significant their channel stuffing scheme in 2H21 truly was for CAD/CAM sales.  For example, the 3Q21 sales of

- 80 -

$147 million and 4Q21 sales of $171 million were 16% and 35% higher than the 2Q21 sales of $127 million.

190.    In addition, the chart above shows that Defendants' inflation of CAD/CAM sales in 2H21 came home to roost in 2022.  For example, in 1Q22 the CAD/CAM sales of $106 million dropped a whopping *38%* from 4Q21 sales of $171 million.  Even adjusting for any potential seasonality, the 1Q22 sales were still *18%* lower than 1Q21.  This is especially damning evidence of how much CAD/CAM inventory was jammed on distributors in 2H21 as 1Q21 would have had a significantly higher negative COVID impact than 1Q22.

191.    In total, the CAD/CAM sales for 2022 ($503 million) fell 12% compared to 2021 ($574 million), demonstrating that the bloated inventory levels at the end of 2021 took at least a year to recover from Defendants' channel stuffing scheme.

### J.    Defendants Materially Misled Investors Regarding the Effectiveness of Dentsply's Internal Controls over Financial Reporting and Disclosure

192.    During the Class Period, Defendants made repeated assurances that Dentsply's internal controls functioned properly to prevent or detect material misstatements in its financial statements.  Specifically, the 2021 Form 10-K (signed by Casey, Gomez, and Chadha) and 2Q21 and 3Q21 Forms 10-Q (signed by Casey and Gomez) falsely stated that the Company's ICFR and its disclosure controls were effective, with each document containing the following false language, or language substantively identical:

> The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report.  Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) [sic] and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report *were effective* to provide reasonable assurance that the information required to be

disclosed by the Company in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and that it is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

193.    In addition, defendants Casey and Gomez signed the Management's Report on Internal Control Over Financial Reporting in the 2021 Form 10-K, which falsely stated the following about the Company's ICFR being effective:

Management of the Company has assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2021. In making its assessment, management used the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on its assessment management concluded that, as of December 31, 2021, the Company's internal control over financial reporting ***was effective*** based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the COSO.

194.    Management was required to disclose any control deficiencies determined to be material weaknesses in management's annual report on its assessment of the effectiveness of ICFR – it cannot disclose that is has assessed ICFR as effective if there is one or more control deficiency determined to be a material weakness in ICFR.[17]

195.    Each of these representations and/or omissions was materially false and misleading. As admitted in the restated 2021 Form 10-K/A, Dentsply had material weaknesses in its ICFR and ineffective disclosure controls and procedures during the Class Period.  Specifically, the Internal Investigation concluded that:

In management's Report on Internal Control Over Financial Reporting in the Company's original Annual Report on Form 10-K for the year ended December 31, 2021 filed on March 1, 2022, management previously concluded that the Company's internal control over financial reporting was effective as of December 31, 2021.  Management subsequently concluded that the ***material weaknesses***

---

[17]    AS 2201.02.

*described herein existed* as of December 31, 2021.  As a result, management has concluded that the Company's internal control over financial reporting *was not effective* as of December 31, 2021 based on the criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.  ***Accordingly, management has restated its report on the Company's internal control over financial reporting***.

\*    \*    \*

At the time the Original Filing for the year ended December 31, 2021 was filed on March 1, 2022, the former Chief Executive Officer and former Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 31, 2021.  Subsequent to that evaluation, the Company's current Chief Executive Officer and current Chief Financial Officer concluded the Company's disclosure controls and procedures ***were not effective*** as of December 31, 2021, due to the material weaknesses in internal control over financial reporting described in Management's Report on Internal Control Over Financial Reporting included under Item 8 of this Form 10-K/A.

196.    The presence of material weaknesses in a company's internal controls is a significant problem for both the company and its investors.  After all, a material weakness is a "deficiency, or a combination of deficiencies, in internal control over financial reporting, ***such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected*** on a timely basis."[18]  Indicators of material weaknesses in ICFR can include the following serious issues:

- Identification of fraud, whether or not material, on the part of senior management;

- Restatement of previously issued financial statements to reflect the correction of a material misstatement;

- Identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and

---

[18]    AS No. 5, Appendix A – Definitions.

4891-2258-9554.v1

- Ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee.[19]

197.    Here, the Company's material weaknesses and ineffective disclosure controls were admitted to have allowed the inflation of the Company's revenues during the 2H21 and resulted in the Company's Restatement of its financial results.  As disclosed in the 2021 Form 10-K/A:

> *These material weaknesses resulted in the restatement of our consolidated financial statements* for the year ended December 31, 2021, and the unaudited interim financial information for the three and nine months ended September 30, 2021.  *These material weaknesses also resulted in adjustments to substantially all of our accounts and disclosures for the interim and annual periods related to 2019, 2020, and 2021.*  Additionally, each of these material weaknesses could result in a misstatement of substantially all of our account balances or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

198.    Contrary to Defendants' false and misleading statements that Dentsply's ICFR and disclosure controls were effective, Dentsply has now admitted to three separate material weaknesses in ICFR stemming from an ineffective control environment surrounding revenue recognition and driven by former management's improper "tone at the top," as described below.

### 1.    Defendants Established an Improper Tone at the Top

199.    A company's control environment includes the integrity and ethical values of the organization and has a pervasive impact on the overall system of control.  A key component of an effective control environment is an appropriate tone at the top of the organization, established by the board of directors and senior management regarding the importance of internal control and expected standards of conduct.[20]  According to the COSO Framework, the internal control framework used by public companies in evaluating ICFR in accordance with SOX:

---

[19]    PCAOB AS 2201.69.

[20]    Committee of Sponsoring Organization of the Treadway Commission in *Internal Control – Integrated Framework* (2013) (the "COSO Framework").  Dentsply's management represented in

*Tone at the top and throughout the organization is fundamental to the functioning of an internal control system*. Without a strong tone at the top to support a strong culture of internal control, *awareness of risk can be undermined, responses to risks may be inappropriate, control activities may be ill defined or not followed, information and communication may falter, and feedback from monitoring activities may not be heard or acted upon*. Therefore tone can be either a driver or a barrier to internal control.

The COSO Framework emphasizes that, "*[m]ore than any other individual, the CEO sets the tone at the top that affects the control environment and all other components of internal control*."

200.    Dentsply has admitted that defendants Casey and Gomez created an ineffective and inappropriate tone at the top during the Restatement period, describing the culture they fostered as one of fear, where "employees did not feel comfortable raising concerns without fear of retaliation."  Specifically, the 2021 Form 10-K/A disclosed the following material weakness:

> The Company did not design and maintain an effective internal control environment as former management failed to set an appropriate tone at the top.  Specifically, certain members of senior management, including the ***Company's former Chief Executive Officer and former Chief Financial Officer***, engaged in conduct that was inconsistent with the Company's culture of compliance and Code of Ethics and Business Conduct.

201.    The toxic tone at the top established by Casey and Gomez is evident in the extreme pressure put on the distributor sales team to meet internal sales goals, and their fear they would be fired if they did not do as Bruno instructed, even over their better judgment.  These fears were well-grounded, as implicitly confirmed by new Dentsply CEO Simon Campion ("Campion") on a November 14, 2022 conference call.  Speaking of the Internal Investigation results and how the Company intended to resolve the issues that led to the Restatement, Campion stated that "what

---

the Company's 2021 Form 10-K that it employed the criteria set forth in the COSO Framework in evaluating ICFR during the Class Period.

we've already begun to drive here is a culture of inclusivity so that people have an opportunity to share their voice and that there is no – that there are 0 consequences for speaking up here at Dentsply Sirona."

202.    The China investigation also concluded that Gomez and Müller, the "head of the Company's Asia-Pacific commercial organization," maintained and promoted an inappropriate control environment, and failed to promote or enforce adherence to the Company's Code of Ethics and Business Conduct – in other words, they also set an improper tone at the top.

**2.    Dentsply's Material Weaknesses Surrounding Revenue Recognition**

203.    Dentsply also admitted to material weaknesses in the revenue recognition areas of customer incentive arrangements and variable consideration.  The 2021 Form 10-K/A disclosed the following material weaknesses:

> The Company did not maintain a sufficient compliment of personnel with an appropriate level of knowledge about accounting for variable consideration related to customer incentive arrangements in a manner commensurate with our financial reporting requirements.

> \*        \*        \*

> The Company did not design and maintain effective controls associated with approving, communicating, and accounting for incentive arrangements with customers, impacting the completeness and accuracy of revenues, including variable consideration.

204.    Combined, these material weaknesses contributed to a massive, wide-ranging negative impact, resulting in restatement of or adjustments to substantially *all* of Dentsply's accounts and disclosures for the interim and annual financial periods related to 2019, 2020, and 2021.

- 86 -

      **3.**     **Dentsply's Admissions Demonstrate How Significant the Material Weaknesses in Its ICFR Were During the Class Period**

205.    The depth and breadth of Dentsply's Restatement and identified material weaknesses in ICFR are illustrated by the Company's extensive remediation plan disclosed in its 2021 Form 10-K/A and 3Q21 Form 10-Q/A. Dentsply was required to "[a]ppoint[] a new Chief Executive Officer, a new Chief Financial Officer and a new Chief Accounting Officer" – confirming that the Individual Defenedants' actions during the Class Period were all identified to have contributed to Dentsply's revenue inflation and Restatement. Similarly, "[t]ermination of certain members of senior management as well as non-executive employees for violations of the Code of Ethics and Business Conduct" – *i.e.*, Petersohn, Müller, and Bruno – was also considered a remedial and preventative step in preventing future restatements.

206.    In addition to major personnel turnover, as part of the remediation process, the Company concluded that it needed to implement a host of new accounting procedures, policies, additional trainings, new internal controls, and enhance its Code of Ethics and Business Conduct to fix the broken culture and accounting practices present at the Company during the Class Period. These items include:

    a.    Review[ing] and enhanc[ing] the Company's Code of Ethics and Business Conduct to clarify responsibilities related to the Company's financial reporting and disclosures and provide incremental training to Company personnel on the updated Code of Ethics and Business Conduct;

    b.    Implement[i]ng written policies and procedures to provide governance and establish responsibility for oversight of incentive arrangements provided to customers, including the appropriate delegation of authority for such approvals;

    c.    Formaliz[ing] written policies and procedures to provide governance and establish[ing] responsibility for guidelines, documentation and oversight of product returns from customers when a contractual right to return exists in a customer agreement;

d.    Requir[ing] and provid[ing] trainings for employees who have a role in negotiating, assessing, agreeing, and accounting for customer incentive arrangements with distributors;

e.    Provid[ing] training on new processes to individuals responsible for execution, oversight and review of customer incentive arrangements with customers;

f.    Enhanc[ing] processes to ensure all applicable terms and conditions for incentive-based programs and customer agreements are timely communicated to individuals responsible for accounting and financial reporting;

g.    Strengthen[ing] internal controls over the accounting for customer incentive arrangements, including: (i) implementing formal controls to continuously review and document the methodology and assumptions used in estimating variable based incentives and (ii) formal controls to ensure the accuracy of the estimated accrued liability analysis;

h.    Evaluat[ing] finance and commercial operations talent and address identified gaps; and

i.    Enhanc[ing] training programs on revenue recognition for commercial and finance personnel.

207.    The actions taken with respect to Dentsply's ineffective disclosure controls and procedures are also revealing with respect to the particular deficiencies during the Class Period. In particular, the Company has purportedly:

a.    Enhanced existing Disclosure Committee responsibilities through a more formal charter, which identifies members and sets forth the roles and responsibilities of the Disclosure Committee, among other requirements; and

b.    Implemented additional and enhanced existing sub-certifications and internal management representation letters, including providing training on the purpose and execution of these processes.

## K.    Casey and Gomez Signed and Caused Materially False Sarbanes-Oxley Certifications to Be Filed with the SEC

208.    SOX was created in the wake of a series of high-profile corporate frauds and resultant market turmoil, and contains a series of reforms designed to enhance corporate responsibility, promote accurate and reliable financial disclosures, and combat accounting and

- 88 -

securities fraud.  Arguably, one of the most important reforms instituted under SOX was SOX §302, Exchange Act Rule 13a-14, which provides that each financial report filed on SEC Forms 10-Q and 10-K must include a certification signed by the issuer's CEO and CFO.

209.    Casey and Gomez signed SOX certifications filed with Dentsply's 2Q21 and 3Q21 Forms 10-Q and 2021 Form 10-K representing that:

(a)    "Based on [the signer's] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report";

(b)    "Based on [the signer's] knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report";

(c)    Casey and Gomez were "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . for the registrant and ha[d]";

(i)    "Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [Casey and Gomez's] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"; and

(ii)    "Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in [the] report [Casey and Gomez's] conclusions about the

- 89 -

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation";

        (d)    Casey and Gomez "ha[d] disclosed, based on [their] most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors":

        (i)    "All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information";

        (ii)    "Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting"; and

        (e)    The information contained in the financial report "fairly presents, in all material respects, the financial condition and result of operations of the Company as of the date of the Report."[21]

    210.    Each of these representations were materially false and misleading when made. As Casey and Gomez knew or recklessly disregarded:

        (a)    As described in §V.G. above, Dentsply's 2Q21 and 3Q21 Forms 10-Q and its 2021 Form 10-K materially misrepresented the Company's financial results, which were not reported in compliance with GAAP and would ultimately require restatement.

        (b)    As described in §V.I. above, Dentsply's ICFR and disclosure controls were not effective in the financial periods covered by the 2Q21 and 3Q21 Forms 10-Q or the 2021 Form

---

[21]   *See* Form 10-Q filed August 5, 2021 at Exhibits 31.1, 31.2, 32; Form 10-Q filed November 4, 2021 at Exhibits 31.1, 31.2, 32; Form 10-K filed March 1, 2022 at Exhibits 31.1, 31.2, 32.

10-K, contained material deficiencies around the recording, accounting for, and reporting of incentive arrangements and variable consideration, and Casey and Gomez had personally failed to promote or maintain an adequate control environment and instead cultivated a culture in which employees were afraid to report concerns.

(c)    Casey and Gomez were engaged in a fraudulent scheme, along with Chadha and other senior managers at Dentsply, to inflate the Company's revenues through channel stuffing and accounting fraud – a matter they certainly did not disclose to the Company's auditors during the Class Period.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    The Individual Defendants Had Financial Motive to Inflate Dentsply's Revenues

211.    The Individual Defendants were highly motivated to maximize Dentsply's 2021 financial results because their 2021 compensation largely depended on it:  *89%* of Casey's compensation and *74%* of Gomez's was designed to be dependent on Company performance.  The Individual Defendants' annual compensation was comprised of three components: (i) a guaranteed annual base salary; (ii) eligibility for an annual incentive award ("cash bonus"); and (iii) eligibility for annual equity incentive compensation (a combination of performance-based restricted stock unit awards ("PRSUs"), stock option awards ("Options"), and time-based restricted stock unit awards ("RSUs") (together, "equity incentives").

212.    In 2021, Casey's target compensation was comprised of 11% annual salary ($1,030,000), 14% cash bonus, and 74% equity incentives, with the equity incentives consisting of 75% PRSUs and 25% Options.  Meanwhile, Gomez's 2021 target compensation was comprised

of 26% annual salary ($769,400), 18% cash bonus, and 56% equity incentives, with the equity incentives consisting of 50% PRSUs, 25% RSUs, and 25% Options.[22]

213.    Thus, and as further described below, the Individual Defendants were highly motivated to hit the pre-set financial targets the Company required to achieve the maximum compensation possible – even if that meant engaging in channel stuffing and accounting fraud. Ultimately, had Defendants' scheme *not* bubbled up to Dentsply's Board in February 2022, as discussed below, Casey and Gomez would have walked away with an ***additional $4.9 million and $2.9 million***, respectively.

### 1.    The Individual Defendants Stood to Earn More than 125% of Their Annual Salaries in Cash Bonuses

214.    Whether and in what amount the Individual Defendants received cash bonuses was subject to the requirements of Dentsply's Annual Incentive Plan, established by the Human Resources Committee of the Board each year.  In 2021, in response to the disruptive effect of COVID-19 on the dental industry, Dentsply bifurcated its Annual Incentive Plan into two six-month periods, and provided for bonus payments to Casey, Gomez, Chadha, and other executives when certain performance criteria were met during the first and second halves of 2021, respectively.

215.    The total funding levels for the plan depended on Dentsply's financial performance for the applicable half of 2021.  Specifically, the funding levels were tied to Dentsply achieving certain adjusted earnings before interest, taxes, depreciation, and amortization ("Adjusted EBITDA") goals.  In 1H21, if the Company achieved $380 million in Adjusted EBITDA, the

---

[22]   While Chadha, as an executive officer, was eligible for the same types of compensation as Casey and Gomez, the particular percentages that each type comprised in Chadha's compensation package is not publicly disclosed.

bonus plan would be funded at 50%; if it achieved $422 million Adjusted EBITDA, funding would be 100%; and if it achieved $443 million, funding would be 125%. Adjusted EBITDA targets were higher for 2H21: for 50% plan funding, the Company had to achieve $461 million Adjusted EBITDA; for 100%, it had to achieve $512 million Adjusted EBITDA; and for the maximum 125% funding, it had to achieve $538 million Adjusted EBITDA. If the Company fell below the 50% funding Adjusted EBITDA level in either half, the plan would not be funded at all for that period; if it fell between any of the designated tiers, funding levels would be calculated using straight line interpolation. In other words, any increase in Adjusted EBITDA between the 50% and 125% target levels would result in increased bonus funding for the Individual Defendants.

216. In 1H21, the Individual Defendants were each awarded the maximum compensation under the 2021 First Half Annual Incentive Plan. But 2H21 was going to require far larger Adjusted EBITDA to obtain their bonuses, and Casey and Gomez knew by the end of the first half that the Company was suffering from undisclosed operational challenges that were hurting sales.

217. Accordingly, the Individual Defendants had ample motive to inflate revenues (and so increase Adjusted EBITDA) in order to obtain the maximum bonus possible. By the end of 4Q21, the Company had achieved sufficient Adjusted EBITDA for the 2021 Second Half Annual Incentive Plan bonus pool to be funded at 84.1%. This would have resulted in payments to Casey and Gomez of $1,346,725 and $603,603, respectively.

2. **The Individual Defendants' Equity Compensation Was Highly Dependent on Dentsply Achieving Performance Metrics at the End of 2021**

218. The Individual Defendants' equity incentives were based on different Company performance metrics, each of which also incentivized the Individual Defendants to engage in the fraudulent scheme alleged herein.

a. **The 2019-2021 PRSU Plan**

219. Under the 2019-2021 PRSU plan, the Individual Defendants stood to earn shares on an annual basis if certain metrics were satisfied. The majority of the award (80%) was based on the Company's adjusted EPS (non-GAAP) performance over the three-year period from 2019-2021. The other 20% of the award was based on total shareholder return ("TSR"). In total, Casey and Gomez were eligible to receive up to 40,576 shares and 20,301 shares respectively if they achieved the target level set pursuant to the 2019-2021 PRSU plan. Based on a December 31, 2021 closing price of $55.79, this had a potential monetary value of *$2.3 million* for Casey and $*1.13 million* for Gomez.

220. Based on the financial targets set, the total number of shares awarded for the 2019-2021 PRSUs could be funded at a minimum of 70% *if* the threshold level of $7.09 adjusted EPS was achieved; 100% funding if the target level of $8.28 adjusted EPS was achieved; or 200% funding if $8.92 adjusted EPS was achieved. If the Company fell below the $7.09 minimum adjusted EPS threshold, then the EPS-based PRSUs would not be awarded. In other words, any increase in the adjusted EPS between the 70% and 200% target levels would result in more shares (and so more money) for the Individual Defendants.

221. As a result of Defendants' channel stuffing and accounting fraud in 2021 inflating revenues and earnings, the Company achieved $7.11 in adjusted EPS over the three-year period

from 2019-2021, and *just barely* reached the 70% threshold funding level for the EPS-based PRSUs (hitting 70.5%). However, if the Company had accounted for its revenue and earnings appropriately in 2021 under GAAP, it would have reported adjusted EPS of only $7.07, resulting in a *complete miss* of the minimum threshold level for an award of EPS-based PRSUs, and Casey and Gomez not receiving nearly 18% or 23% of their respective total 2021 compensation.

### b. One-Time 2019 Operating Margin Transformation Incentive Plan

222.    Casey and Gomez were also incentivized to inflate revenues and income in order to have their stock grants issued pursuant to the One-Time 2019 Operating Margin Transformation Incentive Plan PRSU Awards ("Operating Margin PRSU Awards") vest. In March 2019, the Board approved a grant of  the Operating Margin PRSU Awards to more than 100 of the Company's leaders, including Casey. Gomez received a similar award when he joined Dentsply in August 2019.

The Company's named executive officers each received the following 2019 Operating Margin Transformation Incentive Plan PRSU Awards:

| Named Executive Officer | One-Time 2019 Operating Margin Transformation Incentive Plan PRSU Award Target Value |
|---|---|
| Donald M. Casey Jr. | $5.0 million |
| Jorge Gomez | $3.5 million |

223.    The Operating Margin PRSU Awards were designed to vest upon the attainment of certain adjusted operating margin targets during the January 1, 2019-December 31, 2022 time period. In order for *any* of the Operating Margin PRSU Awards to vest, an adjusted operating margin of at least 18% had to be achieved over a period of four consecutive quarters, measured on a trailing four quarter period, and then sustained on a trailing four quarter basis at the end of the subsequent quarter. The Operating Margin PRSU Awards vested on the following schedule:

| Adjusted Operating Margin Performance(1) | Aggregate Portion of 2019 Operating Margin Transformation Incentive Plan PRSU Awards Vesting |
|---|---|
| 18% | 50% |
| 19% | 100% |
| 20% | 150% |
| 21% | 200% |
| 22% | 250% |
| 23% | 300% |

224.     Thus, as the Company's adjusted operating margin increased, Casey and Gomez's vested stock awards would increase dramatically, up to as high as 300% of their respective $5 million and $3.5 million awards.  In 2022, Dentsply's Proxy Statement filed on April 13, 2022, stated that:

> As a result of the successful implementation of the Company's ongoing restructuring plan and the 2019 Operating Margin Transformation Incentive Plan, for the four-quarter period ended June 30, 2021 and, subsequently, for the four quarter period ended September 30, 2021, the Company achieved an adjusted operating margin greater than 21%. Consequently, an additional 150% of the performance restricted stock units granted in connection with the 2019 Operating Margin Transformation Incentive Plan vested in November 2021.

In other words, Dentsply had hit the four-quarter mark of greater than 21% adjusted operating margin at the end of 2Q21.  3Q21 was therefore highly important: if 3Q21's adjusted operating margin was sufficient to bring the 4Q20-3Q21 adjusted operating margin over 21%, Casey and Gomez would receive $7.5 million and $5.25 million in stock at the end of the quarter.  Ultimately, they did hit the 21% target in 3Q21 – exceeding it by just 0.3% – but only through their channel stuffing and fraudulent accounting scheme.

225.     If Dentsply had **appropriately** accounted for its revenues and income in 3Q21 in accordance with GAAP, both Casey and Gomez would have received millions of dollars less in vested stock from the Operating Margin PRSU Awards.  The Restatement reduced 3Q21 revenues by $29 million and 3Q21 adjusted operating income by $27 million, meaning that Dentsply had actually only achieved an adjusted operating margin of **20.7%** over the 4Q20-3Q21 period, rather than the 21.3% Casey and Gomez's incentives were based on.  Had Casey and Gomez been paid

on the *restated* revenue and income for 3Q21, their Operating Margin PRSU Awards would have been *$2.5 million* lower for Casey and *$1.75 million* lower for Gomez.

226.    Ultimately, the Individual Defendants would lose part of the compensation that they had schemed to maximize.  In February 2022 – with employee complaints about Casey and Gomez surfacing and the official commencement of the Internal Investigation imminent – the Board's Human Resources Committee met to review Dentsply's 2021 results and determine the Individual Defendants' compensation under the various incentive plans.  The Human Resources Committee, purportedly at management's suggestion, decided to reduce the cash bonus payout level from a combined annual 104.6% to the 50% level, so as to "recognize the performance not reflected in the financial and strategic metrics of the plan, specifically the Company's increased expenses in 2021 and the fourth quarter results."  This cost Casey and Gomez $702,975 and $315,074, respectively.  The Human Resources Committee then *unilaterally* made an adjustment to the $7.11 adjusted EPS result for the EPS-based PRSUs that "excluded the impact of the 2021 AIP reduction from the EPS calculation" – in other words, the financial benefit from the reduced bonuses would *not* factor in to the calculation of 2021 EPS for purposes of further compensation decisions.  Consequently, instead of receiving shares based on the 70.5% achievement level they had schemed to achieve, the Individual Defendants received *nothing* for the EPS-based portion of the 2019-2021 PRSUs.[23]  This adjustment made ended up costing Casey approximately $1.7 million and Gomez over $800,000 worth of Dentsply stock.

---

[23]    The total shareholder return portion for the 2019-2021 PRSUs was paid out at the weighted result of 16.5%.

**B.** **Defendants Knowingly or Recklessly Signed False Sarbanes-Oxley Certifications Attesting that They Personally Maintained and Promoted Effective Controls over Financial Reporting**

227. As discussed in §V.J., above, SOX certifications are important to ensuring investor confidence in the accuracy and reliability of a public company's financial reporting, and are relied upon as such.

228. During the Class Period, Casey and Gomez each signed SOX certifications that accompanied Dentsply's 2Q21 and 3Q21 Forms 10-Q and the Form 10-K for 2021, attesting that they had personally supervised and participated in the evaluation of Dentsply's financial controls and procedures, and that the Company's financial reports fairly and accurately presented its financial condition. In light of the admitted material weakness in the Company's internal controls over financial reporting, Casey and Gomez were aware or deliberately reckless in disregarding that the SOX Certifications they signed during the Class Period, which attested to the accuracy and completeness of the Company's financial statements and effective internal controls, were false. Their willingness to sign and file these SOX certifications with the SEC further demonstrates their scienter.

229. First, a key element of a Company's ICFR is the tone set by the CEO and other senior executives (such as the CFO and CAO) regarding compliance, ethics, and integrity. But while signing off on the propriety and efficacy of the Company's ICFR in public reporting, Casey and Gomez had personally cultivated a toxic culture where employees feared being retaliated against if they spoke up about any ethics or compliance concerns. The two placed extreme pressure on and bullied employees – including Bruno – to achieve unrealistic sales targets, publicly belittled, humiliated, or even fired those who disagreed or criticized their directions, and had themselves violated the Company's Code of Ethics and Business Conduct repeatedly. In other

words, Casey and Gomez knew that they were not implementing an acceptable tone at the top, and so did not maintain or promote effective ICFR.

230.    Second, the other internal control deficiencies identified in the Internal Investigation were so fundamental that Casey and Gomez either knew they existed and disregarded that fact, or were reckless in ***not*** knowing they existed, either of which supports scienter.  For example, while Dentsply acknowledged in its 2021 Form 10-K that "[a] Company's internal control over financial reporting includes those policies and procedures that . . . ***provide reasonable assurance that transactions are recorded*** as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles," in reality, Dentsply didn't have ***any*** written policies and procedures governing such essential financial reporting areas as responsibility for and/or oversight of incentive arrangements with customers.  There were also ***no formal controls*** to ensure the "review and document[ation of the accounting] methodology and assumptions used in estimating variable-based incentives and . . . the estimated accrued liability analysis."

### C.    Executive Departures Support a Strong Inference of Scienter

231.    The suspiciously timed departures of six Dentsply executives – each of whom held a position central to the fraud – supports scienter.  The Internal Investigation began in March 2022. On March 17, 2022, Dentsply announced that Bruno had been replaced.  Bruno's departure, along with the facts described in §IV, above, confirms that he was involved in the scheme, given that he was the highest-level sales executive in North America, the internal investigation centered on sales in North America, and Bruno departed soon after the internal investigation commenced.

232.    On April 11, 2022, Dentsply announced that Gomez had suddenly resigned, effective May 6, 2022.  Gomez's departure supports a strong inference of scienter, given that he

- 99 -

departed soon after the Internal Investigation began, he was the Company's highest-ranking finance executive, and the scheme involved fraudulent accounting practices.

233.    Eight days later, on April 19, 2022, Dentsply shocked the investor community by announcing that Casey had been fired, effective immediately.   Evercore described the announcement as "a bit of a shock to most in the investor community."   William Blair likewise stated, "[t]his morning Dentsply made the surprising announcement that its CEO Don Casey has been terminated" and described the termination as "significant and unexpected."   William Blair also highlighted that "[t]his unexpected deterioration in the business comes on the heels of the announced departure on April 11 of CFO Jorge Gomez."   Once the Internal Investigation was announced, Jefferies made the obvious link to Casey's termination, observing on May 11, 2022: "It seems former CEO Don Casey's sudden termination last month was, in part, tied to an investigation into possible inappropriate use of dealer sales incentives in 2H21 . . . ."

234.    Casey's termination came only six days after the Company filed its 2022 Proxy Statement, which recommended Casey as a Board member.   Casey's inclusion on the slate of directors to be re-nominated at the Company's May 25, 2022 annual meeting of stockholders in a widely disseminated proxy just days before his termination undercuts the Company's halfhearted explanation that his termination was due to Company performance under his multi-year leadership. Common sense suggests there was a more immediate cause for his termination – information discovered during the ongoing Internal Investigation.   So too does Dentsply's Definitive Proxy Statement, filed with the SEC on April 14, 2023, in which Dentsply stated that more than a year after Casey was terminated, the Company had taken "no position" with respect to whether Casey would receive more than *$11 million* in termination payments that he would have been entitled to had he been terminated "*without* [c]ause" – with cause being defined in the Severance Plan as

including "committing an act of fraud or an act of malfeasance, recklessness or gross negligence against the Company, breaching a non-compete or non-solicitation agreement or being indicted for or convicted of a felony or crime involving moral turpitude."[24]

EXECUTIVE COMPENSATION TABLES

**Donald M. Casey, Jr.**

The termination of Mr. Casey was effective as of April 19, 2022. The Company has not entered into any agreement with Mr. Casey with respect to his termination. The following table applies to the Company's pre-termination agreements with Mr. Casey in connection with potential payments to Mr. Casey upon termination of employment. As of the date of this proxy statement, the Company has taken no position with respect to these provisions in connection with his departure.

| | Termination by Employee with Good Reason ($) | Termination by Company without Cause ($) | Termination After Change in Control ($) | Death ($) |
|---|---|---|---|---|
| Salary | 2,126,000 | 2,126,000 | 2,126,000 | - |
| Non Equity Incentive Compensation Plan | 3,189,000 | 3,189,000 | 3,189,000 | - |
| Stock Options | - | - | - | - |
| Stock Awards & Dividends | 4,966,076 | 4,966,076 | 7,998,986 | 7,998,986 |
| 401(k) | 39,650 | 39,650 | 39,650 | - |
| Supplemental Executive Retirement Plan | 783,470 | 783,470 | 783,470 | 201,265 |
| Medical, Dental and Vision Insurances | 38,693 | 38,693 | 38,693 | - |
| Short and Long-Term Disability Insurance | 1,020 | 1,020 | 1,020 | - |
| Basic Life and Accidental Death and Dismemberment Insurance | 2,328 | 2,328 | 2,328 | 1,000,000 |
| Total | 11,146,237 | 11,146,237 | 14,179,146 | 9,200,251 |

Accordingly, Casey's termination supports a strong inference of scienter.

235.    As the Internal Investigation continued, so did the departures.  On August 4, 2022, the Company and Chadha, Dentsply's CAO, "mutually agreed" on Chadha's leaving Dentsply. Chadha's departure supports a strong inference of scienter, particularly in light of the fact that he was the Company's highest-ranking accounting employee, and accounting lies at the heart of the fraud alleged here, and he departed while the Internal Investigation was ongoing.

236.    The following month, on September 1, 2022, Dentsply announced Petersohn and the Company had "mutually agreed upon the separation of Mr. Petersohn from the Company, effective September 30, 2022."  The media noted that "Petersohn's departure comes among a slew

---

[24]    By contrast, Dentsply's General Counsel left the Company on February 24, 2023, and as of the April 23, 2023 Definitive Proxy Statement, had received more than $3.2 million in termination benefits.

- 101 -

of exits as Dentsply handles an internal investigation into its financial practices." The timing of Petersohn's departure, along with his role as the head of Dentsply's global commercial team, the fact that all of Dentsply's global sales employees reported to him, and that the scheme involved sales, strongly supports a strong inference of scienter.

237.    Finally, on November 28, 2022, Dentsply announced that Müller had "left Dentsply Sirona." The announcement was sudden and without explanation, and came after Müller's eight-year tenure with the Company. The timing of Müller's departure, along with his position leading Dentsply's commercial team in China, the fact that commercial sales in China were implicated in Defendants' scheme, and the Internal Investigation's findings that he had committed intentional wrongdoing, obstructed the work of the accounting team, and lacked truthfulness, strongly supports a strong inference of scienter.

238.    In sum, that multiple, high-ranking Dentsply officials departed during the course of the internal investigation demonstrates that the scheme was widespread, well-known, and executed at the highest levels of the organization. That the departures were connected to the fraud is further indicated by the Company's "remediation plan" for the material weaknesses identified in its 2021 Form 10-K/A, which included appointment of a new CEO, CFO, and CAO, and termination of certain members of senior management for violations of the Code of Ethics and Business Conduct.

### D.    The Fraud Involved Dentsply's Core Operations, About Which Defendants Held Themselves out as Knowledgeable

239.    Because Defendants' scheme involved Dentsply's digital sales and distributor inventory – each of which was critically important to the Company and closely monitored by Defendants and market analysts – a strong inference arises that Defendants were aware of or recklessly disregarded the true facts when making false statements and/or omitting material facts regarding these areas during the Class Period. First, the transition to digital dentistry featured

- 102 -

prominently in Dentsply's growth story leading up to and throughout the Class Period, and was a cornerstone in Casey's flagship three-year Restructuring Plan.  For example, on the Company's August 5, 2021 earnings call, Casey told analysts and investors, "[w]e're comfortable with the 4% to 5%. I mean, obviously, we're saying, look, *digital is going to be really important*."  And at a June 3, 2021 Stifel Jaws & Paws Conference, Gomez repeated, "[t]he digital scanning capabilities, let's call it, *digital dentistry, from an equipment perspective, very important area for us*."  Later, on the Company's November 4, 2021 earnings call, Casey represented that Dentsply would continue driving growth by focusing on several key areas, including "*our leading role in digital dentistry*."

240.    Critical to the success of Dentsply's digital sales were its CAD/CAM sales, which represented 22.9% of Dentsply's T&E sales during 2021, and which were driven by Primescan and Primemill:

(a)    Casey, January 15, 2020 JPMorgan Healthcare Conference: "*Primescan* is an example where we had gone in, and on a portfolio basis, said we think this is an *incredibly important launch*.  We are able to divert resources that enabled us to accelerate that, and that's really proven important for us as it's been *a real blue ribbon product from us from a perspective of driving growth*, creating organizational wins."

(b)    Casey, March 2, 2020 earnings call: "In late January, we launched Primemill, which is shown on Slide 22.  This represents *another major new product launch*.  This product is designed to save the dentist time at every step of the entire chairside procedure, and is an extremely simple to use.  This mill is state of the art and really delivers a meaningful difference in speed for the dental office.  *Primescan combined with Primemill has really created a whole new standard of performance for CEREC*."

- 103 -

(c)    Casey, August 6, 2020 earnings call: "As I mentioned earlier in the call, in November 2018, we put a plan in place to accelerate growth, improve margins and simplify the organization.  Our results through 2019 and the first quarter of 2020 show significant progress. ***The execution highlights of our plan include: accelerating growth behind new products, including Primescan and Primemill*** as well as other new products in our Consumable portfolio."

241.    Also critical to Dentsply's digital sales success were sales of its imaging equipment, which Defendants discussed repeatedly throughout the Class Period:

(a)    Casey, August 5, 2021 earnings call: "In the imaging space, Dentsply Sirona has a significant installed base comprised of many well-recognized brands that are at the heart of the dental practice.  Our imaging brands include Schick, the Orthophos family, Galileos and our new Axeos wide field of view system.  Dentists all over the world recognize these brands for their high quality and innovative features."

(b)    Casey, November 4, 2021 earnings call: "On Page 20, Dentsply Sirona's impressive digital foundation is outlined.  ***It starts with a large global footprint in imaging*** with major brands like Schick, Orthophos, Galileos and our newest addition, Axeos."

(c)    Gomez, November 22, 2021 Piper Sandler Healthcare Conference: "We continue to be leaders in a lot of areas in imaging as well."

(d)    Casey, January 12, 2022 JPMorgan Healthcare Conference: "Our imaging business has really come back.  If you look at where we might have been 3 years ago, 4 years ago, where we were trying to compete against too broad a framework, we've really focused on high-end, things like 3D CBCT, where Sydexis is going to make a difference.  I would tell you that's what's – gets us excited."

(e)    Gomez, February 28, 2022 earnings call: "So one of our best-selling products today is Orthophos.  Axeos has been doing really well in the market."

242.    The scheme also implicated the Company's distributor channel, which Defendants closely monitored.  Dentsply received detailed spreadsheets from its distributors weekly, which tracked wholesale orders and end-user demand forecasts, and its U.S. sales team, which reported through Bruno to Casey directly, had weekly calls with the distributors regarding their inventory levels and need.

243.    Defendants also held themselves out as knowledgeable about inventory levels, both from a supply perspective and from a distributor channel perspective, and they represented that they "track[ed] and monitor[ed]" inventory levels closely.  For example, during the Company's November 4, 2021 earnings call, in response to a question about whether Defendants expected inventory levels to increase in the coming quarters, Gomez stated:

> I don't think so.  ***No, we watch inventory very closely, our internal inventory, inventory in the channel***.  And our objective at all times is to ensure that our manufacturing process is smooth.  And the worst thing that you can do for any manufacturing process is to move inventory levels too drastically from period to period.
>
> So our goal, at all times, is to keep inventory levels relatively stable.  And our actually long-term goal is frankly to decrease days of inventory, ***and that's a key internal goal that we track and measure very closely***.

244.

**E.    Analysts and Investors Frequently Asked Questions About, and Defendants Frequently Evinced Personal Knowledge by Commenting on, Distributor Inventory Levels and Supply Chain**

245.    Throughout the Class Period, Casey and Gomez were asked specific, direct questions from analysts about inventory levels, and they held themselves out as knowledgeable on the topic.  For example, during the Company's August 5, 2021 earnings call, an analyst asked:

- 105 -

"I'm just curious if you could comment on what you're hearing from your dealers as you think about inventory levels and kind of caseloads going back up." Casey responded:

> In terms of dealer inventory, first, we've been super happy with our dealer partners . . . .
>
> . . . ***And we're working with them every day to make sure that they're getting adequate inventory to service the customer needs***. And that's an ongoing process. And obviously, they'd be in a better position to comment on how their aggregate inventory level is. But we're working with them.

246.    Later in the Class Period, during the Company's November 4, 2021 earnings call, an analyst asked:

> Have you seen – I think you touched on this a little bit earlier, but I just wanted to kind of revisit. Have you seen stock in by the distributors. I know there's a lot of focus on inflation and the price increases that could be coming. ***Do you feel like inventory levels at all – have changed at all with your distribution partners***?

Gomez responded:

> We don't think so. ***We track that closely and we manage our inventory levels in a disciplined way***. And so we are not seeing that at this point.

247.    On the same call, another analyst asked Defendants, "[d]o you expect your inventory level to increase in the coming quarters?" Gomez again responded: "***I don't think so. No, we watch inventory very closely, our internal inventory, inventory in the channel***."

248.    Casey and Gomez similarly held themselves out to analysts as knowledgeable about current and historical supply chain impacts on Dentsply's ability to supply customers with products – something fundamental to Dentsply's business operations and earning potential. For example, during the September 23, 2021 Investment Community Session at Dentsply Sirona World 2021, Casey represented that, although supply chain management was requiring more effort, "***we're very comfortable that we're going to be able to deliver what our customers need***."

249.    Later during the same presentation, in response to an analyst's question about which business segments were impacted the most by supply chain disruptions, Casey volunteered:

The businesses we worry the most about right now are chip-related.  *We feel very good that we have adequate supply*.  But where we might have been holding 180 days, we're now trying to hold more just because we keep hearing from the car industry and other stuff that there's going to be chip challenges.

. . . *Right now, we don't have anything that's blinking yellow or red*.

250.    In response to the same question, Gomez added: "Jason, just to add some flavor to your question.  I think, *so clearly from a supply disruption perspective, we are fine*.  But it is clear that there is inflation in some places."

251.    During the Company's November 4, 2021 earnings call, an analyst asked Defendants for "a walk-through on what you're seeing on the supply chain side right now," and Gomez responded:

Yes, as I indicated in my remarks, there are challenges.  *So far, I also said this so far for us, we have not been impacted in terms of our ability to manufacture products or to supply our distributors is something that we are monitoring very closely*.  The supply chain team is doing a great job because the reality is, it is harder now to find certain components.

It is more expensive in some cases to procure certain materials.  We have managed all of that so far.  *So with respect to what we're seeing in the inventory pipeline or channel, we haven't seen any major disruptions.  Any changes really of material significance at this point*.  But as you know, this is a global situation, and it's something that is hard to predict at this point.  *But so far, we – our financials are not – have not been impacted by the supply chain issues in a material way other than some elevated costs that we have been able to offset or in some cases, for example, we did a price increase*.

252.    Later during the same call, an analyst asked how long Defendants expected the supply chain disruptions to continue.  Gomez again responded: "And the – as I said before, the supply chain team is doing a great job.  And that's why, *so far, we have not impacted our ability to manufacture products*."

253.    Casey continued to discuss supply chain management during the November 11, 2021 Credit Suisse Healthcare Conference, where he stated:

- 107 -

As we go into the fourth quarter, we're optimistic that things get closer and closer to normal.  Obviously, the supply chain is impacting all of us.  When you talk about – in our case, it's – we look at distribution costs are accelerating.  ***To date, we've been able to manage through a lot of that***.  And as we look out, we have a few key products that there's obviously going to be constraints around we're a heavily chip-oriented business.  ***To date, we've been able to make everything we need to make***.  But as we jump out 6, 8, 12 months, we expect to see pressure on that.

> ***We have a terrific supply chain***.  One of the advantages of the structure we put in place over the last 2 years is a centralized supply chain with a pretty sophisticated procurement group, and that's helped us through it.

254.    During the December 1, 2021 Evercore ISI HealthCONX Virtual Conference, an analyst asked: "Can you provide an update on what you're seeing in terms of any supply chain issues at this point or freight costs? Are you having trouble getting a hold of anything? Are you seeing any kind of shipping delays or anything at this point?" Casey responded:

> Yes.  So the supply chain, I break it out into 2 things, Elizabeth, distribution and logistics.  ***We're not seeing huge delays***.  We're seeing increased costs associated with that.  And that's obviously a headwind as we go forward.  The second issue is are we having problems getting anything, we're basically – ***what we're learning is we can get stuff***.  It just takes a lot more effort because it might not be as easy to get.

**F.    Defendants' History of and Warnings Concerning Similar Misconduct Support a Strong Inference of Scienter**

255.    A history of similar misconduct evidences Casey and Gomez's knowledge that the conduct alleged here was improper.

256.    ***First***, on December 13, 2021, Dentsply received a comment letter from the SEC (addressed to Gomez) that requested that the Company revise future filings to include all of the disclosures required by ASC 606-10-50 – something it had not done with respect to its 2Q21 and 3Q21 Forms 10-Q:

> Please revise future filings to include all of the disclosures required by ASC 606-10-50, as applicable.  For example, provide the qualitative and quantitative disclosure about the significant judgments and changes in judgments, including inputs and assumptions, ***related to your accounting for returns, rebates and***

- 108 -

***discounts***, as set forth in ASC 606-10-50-1(b), 50-17, and 50-20, a description of the payment terms under 50-12, and disaggregated revenue under 50-5.

257.   Gomez responded on Dentsply's behalf on January 12, 2022.  Rather than argue that the Company had appropriately provided the requested information in past filings, Gomez simply responded that the Company would comply with the SEC's request:

> We acknowledge the Staff's comment and will revise future filings to include additional disclosures in accordance with ASC 606-10-50, as applicable, including further disaggregation of revenue beyond the information previously provided in footnotes 1 and 5 to the consolidated financial statements.

258.   ***Second***, on December 16, 2020, the SEC issued an order instituting cease-and-desist proceedings against Dentsply for, among other things, failing to disclose under Item 303 the likely unfavorable impact of excess dealer inventory.  The omissions detailed in the cease-and-desist order parallel the omissions alleged in this case.  For example, the SEC found that Dentsply violated Item 303 by failing to disclose in the first three quarters of 2016 that it had sold more of its technology equipment to a dealer than met end-user demand, and that the corresponding glut dealer inventory was likely to have a material unfavorable impact on future sales:

> DSI failed to make required disclosures of trends and uncertainties regarding the Exclusive Distributor in DSI's Forms 10-Q for the first three quarters of 2016.  DSI's Form 10-Q for the first quarter of 2016 reported "positive internal sales growth . . . led by the Technologies segment" in the United States driven by "increased demand" in the U.S.  ***This statement did not also explain that internal sales growth in the U.S. was driven by the Exclusive Distributor's desire to maintain exclusivity rather than end-user market demand alone, and the resulting inventory build at its Exclusive Distributor would likely materially impact future revenue growth***.
>
> DSI's Form 10-Q for the second quarter of 2016 reported "positive internal sales growth" in the technologies segment in the United States.  ***This statement did not also explain that future sales may be negatively impacted by flat retail sales, high inventory at the Exclusive Distributor***, and contract negotiations with the Exclusive Distributor that could impact sales.
>
> In its Form 10-Q for the third quarter of 2016, DSI reported that the technologies segment in the United States "generated . . . positive internal sales growth . . . as a result of higher demand in this region."  It also reported that

"[i]nternal sales growth was positive in [the U.S.] region[] . . . and was the result of higher demand." ***These statements did not also explain that internal sales growth in the U.S. was driven by its Exclusive Distributor's desire to maintain exclusivity rather than end-user market demand alone, and the resulting inventory build at its Exclusive Distributor would likely impact future revenue growth***, especially given the uncertainty surrounding the likely non-extension of the previously disclosed material contracts.

259.    Although the cease-and-desist order concerned conduct that occurred in 2016, it was issued in December 2020 – while Casey and Gomez led Dentsply.  Accordingly, Casey and Gomez knew that the conduct detailed above violated Item 303, given that the cease-and-desist order, which was issued during their tenure, highlighted the impropriety of: (1) failing to disclose the likely materially unfavorable impact of excess dealer inventory; and (2) touting sales growth without also disclosing that the growth was driven in part by dealers purchasing more product than met end-user demand.

260.    ***Finally***, Casey and Gomez were named defendants in *Louisiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc., et al.*, No. 2:19-cv-03347 (S.D. Ohio) – a securities class action that that recently settled for $109 million.  The plaintiff in that action alleged that, from March 2, 2015 through May 2, 2018, Casey, Gomez, and others materially misrepresented Cardinal Health's inventory management problems, including concealing that an acquired company was carrying excess, obsolete, expired, missing, and unaccounted for inventory.  *La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at *2 (S.D. Ohio Sept. 27, 2021).  In upholding the complaint in its entirety, the court in *Cardinal Health* found that: (1) the plaintiff adequately alleged the misstatements "contained material misrepresentations or omissions"; and (2) "a strong inference of scienter . . . may be drawn from the[] facts and circumstances" involved in the case.  *Id.* at *14, *16.  That Casey and Gomez were embroiled in a recent securities class action that involved inventory mismanagement and concealment of excess

- 110 -

inventory – that ultimately settled for over $100 million – further confirms that they were aware of the importance of disciplined inventory management and accurate disclosures regarding inventory levels.

## VII.    LOSS CAUSATION/ECONOMIC LOSS

261.    At all times during the Class Period, the market for Dentsply common stock was open, well-developed, and efficient.  Throughout the Class Period, Dentsply common stock traded at artificially inflated prices as a direct result of Defendants' scheme and materially false and misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public.  Plaintiffs and other Class members purchased or otherwise acquired Dentsply common stock relying upon the integrity of the market price of Dentsply common stock and market information relating to Dentsply, and have been damaged thereby.

262.    When the relevant truth and its impact on Dentsply's financial results and prospects entered the market through a series of partial disclosures, the price of Dentsply stock significantly dropped, as the artificial inflation came out of the stock price over time.  As a result of their purchases of Dentsply stock during the Class Period, Plaintiffs and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

263.    The corrective impact of each partial disclosure during the Class Period, however, was tempered by Defendants' ongoing scheme as well as the misleading statements and omissions that continued to conceal the true nature and impact of Defendants' fraud.  Each partial disclosure did not on its own fully remove the inflation from Dentsply's stock price because it only partially revealed the nature and extent of the fallout from Defendants' previously concealed misconduct. Defendants' ongoing scheme, misrepresentations, and omissions maintained the price of Dentsply

common stock at artificially inflated levels, inducing Class members to continue purchasing artificially inflated shares in Dentsply even after Defendants' partial disclosures.

264.    The disclosures that corrected the market price of Dentsply shares are detailed below.  These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific non-fraud factors.

265.    On February 28, 2022, before the market opened, Dentsply issued a release containing the Company's financial results for 4Q21 and FY21 and financial guidance for 2022. The Company also hosted a conference call for analysts and investors.  Dentsply's reported 4Q21 revenue of $1.088 billion and EPS of $0.76 were below analyst expectations.  Dentsply's 2022 revenue guidance range of $4.3-$4.4 billion also was below consensus analyst estimates of $4.47 billion, and "heavily weighted to the back half of [2022]."  In addition, the Company's anticipated 4%-5% internal sales growth was 10% lower than market consensus had expected and its FY22 adjusted EPS guidance, was $0.06 lower than market consensus had anticipated.

266.    During the earnings call, Defendants told investors that the soft results were primarily due to supply chain issues, which management estimated "suppressed" Dentsply's growth by "approximately 2 to 3 points."  Gomez also told investors that Dentsply's United States and European "Consumables performance was roughly in line with our expectations."  With respect to CAD/CAM, Gomez stated, "[t]he retail demand for Primemill is solid, and our dealer partners in the U.S. have sufficient inventory to meet that demand.  In the short term, this trade-off will reduce our wholesale volume of Primemills but is the right thing to do for our customers." CAD/CAM inventory buildup as a result of Defendants' channel stuffing was a substantial factor in Dentsply's disappointing 2022 guidance as well as the timing of expected 2022 revenue, which was heavily weighted to the second half of the year.

267.    But as Dentsply later admitted in its Form 10-K/A, filed on November 7, 2022, correcting its Form 10-K originally issued on March 1, 2022:

> As of December 31, 2021, certain dealers' inventory of the Company's CAD/CAM products in the United States was higher than at the end of the prior year, by approximately $50 million.  These higher levels of dealer inventory are due to lower-than-expected retail sales in the fourth quarter, as well as timing-related purchases by dealers due primarily to incremental pricing incentives in the second half of the year, and are likely to pose headwinds to the Company's net sales for these products in 2022.

Further, in the Company's Form 10-Q for 3Q22, filed with the SEC on November 14, 2022:

> Dealer inventory on hand for CAD/CAM units was approximately $50 million higher at the start of 2022 than at the beginning of 2021.  The level of inventory was reduced by approximately $30 million during the first nine months of 2022, compared to *a build in inventory levels of approximately $80 million in the first nine months of 2021, partly as a result of incremental incentives offered during that period which did not recur in 2022*.

268.    As a result of the February 28, 2022 disclosures discussed above, Dentsply's stock price declined by $4.55 per share, or over 7.7%, from $58.69 per share on Friday, February 25, 2022 to $54.14 per share on Monday, February 28, 2022, while the S&P 500 Index declined only 0.02%, removing some of the artificial inflation caused by Defendants' fraud and causing Plaintiffs to suffer losses.  Dentsply's stock price remained inflated, however, because Defendants continued to present false and misleading financial results to investors and conceal the true nature and extent of Dentsply's sales and operational problems.

269.    Analysts attributed Dentsply's February 28, 2022 stock price decline to the 4Q21 earnings miss, weaker than expected guidance for FY22, and that FY22 guidance was "back-end" loaded.  For example, Evercore observed in a February 28, 2022 report that "[a]s with many other names that have 2H-heavy 2022 guides, XRAY is selling off today."  Jefferies wrote in a March 1, 2022 report, "XRAY fell 8% y'day as supply chain shortages drove a surprising 4Q rev/EPS miss & soft 1H outlook."  And, Morgan Stanley noted on March 1 that "XRAY's shares fell 8%

- 113 -

following its earnings print, where the 4Q miss and its initial 2022 guidance (which investors view as not conservative enough in light of a rapidly evolving geopolitical and macroeconomic landscape) were not enough to lift enthusiasm for the shares."

270.    On April 19, 2022, a week after Dentsply announced that defendant Gomez had "resigned" as CFO to assume a CFO role at another company, the Company announced the sudden "terminat[ion]" of defendant Casey as CEO and Director.  Dentsply told analysts that the termination was due to performance-related issues.  The Company also released certain preliminary financial results for 1Q22, including 1Q22 revenue of 5% below market consensus, sales growth 2.75% below consensus, and adjusted EPS $0.16, or approximately 24%, below market consensus, attributing the shortfalls to "weaker sales performance in the U.S., global supply chain challenges, and foreign exchange headwinds."  In reality, the poor revenue, sales growth, and EPS performance was due in substantial part to lower demand related to Dentsply's persistent product problems and still-full dealer inventory channels.  Investors, suspecting fraud or major operational problems, fled from Dentsply's stock, causing it to decline by $6.52 per share, or over 13%, from $48.72 per share on April 18, 2022 to $42.20 per share on April 19, 2022, while the S&P 500 Index increased 1.61%,  removing some of the artificial inflation caused by Defendants' fraud and causing Plaintiffs to suffer losses.  Dentsply's stock price remained inflated, however, because Defendants continued to present false and misleading financial results to investors and conceal the true nature and extent of Dentsply's sales and operational problems.  Investors still did not know that the North America sales shortfalls in 1Q22 that Dentsply stated were the cause of the disappointing 1Q22 earnings were actually a direct result of Defendants' concealed channel stuffing during 2H21 that would continue to negatively impact Dentsply's financial results in the coming quarters.  More, although Dentsply would later reveal that the Audit and Finance

Committee had begun its Internal Investigation in March 2022, the Company concealed the investigation and provided limited information regarding Casey's termination, attributing it solely to Dentsply's performance during his tenure.

271.    Analysts warned that this unexpected development might portend larger problems at the Company and that there was more bad news to come.  For example, BofA stated in a report issued on April 19, 2022, "[g]iven XRAY's recent volatile operating performance and headwinds impacting various aspects of the business, combined with the recent CEO/CFO departures, we see limited visibility to drive near-term upside."  In a report issued on April 19, Evercore stated, "[t]oday's news is a bit of a shock to most in the investor community."  JPMorgan stated in an April 19 report that Dentsply "announced that CEO Don Casey was terminated and will no longer serve as CEO or as a member of the Board effective immediately, which the company said stemmed from underperformance vs. peers."  Morgan Stanley observed that "details on Casey's exit were limited, attributing his termination to company performance during his tenure."  William Blair observed in its April 19 report that "the firing of the CEO suggests additional issues such as disagreement between management and the board over strategy."

272.    On May 10, 2022, Dentsply filed a Form 12b-25 Notification of Late Filing with the SEC, announcing that it was unable to file its 1Q22 Form 10-Q on a timely basis due to an ongoing internal investigation "regarding certain financial reporting matters" that had been initiated in March 2022 by the Audit and Finance Committee of the Company's Board following reports of potential misconduct from current and former employees of the Company.  Specifically, Dentsply announced that the Audit and Finance Committee was investigating "the Company's use of incentives to sell products to distributors in the third and fourth quarter of 2021" and "whether those incentives were appropriately accounted for" in the Company's financial statements filed

with the SEC.  The Audit and Finance Committee also stated that it was investigating allegations that "certain former and current members of senior management directed the Company's use of these incentives and other actions to achieve executive compensation targets in 2021."  Dentsply explained that it had advised the SEC that an internal investigation was underway and that the Audit and Finance Committee would provide additional information to the SEC as the investigation proceeded.  As a result, Dentsply was unable to file its quarterly report for the quarter ended March 31, 2022.

273.    Although Dentsply was unable to timely file its quarterly report, the Company announced earnings for 1Q22 on May 10, 2022 and hosted a conference call for analysts and investors.  On the earnings call, several analysts asked management for more details regarding the nature of the internal investigation and the future impact it might have on the Company's earnings and financial statements.  While generally refusing to comment because the investigation was pending, Dentsply's Interim CFO Bodem told investors that the Company's sales in the U.S. had declined 13.5% in the first quarter and "[t]he majority of that decline was related to burning of inventory . . . at the dealers" and connected that burning of inventory to the "$50 million of excess . . . inventory at the end of the year."  Bodem further disclosed that approximately 80% of the U.S. sales decline was a direct result of the dealer inventory buildup from 2H21, primarily CAD/CAM – in fact, there was so much excess inventory that management did not expect inventory levels to normalize until 3Q22 at the earliest.

274.    Analysts were surprised by Dentsply's inability to file its Form 10-Q for 1Q22, the investigation, and the sales shortfall due to excess inventory, and immediately drew a connection to CEO Casey's termination as well as Dentsply's prior channel stuffing misconduct.  For example, Jefferies stated in a May 11, 2022 report that "[i]t seems former CEO Don Casey's sudden

- 116 -

termination last month was, in part, tied to an investigation into possible inappropriate use of dealer sales incentives in 2H21."  Likewise, according to a report issued by William Blair on May 10, 2022 "the company further surprised investors . . . by disclosing it was unable to file its 10-Q on time due to an ongoing forensic accounting investigation" and that "[t]his additional disclosure sheds further light on the surprising moves last month to dismiss the company's former CEO and appoint an interim CEO . . . and the ongoing forensic accounting investigation suggests write-downs are possible in the coming months."

275.    Analysts also noted their concern about the increased risk the Internal Investigation posed to the Company and its operations, but acknowledged that the full picture was not yet clear. Piper Sandler, for example, noted that "at the least[,] these allegations increase the operational risk for a business that we believe already had an elevated risk profile.  In our follow-up call with management, no other details are being provided on this topic, including potential timing of resolution or related financial/legal costs."  William Blair explained that Dentsply's "exclusive relationship with Patterson ended because of unrealistic placement minimums.  And today's disclosures about the use of incentives in the third and fourth quarters imply a similar problem . . . might still be in place, with $50 million in excess product sitting in the channel at year-end." Morgan Stanley stated in a report dated May 10, 2022 that "[w]hile the immediate termination of its CEO . . . had already set a negative tone . . . , the latest disclosure indicating an investigation into distributor incentives is discouraging."  Evercore observed in a May 10, 2022 report that there was an "[e]stimated $50MM of excess CAD/CAM inventory at the end of the year in their 2021 10-K[.] Burn of this inventory was reflected in 1Q results for both CAD/CAM and consumables at dealers[.]  A portion, but not all, was runoff in 1Q (remainder coming in 2Q) . . . ."  In particular, "80% of US decline was related to inventory burn (mostly CAD/CAM with a little but on

consumables) with remaining 20% related to supply chain constraints and slightly lower demand than anticipated."

276.    As a result of this news, Dentsply's stock price declined $2.87 per share, or over 7%, from $39.25 per share on May 9, 2022 to $36.38 per share on May 10, 2022, removing some of the artificial inflation caused by Defendants' fraud and causing Plaintiffs to suffer losses.  In contrast, the S&P 500 Index increased 0.02% on May 10, 2022.  Dentsply's stock price remained inflated, however, because Defendants continued to present false and misleading financial results to investors and conceal the true nature and extent of Dentsply's sales and operational problems.

277.    On November 1, 2022 Dentsply issued a release and filed a Form 8-K announcing the conclusion of the Company's Internal Investigation and restatements of 3Q21 and FY21 financials.  §IV.G.  The Form 8-K disclosed that on October 29, 2022 the Company, in consultation with the Audit and Finance Committee, had reached a determination to restate its financial statements for the three and nine months ended September 30, 2021 and for FY21.  Defendants also disclosed the Company had "identified one or more material weaknesses in the Company's internal control over financial reporting as of September 30, 2021.  The material weaknesses remained in place as of December 31, 2021 and as of the date of" the Form 8-K.  §IV.G.  In the release, Defendants also disclosed Dentsply's preliminary 3Q22 results and 4Q22 revenue outlook.  In particular, Defendants disclosed that on a preliminary basis net sales for 3Q22 were approximately $947 million, a decline in organic sales versus the same quarter the prior year, and that the Company expected sequential net sales would "decline low-single digits in the fourth quarter 2022."

278.    Over the next two days, as the market digested Dentsply's numerous disclosures and what they would mean for the Company's ongoing operations, Dentsply's stock price fell

- 118 -

$4.17 per share from a closing price of $31.00 on November 1, 2022, to $26.83 on November 3, 2022, a decline of more than 13%, removing some of the artificial inflation caused by Defendants' fraud and causing Plaintiffs to suffer losses.  By contrast, the S&P 500 Index declined by only 3.5% between November 1, 2022 and November 3, 2022.

279.    Prior to the start of trading on November 14, 2022, the Company announced 3Q22 financial results and updated 4Q22 guidance.  The Company also hosted a conference call for analysts and investors.  The Company's reported 3Q22 results were consistent with the preliminary results announced on November 1, 2022, while the updated guidance was below expectations. Dentsply cited weaker demand, supply chain challenges, and unfavorable currency translation as the reasons for the lower than expected revenue and earnings guidance.

280.    During the earnings call, new CFO Glenn Coleman stated that Dentsply's "CAD/CAM business declined in the quarter due to tough year-over-year comps and lower wholesale orders."  In its Form 10-Q for 3Q22, also filed on November 14, 2022, the Company elaborated that in the United States:

> The decrease in organic sales was driven primarily by soft demand for Consumables products, and lower wholesale volumes for CAD/CAM products relative to prior year.  Volumes for CAD/CAM products in the third quarter of 2021 benefited from a build in distributor inventory of approximately $35 million, partly as a result of incremental incentives offered during that period which did not recur in 2022, compared to a build of approximately $10 million during the third quarter of 2022 as orders from distributors have weakened in response to a slowdown in retail demand.  Sales volumes during the three months ended September 30, 2022, were also negatively impacted by ongoing global supply chain constraints and reduction in volumes due to product availability, particularly for certain Equipment & Instruments products which rely on electronic components.  The decline in sales volume was partly offset by overall growth in the Orthodontics business.

281.    As a result of the November 14, 2022 news, Dentsply's stock price declined $1.70 per share, or over 5%, from $32.05 per share on November 11, 2022 to $30.35 per share on November 14, 2022, removing some of the artificial inflation caused by Defendants' fraud and

- 119 -

causing Plaintiffs to suffer losses.   In contrast, the S&P 500 Index declined just 0.08% on November 14, 2022.

282.    Analysts and news commentary attributed the stock price decline on November 14, 2022 to the Company's lower than expected FY22 sales and adjusted earnings guidance.   For example, Piper Sandler stated in a November 14, 2022 report that the updated 2022 guidance "including a full-year organic sales decline of 2% to $3,850-$3,880M and adjusted EPS of $1.90-$2.00 . . . implies a challenged 4Q, with organic sales forecasted to be down at least mid-single digits and EPS to be in a range of $0.26-$0.36 (vs. $0.83 in 4Q-21)."   Piper Sandler noted further that Dentsply's "updated organic growth and EPS guidance . . . imply a tough close to 2022 for the business as new management works quickly to address internal issues."   With respect to CAD/CAM, William Blair noted in a report issued the same day that "[y]ear-to-date, management has seen roughly $30 million of inventory draw-down by distributors that have not translated to revenue for the company."

## VIII.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE

283.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that: (i)  Defendants made public misrepresentations or failed to disclose material facts during the Class Period; (ii)  the omissions and misrepresentations were material; (iii)  Dentsply's common stock traded in an efficient market; (iv)  the Company's common stock is liquid and was heavily traded during the Class Period; (v) the Company's common stock was traded on the Nasdaq and was covered by multiple analysts; and (vi) Plaintiffs and members of the Class purchased, acquired, and/or sold Dentsply common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

4891-2258-9554.v1

284.    Based on the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

285.    Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.    NO SAFE HARBOR

286.    The federal statutory "safe harbor" for certain forward-looking statements that are accompanied by meaningful, cautionary language does not apply to any of the allegedly false and misleading statements pleaded here.   Many of the specific statements pleaded here were not identified as "forward-looking statements" when made.   And, in any case, any "forward-looking" statements were not accompanied by meaningful, cautionary language.   To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from any forward-looking statement.   This type of cautionary language was absent from Dentsply's Class Period public disclosures.

287.    The Company's rote risk warnings failed to meaningfully warn the market of the risks detailed here.   They were not meaningfully different quarter-to-quarter, they failed to disclose that certain risks had already begun to materialize, and they altogether failed to disclose other risks. Accordingly, the "cautions" were untethered from known problems at hand, which rendered them meaningless.   Further, given that Defendants were embroiled in some of the circumstances about which they warned, and Defendants had adverse knowledge undermining the warnings, the risk warnings were themselves false and misleading, and they do not shield Defendants from liability.

288.    Moreover, Defendants are liable for any forward-looking statements pleaded here because, at the time each was made, the speaker knew it was false or misleading for the reasons discussed in this Complaint, and/or because the statement was authorized or approved by an executive officer of Dentsply who knew that it was false or misleading.

## X.    CLASS ACTION ALLEGATIONS

289.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased Dentsply common stock during the Class Period, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

290.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Dentsply common stock was actively traded on the Nasdaq, with 218.4 million shares outstanding as of December 31, 2021.  While the exact number of Class members can be determined only by appropriate discovery, Plaintiffs believe that there are likely thousands of Class members that are geographically dispersed, if not more.  Record owners and other members of the Class may be identified from records maintained by Dentsply or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

291.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

292.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained competent counsel with extensive experience in class action securities litigation. Plaintiffs have no material interests antagonistic to or in conflict with those of the Class.

293.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

294.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Defendants' publicly disseminated statements to the investing public during the Class Period omitted and/or misrepresented material facts;

(c)    whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(d)    whether the price of Dentsply common stock was artificially inflated during the Class Period due to the material nondisclosures and/or misrepresentations alleged herein; and

(e)    to what extent the members of the Class have sustained damages, and if so, the appropriate measure of damages.

4891-2258-9554.v1

XI.    **CLAIMS FOR RELIEF**

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

295.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

296.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 by:

(a)    employing devices, schemes, and artifices to defraud;

(b)    making untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaging in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and other members of the Class in connection with their purchases of Dentsply common stock.

297.    Pursuant to the above wrongful course of conduct, each of the Defendants participated directly or indirectly in: (a) a scheme to defraud; and (b) the preparation and/or issuance of the quarterly and annual reports, SEC filings, releases, and other statements described above, including statements made to securities analysts and the media that were designed to influence the market for Dentsply common stock.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Dentsply's operations, finances, and business prospects.

298.    By virtue of their positions at Dentsply, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants

- 124 -

acted with such reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions were committed willfully or with reckless disregard for the truth.

299.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Dentsply, Defendants had knowledge of the details of Dentsply's internal affairs.

300.    Defendants are directly and indirectly liable for the wrongs complained of herein. Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Dentsply.  As officers and/or directors of a publicly held company, Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Dentsply's businesses, operations, future financial condition, and future prospects.  As a result of Defendants' misconduct, the market price of Dentsply stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Dentsply's true business and financial condition, which were concealed by the Individual Defendants, Plaintiffs and other members of the Class purchased or otherwise acquired Dentsply common stock at artificially inflated prices and in doing so relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by the Individual Defendants, and were damaged thereby.

301.    During the Class Period, Dentsply common stock was traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Dentsply common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired it at the inflated prices paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Dentsply common stock was substantially lower than the prices paid by members of the Class. The market price of Dentsply common stock declined upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

302.    By reason of the conduct alleged herein, Defendants have knowingly or recklessly, directly or indirectly, violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

303.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

304.    During the Class Period, the Individual Defendants participated in and oversaw the operation and management of Dentsply, and conducted and participated, directly and indirectly, in the conduct of Dentsply's business affairs. Each of the Individual Defendants exercised control over Dentsply's operations and possessed the power to control, and did control, the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

305.    Each of the Individual Defendants acted as controlling persons of Dentsply within the meaning of §20(a) of the Exchange Act. By virtue of their senior management positions as officers and/or directors of Dentsply, their participation in and awareness of the Company's

operations, and their personal knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, Dentsply's decision-making, including the content and dissemination of the allegedly false and misleading statements and other acts in furtherance of a fraudulent scheme.

306.    In particular, as the CEO (Casey), CFO (Gomez), and CAO (Chadha), each of these defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions, business, and/or accounting practices, and deficient control environment giving rise to the securities violations alleged in Count I, and exercised that power.

307.    Dentsply had the power to control and influence the Individual Defendants and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations.  By virtue of the foregoing, Dentsply had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants, including the content of their public statements.

308.    As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases and/or acquisitions of Dentsply's common stock during the Class Period when the relevant truth was revealed.

309.    By reason of the foregoing, the defendants named in this count violated §20 of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Federal Rule of Civil Procedure 23 and designating Lead Counsel as Class Counsel;

B.      Awarding Plaintiffs and other members of the Class damages together with interest thereon;

C.      Awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees, and other costs and disbursements; and

D.      Awarding Plaintiffs and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  July 28, 2023                     ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          LUKE O. BROOKS (admitted *pro hac vice*)
                                          HILLARY B. STAKEM (admitted *pro hac vice*)
                                          NICOLE Q. GILLILAND (admitted *pro hac vice*)


                                          _____
                                                  s/ Luke O. Brooks
                                                LUKE O. BROOKS

                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)
                                          lukeb@rgrdlaw.com
                                          hstakem@rgrdlaw.com
                                          ngilliland@rgrdlaw.com

4891-2258-9554.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel for Lead Plaintiff Wayne
County Employees' Retirement System

- 129 -

CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

City of Birmingham Retirement and Relief System ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Marechal v. Acadia Pharmaceuticals Inc.*, No. 3:21-cv-00762 (S.D. Cal.)
*Parot v. Clarivate plc*, No. 1:22-cv-00394 (E.D.N.Y.)
*City of North Miami Beach Police Officers' and Firefighters' Retirement Plan v. Barclays PLC*, No. 1 :22-cv-08172 (S.D.N.Y.)
*Hiebert v. Virtu Financial, Inc.*, No. 1:23-cv-03770 (E.D.N.Y.)

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of July, 2023.

City of Birmingham Retirement and Relief System

By: _____
Jay P. Turner, Assistant City Attorney

DENTSPLY

### SCHEDULE A

### SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 07/29/2021 | 8,470 | $65.47 |
| 07/30/2021 | 33,530 | $66.11 |
| 08/05/2021 | 11,350 | $59.76 |
| 08/23/2021 | 7,450 | $60.00 |
| 10/14/2021 | 9,400 | $56.77 |
| 10/15/2021 | 1,600 | $57.80 |
| 10/26/2021 | 500 | $57.11 |
| 11/11/2021 | 7,100 | $54.53 |
| 03/18/2022 | 8,700 | $48.48 |
| 05/31/2022 | 11,900 | $39.40 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 09/09/2021 | 3,800 | $62.58 |
| 01/11/2022 | 500 | $55.64 |
| 01/18/2022 | 1,600 | $53.16 |
| 01/18/2022 | 3,800 | $52.62 |
| 02/10/2022 | 1,600 | $55.13 |
| 04/27/2022 | 2,500 | $40.20 |

Prices listed are rounded up to two decimal places.

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

El Paso Firemen & Policemen's Pension Fund ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*McLeod v. InnovAge Holding Corp.*, No. 1:21-cv-02770 (D. Colo.)
*Rose v. Butterfly Network, Inc. f/k/a Longview Acquisition Corp.*, No. 2:22-cv-00854 (D.N.J.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ⎯22nd⎯ day of July, 2023.

El Paso Firemen & Policemen's Pension Fund

By: _____

Tyler C. Grossman, Executive Director

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 07/19/2021 | 5,900 | $60.41 |
| 07/21/2021 | 1,400 | $63.67 |
| 07/22/2021 | 1,100 | $63.17 |
| 07/23/2021 | 200 | $63.43 |
| 07/23/2021 | 800 | $63.42 |
| 07/23/2021 | 1,170 | $63.58 |
| 07/26/2021 | 2,410 | $63.50 |
| 07/27/2021 | 20 | $63.77 |
| 07/28/2021 | 1,870 | $64.79 |
| 07/29/2021 | 600 | $65.16 |
| 07/29/2021 | 2,330 | $65.33 |
| 07/30/2021 | 1,300 | $66.25 |
| 08/03/2021 | 3,400 | $65.19 |
| 08/04/2021 | 3,800 | $64.23 |
| 08/05/2021 | 7,150 | $59.24 |
| 08/12/2021 | 1,230 | $58.99 |
| 08/13/2021 | 1,500 | $58.58 |
| 08/16/2021 | 60 | $58.91 |
| 10/14/2021 | 1,590 | $56.90 |
| 10/15/2021 | 2,430 | $57.65 |
| 10/18/2021 | 300 | $56.40 |
| 10/18/2021 | 2,580 | $56.46 |
| 11/11/2021 | 4,600 | $54.55 |
| 03/18/2022 | 5,700 | $48.59 |
| 05/27/2022 | 2,320 | $39.53 |
| 05/31/2022 | 7,430 | $39.43 |
| 11/07/2022 | 2,120 | $27.79 |
| 11/08/2022 | 5,680 | $28.24 |
| 11/09/2022 | 4,210 | $28.78 |
| 11/11/2022 | 2,940 | $32.05 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 11/22/2021 | 600 | $52.44 |
| 12/27/2021 | 900 | $55.51 |
| 02/23/2022 | 1,200 | $55.83 |
| 07/26/2022 | 2,700 | $35.54 |
| 08/19/2022 | 400 | $35.68 |

Prices listed are rounded up to two decimal places.

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Monroe County Employees' Retirement System v. AstraZeneca plc*, No. 1:21-cv-00722 (S.D.N.Y.)
*Genesee County Employees' Retirement System v. FirstCash Holdings, Inc.*, No. 4:22-cv-00033 (N.D. Tex.)
*Ciarciello v. Bioventus Inc.*, No. 1:23-cv-00032 (M.D.N.C.)
*In re Sotera Health Company Sec. Litig.*, No. 1:23-cv-00143 (N.D. Ohio)

(b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Schaeffer v. Signature Bank, No.* 1:23-cv-01921 (E.D.N.Y.)

(c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*City of Hollywood Police Officers' Retirement System v. Citrix Systems, Inc.*, No. 0:21-cv-62380 (S.D.Fla.)
*Collinsville Police Pension Board v. Discovery, Inc.*, No. 1:22-cv-08171 (S.D.N.Y.)
*Def. Ben. Plan of the Mid-Jer. Truck. Ind. & Team. Loc. 701 Pen. & Ann. v. PayPal Hold., Inc.*, No. 3:22-cv-05864 (D.N.J.)
*City of Warwick Retirement System v. Catalent, Inc.*, No. 3:23-cv-01108 (D.N.J.)

DENTSPLY

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of July, 2023.

WAYNE COUNTY EMPLOYEES'
RETIREMENT SYSTEM

By: _____

Gerard Grysko, Deputy Director

- 2 -

DENTSPLY

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 07/19/2021 | 2,500 | $60.41 |
| 07/21/2021 | 600 | $63.67 |
| 07/22/2021 | 500 | $63.17 |
| 07/23/2021 | 400 | $63.42 |
| 07/23/2021 | 490 | $63.58 |
| 07/26/2021 | 1,010 | $63.50 |
| 07/28/2021 | 780 | $64.79 |
| 07/29/2021 | 300 | $65.16 |
| 07/29/2021 | 920 | $65.33 |
| 07/30/2021 | 600 | $66.25 |
| 08/03/2021 | 1,400 | $65.19 |
| 08/04/2021 | 1,600 | $64.23 |
| 08/05/2021 | 3,050 | $59.27 |
| 08/12/2021 | 510 | $58.99 |
| 08/13/2021 | 630 | $58.58 |
| 08/16/2021 | 30 | $58.91 |
| 10/14/2021 | 670 | $56.90 |
| 10/15/2021 | 1,020 | $57.65 |
| 10/18/2021 | 100 | $56.40 |
| 10/18/2021 | 1,110 | $56.46 |
| 11/05/2021 | 9,180 | $55.75 |
| 11/11/2021 | 1,900 | $54.55 |
| 12/01/2021 | 8,000 | $49.40 |
| 03/18/2022 | 2,600 | $48.59 |
| 05/27/2022 | 1,050 | $39.53 |
| 05/31/2022 | 3,350 | $39.43 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 06/21/2022 | 3,100 | $35.37 |
| 08/10/2022 | 15,090 | $37.14 |
| 08/11/2022 | 15,888 | $37.51 |
| 09/22/2022 | 1,282 | $29.58 |

Prices listed are rounded up to two decimal places.

*Opening position of 28,157 shares.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on July 28, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Luke O. Brooks
LUKE O. BROOKS

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Email: lukeb@rgrdlaw.com

4891-2258-9554.v1

# Mailing Information for a Case 1:22-cv-06339-JPC San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Javier Bleichmar**
  jbleichmar@bfalaw.com

- **Luke Orion Brooks**
  lukeb@rgrdlaw.com,kmccormack@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Nicole Quaid Gilliland**
  ngilliland@rgrdlaw.com

- **James Ormerod Heyworth , V**
  jheyworth@sidley.com,nyefiling@sidley.com,james-heyworth-0340@ecf.pacerpro.com

- **Nancy A. Kulesa**
  nancy@nkulesa.com

- **Seth L. Levine**
  slevine@levinelee.com,managingclerk@levinelee.com

- **Peter J. Mardian**
  pmardian@sidley.com,peter-mardian-6204@ecf.pacerpro.com,mgomezreichman@sidley.com,nyefiling@sidley.com

- **Joseph F. Murray**
  murray@mmmb.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

- **Hannah Elizabeth Ross**
  hannah@blbglaw.com,catherine@blbglaw.com,managingclerk@blbglaw.com

- **Ross Mitchell Shikowitz**
  rshikowitz@bfalaw.com

- **Hillary B. Stakem**
  hstakem@rgrdlaw.com

- **Andrew W. Stern**
  astern@sidley.com,andrew-stern-8481@ecf.pacerpro.com,nyefiling@sidley.com,ygarcia@sidley.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Alycia         N Broz**
Vorys Sayer Seymour & Pease LLP
52 East Gay Street
P. O. Box 1008
Columbus, OH 43216-1008

**John            C Camillus**
MEYER WILSON CO., LPA
305 W. Nationwide Blvd.
Columbus, OH 43215

**John            L Chaney**
Chaney & Drexel, LLC
One East Livingston Avenue
Columbus, OH 43215