**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAN ANTONIO FIRE AND POLICE PENSION FUND, CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, EL PASO FIREMEN & POLICEMEN'S PENSION FUND, and WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> DENTSPLY SIRONA INC., DONALD M. CASEY, JR., JORGE GOMEZ, and RANJIT S. CHADHA <br><br> Defendants. | Case No. 22-cv-06339-AS <br><br> <u>CLASS ACTION</u> <br><br> Oral Argument Requested |

**DEFENDANTS' OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>JOINT MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

                                                                                        **Page**

TABLE OF AUTHORITIES.................................................................................. iv

PRELIMINARY STATEMENT........................................................................... 1

FACTUAL BACKGROUND ............................................................................... 4

I.      The Parties.................................................................................................. 4

II.     Dentsply's Business and Relevant Operations During the
        Class Period............................................................................................... 5

III.    Dentsply Conducts an Internal Investigation ........................................... 6

IV.     Dentsply Announces the Findings of Its Internal Investigation and
        Restates Its Third Quarter and Year-End 2021
        Financial Statements.................................................................................. 7

V.      Plaintiffs' Claims....................................................................................... 9

PLEADING STANDARD.................................................................................... 10

ARGUMENT........................................................................................................ 12

I.      The AC Fails to Adequately Plead Scienter ........................................... 12

        A.      Plaintiffs Fail to Adequately Plead Motive and Opportunity
                to Commit Fraud .............................................................................. 13

        B.      Plaintiffs Fail to Allege Strong Circumstantial Evidence
                That Defendants Acted with Scienter ............................................. 15

                1.      The AC Fails to Allege Scienter Concerning Supply
                        Chain Disruptions ................................................................ 16

                2.      The AC Fails to Allege Scienter Concerning
                        Product Defects .................................................................... 17

                3.      The AC Fails to Allege Scienter Concerning the
                        Alleged Channel-Stuffing Scheme ....................................... 18

                4.      The AC Fails to Allege Scienter Concerning
                        Alleged Accounting Improprieties........................................ 21

**Page**

5. The AC Fails to Allege Scienter Concerning Alleged Misstatements Regarding the Company's Financial Performance ................................................. 23

6. The AC Fails to Allege Scienter Concerning Alleged Omissions ................................................. 24

7. Defendants' Departures from the Company Do Not Support Scienter ................................................. 25

8. The "Core Operations" Theory Does Not Support Scienter ................................................. 27

C. The AC Fails Even to Plead Individualized, Non-Conclusory Allegations as to Chadha ................................................. 28

II. The AC Fails to Adequately Plead That Many of the Alleged Misstatements Are Materially False or Misleading ................................................. 29

A. The AC Fails to Adequately Plead That Statements About the Supply Chain, Product Quality, and Product Sales Were False or Misleading ................................................. 29

B. Many of the Challenged Statements Are Non-Actionable Puffery ................................................. 30

C. Many of the Challenged Statements Are Non-Actionable Matters of Opinion ................................................. 33

III. The Amended Complaint Fails to Adequately Plead Loss Causation for All But One of the Alleged Corrective Disclosures ................................................. 35

A. The February 28, 2022 Announcement of Lower-Than-Expected Financials Is Neither a Partial Corrective Disclosure Nor a Materialization of Risk ................................................. 35

B. The April 19, 2022 Announcements Did Not Constitute Corrective Disclosures ................................................. 36

C. The May 10, 2022 Announcement of Late Filing and the Internal Investigation Does Not Constitute a Partial Corrective Disclosure ................................................. 37

D. No Loss Causation With Respect to Dentsply's November 14, 2022 Earnings Announcement ................................................. 38

IV. The AC Fails to Plead Control Person Liability ................................................. 39

**Page**

CONCLUSION.......................................................................................................    40

-iii-

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abuhamdan v. Blyth, Inc.*,
    9 F. Supp. 3d 175 (D. Conn. 2014).................................................................. 36

*Africa v. Jianpu Tech. Inc.*,
    No. 21-CV-1419 (JMF), 2023 WL 5432282 (S.D.N.Y. Aug. 23, 2023)..................... 26

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................... 10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)........................................................ 11, 14, 35, 40

*Building Trades Pension Fund of W. Penn. v. Insperity, Inc.*,
    No. 20 Civ. 5635, 2022 WL 784017 (S.D.N.Y. Mar. 15, 2022)................................ 22

*Carvelli v. Ocwen Fin. Corp.*,
    934 F.3d 1307 (11th Cir. 2019) ...................................................................... 25

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
    No. 11 CIV. 4665 PGG, 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)..................... 4, 39

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)........................................................................ 31, 33

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018)............................................................... 33

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)........................................................... 11, 13, 14

*Fort Worth Emps. Ret. Fund v. Biovail Corp.*,
    615 F. Supp. 2d 218 (S.D.N.Y. 2009)............................................................... 35

*Francisco v. Abengoa, S.A.*,
    624 F. Supp. 3d 365 (S.D.N.Y. 2022)............................................................... 27

*Freeman Grp. v. Royal Bank of Scot. Grp., PLC*,
    540 F. App'x 33 (2d Cir. 2013) ...................................................................... 34

**Page(s)**

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)........................................................ 13

*Gillis v. QRX Pharma Ltd.*,
    No. 15 Civ. 4868 (PAE), slip op. (S.D.N.Y. July 6, 2016)........................................ 34

*Gregory v. ProNAi Therapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018)........................................................ 34, 35

*In re Aegean Marine Petrol. Network, Inc. Sec. Litig.*,
    529 F. Supp. 3d 111 (S.D.N.Y. 2021)........................................................ 12

*In re AOL Time Warner, Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007)........................................................ 39

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005)........................................................22, 23, 26

*In re Braskem S.A. Sec. Litig.*,
    246 F. Supp. 3d 731 (S.D.N.Y. 2017)........................................................ 33

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)........................................................2, 20, 23

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004)........................................................ 22

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009)........................................................ 12

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013)........................................................ 31, 33, 37, 39

*In re Hansen Nat. Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007)........................................................ 38

*In re Iconix Brand Grp., Inc.*,
    No. 15 Civ. 4860 (PGG), 2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017)..................... 23

*In re Initial Pub. Offering Sec. Litig.*,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005)........................................................ 37

*In re Inv. Tech. Grp., Inc., Sec. Litig.*,
    No. 15 Civ. 6369, 2018 WL 1449206 (S.D.N.Y. Mar. 23, 2018)...........................18, 21, 24

**Page(s)**

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).............. 14

*In re Mylan N.V. Sec. Litig.*,
No. 16-CV-7926 (JPO), 2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023) ..................... 39

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ................................................................................. 25

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)................................................................................. 37, 39

*In re Plug Power, Inc. Sec. Litig.*,
No. 21 Civ. 2004 (ER), 2022 WL 4631892 ............................................................ 22

*In re PXRE Grp., Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009) ................................................................. 16, 18

*In re Skechers USA, Inc. Sec. Litig.*,
No. 18 Civ. 8039 (NRB), 2020 WL 1233759 (S.D.N.Y. Mar. 12, 2020)................... 35

*In re Sotheby's Holdings, Inc.*,
No. 00 Civ. 1041(DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ..................... 20

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011)....................................................................... 15

*In re Xerox Corp. Sec. Litig.*,
935 F. Supp. 2d 448 (D. Conn. 2013), *aff'd sub nom. Dalberth v. Xerox Corp.*, 766
F.3d 172 (2d Cir. 2014)........................................................................................ 39

*Jackson v. Abernathy*,
960 F.3d 94 (2d Cir. 2020)................................................................................. *passim*

*Janbay v. Canadian Solar, Inc.*,
No. 10 CIV. 4430 RWS, 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012)................... 36, 38

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001).......................................................................... 14, 15, 16, 28

*Katyle v. Penn Nat. Gaming, Inc.*,
637 F.3d 462 (4th Cir. 2011)................................................................................. 37, 38

**Page(s)**

*Kurtzman v. Compaq Comput. Corp.*,
    No. Civ. A. H–99–779, 2002 WL 32442832 (S.D. Tex. Mar. 30, 2002)....................26

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)...................................................................................35

*Macquarie Infrastructure v. Moab Partners, L.P.*,
    No. 22-1165, 2023 WL 6319659 (U.S. Sept. 29, 2023)...........................................25

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
    No. 19 CIV. 7536 (NRB), 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021), *aff'd*, 49
    F.4th 790 (2d Cir. 2022) *and aff'd*, 54 F.4th 82 (2d Cir. 2022)................................27

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
    No. 21-2524, 2022 WL 17815767 (2d Cir. 2022).....................................................25

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).......................................................................13, 15, 16, 22

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd*, 771 F. App'x 51 (2d Cir. 2019)............31, 32

*Okla. Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019).......................................................................10, 20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)................................................................................................33

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)....................................................................................25

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021).......................................................................................31

*Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc.*,
    645 F. Supp. 2d 210 (S.D.N.Y. 2009)......................................................................36

*Rapoport v. Asia Elecs. Holding Co.*,
    88 F. Supp. 2d 179 (S.D.N.Y. 2000)........................................................................4

*Reilly v. U.S. Physical Therapy, Inc.*,
    No. 17 Civ 2347 (NRB), 2018 WL 3559089 (S.D.N.Y. July 23, 2018)...................14

**Page(s)**

*Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*,
No. 21-CV-9582 (ALC)(OTW), 2023 WL 2711342 (S.D.N.Y. Mar. 30, 2023)......... 29

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)................................................................30, 31, 32

*Rotunno v. Wood*,
No. 22-502, 2022 WL 14997930 (2d Cir. Oct. 27, 2022)......................... 16

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009)......................................................... 15

*S.E.C. v. Espuelas*,
698 F. Supp. 2d 415 (S.D.N.Y. 2010)....................................... 20

*Schwab v. E\*TRADE Fin. Corp.*,
258 F .Supp. 3d 418 (S.D.N.Y. 2017)........................................ 27

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)................................................. 24, 25

*Sun v. Tal Educ. Grp.*,
No. 22-cv-01015, 2023 WL 6394413 (S.D.N.Y. Sept. 29, 2023)............... 29

*Thomas v. Shiloh Indus., Inc.*,
No. 15-cv-7449 (KMW), 2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017)................... 15

*Tongue v. Sanofi*,
816 F. 3d 199 (2d Cir. 2016)........................................... 33

*Tyler v. Liz Claiborne, Inc.*,
814 F. Supp. 2d 323 (S.D.N.Y. 2011)..................................... 27

*Wallace v. Intralinks*,
No. 11 CV 8861 (TPG), 2013 WL 1907685 (S.D.N.Y. May 8, 2013)...................... 27

*Wilson v. Merrill Lynch & Co.*,
671 F.3d 120 (2d Cir. 2011).............................................. 4

*Woodley v. Wood*,
No. 20-CV-2357, 2022 WL 103563 (S.D.N.Y. Jan. 11, 2022)................................ 28

**Page(s)**

**Rules and Statutes**

15 U.S.C. § 78u-4 ................................................................................................ 1, 11

Fed. R. Civ. P. 9(b) ............................................................................................. 1, 11

17 C.F.R. § 229.303(a) ....................................................................................... 25, 31

Defendants Dentsply Sirona Inc. ("Dentsply" or the "Company"), Donald M. Casey, Jr., Jorge Gomez, and Ranjit S. Chadha (collectively, "Defendants") respectfully submit this omnibus memorandum of law in support of their joint motion, pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA"), to dismiss with prejudice the amended class action complaint (the "AC") filed by Plaintiffs City of Birmingham Retirement and Relief System, El Paso Firemen & Policemen's Pension Fund, and Wayne County Employees' Retirement System ("Plaintiffs") for failure to state a claim.

## PRELIMINARY STATEMENT

Dentsply is the largest manufacturer of professional dental products and technologies in the world, generating over $4 billion in revenue and over $400 million in net income in 2021. In May 2022, Dentsply announced that the Audit and Finance Committee of its Board of Directors ("Audit Committee") was conducting an internal investigation concerning "the use of incentives to sell products to distributors in the third and fourth quarters of 2021" and whether those incentives were properly accounted for and disclosed. Approximately six months later, in November 2022, Dentsply announced that, following its investigation, the Audit Committee had concluded "there was no evidence of intentional wrongdoing or fraud" on the part of senior management. The Audit Committee identified only "two insignificant accrual errors" affecting just 0.5% of net sales and 2.4% of net income; the Company restated its third-quarter and year-end 2021 financial statements (the "Restatement") and amended certain of its disclosures regarding inventory levels at its distributors.

The AC attempts to convert Dentsply's Restatement and limited amended disclosures into a securities fraud claim against the Defendants. But it is well-settled that a restatement

alone does not give rise to a securities fraud claim. *See, e.g.*, *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 565 (S.D.N.Y. 2004). And there is nothing distinctive about the Restatement here that turns it into a viable claim. The AC should thus be dismissed for multiple independent reasons:

*First*, even if the Restatement supported allegations of falsity, Plaintiffs fail to adequately allege scienter. As noted, the investigation on which the AC heavily relies concluded there was no evidence of intentional misconduct, wrongdoing, or fraud. And the AC does not plead anything to show otherwise. Plaintiffs fail to allege motive or opportunity—their allegations that Casey and Gomez (Dentsply's former Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively) would receive more incentive compensation if Dentsply's stock price went up is true of virtually every public company officer and has been repeatedly rejected as a basis for alleging scienter. Nor do Plaintiffs adequately allege strong circumstantial evidence of conscious misbehavior or recklessness. While Plaintiffs spend much of the AC detailing alleged accounting errors, they fail to show that anyone whose knowledge can be imputed to the Company knew of these errors, let alone made them knowingly or intentionally. Plaintiffs' attempt to make up for this fatal deficiency by pointing to the departures of senior executives fails because the documents incorporated by reference into the AC show there was no finding that any of these executives engaged in fraud or intentional wrongdoing, nor do Plaintiffs plead any other facts to indicate that the departures of these executives were linked to any wrongdoing, let alone any intentional misconduct. Finally, there is nothing about the two small accrual errors in the Restatement, which were particularly negligible in the context of annual net sales exceeding $4 billion and net income exceeding $400 million, that supports a strong inference of scienter. The AC should be dismissed for this reason alone.

2

*Second*, the AC also fails to allege that the vast majority of the nearly 60 alleged misstatements identified in the AC were materially false or misleading. The AC purports to challenge a series of statements concerning the Company's supply chain, dealer inventory, and product sales, but they have nothing to do with the Company's internal investigation or Restatement, and the AC does not allege any facts with particularity showing how those statements were materially false or misleading. The AC also points to findings of the Audit Committee's investigation concerning wrongdoing at the company's China subsidiary, but fails to allege that such issue was material—it was not, as it was at most a $4 million issue for a $4 billion company. Further, many other of the challenged statements—about the Company's year-to-date performance, supply chain and dealer inventory issues, and strong governance policies—are merely puffery or opinion, and not actionable.

*Third*, the AC also fails to allege loss causation as to all but one of the alleged corrective disclosure dates. The AC claims there were five dates on which corrective information led to stock drops that reflect damages, but four of them have nothing to do with the alleged fraud, do not correct any prior challenged statement, and are not plausibly alleged to be a materialization of an undisclosed risk. Those dates should be excluded now as not adequately pleaded.

*Finally*, given their failure to plead a primary claim, Plaintiffs also fail to plead a control person claim under Section 20(a) against any Individual Defendant.

For these reasons, the AC should be dismissed in its entirety with prejudice.

**FACTUAL BACKGROUND**[1]

## I.      The Parties

Plaintiffs purport to bring this action on behalf of purchasers of Dentsply's securities between June 9, 2021 and November 13, 2022 (the "Class Period"). AC ¶ 1. Dentsply is "the world's largest manufacturer of professional dental products and technologies." Ex. 11, Form 10-K for Fiscal Year 2022 at 3.[2] Headquartered in Charlotte, North Carolina, Dentsply conducts business across the United States and in "over 150 foreign countries, principally through its foreign subsidiaries." *Id.* at 3.

Defendant Casey served as Dentsply's CEO and a member of the Dentsply Board of Directors from February 2018 through May 2022. Ex. 4, Form 8-K at 2. Defendant Gomez served as Dentsply's CFO and Executive Vice President from August 2019 through April 2022. Ex. 1, Form 8-K at 2; Ex. 3, Form 8-K at 2. Defendant Chadha served as Dentsply's Chief

---

[1] For purposes of this motion, Defendants accept as true the AC's well-pleaded allegations, "together with those documents . . . incorporated in it by reference and matters of which judicial notice may be taken." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 123 (2d Cir. 2011) (internal citations and quotation marks omitted). The Court may consider any document "where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11 CIV. 4665 PGG, 2014 WL 4832321, at *12 (S.D.N.Y. Sept. 29, 2014) (internal citations and quotation marks omitted). The Court "may also consider legally required public disclosure documents filed with the SEC." *Id.* (internal citations and quotation marks omitted). Where such documents "contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint." *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

[2] Unless indicated otherwise, citations to "Ex." are to the exhibits attached to the Declaration of Roger Cooper, dated October 10, 2023.

Accounting Officer ("CAO") and Principal Accounting Officer from August 2020 through August 2022. Ex. 2, Form 8-K at 2; Ex. 5, Form 8-K at 2.[3]

## II.    Dentsply's Business and Relevant Operations During the Class Period

In 2021, Dentsply generated $4.2 billion in net sales and $411 million in net income. Ex. 10, Form 10-K/A for Fiscal Year 2021 at 53, 66–67. During the Class Period, the Company had two business segments: (1) technologies and equipment ("T&E") and (2) consumables. Ex. 11, Form 10-K for Fiscal Year 2022 at 3. The T&E segment, which comprised about 60% of the Company's global net revenues, consisted of five product categories: dental equipment and instruments, implants, dental computer-aided design/computer-aided manufacturing ("CAD/CAM"), orthodontics, and healthcare. *Id.* at 4–5. The consumables segment, which comprised about 40% of global net revenues, consisted of two product categories: endodontic and restorative products, and other consumables. *Id.* at 5. Dentsply distributes many of its products through third-party distributors, the largest of which are Henry Schein, Inc. ("Henry Schein") and Patterson Companies, Inc. ("Patterson"), which provide sales and service support to end-user customers such as dental offices. *Id.* at 6, 12. Although sales to Henry Schein and Patterson are at the center of the scheme alleged in the AC, for fiscal year 2021, neither distributor accounted for more than 10% of Dentsply's total consolidated net sales. Ex 10, Form 10-K/A for Fiscal Year 2021 at 38; AC ¶¶ 6, 39, 50, 55, 60–61, 67, 74.

Like virtually all dental supply companies, Dentsply experienced certain supply chain constraints during the COVID-19 pandemic. Ex. 9, Form 10-K for Fiscal Year 2021 at 35. The

---

[3] The AC refers to an administrative action initiated by the U.S. Securities and Exchange Commission and a separate class action lawsuit brought against the Company before the initiation of this action. *See* AC at 1 n.1 (citing *Dentsply Sirona Inc.*, File No. 3-20170 (SEC Admin. Proc.); *In re Dentsply Sirona, Inc. Sec. Litig.*, No. 1:18-cv-07253-NG-PK (E.D.N.Y.)). These proceedings arise from conduct by Dentsply's management team between February 2014 and August 2020, which occurred before the Individual Defendants joined the Company.

Company closely monitored and disclosed these issues throughout 2021. It explained in its publicly filed quarterly report for the third quarter of 2021 that "[t]he Company continues to monitor the impact of global supply chain issues related to the pandemic. . . . Although the Company has experienced an increase in supply chain related costs including freight and shipping rates during the first nine months of 2021, these have not yet resulted in a material impact to the results of operations." Ex. 7, Form 10-Q for Third Quarter 2021 at 32. In early 2022, Dentsply disclosed that the issues were becoming more pronounced and "suppressed . . . organic growth by approximately 2 to 3 points" due to "acute supply chain and COVID-related constraints." Ex. 12, J. Gomez, Earnings Call Tr. at 5.

## III.    Dentsply Conducts an Internal Investigation

On May 10, 2022, Dentsply announced that its Audit Committee had commenced an internal investigation into "allegations regarding certain financial reporting matters" (the "Internal Investigation"). Ex. 13, Form 12b-25 at 2. Consequently, the Company announced it would be unable to timely file its quarterly report for the first quarter of 2022. *Id.*

The Internal Investigation looked into (1) whether the Company had used "incentives to sell products to distributors in the third and fourth quarters of 2021 and whether those incentives were appropriately accounted for and the impact of those sales was adequately disclosed in the Company's periodic reports filed with the Securities and Exchange Commission" and (2) "allegations that certain former and current members of senior management directed the Company's use of these incentives and other actions to achieve executive compensation targets in 2021." *Id.* at 3. To assist in its investigation, the Audit Committee retained "independent outside counsel" and a "forensic accounting firm." *Id.* The Company also "voluntarily contacted the SEC to advise it that an internal investigation [was] underway," and the Audit

6

Committee represented that it "intend[ed] to provide additional information to the SEC as the investigation proceed[ed]." *Id.*

In a later released statement, the Company announced that the Audit Committee also (1) engaged in "a separate but concurrent review . . . of the accounting for various customer incentive arrangements unrelated to the transactions subject to the internal investigation" (the "Accounting Review") and (2) expanded the scope of the investigation "to analyze the increase in returns of products in China during the fourth quarter of 2021" (the "China Investigation"). Ex. 6, Form 8-K at 1–2.[4]

**IV.    Dentsply Announces the Findings of Its Internal Investigation and Restates Its Third Quarter and Year-End 2021 Financial Statements**

Nearly eight months after the Internal Investigation was commenced, on November 1, 2022, the Company issued a press release announcing the findings and conclusions of the investigation. *See* Ex. 6, Form 8-K at 2.

The Audit Committee first "concluded that there was no evidence of intentional wrongdoing or fraud," and identified no intentional misstatements by the Company or senior management. *Id.* at 3. The Audit Committee also found no link between Defendants Casey and Gomez and the use of incentives to achieve compensation targets. *Id.* (finding no "evidence that [Defendants Casey and Gomez] specifically directed the Company's use of incentives to achieve executive compensation targets in 2021"). The Audit Committee, rather, determined that Casey and Gomez, among others, had violated the Company's Code of Ethics and Business Conduct. *Id.*

---

[4] During the course of the Internal Investigation, Casey, Gomez, and Chadha ceased to be employed by Dentsply. None were terminated based on a finding that they had engaged in intentional wrongdoing or fraud.

The Audit Committee did identify "instances in which the Company's distributors in North America were offered incremental incentives [by lower level employees] . . . to purchase products in order for the Company to attempt to meet certain internal sales targets in the third and fourth quarters of 2021." *Id.*  The Audit Committee identified just two "insignificant accrual errors" resulting from these incremental incentives and related sales, noting that the use of incentives and sales "contributed to the Company's ability to meet external financial analyst expectations in the third quarter of 2021." *Id.*  Consequently, it concluded that net sales and net income were originally overstated for the third quarter of 2021 by $35 million and $27 million, respectively—just 1.2% of overall net sales and 9.2% of net income for the quarter.  *Id.* at 4.  It concluded that net sales and net income were also overstated in the Company's financial statements for the fiscal year ended 2021, but by just approximately $20 million and $10 million, respectively.  This was just 0.5% of overall net sales and 2.4% of net income for the year.  *Id.* The Company corrected these errors when it issued an amended Form 10-Q for the nine-month period ended September 30, 2021 and an amended Form 10-K for the fiscal year 2021 ("2021 10-K/A").  *See* Ex. 8, Form 10-Q/A for Third Quarter 2021 at 9; Ex. 10, Form 10-K/A for Fiscal Year 2021 at 53.  The Company further revised its disclosures for the third quarter of 2021 concerning sales increases to say:

> The increase in organic sales was attributable to increased volumes in both the Technologies & Equipment and Consumables segments due to a recovery in demand from the impact of the COVID-19 pandemic, sales attributed to recent product launches, and a **timing-related** increase of sales to dealers **in the United States** in the third quarter. **These increases in sales to dealers were due to incremental pricing incentives, as well as purchases** ahead of annual price increases, which previously occurred in the fourth quarter of 2020.

Ex. 8, Form 10-Q/A for Third Quarter 2021 at 45 (emphasis added).  With the exception of these limited accounting errors, the Audit Committee determined that "sales were properly recorded in

each of the respective periods in accordance with" applicable accounting standards. Ex. 6, Form 8-K at 3.

With respect to the China Investigation, the Audit Committee found that the failure to appropriately account for certain returns and exchanges resulted in an overstatement of net sales in the Company's third quarter 2021 financial statements of about $4 million, which should have been recorded for the fourth quarter of 2021. *See id.* This was subsequently corrected in the 2021 10-K/A. *See id.*; Ex. 10, Form 10-K/A for Fiscal Year 2021 at 53.

Although quantitatively immaterial, the Company determined through its Accounting Review that mistakes in the previously issued numbers were qualitatively material "when considered together with certain qualitative and quantitative considerations such as the fact that the misstatements masked a failure to meet internal financial targets and external financial analyst expectations for the three months ended September 30, 2021 and due to the material weaknesses identified through the course of the Audit and Finance Committee's investigation." Ex. 8, Form 10-Q/A for Third Quarter 2021 at 9. But this finding was limited to the one quarter. And the Company did not issue any restated financials other than those for the third quarter of 2021 and the 2021 fiscal year.

## V.    Plaintiffs' Claims

Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") against each of the Defendants, and under Section 20(a) against each of the Individual Defendants. AC ¶¶ 295–309. Plaintiffs allege that in late 2021, purportedly under pressure from Casey and Gomez, Dentsply employees engaged in "channel stuffing" to artificially inflate sales. AC ¶¶ 43–71. Plaintiffs assert that Casey and Gomez were motivated to maximize Dentsply's 2021 financial results because their 2021 compensation was tied to Dentsply revenues. AC ¶¶ 211–26. Plaintiffs allege that, as a result, nearly 60 statements made

in Dentsply's public filings or by Casey and Gomez on a wide range of topics were materially false and misleading. AC ¶¶ 98–210. Finally, Plaintiffs claim that, even though the Company's Restatement adjusted net sales by just 2.7% for the three months ended September 30, 2021, 1.1% for the nine months ended September 30, 2021, and 0.5% for the 2021 fiscal year, *see* Ex. 8, Form 10-Q/A for Third Quarter 2021 at 10, 53, the purported class lost hundreds of millions of dollars as a result of the revelation of the alleged fraud over the course of five separate stock drops between February and November 2022. AC ¶¶ 261–82.

## PLEADING STANDARD

To survive a motion to dismiss, a complaint must contain "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted). Although the Court must accept as true all factual allegations in the AC, that "tenet" is "inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

To sufficiently plead a securities fraud claim, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Okla. Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 30 (S.D.N.Y. 2019) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008)).

Additionally, a securities fraud plaintiff faces two layers of heightened pleading requirements. First, "a complaint alleging securities fraud must satisfy" the particularity pleading requirements of Federal Rules of Civil Procedure 9(b), which require a plaintiff to "(1)

10

specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Second, "private securities fraud actions must also meet the PSLRA's pleading requirements." *Id.* at 99. The PSLRA demands that a complaint (1) "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed,'" *id.* (quoting 15 U.S.C. § 78u 4(b)(1)), and (2) "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (quoting 15 U.S.C. § 78u-4(b)(1)).

With respect to scienter, "'[w]hile [the Court would] normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *Id.* (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *ATSI*, 493 F.3d at 99 (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)).

Where, as here, "fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complained of by each defendant," and "[a] complaint may not simply clump defendants together in vague allegations" to meet these heightened pleading requirements. *In re Aegean Marine Petrol. Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 147 (S.D.N.Y. 2021)

11

(internal citations and quotation marks omitted). The "failure to isolate the key allegations against each defendant supports dismissal." *Id.* (internal citations and quotation marks omitted); *see also In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009) ("[G]uilt by association is impermissible."). And, when a defendant is a corporation, plaintiffs must plead facts giving rise to "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).

## ARGUMENT

While seeking to convert the Internal Investigation and related Restatement into a claim for securities fraud, the AC omits the findings from that investigation that are fatal to Plaintiffs' theories of liability—that there was "no evidence of intentional wrongdoing or fraud" by senior management, and that there was likewise no evidence that senior management "directed the Company's use of incentives to achieve executive compensation targets." Ex. 6, Form 8-K at 3. Plaintiffs have alleged no facts giving rise to a contrary inference. The AC instead presents allegations of mismanagement and "fraud by hindsight" that courts routinely reject, and therefore the AC should be dismissed in its entirety for failing to sufficiently plead scienter. In any event, Plaintiffs also fail to allege that the vast majority of the alleged misrepresentations were materially false or misleading, and fail to sufficiently plead loss causation as to all but one of the alleged corrective disclosure dates.

## I.    The AC Fails to Adequately Plead Scienter

Each of Plaintiffs' claims should be dismissed because Plaintiffs fail to meet the "stringent" standard of alleging "particular allegations" that give rise to "a strong inference of scienter," *ECA*, 553 F.3d at 196, which constitutes "an intent to deceive, manipulate or defraud,"

12

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000). To establish such intent, Plaintiffs must plead with particularity specific facts that either (1) show a "motive and opportunity" to defraud or (2) constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198; *see also Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (same). Here, the AC does not satisfy these standards and therefore it should be dismissed.

## A.   Plaintiffs Fail to Adequately Plead Motive and Opportunity to Commit Fraud

Plaintiffs' attempt to establish scienter by pleading that the Individual Defendants had motive and opportunity to commit fraud, AC ¶¶ 211–26, fails as a matter of law. To plead motive and opportunity, plaintiffs must allege that each defendant "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307–08. Typically, a plaintiff must show unusual stock sales or something similar. *See id.* ("This requirement [is] generally met when corporate insiders were alleged to have misrepresented . . . material facts about . . . performance . . . in order to keep the stock price artificially high while they sold their own shares at a profit."); *ECA*, 553 F.3d 201 (motive pleading requirement "is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at profit," not merely alleging "the desire for the corporation to keep stock prices high to increase officer compensation"). But Plaintiffs do not point to any stock sales—much less "unusual" ones—by any Individual Defendant (or any Dentsply officer) during the Class Period.

Here, by contrast, the gravamen of Plaintiffs' motive theory rests on Individual Defendants' executive compensation plans, which is insufficient as a matter of law. Specifically, Plaintiffs allege that Individual Defendants were motivated by a desire "to obtain the maximum bonus possible" and that the equity incentive plans "incentivized [them] to engage in the

13

fraudulent scheme alleged." AC ¶¶ 212–26. However, "a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers." *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (citing *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)); *see also ECA*, 553 F.3d at 201 ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated.") (internal citations and quotation marks omitted). "[E]ven multi-million dollar bonuses that plaintiffs alleged were directly tied to misstatements [a]re insufficient evidence of motive" because "general performance-based compensation . . . cannot form the basis for motive to commit securities fraud." *Reilly v. U.S. Physical Therapy, Inc.*, No. 17 Civ. 2347 (NRB), 2018 WL 3559089, at *12 (S.D.N.Y. July 23, 2018). In sum, Plaintiffs' allegations amount to generically pleading a "corporate profit" motive that applies in virtually all cases, and which does not support a pleading of scienter as a matter of law. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 573 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

Even were Plaintiffs' motive theory not foreclosed, Plaintiffs simply ignore the very facts demonstrating that such a theory is not "as compelling as any opposing inference" of non-fraudulent intent. *ATSI*, 493 F.3d at 9. Contrary to Plaintiffs' speculative characterization of Individual Defendants' executive compensation plans, the Audit Committee's investigation (on which the AC heavily relies for its truth) found there was no evidence that Individual Defendants engaged in conduct intended to manipulate Dentsply's earnings to achieve higher compensation. *See* Ex. 6, Form 8-K at 3 ("However, the North America Investigation did not find evidence that the former Chief Executive Officer and former Chief Financial Officer specifically directed the Company's use of incentives to achieve executive compensation targets in 2021."). Plaintiffs'

14

allegations surrounding motive are thus categorically insufficient and specifically contradicted by the very investigations on which Plaintiffs otherwise rely.

**B.    Plaintiffs Fail to Allege Strong Circumstantial Evidence That Defendants Acted with Scienter**

Plaintiffs' allegations of circumstantial evidence of scienter also fail. To plead scienter based on circumstantial evidence, Plaintiffs must allege facts showing (1) conscious misbehavior, i.e., "deliberate illegal behavior, such as securities trading by insiders," *Novak*, 216 F.3d at 308, or (2) recklessness, a "state of mind approximating actual intent and not merely a heightened form of negligence," *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal citations and quotation marks omitted), which encompasses "conduct so highly unreasonable that it constitutes an extreme departure from the standards of ordinary care, such that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," *Thomas v. Shiloh Indus., Inc.*, No. 15-cv-7449 (KMW), 2017 WL 1102664, at *3 (S.D.N.Y. Mar. 23, 2017) (internal citations and quotation marks omitted); *see also Kalnit*, 264 F.3d at 140 (same).

To demonstrate recklessness, Plaintiffs must allege that Defendants either (1) "knew facts or had access to information contradicting their public statements" or (2) "failed to review or check information they had a duty to monitor." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 351 (S.D.N.Y. 2011). Significantly, where, as here, "plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information," *Novak*, 216 F.3d at 309, and allege "that *specific* contradictory information was available to the defendants *at the same time* they made their misleading statements," *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (internal citations and quotation marks omitted).

15

Finally, because Plaintiffs failed to plead facts establishing motive and opportunity, the strength of their allegations of conscious misbehavior or recklessness must be "correspondingly greater" in order to support scienter. *Kalnit*, 264 F.3d at 142 ("Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."); *see also Rotunno v. Wood*, No. 22-502, 2022 WL 14997930, at *3 (2d Cir. Oct. 27, 2022) (same).

As set forth below, the AC should be dismissed because it pleads no particularized facts showing that Defendants had knowledge of, or access to, specific contradictory information at the time they made the alleged misrepresentations set forth in the AC.

1.    *The AC Fails to Allege Scienter Concerning Supply Chain Disruptions*

Plaintiffs allege that "Defendants knew or recklessly disregarded," at the time they made relevant public statements, *see* AC ¶¶ 100–108, information related to supply chain disruptions that contradicted Defendants' statements. *See* AC ¶¶ 99, 109. But the AC does not contain a single sufficiently specific allegation that any "contradictory information was available to the defendants at the same time they made" such statements. *In re PXRE Grp.*, 600 F. Supp. 2d at 536.

For example, the AC alleges that, due to "supply problems," "the distribution sales team was having inventory calls . . . every week" by the end of the third quarter of 2021, and "distribution team leaders were having 'shouting matches' about limited supply" by the fourth quarter of 2021. AC ¶ 53. However, Plaintiffs do not allege sufficiently specific facts demonstrating that the Individual Defendants (i.e., Dentsply's senior management at the time) received any reports from these meetings—which involved lower-level employees—that conflicted with the Defendants' subsequent statements. Plaintiffs do not describe with

16

particularity who reported any alleged contradictory information or the source of any such information, *see* AC ¶ 53—they therefore fail to "specifically identify [any] reports or statements containing [contrary] information" to which the Individual Defendants had access at the time they made any relevant public statements. *Id.* (internal quotation marks omitted).

Moreover, because Plaintiffs provide "no connective tissue between" the Individual Defendants' challenged misstatements and those lower-level employees who allegedly knew of information regarding supply chain problems that conflicted with public statements at the relevant time (but whose scienter cannot be imputed to Dentsply for purposes of a securities fraud claim), Plaintiffs necessarily fail to establish a strong inference of corporate scienter. *See Jackson*, 960 F.3d at 98–99 ("it is insufficient to 'separately allege misstatements by some individuals and knowledge belonging to some others where there is no strong inference that, in fact, there was a connection between the two'") (quoting *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 440–41 (S.D.N.Y. 2017)).

## 2. *The AC Fails to Allege Scienter Concerning Product Defects*

Plaintiffs similarly allege that "Defendants knew or recklessly disregarded," at the time they made relevant public statements, *see* AC ¶¶ 111–116, information related to product defects that contradicted Defendants' statements. *See* AC ¶¶ 110, 117. Here, again, the AC fails to set forth any specific allegations that Defendants knew or had access to information contradicting their public statements at the time they were made, *see* AC ¶¶ 46–52, and has "not identified any specific report or statement showing that [Defendants] learned of" the alleged defects prior to making the challenged statements, *In re Inv. Tech. Grp., Inc., Sec. Litig.*, No. 15 Civ. 6369, 2018 WL 1449206, at *5 (S.D.N.Y. Mar. 23, 2018).

Indeed, even the AC's conclusory allegations with respect to Defendants' knowledge of the alleged defects on their face fail to allege that any contradictory information was "available

17

to the defendants *at the same time* they made" the relevant statements.  *In re PXRE Grp.*, 600 F. Supp. 2d at 536; *see* AC ¶ 50 (alleging that on some *unspecified date*, Defendant Casey discussed product quality issues at a dinner); AC ¶ 52 (alleging that on some *unspecified dates*, Defendant Casey (1) received calls from unspecified people about product issues, and (2) occasionally attended meetings with unspecified Company employees that included discussion of product issues).

Moreover, again, without the necessary "connective tissue" between specific, non-conclusory allegations as to the Individual Defendants' knowledge of or access to any product defect–related information contradicting the challenged misstatements at the time the Individual Defendants made those statements (or such knowledge of any individual whose scienter could be imputed to the Company), Plaintiffs also fail to establish corporate scienter.  *See Jackson*, 960 F.3d at 98–99.

3.  *The AC Fails to Allege Scienter Concerning the Alleged Channel-Stuffing Scheme*

Plaintiffs' meritless securities fraud theory is largely premised on an alleged scheme to stuff the Company's distributor channels and conceal such channel-stuffing by engaging in accounting fraud.  *See* AC ¶ 55–81.  Significantly, while Plaintiffs point to the Internal Investigation and the Company's subsequent Restatement in an attempt to substantiate every element of their alleged securities fraud claims, *see, e.g.*, AC ¶¶ 2, 8, 18, 125, 130, 133, 146, 151, 158, 167, Plaintiffs simply ignore the Internal Investigation's findings that vitiate any reasonable inference that Defendants acted with fraudulent intent.

For example, the Audit Committee's North America investigation found "*no evidence of intentional wrongdoing or fraud*." Ex. 6, Form 8-K at 3 (emphasis added).  Moreover, although the investigation identified instances where the Company's North America distributors were

offered incremental incentives to purchase products as a means of "meet[ing] certain internal sales targets in the third and fourth quarters of 2021," the Audit Committee "*did not find evidence that [Casey and Gomez] specifically directed the Company's use of incentives to achieve executive compensation targets in 2021*." *Id.* (emphasis added). In other words, an independent investigation—spanning over seven months—uncovered no evidence of a scheme orchestrated by Defendants Casey and Gomez that would support any inference of scienter.

Plaintiffs try (unsuccessfully) to circumvent this fatal scienter deficiency by alleging, *inter alia*, (1) that the head of the North America regional commercial organization "told the distributor team to bridge the gap," AC ¶ 55; (2) that "Dentsply's marketing team" worked to "convince Patterson and Henry Schein to take on excess inventory," *id.* ¶ 60; (3) that the North America regional commercial team, the distribution team, and finance team, and distributors Patterson and Henry Schein engaged in discussions regarding incentives, *see id.* ¶¶ 61–62; and (4) that the head of the North America regional commercial organization "demanded that the distributor team obtain sales above actual inventory needs, then negotiated massive incentives to get Patterson and Henry Schein to make the orders." *Id.* ¶¶ 66–67.

But the AC contains no allegations that the Individual Defendants had knowledge of the above-referenced conduct of lower-level Dentsply employees at the time of their challenged statements, and Plaintiffs' bare assertions, *see, e.g.*, *id.* ¶¶ 55, 62, "that the defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports, without any further facts or details will not suffice to create a strong inference of scienter." *Okla. Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 36–37 (S.D.N.Y. 2019) (internal alterations and quotation marks omitted); *see also In re Sotheby's Holdings, Inc.*, No. 00 Civ.

19

1041(DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("[B]oilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on . . . board membership or executive positions are insufficient to plead scienter.").

Moreover, the AC does not attribute any of the alleged misstatements to these lower-level employees with alleged knowledge, leaving the Court to "guess what role those employees played in crafting or reviewing the challenged statements." *See Jackson*, 960 F.3d at 99. Nor can Plaintiffs supply the requisite "connective tissue" between the alleged actions of select lower-level employees and what was ultimately reported to Company management who made the alleged misstatements; thus, scienter cannot be imputed to Dentsply on this basis. *See id.* at 98–99.

In any event, even had the Internal Investigation found evidence that the Individual Defendants directed the use of incentives to reach targets (it did not), and even had Plaintiffs otherwise alleged facts demonstrating such knowledge (they did not), that would "contribute[] little to a strong inference of fraud because such actions are common practice." *S.E.C. v. Espuelas*, 698 F. Supp. 2d 415, 430 (S.D.N.Y. 2010) (internal quotation marks omitted); *see also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004) ("Offering incentives to meet sales or earnings goals is a common practice, and, without additional allegations not present here, the allegation that the sales at issue were made pursuant to incentives to meet goals set by management is an insufficient basis on which to infer conscious misbehavior or recklessness.")

Finally, Plaintiffs allege that, based on their alleged channel stuffing scheme, "Defendants knew or recklessly disregarded," at the time they made relevant public statements, *see* AC ¶¶ 119–24, information related to dealer inventory levels that contradicted Defendants'

20

statements. *See* AC ¶ 125. As discussed above, the AC contains no specific, non-conclusory allegations that Defendants had knowledge of the lower-level employees' complained-of conduct, and Plaintiffs again fail to precisely describe, as they are required to do, the source of the contradictory information. *See In re Inv. Tech. Grp.*, 2018 WL 1449206, at *5.

4.    *The AC Fails to Allege Scienter Concerning Alleged Accounting Improprieties*

As a preliminary matter, Plaintiffs' failure to sufficiently plead Defendants' fraudulent intent with respect to the alleged channel stuffing scheme renders meritless their related allegations that Defendants engaged in accounting fraud to "hide" the alleged channel stuffing as the source of "additional sales revenue." *See, e.g.*, AC ¶ 63.

In any event, the Audit Committee investigation's findings to which Plaintiffs selectively point—including, *inter alia*, that (1) there were inadequate processes in place for approving the incentives and maintaining or providing copies of agreements or arrangements with distributors to the accounting department; (2) the Company's independent registered accounting firm was not informed of these incremental incentive arrangements when auditing the 2021 consolidated financial statements; and (3) there were potential control deficiencies, *see* Ex. 6, Form 8-K at 2–4—are not actionable. Allegations that a company's processes or controls did not function as intended, or even were "inconsistent with [its] stated risk management policies and historical business practices," amount "to nothing more than a charge that [a] business was mismanaged," and "[s]uch allegations of mismanagement, even where a plaintiff claims that it would not have invested in an entity had it known of the management issues, are insufficient to support a securities fraud claim under section 10(b)." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375 (S.D.N.Y. 2004).

21

For similar reasons, with respect to the specific accounting issues the Company encountered and disclosed, "GAAP violations standing alone are insufficient to support a section 10(b) cause of action," because a "GAAP violation claim is fundamentally one challenging [a company's] management of its financial reporting function and does not allege the sort of fraudulent or deceptive conduct that is actionable under section 10(b)." *Id.* at 378; *see also In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 448 (S.D.N.Y. 2005) (finding that "misleading financial reports" were insufficient to establish conscious misbehavior or recklessness because such reports "could well be products of negligence or mismanagement" rather than fraud or recklessness).

At base, Plaintiffs ask this Court to infer that, because the Company's investigations and related Restatement ultimately identified issues with respect to the accounting treatment of customer incentives, the Individual Defendants must have known about such issues when making statements or signing certifications related to these issues. But courts have routinely "refused to allow plaintiffs to proceed with [such] allegations of 'fraud by hindsight.'" *Novak*, 216 F.3d at 309; *see also In re Plug Power, Inc. Sec. Litig.*, No. 21 Civ. 2004 (ER), 2022 WL 4631892, at *17 ("Courts in this district have rejected fraud-by-hindsight allegations of scienter simply based on the fact that there was a restatement."); *Building Trades Pension Fund of W. Penn. v. Insperity, Inc.*, No. 20 Civ. 5635, 2022 WL 784017, at *16 (S.D.N.Y. Mar. 15, 2022) ("Plaintiff does not point to any contradictory predictions, reports, or piece of information that defendants actually possessed that demonstrated their statements were false. Without these allegations, the mere inconsistency between the challenged statements and after-the-fact results amounts to nothing more than a claim of 'fraud by hindsight,' which the Second Circuit has held insufficient to plead scienter.") (internal citations and quotation marks omitted).

22

Accordingly, the mere fact that the financial statements were later determined to be incorrect and needing restatement does not show that anyone knew they were incorrect at the time they were initially issued, much less that Casey and Gomez knew of this simply because they signed them.

Finally, Plaintiffs' focus on the fact and extent of Dentsply's Restatement likewise does not render their claim actionable. *See, e.g.*, AC ¶ 86. Merely issuing a restatement does not create an inference of scienter. *See In re Bristol-Myers Squibb*, 312 F. Supp. 2d at 565 ("[A] Restatement of financial results . . . without corresponding fraudulent intent, [is] not sufficient to state a securities fraud claim . . . .") (citation omitted). Nor is the "magnitude and number of [Dentsply's] accounting errors" indicative of scienter. *In re Iconix Brand Grp., Inc.*, No. 15 Civ. 4860 (PGG), 2017 WL 4898228, at *18 (S.D.N.Y. Oct. 25, 2017); *see also In re BISYS*, 397 F. Supp. 2d at 447 (rejecting Plaintiffs' argument that "the size of the restatement alone constitutes strong evidence of scienter").

5.      *The AC Fails to Allege Scienter Concerning Alleged Misstatements Regarding the Company's Financial Performance*

Plaintiffs further allege that "Defendants knew or recklessly disregarded," at the time they made public statements related to the Company's financial performance, *see, e.g.*, AC ¶¶ 127–29, 132–34, 137–45, information purportedly contradicting those statements. *See, e.g.*, AC ¶¶ 130, 135, 145. However, Plaintiffs' allegations again lack the requisite specificity as to Defendants' knowledge of or access to contrary information at the time the relevant public statements or filings were made. *Compare* AC, Section IV, *with* AC ¶¶ 130, 135, 145; *see also In re Inv. Tech. Grp.*, 2018 WL 1449206, at *5 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." (internal quotation marks omitted)). Indeed, Plaintiffs' allegations improperly rely

23

on either (1) deficient allegations that Defendants were aware of lower-level employees' alleged knowledge and/or conduct related to channel stuffing, supply chain issues, or product defects; or (2) fraud-by-hindsight—based on the Internal Investigation's and Accounting Review's findings and the Company's subsequent Restatement, all of which fail to establish Defendants knew *at the time* that relevant public statements or filings were incorrect.

6.    *The AC Fails to Allege Scienter Concerning Alleged Omissions*

Plaintiffs' scienter allegations as to any purported omissions are likewise deficient because they fail to specifically allege that Defendants knew, at the time of the alleged omission, material facts that Plaintiffs contend created an affirmative disclosure obligation or rendered any affirmative statements misleading.  *See, e.g.*, AC ¶¶ 109(g), 117(f), 125(c)–(e); *see also Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100–01 (2d Cir. 2015) ("[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts. [As relevant here,] [s]uch a duty may arise when there is . . . a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading.") (internal citations and quotation marks omitted).  For example, Plaintiffs repeatedly allege that Defendants had an affirmative duty to disclose information—beyond what Defendants did in fact disclose—related to supply chain issues or product defects.  However, as shown in Argument, Section I.B.2–3, *supra*, Plaintiffs plainly did not meet their burden to show that Defendants were aware of or had access to information that contradicted, or otherwise rendered misleading, any of the relevant public statements at the time such statements were made.

Further, to the extent that Plaintiffs allege that Defendants violated Item 303 by, *inter alia*, "failing to inform investors about the Company's trend of increasing channel inventory in [the second half of 2021] that would negatively impact sales in 2022," AC ¶ 183, Item 303

24

creates an obligation to disclose "material events and uncertainties *known to management.*" 17 C.F.R. § 229.303(a) (emphasis added).[5]  Here, however, Plaintiffs' scienter allegations fail to establish the required threshold showing of Defendants' knowledge of a known trend; specifically, Plaintiffs fail to demonstrate the "connective tissue" between the alleged "material events," e.g., alleged channel stuffing, and Defendants' knowledge of the complained of conduct at the time of the relevant public statements and filings.  *See supra* Argument, Section I.B.1–5, *supra*; *see also Stratte-McClure*, 776 F.3d at 102–03 (acknowledging that "[t]he failure to make a required disclosure under Item 303 . . . is not by itself sufficient to state a claim for securities fraud under Section 10(b)").

7.       *Defendants' Departures from the Company Do Not Support Scienter*

Plaintiffs' allegations regarding the fact or timing of the Individual Defendants' departures from Dentsply are also insufficient to support scienter.  *See, e.g.*, AC ¶¶ 17, 78, 232–35, 270.  It is well-established that "absent any alleged facts linking . . . resignations and the alleged fraud, the resignations of [executives] do not support an inference of conscious misbehavior or recklessness."  *In re BISYS*, 397 F. Supp. 2d at 447; *see also Africa v. Jianpu Tech. Inc.*, No. 21-CV-1419 (JMF), 2023 WL 5432282, at *8 (S.D.N.Y. Aug. 23, 2023) ("Resignations do not raise a strong inference of scienter absent additional factual allegations linking the executives' resignation to the alleged fraud."); *Kurtzman v. Compaq Comput. Corp.*,

---

[5] Defendants respectfully note that, while the Second Circuit's recent opinion in *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, No. 21-2524, 2022 WL 17815767, at *1-2 (2d Cir. 2022), held that violations of Item 303 may serve as a basis for a Section 10(b) claim, the Third, Ninth, and Eleventh Circuits have arrived at contrary conclusions. *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307 (11th Cir. 2019); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014); *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000).  On September 29, 2023, the Supreme Court granted certiorari on this contested issue. *Macquarie Infrastructure v. Moab Partners, L.P.*, No. 22-1165, 2023 WL 6319659, at *1 (U.S. Sept. 29, 2023).  Defendants maintain that Item 303 should not serve as a basis for a Section 10(b) violation, and intend to pursue this defense to the extent *Moab* is overturned.

No. Civ. A. H–99–779, 2002 WL 32442832, at \*10 (S.D. Tex. Mar. 30, 2002) ("[T]here are many reasons not related to fraud why people resign and more is needed before one reasonably could infer, no less before a strong inference arises, that the resignations were motivated by anything besides a sense of inadequacy for the job in the face of [the company's] troubles.") (internal quotation marks omitted).

Here, the announcements regarding the Individual Defendants' departures did not link their departures to any finding that they had engaged in fraud or other intentional misconduct, and the Internal Investigation determined just the opposite. With respect to Casey and Gomez, the Internal Investigation found that they had *not* engaged in any intentional wrongdoing in connection with the accounting issues or anything else. *See supra* Factual Background, Section III. And, with respect to Chadha, he was not even mentioned in the Company's Form 8-K regarding the Internal Investigation, and the AC does not otherwise allege that Chadha's "mutually agreed" departure was linked to any misconduct.[6] *See* Ex. 6, Form 8-K. Plaintiffs' assertion that the departures appear "suspicious" is not "enough to rescue plaintiffs' claims" where there is no other circumstantial evidence of fraud. *See Francisco v. Abengoa, S.A.*, 624 F. Supp. 3d 365, 402 (S.D.N.Y. 2022) ("As there is no other circumstantial evidence of fraud, even if the Court were to find [the officer's] resignation suspicious, it would not be enough to rescue plaintiffs' claims."). There is therefore no basis to infer from the Individual Defendants' departures that they intended to defraud investors or were deliberately reckless.

---

[6] Although Plaintiffs characterize Chadha's departure as a "terminat[ion]" in paragraph 33 of the AC, Plaintiffs acknowledge in paragraph 235 that Chadha's departure was instead "mutually agreed" between Chadha and the Company.

8.    *The "Core Operations" Theory Does Not Support Scienter*

Plaintiffs' claim that the alleged scheme involved Dentsply's "core operations" also fails to support a strong inference of scienter.  But even where adequately pleaded, courts generally "consider the 'core operations' allegations to constitute supplementary, but not an independent, means to plead scienter." *Schwab v. E\*TRADE Fin. Corp.*, 258 F.Supp. 3d 418, 434 (S.D.N.Y. 2017); *see also Wallace v. Intralinks*, No. 11 CV 8861 (TPG), 2013 WL 1907685, at \*8 (S.D.N.Y. May 8, 2013) ("[T]his circuit appears to accept that although the doctrine cannot provide the sole basis for inferring scienter, it can provide additional evidence.").  That is, standing alone, such allegations are never enough, and other allegations of scienter are also needed.  Moreover, a "naked assertion" that a business was "key" for the defendants will not suffice to support the core operations theory itself.  *See Jackson*, 960 F.3d at 99 (rejecting plaintiffs' core operations theory of scienter where plaintiffs "merely stat[ed] that the [product] was a 'key product' for the Corporate Defendants").  Indeed, for the "core operations" doctrine to apply at all, "courts have required that the operation in question constitute nearly all of a company's business." *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011); *see also Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19 CIV. 7536 (NRB), 2021 WL 1199035, at \*26 (S.D.N.Y. Mar. 30, 2021) (finding it "implausible to conclude that [a subsidiary's] sales in two countries that represent a small portion of its overall sales are the 'core operations' of [the parent company], a company that generated \$5.1 billion in sales derived from nearly every country on Earth"), *aff'd*, 49 F.4th 790 (2d Cir. 2022), *and aff'd*, 54 F.4th 82 (2d Cir. 2022).

Here, the operations in question are not "core" in nature at all.  Plaintiffs assert that the alleged "scheme involv[ed] Dentsply's digital sales and distributor inventory," specifically its CAD/CAM products, claiming that these products were "critically important to the Company

27

and closely monitored by Defendants and market analysts." AC ¶¶ 110, 239. But Plaintiffs do no more than make the "naked assertion" that the CAD/CAM products were "critically important" to the Company. *See Jackson*, 960 F.3d at 99; AC ¶ 239. The contrary is true. This line of products is just one of five subsegments within the T&E segment of Dentsply's business. *See* Ex. 11, Form 10-K for Fiscal Year 2022 at 4. And in 2021 and 2022, CAD/CAM products constituted less than 14% and 13% of Dentsply's net sales, respectively. *See id.* at 5; Ex. 9, Form 10-K for Fiscal Year 2021 at 5. In sum, Plaintiffs' "core operations" theory of scienter fails because the businesses in question are not core to Dentsply at all, and even if they were, Plaintiffs do not adequately plead any other allegations to support scienter, and so the "core operations" allegations would fail to demonstrate scienter in any event.

## C.       The AC Fails Even to Plead Individualized, Non-Conclusory Allegations as to Chadha

Although Plaintiffs fail to establish scienter with respect to all Defendants, Plaintiffs do not even attempt to provide individualized, non-conclusory allegations as to Chadha. Plaintiffs named Chadha, Dentsply's former CAO, as a defendant in its most recent amendment of its complaint. Plaintiffs allege in a conclusory fashion only that Chadha "knew," had "actual knowledge," or "must have known" about Dentsply's incorrect accounting for incentive-related expenses and certain other estimates in its 2021 Form 10-K. *See* AC ¶¶ 7, 35, 63, 298. But the AC nowhere alleges any particularized facts supporting these assertions, which is fatal to Plaintiffs' claim. *See Woodley v. Wood*, No. 20-CV-2357, 2022 WL 103563, at *10 (S.D.N.Y. Jan. 11, 2022) (rejecting "arguments that the occurrence of . . . accounting errors that led to [a] restatement is itself evidence of fraudulent intent" because "mistakes can be made without fraudulent intent"); *see also Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("A plaintiff cannot base securities fraud claims on speculation and conclusory allegations."). The best

28

Plaintiffs can point to in their 128-page complaint is (1) Chadha's departure from Dentsply during the internal investigation, AC ¶ 235, and (2) Chadha's compensation arrangements, AC ¶ 218.  But, for the reasons explained above, these allegations—either in isolation or collectively— are insufficient.  *See supra* Argument, Section I.A, B.7.  At bottom, Plaintiffs' only claim with respect to Chadha is that he possessed scienter because the alleged misstatements concerned accounting and he was the CAO during the relevant time.  But the mere fact that Chadha held this position is not a substitute for particularized facts suggesting he knew or was deliberately reckless as to the alleged falsity of certain of Dentsply's financials.  *Sun v. Tal Educ. Grp.*, No. 22-cv-01015, 2023 WL 6394413, at *32 (S.D.N.Y. Sept. 29, 2023) ("[P]leading access to information based on an individual defendant's executive position is insufficient to support an inference of scienter.").

## II. The AC Fails to Adequately Plead That Many of the Alleged Misstatements Are Materially False or Misleading

Much of the AC should be dismissed for the independent reason that many of the challenged statements are unrelated to the Restatement or are either generic statements of corporate puffery or mere statements of opinion, and not actionable as a matter of law.

### A. The AC Fails to Adequately Plead That Statements About the Supply Chain, Product Quality, and Product Sales Were False or Misleading

The AC asserts that Dentsply's statements regarding its supply chain, product defects and sales, and dealer inventory were false or misleading.  AC ¶¶ 99–124.  As discussed *infra* Argument, Section II.B–C, many of these statements are non-actionable puffery and/or opinion. In any event, Plaintiffs also fail to adequately plead facts showing that these statements were false at the time they were made.  "A violation of Section 10(b) . . . premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made." *Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, No.

21-CV-9582 (ALC)(OTW), 2023 WL 2711342, at *14 (S.D.N.Y. Mar. 30, 2023).  To sufficiently plead falsity, Plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  Plaintiffs' bare allegations that "supply chain disruptions and electronic component shortages had hindered Dentsply's ability to fulfill orders," *see, e.g.*, AC ¶¶ 99–109, rendering Defendants' statements on supply chain issues false or misleading, do not satisfy this standard.  To be sure, the Company faced issues with its supply chain like virtually all other manufacturers at the time.  *See supra* Factual Background, Section II.  But Plaintiffs base their allegations that there were "severe" product quality and supply chain problems "materially restrict[ing] Dentsply's ability to sell digital equipment during 2021," *see, e.g.*, AC ¶¶ 52, 110, 130, 145, on nothing at all.  Nothing in the findings of the Internal Investigation, the Restatement, or anything else supports Plaintiffs' allegations that these statements were false when they were made.  And the AC points to no corrective disclosure or other revelation when the market ever learned that these statements were false as claimed.

Any attempt by Plaintiffs to allege that the Defendants violated Item 303 via their statements regarding product quality and sales, and supply chain issues must also fail because, as discussed *supra* Argument, Section I.B.6, Item 303 creates an obligation to disclose "material events and uncertainties known to management."  17 C.F.R. § 229.303(a).  Here, the details known to the Defendants regarding product quality and sales, and supply chain were disclosed to the public and the Plaintiffs allege no facts showing that the Defendants failed to disclose any other known material information on those issues.

### B.       Many of the Challenged Statements Are Non-Actionable Puffery

It is well-established that "expressions of puffery and corporate optimism do not give rise to securities violations."  *Rombach*, 355 F.3d at 174.  Such statements include expressions of

general optimism regarding future earnings or results of operations, *see id.* at 173–74, statements about "expectations of business success," *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018), *aff'd*, 771 F. App'x 51 (2d Cir. 2019), and "[g]eneral statements regarding reputation, integrity, and compliance with ethical norms" and about the strength of a company's control systems, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013) (statements regarding bank's "best-of-class" compliance program were puffery). Such representations are all "too general to cause a reasonable investor to rely upon them," *City of Pontiac*, 752 F.3d at 183; *see also Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103 (2d Cir. 2021) ("General declarations about the importance of acting lawfully and with integrity are inactionable puffery, especially when expressed in aspirational terms." (internal citations and quotation marks omitted)), and cannot be the basis for a securities cause of action.

Many of the statements Plaintiffs challenge are classic non-actionable puffery, including, *inter alia*:

- Casey's statements on strong year-to-date performance:

    > To summarize, our strong performance year-to-date gives us confidence going forward for the remainder of 2021. We have good momentum leading into the future. Our results reflect the underlying resilience of the dental market and our team's disciplined performance against our operational goals and progress against our key strategic priorities.

AC ¶ 129. Here, Casey was not restating past or existing facts, but was merely expressing his generally positive assessment of the Company performance and optimism regarding future performance. Thus, it, along with other similar statements identified by Plaintiffs, *see, e.g.*, AC ¶ 132 (predictions of strong performance); *id.* ¶¶ 137–44 (predictions of future growth); *id.* ¶¶

111–14 (view of healthy product demand in digital sales), are mere puffery. *See Rombach*, 355 F.3d at 174; *Xerox Corp.*, 300 F. Supp. 3d at 570.

- Casey's statements regarding Dentsply's view on supply chain issues. For example, Plaintiffs challenge Casey's statement:

> As we go into the fourth quarter, we're optimistic that things get closer and closer to normal. Obviously, the supply chain is impacting all of us. When you talk about – in our case, it's – we look at distribution costs are accelerating. To date, we've been able to manage through a lot of that. And as we look out, we have a few key products that there's obviously going to be constraints around we're a heavily chip-oriented business. To date, we've been able to make everything we need to make. But as we jump out 6, 8, 12 months, we expect to see pressure on that. We have a terrific supply chain. One of the advantages of the structure we put in place over the last 2 years is a centralized supply chain with a pretty sophisticated procurement group, and that's helped us through it. But we're also – we took price in the – at the very end of the third quarter, with the idea that we want to get in front of inflation.

AC ¶ 105. Here, Casey's statement of the Company's general expectations in dealing with supply chain issues is a classic statement of "corporate optimism"; thus, it, along with other similar statements identified by Plaintiffs, *see, e.g.*, AC ¶¶ 100–102 (discussing challenges of supply chain issues amidst COVID-19 and general optimism), *id.* ¶¶ 120–22 (discussing satisfaction with dealer inventory levels), are also mere puffery.

- Gomez's statements regarding Dentsply's strong governance policies. For example:

> The most interesting thing about ESG [environmental, social and governance policies] for me so far has been the fact that, across the company, across the globe, all of our employees are embracing ESG. . . . The last point I would say is one of the key aspects of ESG is managing risks. And it ties perfectly into our enterprise risk management process, which, from a governance perspective, as you know, is extremely important. So all of these things are coming together really nicely . . . .

32

AC ¶ 147.  As with other statements above, this statement of optimism is also too general and vague to be actionable.

Plaintiffs also challenge statements contained in Dentsply's Code of Ethics and business Conduct.  *Id.* ¶¶ 149–50.  But it is well-established in this Circuit that such statements about risk management and a company's control systems are puffery and are therefore not actionable.  *City of Pontiac*, 752 F.3d at 183; *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 370; *see also Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 806 (S.D.N.Y. 2018) (statement in ethics standards that corporation "do[es] not commit, or become involved in, bribery or corruption" was puffery); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 756 (S.D.N.Y. 2017) (anti-bribery provisions puffery where "pitched at a general and aspirational level").

## C.      Many of the Challenged Statements Are Non-Actionable Matters of Opinion

Numerous challenged statements are also statements of opinion that are not adequately alleged to be actionable.  For statements expressing opinion or belief to be actionable, plaintiffs must plead specific facts showing that (1) "the speaker did not hold the belief she professed," (2) the opinion contained "embedded statements of fact" that were untrue, or (3) a "reasonable investor" would understand the opinion statement "to convey facts about how the speaker has formed the opinion" but "the real facts are otherwise" and "not provided," which is "no small task." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 182–89 (2015); *see also Tongue v. Sanofi*, 816 F. 3d 199, 209–10 (2d Cir. 2016) (applying *Omnicare* to 10(b) claims).  Plaintiffs fail to meet this standard here.

Specifically, Plaintiffs challenge numerous statements by Casey reflecting his subjective beliefs regarding the supply chain and dealer inventory.  For example, on August 5, 2021, Casey stated "[Dentsply's dealer partners have] done a really good job, in our opinion, on helping us buffer some pretty radical supply chain swing—not supply chain swings, demand swings . . . ."

33

AC ¶ 120. Similarly, on September 23, 2021, Casey opined that "[w]e feel very good that we have adequate supply." AC ¶ 102. And Plaintiffs challenge Casey's statements regarding the Company's performance where he says: "As we turn our attention to investing for future growth, we are confident that the underlying fundamentals of our business are strong and that we are well-positioned." *Id.* ¶ 137 (emphasis omitted). The language used in these statements is "classically indicative of opinion," *see Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018) (opinion statements include those that use "phrases classically indicative of opinion such as 'I believe' and 'I think'"), and accordingly is not actionable because Plaintiffs do not plead any particularized facts to show that the Defendants did not believe the accuracy of these statements or otherwise plead they are actionable. *See id.*; *Gillis v. QRX Pharma Ltd.*, No. 15 Civ. 4868 (PAE), slip op. at 55 (S.D.N.Y. July 6, 2016) (dismissing claims as to statements of opinion where "[t]he SAC does not come close to pleading facts on which to conclude that defendants disbelieved their own statements").

Plaintiffs also challenge statements regarding Dentsply's risk management systems and governance policies, including, *inter alia*, those excerpted *supra* Argument, Section II.B, and the statement in the Company's Form 10-K for fiscal year 2021 that "the Company believes it is in substantial compliance with the laws and regulations that regulate its business." AC ¶ 148; Ex. 9, Form 10-K for Fiscal Year 2021 at 10; *see also id.* ¶ 147 ("All of our employees are embracing ESG . . . ."). But Dentsply's executives' subjective beliefs on compliance with applicable regulations and the general effectiveness of the Company's risk management efforts and employee embrace of ESG are also mere opinions and thus not actionable. *See Freeman Grp. v. Royal Bank of Scot. Grp., PLC*, 540 F. App'x 33, 37 (2d Cir. 2013); *Gregory*, 297 F. Supp. 3d at 406.

34

**III.    The Amended Complaint Fails to Adequately Plead Loss Causation for All But One of the Alleged Corrective Disclosures**

To adequately plead loss causation, Plaintiffs must allege "a direct causal connection" between an allegedly fraudulent statement and Plaintiffs' claimed loss. *Fort Worth Emps. Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 228 (S.D.N.Y. 2009). This requires allegations that either the market reacted negatively to a corrective disclosure or that Plaintiffs' claimed loss was "foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 107 (2d Cir. 2007); *see also In re Skechers USA, Inc. Sec. Litig.*, No. 18 Civ. 8039 (NRB), 2020 WL 1233759, at *6 (S.D.N.Y. Mar. 12, 2020) (same). To plead loss causation, "[plaintiffs] must allege facts that support an inference that [the defendant's] misstatements and omissions *concealed the circumstances that bear upon the loss suffered* such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) (emphasis added). Plaintiffs fail to establish loss causation with respect to all but one of their alleged "corrective disclosures."

**A.    The February 28, 2022 Announcement of Lower-Than-Expected Financials Is Neither a Partial Corrective Disclosure Nor a Materialization of Risk**

Plaintiffs allege that Dentsply's February 28, 2022 announcement of certain financial results and guidance "remov[ed] some of the artificial inflation caused by Defendants' fraud and caus[ed] Plaintiffs to suffer losses." AC ¶¶ 265–68. Plaintiffs do not—and cannot—allege that the announcement contained any information to correct any alleged fraud. As Plaintiffs admit, this announcement, which was released in connection with a regular earnings call, merely served to update the market on Dentsply's financial results and provide guidance for the upcoming months. It said nothing about the channel stuffing scheme that Plaintiffs allege or anything else to correct any prior statements by the Company. Plaintiffs' allegations are thus nothing more

35

than a recital of the loss causation standard articulated in *Lentell* and are thus insufficient to withstand a motion to dismiss. *See Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 209 (D. Conn. 2014).

## B. The April 19, 2022 Announcements Did Not Constitute Corrective Disclosures

Plaintiffs also attempt to plead loss causation with respect to Dentsply's April 19, 2022 announcement of Defendant Casey's departure from the Company, AC ¶ 270, as well as the Company's filing of its Form 8-K, releasing preliminary first quarter results for 2022. Neither succeeds.

To plead loss causation based on the announcement of an executive's departure, plaintiffs must plead that the departure was attributed to the fraud alleged by plaintiffs. *Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009) ("Standing alone, the announcement of the departure of an officer, without explanation, would not alert investors to any improprieties so as to allege loss causation."); *Omnicom*, 541 F. Supp. at 553 ("[A] disclosure attributing a director's resignation to reasons other than the fraud alleged by plaintiffs similarly does not disclose the alleged fraud."). The AC does not and cannot allege this. In fact, the AC admits that the announcement of Casey's termination was not linked to the Internal Investigation (which was not publicly announced until May 10, 2022) but rather that "Dentsply told analysts that the termination was due to performance-related issues." AC ¶ 271. Absent any factual link between Casey's departure and the alleged fraud, the AC relies solely on investor speculation about the termination. *See, e.g.*, AC ¶ 270 ("Investors, suspecting fraud or major operational problems, fled from Dentsply's stock."). But that is not nearly enough. "[T]he raising of questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud . . . ." *Janbay v. Canadian Solar, Inc.*, No. 10 CIV. 4430 RWS, 2012 WL

36

1080306, at *16 (S.D.N.Y. Mar. 30, 2012); *see also Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 477 (4th Cir. 2011) ("Sentiment simply is not enough to sufficiently plead loss causation. Speculation and conjecture, even a well-educated guess, in the context of market prognostication does not suffice to establish a fact."). Indeed, the AC itself acknowledges that the market did not necessarily connect Casey's departure to suspicion of fraud (which would be insufficient in any event), alleging investors suspected "fraud *or major operational problems*," AC ¶ 270 (emphasis added). Thus, the AC's attempt to plead loss causation with respect to the April 19, 2022 stock drop based on the announcement of Casey's termination should be rejected.

The Company's filing of its preliminary financial results for the first quarter of 2022 fares no better. While those results were below market-consensus, an announcement of "a failure to meet earnings forecasts" is not—without more—a corrective disclosure. *See In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (where "an event—in this case, a failure to meet earnings forecasts or a statement foreshadowing such a failure—disabused the market of that belief does not mean that the event disclosed the alleged scheme to the market. In other words, a failure to meet earnings forecasts has a negative effect on stock prices, but not a corrective effect"); *see also In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 389 ("[N]either of the earnings announcements contain any disclosure of the alleged fraud, despite reporting reductions in full-year revenue guidance and earnings expectations."). Here, the AC offers nothing more. Thus, this non-fraud related announcement cannot support Plaintiffs' allegations of loss causation.

## C.   The May 10, 2022 Announcement of Late Filing and the Internal Investigation Does Not Constitute a Partial Corrective Disclosure

Plaintiffs also fail to plead loss causation based on Dentsply's May 10, 2022 announcement of its Internal Investigation and inability to timely file its Form 10-Q for the first

quarter of 2022. A company's inability to timely file its quarterly financial results is by itself insufficient to plead loss causation. *See Janbay*, 2012 WL 1080306, at *15 ("The announcement of a delay in the reporting of . . . financials does not establish loss causation because it fails to reveal the truth that CSI had engaged in sham sales, secret consignments, or any wrongdoing asserted in the Complaint."). This is true even when a Company attributes the delay to an internal investigation. *See In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) (disclosure that company "would not be able to file its 10-Q for the third quarter of 2006 on time due to the Special Committee's investigation" not corrective). The AC's allegations of investor speculation regarding "the increased risk the Internal Investigation posed to the Company and its operations" are also not sufficient to plead loss causation, as they did not reveal any fraud or correct any prior challenged statements. AC ¶¶ 270, 275; *see Janbay*, 2012 WL 1080306, at *16 ("[T]he raising of questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud . . . ."); *see also Katyle*, 637 F.3d at 476 ("The 'unsubstantiated speculation' and 'significant uncertainty' surrounding [the prospects of the announced acquisition of the company] did not in any sense reveal to the market the alleged fraudulent nature of [the company's] practices over the course of the class period.").

**D.    No Loss Causation With Respect to Dentsply's November 14, 2022 Earnings Announcement**

Plaintiffs' attempt to allege loss causation based on Dentsply's November 14, 2022 announcements containing disappointing earnings (two weeks after the findings of the Internal Investigation and the Restatement had been announced on November 1, 2022) also must be rejected. First, Plaintiffs do no more than allege that the November 14, 2022 announcements contained information about third quarter 2022 results (which were "consistent" with expectations) and fiscal year 2022 guidance (which was "below expectations"). *See* AC ¶¶ 279–

38

81. This is not enough. *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 389 ("[N]either of the earnings announcements contain any disclosure of the alleged fraud, despite reporting reductions in full-year revenue guidance and earnings expectations.").

Second, Plaintiffs do not allege any "new fraud-related information" in those earnings announcements. *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd sub nom. Dalberth v. Xerox Corp.*, 766 F.3d 172 (2d Cir. 2014); *see also In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (no loss causation where plaintiff merely alleges a "negative characterization of already-public information"); *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2023 WL 2711552, at *35 (S.D.N.Y. Mar. 30, 2023) ("Where the information was publicly known at the time of the defendant's alleged misstatements, the fraud claim fails, because nothing in the record would support the inference that the defendant altered the total available mix of available information.") (internal citation and quotation marks omitted); *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678–79 (S.D.N.Y. 2007) ("[I]t is not enough to argue that [a statement] concealed the risk that [the defendants] would be unable to meet future revenue projections, because the mere failure to meet earnings forecasts is insufficient to establish loss causation."). Plaintiffs do not allege that the November 14, 2022 announcements contained any "fraud-related information"—new or otherwise—and thus fail to adequately allege loss causation. *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d at 496.

## IV.    The AC Fails to Plead Control Person Liability

Plaintiffs' failure to plead a primary violation of Section 10(b) of the Exchange Act requires dismissal of the control person claims under Section 20(a) as well. *See City of Brockton Ret. Sys. v. Avon Prod., Inc.*, No. 11 Civ. 4665 PGG, 2014 WL 4832321, at *33 (S.D.N.Y. Sept. 29, 2014). Plaintiffs also fail to allege any facts that each of the Individual Defendants was "in

39

some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108.

**CONCLUSION**

For the foregoing reasons, the Defendants respectfully request that the AC be dismissed in its entirety with prejudice.

Dated: October 10, 2023
     New York, New York

Respectfully submitted,

*/s/ Roger A. Cooper*
Roger A. Cooper
racooper@cgsh.com
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006
T: 212-225-2000
F: 212-225-3999

*Counsel to Defendant Dentsply Sirona Inc.*


*/s/ Bryce L. Friedman*
Bryce L. Friedman
bfriedman@stblaw.com
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017-3954
T: 212-455-2000
F: 212-455-2502

*Counsel to Defendant Donald M. Casey, Jr.*


*/s/ Seth L. Levine*
Seth L. Levine
slevine@levinelee.com
LEVINE LEE LLP
1500 Broadway, Suite 2501
New York, NY 10036
T: 212-223-4400

*Counsel to Defendant Jorge Gomez*


*/s/ H. Christopher Boehning*
H. Christopher Boehning
cboehning@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
T: 212-373-3000

*Counsel to Defendant Ranjit S. Chadha*