UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

SAN ANTONIO FIRE AND POLICE PENSION :   Civil Action No. 1:22-cv-06339-AS
FUND, CITY OF BIRMINGHAM :   (Consolidated)
RETIREMENT AND RELIEF SYSTEM, EL :
PASO FIREMEN & POLICEMEN'S PENSION :   <u>CLASS ACTION</u>
FUND, and WAYNE COUNTY EMPLOYEES' :
RETIREMENT SYSTEM, Individually and on :   PLAINTIFFS' OPPOSITION TO
Behalf of All Others Similarly Situated, :   DEFENDANTS' OMNIBUS JOINT MOTION
                                Plaintiff, :   TO DISMISS THE AMENDED COMPLAINT
                                   :
      vs. :
                                     :
DENTSPLY SIRONA INC., DONALD M. :
CASEY, JR., JORGE GOMEZ, and RANJIT S. :
CHADHA, :
                                   :
                         Defendants. :

---------------------------------------------------------------- x

4854-2065-3461.v1

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................................1

II.   SUMMARY OF THE FRAUD ............................................................................3

III.  LEGAL STANDARD .........................................................................................9

IV.   THE COMPLAINT SUFFICIENTLY PLEADS THAT DEFENDANTS
      PARTICIPATED IN A FRAUDULENT SCHEME AND MADE MATERIAL
      MISREPRESENTATIONS WITH SCIENTER.................................................10

      A.    The Complaint Pleads Deceptive Conduct in Furtherance of a Scheme.....................10

      B.    The Complaint Pleads Actionable Misstatements and Omissions..............................11

            1.    The Complaint Pleads Actionable Misstatements and Omissions
                  Regarding Dentsply's Supply Chain ..............................................12

            2.    The Complaint Pleads that Defendants Made Actionable Misstatements
                  and Omissions Regarding Dentsply's Dealer Inventory Levels.....................16

            3.    The Complaint Pleads Actionable Statements Concerning Financial
                  Results, Digital Sales Success, and Growth Positioning................................17

            4.    The Complaint Pleads Actionable Misstatements Concerning
                  Defendants' Governance and Risk Management Practices............................21

      C.    The Complaint Sufficiently Pleads Scienter ...............................................23

            1.    Defendants Knew About Dentsply's Operational Challenges and
                  Orchestrated the Channel-Stuffing and Accounting Fraud ............................23

            2.    The Degree to Which the Individual Defendants' Compensation
                  Depended on Metrics Impacted by the Scheme Supports Scienter .................31

            3.    Executive Departures Support Scienter........................................32

            4.    Defendants' Remaining Arguments Do Not Undermine Scienter ..................33

            5.    The Complaint Pleads Dentsply's Scienter....................................37

V.    THE COMPLAINT SUFFICIENTLY PLEADS LOSS CAUSATION ................................38

VI.   THE COMPLAINT SUFFICIENTLY PLEADS CONTROL PERSON LIABILITY
      AGAINST ALL DEFENDANTS........................................................................45

4854-2065-3461.v1

**Page**

VII.    CONCLUSION.................................................................................................................45

4854-2065-3461.v1

## TABLE OF AUTHORITIES

**Page**

### CASES

*Abuhamdan v. Blythe*,
   9 F. Supp. 3d 175 (D. Conn. 2014) ................................................................................41

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ............................................................................................9

*Bishins v. CleanSpark, Inc.*,
   2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) ...............................................................14, 15

*Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*,
   2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) ................................................................36

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
   556 F. Supp. 3d 100 (D. Conn. 2021) ......................................................29, 39, 42, 43

*Christine Asia Co. Ltd. v. Ma*,
   718 F. App'x 20 (2d Cir. 2017) ................................................................................26, 27

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
   957 F. Supp. 2d 277 (S.D.N.Y. 2013) .............................................................................1

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012) ...........................................................................23

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
   477 F. Supp. 3d 123 (S.D.N.Y. 2020) ...........................................................................13

*Dobina v. Weatherford Int'l Ltd.*,
   909 F. Supp. 2d 228 (S.D.N.Y. 2012) ...........................................................................30

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ..................................................................................................38, 39

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015) ...........................................................................................11

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017) ..................................................................... *passim*

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) ......................................................................39, 40

4854-2065-3461.v1

**Page**

*Gross v. GFI Grp., Inc.*,
    162 F. Supp. 3d 263 (S.D.N.Y. 2016)..................................................................................38

*Guevoura Fund v. Sillerman*,
    2016 WL 4939372 (S.D.N.Y. Sept. 12, 2016)..............................................................10, 11

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
    529 F. Supp. 3d 111 (S.D.N.Y. 2021)................................................................................20

*In re AOL Time Warner, Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007)................................................................................44

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015)..................................................................................45

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)................................................................................25

*In re Cannavest Corp. Sec. Litig.*,
    307 F. Supp. 3d 222 (S.D.N.Y. 2018)................................................................................30

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
    586 F. Supp. 3d 199 (E.D.N.Y. 2022) ................................................................................1

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2018 WL 2382600 (S.D.N.Y. May 24, 2018) ....................................................................25

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004)................................................................................35

*In re Dentsply Sirona, Inc. Sec. Litig.*,
    2023 WL 2682905 (E.D.N.Y. Mar. 29, 2023)........................................................... *passim*

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)................................................................................16

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..........................................................................41, 44

*In re Glob. Crossing, Ltd. Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004)................................................................................10

*In re Hansen Nat. Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ........................................................................43, 44

4854-2065-3461.v1

**Page**

*In re Initial Pub. Offering Sec. Litig.*,
  399 F. Supp. 2d 261 (S.D.N.Y. 2005)......................................................................41

*In re Insys Therapeutics, Inc. Sec. Litig.*,
  2018 WL 2943746 (S.D.N.Y. June 12, 2018) .....................................................27, 30

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...................................................................36

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006).......................................................................37

*In re Mylan N.V. Sec. Litig.*,
  2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023) ...........................................................45

*In re Omnicom Grp., Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008).......................................................................42

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010).....................................................................................45

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014).....................................................................12, 13

*In re Pareteum Sec. Litig.*,
  2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021)...........................................................33

*In re PXRE Grp., Ltd., Sec. Litig.*,
  600 F. Supp. 2d 510 (S.D.N.Y. 2009).......................................................................29

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)............................................................34

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)..................................................................................10, 26

*In re Scottish Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007).......................................................................35

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)............................................................15

*In re Sipex Corp. Sec. Litig.*,
  2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) ..........................................................33

4854-2065-3461.v1

**Page**

*In re St. Jude Med., Inc. Sec. Litig.*,
    836 F. Supp. 2d 878 (D. Minn. 2011) ....................................................................40

*In re Stillwater Cap. Partners Inc. Litig.*,
    858 F. Supp. 2d 277 (S.D.N.Y. 2012) ...................................................................42

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d Cir. 2021) ..................................................................................13

*In re Tenaris S.A. Sec. Litig.*,
    2021 WL 2843204 (E.D.N.Y. July 1, 2021) ..........................................................23

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ........................................................................ *passim*

*In re Vivendi Universal, S.A., Sec. Litig.*
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ......................................................32, 40, 41

*In re Xerox Corp. Sec. Litig.*,
    935 F. Supp. 2d 448 (D. Conn. 2013) ...................................................................45

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016) ...............................................................................12, 22

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ..................................................................................28

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020) ....................................................................................38

*Janbay v. Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ......................................................43

*Katyle v. Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) .................................................................................43

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991) ....................................................................................1

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ..................................................................18

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) .............................................................................11, 12

4854-2065-3461.v1

**Page**

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015)................................................................10, 37, 38

*Lorenzo v. SEC*,
587 U.S. __, 139 S. Ct. 1094 (2019)..............................................................10

*Lynch v. Rawls*,
429 F. App'x 641 (9th Cir. 2011) ...................................................................37

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)......................................................................................9, 11

*Metz v. U.S. Life Ins. Co. in N.Y.C.*,
662 F.3d 600 (2d Cir. 2011)..............................................................................9

*Meyer v. Jinkosolar Holdings Co. Ltd.*,
761 F.3d 245 (2d Cir. 2014)............................................................................18

*Moshell v. Sasol Ltd.*,
481 F. Supp. 3d 280 (S.D.N.Y. 2020)......................................................27, 33

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) ................................................................11, 29

*Nguyen v. NewLink Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018),
aff'd in part and vacated in part on other grounds sub nom.
*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)......................................................................31, 32

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)..........................................................11, 16, 23, 36

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019).......................................20, 24, 29, 34

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018)............................................................21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)........................................................................15, 17, 23

*Ontario Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
432 F. Supp. 3d 131 (D. Conn. 2019)........................................................39, 42

4854-2065-3461.v1

**Page**

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
    595 F.3d 86 (2d Cir. 2010)...................................................................................................11

*Peifa Xu v. Gridsum Holding Inc.*,
    2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020) .................................................................34, 35

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
    2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)..............................................................18, 20, 29

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015).....................................................................................43

*Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc.*,
    645 F. Supp. 2d 210 (S.D.N.Y. 2009)....................................................................................42

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ................................................................................................43

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..................................................................................................21

*SEC v. Gabelli*,
    653 F.3d 49 (2d Cir. 2011),
    *rev'd on other grounds*, 568 U.S. 442 (2013).........................................................................11

*SEC v. Obus*,
    693 F.3d 276 (2d Cir. 2012)..................................................................................................36

*SEC v. Shapiro*,
    2018 WL 2561020 (S.D.N.Y. June 4, 2018) .........................................................................32

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
    545 F. Supp. 3d 120 (S.D.N.Y. 2021)....................................................................................25

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008)..................................................................................................37

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007).........................................................................................................9, 23

*Thomas v. Shiloh Indus., Inc.*,
    2017 WL 2937620 (S.D.N.Y. July 7, 2017) ..........................................................................37

4854-2065-3461.v1

**Page**

*Tolbert v. Queens Coll.*,
  242 F.3d 58 (2d Cir. 2001)......................................................................................19

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016).....................................................................................16

*Williamson v. United States*,
  512 U.S. 594 (1994).................................................................................................37

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
  Rule 9(b) ......................................................................................................10, 13, 25
  Rule 12(b)(6)...........................................................................................................9, 38

Federal Rules of Evidence
  Rule 804(b)(3).............................................................................................................37

15 U.S.C.
  §78j(b).................................................................................................9, 11, 37, 45
  §78t(a) ........................................................................................................................45

17 C.F.R.
  §229.303(a) ................................................................................................................29
  §229.303(b)(2)(ii) ......................................................................................................12
  §240.10b-5 ...........................................................................................................12, 45
  §240.10b-5(a)............................................................................................................10
  §240.10b-5(b)..............................................................................................................9
  §240.10b-5(c).............................................................................................................10

4854-2065-3461.v1

Lead Plaintiffs City of Birmingham Retirement and Relief System, El Paso Firemen & Policemen's Pension Fund, and Wayne County Employees' Retirement System (together, "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants'[1] joint motion to dismiss the Complaint (ECFs 94-96) ("Motion" or "Mot.").[2]

## I.    INTRODUCTION

From June 9, 2021 through November 13, 2022 (the "Class Period"), Defendants engaged in channel-stuffing and accounting fraud designed to allow Dentsply to: (1) achieve its third quarter 2021 ("3Q21"), fourth quarter 2021 ("4Q21"), and full year 2021 ("FY21") financial targets; and (2) conceal ongoing product defects and supply chain shortages that had reduced end-user demand and threatened to undermine the Company's growth story.  While Defendants' scheme worked in the short-term, allowing Dentsply to meet 3Q21 financial expectations and increasing the Individual Defendants' 2021 compensation, it inevitably imploded.  Defendants' channel-stuffing in the second half of 2021 ("2H21") led to massively inflated inventory levels that caused significantly lower sales in 2022.  Indeed, inventory levels were so high that they would not normalize for more than a *year* after Defendants implemented their scheme.

---

[1] Defendants are Dentsply Sirona Inc. ("Dentsply" or the "Company") and Donald M. Casey, Jr. ("Casey") (former Chief Executive Officer ("CEO") of Dentsply), Jorge Gomez ("Gomez") (former Chief Financial Officer ("CFO")), and Ranjit S. Chadha ("Chadha") (former Chief Accounting Officer ("CAO")) (together, the "Individual Defendants").  The "Complaint" is ECF 72 and, unless otherwise noted, all "¶__ or ¶¶__" references are to the Complaint, and emphasis is added and citations are omitted.

[2] Defendants improperly ask this Court to consider documents that were not cited in the Complaint for the truth of their contents.  *See, e.g.*, Mot. at 4 n.1, 7, 28.  But judicial notice is used "only 'to determine what statements [the documents] contain[],' not for the truth of the matters asserted."  *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 216 (E.D.N.Y. 2022) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).  The same is true for uncited portions of documents referenced in the Complaint.  *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 289 (S.D.N.Y. 2013) (where a court takes judicial notice of a public record that is integral to a fraud complaint, it does so in order """to determine *what* statements [they] contained" – but "again *not for the truth of the matters asserted*"") (emphasis in original).

- 1 -

In March 2022, after employees submitted complaints about CEO Casey and CFO Gomez, the Audit and Finance Committee of Dentsply's Board of Directors (the "Board") initiated an internal investigation into, among other things, the use of incentives to increase sales to dealers and make financial targets in 3Q21 and 4Q21 (the "Internal Investigation"). On November 1, 2022, Dentsply announced the damning findings of the seven-month Internal Investigation. The Company admitted it had not accounted for large incentives provided to dealers in 3Q21, which allowed it to meet Wall Street expectations. Dentsply had also inflated its revenues, operating income, and net income, and had misstated nearly every account on its balance sheet and income statement. In sum, Dentsply's reported financials for 3Q21, 4Q21, and FY21 would need to be restated. Further, Dentsply's Internal Controls over Financial Reporting ("ICFR") and Disclosure Controls and Procedures ("Disclosure Controls") were determined to be ineffective, and Casey and Gomez were found to have created an "improper tone at the top" and a culture where employees feared retaliation for speaking up about compliance issues. As Defendants' scheme unraveled, a series of disclosures constructively disclosed Defendants' fraud, causing Dentsply's stock price to plummet and costing investors hundreds of millions of dollars.

Faced with a detailed recitation of their misconduct, Defendants ignore allegations they find inconvenient, dispute facts that must be accepted as true, and play fact-finder by declaring that Dentsply's own self-serving and untested conclusion of no fraudulent conduct (reached while this action was pending) trumps the Complaint's well-pleaded allegations. Defendants paint such a benign picture of their actions, one would never guess that in their desperation to hit financial targets, Casey and Gomez created a culture of fear, fraud, and noncompliance, or that Defendants' misconduct led to a year-long sales disruption, more than $70 million in investigation, remediation and personnel costs, the terminations or resignations of Casey, Gomez, CAO Chadha, and other senior executives, and triggered an ongoing investigation by the U.S. Securities and Exchange Commission ("SEC"). But this case is at the pleading stage. Defendants'

- 2 -

4854-2065-3461.v1

alternative narrative and disregard of the standards for a motion to dismiss should be rejected, as should their Motion.

## II.    SUMMARY OF THE FRAUD

The facts giving rise to this action are set forth in the Complaint, and in the interest of brevity, the Complaint constitutes Plaintiffs' statement of facts.  Below is a brief summary of the alleged fraud.

At the beginning of 3Q21, Defendants had a serious problem.  In the first half of 2021, Casey and Gomez had assured investors that end-user demand for Dentsply's expensive capital equipment had rebounded once COVID-19 pandemic restrictions had eased.  ¶3.  They also were determined to show the market that Dentsply could grow significantly *and* sustainably, as promised in Casey's flagship three-year restructuring plan announced in late 2018 (the "Restructuring Plan").  ¶¶43, 45.  But by the end of the second quarter ("2Q21"), internal forecasts showed that revenues from Dentsply's critical Technology and Equipment ("T&E") segment, which housed Dentsply's digital products, would leave the Company well short of internal and Wall Street financial expectations for 3Q21 and FY21.  ¶¶46, 55.  Not only would the shortfall damage the Company's post-COVID-19 recovery and growth story, but the Individual Defendants would also miss out on *millions* of dollars of compensation.  ¶¶211-226.  To make its numbers, Dentsply needed its T&E distributor partners, Patterson and Henry Schein, to buy more T&E products to close the gaps.  ¶¶55, 66-67.  This was easier said than done.

First, the distributors typically purchased only enough inventory to meet expected end-user demand – they did not want product sitting on their books any longer than necessary.  ¶¶6, 40.  Unbeknownst to investors, end-user demand for Dentsply's T&E products had decreased since the beginning of 2021, in large part due to product quality problems in some of its most highly touted products.  ¶¶46-50.  In January 2021, Dentsply had begun manufacturing one of its computer-assisted design and manufacturing (CAD/CAM) products, Primemill, with cheaper materials in order to increase margins.  ¶48.

Unfortunately, this resulted in fully *half* of new Primemills being defective. *Id.* And, because Patterson preferred to sell Primemill and Primescan together as a package, demand for Primescan decreased significantly as well. *Id.* At the same time, Dentsply was also juggling significant product issues with its best-selling and high-margin Axeos and Orthophos imaging equipment. ¶51.

Second, Dentsply faced undisclosed supply chain shortages that had significantly worsened beginning in mid-2021 and inhibited Dentsply's ability to manufacture its digital imaging equipment. ¶53. Dentsply's bottom line was directly impacted by the supply chain issues, as the Company could not recognize revenue from sales until the ordered equipment shipped. *Id.* Accordingly, if Defendants were going to be able to close the gap to their 3Q21 financial targets, Dentsply needed revenue from sales of equipment that could be shipped quickly. ¶55. With a significant backlog in imaging equipment, that meant Primemill and Primescan. *Id.*

Accordingly, in mid-3Q21, Eric Bruno ("Bruno") (Senior Vice President and head of Dentsply's North America sales region), under extreme pressure from Casey, directed Dentsply's distributor sales team to ask Patterson to purchase *tens of millions of dollars* of CAD/CAM in excess of end-user demand. ¶¶55, 63. Patterson understood the request had come from Dentsply's C-Suite, but still refused. ¶60. Desperate and leaned on by Casey, Bruno then offered Patterson outsized incentives to induce Patterson to make the additional purchases. ¶¶55, 61-62. The incentives included: (i) guaranteed, direct payments to Patterson for making the purchases; (ii) back-end rebates; (iii) promised future payments if Patterson increased end-user demand over pre-set targets; and (iv) extended payment terms. ¶61. Dentsply offered the same types of incentives to Henry Schein. ¶62. While Dentsply's typical practice was not to offer "cash back" incentives with capital equipment, in 3Q21, it agreed to *millions* of dollars in cash back incentives to T&E distributors. *Id.* Defendants' scheme resulted in tens of millions of dollars in additional sales in 3Q21 that would not otherwise have been made. ¶63.

4854-2065-3461.v1

Defendants had met the internal revenue goals.  But for their channel-stuffing to pay off, they needed to hide the extraordinary incentives used to induce the sales.  *Id.*  If Dentsply properly accounted for the incentives as required under Generally Accepted Accounting Principles ("GAAP"), revenue would be offset by the amount of the incentives, which would be recognized as accrued liabilities on the Company's balance sheet.  *Id.*  As Dentsply would later admit, proper accounting would have caused the Company to miss financial targets.  ¶87.  Further, disclosing the incentives would undermine Defendants' public assurances of robust end-user demand.  ¶63.  Accordingly, Defendants omitted the incentives from Dentsply's financial statements, violating GAAP.  *Id.*

The scheme allowed Defendants to report key financial metrics that met or exceeded market expectations for 3Q21.  ¶¶64-65.  Defendants did ***not*** disclose that as a result of Dentsply's channel-stuffing, CAD/CAM inventory in the distributor channel at the end of 3Q21 was ***$80 million higher*** than at the beginning of the year, which would predictably decrease sales to distributors in future quarters.  ¶64.  Instead, in public statements, Defendants claimed that inventory levels were stable and that Dentsply had not seen "[a]ny changes really of material significance" in the dealer channel.  ¶¶64, 103.  They also continued to disclaim any supply chain problems, and when discussing the drivers of the Company's 3Q21 sales success, Casey ignored the incentive scheme and instead falsely attributed the success to "'recovery in the dental market and robust demand from our recent product launches.'"  ¶127.  Defendants even used Dentsply's 3Q21 results to convince investors 4Q21 would be just as strong, stating "our strong performance year-to-date gives us confidence going forward for the remainder of 2021."  ¶¶65, 129.

Entering 4Q21, with product defects and supply constraints still plaguing the Company, and now with hugely elevated dealer inventories, the only way that Dentsply could meet financial targets was through even more channel-stuffing.  ¶66.  Casey again placed immense pressure on Bruno, and the Company once again negotiated massive incentives with its distributors to convince them to purchase

- 5 -

4854-2065-3461.v1

excess inventory. ¶¶66-67. Absent its channel-stuffing, Dentsply would have fallen short of forecasted CAD/CAM sales to Patterson in 4Q21 by $45-$50 million in revenue. ¶67. In 4Q21, Defendants took the scheme one step further and offered unprecedented cash-back incentives to end-users, too. ¶¶68-70. Defendants again concealed the incentives through fraudulent accounting. ¶71.

But this time, even Defendants' channel-stuffing could not save Dentsply's results. When Dentsply announced its financial results for 4Q21 and FY21 on February 28, 2022, Dentsply's FY21 revenue had missed consensus expectations. ¶¶72, 265. Notably, the only area in which Dentsply came close to meeting expectations in FY21 was in T&E revenues, which the scheme inflated. ¶72. Dentsply also announced 2022 revenue guidance and anticipated sales growth lower than market expectations, attributing the lowered guidance to supply shortages, which they falsely claimed had only just begun in 4Q21. ¶¶72-73, 266. In reality, as Defendants knew, the decreased guidance was driven by Defendants' channel-stuffing during 2H21 – by enticing distributors and end-users with massive incentives, they had cannibalized sales that would otherwise have been made in 2022. ¶¶74, 267. By the market's close on February 28, 2022, Dentsply's stock price had dropped by 7.7%. ¶¶75, 268.

On March 17, 2022, the Company announced that Bruno had been replaced – the first of many executive departures to come. ¶231. On April 11, 2022, Dentsply announced that Gomez would be leaving the Company. ¶¶78, 232. Then, on April 19, 2022, Dentsply unexpectedly announced that it had terminated Casey – less than one week after the Board had re-nominated him to a Board seat. ¶¶80, 233, 270. The same day, Dentsply released disappointing preliminary financial results for the first quarter of 2022 ("1Q22"). ¶¶79, 270. The April 19, 2022 news caused Dentsply's stock to decline another 13%. ¶¶80, 270. But Dentsply continued to conceal the fraud by attributing Casey's termination to "performance-related issues" and blaming the disappointing financial results on weaker U.S. sales and foreign exchange headwinds. ¶270.

- 6 -

Then, on May 10, 2022, Dentsply announced that in March 2022, its Audit Committee had commenced an internal investigation "focused on the Company's use of incentives to sell products to distributors in the third and fourth quarters of 2021 and whether those incentives were appropriately accounted for and the impact of those sales was adequately disclosed in the Company's periodic reports filed with" the SEC. ¶¶82, 272. The Company was also investigating "allegations that certain former and current members of senior management directed the Company's use of these incentives and other actions to achieve executive compensation targets in 2021." *Id.* Dentsply further announced it would be unable to timely file its 1Q22 Form 10-Q, but disclosed disappointing 1Q22 results. ¶¶83, 272-273. On Dentsply's earnings call later that day, the Company revealed that a key driver of the disappointing 1Q22 results was weaker U.S. sales. ¶¶83, 273. Notably, the Company's new interim CFO disclosed that *approximately 80%* of the U.S. sales decline was a direct result of dealer inventory buildup in 2H21, *primarily from CAD/CAM*, with the remaining 20% related to *supply chain constraints* and slightly *lower demand* than anticipated. ¶¶83, 273, 275. This news caused Dentsply's stock price to decline more than 7%. ¶276.

As the Internal Investigation continued throughout the second quarter of 2022 and the third quarter of 2022 ("3Q22"), so too did Dentsply's executive departures. Chadha and Dentsply "mutually agreed" he would leave on August 4, 2022. ¶235. Chief Commercial Officer ("CCO") Walter Petersohn ("Petersohn"), "mutually agreed" to his separation on September 1, 2022. ¶236. And on November 28, 2022, Dentsply announced that the head of the commercial team in China (which was under review as part of the Internal Investigation), Henning Müller ("Müller"), had "left Dentsply Sirona" after eight years. ¶237.

On November 1, 2022, Dentsply announced the results of the Internal Investigation. ¶¶86, 277. The Company would restate Dentsply's financial statements for 3Q21 and FY21 (the "Restatement") due to *material misstatements* in the prior financial reports that "masked a failure to meet internal financial

4854-2065-3461.v1

targets and external financial analyst expectations for [3Q21]." ¶¶87, 167, 277. The Company also announced that the initial scope of the investigation had been expanded to include, in additional to the Internal Investigation, a "China Investigation" and "Accounting Review." ¶86.

> The Internal Investigation findings were damning. Dentsply admitted that:

> [D]istributors in North America were offered incremental incentives, including extended payment terms, to purchase products *in order for the Company to attempt to meet certain internal sales targets in the third and fourth quarters of 2021*. These incentives were offered in conjunction with net sales transactions amounting to approximately *$38 million and $70 million in the third and fourth quarters of 2021*, respectively, which in turn contributed to higher levels of distributor inventory at the end of such periods, and lower sales to these distributors in the first and second quarters of 2022. . . . *[T]hese incremental incentives and the sales to which they applied contributed to the Company's ability to meet external financial analyst expectations in the third quarter of 2021. . . . The . . . Investigation noted potential omissions in public disclosures made by the Company regarding the use of these incentives or their potential future impacts in the third and fourth quarters of 2021.*

¶90. Dentsply also admitted that it had inflated revenues by "utiliz[ing] incorrect accounting and assumptions in the determination of estimates related to its sales returns provisions, warranty reserve provisions and variable consideration" and that, despite Casey and Gomez repeatedly submitting certifications to the contrary, the Company's ICFR and Disclosure Controls were ineffective. ¶¶91, 95, 177. Over the next two days, Dentsply's stock price fell more than 13%. ¶¶96, 278.

On November 7, 2022, Defendants filed amended Forms 10-K/A for 2021 and 10-Q/A for 3Q21, which included the restated financial results for FY21 and 3Q21, respectively. ¶¶159-160. Nearly *every* financial account on Dentsply's income statements and balance sheets was adjusted. ¶162. The Form 10-Q/A revealed Dentsply had overstated its operating income by 20%, net income by 23%, and diluted earnings per share ("EPS") by 24% in 3Q21, while understating its accrued liabilities by 13%. ¶162. The Form 10-K/A revealed the Company had understated its accrued liabilities for sales and marketing – *i.e.*, "discounts, rebates and free goods" – by $46 million, or *230%*, in 4Q21. ¶168.

The Form 10-K/A also spelled out the remediation steps necessary to correct the material

- 8 -

weaknesses in its ICFR and Disclosure Controls.  These included "appoint[ing] a new Chief Executive Officer, a new Chief Financial Officer and a new Chief Accounting Officer," "[t]ermination of certain members of senior management as well as non-executive employees for violations of the Code of Ethics and Business Conduct," "[i]mplement[i]ng written policies and procedures to provide governance and establish responsibility for oversight of incentive arrangements provided to customers," and "[s]trengthen[ing] internal controls over the accounting for customer incentive arrangements, including . . . implementing formal controls."  ¶¶205-206.

A week later, on November 14, 2022, the Company announced its 3Q22 financial results and lowered fourth quarter 2022 guidance below market expectations.  ¶279.  The Company also reported a decrease in organic sales in the United States that was driven in part by "lower wholesale volumes for CAD/CAM products relative to prior year," which was a direct result of Defendants' scheme.  ¶280.  As a result of the November 14, 2022 news, Dentsply's stock price declined another 5%.  ¶281.

## III.    LEGAL STANDARD

On a Rule 12(b)(6) motion, courts must "consider the complaint in its entirety" and "accept all factual allegations in the complaint as true."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  Courts must also "'draw[] all reasonable inferences in favor of the plaintiff.'"  *Metz v. U.S. Life Ins. Co. in N.Y.C.*, 662 F.3d 600, 602 (2d Cir. 2011).  "'[F]act-specific question[s] cannot be resolved on the pleadings.'"  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

To state a claim for securities fraud under §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5(b), a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).  To state a claim for

4854-2065-3461.v1

securities fraud under Rule 10b-5(a) and (c), the complaint must allege that the defendant (1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance.  17 C.F.R. §240.10b-5(a), (c); *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004).  Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") "do not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).  Rather, an "alleged fraud need only be **plausible** based on the complaint; it need not be more likely than other possibilities." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (emphasis in original).

## IV.    THE COMPLAINT SUFFICIENTLY PLEADS THAT DEFENDANTS PARTICIPATED IN A FRAUDULENT SCHEME AND MADE MATERIAL MISREPRESENTATIONS WITH SCIENTER

### A.    The Complaint Pleads Deceptive Conduct in Furtherance of a Scheme

Defendants do not dispute that the Complaint pleads the existence of a fraudulent scheme for purposes of Rule 10b-5(a) and (c).  The Exchange Act's scheme liability "provisions capture a wide range of conduct," including the misconduct alleged here. *Lorenzo v. SEC*, 587 U.S. __, 139 S. Ct. 1094, 1101 (2019).  Allegations of deceptive conduct need only satisfy Rule 9(b) by "'plead[ing] with particularity the nature, purpose, and effect of the fraudulent conduct and the role of the defendants,'" which can be done "'in broad strokes.'" *Guevoura Fund v. Sillerman*, 2016 WL 4939372, at *8 (S.D.N.Y. Sept. 12, 2016).  The Complaint's allegations easily satisfy this standard.

Defendants, facing severe supply constraints and ongoing product defects, devised and directed a scheme to conceal Dentsply's operational challenges from investors and inflate Dentsply's revenues and earnings in 2H21.  ¶¶36-71.  The scheme involved: (i) offering outsized incentives to distributors to induce them to purchase excess digital equipment; (ii) falsely assuring investors that the supply chain and end-user demand were healthy and stable, and that the Company's financial growth was sustainable, while

- 10 -

concealing material facts to the contrary (*see* §IV.B., *infra*); and (iii) falsifying Dentsply's financial results reported to investors and the SEC by not accounting for the extraordinary incentives, in blatant violation of GAAP. ¶¶36-71. This scheme created an illusion that Dentsply was growing sustainably and allowed Defendants to achieve financial expectations that they otherwise would not have met, unlocking millions in additional compensation. *Id.*; ¶¶211-226. It also mortgaged the Company's 2022 sales for short-term gain, as distributors would not purchase more inventory from Dentsply until they were able to burn through the excess purchased in 3Q21 and 4Q21. ¶¶58, 76, 81, 83, 191.

### B.    The Complaint Pleads Actionable Misstatements and Omissions

A complaint adequately pleads falsity when it: (i) specifies the allegedly false statement; (ii) identifies the speaker; (iii) states where and when the statement was made; and (iv) explains why the statement was false. *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010). Indeed, "[t]he law is well settled . . . that so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013). Falsity may thus be established by allegations of contemporaneous facts inconsistent with the alleged statements. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000).

Materiality is an "inherently fact-specific finding," which imposes a low bar on a plaintiff at motion to dismiss. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011). A fact is material under §10(b) "when there is a "'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available."'" *Matrixx*, 563 U.S. at 38. A district court may not dismiss for lack of materiality unless "the

- 11 -

alleged omissions and misstatements 'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Litwin*, 634 F.3d at 718.

Defendants concede that many of the alleged misstatements and omissions were materially false and misleading when made. Specifically, Defendants do not contest falsity related to: (1) Dentsply's financial reporting in violation of GAAP (¶¶153-179); (2) the effectiveness of Dentsply's internal controls (¶¶192-193); or (3) Casey's and Gomez's Sarbanes Oxley ("SOX") certifications (¶¶208-209). *See* Mot. at 29-34. Nor do Defendants dispute the trend in increasing CAD/CAM inventory that Dentsply was required to disclose under Item 303 of SEC Regulation S-K ("Item 303").[3] ¶¶180-191; Mot. at 24. Defendants have accordingly waived any challenge to these statements. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 634 (S.D.N.Y. 2014). Nor could they credibly do so; Dentsply admitted the misrepresentations' falsity and materiality when it restated its financials for 2Q21, 3Q21, and FY21 (¶¶158-170, 177-178), stated that there were material weaknesses in its ICFR that resulted in the Restatement (¶¶196-198), and acknowledged, *e.g.*, "potential omissions in public disclosures made by the Company regarding the use of these incentives or their potential future impacts in the third and fourth quarters of 2021" (¶¶182-185). Defendants' challenges to the remaining misrepresentations and omissions are meritless.

### 1.     The Complaint Pleads Actionable Misstatements and Omissions Regarding Dentsply's Supply Chain

Throughout 2H21, Defendants reassured investors that although the COVID-19 pandemic had wrought havoc on supply chains around the globe, ***Dentsply's*** supply chain was intact, the Company was able to fulfill distributor orders with no (or minimal) delay, and any supply-related challenges were limited

---

[3] Item 303 required Dentsply's quarterly and annual filings with the SEC to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii); *Litwin*, 634 F.3d at 716. Violations of Item 303 constitute actionable omissions for purposes of Rule 10b-5, so long as the element of materiality is also satisfied. *See Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 (2d Cir. 2016).

- 12 -

to increased costs. ¶¶99-109. These statements were materially false and misleading and/or omitted material facts when made. *Id.*

Specifically, by 3Q21, Dentsply was experiencing significant and worsening electronic component shortages that affected its imaging equipment, including Axeos and Orthophos. ¶¶4, 46, 53-55. The snowballing shortages were discussed on distribution sales team inventory calls that initially took place every other week, and by September 2021 took place every week, with shouting matches arising regarding the limited supply. ¶53. Bruno told a director of national distributor accounts in September 2021 that he was getting pressure from the C-Suite related to supply chain challenges, and that Chief Supply Chain Officer Dan Key and CCO Petersohn were allocating too little of the supply-constrained product to North America for Bruno to meet Casey's sales targets. ¶66. By 4Q21, when, *e.g.*, Casey told investors and analysts that "[w]e're not seeing huge delays[,] [w]e're seeing increased costs associated with that" (¶106), there was actually a ***nine-month*** delay between when dealers placed orders for imaging equipment and when those orders actually shipped (in non-supply-constrained periods, Dentsply's lead time on imaging products was generally six to eight weeks). ¶¶4, 46, 53-55, 66, 73, 109. Defendants even admitted on February 28, 2022, that the Company had faced meaningful supply chain constraints around imaging and other equipment in 4Q21 (though they falsely maintained they had not experienced them earlier). ¶73.

These allegations are more than sufficiently particularized to satisfy Rule 9(b) and the PSLRA. *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 169 (2d Cir. 2021) (particularity requirement satisfied by "numerous allegations in . . . amended complaint that 'explain why the statement [was] fraudulent'"); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 133 (S.D.N.Y. 2020) ("[A] plaintiff need not offer admissible proof of its allegations for the Court [to] accept them as true at this stage."). Tellingly, while Defendants claim that Plaintiffs' supply allegations are based "on nothing at all," Defendants deliberately ignore the very paragraphs in the Complaint discussing the supply constraints.

- 13 -

*Compare* Mot. at 30 (citing only ¶¶52, 110, 130, 145), *with* Ex. 1 (listing supporting paragraphs), attached hereto.  To the extent Defendants claim there was no corrective disclosure of the supply issues (Mot. at 30), that has no bearing on falsity.  More, ***it is not true***: Defendants admitted on Dentsply's February 28, 2022 earnings call that the Company was supply-constrained with respect to its imaging products; further, because Defendants' channel-stuffing was done at least in part to mask the revenue shortfalls resulting from supply chain problems, Defendants' reduced financial guidance on February 28, 2022 – a result of the channel-stuffing – was a corrective disclosure as well.  *Compare* Mot. at 30, *with* ¶¶73-74, 107-108, 266; Mot., Ex. 12 at 5 ("In the fourth quarter, we started to face significant component shortages impacting the production of imaging equipment and treatment centers.").

Defendants next claim that the specific misrepresentations about Dentsply's supply chain are inactionable puffery.  Mot. at 32 (claiming statements in ¶¶100, 102, 105 are "corporate optimism").  But puffery encompasses statements that are too general to cause a reasonable investor to rely upon them, not statements that are specific or "grounded in the present." *Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *7-*8 (S.D.N.Y. Jan. 5, 2023) (statement on the strength of past due diligence not puffery).  The statements that Defendants claim are "optimism" are not statements of general expectations for the future – they are specific statements regarding (1) how the Company's supply chain had operated in the past:

- "***To date, we've been able to make everything we need to make***."  ¶105; and

- "The supply chain team has done an outstanding job of managing situations like . . . ***some risks of supply disruption relative to certain electronic components . . . . [T]he team has done a great job doing that***."  ¶100;

and (2) the current status of Dentsply's supply chain:

- "***[W]e're very comfortable that we're going to be able to deliver what our customers need***, but it's certainly taking a lot more effort."  ¶101;

- "***We feel very good that we have adequate supply. . . . Right now, we don't have anything that's blinking yellow or red***."  ¶102; and

- 14 -

- *"**I think, so clearly from a supply disruption perspective, we are fine**."  Id.*

More, analysts repeatedly *asked* Casey and Gomez about the health of Dentsply's supply chain and whether they were seeing delays.  ¶¶100-104.  The alleged misstatements were made to reassure the public that the supply chain was strong and intact – distinguishing Dentsply in a period when supply chain issues were widely impacting manufacturers, and investors were particularly attuned to supply chain management.  *Id.*; *see In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018) ("While certain statements, viewed in isolation, may be mere puffery, when the statements are 'made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors.'").

Finally, Defendants claim that Casey's statement in ¶102 that "[w]e feel very good that we have adequate supply," is inactionable opinion.  *See* Mot. at 34.  Not so.  Statements of opinion are actionable where: (i) the speaker does not hold the professed belief; (ii) the embedded facts supplied are untrue; or (iii) the speaker omits information whose omission makes the statement misleading to a reasonable investor. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015); *accord Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 546 (S.D.N.Y. 2017).  Here, this statement is actionable under all three categories.  First, the Complaint pleads that Casey knew the Company did not have adequate supply.  ¶53.  Second, Casey's statement contains an embedded statement of objective fact – that Dentsply had an adequate supply of electronic chips to produce the products requiring them.  This is particularly clear in context:

> The businesses we worry the most about right now are chip-related.  ***We feel very good that we have adequate supply***.  But where we might have been holding 180 days, we're now trying to hold more just because we keep hearing from the car industry and other stuff that there's going to be chip challenges.

¶102.  A reasonable investor would understand Casey's statement as representing that the Company had adequate supply of components for Dentsply's digital products, which, given the severe shortage of those

4854-2065-3461.v1

components, was false. ¶¶53, 109(b); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 401-02 (S.D.N.Y. 2012) (statements that "'GE has performed well during the recent market volatility'" and "'we successfully meet our commercial paper needs,'" actionable where there were "serious difficulties in GE Capital's access to short-term financing"). Third, Casey's statement omitted material facts – *i.e.*, that Dentsply was supply-constrained with respect to imaging products, and that product defects in Axeos and Orthophos devices were exacerbating the need for additional imaging equipment – rendering the statement misleading. *See* ¶¶51-55, 102, 110; *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) ("core inquiry" is whether omitted facts "'conflict with what a reasonable investor would take from the statement itself'").

### 2. The Complaint Pleads that Defendants Made Actionable Misstatements and Omissions Regarding Dentsply's Dealer Inventory Levels

Defendants do not challenge the alleged misstatements in ¶¶119 and 123-124, in which Defendants: (i) falsely represented that Dentsply matched end-customer demand with sales (¶119); (ii) failed to disclose the role of channel-stuffing in its 3Q21 sales results (¶123); and (iii) claimed that the reason for dealer CAD/CAM inventory being ***$50 million*** higher at the end of 2021 compared to 2020 was because of unexpectedly low retail sales in 4Q21 (rather than Defendants' channel-stuffing) (¶124). Their unconvincing attacks on the remaining dealer inventory statements are readily dispatched.

First, the alleged misstatements in ¶¶120-122 are not puffery. *See* Mot. at 32. These were specific, concrete statements made directly in response to analyst questions as to whether dealer inventory levels were increasing. ¶¶120-122. That analysts repeatedly asked about dealer inventory levels demonstrates that the issue was material to the market – as numerous courts have determined. *See Novak*, 216 F.3d at 315 (defendants' statements that "the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true" were actionably false); *In re Dentsply Sirona, Inc. Sec. Litig.*, 2023 WL 2682905, at *16 (E.D.N.Y. Mar. 29, 2023) ("*Dentsply I*") (statements "made in response to direct

questions by analysts about the Schein and Patterson relationships" were "not mere puffery").

Second, Casey's August 5, 2021 statement cited in ¶120 is not inactionable opinion.  Casey was asked by an analyst what the Company was hearing from "dealers as you think about inventory levels and kind of caseloads going back up." ¶120.  Casey's response that Dentsply was happy with dealer partners and that dental providers were "challenged to maintain inventory" was intended to reassure the market that end-user demand was healthy, when actually, end-user demand for Dentsply's digital products had been significantly damaged by ongoing product defects. *See Omnicare*, 575 U.S. at 185-86; *Dentsply I*, 2023 WL 2682905, at *18 (defendants lacked a reasonable basis for opinion where they omitted material facts regarding "sales of 'excess inventory' to Patterson and lack of end-user demand").

### 3.    The Complaint Pleads Actionable Statements Concerning Financial Results, Digital Sales Success, and Growth Positioning

During the Class Period, Defendants consistently touted Dentsply's financial results (¶¶127-129, 132-134), growth positioning (¶¶137-144), and the success of its digital products (¶¶111-116), and falsely attributed those successes and growth potential to legitimate business factors.  These statements included:

- Casey's August 5, 2021 statement that "*we are confident that the underlying fundamentals of our business are strong and that we are well positioned*." ¶137;

- Casey's November 4, 2021 representation that "'[i]n the third quarter . . . [o]rganic sales grew over 21%, *driven by continued recovery in the dental market and robust demand*.'" ¶127;

- Casey's November 4, 2021 statement that "*our strong performance year-to-date gives us confidence going forward for the remainder of 2021.  We have good momentum leading into the future.  Our results reflect the underlying resilience of the dental market and our team's disciplined performance against our operational goals* . . . ." ¶141;

- Casey's November 11, 2021 representation that "*we had a very, very strong third quarter. We think that business going forward is sustainable* . . . ." ¶143;

- Gomez's November 4, 2021 statement that "*in our guidance for the fourth quarter, we are including pretty substantial growth for CAD/CAM, for imaging in general*." ¶113;

- Casey's February 28, 2022 statement attributing the Company's success that year to "'*the resilience of the dental market, the strength of our global portfolio, and our team's*

- 17 -

> ***ability to execute well in an environment still impacted by the pandemic***.'"  ¶132; and

- Gomez's February 28, 2022 statements that "***CAD/CAM business posted a strong growth in the quarter***" and "***[t]here is also good progress on Primemill***."  ¶115.

When a defendant "'puts the topic of the cause of its financial success at issue, then it is "obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information."'" *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006); *see also Meyer v. Jinkosolar Holdings Co. Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *7 (S.D.N.Y. Apr. 14, 2020).  Instead, Defendants omitted material facts necessary to make statements about how they had achieved their successes in 2H21 not misleading.

Dentsply's financial results in 3Q21 and 4Q21 were driven not by "robust demand" or "disciplined performance against . . . operational goals," but by Defendants' ongoing channel-stuffing and accounting fraud. *E.g.*, ¶¶130(b), 135(d), 167.  Indeed, Dentsply has admitted that but for the scheme, it would have fallen short of internal financial goals and Wall Street expectations in 3Q21.  ¶167.  It has also admitted in its restated SEC filings that the Company's increase in organic T&E sales in 3Q21 was due to "incremental pricing incentives," and sales results for FY21 "were also affected by a build in dealer inventory during the year, partly as a result of incremental pricing incentives in the second half of the year."  ¶¶130(b), 135(d). More, because Defendants were resorting to channel-stuffing in 2H21, and were thereby cannibalizing future sales, Dentsply was not poised to deliver sustainable growth in 3Q21, 4Q21, or 2022. ¶¶135(d), 267-268.  As Dentsply later admitted in its November 7, 2022 Form 10-K/A for 2021, Defendants' channel-stuffing had created such high levels of inventory by the end of 4Q21, they would have a substantial negative impact on the Company's net sales for CAD/CAM products in 2022.  ¶¶135(d), 267.

Similarly, Defendants' statements emphasizing the success and sustainability of Dentsply's digital product sales were misleading because they concealed the supply chain and quality issues that were

4854-2065-3461.v1

hampering Dentsply's digital sales.  For example, while imaging products may have been in high demand, Dentsply had a significant manufacturing backlog that steadily worsened as 3Q21 went on, and by 4Q21, dealers were waiting as long as **nine months** for orders of imaging equipment to arrive.[4]  Thus, while Defendants' statements implied that imaging equipment demand would lead to increased revenues in 3Q21, 4Q21, and early 2022, and contribute to sustainable growth (*e.g.*, ¶¶113, 115, 144), Dentsply could not capitalize on increased imaging demand for at least two to three quarters when they would be able to ship the equipment.  ¶¶53, 55.  Further, far from making "good progress on Primemill," fully half of the models produced since January 2021 were defective.  ¶48.  The quality problems were so severe and persistent that a new executive role was created to deal with them, and teams across the Company were set to resolving the issue.  ¶¶49, 51.  The ongoing quality issues had dampened demand for both Primemill and its partner product, Primescan.  ¶¶47-48.  The defects were so significant that warranty expenses in 2021 increased by approximately **63%** over the prior year.  ¶91.

Defendants claim that certain of the alleged misstatements are puffery.  Mot. at 30-32 (citing ¶¶111-114, 129, 132, 137-144).[5]  They are not.  As an initial matter, Defendants waived their argument that the statements in ¶¶111-114 about "healthy product demand in digital sales" are puffery by raising them in a perfunctory parenthetical reference without any actual argument or basis for why they would be puffery. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) (undeveloped argument deemed waived).

Regardless, statements about the causes or sustainability of a company's financial success or demand for its products are not puffery, as numerous courts in this Circuit have concluded.  For example, Judge Gershon recently upheld nearly identical statements made by Dentsply and its former officers in

---

[4] Defendants claim that Plaintiffs' allegations that there were product quality and supply chain problems at Dentsply are based on "nothing at all."  Mot. at 30.  To the contrary, the Complaint is replete with specific allegations detailing the product quality and supply chain problems that were ongoing at Dentsply. *See* Ex. 1.

[5] Defendants do not specifically challenge the actionability of ¶¶115-116, 127-128, or 133-134.

4854-2065-3461.v1

connection with its prior sales misconduct in *Dentsply I*. These included Dentsply's statements attributing financial results to "'global dental market growth, innovation and new products launched by the Company, and continued investments in sales and marketing resources, including clinical education'" because the statements "attribute[d] growth to certain factors but omit[ted] that a portion of the growth was the result of [illegal or improper] conduct." 2023 WL 2682905, at *16. Similarly, the court found the defendants' statements that "'[r]evenues benefited primarily from **strong demand** for our CAD/CAM Systems and Imaging products'" were actionably misleading because "[a] reasonable investor could have understood this statement to mean that end-user demand was strong when, in fact, sales were driven by [excessive sales to distributors]" and "whether the revenues were driven by 'inflated channel inventory' or 'end-user demand' 'fundamentally differ[s] in sustainability.'" *Id.* at *14.

Other courts have found statements similar to those alleged here actionable. *See Davis*, 2020 WL 1877821, at *9 (defendants were obligated to "disclos[e] that their sales growth was, at least in part, the result of short-run sales tactics that led to a buildup of inventory"); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 33 (S.D.N.Y. 2019) (reasonable investor would find material that revenues were driven by inflated channel inventory, not increased end-user demand); *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 172-73 (S.D.N.Y. 2021) (statement that "'we built our track record of solid financial performance and believe we are very well positioned for the year ahead'" not puffery because statement was "'grounded in historical facts'" and "'plausibly designed to mislead investors into believing'" that the company's "'present (as well as future) was rosier than reality'"). More, certain of the misstatements were made in response to direct questions by analysts. *E.g.*, ¶113. "In this context, the challenged statements . . . are not mere puffery." *Dentsply I*, 2023 WL 2682905, at *16; *comScore*, 268 F. Supp. 3d at 547 (statement that "'based on the revenue growth . . . we feel like over the next three to five years, this should be a mid-20%s EBITDA margin'" was actionable).

4854-2065-3461.v1

Further, Defendants' argument that these statements are immaterial is inconsistent with Dentsply's decision to correct similar statements made in its 3Q21 Form 10-Q and 2021 Form 10-K. In those SEC filings, Dentsply initially reported that its increase in organic sales was attributable to, among other things, "recovery in demand" and "recent product launches." *See* ¶130(b). When the Company restated its 3Q21 Form 10-Q, it amended the language to include that the increase in sales resulted from "timing-related increase in sales to dealers" that were "due to incremental pricing incentives." *Id.* The Company also added that the increase in sales to dealers led to inventory levels that were ***$80 million higher*** at the end of 3Q21 than they were in the beginning of the year. *Id.* In the Company's 2021 Form 10-K/A, it included for the first time that "[s]ales were also affected by a build in dealer inventory during the year, partly as a result of incremental pricing incentives in the second half of the year." ¶135(d). Dentsply's amendment of the original language demonstrates its materially misleading incompleteness.

Defendants' cases are inapposite. In *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004), unlike here, the optimistic statements "included 'substantial cautionary language and specific risk factors.'" *Id.* at 169. Also unhelpful is *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551 (S.D.N.Y. 2018), where the court discussed positive descriptions of performance and "expectations of business success." *Id.* at 569. The statements here discussed the reasons for Dentsply's past performance and current positioning, which were made false and misleading by then-existing facts.

### 4. The Complaint Pleads Actionable Misstatements Concerning Defendants' Governance and Risk Management Practices

Dentsply has admitted that during the Class Period, Casey and Gomez violated "provisions of the Company's Code of Ethics and Business Conduct," failed to "maintain and promote an appropriate control environment focused on compliance" and to "sufficiently promote, monitor or enforce adherence to the Code of Ethics and Business Conduct," and "created a culture where employees did not feel comfortable raising concerns without fear and retaliation." ¶89. But as they were intimidating employees into actions

- 21 -

that violated Dentsply's stated business ethics and management practices, Defendants repeatedly pointed investors to Dentsply's Code of Ethics and Business Conduct, which Dentsply specifically stated "***applies to the Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer . . . and substantially all of the Company's management level employees***." *Compare* ¶44, *with* ¶¶147-150. The Code of Ethics and Business Conduct included not just vague optimism for corporate behavior, but concrete statements such as, "[i]t is ***critically important*** that our books, records, accounts, and financial statements be maintained in reasonable detail. '***Off the books' accounts, transactions, and assets are prohibited***'" (¶150(i)), and "***[a]ll managers must . . . [i]mplement control measures, such as appropriate financial controls to identify and prevent fraud and other violations***." ¶150(g). Speaking at an investor conference specifically discussing Dentsply's environmental, social, and governance policies on June 17, 2021, Gomez stated that "***all of our employees are embracing ESG***" and that "***one of the key aspects of ESG is managing risks. And it ties perfectly into our enterprise risk management process, which, from a governance perspective, as you know, is extremely important***." ¶147.

Defendants do not dispute that these statements were false, but instead argue that they are immaterial as a matter of law or inactionable opinion. Mot. at 33-34. But it is axiomatic that materiality is context dependent, and the Second Circuit has rejected the notion that statements about a company's reputation for integrity or ethical conduct can never give rise to a securities violation. *SAIC*, 818 F.3d at 98. Specifically, the Second Circuit acknowledged that "[s]ome statements, in context, may amount to more than 'puffery' and may in some circumstances violate the securities laws: for example, a company's specific statements that emphasize its reputation for integrity or ethical conduct as central to its financial condition." *Id.* Here, Defendants' statements about Dentsply's risk management, governance policies, and compliance with relevant laws and ethics were particularly material in light of the Company's recent history of channel-stuffing and securities law violations – the Company had just completed a years-long

SEC investigation and received a cease-and-desist order from the SEC on December 21, 2020. ¶42; *see In re Tenaris S.A. Sec. Litig.*, 2021 WL 2843204, at \*2 (E.D.N.Y. July 1, 2021) (reasonable investor could find statements in company's code of conduct regarding compliance material where company had deferred prosecution agreement with the SEC related to past violations). And, to the extent any of the statements are considered opinion, they are still actionable. Since Casey and Gomez were (i) responsible for but did not ensure the Company had adequate ICFR and Disclosure Controls, (ii) violating the Code of Ethics and Business Conduct, including by cultivating a culture of fear and non-compliance that allowed an accounting restatement to occur, and (iii) exposing the Company to increased financial, regulatory, and reputational risk, they plainly did not reasonably believe in the statements that they and the Company made regarding compliance with the Code of Conduct and risk management policies. *See Omnicare*, 575 U.S. at 184-85.

### C.    The Complaint Sufficiently Pleads Scienter

The PSLRA's "strong inference" of scienter standard is satisfied when, accepting the allegations as true and considering them collectively, a reasonable person would deem the inference of scienter at least as strong as an opposing inference. *Tellabs*, 551 U.S. at 324. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences . . . ." *Id*. "[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). Scienter may be shown with """"facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."""" *Novak*, 216 F.3d at 307.

### 1.    Defendants Knew About Dentsply's Operational Challenges and Orchestrated the Channel-Stuffing and Accounting Fraud

Scienter is established by the facts pled demonstrating Defendants' knowledge of Dentsply's operational challenges and the resultant channel-stuffing and accounting fraud. Defendants would have the

- 23 -

Court believe that the Company's CEO, CFO, and CAO were unaware of multiple major threats to the Company's revenue, tens of millions of dollars spent on unprecedented dealer incentives, extensive violations of GAAP related to those very incentives and revenues, and almost non-existent internal controls. Mot. at 15-28. Even if this inference did not require the Court to suspend common sense, the facts pleaded in the Complaint conclusively undermine any non-fraud inference.

First, Casey and Gomez undeniably had direct knowledge of the product defects and their impacts on end-user demand and the Company's bottom line, as shown by, *e.g.*, allegations that:

- As of early 2021, Dentsply had instituted a policy that returns of faulty Primemill equipment could be accepted **only if** Casey or Gomez personally authorized the return. This policy, along with a requirement that Primemill equipment be serviced three times before any return request would be considered, was instituted in order to avoid taking substantial revenue off of the Company's books because of the Primemill defects. ¶50.

- Casey often attended meetings where Dentsply employees discussed how to address the product failures, and angry customers called Casey directly to discuss the product failures. ¶52.

- Casey appeared unannounced at a dinner where he confronted Bruno and Patterson executive Josh Killian ("Killian") about making too much of the quality issues with Primemill and complained about Patterson's unwillingness to purchase greater quantities of Primemill. Casey represented to Killian that Dentsply's commercial regions outside of the U.S. were receiving fewer complaints about Primemill, demonstrating that Casey both had access to and reviewed information about the defects and how much CAD/CAM product distributors were purchasing. ¶50.

- The distributors regularly provided Dentsply with detailed spreadsheets tracking orders from end-users and the distributors' current stock of products. ¶¶40, 57-58.

- In April 2021, Dentsply created a full-time product quality group Vice President role to manage and resolve quality issues, with a focus throughout 2H21 on getting the Primemill quality problems under control. ¶49.

*See also* Ex. 1. These allegations are more than sufficient to plead scienter. *See Dentsply I*, 2023 WL 2682905, at *21 (scienter adequately alleged where Dentsply executives had access to monthly reports from Patterson regarding the market for Dentsply products, Patterson's sales of each product for the month, and its stock of the products); *Lexmark*, 367 F. Supp. 3d at 37 (where "Individual Defendants attended meetings where [specific company issues] were discussed, the Individual Defendants had information

- 24 -

belying the accuracy of their public statements about [those issues]").

Defendants' only rejoinder is that the Complaint lacks specific dates on which Casey interrupted Bruno's dinner with the Patterson executive and attended product quality meetings. Mot. at 18. But "'[t]o satisfy Rule 9(b), a plaintiff need not plead dates, times and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based.'" *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 141 (S.D.N.Y. 2021) (quoting *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 162 (S.D.N.Y. 2008)). In any event, the Complaint alleges the dates the product issues began (for Primemill, in 1Q21) and that the Patterson dinner took place before Defendants' channel-stuffing scheme was enacted in 3Q21. ¶¶47, 50, 55, 57. Given when the defects arose and the many ways in which Casey and Gomez were made aware of them, it is implausible that Casey's and Gomez's knowledge did not arise until after the Class Period.

Meanwhile, the product failures caused ballooning equipment servicing costs and refund charges that would significantly offset Dentsply's 2021 revenues and earnings, increasing Dentsply's warranty expense by approximately *63%* and its warranty accrual *56%* year-over-year. ¶91. As Dentsply's CFO and CAO, Gomez and Chadha either knew of the steep increases in warranty costs and accrual during the Class Period and understood the cause, or were reckless in speaking without monitoring that information. *See In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *9 (S.D.N.Y. May 24, 2018) (CAO's scienter alleged where officer "not only had access to the facts underlying the Company's financial reporting," but was "responsible for it and attested to its accuracy by signing" SEC filings).

Second, the Complaint establishes Defendants' contemporaneous understanding of Dentsply's supply chain disruptions. Dentsply's senior leadership knew in summer 2021 that Dentsply's revenue shortfalls from decreasing end-user demand could not be bridged through sales of the Company's imaging equipment because of supply chain shortages. ¶¶53, 55, 66. In implementing Casey's directive to meet

- 25 -

unrealistic T&E sales targets in 3Q21, Bruno specifically directed the distributor team to push CAD/CAM, because that was what could ship immediately. ¶55.  During the September 2021 Dentsply-Sirona World trade show, Bruno, Casey's direct report, told a director of national distributor accounts that executives in the C-Suite (which included the Individual Defendants) were putting extreme pressure on him to meet sales targets despite the supply constraints.  ¶¶66-67.  He also described fighting with Chief Supply Chain Officer Key and CCO Petersohn to get enough supply-constrained digital equipment allocated to North America to meet Casey's imposed sales quotas.  ¶66.

As the supply chain problems, shortage of imaging equipment, and resultant drag on sales were active concerns among the top echelon of the Company's leadership, including multiple C-Suite executives and direct reports to Casey and Gomez, it is "virtually inconceivable" that such problems were not communicated to Defendants. ¶¶55, 66; *compare* Mot. at 17 (wrongly claiming allegations were limited to "lower-level employee" knowledge); *Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (that subject of the fraud was a serious threat to the company and discussed at a meeting attended by defendants' direct reports, made it "virtually inconceivable" problems were not communicated to defendants); *see also Scholastic*, 252 F.3d at 76 (executive's scienter inferred from involvement in making false statements and his position, which allowed him to access internal documents, and "converse[] with other officers and employees and attend[] management and committee meetings").

Third, despite Casey's awareness of the supply and product issues and their impending impact on the Company's financial targets, Casey imposed unrealistic sales targets on the distributor sales team, then put extreme pressure on Bruno to achieve those infeasible targets. ¶¶55, 59, 66-67.  And when Dentsply asked Patterson to take on tens of millions of dollars' worth of product above what the end-user demand reports Patterson regularly sent to Dentsply showed was actually needed, Patterson expressed understanding that the request came from Dentsply's C-Suite. ¶¶38, 57, 242.

- 26 -

4854-2065-3461.v1

More, because the incentives were extraordinary both in size and type, they could ***only*** be negotiated and entered into by senior leadership. ¶¶61-62. It was Bruno – leaned on by Casey – that offered and negotiated the outsized incentives. ¶¶61, 66-67. Gomez's direct report, Ivan Zeljkovic ("Zeljkovic"), the Company's Vice President of Commercial Finance, personally signed off on the large dealer incentives Bruno negotiated, while the CFO for North America, Jerry Asamoah ("Asamoah") (another of Gomez's direct reports), was present on the joint calls with Patterson and Henry Schein regarding inventory levels and sales, and knew that sales were being made that exceeded end-user demand. ¶62; *compare* Mot. at 20 (referring to "lower-level employees"). With senior Company officers reporting to Casey and Gomez responsible for executing the channel-stuffing, in light of the continuous and extreme pressure Casey exerted on Bruno and the accounting fraud required to cover up the incentives' impact, the most plausible inference is that the Individual Defendants themselves orchestrated the channel-stuffing scheme. Certainly they knew about it. Defendants' competing inference – that the Individual Defendants had no idea what was going on – is deeply implausible. *Christine Asia*, 718 F. App'x at 23.

The inference of scienter is further strengthened by Dentsply's admission that Casey and Gomez "created a culture where employees did not feel comfortable raising concerns without fear of retaliation." ¶89. Former employee recollections that Casey was a "bully," "total tyrant," "disconnected from what was feasible," and fired people that didn't agree with him, and that Gomez "belittled" and "intimidat[ed]" employees lend further credence to the inference that their direct reports would not go out on a limb to offer unprecedented incentives to pull sales forward from future quarters without the approval of Casey and Gomez. ¶¶44, 200-201; *see Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 290 (S.D.N.Y. 2020) ("very strong additional evidence of scienter," alleged where "internal review uncovered not only 'errors, omissions, and inaccuracies in'" accounting, but also "inappropriate conduct and an improper tone at the top"); *In re Insys Therapeutics, Inc. Sec. Litig.*, 2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018) (scienter alleged where

4854-2065-3461.v1

"'the management in the finance and accounting group did not display adequate tone at the top with respect to judgment and rigor required to resolve the accounting'").

That the extraordinary incentives in 3Q21 and 4Q21 were omitted from Dentsply's books for accounting purposes undermines any suggestion that the channel-stuffing was innocent or that the Individual Defendants were uninvolved in the fraud. ¶¶63, 71. Defendants' competing inference that across multiple quarters, senior officers responsible for approving the incentives and/or North America sales and finance (*e.g.*, Bruno, Zeljkovic, Asamoah) – direct reports of Casey and Gomez – *all* "failed" to report these unprecedentedly large incentives to their bosses, Dentsply's accounting group, *and* external auditors, is highly implausible, particularly in light of the actions taken in the Internal Investigation's aftermath. ¶¶63, 71, 95. That these accounting violations overstated revenues, understated accrued liabilities, and "masked a failure to meet internal financial targets and external financial analyst expectations" also strengthens the scienter inference. ¶¶161-162, 168, 179.

Further undermining any non-fraud inference, Defendants, across multiple earnings calls and presentations, made specific, concrete statements to investors about the strength of Dentsply's supply chain, its dealer inventory levels, and the sufficiency of Dentsply's internal controls while either: (i) knowing then-existing facts contradicting their statements; or (ii) recklessly disregarding that their statements were false and misleading. The content and context of Defendants' statements are themselves "powerful evidence of scienter." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009).

For example, because companies globally were suffering from severe supply chain breakdowns due to COVID-19, analysts repeatedly asked about Dentsply's supply chain. Defendants quelled their fears by repeatedly asserting that, *e.g.*, "we haven't seen any major disruptions" (¶103) and "[w]e're not seeing huge delays" (¶106). Of course, at the time these statements were made, the Company was experiencing significant shortages of imaging equipment, and by 4Q21, the Company's imaging equipment manufacture

was backlogged by *nine months* – making Defendants' statements at a minimum severely reckless. ¶¶54, 100-104, 106, 248-254; *see New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (plaintiffs properly pleaded scienter where inventory levels were "key to measuring Celestica's financial performance and [were] a subject about which investors and analysts often inquired"); *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 133-34 (D. Conn. 2021) ("'Actively communicating with the public about this issue demonstrates defendants' sensitivity to it,' and is 'strong circumstantial evidence that [these defendants] were receiving some form of specific information' about the subject."); *accord comScore*, 268 F. Supp. 3d at 553. *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009), is distinguishable, as there, the alleged misstatements involved the defendant company's subjective assessments of loss, not objective responses to analyst questions.

Casey and Gomez also reassured analysts who asked about changes in channel inventory levels, telling them that there were no significant changes and inviting their trust by asserting *e.g.*, "*we watch inventory very closely, our internal inventory, inventory in the channel.*" ¶247; *see also* ¶¶121-122, 245-247. In light of those assurances, and presuming Chadha performed his duties as CAO, Defendants knew at the end of 3Q21 and 4Q21 that CAD/CAM inventory levels had increased by *$80 million* and *$50 million* since the beginning of the year, respectively – or were lying and had not monitored inventory levels as they promised investors.[6]

Defendants also knew that CAD/CAM sales were reasonably likely to decrease materially in subsequent quarters. ¶¶258-259. The Individual Defendants were seasoned executives at a public Company that had just months earlier been issued a cease-and-desist order from the SEC stemming from Dentsply's failure to disclose future quarters' likely sales shortfalls as a result of prior channel-stuffing.

---

[6]    For the same reason, Defendants' argument that Plaintiffs fail to plead a "known" trend under Item 303 (Mot. at 24-25), is meritless. *See* ¶¶180-191; 17 C.F.R. §229.303(a); *Dentsply I*, 2023 WL 2682905, at *20; *Lexmark*, 367 F. Supp. 3d at 35; *Davis*, 2020 WL 1877821, at *13.

- 29 -

4854-2065-3461.v1

Defendants thus undeniably understood the repercussions of their channel-stuffing and its importance to investors when making their statements. *See also* ¶¶256-257 (Gomez's receipt of SEC comment letter).

Finally, Casey and Gomez submitted SOX certifications with Dentsply's 2Q21 and 3Q21 Forms 10-Q and its 2021 Form 10-K attesting that they had personally supervised and participated in the evaluation of Dentsply's financial controls and procedures, that the Company's financial reports fairly and accurately presented its financial condition, that the Company's internal control over financial reporting was effective as of December 31, 2021, and that the financials complied with GAAP. ¶¶31-33, 192-194, 227-230. But, as the Company later admitted, its internal controls had material weaknesses that "resulted in the restatement" of its financial statements for 3Q21 and FY21, and "adjustments to substantially all . . . accounts and disclosures for the interim and annual periods related to 2019, 2020, and 2021." ¶197. More, Casey and Gomez had personally instituted an improper tone at the top and failed to promote an effective internal control environment. ¶¶199-200, 229.

The Individual Defendants could not have monitored and attested to the efficacy of the Company's controls without noticing and disregarding the blatant deficiencies. *E.g.*, ¶¶205-207, 230; *see In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 246 (S.D.N.Y. 2018) ("weak internal controls will support an inference of scienter"); *Insys*, 2018 WL 2943746, at *6 ("officers failed 'to maintain sufficient internal controls to avoid fraud[, which is] sufficiently indicative of scienter'"); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012) (scienter alleged where company had "inadequate internal controls" and defendant "was '"responsible for establishing and maintaining"' those controls and '"designed"' or caused such controls to be designed under his supervision"). It is telling that the Company needed to "***[a]ppoint[] a new Chief Executive Officer, a new Chief Financial Officer and a new Chief Accounting Officer***" in order remediate the material weaknesses – directly tying the Individual Defendants to the accounting fraud and deficient controls. ¶205.

4854-2065-3461.v1

### 2. The Degree to Which the Individual Defendants' Compensation Depended on Metrics Impacted by the Scheme Supports Scienter

Because the lion's share of the Individual Defendants' compensation was closely tied to the fraud, it presented a "concrete and personal benefit" that adds to the scienter inference. While the generally held desire to increase compensation cannot alone establish scienter, specific facts that tie outsized incentive compensation to an alleged fraud "may certainly be considered as part of the calculus in assessing" whether scienter is pled. *Nguyen v. NewLink Genetics Corp.*, 297 F. Supp. 3d 472, 498 (S.D.N.Y. 2018), *aff'd in part and vacated in part on other grounds sub nom. Abramson v. NewLink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020).

Here, an outsized portion of the Individual Defendants' total 2021 compensation depended upon meeting financial targets impacted by the fraud. In 2021, *89%* of Casey's compensation and *74%* of Gomez's compensation was designed to depend on the Company's financial performance. ¶211. For example, in 2021, Casey and Gomez stood to receive more than *125%* of their annual salaries in cash bonuses dependent on Dentsply's achievement of certain earnings before interest, taxes, depreciation, and amortization ("EBITDA") goals. ¶215. Further, *74%* of Casey's and *56%* of Gomez's 2021 compensation were based on equity awards, which were tied to EPS performance and total shareholder return. ¶212. Under the 2019 Operating Margin Transformation Incentive Plan ("Operating Margin Plan"), if Dentsply achieved a specific operating margin in 3Q21, Casey and Gomez would receive *$7.5 million* and *$5.25 million* in stock at the end of the quarter. ¶224. Chadha also received these same types of performance-based compensation, though the particular percentages each comprised was not disclosed. ¶212 n.22.

The fraud allowed Defendants to meet the financial goals required to achieve the majority of their 2021 compensation. ¶225. The Company's fraudulent accounting and channel-stuffing achieved EBITDA entitling Casey and Gomez to $1,346,725 and $603,603, respectively. ¶217. The Company achieved an EPS level that just barely reached the minimum threshold required for the Individual Defendants to obtain

- 31 -

performance-based restricted stock units. ¶221. Critically, had Defendants properly accounted for revenue and earnings in 2021, Dentsply would have fallen below the minimum threshold, and Casey and Gomez *would not have received 18% and 23% of their respective total 2021 compensation*. *Id.* Similarly, regarding the Operating Margin Plan, the fraud allowed the Company to exceed its margin target by 0.3%. ¶224. But for the scheme, Casey's and Gomez's awards under the Operating Margin Plan would have been *$2.5 million* and *$1.75 million* lower, respectively. ¶225.

The degree to which the Individual Defendants' total compensation depended upon the fraud accordingly supports scienter. *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (defendant received "'concrete and personal benefit' in the form of a bonus worth more than $3 million, amounting to two and half times his normal salary, for boosting . . . EBITDA"); *SEC v. Shapiro*, 2018 WL 2561020, at *7 (S.D.N.Y. June 4, 2018) (scienter alleged where defendant "would receive a personal benefit (in the form of his compensation) as a result of misstatements to customers"); *NewLink*, 297 F. Supp. 3d at 498 (that defendants would "reap a concrete benefit in the form of bonuses amounting to nearly 60% and 49% of their base salaries" from fraud supported scienter).

### 3. Executive Departures Support Scienter

The suspiciously timed departures of multiple senior Dentsply executives, each of whom held a position central to the fraud, further supports scienter. ¶¶231-238. During the course of the Internal Investigation, which began in March 2022: (i) Bruno was fired (March 2022); (ii) Gomez suddenly resigned for a new position (early-April 2022), and then was fired by his new company one day after starting; (iii) Casey was suddenly fired just days after having been re-nominated as a Board member in the Company's proxy statement (mid-April 2022), and later forfeited more than $11 million in severance payments to which he would have been entitled had his termination been "without [c]ause";[7] (iv) Chadha

---

[7] Prior to the filing of the Complaint, the Company had taken "no position" on whether Casey was entitled

and Dentsply "mutually agreed" he would resign (early-August 2022); (v) CCO Petersohn "mutually agreed" to resign (early-September 2022); and (vi) Müller, head of Dentsply's commercial team in China, "left Dentsply Sirona" (November 2022). ¶¶231-238. "Such house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls." *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005); *see In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) ("The timing of terminations and resignations, in relation to the magnitude of corrections in a restatement, also can be a strong inference of scienter, 'approaching recklessness or even conscious malfeasance . . . .'"); *Moshell*, 481 F. Supp. 3d at 286, 291 (termination of executives in connection with internal investigation supported scienter); *comScore*, 268 F. Supp. 3d at 553 (resignations supported scienter).

Defendants' suggestion that the extensive executive turnover does not support scienter because Dentsply did not affirmatively declare the terminations, resignations, and separations to be fraud-related is frivolous. *See* Mot. at 26. Defendants cite no authority suggesting a requirement that an executive's resignation be specifically identified as fraud-related by a defendant company in order to support scienter. *Id.* The cases they do cite are irrelevant, as here the terminations and/or resignations of the Individual Defendants, as well as those of unnamed "senior executives" (*i.e.*, Bruno, Petersohn, and Müller), were specifically identified in Dentsply's 2021 Form 10-K/A as ***remedial*** steps taken to address material weaknesses in Dentsply's ICFR, directly tying the executive departures to the fraud. ¶¶205, 238.

### 4.    Defendants' Remaining Arguments Do Not Undermine Scienter

Defendants' remaining attempts to undermine an inference of scienter are unpersuasive.

---

to his contracted $11 million severance payment, which would be forfeited if he was terminated "with cause" – *i.e.*, for "committing an act of fraud or an act of malfeasance, recklessness or gross negligence against the Company." ¶234. But on September 10, 2023, Dentsply filed a Form 8-K announcing a settlement with Casey in which Casey forfeited any claim to his severance payment and Dentsply agreed not to seek clawback of compensation already paid to Casey.

4854-2065-3461.v1

*First*, Defendants argue that the scheme was beneath the Individual Defendants' notice, because the product used to stuff the channels, CAD/CAM, was "just one of five subsegments within the T&E segment of Dentsply's business" and so not core to its operations. Mot. at 27-28. Their attempt to minimize the relevance of CAD/CAM to the Company ignores allegations that: (i) sales of T&E products represented approximately 60% of Dentsply's revenue in 2020 (¶37); (ii) CAD/CAM represented 22.9% of T&E sales in 2021 (¶240); (iii) digital products were key to the Company's transformation to "digital dentistry" – a pillar of Casey's touted restructuring plan (¶¶43, 239); (iv) the product problems with CAD/CAM were so pervasive, and CAD/CAM so associated with Dentsply, that they impacted the end-user demand for Dentsply's digital products *generally* (¶¶46-47, 50); and (v) CAD/CAM was critical to Defendants falsely achieving internal and external 3Q21 and FY21 expectations because it was available when imaging equipment was in short supply. ¶55; *see Lexmark*, 367 F. Supp. 3d at 38 (core operations doctrine applied where sales "channel accounted for 35% of revenue for [business] division that comprised 83% of [company's] business"); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *16 (S.D.N.Y. Apr. 22, 2016).

*Second*, Defendants' attempt to minimalize the Company's extensive accounting fraud as mere "error" is absurd. Mot. at 22-23. The Restatement resulted in adjustment of nearly *every* financial account on Dentsply's income statements and balance sheets for 3Q21 and FY21 due to GAAP violations. ¶¶161-162. In 3Q21, revenue was overstated by $29 million (3%), operating income by $27 million (20%), net income by $19 million (23%), and diluted EPS by $0.09 (24%). ¶162. The accounting manipulations, which included improper assumptions related to sales returns, warranty reserves, and the massive CAD/CAM incentives, resulted in accrued liabilities being understated in 3Q21 and 4Q21 by $84 million (13%) and $81 million (12%), respectively. ¶¶168, 171-172, 177-179. The extent of the accounting violations demonstrates that the Restatement did not simply result from a careless error or trivial miscalculation. *Peifa Xu v. Gridsum Holding Inc.*, 2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020) (scienter

4854-2065-3461.v1

supported by restatement that decreased revenue by 9%, and increased liabilities by 9%). Defendants' argument that the Restatement and GAAP violations, ***standing alone***, do not support scienter (Mot. at 21-22) is irrelevant: Plaintiffs' scienter allegations do not rest on GAAP violations alone. Accordingly, Defendants' caselaw, in which GAAP violations are the only scienter evidence at issue, is inapposite. *Id.*

Defendants' recasting of the extensive material weaknesses in Dentsply's ICFR and Disclosure Controls as "mere mismanagement" is similarly unavailing. The Internal Investigation identified a laundry list of severe deficiencies, including that Casey and Gomez created an improper tone at the top (fundamental for a company's internal control system to function, *see* ¶¶199-201) and failed to promote or enforce adherence to the Company's Code of Ethics and Business Conduct (¶202). More, the material weaknesses in Dentsply's ICFR surrounding incentive arrangements and variable consideration demonstrate that any financial controls were practically ***non-existent***. ¶¶203-207. Dentsply admitted that its accounting department lacked: (i) "an appropriate level of knowledge about accounting for variable consideration"; (ii) "written policies and procedures to provide governance and establish responsibility for oversight of incentive arrangements provided to customers"; (iii) "formal controls to continuously review and document the methodology and assumptions used in estimating variable based incentives"; and (iv) "formal controls to ensure the accuracy of the estimated accrued liability analysis." ¶¶203, 206. These deficiencies far exceed mismanagement. *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004), which discussed transactions that were "inconsistent with Citigroup's stated risk management policies and historical business practices" (*id.* at 375), is inapposite.

Nor is the Complaint's reliance on the Restatement "fraud-by-hindsight." Mot. at 22-24. Plaintiffs are not "pleading fraud based on changed circumstances that were unforeseen by defendants at the time they made their statements." *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007). As discussed above, the Internal Investigation revealed facts and circumstances that existed ***during the***

- 35 -

***Class Period***, and Plaintiffs' extensive scienter allegations address what Defendants knew or recklessly disregarded ***at that time***. Plaintiffs do not allege Defendants needed to be "clairvoyant," or a "'mere inconsistency between the challenged statements and after-the-fact results,'" as discussed in Defendants' authority. *Novak*, 216 F.3d at 309; *Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*, 2022 WL 784017, at \*16 (S.D.N.Y. Mar. 15, 2022). Rather, Plaintiffs allege that Defendants were "responsible for revealing those material facts reasonably available to them." *Novak*, 216 F.3d at 309.

***Finally***, Defendants' assertion that Plaintiffs cannot establish scienter because the North America Internal Investigation "concluded that there was no evidence of intentional wrongdoing or fraud" (Mot. at 12), fails for several reasons, not least of which is that it ignores that Plaintiffs do not need to establish intentional misconduct in order to plead scienter. *See Novak*, 216 F.3d at 307. Defendants have no basis to claim that the Court must adopt the Internal Investigation's self-serving conclusion. *See* Mot. at 12. The Internal Investigation was not a court proceeding, it was an investigation "motivated by corporate interests that may or may not coincide with the public interest in unearthing wrongdoing and affording a remedy." *SEC v. Obus*, 693 F.3d 276, 291 (2d Cir. 2012) ("[T]he conclusion of such an internal investigation cannot bind a jury, which will make its own independent assessment of the evidence."); *see also In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008) ("[O]fficers and directors are not exonerated when their own audit committee finds nothing wrong in the company's accounting practices. To rule otherwise would create a huge fox-guards-the-chicken-house loophole in our private securities law enforcement."). It would be particularly improper for the Court to adopt this finding since there is no indication of what standard was used in concluding there was no "intentional wrongdoing or fraud," let alone the facts considered. *See* Mot., Ex. 6 at 3. That the SEC has not yet concluded its own investigation into Defendants' misconduct, more than a year after the conclusion of the Internal Investigation, also counsels against accepting Dentsply's self-serving assertion.

- 36 -

4854-2065-3461.v1

Nor are Defendants correct that Plaintiffs cannot rely on some findings from the Internal Investigation, but not others. *See* Mot. at 18-19. The law has long recognized that while statements against a declarant's (here, Defendants') interest are inherently reliable, self-serving statements are not. *See* Fed. R. Evid. 804(b)(3); *Williamson v. United States*, 512 U.S. 594, 599-600 (1994) ("The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature."); *Lynch v. Rawls*, 429 F. App'x 641, 643 n.1 (9th Cir. 2011) ("Plaintiffs may rely on the self-incriminatory portions of Finisar's 10-K without having to take the 10-K's self-serving, self-exonerating conclusion of no malfeasance on behalf of the majority of Finisar's board as true."). It would therefore be inappropriate for the Court to grant equal credence to Dentsply's self-exculpatory statement – made more than five months after this lawsuit was filed – as to the findings relied upon by Plaintiffs.

### 5.    The Complaint Pleads Dentsply's Scienter

Corporate scienter is pled when "'someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *Loreley*, 797 F.3d at 177. "In most cases, the most straightforward way to [plead scienter] for a corporate defendant will be to plead it for an individual defendant." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). The Complaint adequately pleads scienter for the Individual Defendants, and thus does so for Dentsply.

Alternatively, given that the scheme permeated the Company's highest levels, corporate scienter is also pled through the scienter of the multiple executive-level employees who reported directly to Casey and Gomez and knew about and participated in each aspect of the scheme. *See Thomas v. Shiloh Indus., Inc.*, 2017 WL 2937620, at *3 (S.D.N.Y. July 7, 2017) ("[C]ourts in this District have held that 'management level' employees can serve as proxies for the corporation in suits filed under the Exchange Act."); *In re*

4854-2065-3461.v1

*Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) (same). These executives included Bruno (¶¶55, 59, 61-62, 66-67), Zeljkovic (¶62), Asamoah (¶62), Key (¶66), Petersohn (¶66, 236), and Müller (¶¶8, 92-94, 237). *Jackson v. Abernathy*, 960 F.3d 94 (2d Cir. 2020), is inapposite: there, the complaint "offer[ed] only general allegations of warnings made to unidentified senior executives." *Id.* at 99.

## V.    THE COMPLAINT SUFFICIENTLY PLEADS LOSS CAUSATION

Loss causation is the """"causal link"""" between the alleged misrepresentations or scheme and the economic harm Plaintiffs suffered. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 260 (2d Cir. 2016). With respect to pleading loss causation, Plaintiffs' "burden is not a heavy one." *Loreley*, 797 F.3d at 187. All that is required is "some indication of the loss and the causal connection." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016) ("when it is unclear whether the plaintiff's losses were caused by the fraud or some other intervening event, 'the chain of causation is . . . not to be decided on a Rule 12(b)(6) motion to dismiss'"). Plaintiffs need only allege that "'the **subject** of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Vivendi*, 838 F.3d at 261 (emphasis in original). Plaintiffs may plead a loss-causing event or a "series of events," that (i) "constructively" disclose the relevant truth or (ii) were a foreseeable "materialization" of the risk concealed by the fraud. *Id.* at 262.

Plaintiffs readily plead loss causation under this standard. The Complaint alleges that Dentsply's stock price was artificially inflated by: (i) Defendants' channel-stuffing and accounting fraud, which led to false reporting of financial results and inevitable future sales shortfalls; and (ii) the material misstatements and omissions Defendants made concerning supply chain, digital products, Dentsply's growth and sustainability of operations, the drivers of Dentsply's purported financial successes, and inventory levels to conceal its ongoing operational challenges, channel-stuffing, and accounting scheme. The Complaint

4854-2065-3461.v1

further alleges the "series of events" that constructively revealed Defendants' fraud.  ¶¶266-281.  The "'relevant truth . . . leak[ed] out'" through these disclosures, causing investor losses as Dentsply's stock price declined following each disclosure.  *Vivendi*, 838 F.3d at 261.

Courts consistently sustain loss causation allegations based on precisely the types of events alleged here.  *Alexion*, 556 F. Supp. 3d at 140 (loss causation pled based on series of disclosures including "delayed 10-Q filing and announcement of the audit committee's investigation" and high-level executive departures); *Ontario Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 174 (D. Conn. 2019) ("sequence of events . . . [that] constructively disclosed the fraud" included disclosure that "revealed disappointing financial numbers," announcements that "high-level executives were fired or quit," and "media report[s] that pricing pressure was creating uncertainty for Teva's future").

Defendants' loss causation arguments fail.

First, Defendants concede that the Complaint alleges loss causation based on Dentsply's November 1, 2022 disclosure.  ¶¶277-278.  This alone precludes dismissal on loss causation grounds.

Second, Defendants argue that alleged loss-causing events must explicitly "reveal" Defendants' scheme – effectively requiring a mirror-image corrective disclosure.  Mot. at 35-39.  However, even a "'corrective disclosure' is not required . . . [and] neither the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure be a 'mirror image' tantamount to a confession of fraud."  *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).  Thus, loss causation does not require the explicit revelation of Defendants' channel-stuffing scheme or express contravention of Defendants' prior misstatements.  Instead, "the 'relevant truth' required under *Dura* is not that a fraud was committed per se, but that the 'truth' about the company's ***underlying condition***, when revealed, causes the 'economic loss.'"  *Id.*  For this reason, courts regularly sustain loss causation allegations where a company suffers financial losses relating to the fraud but there is

- 39 -

no express disclosure of the fraud itself. *See Vivendi*, 838 F.3d at 261-62; *Freudenberg*, 712 F. Supp. 2d at 203 (write-down of loan portfolio was loss-causing event even before it was known that the company had concealed purchases of low-quality loans); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 909-10 (D. Minn. 2011) (loss causation alleged based on guidance miss despite defendants "not 'correctively disclos[ing]' the particular practices that Plaintiffs allege, largely channel stuffing accompanied by misleading accounting for such sales").

The Second Circuit's controlling decision in *Vivendi* is instructive. There, defendants made alleged false statements concealing the company's liquidity crisis. *See Vivendi*, 838 F.3d at 262-63. But "no specific corrective disclosure ever exposed the precise extent" of Vivendi's liquidity crisis. *Id*. at 262. Instead, a "series of events" occurred as a result of the crisis that caused Vivendi's stock price to drop, including: (i) a downgrade of Vivendi's credit; (ii) Vivendi's sale of securities and assets to raise cash; and (iii) Vivendi's acknowledgement of short-term liquidity problems. *Id*. at 262-63. In rejecting defendants' contention that these events and disclosures did not sufficiently reveal the relevant truth, the Second Circuit held that "[w]hether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *Id.* at 262. So long as a complaint alleges a link between the fraud and the loss, causation is adequately alleged. The Complaint provides that link.

*February 28, 2022*: Dentsply announced disappointing 4Q21 financial results and full year 2022 ("FY22") guidance below expectations, which reflected the negative consequences of Dentsply's channel-stuffing. ¶¶72-75, 265. Defendants had cannibalized sales that otherwise would have been made in 2022 by offering massive, undisclosed incentives to distributors in 2H21 to induce purchases of then-unneeded product. ¶¶74, 266-268. Indeed, Dentsply later admitted in its corrected Form 10-K/A that at the end of 2021, "certain dealers' inventory of the Company's CAD/CAM products in the United States was higher

than at the end of the prior year, by approximately $50 million" ***because of*** "lower-than-expected" 4Q21 sales and "timing-related purchases by dealers due primarily to incremental ***pricing incentives in the second half of the year***." ¶267. Defendants also admitted that as of February 28, 2022, the "higher levels of dealer inventory" were "likely to pose headwinds to the Company's net sales for these products in 2022." *Id.* And, while downplaying the supply constraints, Defendants noted that supply chain disruptions had constrained growth in 4Q21. ¶107. Defendants' authority is inapposite because it requires that the disclosure "actually disclose" the fraud – a standard rejected in *Vivendi*. *See Abuhamdan v. Blythe*, 9 F. Supp. 3d 175, 209 (D. Conn. 2014). And the plaintiff in *Blythe* "did not even attempt" to tie the disclosure to the fraud. Here, on the other hand, Plaintiffs have alleged specific facts explaining how the February 28, 2022 announcement was linked to the fraud. ¶¶74, 266-267.

*April 19, 2022*: Dentsply preliminarily announced poor revenue, sales growth, and EPS performance – results caused by persistent product problems and bloated dealer inventories. ¶270. Defendants linked the 1Q22 shortfall to their channel-stuffing scheme when they later admitted that the sales incentives "contributed to higher levels of distributor inventory at the end" of 3Q21 and 4Q21 and "***lower sales to these distributors in the first*** and second quarters of 2022." ¶90; *see also* ¶267. In other words, the negative 1Q22 preannouncement was a direct and foreseeable consequence of the fraud: Defendants' channel-stuffing led to a massive build of excess inventory in 2H21, and burning off that inventory cut into Dentsply's revenues during 1Q22. *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 388-89 (E.D.N.Y. 2013), and *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005), are unhelpful. There, the earnings announcements were not linked to the fraud; here, the announcement was directly attributed to conditions previously concealed by the fraud (weaker U.S. sales and supply chain issues), announced at the same time as Casey's firing and shortly after Gomez's departure, and subsequently tied directly to the fraud. ¶¶270-271.

- 41 -

4854-2065-3461.v1

Regarding Casey's dismissal, Defendants assert that there can be no loss causation because Dentsply did not outright tell the market that Casey was fired due to the fraud.  Again, Defendants misstate the law.  Executive resignations are sufficient to allege loss causation when taken in context.  *Compare In re Stillwater Cap. Partners Inc. Litig.*, 858 F. Supp. 2d 277, 289 (S.D.N.Y. 2012) (executive resignation shortly following report of company misconduct), *and Teva*, 432 F. Supp. 3d at 174 (executive departures one in a sequence of events that constructively disclosed fraud), *with Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009) (executive departures, "*[s]tanding alone*" insufficient to allege loss causation), *and In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008) (holding, at summary judgment, that director's resignation did not reveal the fraud because it was not "connected to" the fraud).  Casey was abruptly terminated – without a permanent replacement – during the Internal Investigation and six days after the Company recommended Casey as a Board member.  ¶¶80, 234.  The firing was a "shock" to investors, and analysts warned of more bad news to come.  ¶271.  Based on that investigation, the Company later revealed that Casey had, *inter alia*: (i) "violated provisions of the Company's Code of Ethics and Business Conduct"; (ii) "created a culture where employees did not feel comfortable raising concerns without fear of retaliation"; and (iii) fostered an "inappropriate tone at the top."  ¶89.  Further, in connection with the Restatement, Dentsply identified "[t]ermination of certain members of senior management . . . for violations of the Code of Ethics and Business Conduct" and appointment of a new CEO as remedial steps taken to prevent future restatements.  ¶205.

Ignoring these allegations, Defendants contend that Plaintiffs cannot allege Casey's firing and the fraud are linked because "'Dentsply told analysts that the termination was due to performance-related issues.'"  Mot. at 36.  Defendants' argument falls flat – Defendants cannot absolve themselves of liability for securities fraud simply by obscuring the true reason for Casey's departure.  *Alexion*, 556 F. Supp. 3d at 140-41 (upholding loss causation allegations based on executive departures even though the "'departures

4854-2065-3461.v1

were in fact attributed to non-fraudulent motivations'"); *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 324 (5th Cir. 2014) (resignation for reasons purportedly unrelated to fraud was a loss-causation event, along with a U.S. Department of Justice investigation and negative earnings report). *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012), and *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 477 (4th Cir. 2011), are inapposite. Neither discusses executive departures, and further, the plaintiffs there alleged that articles and analyst reports were themselves corrective disclosures that caused stock drops. Here, Plaintiffs allege concrete news of Casey's departure followed by analyst commentary which provides an additional link between the departure and the fraud.[8] *Alexion*, 556 F. Supp. 3d at 141 (plaintiffs' theory of loss causation was supported by allegation that contemporaneously, "[a]nalysts were unsurprisingly disturbed by this new announcement of high-level resignations").

*May 10, 2022*: Dentsply announced that it was unable to timely file its 1Q22 Form 10-Q because of the (previously undisclosed) Internal Investigation. ¶272. Defendants' contention that the May 10, 2022 disclosures "did not reveal any fraud or correct any prior challenged statements" (Mot. at 38) again misapprehends the law. As discussed, there is no "mirror image" disclosure requirement. Further, numerous courts have upheld investigation-related loss causation allegations. *See, e.g.*, *Alexion*, 556 F. Supp. 3d at 140 (loss causation alleged for stock price decline caused by "delayed 10-Q filing and announcement of the audit committee's investigation" into alleged improper sales practices); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 620 (S.D.N.Y. 2015) ("[C]ourts within this District have concluded that the disclosure of an investigation 'into a particular business practice can be sufficient to allege loss causation with respect to alleged misstatements regarding that practice.'") (collecting cases); *Vivendi*, 838 F.3d at 263. *Janbay*, 2012 WL 1080306, at *15, and *In re Hansen Nat.*

---

[8] Defendants' attempt to parse the allegation that investors suspected "'fraud or major operational problems'" after Casey was fired (Mot. at 36 (quoting ¶270)) ignores the obvious fact that the fraud was committed to conceal softening sales due to undisclosed product defects and supply chain issues – *i.e.*, major operational problems.

*Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007), are distinguishable because the disclosures there lacked the specificity of Dentsply's disclosure that it was investigating internal complaints concerning the exact misconduct Plaintiffs allege. ¶¶82, 272-273.

Defendants fail to address Plaintiffs' allegations regarding the 13.5% sales decline also announced on May 10, 2022. ¶273. Interim CFO Barbara Bodem linked the decline to Defendants' fraud when she told investors on May 10 that "[t]he majority of that decline was related to burning of inventory . . . at the dealers" and connected that burning of inventory to the "$50 million of excess . . . inventory at the end of the year." *Id.* She further disclosed that approximately 80% of the U.S. sales decline was a direct result of the dealer inventory buildup from 2H21, primarily CAD/CAM – in fact, there was so much excess that management did not expect inventory levels to normalize until 3Q22 *at the earliest*. *Id.* Defendants later admitted that the dealer incentives led directly to the 1Q22 sales decline. ¶¶90, 267.

*November 14, 2022*: Finally, the Complaint links the fraud to Dentsply's disappointing November 14, 2022 sales and earnings guidance. ¶279. During the earnings call, new CFO Glenn Coleman stated that Dentsply's "CAD/CAM business declined in the quarter due to tough year-over-year comps and lower wholesale orders." ¶280. In its Form 10-Q, Dentsply elaborated that the decrease in U.S. organic sales was driven in part by "lower wholesale volumes for CAD/CAM products relative to prior year." *Id.* Defendants assert that the disclosure did not contain any "'fraud-related information'" (Mot. at 38-39) but ignore that Defendants themselves linked Dentsply's disappointing 2022 performance to supply challenges, weakened demand, and a "***build in distributor inventory of approximately $35 million, partly as a result of incremental incentives offered during that period which did not recur in 2022***" (¶280) – *i.e.*, the channel-stuffing scheme. Because Dentsply explicitly attributed the disclosure to the fraud, *Gentiva*, 932 F. Supp. 2d at 352, and *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666 (S.D.N.Y. 2007), are inapposite. As a result of the November 14, 2022 news, Dentsply's stock price declined over 5%. ¶281.

4854-2065-3461.v1

Analysts and news commentary attributed the decline to the Company's FY22 sales and adjusted earnings guidance, which "implie[d] a challenged 4Q, with organic sales forecasted to be down at least mid-single digits and EPS to be in a range of $0.26-$0.36 (vs. $0.83 in 4Q-21)." ¶282. *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448 (D. Conn. 2013), *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010), and *In re Mylan N.V. Sec. Litig.*, 2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023), are inapplicable because they determined, at ***summary judgment***, the fact-specific question of whether disclosures revealed new information. *See Xerox*, 935 F. Supp. 2d at 451, 496; *Omnicom*, 597 F.3d at 503-04, 512; *Mylan*, 2023 WL 2711552, at *1, *35. Regardless, here, the disclosure shed additional light on the extent of Dentsply's supply, demand, and fraud-related inventory challenges, and the time it would take for them to resolve. ¶¶279-280.

## VI. THE COMPLAINT SUFFICIENTLY PLEADS CONTROL PERSON LIABILITY AGAINST ALL DEFENDANTS

Defendants do not dispute that they are "control persons" for purposes of §20(a) of the Exchange Act. Mot. at 39-40. Instead, Defendants cursorily claim that Plaintiffs fail to plead each Defendant's "'culpable particip[ation]'" in the fraud. *Id.* As discussed above, the Individual Defendants each signed SEC filings the Company later admitted were materially misleading (¶¶31-35, 153), certified that they were responsible for establishing the Company's deficient internal controls (¶¶192-210), and made numerous representations to investors while knowingly or recklessly disregarding their material falsity (¶¶99-151). These allegations suffice to establish culpable participation. *See In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 741-42 (S.D.N.Y. 2015).

## VII. CONCLUSION

Plaintiffs have adequately pled their claims under §§10(b) and 20(a) of the Exchange Act and Rule 10b(5). Defendants' Motion should be rejected in its entirety.

4854-2065-3461.v1

DATED:  December 8, 2023

Respectfully submitted,

ROBBINS GELLER RUDMAN
    & DOWD LLP
LUKE O. BROOKS (admitted *pro hac vice*)
HILLARY B. STAKEM (admitted *pro hac vice*)
NICOLE Q. GILLILAND (admitted *pro hac vice*)


s/ Luke O. Brooks
LUKE O. BROOKS

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
lukeb@rgrdlaw.com
hstakem@rgrdlaw.com
ngilliland@rgrdlaw.com

ROBBINS GELLER RUDMAN
    & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel for Lead Plaintiffs

- 46 -

4854-2065-3461.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on December 8, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Luke O. Brooks
LUKE O. BROOKS

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Email: lukeb@rgrdlaw.com

4854-2065-3461.v1

# Mailing Information for a Case 1:22-cv-06339-AS San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Javier Bleichmar**
  jbleichmar@bfalaw.com

- **H. Christopher Boehning**
  cboehning@paulweiss.com,Mao_fednational@paulweiss.com

- **Luke Orion Brooks**
  lukeb@rgrdlaw.com,kmccormack@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Kristina Anne Bunting**
  kbunting@paulweiss.com,mao_fednational@paulweiss.com

- **Roger Allen Cooper**
  racooper@cgsh.com,maofiling@cgsh.com

- **Bryce Leigh Friedman**
  bfriedman@stblaw.com,managingclerk@stblaw.com,5962535420@filings.docketbird.com

- **Nicole Quaid Gilliland**
  ngilliland@rgrdlaw.com

- **Meredith Dawn Karp**
  meredith.karp@stblaw.com,5128371420@filings.docketbird.com,managingclerk@stblaw.com

- **Nancy A. Kulesa**
  nancy@nkulesa.com

- **Seth L. Levine**
  slevine@levinelee.com,managingclerk@levinelee.com

- **Mark Edward McDonald**
  memcdonald@cgsh.com,maofiling@cgsh.com

- **Joseph F. Murray**
  murray@mmmb.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

- **Hannah Elizabeth Ross**
  hannah@blbglaw.com,catherine@blbglaw.com,managingclerk@blbglaw.com

- **Ross Mitchell Shikowitz**
  rshikowitz@bfalaw.com

- **Hillary B. Stakem**
  hstakem@rgrdlaw.com

- **Craig Scott Waldman**
  cwaldman@stblaw.com,2395227420@filings.docketbird.com,managingclerk@stblaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Alycia              N Broz
Vorys Sayer Seymour & Pease LLP
52 East Gay Street
P. O. Box 1008
Columbus, OH 43216-1008

John                C Camillus
MEYER WILSON CO., LPA
305 W. Nationwide Blvd.
Columbus, OH 43215

John                L Chaney
Chaney & Drexel, LLC
One East Livingston Avenue
Columbus, OH 43215
```