# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAN ANTONIO FIRE AND POLICE PENSION FUND, CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, EL PASO FIREMEN & POLICEMEN'S PENSION FUND, and WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiffs,<br><br>    v.<br><br><br>DENTSPLY SIRONA INC., DONALD M. CASEY, JR., and JORGE GOMEZ<br><br>       Defendants. | Case No. 1:22-cv-06339-AS |

<br><br>

# EXPERT REPORT OF PAUL ZUREK, PH.D.

# December 20, 2024

# Table of Contents

I.    Qualifications ........................................................................................................... 1

II.   Assignment and Compensation ............................................................................... 1

III.  Summary of Opinions .............................................................................................. 2

IV.   Background and Summary of Allegations ............................................................... 5

    A.    Background on Dentsply .................................................................................. 5

    B.    Alleged Scheme and Alleged Misrepresentations ........................................... 7

    C.    Alleged Disclosures or "Loss-Causing Events" .............................................. 8

V.    Dr. Cain Has Not Articulated a Damages Methodology that Can Measure Damages Consistently with Plaintiffs' Alleged Theories of Liability .............................................. 11

    A.    Dr. Cain's Opinions in Section VI of the Cain Report Do Not Address Plaintiffs' Alleged Theories of Liability .......................................................................................... 11

    B.    Dr. Cain Has Failed to Analyze the Implications of Plaintiffs' Alleged Theories of Liability for the Ability of the Event Study Methodology to Estimate Inflation, a Key Input to "Out-Of-Pocket" Damages ...................................................................... 14

        1.    Dr. Cain Fails to Address the "Mismatch" Between the Alleged Misrepresentations and the Alleged Truth Revealed by the Disclosures ............. 17

        2.    Dr. Cain Does Not Address the Insufficiency of an Event Study to Measure Inflation in the Presence of a "Mismatch" ............................................ 20

    C.    Dr. Cain Has Proposed No Methodology or Model to Reliably Measure Inflation Given that the Nature of the Allegedly Withheld Information Changed Over Time ....... 23

    D.    Dr. Cain Has Failed to Provide a Methodology or Model Capable of Reliably Assessing How Inflation May Have Varied Over the Proposed Class Period ................. 30

    E.    Dr. Cain Has Failed to Analyze the Implication of Plaintiffs' Alleged Theory of Liability that the November 1, 2022 Disclosure Resulted in a Delayed, Multi-Day Price Reaction .................................................................................................................. 33

    F.    Dr. Cain's Discussion of How One Might Account for Confounding News Is Speculative and Fails to Address the Complexity of the Disclosures at Issue Under Plaintiffs' Alleged Theories of Liability ............................................................................ 37

## I.      Qualifications

1.      I am a Vice President at Cornerstone Research, a financial and economic consulting firm. I hold Ph.D. and M.A. degrees in finance and a B.S. degree in economics from the Wharton School at the University of Pennsylvania.  My research and work experience span a number of areas in financial economics, with a focus on asset pricing, valuation, and statistical analysis of financial data.  A copy of my curriculum vitae is attached as **Appendix A**.

2.      I have authored textbook chapters on issues in finance and economics.  I have taught valuation, corporate finance, risk management, and asset pricing, including in executive education programs, at the Wharton School at the University of Pennsylvania and at Stanford Law School.

3.      I have more than a decade of experience conducting economic analyses on complex matters at all stages of litigation.  At Cornerstone Research, I have consulted on numerous litigation matters, including securities lawsuits by shareholders.  In that context, my work has involved issues of market efficiency, price impact, loss causation, and valuation, as well as the calculation of per-share damages.  I have previously served as an expert in litigation, including in securities matters, testified in arbitration, testified in trial, and presented findings of my analyses to regulators.  I have also spoken on various matters related to securities litigation.  A list of my prior testimony is included in **Appendix A**.

## II.     Assignment and Compensation

4.      I have been retained by counsel for Dentsply Sirona Inc. ("Dentsply" or the "Company") to review and respond to certain opinions expressed in the Expert Report of Matthew D. Cain, Ph.D., dated November 15, 2024 (the "Cain Report").

5.      I understand that Lead Plaintiffs are seeking to certify a class of "[a]ll persons and entities who purchased the publicly traded common stock of [Dentsply] between June 9, 2021 and November 13, 2022, inclusive (the 'Class Period'), and were damaged thereby (the

'Proposed Class')."[1]  According to the Cain Report, Dr. Cain was asked, among other topics, "to opine on whether per-share damages for traders of Dentsply Common Stock can be assessed for all Class members based upon a methodology common to all Class members and consistent with Plaintiffs' theories of liability."[2]

6.      I have been asked to assess Dr. Cain's opinion that "[d]amages in this matter can be calculated on a class-wide basis subject to a standard, common methodology for Plaintiffs' pending claims."[3]

7.      In undertaking my assignment, I have examined various materials, including legal pleadings, academic literature, securities analyst reports, press articles, and various other public sources.  A list of materials that I have considered in forming my opinions is attached as **Appendix B**.

8.      I have been assisted in the preparation of this report by staff of Cornerstone Research, who worked under my direction.  Cornerstone Research is being compensated for my work in this matter at an hourly rate of $1,100.  My compensation is not affected by the outcome of this matter.  My work is ongoing, and I reserve the right to supplement my opinions if additional information becomes available and/or Dr. Cain expresses additional opinions.

## III.    Summary of Opinions

9.      Contrary to its claims, the Cain Report fails to demonstrate that, as an economic matter, "per-share damages for traders of Dentsply Common Stock can be assessed for all Class members based upon a methodology common to all Class members and consistent with Plaintiffs' theories of liability."[4]  Instead, the Cain Report appears to essentially conclude that out-of-pocket damages can be calculated on a class-wide basis using some unspecified application of an event study methodology and/or other economic tools.

---

[1] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *San Antonio Fire and Police Pension Fund et al., vs. Dentsply Sirona Inc. et al.*, Case No. 1:22-cv-06339-AS, November 15, 2024 ("Class Cert Motion"), p. 1.
[2] Cain Report, ¶ 95.
[3] Cain Report, ¶ 3.d.
[4] Cain Report, ¶ 95.  See also Cain Report, ¶ 3.d.

10.     As an initial matter, it is not clear that Dr. Cain is of the opinion that the damages "approach" he outlines in his report is in fact "consistent with Plaintiffs' theories of liability." This is because the Cain Report neither analyzes Plaintiffs' alleged theories of liability in this matter in the context of its discussion of damages nor explicitly states that Dr. Cain has reached such an opinion.  Instead, Dr. Cain's stated conclusion appears to be limited to the class-wide nature of his proposed "approach."  In any case, there is no economic basis provided in the Cain Report to support a conclusion that damages can be calculated in a manner "consistent with Plaintiffs' theories of liability."

11.     First, the economic implication of Plaintiffs' allegations in this matter as I understand them is that the disclosures of information about Dentsply's financial results, its internal investigations, and its restatements on five dates in 2022 (which I understand have also been characterized by the Court in its Motion to Dismiss ruling as "loss-causing events"[5]) represent a "mismatch" with the alleged misrepresentations, in that they disclose information that does not simply reveal that the alleged misrepresentations were false but instead are disclosures of alleged consequences of the misrepresentations.  In particular, I understand that the Court suggested in its MTD Opinion that the information that was "concealed by the fraudulent statement[s]" was a "risk" that ultimately materialized and was revealed in various disclosures regarding Dentsply's financial results and its internal investigations and restatements.[6]  The information allegedly withheld from the market (the risk, representing a range of possible future, uncertain outcomes for Dentsply) is different from the information that purportedly represents the materialization of that risk (the consequences of the risk having materialized and uncertainty having been resolved in a specific way).  The particular nature of this mismatch here means that Dr. Cain cannot assume that inflation can, as a matter of economics, be measured using company-specific residual price declines on dates when information about the alleged undisclosed risks was allegedly revealed.  The Cain Report has identified no alternative methodology or model to account for this implication of Plaintiffs' alleged theories of liability, and Dr. Cain therefore has no basis in economics to claim that damages can be calculated "in a manner consistent with

---

[5] Opinion and Order, *San Antonio Fire and Police Pension Fund et al., vs. Dentsply Sirona Inc. et al.*, Case No. 1:22-cv-06339-AS, May 1, 2024 ("MTD Opinion"), p. 15.
[6] MTD Opinion, p. 15.

Plaintiffs' theories of liability."  As I discuss in the report, this omission in the Cain Report's analysis is particularly relevant for the November 1, 2022 and November 14, 2022 disclosures.

12.      Second, there are additional features of the November 1, 2022 and November 14, 2022 disclosures (beyond these disclosures reflecting a mismatch with the alleged misrepresentations) that, as an economic matter, pose further challenges to using an event study methodology to measure damages.  These features include that:  (1) there was no statistically significant company-specific price decline following the November 1 disclosure; (2) Plaintiffs allege a multi-day, delayed-reaction price decline following the November 1 disclosure; (3) applying similar logic to other disclosures identified by Plaintiffs as having revealed the alleged truth (May 10 and November 14) indicates a lack of statistically significant company-specific residual returns under Dr. Cain's event study model following those announcements; and (4) the overall price reaction to the company-specific information released from November 1 through November 14 (which includes multiple announcements regarding Dentsply's financial performance and its accounting restatement) is not statistically significant.  Given the lack of any discussion of these specific features arising from Plaintiffs' allegations, the Cain Report has not established from an economic perspective that damages can be calculated consistently with Plaintiffs' alleged theories of liability for the November 2022 disclosures.

13.      Third, despite discussing the possibility that "artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements,"[7] Dr. Cain does not identify any methodology or model that could reliably assess how inflation may have varied over time given the specific circumstances of this case.

14.      Fourth, while acknowledging the need to account for confounding information when calculating inflation, Dr. Cain fails to articulate any methodology or model for dealing with confounding information that reflects the particular circumstances of this case, even though Plaintiffs' allegations appear to specifically recognize that confounding information was present on certain dates.

15.      For the foregoing reasons, Dr. Cain has not established any reliable economic basis in the Cain Report to conclude that, as an economic matter, damages in this litigation "can be assessed

---

[7] Cain Report, ¶ 104.

for all Class members based upon a methodology common to all Class members and consistent with Plaintiffs' theories of liability."[8]

## IV.    Background and Summary of Allegations

### A.    Background on Dentsply

16.    Per its public disclosures, Dentsply "develops, manufactures, and markets a comprehensive solutions offering including dental equipment and dental consumable products" and "manufactures and markets healthcare consumable products."[9]  As of fiscal year 2021, Dentsply's sales were categorized under two main product segments:

- **Technologies and Equipment ("T&E")**, which includes "dental implants, CAD/CAM systems, orthodontic clear aligner products, imaging systems, treatment centers, instruments, as well as certain healthcare device products, primarily catheters."[10]  This segment accounted for 59% of Dentsply's net sales in 2021.[11]

- **Consumables**, which "consist[s] of value-added dental supplies and small equipment used in dental offices for the treatment of patients."[12]  This segment accounted for 41% of Dentsply's net sales in 2021.[13]

17.    Within the T&E segment, Dentsply further categorizes products as Equipment and Instruments, CAD/CAM, Orthodontics, Healthcare, and Implants:[14]

- Equipment and Instruments includes dental equipment such as "treatment centers, imaging equipment, motorized dental handpieces, and other instruments."[15] Among other products, Equipment and Instruments includes Axeos and

---

[8] Cain Report, ¶ 95.
[9] Dentsply Sirona Inc., SEC Form 10-KA for the fiscal year ended December 31, 2021, filed November 7, 2022 ("FY 2021 10-KA"), p. 27.
[10] FY 2021 10-KA, p. 27.
[11] FY 2021 10-KA, p. 66.
[12] FY 2021 10-KA, p. 67.
[13] FY 2021 10-KA, p. 66.
[14] FY 2021 10-KA, pp. 66–67.
[15] FY 2021 10-KA, p. 66.

Orthophos, two types of X-ray imaging devices.[16]  Equipment and Instruments accounted for 17% of Dentsply's net sales in fiscal year 2021.[17]

- CAD/CAM products include "digital impressions … intraoral scanners, mills, and services."[18]  Among other products, this product category includes Primemill (a milling device used to construct crowns, bridges, and other restorations)[19] and Primescan (a device used in performing intraoral scans).[20]  CAD/CAM accounted for 14% of Dentsply's net sales in fiscal year 2021.[21]

- Orthodontics "primarily includes a dentist-directed clear aligner solution, SureSmile, and a direct-to-consumer clear aligner solution, Byte."[22]

- Healthcare "consists mainly of urology catheters and other healthcare-related consumable products."[23]

- Implants includes a "portfolio of innovative dental implant products, bone regenerative and restorative solutions, and educational programs."[24]

18.     Within the Consumables segment, Dentsply categorizes products as:  (1) Endodontic and Restorative Products; and (2) Other Consumables.  Endodontic products include "drills, filers, sealers, irrigation needles and other tools or single-use solutions which support root canal procedures."[25]  Restorative products include "dental prosthetics, such as artificial teeth, dental ceramics, digital dentures, precious metal dental alloys, and crown and bridge porcelain products."[26]  Other Consumables include "small equipment products such as intraoral curing

---

[16] "Discover our Extraoral X-Ray Products," Dentsply Sirona, available at https://www.dentsplysirona.com/en-us/discover/discover-by-category/imaging-systems/extraoral-imaging.html, accessed on December 11, 2024.
[17] FY 2021 10-KA, p. 66.
[18] FY 2021 10-KA, p. 66.
[19] "CEREC Primemill," Dentsply Sirona, available at https://www.dentsplysirona.com/en-us/discover/discover-by-brand/cerec-primemill.html, accessed on December 11, 2024.
[20] "Primescan," Dentsply Sirona, available at https://www.dentsplysirona.com/en-us/discover/discover-by-brand/primescan.html, accessed on December 11, 2024.
[21] FY 2021 10-KA, p. 66.
[22] FY 2021 10-KA, p. 66.
[23] FY 2021 10-KA, p. 67.
[24] FY 2021 10-KA, p. 66.
[25] FY 2021 10-KA, p. 67.
[26] FY 2021 10-KA, p. 67.

light systems, dental diagnostic systems and ultrasonic scalers and polishers, as well as other dental supplies."[27]

19.     In 2021 and 2022, the U.S. market accounted for approximately 35% of Dentsply's net sales, Europe accounted for approximately 40% of net sales, and other international sales accounted for the remaining 25% of the Company's net sales.[28]

### B.     Alleged Scheme and Alleged Misrepresentations

20.     I understand that Plaintiffs allege that Defendants "engaged in a scheme to defraud that created the illusion that Dentsply's business was robust and sustainably growing, when, in reality, it was experiencing severe operational challenges" as a result of:  (1) product defects; and (2) supply chain issues.[29]  Plaintiffs also allege that the Company "engage[d] in 'channel-stuffing'" for "high-margin products not impacted by supply chain shortages … such as CAD/CAM products Primescan and Primemill,"[30] which involved "offer[ing] distributors outsized incentives … to purchase additional CAD/CAM equipment that exceeded end-user demand."[31]  Plaintiffs further allege that "Dentsply largely ignored the incentives when preparing its financial reports, resulting in falsely overstated revenue and understated liabilities" and leading to "improper accounting, which violated Generally Accepted Accounting Principles ('GAAP')."[32]

21.     Specifically, Plaintiffs allege that Defendants made misrepresentations with respect to: "(1) the supply chain disruptions in 2H21; (2) the success and drivers of Dentsply's digital product sales; (3) dealer inventory levels; (4) the Company's success in 3Q21 and its results for 4Q21 and FY21; (5) the Company's 'sustainable' growth profile based on 'strong underlying fundamentals'; and (6) Dentsply's governance policies and ethics."[33]  Plaintiffs also allege that

---

[27] FY 2021 10-KA, p. 67.

[28] FY 2021 10-KA, p. 67; Dentsply Sirona Inc., SEC Form 10-KA for the fiscal year ended December 31, 2022, filed August 7, 2023, p. 27.

[29] Class Cert Motion, pp. 2–3.

[30] Amended Complaint for Violations of the Federal Securities Laws, *San Antonio Fire and Police Pension Fund et al., vs. Dentsply Sirona Inc. et al.*, Case No. 1:22-cv-06339-AS, August 1, 2023 ("Complaint"), ¶ 5, Section IV.C.

[31] Class Cert Motion, p. 4.

[32] Class Cert Motion, p. 5.

[33] Complaint, ¶ 98.

Defendants "commit[ed] material violations of GAAP, SEC reporting rules, and SOX;"[34] "violated GAAP and SEC disclosure rules with respect to Dentsply's SEC filings" in 2021;[35] and misrepresented the effectiveness of Dentsply's internal controls.[36]

22.    I understand that certain alleged misrepresentations were dismissed in the Court's MTD Opinion.[37]  See **Exhibit 1** for a summary of the alleged misrepresentations that I understand remain at issue.

### C.    Alleged Disclosures or "Loss-Causing Events"

23.    Plaintiffs claim that the truth about the alleged misrepresentations and the alleged "scheme to defraud" was revealed to the market through disclosures of information about Dentsply's financial results and its internal investigations and restatements on five dates in 2022 (which I understand have been characterized by the Court in its MTD Opinion as "loss-causing events"), on February 28; April 19; May 10; November 1; and November 14.[38]

24.    On February 28, 2022, Dentsply released financial results for 4Q21 and FY21, provided guidance for FY22, and held a conference call with investors.[39]  According to the Complaint, 4Q21 financials and FY22 guidance were below analyst expectations.[40]  Plaintiffs assert that "[d]uring the earnings call, Defendants told investors that the soft results were primarily due to supply chain issues, which management estimated 'suppressed' Dentsply's growth by 'approximately 2 to 3 points.' … CAD/CAM inventory buildup as a result of Defendants' channel stuffing was a substantial factor in Dentsply's disappointing 2022 guidance as well as the timing of expected 2022 revenue, which was heavily weighted to the second half of the year."[41]  Plaintiffs claim that "[a]s a result of the February 28, 2022 disclosures …, Dentsply's stock price declined by $4.55 per share, or over 7.7%" on February 28, 2022.[42]

---

[34] Complaint, ¶ 152.
[35] Complaint, ¶ 180.
[36] Complaint, ¶ 192.
[37] MTD Opinion, p. 18.
[38] Complaint, ¶¶ 265–282; MTD Opinion, p. 15.
[39] Complaint, ¶ 265.
[40] Complaint, ¶ 265.
[41] Complaint, ¶ 266.
[42] Complaint, ¶ 268.

25.     On April 19, 2022, Dentsply announced the termination of its Chief Executive Officer ("CEO") Donald Casey and released preliminary 1Q22 financial results.[43]  Dentsply had previously announced the resignation of its Chief Financial Officer ("CFO") Jorge Gomez on April 11, 2022.[44]  According to the Complaint:

> [T]he Company announced the sudden "terminat[ion]" of defendant Casey as CEO and Director. Dentsply told analysts that the termination was due to performance-related issues. The Company also released certain preliminary financial results for 1Q22, including 1Q22 revenue of 5% below market consensus, sales growth 2.75% below consensus, and adjusted EPS $0.16, or approximately 24%, below market consensus, attributing the shortfalls to "weaker sales performance in the U.S., global supply chain challenges, and foreign exchange headwinds." In reality, the poor revenue, sales growth, and EPS performance was due in substantial part to lower demand related to Dentsply's persistent product problems and still-full dealer inventory channels.[45]

Plaintiffs claim that these disclosures led Dentsply's stock "to decline by $6.52 per share, or over 13%" on April 19, 2022.[46]

26.     On May 10, 2022, Dentsply announced that an internal investigation into financial reporting matters had been initiated in March 2022 and was still ongoing and that, as a result, there would be a delay in filing the Company's Form 10-Q for 1Q22 with the SEC.[47]  Despite the filing delay, Dentsply announced preliminary 1Q22 financial results and held a conference call with investors.[48]  According to the Complaint:

> Dentsply filed a Form 12b-25 Notification of Late Filing with the SEC, announcing that it was unable to file its 1Q22 Form 10-Q on a timely basis due to an ongoing internal investigation "regarding certain financial reporting matters[.]" … Dentsply announced that the Audit and Finance Committee was investigating "the Company's use of incentives to sell products to distributors in the third and fourth quarter of 2021" and "whether those incentives were appropriately accounted for" in the Company's financial statements[.] … Dentsply's Interim CFO Bodem told investors that the Company's sales in the U.S. had declined 13.5% in the first quarter and … further disclosed that approximately 80% of the

---

[43] Complaint, ¶ 270.
[44] Complaint, ¶ 15.
[45] Complaint, ¶ 270.
[46] Complaint, ¶ 270.
[47] Complaint, ¶ 272.
[48] Complaint, ¶ 273.

U.S. sales decline was a direct result of the dealer inventory buildup from 2H21, primarily CAD/CAM – in fact, there was so much excess inventory that management did not expect inventory levels to normalize until 3Q22 at the earliest."[49]

Plaintiffs claim that "[a]s a result of this news, Dentsply's stock price declined $2.87 per share, or over 7%" on May 10, 2022.[50]

27.    On November 1, 2022, Dentsply announced the results of its internal investigation, the preliminary restatement of its 2021 financial results, preliminary 3Q22 results, and preliminary guidance for 4Q22.[51]  According to the Complaint:

> The Form 8-K disclosed that on October 29, 2022 the Company, in consultation with the Audit and Finance Committee, had reached a determination to restate its financial statements for the three and nine months ended September 30, 2021 and for FY21.  Defendants also disclosed the Company had "identified one or more material weaknesses in the Company's internal control over financial reporting as of September 30, 2021.  The material weaknesses remained in place as of December 31, 2021 and as of the date of" the Form 8-K. … Defendants disclosed that on a preliminary basis net sales for 3Q22 were approximately $947 million, a decline in organic sales versus the same quarter the prior year, and that the Company expected sequential net sales would "decline low-single digits in the fourth quarter 2022."[52]

Plaintiffs claim that "[o]ver the next two days, as the market digested Dentsply's numerous disclosures and what they would mean for the Company's ongoing operations, Dentsply's stock price fell $4.17 per share from a closing price of $31.00 on November 1, 2022, to $26.83 on November 3, 2022, a decline of more than 13%."[53]

28.    Finally, on November 14, 2022, Dentsply released 3Q22 financial results and 4Q22 guidance and held a conference call.[54]  According to the Complaint, "[t]he Company's reported 3Q22 results were consistent with the preliminary results announced on November 1, 2022, while the updated guidance was below expectations."[55]  The Complaint further alleges that

---

[49] Complaint, ¶¶ 272–273.
[50] Complaint, ¶ 276.
[51] Complaint, ¶ 277.
[52] Complaint, ¶ 277.
[53] Complaint, ¶ 278.
[54] Complaint, ¶ 279.
[55] Complaint, ¶ 279.

"Dentsply cited weaker demand, supply chain challenges, and unfavorable currency translation as the reasons for the lower than expected revenue and earnings guidance" and that "[d]uring the earnings call, new CFO Glenn Coleman stated that Dentsply's 'CAD/CAM business declined in the quarter due to tough year-over-year comps and lower wholesale orders.'"[56]  Plaintiffs claim that "[a]s a result of the November 14, 2022 news, Dentsply's stock price declined $1.70 per share, or over 5%" on November 14, 2022.[57]

### V.      Dr. Cain Has Not Articulated a Damages Methodology that Can Measure Damages Consistently with Plaintiffs' Alleged Theories of Liability

#### A.      Dr. Cain's Opinions in Section VI of the Cain Report Do Not Address Plaintiffs' Alleged Theories of Liability

29.      In Section VI of his report (titled "Ability to Calculate Damages on a Class-Wide Basis"), Dr. Cain states that his assignment was to "opine on whether per-share damages for traders of Dentsply Common Stock can be assessed for all Class members based upon a methodology *common* to all Class members and *consistent with Plaintiffs' theories of liability*."[58]  Despite these two aspects of his assignment (common methodology and consistency with Plaintiffs' theories of liability), Dr. Cain's opinion appears to be limited to the former ("damages for each of Plaintiffs' claims can be calculated on a class-wide basis through a common methodology"), while his report is silent on the latter.[59]  Indeed, as discussed further in **Sections V.B–V.F**, Dr. Cain's Section VI entirely fails to grapple with the question of how damages would be calculated in a manner that would be "consistent with Plaintiffs' theories of liability."  I first provide a brief description of Dr. Cain's "analysis" of damages below.

30.      <u>First</u>, Dr. Cain opines that his understanding of Plaintiffs' allegations is that the alleged misrepresentations and the alleged scheme caused Dentsply's stock price to trade at artificially inflated prices.[60]  He opines that the "out-of-pocket" methodology can be used "formulaically" on a class-wide basis to yield a measure of damages based on when a given investor purchased

---

[56] Complaint, ¶¶ 279–280.
[57] Complaint, ¶ 281.
[58] Cain Report, ¶ 95 (emphasis added).
[59] Cain Report, ¶ 95.
[60] Cain Report, ¶ 96.

and sold Dentsply shares (to be determined through the claims process), applying formulaic restrictions on recoverable damages mandated by the PSLRA.[61]

31.    Dr. Cain recognizes that the "out-of-pocket" formula requires another input, namely "the quantification of artificial inflation per share" but claims that "[he has] not been asked to perform a loss causation analysis at this time, and such analysis often incorporates information produced during discovery."[62]  Although the Cain Report does not explicitly discuss how inflation would be calculated in a manner consistent with Plaintiffs' alleged theories of liability, Dr. Cain nonetheless mentions (seemingly in passing) that event studies can be applied to the Company's stock returns on dates when the truth was allegedly revealed.[63]  Further, while Dr. Cain performs an event study in his analysis of whether Dentsply's stock traded in an efficient market, he seems to specifically disavow the use of that event study to measure inflation, stating that the "event study in [his] report was not intended to quantify artificial inflation."[64]  Nevertheless, and despite a lack of any analysis specific to this litigation, Dr. Cain claims that "the method employed to eventually calculate artificial inflation can be applied class-wide as an input to the out-of-pocket formula" and that it "[does] not rely on individual class member-specific information."[65]

32.    Crucially, in stating his conclusion, Dr. Cain does not mention the second aspect of his assignment with respect to damages, i.e., the question of whether damages can be calculated in a manner that would be "consistent with Plaintiffs' theories of liability."  Instead, the Cain Report only discusses the class-wide application of the "out-of-pocket" formula.

33.    Second, Dr. Cain appears to recognize that, as a general matter, the calculation of inflation can be complicated by the presence of confounding information and that inflation can vary over time.[66]  With respect to confounding information, he claims that "various accepted methodologies, such as event study analysis, valuation analysis, analyst reports, principles of finance and valuation analysis, and peer-reviewed academic research" could be used to value confounding information.[67]  However, he does not in any way address Plaintiffs' alleged theories

---

[61] Cain Report, ¶ 97.
[62] Cain Report, ¶ 99.
[63] Cain Report, ¶ 99.
[64] Cain Report, fn. 92.
[65] Cain Report, ¶ 99.
[66] Cain Report, ¶¶ 100–101, 104.
[67] Cain Report, ¶ 100.

of liability in this matter, whether these theories could result in there being confounding information (the Complaint suggests the presence of confounding information[68]), or how one could account for such confounding information in this specific case using any particular tool.

34.     With respect to measuring inflation over time, throughout the proposed Class Period, Dr. Cain mentions three possible approaches without addressing which of these approaches (if any) may be applicable given Plaintiffs' alleged theories of liability in this matter.  In particular, the Cain Report mentions the possibility of using a "constant dollar inflation" approach, a "constant percentage inflation" approach, or a different approach entirely, given that "inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements."[69]  While he concludes that "[a]ll of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual Class member identities or circumstances,"[70] Dr. Cain again fails to address the compatibility of any of his proposed approaches with Plaintiffs' alleged theories of liability in this matter.

35.     Third, Dr. Cain opines in Section VI.B that the "out-of-pocket" methodology is flexible and can account for alternative findings regarding inputs to the formula "regardless of whether a jury finds that the analysis [he] may conduct results in the most appropriate inflation figure, or they determine that based upon the evidence, a different amount is more appropriate."[71]  It is not clear how such a conclusion—that if the jury were to ultimately disagree with Dr. Cain's opinions, then those opinions could be disregarded in favor of the jury's own findings—provides any economic basis to conclude that damages in this matter can be calculated on a class-wide basis and consistently with Plaintiffs' alleged theories of liability.  I therefore do not address Dr. Cain's claims in Section VI.B other than noting that, as an economic matter, his assertions do not demonstrate that damages can reliably be calculated given the nature of Plaintiffs' allegations in this case.

---

[68] For example, Plaintiffs claim that Dentsply's financial performance in 1Q22, first disclosed on April 19, 2022 "was due **in substantial part** to lower demand related to Dentsply's persistent product problems and still-full dealer inventory channels."  This suggests that a part of the disclosure represented confounding information.  See Complaint, ¶ 270 (emphasis added).

[69] Cain Report, ¶¶ 102–104.

[70] Cain Report, ¶ 105.

[71] Cain Report, ¶ 107.  Dr. Cain also states that a jury's findings regarding the value of confounding information, changes in inflation over time, and the timing of the first actionable misstatement can be incorporated into the calculation.  See Cain Report, ¶¶ 107–110.

36.    In the following subsections, I address Dr. Cain's failure to demonstrate how his proposed "approach" would be able to calculate damages consistently with Plaintiffs' alleged theories of liability.  In particular, I identify specific reasons why, as an economic matter, Dr. Cain's proposed "approach" cannot be assumed to reliably calculate damages given Plaintiffs' allegations in this case.

### B.    Dr. Cain Has Failed to Analyze the Implications of Plaintiffs' Alleged Theories of Liability for the Ability of the Event Study Methodology to Estimate Inflation, a Key Input to "Out-Of-Pocket" Damages

37.    I understand that the Supreme Court's decision in *Comcast* requires plaintiffs to identify a damages methodology that measures damages stemming from the defendant's actions that created the legal liability.[72]  *Comcast* states that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the plaintiffs' liability] theory."[73]  I further understand that plaintiffs are not required to actually perform a calculation of damages at the class certification stage of litigation.

38.    I also understand that, in matters such as this one, "out-of-pocket" losses, measured as the difference between share price inflation at time of purchase and at time of sale (or the first day after the class period if shares are held past the end of the class period) are a commonly used measure of damages.[74]  Inflation is the difference between a security's actual or observed market price and the hypothetical lower price that would have prevailed absent the alleged misrepresentations.  The amount of inflation can change over time (e.g., due to partial revelation

---

[72] *Comcast Corp. et al. v. Behrend et al.,* 569 U.S. 27 (2013) ("*Comcast*").

[73] *Comcast*.

[74] Dr. Cain similarly notes that "[t]he 'out-of-pocket' method of calculating damages represents a standard and well-accepted methodology under §10(b) of the Exchange Act."  Dr. Cain states that the "out-of-pocket" method is calculated as "the artificial inflation in the stock price at the time of an investor purchase minus the artificial inflation in the stock price at the time of an investor sale," and "[i]f shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Private Securities Litigation Reform Act of 1995 ('PSLRA')."  See Cain Report, ¶ 97.  I understand that a showing of loss causation is a separate requirement that requires plaintiffs to show a causal connection between the alleged misrepresentations and subsequent losses, in addition to proving that the price of the security was artificially inflated in order to be able to recover damages.  I do not analyze loss causation in this report, and I understand that Plaintiffs are not required to demonstrate loss causation at the class certification stage.

of the alleged fraud or due to changing value implications of the allegedly omitted or misrepresented information).[75]

39.     Therefore, in order to demonstrate that "out-of-pocket" damages could be calculated on a class-wide basis and consistently with the above definition of inflation, an economist would need to identify a methodology that is consistent with the plaintiff's theory of liability and that is able to calculate inflation in the market price on every day securities were purchased or sold (typically every trading day of the class period).  From the perspective of a financial economist, "out-of-pocket" damages and inflation are definitional concepts, i.e., they must ultimately be calculated as the output of some specific methodology.  As an economic matter, they do not, in and of themselves, constitute a methodology that can be used to perform the calculation of inflation.  Therefore, in order to eventually calculate inflation, it is necessary to develop a methodology consistent with the relevant theory of liability, assuming such a methodology exists.  Economic theory provides no "off-the-shelf" tools that can be used to compute inflation without taking into account the particular circumstances of a given litigation.  In fact, it may be the case that, despite Dr. Cain's claim that "various accepted methodologies, such as event study analysis, valuation analysis, analyst reports, principles of finance and valuation analysis, and peer-reviewed academic research" are available as tools, it may not be possible for an expert to apply those tools in a specific matter to reliably calculate inflation.[76]

40.     Because class-wide damages are typically based on market prices (the actual price at which investors purchased or sold and a hypothetical price that would have prevailed in the market in the absence of the alleged misrepresentations), establishing the feasibility of calculating inflation-based "out-of-pocket" damages generally requires a determination of:  (1) what information would have been available to the market absent the alleged misrepresentations; and (2) whether a methodology exists to reliably translate that information into its impact on the market price.  The first step requires consideration of what is alleged to have been misrepresented and how those alleged misrepresentations affected information available to the market.  The second step is an assessment of whether one can measure the impact on the market price of the difference in the information available to the market with and without the alleged

---

[75] Dr. Cain also acknowledges that "artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements."  See Cain Report, ¶ 104.
[76] Cain Report, ¶ 100.

misrepresentations at a given point in time. As an economic matter, that impact provides a measure of inflation at that point in time. Because Dr. Cain has not analyzed the implications of Plaintiffs' alleged theories of liability in his report (as discussed earlier), he has not established an economic basis to demonstrate that he (or another expert) can calculate inflation, and therefore class-wide damages consistent with Plaintiffs' alleged theories of liability, at a later stage.

41.    Dr. Cain mentions using an event study as a tool to be used in the calculation of damages.[77] In some circumstances, the value impact of allegedly withheld information can indeed be measured using an event study applied to the observed increase in the stock price at the time of an alleged misrepresentation, assuming one can isolate the price movement that is specific to the alleged misrepresentation (i.e., assuming one can reliably account for any confounding information). In other circumstances, a price decline upon the revelation of the alleged truth can represent the value impact of allegedly withheld information, again assuming that one can isolate the price movement specific to that revelation. Measuring value impact in this manner (i.e., using an event study methodology to isolate company-specific price movements on alleged misrepresentation dates or dates when the alleged truth was revealed) can therefore, under certain circumstances, yield a measure of inflation based on the observed changes in the stock price. However, calculations of inflation based on observed changes in the stock price due to alleged misrepresentations or alleged revelations of truth may not be possible for a variety of reasons, including changes in the amount of inflation over time or differences between the information allegedly withheld from the market and the information that is ultimately revealed and alleged by plaintiffs to have caused investors' losses.

42.    In particular, it may not be possible to measure damages directly using the observed change in the stock price on the dates when the alleged truth was revealed if the information released on those dates represents (at least in part) information that could not have been released earlier or information that is different in its content from the underlying truth behind the alleged misrepresentations (i.e., information that is not a "mirror image" of the alleged misrepresentations but, e.g., a consequence of the alleged misrepresentations). Consistent with this economic reasoning, I understand that the Supreme Court noted in *Goldman*:

---

[77] Cain Report, ¶ 99 ("[E]vent studies are widely employed to calculate artificial inflation.").

Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation. … But that final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure.[78]

43.    If one were to conclude that it is not reasonable to measure the impact of information throughout a given class period using observed price changes at the time the alleged misrepresentations occurred or at the time the relevant truth about the alleged fraud was revealed, it would be necessary to ascertain whether other appropriate valuation techniques exist to reliably calculate inflation and whether the data required to apply those techniques is available.  As discussed next, while such complicating circumstances do indeed appear to be present in this matter (i.e., there is a mismatch between what Plaintiffs allege was withheld from the market and what Plaintiffs allege constitutes a revelation of the alleged truth), Dr. Cain has not accounted for the implications of such complicating circumstances on the ability to reliably calculate inflation in a manner consistent with Plaintiffs' theories of liability.

1.    **Dr. Cain Fails to Address the "Mismatch" Between the Alleged Misrepresentations and the Alleged Truth Revealed by the Disclosures**

44.    There are at least two related reasons why there is a mismatch between what I understand Plaintiffs allege was withheld from the market and what Plaintiffs claim constitutes revelation of the alleged truth in this matter.

45.    First, I understand that Plaintiffs claim that the truth about the alleged scheme was revealed through a series of disclosures that included various releases of Dentsply's financial results during 2022 (discussed above in **Section IV.C**), which I understand the Court characterized as "loss-causing events" that represent the "materialization of the risk concealed by the fraudulent statement[s]."[79]  On the other hand, as discussed previously, Plaintiffs allege that Defendants made misrepresentations with respect to:  "(1) the supply chain disruptions in 2H21;

---

[78] *Goldman Sachs Group, Inc., et al. v. Arkansas Teacher Retirement System, et al.*, 594 U.S. 113 (2021).
[79] MTD Opinion, p. 15.

(2) the success and drivers of Dentsply's digital product sales; (3) dealer inventory levels; (4) the Company's success in 3Q21 and its results for 4Q21 and FY21; (5) the Company's 'sustainable' growth profile based on 'strong underlying fundamentals'; and (6) Dentsply's governance policies and ethics."[80]  Plaintiffs also allege that Defendants "commit[ed] material violations of GAAP, SEC reporting rules, and SOX;"[81] "violated GAAP and SEC disclosure rules with respect to Dentsply's SEC filings" in 2021;[82] and misrepresented the effectiveness of Dentsply's internal controls.[83]

46.    I also understand that, in analyzing whether Plaintiffs have sufficiently pled loss causation, the Court ruled in its MTD Opinion that "Plaintiffs say the five loss-causing events here fit the materialization category," meaning that "the loss [allegedly suffered by proposed class members] was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement[s]."[84]  The Court's statements suggest that the information that was "concealed by the fraudulent statement[s]" was a "risk" that ultimately materialized and was revealed to the market in various subsequent announcements regarding Dentsply's financial performance and results.  I further understand that the Court noted that, for the purposes of assessing Defendants' motion to dismiss, "Plaintiffs have plausibly linked each disappointing earnings report to the risks concealed by the fraud."[85]  However, the information allegedly withheld from the market (the risk to, and uncertainty about, Dentsply's business) is different from the information that purportedly represents the materialization of that risk (the consequences of the risk having materialized and the underlying uncertainty about the business having been resolved), thus representing a mismatch.  As an economic matter, and as further discussed in **Section V.B.2**, this type of mismatch implies that any stock price decline in response to the subsequent disclosures identified by Plaintiffs would not generally be a reliable measure of inflation in the stock price at an earlier time.

47.    Second, Plaintiffs allege that "Defendants issued a series of materially false and misleading statements and engaged in a scheme to defraud that created the illusion that

---

[80] Complaint, ¶ 98.
[81] Complaint, ¶ 152.
[82] Complaint, ¶ 180.
[83] Complaint, ¶ 192.
[84] MTD Opinion, p. 15.
[85] MTD Opinion, p. 16.

Dentsply's business was robust and sustainably growing, when, in reality, it was experiencing severe operational challenges," the truth of which they allege was gradually revealed by a series of disclosures about Dentsply's financials, management changes, and its internal investigation and subsequent restatements.[86]

48.     Again, Plaintiffs' alleged theories of liability imply that there is a difference (or mismatch) between the alleged misrepresentations regarding the alleged scheme (e.g., statements about supply chain issues, drivers of digital product sales, dealer inventory levels, and growth positioning) and the subsequent disclosures about Dentsply's specific financial results in 2022. As an economic matter, assuming Plaintiffs' allegations will be proven true, Dentsply faced business uncertainty and was at risk of future negative financial performance as a result of the alleged scheme.[87]  For example, the alleged misrepresentations about dealer inventory levels, supply chain issues, or growth prospects may have led the market to expect that Dentsply would achieve a better range of financial outcomes than the range of outcomes that the market would have expected had the alleged relevant truth been revealed.  However, this does not imply (and there is no economic basis to assume) that the financial results that were ultimately realized by Dentsply in 2022, and in particular results allegedly as disappointing as Plaintiffs assert, would have been *certain* to occur at the time the alleged misrepresentations were made.  Importantly, Dr. Cain has not shown that the disappointing financial results were certain to occur at the time of the alleged misrepresentations.  As an economic matter, and as also discussed in **Section V.B.2**, when the mismatch is of the nature that the alleged misrepresentations concern uncertainty faced by a company and the subsequent disclosures represent a particular resolution of that uncertainty, this implies that any stock price decline in response to a later disclosure would not generally be, as an economic matter, a measure of inflation in the stock price at an earlier time.

---

[86] Class Cert Motion, pp. 2, 5–6.

[87] As the Court noted:  "Plaintiffs' whole story is that the company faced a three-headed threat of supply-chain constraints, product defects, and declining end-user demand that Defendants papered over with channel stuffing, mortgaging the company's future.  The complaint has specifically alleged a connection between that scheme and each wave of disappointing earnings."  See MTD Opinion, p. 16.

### 2.    Dr. Cain Does Not Address the Insufficiency of an Event Study to Measure Inflation in the Presence of a "Mismatch"

49.    An event study, which Dr. Cain mentions as one analytical tool that could in his opinion be used to calculate inflation, is a statistical tool that allows a researcher to estimate the company-specific "residual return" (or "abnormal return") over a pre-specified time window (frequently one day), i.e., a return that "removes" the impact of market (and industry) movements over that same window.[88]  However, as I discuss in this subsection, estimating the company-specific residual return on a certain date, e.g., the date of a specific disclosure, is not necessarily sufficient to measure inflation (if any) removed from the stock price on that day or the amount of inflation present earlier in time.  In particular, estimating the company-specific residual return on a particular date is generally insufficient to measure inflation when:  (1) the allegations concern risks that subsequently materialize; or (2) the allegations concern allegedly withheld information that would have revealed to the market uncertainty regarding possible adverse future consequences and a specific eventual adverse development (i.e., earlier uncertainty that subsequently resolves in a particular way).

50.    In other words, a company-specific price decline representing the materialization of a previously undisclosed or under-disclosed risk does not measure the amount of inflation removed due to the allegedly insufficient disclosure of that risk earlier in time.  I start by noting that—as an economic matter—the definition of a risk encompasses a broad range of circumstances in which a company faces multiple possible future outcomes, including circumstances where allegedly withheld information would have revealed to the market uncertainty regarding possible adverse future consequences.

51.    There is an important economic distinction between the market's reaction to the public disclosure of a risk or uncertainty before that risk materializes (i.e., the reaction to a disclosure of the possibility that a negative outcome could occur), and the market's reaction to the

---

[88] Cain Report, ¶ 99.  See also, e.g., MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35,  no. 1 (1997), pp. 13–39 ("MacKinlay (1997)") at p. 15 ("The abnormal return is the actual ex post return of the security over the event window minus the normal return of the firm over the event window. The normal return is defined as the expected return without conditioning on the event taking place. … There are two common choices for modeling the normal return[.] … The market model assumes a stable linear relation between the market return and the security return.").

materialization of that risk (i.e., the reaction to learning that a negative outcome did in fact occur in some particular form). The two disclosures would generally be, as an economic matter, associated with different price reactions in an efficient market.[89] Therefore, any stock price reaction to risk materialization or to the resolution of uncertainty cannot generally be used to measure the alleged inflation in the stock price attributable to the earlier risk or uncertainty (the price decline upon a hypothetical earlier disclosure of the existence of a risk or uncertainty that had not yet materialized or been resolved).

52.     To further illustrate why a price decline following the materialization of a risk is not generally a measure of inflation stemming from a previously undisclosed or under-disclosed risk, consider the following illustrative example. A company's management is engaged in a scheme to hide from the market an adverse development in its business that creates an uncertainty regarding the company's future performance. Had the scheme been disclosed, the market would have recognized the inherent uncertainty, and understood that such uncertainty would entail a 50% probability of a severe impact on future performance (say a $100 million valuation decline) and a 50% probability of a moderate impact on future performance (say a $20 million valuation decline). As the market is unaware of the scheme, it assigns 0% probability to any negative

---

[89] For example, consider a company announcing that it has entered into an agreement to be acquired. In this case, uncertainty arises because the acquisition may not ultimately occur (for a variety of potential reasons, including lack of regulatory approval or a failed shareholder vote, among others). Given this uncertainty, the stock price of the target company following the announcement may be lower than the price offered by the acquirer, i.e., the expected value of the shares as incorporated into the price reflects the possibility of the acquisition being unsuccessful. Only once the uncertainty is resolved and the acquisition closes (e.g., the shareholder vote succeeds or regulatory clearance is obtained) would the stock price converge to the acquisition price. See, e.g., Berk, Jonathan, and Peter DeMarzo, *Corporate Finance*, 3rd Edition (Boston, M.A.: Pearson, 2013), p. 943 ("Once a tender offer is announced, there is no guarantee that, in fact, the takeover will take place at this price. Often acquirers have to raise the price to consummate the deal. Alternatively, the offer may fail. … Because of this uncertainty about whether a takeover will succeed, the market price generally does not rise by the amount of the premium when the takeover is announced."); Lhabitant, François-Serge, *Handbook of Hedge Funds* (West Sussex, U.K.: John Wiley & Sons, Ltd., 2006), p. 247 ("Immediately after the announcement, merger arbitrageurs start gathering as much information as possible about the target and the bidder. This is then analysed. They have essentially two cases to consider: (i) the transaction is successful, the market price of the target shares rises and converges towards the offered price; or (ii) the transaction is not successful, the market price of the target shares diverges from the offered price and may fall dramatically. … After the announcement and filing of the takeover offer, the market price of the target firm usually moves upward again, but it still does not reach the bid price. The remaining gap between the bid and the market price (the arbitrage spread) is usually expressed as the percentage difference between the initial bid price and the target's closing price on the day after the acquisition announcement. ... if the transaction is successful, it should converge to zero.").

valuation impact occurring.  Subsequently, suppose that the company announces severe poor performance, leading to a negative valuation impact of $100 million when the uncertainty is resolved.  The stock price decline after the company's announcement represents the reaction to the certainty (100% probability) of the severe case valuation impact.  Crucially, however, a truthful disclosure earlier of the adverse development in the underlying business would have led the market to assess a 50% probability of a $100 million valuation decline (severe case) and a 50% probability of a $20 million valuation decline (moderate case), with an expected value of $60 million, not the $100 million valuation decline that ultimately occurred.

53.    This is an example in which the stock price decline when uncertainty is resolved (the "back-end price drop" of $100 million) is not a measure of "front-end inflation" of $60 million.  The "back-end price drop" is $100 million, i.e., when the company announces severe underperformance, the stock loses $100 million of its aggregate market capitalization.  Had the company revealed the adverse development in the underlying business earlier, before the resulting uncertainty had been resolved, the hypothetical market capitalization of the company's stock would have decreased by only $60 million, reflecting the uncertainty of the eventual outcome.  This $60 million is the amount of inflation, assuming that the company had a duty to disclose the adverse development but failed to do so.[90]  The example illustrates that using the valuation decline of $100 million observed upon the resolution of uncertainty to measure inflation would overstate aggregate inflation by $40 million relative to its correct value of $60 million.[91]

54.    A circumstance in which a company-specific price decline due to the resolution of uncertainty could in general reliably measure inflation is when the eventual disclosure is not a true resolution of "uncertainty" at all but rather the disclosure of a specific outcome that was foreseeable with certainty, because there would be no uncertainty if the appropriate hypothetical disclosure had been made earlier.  In the context of the above example, for the $100 million observed valuation decline to be a measure of inflation, it would have to be the case that the market would have assigned 100% probability to the severe impact outcome and 0% probability

---

[90] Note that these are illustrative examples, and, for simplicity, I do not account for any impact of discounting in these examples or for any other potential complications.

[91] If the moderate case outcome were the outcome that was ultimately realized, using the valuation decline observed upon the resolution of uncertainty would understate inflation present earlier.

to the moderate impact outcome if the adverse development in the underlying business was disclosed and the market would have foreseen with certainty the associated $100 million valuation impact.

55.     In the simple illustrative examples above, the various probabilities and potential exposures were assumed to be known.  However, assessing these probabilities and exposures in practice would generally require one to identify a reliable methodological approach.  From an economic perspective, identifying such an approach is a prerequisite to demonstrating that inflation (and therefore damages) attributable to a plaintiff's theory of liability can be calculated if that theory is premised on the presence of mismatch of the form described in this sub-section.

56.     Despite the above, the Cain Report is silent on how damages would be calculated in this case given the mismatch between the alleged misrepresentations (an allegedly undisclosed risk or uncertainty) and the information representing revelation of the alleged truth (i.e., the revelation of the resolution of the previously allegedly undisclosed uncertainty).  Therefore, Dr. Cain has no economic basis to claim that he can calculate damages in this case consistently with Plaintiffs' alleged theories of liability.

### C.     Dr. Cain Has Proposed No Methodology or Model to Reliably Measure Inflation Given that the Nature of the Allegedly Withheld Information Changed Over Time

57.     Starting in February 2022, Dentsply released information about its business—including about excess dealer inventory levels and supply chain issues—that conveyed to the market risks to the Company's future financial performance (discussed in **Section IV.C**).  Securities analysts discussed this information and assessed its potential implications for Dentsply's financial performance.  As detailed below, analyst commentary regarding the effects of supply chain issues and dealer inventory levels on Dentsply's financial performance, including implications for the Company's future results, suggests that, as time passed during the proposed Class Period, market participants were increasingly on notice about potential risks Dentsply faced that could impact the Company's future earnings.  In other words, the information allegedly withheld from the market was being revealed over time such that the original "bundle" of information that the market allegedly did not have at the beginning of the proposed Class Period was becoming smaller with the passage of time.

58.     This revelation of information over time presents a complication in the calculation of damages that the Cain Report does not address.  Specifically, Dr. Cain has not provided any methodology or model to determine what portion of the observed price declines associated with later disclosures identified by Plaintiffs (such as on November 14, 2022) represents the removal of inflation as opposed to the market's reaction to the by-then disclosed risk to Dentsply's future performance from supply chain issues and/or excess inventory further materializing.

59.     For example, on February 28, 2022, Dentsply linked its 4Q21 earnings results at least in part to supply chain issues,[92] and on March 1, 2022, Dentsply's FY21 10-K disclosed excess CAD/CAM dealer inventory of approximately $50 million compared to the end of 2020.[93] Securities analysts discussed the negative impact of excess dealer inventory at the end of 2021 and of Dentsply's ongoing supply chain issues on the Company's earnings:

- On February 28, 2022, Baird noted that "[s]everal anticipated/known issues weighed 4Q revenue/margins, including imaging supply constraints and Fx headwinds, while it also looks like inventory pull-forward in 3Q ahead of 4Q price increases and some pre-loading of 2022 expenses into 2021 also negatively impacted a bit."[94]

- On March 7, 2022, Morgan Stanley acknowledged the $50 million excess CAD/CAM inventory, noting that Dentsply "disclosed that dealers' inventory of its CAD/CAM products as of FYE21 was ~$50 million higher relative to prior year levels, in part due to lower-than-expected retail sales in 4Q, according to XRAY's 10-K. We also suspect distributors could be either purchasing ahead of incremental price increases this year … or purchasing ahead of a constrained supply chain."[95]

---

[92] Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed February 28, 2022, p. 2 ("The increase in organic sales was primarily driven by strong performance in CAD/CAM, Implants, and Orthodontics partially offset by supply chain constraints.").

[93] Dentsply Sirona Inc., SEC Form 10-K for the fiscal year ended December 31, 2021, filed March 1, 2022 ("FY 2021 10-K"), p. 36 ("As of December 31, 2021, certain dealers' inventory of the Company's CAD/CAM products was higher than at the end of the prior year, by approximately $50 million.  These higher levels of dealer inventory are due to lower-than-expected retail sales in the fourth quarter and may pose headwinds to the Company's net sales for these products in 2022.").

[94] Baird, "4Q Prelim Review - A Few 4Q Issues, 2022 Guide Largely as Expected," February 28, 2022, p. 1.

[95] Morgan Stanley, "Model Update Post 10K; Highlighting New Segment Disclosure, Recent Feedback," March 7, 2022, p. 1.  Dentsply trades under the ticker "XRAY."

- On February 28, 2022, Bank of America and Piper Sandler both noted that supply chain issues could persist throughout 2022.[96]

60.    Following the April 19, 2022 announcement of Dentsply's preliminary 1Q22 financial results, analysts noted that ongoing supply chain issues had contributed to Dentsply's weak 1Q21 preliminary financial results.  The commentary suggests that securities analysts expected the negative impact to persist in the near-term.  For example:

- On April 19, 2022, Baird stated that "[c]ontributing to the 1Q EPS under-performance were below-expected U.S. performance and continued global supply chain and Fx headwinds. … Our view, however, is that with little evidence near-term that supply chain constraints are improving and with the USD likely to remain strong near term, at least two of the three issues impacting 1Q will likely continue moving forward."[97]

- On April 19, 2022, J.P. Morgan noted that "[w]e spoke with the company and the team flagged that the deteriorating global supply chain environment paired with softness in the U.S. led to -1.4% organic declines in 1Q … While we acknowledge XRAY has made progress with recent portfolio adjustments and cost saving initiatives, we believe the supply chain constraints and management transitions cloud the visibility on the near term portfolio alignment and turnaround."[98]

- On April 19, 2022, Morgan Stanley also noted that "XRAY's 1Q preannouncement fell well short of our estimates and consensus expectations, attributable to onerous supply chain challenges, FX headwinds, and a weaker US sales performance. … We are cutting 2022e EPS to $2.64 (from $3.17), now reflecting revenue growth of -2.1% (vs. prior +3.3%) and EBITDA margin degradation of 120 bps y/y with likely

---

[96] Bank of America, "Cloudy near-term more macro-impacted, longer-term growth drivers unchanged," February 28, 2022, p. 1 ("The uncertainties around macro factors, including utilization, supply chain, and Byte in particular, continue to overshadow what remains a steady business with multiple levers to driver both organic growth and margin expansion.  Both of these were still comfortably within the long-term range, with some of the mitigating factors (Covid utilization, supply chain dynamics, Byte comps) driving a very understandable ramp over the course of FY22."); Piper Sandler, "4Q-21 Recap - Many Moving Parts at Present, Valuation Keeps Us Overweight," February 28, 2022, p. 1 ("2022 guidance didn't disappoint, but a variety of cross currents in the macro environment and as they relate to XRAY (COVID, Fx, Russia, supply chain, new products) make this guide look more realistic than conservative.").
[97] Baird, "CEO Terminated, Next Steps Unclear; Downgrading to Neutral," April 19, 2022, p. 1.
[98] J.P. Morgan, "1Q22 Miss & Management Transition Creates Difficult Set Up for 2022; Details from Call w/ Management," April 19, 2022, p. 1.

many of the aforementioned headwinds continuing for the balance of the year."[99]

- On April 19, 2022, Piper Sandler indicated that "[c]omponent sourcing and fulfillment delays have persisted and, in some cases, worsened, according to checks during the recent Dental Day we hosted. We have growing concerns regarding these challenges impacting a key category like DI (Primescan for XRAY) or the company's ability to deliver on potential Primeprint demand. We've already seen an uncommon approach with milling units (disassembling finished units for service parts), a concerning near-term indicator regarding component sourcing, in our opinion."[100]

61.    Following the May 10, 2022 announcement of Dentsply's preliminary 1Q22 financial results and 2022 outlook,[101] securities analysts continued to discuss the impact of supply chain issues and excess dealer inventory on Dentsply's current financial results and future performance.  For example:

- On May 10, 2022, William Blair wrote that "we are expecting supply chain pressures and excess channel inventory to continue to dampen sales growth in the second quarter, with the situation incrementally improving in the second half."[102]

- On May 10, 2022, UBS noted regarding Dentsply's revised outlook that "Supply Chain shortages [would] be a full-year headwind vs in 1H22 only anticipated before" and "Dealer inventory (XRAY had ~50M of excess as of Dec. 31, 2021) burn in CAD/CAM to start normalizing in 2H (Consumables inventory already normalized)."[103]

62.    Following Dentsply's November 1, 2022 announcement of the preliminary restatements, 3Q22 results, guidance for 4Q22, and the goodwill impairment charge,[104] securities analysts

---

[99] Morgan Stanley, "Management Shake-Up; Cutting Estimates, Price Target," April 19, 2022, p. 1.

[100] Piper Sandler, "Downgrade to Neutral; Challenges Aplenty, and No Quick Fix that We See," April 19, 2022, p. 1.

[101] Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed May 10, 2022.

[102] William Blair, "Post-Call Model Adjustments; Gaining Further Clarity Amidst 10-Q Filing Delay," May 10, 2022, p. 2.

[103] UBS, "1Q22: Caliendo's Conference Call Commentary," May 10, 2022, p. 1.

[104] Dentsply Sirona Inc., SEC Form 8-K, filed November 1, 2022; Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed November 1, 2022.

again commented on factors such as continued supply chain issues and customer demand impacting the Company's financial results.  For example:

- On November 1, 2022, Evercore ISI wrote that "[m]gmt also pre-announced preliminary 3Q revs of $947 MM. We do not yet have a segment breakdown, but it is likely that equipment sales were down ~(4%)-(8%) in the quarter (presuming consumable sales growth of 0-5%). This is ~9% worse than the not-very-robust consensus of $1,042 MM and is a result of Fx, supply chain challenges, and softer US/China volumes. The company also guided SEQUENTIAL revenue growth of flat to down LSD, or $919-938 MM, under St expectations, but it is unclear what assumptions underpin this guidance[.]"[105]

- On November 1, 2022, Bank of America noted that "[t]he more negative update is on the preliminary 3Q/4Q views, with 3Q revenue of ~$947MM coming out ~6% below consensus while 4Q revenue expected to decline sequentially, with a modest sequential organic uptick, in what is typically the strongest quarter of the year. … Given macro concerns about the current pace of dental demand we cannot say this is surprising but still represents a negative reversion vs. our/consensus views."[106]

- On November 2, 2022, Morgan Stanley commented that "[w]hile the magnitude of the restatement is relatively benign … and should alleviate some investor concern, focus is on weaker preliminary 3Q22 sales of ~$947m (vs $1,017m MSe and $1,037m Consensus), implying a slight decline y/y on an organic basis, driven by FX headwinds, supply chain challenges, and a weaker US/China experience. It is also targeting a LSD sequential decline to 4Q sales (flat to +LSD CC sequential growth), which is below MSe/Cons of -1%/+4% reported sequential growth. Importantly, it did not disclose margins for 3Q/4Q, where investor questions remain. XRAY will also incur a non-cash goodwill impairment charge of $1.0-$1.3b, attributable to worsening macro factors, unfavorable FX, and supply chain challenges."[107]

63.    Dentsply also provided additional information about its financials during the first two weeks of November 2022, starting with the release of preliminary information about the

---

[105] Evercore ISI, "Pre-A 3Q Revs of $947 MM, 4Q guide $919-938 MM (below, but no details[)]; Reporting 3Q Nov 9 + $20 MM '21 Restatement," November 1, 2022, p. 1.
[106] Bank of America, "XRAY announces completion of accounting review and prelim soft 3Q/4Q revenues," November 1, 2022, p. 1.
[107] Morgan Stanley, "Investigation Concludes - Restatement Benign, but Questions Linger," November 2, 2022, p. 1.

restatements, the outcome of the internal investigations, and preliminary financial results for 3Q22 on November 1, 2022.[108]  On November 7, 2022, Dentsply filed restatements to its 3Q21, 4Q21, and FY21 financial results and filed results for 1Q22 and 2Q22 with the SEC.[109]  The restatements revised down 3Q21 and FY21 net sales and net income and revised up 4Q21 net sales and net income.  In total, FY21 net sales and net income were revised down by approximately $20 million and $10 million, respectively,[110] consistent with the preliminary results that Dentsply had announced on November 1, 2022.[111]  Securities analysts commented on Dentsply's internal investigations and, specifically on the related restatements following these disclosures, noting that they generally viewed this information as neutral to positive given their prior expectations (expectations presumably formed based on, at least in part, prior disclosures by Dentsply).  For example:

- On November 1, 2022, William Blair noted that "[i]n our view, many of these updates were less severe than feared, especially with restatements limited to 2021 results (changes were made to other years but were immaterial) and the impact of these restatements to full year 2021 accounting for just low single digits or less of full-year sales and net income."[112]

- On November 1, 2022, Evercore ISI wrote that "we applaud the new management team for making major progress in cleaning up the financials, and … [w]e also see it as positive that the total revenue overstatement in 2021 is $20 MM ($35 MM in 3Q), less than estimate from the interim mgmt team (of $50 MM) as given the length of the investigation, some were starting to fear that size of the misstatements could have been greater."[113]

---

[108] Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed November 1, 2022.

[109] Dentsply Sirona Inc., SEC Form 10-QA for the fiscal quarter ended September 30, 2021, filed November 7, 2022; FY 2021 10-KA; Dentsply Sirona Inc., SEC Form 10-Q for the fiscal quarter ended March 31, 2022, filed November 7, 2022; Dentsply Sirona Inc., SEC Form 10-Q for the fiscal quarter ended June 30, 2022, filed November 7, 2022.

[110] FY 2021 10-KA, pp. 53, 117–119; Dentsply Sirona Inc., SEC Form 10-QA for the fiscal quarter ended September 30, 2021, filed November 7, 2022, pp. 9–10.

[111] Dentsply Sirona Inc., SEC Form 8-K, filed November 1, 2022, p. 4.

[112] William Blair, "Audit Conclusion Is a Step in the Right Direction, but Recent Results Leave Question on Long-Term Growth Strategies," November 1, 2022, p. 1.

[113] Evercore ISI, "Pre-A 3Q Revs of $947 MM, 4Q guide $919-938 MM (below, but no details[)]; Reporting 3Q Nov 9 + $20 MM '21 Restatement," November 1, 2022, p. 1.

- On November 1, 2022, Piper Sandler wrote that "[t]he investigation didn't find any intentional wrongdoing or fraud from XRAY's former executives, nor was there evidence that these executives intentionally used incentives to hit 2021 compensation targets (two points of relief based on our investor conversations). … From our perspective, it does look like the bigger unknowns are moving behind the company, and the new management team is taking the first steps to better position the company."[114]

64.    On November 9, 2022, Dentsply announced a delay in filing its 3Q22 financial results.[115] After market close that day, Dentsply filed an 8-K announcing restated non-GAAP financial measures for FY21 and non-GAAP financial measures for 1Q22 and 2Q22, including organic sales, adjusted operating income and margin, adjusted net income, and adjusted earnings per diluted share.[116]

65.    On November 10, 2022, Dentsply announced that it had previously "obtained the consent of the requisite lenders under its revolving credit facility … to further extend the time period for delivery of the Company's unaudited financial statements for the fiscal quarter ended June 30, 2022" on November 4, 2022, and that it had reached an agreement with its noteholders for "an extension of time for delivery of the Company's unaudited financial statements for the fiscal quarters ended March 31, 2022 … and the Q2 Financials and the related certificates" on November 5, 2022.[117]

66.    Finally, on November 14, 2022, Dentsply released 3Q22 financial results consistent with the preliminary results that it had previously announced on November 1, 2022.  Dentsply also provided a more detailed FY22 outlook, lowering its guidance on, and providing specific estimates for, organic sales, net sales, adjusted operating income margin, and adjusted earnings per share.[118]

67.    Given Dentsply's prior releases of information pertaining to supply chain issues, dealer inventory levels, and more broadly the Company's financial performance throughout 2022, it is possible that the information regarding Dentsply's financial performance and guidance released

---

[114] Piper Sandler, "Accounting Investigation Closed, 3Q Prelim Results Provided," November 1, 2022, p. 1.
[115] Dentsply Sirona Inc., SEC Form 12b-25 Notification of Late Filing, filed November 9, 2022, p. 2.
[116] Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed November 9, 2022, pp. 1–2.
[117] Dentsply Sirona Inc., SEC Form 8-K, filed November 10, 2022.
[118] Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed November 14, 2022, p. 2.

on November 14, 2022 would represent the materialization of the by-then fully disclosed risk of poor financial performance.  If so, any stock price decline would reflect the market's reaction to the materialization of this disclosed risk, but not the dissipation of inflation (given that the risk had been fully disclosed).[119]  The risk would have been fully disclosed if Dentsply's prior releases of financial information and discussion of supply chain issues and dealer inventory levels fully disclosed the risk of subsequent negative financial performance and the range and likelihood of uncertain future financial outcomes.

68.     To the extent that Plaintiffs are claiming that the risk was not fully disclosed prior to November 14, 2022 (despite Dentsply's earlier releases of information), then Dr. Cain has not provided any methodology or model to determine the amount of the observed price decline on November 14, 2022 that represents the removal of inflation as opposed to reflecting a materialization of the by-then disclosed risk.  In particular, Dr. Cain has provided no methodology or model to assess what portion (if any) of the price decline on November 14, 2022 would reflect the removal of inflation from an under-disclosed risk versus a price decline from the materialization of the by-then already disclosed risk.  Similarly, the Cain Report provides no discussion of how to account for this issue for any of the other disclosures that Plaintiffs identify as having revealed the alleged truth (which I understand the Court has characterized as materializations of risk), if similar circumstances where the risk had already been at least partially disclosed were present.[120]  Without providing such a methodology, Dr. Cain has no basis in economics to claim that damages can be calculated consistently with Plaintiffs' alleged theories of liability in this matter.

### D.     Dr. Cain Has Failed to Provide a Methodology or Model Capable of Reliably Assessing How Inflation May Have Varied Over the Proposed Class Period

69.     Setting aside the issues described in **Sections V.B–V.C**, even if one were able to measure the alleged artificial inflation removed from Dentsply's stock price based on the price declines

---

[119] The MTD Opinion notes that "[t]he November 14 announcement presents an added wrinkle. Defendants argue that the November 1 release of the internal investigation's findings fully disclosed the fraud.  If that were true, then Plaintiffs could not claim that any further loss was attributable to any further disclosure or materialization of a 'concealed' risk.  Yet this issue presents largely the same proof question.  It might be even harder for Plaintiffs to prove loss causation for this event."  See MTD Opinion, p. 16.
[120] MTD Opinion, p. 15.

on the dates the alleged truth was revealed, Dr. Cain has not addressed the extent to which the resulting measure of inflation would reflect the level of alleged artificial inflation throughout the entire proposed Class Period. In particular, to the extent that market participants' reaction to an earlier disclosure of the alleged scheme would have changed as they learned information about Dentsply's financial performance in combination with broader market and macroeconomic conditions affecting Dentsply during the course of 2022, inflation would have changed over the course of the proposed Class Period.[121] Dr. Cain has proposed no methodology or model to deal with such changes.

70.    For instance, the impact of any excess dealer inventory—which started to be revealed at least as of March 1, 2022 (as discussed previously)[122]—on Dentsply's financial performance is tied to the dealers' ability to work down that inventory. All else equal, if customer demand were to weaken as a result of market and macroeconomic conditions, it could take more time for dealers to work through the same quantity of excess inventory, which would in turn increase the negative impact on Dentsply's subsequent financial performance. Indeed, securities analysts discussed how long they expected it to take for excess dealer inventory to be worked down in 2022. For example:

- On May 10, 2022, Evercore ISI noted that "[b]urn of [the excess CAD/CAM] inventory was reflected in 1Q results for both CAD/CAM and consumables at dealers. A portion, but not all, was runoff in 1Q (remainder coming in 2Q) – expect to be normalized by 3Q."[123]

- On June 1, 2022, UBS noted that "XRAY disclosed in its 10-K that it had $50M of excess inventory in the channel, a concern given the company's history when channel stuffing led to a meaningful de-rating of the stock in 2019. In this instance, our channel checks, as well as our analysis of various balance sheet components, suggest that the inventory issue is manageable in size, largely transitory and should be completely resolved in 2022. Unlike 2019, when XRAY's distribution model allowed for

---

[121] The issue here, that inflation would vary over time given the changing macroeconomic context relevant to what was allegedly withheld from the market about dealer inventory levels, is distinct from the previously discussed notion that inflation would decrease over time as it was dissipated by gradual revelation of the alleged truth.
[122] FY 2021 10-K, p. 36.
[123] Evercore ISI, "The Kitchen Sink," May 10, 2022, p. 2.

stuffing, today the distribution channel is better equipped to match supply and demand."[124]

71.     Securities analysts also commented on increasingly softer customer demand throughout 2022, noting increasing weaknesses across a variety of products and geographies.  For example:

- On November 14, 2022, Baird noted that "[a] lot has changed over the past ~6 months since XRAY's last guidance update, both internally at the company and in the broader dental environment. Most notable as it relates to the company's guidance is the worsening dental environment, with our continued survey work and ongoing channel checks pointing to two distinct periods of slowing in dental volumes in recent months, including in the May/June period when gas prices first spiked, and then again over the past month or two when consumer confidence again moderated, inflation remained sticky, and dental volumes simply didn't pick up coming out of late summer the way many of our industry contacts expected."[125]

- On November 14, 2022, Piper Sandler noted that "[m]anagement updated organic growth and EPS guidance, each of which imply a tough close to 2022 for the business as new management works quickly to address internal issues at a time when the external environment is presenting plenty of persistent (supply chain) or new (China VBP, softening U.S./European demand) headwinds. … [W]e believe a weakened consumer environment could have the effect of limiting volumes on higher out-of-pocket procedures (implants/orthodontics). This factor along with higher interest rates is also influencing an outlook for potentially lighter equipment sales."[126]

72.     As such, to the extent that changes in market conditions through 2022 had an impact on investors' expectations about customer demand or how rapidly the disclosed excess dealer

---

[124] UBS, "Upgrading to Buy; Favorable Risk-Reward as Inventory Issue Appears to be Manageable," June 1, 2022, p. 3.

[125] Baird, "3Q Recap - Incremental Hasn't Worked, We'd Go Big," November 14, 2022, p. 8.

[126] Piper Sandler, "Taking the Right Steps to Reposition, but Continue Monitoring from Sidelines," November 14, 2022, pp. 1–2.  See also Morgan Stanley, "New Bars Being Set, but 2023 Visibility Remains Limited," November 14, 2022, p. 1 ("XRAY's revised 2022 guidance is worse than anticipated, calling for 2022 EPS of $1.90-2.00 ($2.35-$2.55 previously) and organic sales growth of -2% for the year, both of which imply a significant deterioration in 4Q …, reflecting FX, incrementally softer U.S. demand, and China headwinds (VBP, lockdowns) with inflationary and supply chain challenges roughly in-line with previous assumptions.").

inventory could be worked down, the stock price reaction to an earlier disclosure of the alleged scheme (and therefore inflation) presumably would have varied over time.

73.    Despite discussing this very possibility—that "artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements"[127]—Dr. Cain provides no discussion of how he would assess any changes in inflation over time resulting from Plaintiffs' alleged theory of liability stemming at least in part from the market being allegedly misled about dealer inventory levels.  Instead, he states that this assessment would be "based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents."[128]  This vague statement about generic tools that Dr. Cain may ultimately use is not an economic basis for claiming that damages can be calculated consistently with Plaintiffs' alleged theories of liability in this matter, including the potential for time-varying inflation.  Nor has Dr. Cain identified any methodology or model that could reliably assess how inflation may have varied throughout the proposed Class Period.

**E.    Dr. Cain Has Failed to Analyze the Implication of Plaintiffs' Alleged Theory of Liability that the November 1, 2022 Disclosure Resulted in a Delayed, Multi-Day Price Reaction**

74.    Plaintiffs allege that "[w]hen the relevant truth and its impact on Dentsply's financial results and prospects entered the market through a series of partial disclosures, the price of Dentsply stock significantly dropped, as the artificial inflation came out of the stock price over time."[129]  With respect to November 1, 2022—Dentsply's announcement of the conclusion of its internal investigation and restatement of financials for certain periods, which occurred prior to market open on that date—Plaintiffs claim that the stock price declines on November 2 and November 3 represent the dissipation of inflation (there was no apparent decline on November 1).[130]

---

[127] Cain Report, ¶ 104.
[128] Cain Report, ¶ 104.
[129] Complaint, ¶ 262.
[130] Complaint, ¶¶ 277–278.  **Exhibit 2** shows that the company-specific residual return on November 1, 2022 was positive and not statistically significant.

75.     As noted earlier, although Dr. Cain acknowledges that "event studies are widely employed to calculate artificial inflation,"[131] he asserts that the purpose of the event study presented in the Cain Report is to "assist with the evaluation of market efficiency," and is "not intended to quantify artificial inflation."[132]  As an initial matter, Dr. Cain fails to explain why the event study model he would use to "quantify artificial inflation" should be different from the model he uses in the Cain Report to evaluate market efficiency.  An event study model is typically used to isolate company-specific price movements (accounting for market and industry factors) following one or more events of interest and to evaluate whether such price movements are statistically unusual in magnitude.  As such, the way company-specific residual returns are calculated (or tested) generally should not depend on whether the goal is to assess the price reaction to new, value-relevant information more broadly (e.g., if one were evaluating market efficiency) or to assess how the price changed following the dissemination of certain specific pieces of information (e.g., to measure artificial inflation dissipated by a particular disclosure).

76.     In any case, based on the event study model presented in the Cain Report, Dentsply's residual stock return on November 1, 2022 is positive and not statistically significant (see **Exhibit 2**).  Dr. Cain does not address the implications of this result for his purported damages methodology.  He does not explain how an event study methodology could be employed to reliably measure the alleged inflation (if any) that was removed from Dentsply's stock price on November 1, 2022, given the lack of a statistically significant negative price reaction to the November 1 announcement.

77.     Moreover, to the extent that Dr. Cain is claiming that, consistent with Plaintiffs' Complaint, inflation that was removed from Dentsply's stock price should instead be estimated based on the return over a three-day period following the  November 1, 2022 disclosure (i.e., the November 1–3, 2022 period), he has not explained why such an approach would be appropriate or how it would be consistent with either his use of one-day event windows in his *Cammer* 5 analysis or his conclusion that Dentsply's stock traded in an efficient market during the proposed Class Period.[133]  Indeed, while he acknowledges that market efficiency implies that "the market

---

[131] Cain Report, ¶ 99.
[132] Cain Report, fn. 92.
[133] See Cain Report, Section V.E.  I have not been asked to offer an opinion on the efficiency of the market for Dentsply's common stock.

price of securities begins to respond quickly to publicly available information,"[134] Dr. Cain does not explain how his conclusion that Dentsply's stock traded in an efficient market is consistent with both the apparent *lack* of a reaction on November 1, 2022 (as measured by the residual return on that date) and a reaction only on subsequent days. Importantly, semi-strong market efficiency, which I understand is the most relevant in this context, implies that new, value-relevant information is *rapidly* and *fully* incorporated in security prices.[135] Dr. Cain does not explain how Plaintiffs' apparent claim that it took *three* trading days (starting on the second day) for the market to react to and "digest" the information Dentsply disseminated on November 1, 2022 is consistent with market efficiency.

78.      More generally, Dr. Cain does not propose any methodology for determining the appropriate event window to assess any stock price impact of the other disclosures identified by Plaintiffs as having revealed the alleged truth in this matter. Indeed, Dr. Cain does not explain why, if a multi-day window were needed to evaluate the price reaction to the November 1, 2022 disclosure, a similar multi-day approach should not be used to assess inflation following any of the other disclosures identified by Plaintiffs. For example, were Dr. Cain to use a three-day event window (as the Complaint suggests is needed following the November 1, 2022 disclosure) for the other disclosures identified by Plaintiffs, his own event study model, applied on those dates, would find no statistically significant price declines following the May 10, 2022 and November 14, 2022 disclosures. As shown in **Exhibit 2**,[136] under Dr. Cain's event study model (extended to cover November 15 and 16), the cumulative abnormal returns computed over the

---

[134] Cain Report, ¶ 23.

[135] Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970), pp. 383–417.

[136] Consistent with MacKinlay (1997), I calculate cumulative abnormal returns over an event window by summing the abnormal returns estimated under Dr. Cain's event study model for each day in the window. I calculate the standard errors for the cumulative abnormal returns as the square root of the sum of the estimated mean squared error of the rolling regression for each abnormal return in the event window. Consistent with Dr. Cain's methodology, I evaluate the statistical significance of the cumulative abnormal returns by performing a *t*-test, where the *t*-statistic is calculated as the ratio between the cumulative abnormal return and the standard error. See MacKinlay (1997), p. 21. I note that Dr. Cain does not implement his event study for any trading day following the end of the proposed Class Period. See Cain Report, ¶ 65. Therefore, to compute company-specific residual returns for November 14–16, 2022, I extend Dr. Cain's event study model to these dates.

May 10–12, 2022 and the November 14–16, 2022 windows are negative, but not statistically significant at the 95% confidence level.[137]

79.    Finally, while the Complaint cites two specific dates in the first two weeks of November 2022 (November 1 and November 14) as dates when the alleged truth was purportedly revealed, other information that appears related to the restatement and/or Dentsply's financial performance was released by the Company on multiple other dates during this two-week period.[138]  Based on Dr. Cain's event study model, the cumulative abnormal return computed over this two-week period (as well as the cumulative abnormal return limited to only the dates during this period with releases of company-specific information) is not statistically significant, as shown in **Exhibit 3**.  Dr. Cain again fails to explain how he would deal with this additional complication when ultimately calculating damages.

80.    In sum, Dr. Cain fails to articulate a methodology capable of measuring damages consistent with Plaintiffs' theories of liability and with Plaintiffs' claim that Dentsply traded in an efficient market, at least in part because of his failure to explain how an event study methodology could be employed to reliably measure the inflation (if any) that was removed from Dentsply's stock price on the dates when the alleged truth was revealed.  This is because: (1) there was no statistically significant company-specific price decline following the November 1 disclosure; (2) Plaintiffs allege a multi-day, delayed-reaction price decline following the November 1 disclosure; (3) applying similar logic to other disclosures identified by Plaintiffs as having revealed the alleged truth (May 10 and November 14) indicates a lack of statistically significant company-specific residual returns under Dr. Cain's event study model following those announcements; and (4) the overall price reaction to the company-specific information released from November 1 through November 14 (which includes multiple

---

[137] The results are consistent in direction and statistical significance if a shorter, two-day event window were employed instead of a three-day window.

[138] As discussed earlier in **Section V.C**, Dentsply filed its restated financial results for periods in 2021 and financial results for 1Q22 and 2Q22 on November 7, 2022; announced a delay in filing its 3Q22 results as well as restated non-GAAP financial measures for FY21 and non-GAAP financial measures for 1Q22 and 2Q22 on November 9, 2022; and announced on November 10, 2022 that it had previously obtained consent from its lenders to extend the deadline for the release of its 2Q22 financials on November 4, 2022, and that it had previously come to an agreement with its noteholders for an extension of the deadline for the release of its 1Q22 and 2Q22 financials on November 5, 2022.

announcements regarding Dentsply's financial performance and its accounting restatement) is not statistically significant.

### F.    Dr. Cain's Discussion of How One Might Account for Confounding News Is Speculative and Fails to Address the Complexity of the Disclosures at Issue Under Plaintiffs' Alleged Theories of Liability

81.    Dr. Cain appears to correctly recognize that, as a general matter, the calculation of inflation can be complicated by the presence of confounding information, and he claims that "various accepted methodologies" could be used to value confounding information.[139]  However, he does not in any way address Plaintiffs' alleged theories of liability in this matter, whether these theories could result in there being confounding information (as Plaintiffs suggest might be the case[140]), or how one could account for such confounding information.

82.    For example, Plaintiffs identify Dentsply's announcement of 3Q22 earnings and updated 4Q22 guidance on November 14, 2022 as revealing the alleged truth.[141]  However, given that the November 14, 2022 earnings announcement is informationally complex,[142] a purported damages methodology would have to be capable of disaggregating the price effect of any confounding news from any price reaction to these disclosures.  Indeed, Dentsply's announcement on November 14, 2022 included, among others, information about products or segments, such as Consumables, that I understand are not at issue in this litigation, as well as about broad macro factors negatively affecting Dentsply's business.[143]  Securities analysts highlighted some of these

---

[139] Cain Report, ¶ 100.

[140] For example, Plaintiffs claim that Dentsply's financial performance in 1Q22, first disclosed on April 19, 2022 "was due *in substantial part* to lower demand related to Dentsply's persistent product problems and still-full dealer inventory channels."  See Complaint, ¶ 270 (emphasis added).

[141] Complaint, ¶¶ 279–280.

[142] The MTD Opinion states that "[t]he November 14 announcement presents an added wrinkle. Defendants argue that the November 1 release of the internal investigation's findings fully disclosed the fraud.  If that were true, then Plaintiffs could not claim that any further loss was attributable to any further disclosure or materialization of a 'concealed' risk [on November 14]."  MTD Opinion, p. 16.

[143] See, e.g., Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed November 14, 2022, pp. 1–2 ("Our third quarter results reflect continued macroeconomic headwinds, including foreign currency impacts, global supply chain challenges, and regional softness in the U.S. and China. … Consumables[:] Third quarter 2022 net sales were $391 million, down (8.7%) versus prior year. Foreign currency negatively impacted sales by (6.2%), while organic sales decreased by (2.5%) as compared to prior year. The decrease in organic sales was driven by softening demand in the U.S. and China; partially offset by demand for preventive consumables.").

potentially confounding factors in their commentary following the earnings announcement.  For example:

- On November 15, 2022, Bank of America noted that "macro impacts are still a significant headwind in the back-half of the year and into FY23 as the company faces ongoing pressures from foreign exchange and inflation, as well as supply chain and volume challenges in the US and China."[144]

- On November 14, 2022, Morgan Stanley wrote that "XRAY's revised 2022 guidance is worse than anticipated, calling for 2022 EPS of $1.90-2.00 ($2.35-$2.55 previously) and organic sales growth of -2% for the year, both of which imply a significant deterioration in 4Q …, reflecting FX, incrementally softer U.S. demand, and China headwinds (VBP, lockdowns) with inflationary and supply chain challenges roughly in-line with previous assumptions."[145]

83.    Other than a vague statement that he could use "various accepted methodologies,"[146] and providing examples of such methodologies that he does not link to the specific issues in this matter, Dr. Cain has failed to explain how any particular methodology would be able to disaggregate the price impact of potentially confounding information, including unfavorable movements in exchange rates and headwinds in China, that was released contemporaneously with any revelation of the alleged truth on November 14, 2022.

84.    The earlier disclosures identified by Plaintiffs were also informationally complex, given that they were either earnings releases (February 28, 2022) or included a variety of information about Dentsply's financial performance (April 19, 2022, May 10, 2022, and November 1, 2022). For example, on November 1, 2022, Dentsply also announced that it would record an impairment

---

[144] Bank of America, "Long-term still appealing but potential bumpy road to get back to LT targets," November 15, 2022, p. 1.
[145] Morgan Stanley, "New Bars Being Set, but 2023 Visibility Remains Limited," November 14, 2022, p. 1.
[146] Cain Report, ¶ 100.

to its goodwill.[147]  Similarly, for earlier disclosures identified by Plaintiffs, Dentsply noted that a variety of other factors were impacting its financial results and financial outlook for 2022, including COVID-related restrictions in China (February 28 and May 10) and currency headwinds (February 28, April 19, and May 10).[148]  Dr. Cain has failed to explain how his methodology would be able to disaggregate the price impact of any confounding information released contemporaneously with any materialization of alleged undisclosed risks on these other dates.

85.    In sum, while acknowledging the need to account for confounding information when calculating inflation, Dr. Cain fails to articulate any methodology or model for dealing with confounding information that reflects the specific circumstances of this case.

---

[147] Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed November 1, 2022.  Analysts commented on this announcement.  For example, on November 1, 2022, JP Morgan noted that "[u]nrelated to the internal investigation, XRAY announced it expects to record a non-cash impairment charge to goodwill and intangible assets of $1.0-1.3B during 3Q22 due to a higher cost of capital, inflation, Fx, supply chain costs, lower OPM, and reduced future cash flow expectations …" and on November 1, 2022, Bank of America indicated that "[t]he goodwill impairment is fairly significant but also a one-time adjustment to the company's underlying value."  See J.P. Morgan, "Internal Investigation Concludes with Restated 2021 Financials; 3Q Pre-announced and Prelim 4Q Guide Below Consensus," November 1, 2022, p. 1; Bank of America, "XRAY announces completion of accounting review and prelim soft 3Q/4Q revenues," November 1, 2022, p. 1.

[148] Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed May 10, 2022; "Q1 2022 DENTSPLY SIRONA Inc Earnings Call – Final," *VIQ FD Disclosure*, May 10, 2022; Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed April 19, 2022; "Q4 2021 DENTSPLY SIRONA Inc Earnings Call – Final," *VIQ FD Disclosure*, February 28, 2022.  Analysts noted these factors in their commentary.  For example, on February 28, 2022, Piper Sandler commented that the "2022 guidance didn't disappoint, but a variety of cross currents in the macro environment and as they relate to XRAY (COVID, Fx, Russia, supply chain, new products) make this guide look more realistic than conservative."  Similarly, on April 19, 2022, William Blair noted that "[t]his morning's press release points to weaker sales performance in the U.S., global supply chain challenges, and foreign exchange headwinds.  Since the fourth-quarter call on February 28, we know further headwinds have cropped up in the form of the stronger dollar, war in Ukraine, and COVID-related lockdowns in China."  Along the same lines, on May 10, 2022, Credit Suisse explained that "[c]hanges in guide reflect tougher FX, Russia/Ukraine sales risk, as well as full year supply chain and China impacts vs partial year impact assumed from these factors previously."  See Piper Sandler, "4Q-21 Recap - Many Moving Parts at Present, Valuation Keeps Us Overweight," February 28, 2022, p. 1; William Blair, "Downgrading Rating and Lowering Estimates Given Surprising Leadership Changes Announced This Morning," April 19, 2022, p. 2; Credit Suisse, "Q1 vs. Our Estimates: In Line with Pre-Release; Guide Reflects Tougher FX and Protracted Headwinds; Reiterate Outperform," May 10, 2022, p. 1.

Executed this 20th day of December, 2024

_____
Paul Zurek, Ph.D.

**Appendix A**

# PAUL ZUREK, Ph.D.
## Vice President

**Cornerstone Research**
Two Embarcadero Center, 20th Floor • San Francisco, CA 94111
415.229.8225 • mobile 917.434.7602
pzurek@cornerstone.com

## ACADEMIC BACKGROUND

2002 – 2008    **The Wharton School, University of Pennsylvania**    Philadelphia, Pennsylvania
*Ph.D. and M.A. in Finance*
Research interests include valuation, asset pricing, financial econometrics and financial institutions risk management.

1998 – 2002    **The Wharton School, University of Pennsylvania**    Philadelphia, Pennsylvania
*B.S. in Economics, Concentration in Finance, Minor in Mathematics, Summa Cum Laude*

## PROFESSIONAL EXPERIENCE

7/08 – Present    **Cornerstone Research, Inc.**    New York and San Francisco
*Vice President*
Experience conducting financial and economic analysis for financial institution and other corporate and individual clients in complex litigation, including securities, valuation, appraisal, market structure, market manipulation, hedge funds, PE and investment management, international arbitration, financial fraud, risk management, and government investigations.  Design and oversee development of quantitative analysis models.
Provide testimony and presentation of findings to regulators and arbitration panels.

2023 – Present    **Stanford University Law School**    Palo Alto, California
Lecturer in Law, teaching Corporate Finance and Valuation

6/10 – 03/11    **United Poles Federal Credit Union**    Perth Amboy, New Jersey
*Director and ALCO Committee Member*
Member of the Board of Directors.  Advised on issues of strategy and risk.

9/02 – 12/07    **Kimberton International Associates – The Banking Group**    Kimberton, Pennsylvania
*Senior Consultant*
Designed executive education programs for banking and financial services.  Taught seminars on financial institutions risk management, macroeconomics, banking, and general business management.  Worked with clients in the United States, Europe and Latin America.

5/01 – 8/01    **Credit Suisse First Boston**    San Francisco, California
*Mergers & Acquisitions Summer Analyst*
Assisted in transactions during both preparatory and due-diligence stages.  Performed financial statement, precedent transaction and comparable company analysis.  Updated league tables and analyzed revenue, market share and headcount trends in the Technology M&A Group.

**Appendix A**

---

**TEACHING EXPERIENCE**

| | |
|---|---|
| Stanford Law School<br>*Lecturer, teaching Corporate Finance and Valuation* | 2023, 2024, 2025 |
| Wharton / Ping An Bank Executive Education Program<br>*Taught global economics and credit risk modeling in Beijing, China.* | 2015 |
| Wharton China Asset Management Company Executive Development Program<br>*Taught global financial markets and market microstructure.* | 2011 |
| Risk Management Association and Wharton Advanced Risk Management Program<br>*Instructor (2007–2009) and Academic Co-Director (2009)* | 2007 – 2009 |
| Wharton Hana Financial Hana Leaders Academy Global Course<br>*Instructor in Risk Management* | 2008 |
| Merrill Lynch Investment Banking Institute<br>*Teaching Assistant* | 2006, 2007 |
| Investment Management, Derivative Securities, International Banking,<br>Venture Capital, Corporate Finance, Macroeconomics, Microeconomics<br>*Teaching Assistant* | 2002 – 2008 |

**RESEARCH AND PUBLICATIONS**

"Momentum and Long-Run Risks," Working Paper, *The Wharton School*, November 2007.
"Essays on Asset Pricing," Doctoral Dissertation, *The University of Pennsylvania*, 2008.
The Guide to Damages in International Arbitration. Chapter 16:  Market Approach or Comparables (with José Alberro), 1st Edition, November 2016, 2nd Edition, December 2017, 3rd Edition, November 2018.
Commodities:  Markets, Performance, Strategies. Chapter 14:  Commodity Mutual Funds (with Gustavo Camilo and Janko Cizel), Oxford University Press 2018.
"Collateralized loan obligations in the age of COVID-19" (with Yan Cao and Manuel Vasconcelos), Thomson Reuters Westlaw Expert Analysis, June 22, 2020.

**HONORS AND AWARDS**

| | |
|---|---|
| Outstanding Doctoral Student Paper Award at the Southern Finance Association<br>Annual Meeting, Western Finance Association Doctoral Student Travel Grant | 2008 |
| Weiss Center for International Financial Research Summer Fellowship | 2007 |
| Dean's Fellowship for Distinguished Merit | 2002 |
| Class of 1939 Fellowship | 2002 |

**Appendix A**

---

**INVITED AND CONFERENCE PRESENTATIONS, SPEAKING ENGAGEMENTS**

| | |
|---|---|
| "Delaware Shareholder Litigation," invited lecture, Corporate Finance, Professor Prasad Krishnamurthy, Berkeley Law School | 2023 |
| "Securities Litigation Trends in 2022: Notable Developments and Challenges" webcast, The Knowledge Group | 2022 |
| "The Rise of Special Purpose Acquisition Companies (SPACs): How to Minimize Securities Litigation Risks" webcast, The Knowledge Group | 2021 |
| "Trends and Updates on Class Action Litigation: Hot Buttons During the COVID-19 Crisis," webcast, The Knowledge Group | 2020 |
| "Discussion: Loss Causation in a Bear Market: The Economists' Perspective," Chicago Bar Association Securities Law Committee | 2020 |
| "The Evolving Securities Litigation Landscape:  Recent Trends and Updates You Need to Know," webcast, The Knowledge Group | 2020 |
| "Effective Use of Statistical Evidence in Class Action Litigation: Practical Guide in 2019," webcast, The Knowledge Group | 2019 |
| "Securities Litigation in 2019:  Winning Tips and Strategies," webcast, The Knowledge Group | 2019 |
| "Proving and Determining Damages in International Arbitration: Methods, Trends and Best Practices," webcast, The Knowledge Group | 2019 |
| Cambridge Forums Forum on Securities Litigation, panel speaker. | 2019 |
| Western Finance Association Annual Meeting, Southern Finance Association Annual Meeting, Drexel University, Ohio State University, University of Iowa, University of Minnesota, University of Notre Dame, Virginia Polytechnic Institute and State University | 2008 |
| The Wharton School | 2007 |

**CONFERENCE PARTICIPATION**

| | |
|---|---|
| Wharton Rodney L. White Center for Financial Research Conference on Financial Decisions and Asset Markets[*] | 2019 |
| American Finance Association Annual Meeting | 2008, 2009, 2011 – 2020 |
| Western Finance Association Annual Meeting[*] | 2008, 2016 – 2018 |
| NYU Five Star Conference in Finance | 2012 |
| Wharton FIC and Oliver Wyman's Risk Roundtable | 2003, 2011 |
| Southern Finance Association Annual Meeting[*], Mid-Atlantic Research Conference in Finance[*] | 2008 |
| Mid-Atlantic Research Conference in Finance[*], Wharton FIC and Oliver Wyman's Risk Roundtable | 2007 |
| NBER's Asset Pricing Program Meeting | 2006 |
| The Philadelphia Fed Policy Forum | 2003 |
| NSF/NBER Time Series Conference | 2002 |

* Paper Discussant or Presenter

**Appendix A**

## OTHER PAST ACTIVITIES

Referee for the Journal of Economic Dynamics and Control and Finance Research Letters.  Fellow at the Wharton Financial Institutions Center.

**Appendix A**

---

**TESTIMONY AND EXPERT REPORTS**

In the Matter of Deutsche Bank Securities, Inc. (SEC administrative proceeding 3-17730), presentation to the SEC and NY AG, June 2015.

Pattelli v. Lending Club Corporation (American Arbitration Association), testimony, January 2016.

In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation (MDL No. 2672 CRB (JSC), USDC ND California), expert declaration, August 2016.

Confidential expert reports submitted to the SEC regarding execution quality in FX markets, September 2016 and October 2016.

B.K. et al v. Gregory McKay (2:15-cv-00185, USDC District of Arizona), expert report, December 2017.

MidCoast Council and Division CCMF Ltd. v. Fitch Ratings, Inc., Federal Court of Australia, New South Wales (NSD995 of 2014), expert reports, June 2018 and February 2019, expert conclave and joint expert report, June 2019.

In Re: RH Securities Litigation (4:17-cv-00554, USDC ND California), expert report, August 2018, deposition, September 2018.

Public Employees' Retirement System of Mississippi v. Treehouse Foods, Inc. et al (1:16-cv-10632, USDC ND Illinois), expert report, October 2018, deposition, April 2019.

Aaron Booth and Cody Tucker on behalf of themselves and all others similarly situated v. Galveston County, Texas, et al (3:18-cv-104, USDC SD Texas), two expert declarations and deposition, January 2019.

Brian C. Schartz, On Behalf of Himself and All Others Similarly Situated and Derivatively on Behalf of Nominal Defendant The Female Health Company v. O.B. Parrish, et al (2016CH14488 and 2016CH13815, Circuit Court of Cook Country, Illinois, County Department, Chancery Division), expert report, February 2019, deposition, March 2019.

In Re: Spectrum Pharmaceuticals, Inc. Securities Litigation (2:16-cv-02279, USDC District of Nevada), expert report, March 2019.

Trevor Mild, Individually and on Behalf of All Others Similarly Situated v. PPG Industries, Inc., Michael H. McGarry, Vincent J. Morales, and Mark C. Kelly (2:18-cv-04231, USDC CD California), expert report and deposition, April 2019.

In Re: Novo Nordisk Securities Litigation (3:17-cv-00209, USDC District of New Jersey), expert report, June 2019, deposition July 2019.

Christakis Vrakas et al v. United States Steel Corporation et al (2:17-cv-00579, USDC WD Pennsylvania), expert report and deposition, June 2019.

Margaret Tinsley, et al v. Michael Faust, et al (2:15-cv-00185, USDC District of Arizona), expert reports, October and November 2019, deposition, January 2020.

In re Health Insurance Innovations Securities Litigation (8:17-cv-02186, USDC MD Florida), expert report, January 2020, deposition, February 2020.

Frederic Haghebaert, Individually and On Behalf of All Others Similarly Situated v. Tandy Leather Factory, Inc., Janet Carr, Tina L. Castillo, and Shannon L. Greene (4:19-cv-01000, USDC ND Texas), expert declaration, February 2020.

Matt Karinski v. Stamps.com, Inc. et al (2:19-cv-01828, USDC CD California), expert report, August 2020, deposition, October 2020.

**Appendix A**

Matt Wolther, individually and on behalf of all others similarly situated v. Shubham Maheshwari et al (18CV329690, Superior Court of the State of California, County of Santa Clara), expert report, February 2021.

Cambridge Retirement System, Individually and On Behalf of All Others Similarly Situated v. Amneal Pharmaceuticals, Inc. et al (SOM-L-1701-19, Superior Court of New Jersey, Law Division, Somerset County), expert report, March 2021.

Indiana Public Retirement System, Individually and on Behalf of All Others Similarly Situated v. Michael T. Cartwright, Kirk R. Manz, and Andrew W. McWilliams (3:19-cv-00407, USDC MD Tennessee), expert report, September 2021, deposition June 2022.

Shela Camenisch and Dale Dean; Luna Baron; and Eva King, Individually and as Trustee of the Eva M. King Trust, individually and on behalf of all others similarly situated v. Umpqua Bank (3:20-cv-5905-RS, USDC ND California), expert report, March 2022, deposition, April 2022.

Lewis Stein, Individually and on Behalf of All Others Similarly Situated v. U.S. Xpress Enterprises, Inc. et al (1:19-cv-00098, USDC ED Tennessee), expert report, October 2022, deposition, November 2022.

In Re Maxar Technologies, Inc. Shareholder Litigation (19CV357070, Superior Court of the State of California, County of Santa Clara), expert report, December 2022.

In Re Jernigan Capital, Inc. Securities Litigation (1:20-cv-09575, USDC SD New York), expert report, February 2023, deposition, March 2023.

In Re Fibrogen Inc. Securities Litigation (3:21-cv-02623, USDC ND California), expert report, May 2023, deposition June 2023.

RSBIX Corp. v. Eris Exchange LLC and Eris Clearing LLC (American Arbitration Association), expert report, May 2023, hearing testimony, June 2023.

Barbara Strougo, individually and on behalf of all others similarly situated v. Mallinckrodt Public Limited Company et al (3:20-cv-10100, USDC District of New Jersey), expert report, June 2023, deposition, August 2023.

L-5 Healthcare Partners, LLC v. Alphatec Holdings, Inc. (2019-0412-NAC, Court of Chancery of the State of Delaware), expert report, September 2023 and October 2023, deposition, November 2023, trial testimony, January 2024.

Virgo Ventures Liquidating Trust et al v. Daniel Rosenberg et al (2019 L 011889, Circuit Court of Cook County, Illinois, Country Department, Law Division), expert report, December 2023, March 2024.

Michael Pardi, individually and on behalf of all others similarly situated v. Tricida, Inc. and Gerritt Klaerner (4:21-cv-00076, USDC ND California), expert report, July 2024.

David Hall and Marta Hall v. Jeffrey Vetter, Michael Dee, Anand Gopalan, James Graf, Andrew Hamer, Julie Levenson, Michael Vella, and Does 1 through 30 (JAMS Arbitration), expert report, December 2024.

**Appendix B**

# Documents Considered List

## Academic Articles

- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970), pp. 383–417

- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997), pp. 13–39

## Analyst Reports

Available analyst reports for the period June 9, 2021, to November 15, 2022, obtained from counsel, *Capital IQ*, *LSEG Workspace*, and Dr. Cain's production materials, including (but not limited to):

- Baird, "4Q Prelim Review - A Few 4Q Issues, 2022 Guide Largely as Expected," February 28, 2022

- Bank of America, "Cloudy near-term more macro-impacted, longer-term growth drivers unchanged," February 28, 2022

- Piper Sandler, "4Q-21 Recap - Many Moving Parts at Present, Valuation Keeps Us Overweight," February 28, 2022

- Morgan Stanley, "Model Update Post 10K; Highlighting New Segment Disclosure, Recent Feedback," March 7, 2022

- Baird, "CEO Terminated, Next Steps Unclear; Downgrading to Neutral," April 19, 2022

- J.P. Morgan, "1Q22 Miss & Management Transition Creates Difficult Set Up for 2022; Details from Call w/ Management," April 19, 2022

- Morgan Stanley, "Management Shake-Up; Cutting Estimates, Price Target," April 19, 2022

- Piper Sandler, "Downgrade to Neutral; Challenges Aplenty, and No Quick Fix that We See," April 19, 2022

- William Blair, "Downgrading Rating and Lowering Estimates Given Surprising Leadership Changes Announced This Morning," April 19, 2022

- Credit Suisse, "Q1 vs. Our Estimates: In Line with Pre-Release; Guide Reflects Tougher FX and Protracted Headwinds; Reiterate Outperform," May 10, 2022

- Evercore ISI, "The Kitchen Sink," May 10, 2022

- UBS, "1Q22: Caliendo's Conference Call Commentary," May 10, 2022

- William Blair, "Post-Call Model Adjustments; Gaining Further Clarity Amidst 10-Q Filing Delay," May 10, 2022

**Appendix B**

- UBS, "Upgrading to Buy; Favorable Risk-Reward as Inventory Issue Appears to be Manageable," June 1, 2022

- Bank of America, "XRAY announces completion of accounting review and prelim soft 3Q/4Q revenues," November 1, 2022

- Evercore ISI, "Pre-A 3Q Revs of $947 MM, 4Q guide $919-938 MM (below, but no details[)]; Reporting 3Q Nov 9 + $20 MM '21 Restatement," November 1, 2022

- J.P. Morgan, "Internal Investigation Concludes with Restated 2021 Financials; 3Q Pre-announced and Prelim 4Q Guide Below Consensus," November 1, 2022

- Piper Sandler, "Accounting Investigation Closed, 3Q Prelim Results Provided," November 1, 2022

- William Blair, "Audit Conclusion Is a Step in the Right Direction, but Recent Results Leave Question on Long-Term Growth Strategies," November 1, 2022

- Morgan Stanley, "Investigation Concludes - Restatement Benign, but Questions Linger," November 2, 2022

- Baird, "3Q Recap - Incremental Hasn't Worked, We'd Go Big," November 14, 2022

- Morgan Stanley, "New Bars Being Set, but 2023 Visibility Remains Limited," November 14, 2022

- Piper Sandler, "Taking the Right Steps to Reposition, but Continue Monitoring from Sidelines," November 14, 2022

- Bank of America, "Long-term still appealing but potential bumpy road to get back to LT targets," November 15, 2022


**Books**

- Berk, Jonathan, and Peter DeMarzo, *Corporate Finance*, 3rd Edition (Boston, M.A.: Pearson, 2013)

- Lhabitant, François-Serge, *Handbook of Hedge Funds* (West Sussex, U.K.: John Wiley & Sons, Ltd., 2006)


**Earnings Call Transcripts**

- "Q2 2021 DENTSPLY SIRONA Inc Earnings Call – Final," *VIQ FD Disclosure*, August 5, 2021

- "Q3 2021 DENTSPLY SIRONA Inc Earnings Call – Final," *VIQ FD Disclosure*, November 4, 2021

- "Q4 2021 DENTSPLY SIRONA Inc Earnings Call – Final," *VIQ FD Disclosure*, February 28, 2022

- "Q1 2022 DENTSPLY SIRONA Inc Earnings Call – Final," *VIQ FD Disclosure*, May 10, 2022

**Appendix B**

- "Q3 2022 DENTSPLY SIRONA Inc Earnings Call – Final," *VIQ FD Disclosure*, November 14, 2022

**Expert Reports**

- Expert Report of Matthew D. Cain, Ph.D., November 15, 2024, and Associated Production

**Legal Documents**

- Amended Complaint for Violations of the Federal Securities Laws, *San Antonio Fire and Police Pension Fund et al., vs. Dentsply Sirona Inc. et al.,* Case No. 1:22-cv-06339-AS, August 1, 2023

- *Comcast Corp. et al. v. Behrend et al.,* 569 U.S. 27 (2013)

- *Goldman Sachs Group, Inc., et al. v. Arkansas Teacher Retirement System, et al.,* 594 U.S. 113 (2021)

- Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *San Antonio Fire and Police Pension Fund et al., vs. Dentsply Sirona Inc. et al.,* Case No. 1:22-cv-06339-AS, November 15, 2024

- Opinion and Order, *San Antonio Fire and Police Pension Fund et al., vs. Dentsply Sirona Inc. et al.,* Case No. 1:22-cv-06339-AS, May 1, 2024

**SEC Filings**

- Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed February 28, 2022

- Dentsply Sirona Inc., SEC Form 10-K for the fiscal year ended December 31, 2021, filed March 1, 2022

- Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed April 19, 2022

- Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed May 10, 2022

- Dentsply Sirona Inc., SEC Form 8-K, filed November 1, 2022

- Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed November 1, 2022

- Dentsply Sirona Inc., SEC Form 10-KA for the fiscal year ended December 31, 2021, filed November 7, 2022

- Dentsply Sirona Inc., SEC Form 10-Q for the fiscal quarter ended March 31, 2022, filed November 7, 2022

- Dentsply Sirona Inc., SEC Form 10-Q for the fiscal quarter ended June 30, 2022, filed November 7, 2022

- Dentsply Sirona Inc., SEC Form 10-QA for the fiscal quarter ended September 30, 2021, filed November 7, 2022

**Appendix B**

- Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed November 9, 2022
- Dentsply Sirona Inc., SEC Form 12b-25 Notification of Late Filing, filed November 9, 2022
- Dentsply Sirona Inc., SEC Form 8-K, filed November 10, 2022
- Dentsply Sirona Inc., SEC Form 8-K, Exhibit 99.1, filed November 14, 2022
- Dentsply Sirona Inc., SEC Form 10-KA for the fiscal year ended December 31, 2022, filed August 7, 2023
- Other SEC Filings by the Company during the proposed Class Period

**Websites**

- "CEREC Primemill," Dentsply Sirona, available at https://www.dentsplysirona.com/en-us/discover/discover-by-brand/cerec-primemill.html, accessed on December 11, 2024
- "Discover our Extraoral X-Ray Products," Dentsply Sirona, available at https://www.dentsplysirona.com/en-us/discover/discover-by-category/imaging-systems/extraoral-imaging.html, accessed on December 11, 2024
- "Primescan," Dentsply Sirona, available at https://www.dentsplysirona.com/en-us/discover/discover-by-brand/primescan.html, accessed on December 11, 2024

Note:  In addition to the documents on this list, I considered all documents cited in my report and my exhibits to form my opinions.

**Exhibit 1**

## At-Issue Alleged Misrepresentations

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|------|---------|----------|--------|----------------|---------------------|---------------------|------------|
| 11/4/21 | Gomez | Supply Chain Disruptions | Earnings Conference Call | 3Q21 | ¶ 103 | | "Yes, as I indicated in my remarks, there are challenges. So far, I also said this so far for us, **we have not been impacted in terms of our ability to manufacture products or to supply our distributors is something that we are monitoring very closely**. The supply chain team is doing a great job because the reality is, it is harder now to find certain components. It is more expensive in some cases to procure certain materials. **We have managed all of that so far. So with respect to what we're seeing in the inventory pipeline or channel, we haven't seen any major disruptions. Any changes really of material significance at this point**. But as you know, this is a global situation, and it's something that is hard to predict at this point. **But so far, we – our financials are not –have not been impacted by the supply chain issues in a material way other than some elevated costs that we have been able to offset or in some cases, for example, we did a price increase**." |
| 11/4/21 | Gomez | Supply Chain Disruptions | Earnings Conference Call | 3Q21 | ¶ 104 | | "And the – as I said before, the supply chain team is doing a great job. And that's why, **so far, we have not impacted our ability to manufacture products**." |
| 11/11/21 | Casey | Supply Chain Disruptions | Credit Suisse Healthcare Conference | | ¶ 105 | ✔ | "~~As we go into the fourth quarter, we're optimistic that things get closer and closer to normal~~. Obviously, the supply chain is impacting all of us. When you talk about – in our case, it's – we look at distribution costs are accelerating. To date, we've been able to manage through a lot of that. And as we look out, we have a few key products that there's obviously going to be constraints around we're a heavily chip-oriented business. **To date, we've been able to make everything we need to make**. But as we jump out 6, 8, 12 months, we expect to see pressure on that. **We have a terrific supply chain**. One of the advantages of the structure we put in place over the last 2 years is a centralized supply chain with a pretty sophisticated procurement group, and that's helped us through it. But we're also – we took price in the – at the very end of the third quarter, with the idea that we want to get in front of inflation." |
| 12/1/21 | Casey | Supply Chain Disruptions | Evercore ISI HealthCONX Conference | | ¶ 106 | | "Yes. So the supply chain, I break it out into 2 things, Elizabeth, distribution and logistics. **We're not seeing huge delays. We're seeing increased costs associated with that**. And that's obviously a headwind as we go forward. The second issue is **are we having problems getting anything, we're basically – what we're learning is we can get stuff**. It just takes a lot more effort because it might not be as easy to get." |

**Exhibit 1**

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|---|---|---|---|---|---|---|---|
| 2/28/22 | Gomez | Supply Chain Disruptions | Earnings Conference Call | 4Q21/FY21 | ¶ 107 | | "In the quarter, we also experienced more acute supply chain and COVID related constraints, which we estimate to have suppressed our total company organic growth by approximately 2 to 3 points. We view this as a **temporary headwind** but anticipate that our supply chain will be – will remain challenging for at least **1 or 2 quarters in 2022**." |
| 6/9/21 | Gomez | Success and Drivers of Dentsply's Digital Sales | Goldman Sachs Global Healthcare Conference | | ¶ 111 | ✔ | "Specifically for us, **we have seen a good rebound of our sales in CAD/CAM in general** and is happening pretty much across all of the categories within equipment. ~~I think we're seeing great recovery~~ and imaging across the board, **CAD/CAM**. And we feel frankly, in some places, we are probably gaining share. At a minimum, we are tracking with a fast market growth rate. . . . <br><br> . . . **So across that entire ecosystem, we've seen good recovery, good progress. And so both short-term rebound is good. And then long-term trend**, this is part of a good trend, and we're excited about that business. And I think the potential is there for us and for all." |
| 9/15/21 | Gomez | Success and Drivers of Dentsply's Digital Sales | Robert W. Baird Global Healthcare Conference | | ¶ 112 | | "[W]e have a few key objectives with this year. One of them is continued momentum with our digital dentistry and the [end-user] promotions that you talk about. **Primescan continues to do well. Selling cameras alone is doing really well. CEREC is also doing well. So that – the momentum in that business has continued**. . . . <br><br> And so I think our digital business – digital dentistry business continues to be strong and we have more things coming down the pike." |
| 11/4/21 | Gomez | Success and Drivers of Dentsply's Digital Sales | Earnings Conference Call | 3Q21 | ¶ 113 | | "[T]here continues to be a strong momentum on increasing digital capabilities within dental offices. **Demand is high for digital devices such as Primescan** and imaging equipment such as our new Axeos unit." <br><br> "Yes, what we're seeing for T&E going into the fourth quarter is along the lines of what we said in our prepared remarks, which is, **we have great momentum**. **There is great demand for Primescan**, great demand for Axeos and imaging in general. The timing of sales relative to DS World, most of those sales actually happened in the fourth quarter. We – there was a lot of great excitement. <br><br> And so in our guidance for the fourth quarter, we are including pretty substantial growth for CAD/CAM, for imaging in general. So the performance in that business – that part of the business continues to be strong." |

**Exhibit 1**

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|------|---------|----------|--------|----------------|---------------------|---------------------|------------|
| 2/28/22 | Gomez | Success and Drivers of Dentsply's Digital Sales | Earnings Conference Call | 4Q21/FY21 | ¶ 115 | | "Our clear aligners, implants and **CAD/CAM businesses posted a strong growth in the quarter**.<br>* * *<br>T&E segment organic sales expansion was led by **double-digit growth** in clear aligners, **CAD/CAM** and implants. The T&E segment posted a strong growth despite difficult supply chain conditions." |
| 2/28/22 | Casey | Success and Drivers of Dentsply's Digital Sales | Earnings Conference Call | 4Q21/FY21 | ¶ 115 | | "**There was strong progress within the CEREC franchise during 2021**. In addition to a record number of DI cameras sold, we were able to launch major software innovations with CEREC 5.2 and SureSmile 7.6. **There is also good progress on Primemill**. Our higher-end CACTI imaging systems also saw robust demand. **This stems from dentists looking to add more sophisticated diagnostic tools** that will allow them to incorporate more complex procedures like implants and clear aligners to the practices." |
| 2/28/22 | Gomez | Success and Drivers of Dentsply's Digital Sales | Earnings Conference Call | 4Q21/FY21 | ¶ 116 | | "**The retail demand for Primemill is solid, and our dealer partners in the U.S. have sufficient inventory to meet that demand. In the short term, this tradeoff will reduce our wholesale volume of Primemills but is the right thing to do for our customers**." |
| 6/9/21 | Gomez | Dealer Inventory Levels | Goldman Sachs Global Healthcare Conference | | ¶ 119 | | "We have thrown in more sophisticated and strategic incentive plans. We went from doing a lot of incentives with our dealer partners, and we have redirected those dollars mostly to the end customer. **And so trying to match end-customer demand with our sales. That is a very important thing**." |
| 8/5/21 | Gomez | Dealer Inventory Levels | Earnings Conference Call | 2Q21 | ¶ 121 | | "**We don't think so. We track that very closely and we manage our inventory levels in a disciplined way. And so we are not seeing that at this point**." |
| 8/5/21 | Gomez | Dealer Inventory Levels | Earnings Conference Call | 2Q21 | ¶ 122 | | "**I don't think so. No, we watch inventory very closely, our internal inventory, inventory in the channel**. And our objective at all times is to ensure that our manufacturing process is smooth. And the worst thing that you can do for any manufacturing process is to move inventory levels too drastically from period to period.<br><br>So our goal, at all times, is to keep inventory levels relatively stable. And our actually long-term goal is frankly to decrease days of inventory, and that's a key internal goal that we track and measure very closely." |

**Exhibit 1**

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|---|---|---|---|---|---|---|---|
| 11/4/21 | Dentsply | Dealer Inventory Levels | Form 10-Q | 3Q21 | ¶ 123 | | "The increase in organic sales was attributable to both the Technologies & Equipment and the Consumables segments and resulted from the overall higher volumes during the three months ended September 30, 2021 due to the recovery in demand from the COVID-19 pandemic, sales attributed to recent product launches, and an increase in sales to dealers in the third quarter ahead of annual price increases which previously occurred in the fourth quarter of 2020." |
| 3/1/22 | Dentsply | Dealer Inventory Levels | Form 10-K | FY21 | ¶ 124 | | "As of December 31, 2021, certain dealers' inventory of the Company's CAD/CAM products was higher than at the end of the prior year, by approximately $50 million. **These higher levels of dealer inventory are due to lower-than-expected retail sales in the fourth quarter and may pose headwinds to the Company's net sales for these products in 2022**." |
| 11/4/21 | Casey | Company's Success in the Third Quarter of 2021 | Press Release | 3Q21 | ¶ 127 | | "In the third quarter **we delivered strong results** in an environment still impacted by the pandemic. Organic sales grew over 21%, **driven by continued recovery in the dental market and robust demand from our recent product launches**. Our teams have also done a commendable job navigating supply chain bottlenecks to deliver products to our customers . . . ." |
| 11/4/21 | Dentsply | Company's Success in the Third Quarter of 2021 | Form 10-Q | 3Q21 | ¶ 128 | | "**The increase in organic sales was attributable to increased volumes in both the Technologies & Equipment and Consumables segments due to a recovery in demand from the impact of the COVID-19 pandemic, sales attributed to recent product launches, and an increase of sales to dealers in the third quarter** ahead of annual price increases, which previously occurred in the fourth quarter of 2020.<br>* * *<br>[Technologies & Equipment:] **The increase in organic sales occurred across all dental businesses and resulted from overall higher volumes during the three months ended September 30, 2021 due to a recovery in demand from the COVID-19 pandemic, timing of sales to dealers, and sales attributed to recent product launches**.<br>* * *<br>[United States:] **The increase in organic sales was attributable to both the Technologies & Equipment and the Consumables segments and resulted from the overall higher volumes during the three months ended September 30, 2021 due to the recovery in demand from the COVID-19 pandemic, sales attributed to recent product launches, and an increase in sales to dealers in the third quarter** ahead of annual price increases which previously occurred in the fourth quarter of 2020." |

**Exhibit 1**

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|---|---|---|---|---|---|---|---|
| 11/4/21 | Casey | Company's Success in the Third Quarter of 2021 | Earnings Conference Call | 3Q21 | ¶ 129 | | "To summarize, our **strong performance year-to-date** gives us confidence going forward for the remainder of 2021. We have good momentum leading into the future. **Our results reflect the underlying resilience of the dental market and our team's disciplined performance against our operational goals and progress against our key strategic priorities**." |
| 2/28/22 | Casey | Company's Results for the Fourth Quarter and Full Year 2021 | Press Release | 4Q21/FY21 | ¶ 132 | | "**Our 2021 performance reflects the resilience of the dental market, the strength of our global portfolio, and our team's ability to execute well in an environment still impacted by the pandemic**. We delivered strong results with **organic sales growth of nearly 25%, double-digit EPS growth, and solid cash flow generation**. We made meaningful progress on the commitments we set three years ago to strengthen the foundation of the business and position it for long-term sustainable growth . . . . We are optimistic about our future. We have a healthy innovation pipeline, **a well-positioned portfolio**, and new strategic partnerships to accelerate our growth." |
| 2/28/22 | Gomez | Company's Results for the Fourth Quarter and Full Year 2021 | Earnings Conference Call | 4Q21/FY21 | ¶ 133 | | "**The last week or 2 in December became more complicated for dental practices in many markets primarily as a result of staffing shortages**, and as a result, volume tended to go down a little bit again in the last couple of weeks in December in a lot of markets.<br><br>**We had also situations like China where many provinces still have the zero COVID policy** and, as a result, are in major lockdowns, which restricts substantially patient traffic. **So those are probably the 2 main constraints we were facing from a volume – from a demand perspective**." |
| 3/1/22 | Dentsply | Company's Results for the Fourth Quarter and Full Year 2021 | Form 10-K | FY21 | ¶ 134 | | "**The increase in organic sales was attributable to both the Technologies & Equipment and the Consumables segments and was primarily due to overall higher volumes during the year ended December 31, 2021, following periods of lower demand resulting from the COVID-19 pandemic. In addition to the overall increases due to more normalized demand across the product lines, the Company achieved additional topline growth domestically as a result of successful product launches in the Implants, Orthodontics, and Endodontic & Restorative Consumables businesses, partly offset by delays in shipments of some products ate in the year due to supply chain constraints**." |
| 8/5/21 | Casey | Dentsply's Growth Positioning | Press Release | 2Q21 | ¶ 137 | | "Our financial results reflect the resilience of the dental market and demonstrate our team's ability to execute operationally and financially. As we turn our attention to investing for future growth, **we are confident that the underlying fundamentals of our business are strong and that we are well positioned**. Additionally, we remain committed to completing our restructuring goals on time and on budget." |
| 8/5/21 | Casey | Dentsply's Growth Positioning | Earnings Conference Call | 2Q21 | ¶ 138 | | "We are reaffirming our 2021 outlook. The dental market continues to show resilience as well as strong underlying fundamentals. **We believe that Dentsply Sirona is well positioned to deliver sustainable growth in the future**." |

**Exhibit 1**

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|---|---|---|---|---|---|---|---|
| 9/15/21 | Gomez | Dentsply's Growth Positioning | Robert W. Baird Global Healthcare Conference | | ¶ 139 | | "**Yes**. We think we have the levers. **I think the market is healthy in many areas where we have exposure**. We are making investments in areas where we are under indexed. **And so we think we have a very good shot at being able to deliver that type of growth rate sustainably**, which is something that the company has not done in many, many years." |
| 11/4/21 | Dentsply | Dentsply's Growth Positioning | Press Release | 3Q21 | ¶ 140 | | "**Based on the results of the third quarter and the continued gradual recovery of the global dental market, we are raising our fiscal year 2021 earnings outlook and tightening our revenue outlook to the top of the previous range**. We expect revenues to be in the $4.25 billion to $4.3 billion range, up approximately 27-30% on a reported basis and 22-25% on an organic basis. Our Non-GAAP EPS outlook for FY2021 is now $2.87 to $2.92." |
| 11/4/21 | Casey | Dentsply's Growth Positioning | Earnings Conference Call | 3Q21 | ¶ 141 | | "Overall, we continue to be pleased with the recovery in the dental market, how we are operating and our prospects for growth in the future.<br>* * *<br>**To summarize, our strong performance year-to-date gives us confidence going forward for the remainder of 2021. We have good momentum leading into the future**. Our results reflect the underlying resilience of the dental market and **our team's disciplined performance against our operational goals** and progress against our key strategic priorities. Based on this, as Jorge said, we are raising our '21 earnings outlook. Going beyond the quarter-to-quarter discussion, we also believe that **Dentsply Sirona is well positioned to transform dentistry and deliver sustainable growth going forward**." |
| 11/4/21 | Gomez | Dentsply's Growth Positioning | Earnings Conference Call | 3Q21 | ¶ 142 | | "Now let me provide an update on our financial expectations for 2021. **Based on the solid performance of our business year-to-date and the current market trends, we are increasing our estimates for 2021 as follows**. We are tightening our revenue outlook by increasing the bottom of our range. We now expect revenues to be in the $4.25 billion to $4.3 billion range.<br><br>With respect to EPS, we are increasing and narrowing our estimates for fiscal year 2021. The new EPS outlook range is now $2.87 to $2.92. This range is based on a new assumption for the euro to USD rate of 1.16. This is lower than the fiscal year '21 budget assumption of 1.22 and lower than last quarter's assumption for the second half of the year of 1.18.<br><br>. . . Overall, we are very pleased with the current momentum in our business and our new 2021 outlook for revenue and earnings reflects that confidence." |

**Exhibit 1**

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|------|---------|----------|--------|----------------|---------------------|---------------------|------------|
| 11/11/21 | Casey | Dentsply's Growth Positioning | Credit Suisse Healthcare Conference | | ¶ 143 | ✔ | "If you look at the growth number coming off '19 versus '18 and how we feel coming out of the pandemic, **we said we think we can raise that long-term target to 4% to 5%. And as we sit here today,** ~~we're pretty optimistic that our growth prospects are good~~ **and that 4% to 5% is definitely attainable**.<br>* * *<br>So in aggregate, **we had a very, very strong third quarter. We think that business going forward is sustainable** as we bring these new products in." |
| 2/28/22 | Gomez | Dentsply's Growth Positioning | Earnings Conference Call | 4Q21/FY21 | ¶ 144 | | "Now let me provide an overview of our financial expectations for fiscal 2022. **We expect organic sales to be in the 4% to 5% range**. This equates to a net sales range of $4.3 billion to $4.4 billion. . . .<br><br>From a revenue perspective, market demand remains strong despite COVID variant challenges in certain markets. . . . **We expect strong contributions to growth from** clear aligners, **CAD/CAM**, implants and imaging.<br>* * *<br>**Overall, we are confident that the progress we are making in key growth areas**, combined with the resilience of the dental market, **will allow us to continue to expand revenue and earnings over time**. Additionally, the strength of our EBITDA generation enable the funding of our investment priorities and the funding of a very competitive cash flow yield to our shareholders." |
| 2/28/22 | Casey | Dentsply's Growth Positioning | Earnings Conference Call | 4Q21/FY21 | ¶ 144 | | "In late 2018, we had outlined a program to accelerate growth, improve margin and to simplify the organization. Despite challenges, **we have largely achieved the targets that we had laid out**. Just as important, our team has also sharpened our strategy while improving our innovation capabilities. As Jorge said, **going forward, we expect to build on those capabilities to deliver reliable 4% to 5% growth in revenue, continuous improvement in our margins and double-digit earnings growth**. We believe our strategy of delivering superior integrated workflows in critical procedures will allow Dentsply Sirona to become the indispensable digital partner to the dentist." |
| 3/1/22 | Dentsply | Dentsply's Governance Policies and Ethics | Form 10-K | FY21 | ¶ 149 | | "The Company has a Code of Ethics and Business Conduct that applies to the Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and the Board of Directors and substantially all of the Company's management level employees. A copy of the Code of Ethics and Business Conduct is available in the Investor Relations section of the Company's website at www.dentsplysirona.com." |

**Exhibit 1**

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|------|---------|----------|--------|----------------|---------------------|---------------------|------------|
| Throughout the Class Period | Dentsply | Dentsply's Governance Policies and Ethics | Dentsply's Website | | ¶ 150 | | "Dentsply Sirona demonstrates an unwavering commitment to performance with integrity."<br><br>"We ask that all members of the Dentsply Sirona community – employees, officers, directors and business partners - comply not only with these policies, but also use good judgment and integrity in all situations that may not be specifically addressed in the Dentsply Sirona Code."<br><br>"Our Dentsply Sirona business leaders are responsible for their own actions and for fostering a culture consistent with our Code of Ethics and Business Conduct, policies and applicable laws. Leaders are expected to address employees' concerns about appropriate conduct promptly and with care and respect."<br><br>"We think and act with positive intent and the highest integrity."<br><br>"It is Dentsply Sirona's policy and must also be every employee's commitment to comply with the law everywhere we do business." |
| Throughout the Class Period | Dentsply | Dentsply's Governance Policies and Ethics | Dentsply's Website | | ¶ 150 | | "The tone from the top is important in creating a foundation for a culture of integrity but then leaders at all levels must live those values and demonstrate unwavering integrity in everything we do."<br><br>"All managers must": "Implement control measures, such as appropriate financial controls to identify and prevent fraud and other violations[;] . . . Encourage employees to speak up and report integrity or compliance issues[; and] Promptly implement corrective action to fix identified compliance weaknesses."<br><br>"Retaliation Violates Our Policy[:] Dentsply Sirona absolutely prohibits retaliation against anyone who in good faith raises or helps to address an ethics, integrity or a compliance concern. Retaliation is grounds for discipline up to and including dismissal."<br><br>"Internal Controls and Accurate Record Keeping[:] Dentsply Sirona maintains internal controls to comply with legal, accounting, tax, and other regulatory requirements. Keeping accurate records instills trust in Dentsply Sirona by its employees, customers, patients, investors, and business partners. Accurate recordkeeping allows us to make strategic, commercial, and operational decisions. It is critically important that our books, records, accounts, and financial statements be maintained in reasonable detail. 'Off the books' accounts, transactions, and assets are prohibited." |

**Exhibit 1**

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|------|---------|----------|--------|----------------|---------------------|---------------------|------------|
| 8/5/21 | Dentsply | Misleading Financial Reporting and Non-Compliance with GAAP | Form 10-Q | 2Q21 | ¶ 153 | | "[H]ave been prepared in accordance with accounting principles generally accepted in the United States of America" and "the rules of the [SEC]." |
| 11/4/21 | Dentsply | Misleading Financial Reporting and Non-Compliance with GAAP | Form 10-Q | 3Q21 | ¶ 153 | | "[H]ave been prepared in accordance with accounting principles generally accepted in the United States of America" and "the rules of the [SEC]." |
| 3/1/22 | Dentsply | Misleading Financial Reporting and Non-Compliance with GAAP | Form 10-K | FY21 | ¶ 153 | | "[T]he preparation of the Company's consolidated financial statements in conformity with . . . GAAP." |
| 8/5/21 | Dentsply | Misleading Financial Reporting and Non-Compliance with GAAP | Press Release | 2Q21 | ¶ 155 | | "Second quarter net sales of $1,067 million increased 117.3%, compared to $491 million in the second quarter of 2020. Net income for the second quarter of 2021 was $99 million, or $0.45 per diluted share, compared to a net loss of ($95) million, or ($0.44) per diluted share in the second quarter of 2020. Non-GAAP net earnings per diluted share increased to $0.71 compared to ($0.18) in the second quarter of 2020." |
| 11/4/21 | Dentsply | Misleading Financial Reporting and Non-Compliance with GAAP | Press Release | 3Q21 | ¶ 156 | | "Third quarter net sales of $1,069 million increased 19.4%, compared to $895 million in the third quarter of 2020. Net income for the third quarter of 2021 was $103 million, or $0.47 per diluted share, compared to $53 million, or $0.25 per diluted share in the third quarter of 2020. Non-GAAP net earnings per diluted share increased to $0.68 compared to $0.67 in the third quarter of 2020." |
| 2/28/22 | Dentsply | Misleading Financial Reporting and Non-Compliance with GAAP | Press Release | 4Q21/FY21 | ¶ 157 | | "Fourth quarter 2021 net sales of $1,088 million increased 0.6%, compared to $1,082 million in the fourth quarter of 2020. Net income was $102 million, or $0.47 per diluted share, compared to $99 million, or $0.45 per diluted share in the fourth quarter of 2020. Adjusted earnings per diluted share decreased to $0.76 compared to $0.87 in the fourth quarter of 2020." |

**Exhibit 1**

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|------|---------|----------|--------|----------------|---------------------|---------------------|------------|
| 2/28/22 | Dentsply | Misleading Financial Reporting and Non-Compliance with GAAP | Press Release | 4Q21/FY21 | ¶ 157 | | "Full year 2021 net sales of $4,251 million increased 27.2%, compared to $3,342 million for the full year of 2020. Net income was $421 million, or $1.91 per diluted share, compared to a loss of ($83) million, or ($0.38) per diluted share for the full year of 2020. Adjusted earnings per diluted share grew to $2.87 compared to $1.79 in 2020." |
| 3/1/22 | Dentsply | Misleading Financial Reporting and Non-Compliance with GAAP | Form 10-K | FY21 | ¶ 171 | | "[R]evenue is measured as the amount of consideration the Company expects to receive in exchange for transferring goods or services in accordance with ASC 606-10, Revenues from Contracts with Customers." |
| | | | | | | | "The Company exercises judgment in estimating variable consideration, which primarily includes volume discounts, sales rebates, and product returns. The Company adjusts the estimate of revenue at the earlier of when the most likely amount of consideration can be estimated, the amount expected to be received changes, or when the consideration becomes fixed. The Company estimates volume discounts by evaluating specific inputs and assumptions, including the individual customer's historical and estimated future product purchases. Discounts are deducted from revenue at the time of sale or when the discount is offered, whichever is later. In estimating sales rebates, the Company evaluates inputs such as customer-specific trends, terms of the customers' contracted rebate program, historical experience, and the forecasted performance of a customer and their expected level of achievement within the rebate programs. The accruals for these rebate programs are updated as actual results and updated forecasts impact the estimated achievement for customers within the rebate programs. When the Company gives customers the right to return eligible products and receive credit, returns are estimated based on an analysis of historical experience. However, returns of products, excluding warranty-related returns, are not material. To the extent the transaction price includes variable consideration, the Company applies judgment in constraining the estimated variable consideration due to factors that may cause reversal of revenue recognized. The Company evaluates constraints based on its historical and projected experience with similar customer contracts." |
| 3/1/22 | Dentsply | Misleading Financial Reporting and Non-Compliance with GAAP | Form 10-K | FY21 | ¶ 175 | | "Dentsply's revenue recognition accounting policy as disclosed in its 2021 Form 10-K stated that the relevant variable consideration Dentsply considered 'primarily include[d] volume discounts, sales rebates, and product returns.'" |
| 3/1/22 | Dentsply | Misleading Financial Reporting and Non-Compliance with GAAP | Form 10-K | FY21 | ¶ 176 | | "[E]stimate of revenue at the earlier of when the most likely amount of consideration can be estimated, the amount expected to be received changes, or when the consideration becomes fixed." |

**Exhibit 1**

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|---|---|---|---|---|---|---|---|
| 8/5/21 | Dentsply | Violation of Item 303 of Regulation S-K and ASC 606-10-50 Disclosure Requirements | Form 10-Q | 2Q21 | ¶¶ 184–187 | | "Dentsply had filed its 2Q21 Form 10-Q on August 5, 2021, and its 3Q21 Form 10-Q on November 4, 2021. Neither contained the required disclosures under ASC 606-10-50, including disclosures concerning the Company's judgments around accounting for returns, rebates, and discounts – the very same sales incentive areas that were later identified as materially misstated during the Class Period and led to the Restatement. Accordingly, the 2Q21 and 3Q21 Forms 10-Q were materially false and misleading in this manner as well." <br><br>"Finally, after receiving the SEC comment letter, the Company for the first time provided a new 'REVENUE' note in its 2021 Form 10-K (filed March 1, 2022), which disclosed Dentsply's net sales disaggregated by product category, as required by ASC 606-10-50-5. Neither the 2Q21 nor 3Q21 Forms 10-Q contained this disclosure, and violated GAAP for this additional reason." |
| 11/4/21 | Dentsply | Violation of Item 303 of Regulation S-K and ASC 606-10-50 Disclosure Requirements | Form 10-Q | 3Q21 | ¶¶ 184–187 | | "Dentsply had filed its 2Q21 Form 10-Q on August 5, 2021, and its 3Q21 Form 10-Q on November 4, 2021. Neither contained the required disclosures under ASC 606-10-50, including disclosures concerning the Company's judgments around accounting for returns, rebates, and discounts – the very same sales incentive areas that were later identified as materially misstated during the Class Period and led to the Restatement. Accordingly, the 2Q21 and 3Q21 Forms 10-Q were materially false and misleading in this manner as well." <br><br>"Finally, after receiving the SEC comment letter, the Company for the first time provided a new 'REVENUE' note in its 2021 Form 10-K (filed March 1, 2022), which disclosed Dentsply's net sales disaggregated by product category, as required by ASC 606-10-50-5. Neither the 2Q21 nor 3Q21 Forms 10-Q contained this disclosure, and violated GAAP for this additional reason." |
| 8/5/21 | Dentsply | Effectiveness of Dentsply's Internal Controls over Financial Reporting and Disclosure | Form 10-Q | 2Q21 | ¶ 192 | | "The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) [sic] and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report **were effective** to provide reasonable assurance that the information required to be disclosed by the Company in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and that it is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure." |

**Exhibit 1**

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|------|---------|----------|--------|----------------|---------------------|---------------------|------------|
| 11/4/21 | Dentsply | Effectiveness of Dentsply's Internal Controls over Financial Reporting and Disclosure | Form 10-Q | 3Q21 | ¶ 192 | | "The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) [sic] and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report **were effective** to provide reasonable assurance that the information required to be disclosed by the Company in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and that it is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure." |
| 3/1/22 | Dentsply | Effectiveness of Dentsply's Internal Controls over Financial Reporting and Disclosure | Form 10-K | FY21 | ¶ 192 | | "The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) [sic] and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report **were effective** to provide reasonable assurance that the information required to be disclosed by the Company in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and that it is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure." |
| 3/1/22 | Dentsply | Effectiveness of Dentsply's Internal Controls over Financial Reporting and Disclosure | Form 10-K | FY21 | ¶ 193 | | "Management of the Company has assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2021. In making its assessment, management used the criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on its assessment management concluded that, as of December 31, 2021, the Company's internal control over financial reporting **was effective** based on the criteria established in Internal Control - Integrated Framework (2013) issued by the COSO." |

**Exhibit 1**

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|------|---------|----------|--------|----------------|---------------------|---------------------|------------|
| 8/5/21 | Dentsply | Materially False Sarbanes-Oxley Certifications Filed with the SEC | Form 10-Q | 2Q21 | ¶ 209 | | "Based on [the signer's] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" <br><br> "Based on [the signer's] knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" |
| 8/5/21 | Dentsply | Materially False Sarbanes-Oxley Certifications Filed with the SEC | Form 10-Q | 2Q21 | ¶ 209 | | "Casey and Gomez were 'responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . for the registrant and ha[d]': (i) 'Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [Casey and Gomez's] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles'; and (ii) 'Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in [the] report [Casey and Gomez's] conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation'" <br><br> Casey and Gomez 'ha[d] disclosed, based on [their] most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors': (i) 'All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information'; (ii) 'Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting'" <br><br> The information contained in the financial report 'fairly presents, in all material respects, the financial condition and result of operations of the Company as of the date of the Report.'" |

**Exhibit 1**

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|---|---|---|---|---|---|---|---|
| 11/4/21 | Dentsply | Materially False Sarbanes-Oxley Certifications Filed with the SEC | Form 10-Q | 3Q21 | ¶ 209 | | "Based on [the signer's] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"<br><br>"Based on [the signer's] knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" |
| 11/4/21 | Dentsply | Materially False Sarbanes-Oxley Certifications Filed with the SEC | Form 10-Q | 3Q21 | ¶ 209 | | "Casey and Gomez were 'responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . for the registrant and ha[d]': (i) 'Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [Casey and Gomez's] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles'; and (ii) 'Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in [the] report [Casey and Gomez's] conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation'"<br><br>Casey and Gomez 'ha[d] disclosed, based on [their] most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors': (i) 'All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information'; (ii) 'Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting'"<br><br>The information contained in the financial report 'fairly presents, in all material respects, the financial condition and result of operations of the Company as of the date of the Report.'" |

**Exhibit 1**

| Date | Speaker | Category | Source | Fiscal Quarter | Complaint Paragraph | Partially Dismissed | Excerpt[1] |
|---|---|---|---|---|---|---|---|
| 3/1/22 | Dentsply | Materially False Sarbanes-Oxley Certifications Filed with the SEC | Form 10-K | FY21 | ¶ 209 | | "Based on [the signer's] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"<br><br>"Based on [the signer's] knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" |
| 3/1/22 | Dentsply | Materially False Sarbanes-Oxley Certifications Filed with the SEC | Form 10-K | FY21 | ¶ 209 | | "Casey and Gomez were 'responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . for the registrant and ha[d]': (i) 'Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [Casey and Gomez's] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles'; and (ii) 'Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in [the] report [Casey and Gomez's] conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation'"<br><br>Casey and Gomez 'ha[d] disclosed, based on [their] most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors': (i) 'All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information'; (ii) 'Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting'"<br><br>The information contained in the financial report 'fairly presents, in all material respects, the financial condition and result of operations of the Company as of the date of the Report.'" |

Source: Complaint; MTD Opinion

Note:
[1] Strikethroughs represent claims that have been dismissed according to the MTD Opinion.

**Exhibit 2**

# Dentsply Sirona Abnormal Returns[1]
## 2/28/22 – 11/14/22

| Start Date | One-Day[2] | | Two-Day[2] | | Three-Day[2] | |
| | Abnormal Return | p-value | Cumulative Abnormal Return | p-value | Cumulative Abnormal Return | p-value |
|---|---|---|---|---|---|---|
| 2/28/22 | -7.40% | 0.00 * | -5.86% | 0.00 * | -11.07% | 0.00 * |
| 4/19/22 | -14.40% | 0.00 * | -12.98% | 0.00 * | -13.92% | 0.00 * |
| 5/10/22 | -7.51% | 0.00 * | -3.02% | 0.10 | -2.88% | 0.21 |
| 11/1/22 | 0.95% | 0.47 | -5.68% | 0.00 * | -9.43% | 0.00 * |
| 11/14/22[3] | -4.55% | 0.00 * | -1.85% | 0.36 | -3.49% | 0.17 |

Source: Cain Report; CAIN0001816; CAIN0001835

Note:
[1] Abnormal returns are calculated based on Dr. Cain's event study methodology, using a rolling two-factor model of the previous 120 trading days and controlling for the S&P 500 Total Return Index and the S&P 500 Health Care Index excluding Dentsply. The rolling regression excludes dates excluded in the Cain Report regression analysis.
[2] Cumulative abnormal returns ("CARs") are calculated over an event window by summing the abnormal returns estimated under Dr. Cain's event study model for each day in the window. Standard errors for the cumulative abnormal returns are the square root of the sum of the estimated mean squared error of the rolling regression for each abnormal return in the event window. The $p$-value of the CAR is based on the $t$-statistic, which is calculated as the ratio between the CAR and the standard error. A star indicates statistical significance at the 95% level.
[3] Rolling regressions for 11/15/22 and 11/16/22 exclude 11/14/22 as a day when "the relevant truth was allegedly revealed" (Cain Report, Ex. 7).

**Exhibit 3**

# Dentsply Sirona Abnormal Returns
# Using Dr. Cain's Methodology[1]
## 11/1/22 – 11/14/22

| Date | Dates with Dentsply Disclosures[2] | Abnormal Return | p-value[3] |
|---|:---:|---:|---:|
| 11/1/22 | ✔ | 0.95% | 0.47 |
| 11/2/22 | | -6.63% | 0.00 * |
| 11/3/22 | | -3.75% | 0.00 * |
| 11/4/22 | | 0.26% | 0.84 |
| 11/7/22 | ✔ | 2.38% | 0.06 |
| 11/8/22 | | -0.22% | 0.86 |
| 11/9/22 | ✔ | 4.31% | 0.00 * |
| 11/10/22 | ✔ | 1.01% | 0.45 |
| 11/11/22 | | 5.96% | 0.00 * |
| 11/14/22 | ✔ | -4.55% | 0.00 * |

**Cumulative Abnormal Return[4]**

| | Abnormal Return | p-value |
|---|---:|---:|
| 11/1/22 – 11/14/22 | -0.29% | 0.94 |
| Dates with Dentsply Disclosures | 4.10% | 0.17 |

Source: Cain Report; CAIN0001816; CAIN0001835

Note:
[1] Abnormal returns are calculated based on Dr. Cain's event study methodology, using a rolling two-factor model of the previous 120 trading days and controlling for the S&P 500 Total Return Index and the S&P 500 Health Care Index excluding Dentsply. The rolling regression excludes dates excluded in the Cain Report regression analysis.
[2] Dates on which Dentsply disclosed information about restatements to prior financial results, financial performance, or future guidance.
[3] A star indicates statistical significance at the 95% level.
[4] Cumulative abnormal returns ("CARs") are calculated over an event window by summing the abnormal returns estimated under Dr. Cain's event study model for each day in the window. Standard errors for the cumulative abnormal returns are the square root of the sum of the estimated mean squared error of the rolling regression for each abnormal return in the event window. The *p*-value of the CAR is based on the *t*-statistic, which is calculated as the ratio between the CAR and the standard error. A star indicates statistical significance at the 95% level.