# EXHIBIT 4

# EXHIBIT A

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re VAXART, INC. SECURITIES LITIGATION | Case No. 3:20-cv-05949-VC<br><br>CLASS ACTION |
| *This Document Relates to:*<br> *ALL ACTIONS* | Hearing Date: March 21, 2024<br>Time: 10:00 a.m.<br>Courtroom: 4, 17th Floor<br>Judge: Hon. Vince Chhabria |

EXPERT REPORT OF MATTHEW D. CAIN, PH.D.

December 1, 2023

**Table of Contents**

I.    Scope of Report and Opinions ..................................................................3

II.   Qualifications.............................................................................................4

III.  Case Background and Alleged Fraud Scheme ........................................7

IV.   Bases for Opinions on Market Efficiency .............................................10

V.    Evaluation of Market Efficiency Factors for Vaxart Common Stock ........................13

    A.   *Cammer* Factor 1: Average Weekly Trading Volume ............................... 14

    B.   *Cammer* Factor 2: Analyst Coverage ....................................................... 16

    C.   *Cammer* Factor 3: Market Makers ............................................................ 19

    D.   *Cammer* Factor 4: SEC Form S-3 Filing Eligibility ................................ 22

    E.   *Cammer* Factor 5: Cause and Effect Relationship Between
        Company Information and Stock Prices........................................................ 23

    F.   Additional Factor 1: Market Capitalization ............................................... 31

    G.   Additional Factor 2: Bid-Ask Spread.......................................................... 32

    H.   Additional Factor 3: Public Float ............................................................... 33

    I.   Additional Factor 4: Institutional Ownership.............................................. 34

    J.   Additional Factor 5: Autocorrelation .......................................................... 35

    K.   Additional Factor 6: Active Options Trading ............................................. 37

VI.   Evaluation of Market Efficiency for Options on Vaxart Common Stock ..................37

    A.   Overview of Option Types and Pricing........................................................ 38

    B.   The Academic Literature Strongly Supports the Presumption that
        Options Quickly Reflect Value-Relevant Information ............................... 38

    C.   The *Cammer* and *Krogman* Factors are not Relevant for Gauging
        Market Efficiency of Options Markets.......................................................... 40

    D.   Multiple Additional Relevant Factors Support the Finding That
        the Market for Vaxart Options Was Efficient ............................................. 41

    E.   Market Efficiency in the Market for Vaxart's Common Stock
        Strongly Reinforces the Conclusion that the Vaxart Options Also
        Traded in an Efficient Market ...................................................................... 43

VII.  Ability to Calculate Damages on a Class-Wide Basis.........................43

    A.   Calculation of Damages for Violation of Sections 10(b) and 20(a)
        of the Exchange Act ..................................................................................... 44

    B.   Calculating Damages for Violation of Section 20A of the
        Exchange Act ............................................................................................... 47

C.      Damage Methodologies are Flexible and Can Incorporate
        Alternative Findings ............................................................................ 49

VIII.  **Conclusion** ...................................................................................................**50**

**Appendix A**.............................................................................................................. **A-1**

**Appendix B** ..............................................................................................................**B-1**

**Exhibits** ....................................................................................................................**E-1**

## I.      Scope of Report and Opinions

1.      Plaintiffs, through their attorneys Hagens Berman Sobol Shapiro LLP and Scott+Scott Attorneys at Law LLP ("Plaintiffs' Counsel") have asked me to determine whether the market for Vaxart, Inc. ("Vaxart" or the "Company") common stock ("Common Stock") and options ("Options") was efficient during the period June 15, 2020 to August 19, 2020, inclusive (the "Class Period").

2.      In addition, Plaintiffs have asked me to opine on whether damages for investors trading in Vaxart Common Stock and Options during the Class Period can be calculated using a common methodology for all Class members that is consistent with Plaintiffs' claims under (i) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5(a), (b), and (c) adopted thereunder (collectively, the "§ 10(b) claims"), (ii) Section 20(a) of the Exchange Act, and (iii) Section 20A of the Exchange Act against the Armistice Defendants.[1]

3.      Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the following opinions:

a.      The market for Vaxart Common Stock was efficient throughout the Class Period.

b.      The *Cammer*, *Krogman*, and other additional factors accepted and applied by courts in the Ninth Circuit to assess market efficiency corroborate that Vaxart Common Stock traded in an efficient market.

---

[1] *See* Complaint (Doc. No. 303); Order re: Motion to Dismiss Re. Doc. No. 261, dated May 25, 2023 (Doc. No. 293) ("May 2023 MTD Order"). I understand the Armistice Defendants to include Armistice Capital, LLC and Armistice Capital Master Fund Ltd. (collectively, "Armistice"), as well as Steven J. Boyd, and Keith Maher. *See id*.

    c.    Though not necessary for a finding of market efficiency, the cause-and-effect relationship between new Company disclosures and resulting Common Stock price movements (which I analyze under the fifth *Cammer* factor) further shows that Vaxart Common Stock traded in an efficient market throughout the Class Period.

    d.    The market for Vaxart Options was efficient throughout the Class Period.

    e.    Damages in this matter can be calculated on a class-wide basis subject to standard, common methodologies for each of Plaintiffs' pending claims. In particular, the out-of-pocket damages methodology, which is used in virtually all Section 10(b) class action securities cases, is appropriate and applicable here, and the Court will also have a choice of common methodologies for determining damages for that subset of Class members with insider trading claims under Section 20A.

4. The remainder of my report is organized as follows: **Section II** describes my qualifications. **Section III** summarizes the case background. **Section IV** briefly explains the bases for the reliance requirement and the "fraud on the market" theory relating to market efficiency. **Section V** presents my analyses of the market efficiency factors for the Common Stock during the Class Period. **Section VI** discusses how the market efficiency of common stock relates to the options markets, and why I conclude that the market for Vaxart Options was also efficient. **Section VII** addresses how damages can be calculated on a class-wide basis subject to common methodologies under both Sections 10(b) and 20A. **Section VIII** summarizes my conclusions.

## II. Qualifications

5. I hold a Ph.D. in Finance from Purdue University and am a Senior Fellow at the Berkeley Center for Law and Business at the University of California - Berkeley. I teach courses,

deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business.

6.      My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. I previously held a fellowship with the Harvard Law School Program on Corporate Governance, where I participated in research seminars and related activities.

7.      Before my current roles, I worked at the U.S. Securities and Exchange Commission ("SEC") between 2014 and 2018 as a Financial Economist. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research for which I was awarded the Chairman's Award for Economic Research.

8.      Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

9.      Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at

National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

10. In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

11. I have published research in leading peer-reviewed journals in the fields of finance, accounting, law, and economics, including the *Journal of Financial Economics, Journal of Law and Economics*, *Journal of Accounting and Economics, Journal of Empirical Legal Studies*, and *Journal of Financial and Quantitative Analysis*. My curriculum vitae, attached as **Appendix A**, further details my publications.

12. In addition to my teaching, research, and academic responsibilities, I provide consulting services and expert testimony in a variety of matters through my LLC, Cleveland Analytics, as well as in conjunction with other consulting firms. As an expert in financial economics, I have conducted analyses or presented expert opinions related to market efficiency, valuation, securities trading, corporate disclosures, and loss causation/damages in over 60 cases. My curriculum vitae, attached as **Appendix A**, further details my testimony experience.

13. The materials I have considered in forming my opinions are listed and summarized in **Appendix B**. My time is billed at a rate of $950 per hour for my work on this matter. I have been assisted in this matter by staff at Cleveland Analytics, LLC working under my direction, and I receive further compensation based on those billings.

14. My compensation is in no way contingent on the outcome of this case.

15.     My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

## III.    Case Background and Alleged Fraud Scheme

16.     The Complaint alleges that, up through the Class Period, Vaxart was a small, clinical-stage biotechnology company focused primarily on the development of oral, tablet-based vaccines.[2] According to the Complaint, as of January 2020, Vaxart had not successfully developed a single commercial vaccine despite its 16 years in business.[3] During the Class Period, Vaxart's Common Stock was traded in the U.S. on the NASDAQ.[4]

17.     The Complaint alleges that throughout the Class Period, Defendants perpetrated a scheme, misled investors, and made numerous materially false and misleading statements and omissions relating to the development of oral vaccines.[5] Specifically, the Complaint alleges that Armistice and Vaxart, and their respective officers and directors (including defendants Boyd and Maher, who held positions with both Vaxart and Vaxart's largest shareholder, Armistice), caused Vaxart to publish a slew of false and misleading press releases, culminating with the public

---

[2] Complaint ¶ 5 (Doc. No. 303). The following overview section summarizes the allegations in the Complaint as context for Plaintiffs' claims. I make no findings or opinions as to these allegations, and the opinions I reach in other sections of this report regarding market efficiency and the calculation of damages are not tied to any specific allegations summarized herein.

[3] *Id.* ¶ 7.

[4] *Id.* ¶ 370.

[5] I understand that according to the Complaint, the Dec. 2021 MTD Order (Doc. No. 182), and the May 2023 MTD Order (Doc. No. 293), Plaintiffs allege violations of Section 10(b), Section 20(a), and Rule 10b-5(a), (b), and (c) by Vaxart and its officers and directors; and violations of Section 20A and Rule 10b-5(a) and (c) (the "Insider Trading" claims), Rule 10b-5(b), and Rule 10b-5(a) and (c) (the "Scheme Liability" claims) by the Armistice Defendants. I further understand that on January 25, 2023, the court granted final approval of a partial settlement, settling all claims against Vaxart and its officers and directors (including Boyd and Maher solely in their capacities as Vaxart directors), but not Armistice. *See* Order and Final Judgment Approving Partial Class Settlement (Doc. No. 273).

announcement to investors that Vaxart had been "selected for the U.S. Government's 'Operation Warp Speed'" ("OWS")—a funding program to fast-track the development and production on a commercial scale of an effective Covid vaccine.[6]

18.     The Complaint alleges that, in reality, Armistice and Vaxart leadership knew there was effectively no chance Vaxart would be selected by the federal government as one of eight OWS finalists that would receive massive OWS funding.[7] The Complaint further alleges that Vaxart had merely been invited by the federal Biomedical Advanced Research and Development Authority ("BARDA") to participate in an upcoming preliminary, non-human primate clinical trial.[8]

19.     The Complaint further alleges that the relevant truth about the condition of Vaxart, its prospects, and its *non*-selection for OWS began to be disclosed on July 25, 2020, when the *New York Times* published an article entitled "Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine", which reported that Vaxart had *not* been selected for OWS funding.[9] The Complaint also alleges that, according to the same article, the U.S. Department of Health and Human Services' (HHS) assistant secretary for public affairs, Michael R. Caputo, had told the *New York Times* that HHS had neither agreed to fund Vaxart nor had it even participated in any negotiations to do so.[10] Additionally, the Complaint alleges that this *NYT* article further disclosed that HHS had relayed its concerns "about whether companies including Vaxart are trying to inflate their stock prices by exaggerating their roles in Warp Speed" to the SEC.[11]

---

[6] Complaint ¶¶ 7-9.

[7] *Id*. ¶¶ 11-12.

[8] *Id*. ¶ 235.

[9] *Id*. ¶ 30.

[10] *Id*. ¶ 212.

[11] *Id*. ¶ 214.

20.     The Complaint also alleges that the relevant truth was further partially revealed on the same date of the *New York Times* article, when HSS posted via Twitter: "The US Department of Health and Human Resources has entered into funding agreements with certain vaccine manufacturers and we are negotiating with others. Neither is the case with Vaxart." [12]

21.     The Complaint alleges that the relevant truth was further partially revealed on August 19, 2020 when *Business Insider* released an interview with the head of OWS, Moncef Slaoui, in which he stated that "There's been a number of cases where companies have, frankly, made press releases that have frustrated the hell out of me because they misled, I think, their shareholders and their share price went up the roof just by saying the words Operation Warp Speed in the title of the press release."[13] While Mr. Slaoui did not single out Vaxart in the interview, the Complaint also alleges that the *Business Insider* article identified Vaxart as fitting Mr. Slaoui's description, given that Vaxart's June 26, 2020 press release was entitled "Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed", even though Vaxart had not been selected for OWS.[14]

22.     The Complaint also alleges that, as a result of Defendants' allegedly wrongful acts and omissions, investors allegedly traded Vaxart Common Stock and Options at artificially inflated prices during the Class Period.[15] **Exhibit 1** graphs the closing stock price and trading volume for Vaxart's Common Stock shares throughout the Class Period. The Complaint further claims that the Armistice Defendants sold Vaxart stock contemporaneously with trading by Plaintiffs while in possession of material, nonpublic information concerning Vaxart, in violation of Section 20A.[16]

---

[12] *Id*. ¶¶ 215-216.

[13] *Id*. ¶ 220.

[14] *Id*. ¶ 221.

[15] *Id*. ¶¶ 246; 15 (defining the Class to include all "securities").

[16] *Id*. ¶¶ 341-42.

## IV.    Bases for Opinions on Market Efficiency

23.     I understand that, with respect to their claims under §10(b), Plaintiffs assert the "fraud-on-the-market" theory of class-wide reliance, *e.g.*, that all Vaxart shareholders relied on the alleged misrepresentations or material omissions of fact (and the fraudulent schemes and acts underlying such misstatements) through their effect on stock prices in an informationally efficient market.[17]

24.     As courts, including the Supreme Court, have repeatedly explained, the "fraud-on-the-market" theory of class-wide reliance holds that investors in securities traded in an informationally efficient market rely on any misrepresentations or material omissions of fact because those statements or material omissions of fact have distorted the value of each class member's purchase price. As the Supreme Court explained in its *Basic Inc. v. Levinson* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[18]

25.     The Supreme Court reaffirmed the availability of this theory to satisfy Section 10(b)'s reliance requirement on a class-wide basis in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that

---

[17] *Id.* ¶ 312.

[18] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

decision and decline to modify the prerequisites for invoking the presumption of reliance.[19]

26.     A market is defined as informationally efficient if prices of securities trading in that market reflect all material, widely available public information up to the point that any marginal profits to be gained from trading on existing information do not exceed trading costs.[20] Economic research and literature support the concept of market efficiency for publicly traded securities. For example, Nobel Prize winner Eugene Fama has observed that "[t]he evidence in support of the efficient markets model is extensive, and (somewhat uniquely in economics) contradictory evidence is sparse."[21] More recently, Professor Fama reiterated that "the past research on market efficiency is among the most successful in empirical economics, with good prospects to remain so in the future."[22]

27.     Indeed, research continues to support the empirical soundness of the efficient market hypothesis, as modern scholars have concluded that, in fact, "capital markets are more efficient than previously recognized."[23] Academic research thus provides ample support for the concept of market efficiency of public exchange-traded securities.

28.     Litigants and scholars have argued that markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and NASDAQ, should be granted a presumption of efficiency for virtually all securities traded on them.[24] The continuous reporting of trading statistics, significant trading volumes, rapid

---

[19] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

[20] *See, e.g.*, Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46, at 1575.

[21] Eugene F. Fama, 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, at 383, 416.

[22] Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46, at 1575, 1576.

[23] *See, e.g.*, Kewei Hou, Chen Xue, and Lu Zhang, 2020, "Replicating Anomalies," *Review of Financial Studies* 33, at 2071.

[24] *See Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*") ("'We think that, at a minimum, there should be a presumption – probably conditional for class determination – that

information dissemination, and other rules for these exchanges practically guarantee a liquid market for securities traded on these exchanges.[25] The fact that Vaxart's Common Stock traded on the NASDAQ leads to a strong presumption of market efficiency.[26]

29.     The U.S. Supreme Court has not set forth a definitive test for assessing market efficiency for securities. The district court in *Cammer v. Bloom* developed a widely cited five-factor test to evaluate whether a market is efficient for the purposes of establishing the presumption of investor reliance articulated by the Supreme Court in Basic.[27] In another widely cited opinion, the district court in *Krogman v. Sterritt* articulated several additional factors useful in evaluating market efficiency.[28]

30.     Principles of economics and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency.[29] However, as explained below, it is important to understand that an assessment of market efficiency does not turn on any one single factor; rather,

---

certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.'" (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988))).

[25] *Id.*

[26] *See In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 312 (D. Md. 2022) (finding efficient market where security traded on the NYSE in substantial volumes); *In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 119 (E.D. Va. 2012) (Defendant "has cited no case, and none has been found, holding that the NYSE is not an efficient market for shares of common stock traded, as here, in substantial volumes.").

[27] *Cammer*, 711 F. Supp. at 1292.

[28] *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

[29] *See, e.g.,* Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57.

it is an assessment of all the factors together that allows one to reach the conclusion that a market for a security is efficient.[30]

## V.    Evaluation of Market Efficiency Factors for Vaxart Common Stock

31.    In the following section, I discuss the *Cammer*, *Krogman*, and additional factors and evaluate them in relation to Vaxart Common Stock. In doing so, I compare the factors' application to Vaxart's Common Stock against: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

32.    As discussed below, my analyses and findings on the various market efficiency factors support the conclusion that Vaxart Common Stock traded in an efficient market throughout the Class Period.

33.    One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, which I refer to as the "MRK Study."[31] In this study, these authors examined two samples of firms. One sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[32]

---

[30] *Id.*, at pp. 204-205.

[31] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, "Is There Life After the Complete Loss of Analyst Coverage?," *Accounting Review* 88, at 667-705.

[32] MRK Study at 678, 681-682.

34.     The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock. . . . Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[33]

35.     The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[34] Therefore, I interpret the sample of MRK Covered firms as those eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets.

36.     Below, I compare several of Vaxart's market efficiency factors to the samples of firms in the MRK Study to assess whether Vaxart's characteristics are consistent with firms operating in efficient markets.

### A.     *Cammer* Factor 1: Average Weekly Trading Volume

37.     Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security.[35] Thus,

---

[33] MRK Study at 667.

[34] MRK Study at 681 (footnotes omitted).

[35] *See, e.g.,* Bhole, Bharat, Sunita Surana, and Frank Torchio, 2020, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Law Review Online*, at 101-102; Randall S. Thomas and James F. Cotter, 2000, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, at 108; MRK Study at 681.

14

trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock.[36] Thomas and Cotter have stated that "[t]rading volume was also considered as an eligibility standard [for exchange listing] because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[37]

38.     The first *Cammer* factor for stock trading volume has been defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[38]

39.     **Exhibit 2** graphs Vaxart's Common Stock weekly trading volume as a fraction of shares outstanding throughout the Class Period.[39] The average weekly trading volume was 169% of Vaxart's common shares outstanding over the Class Period. This level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court. As a result, Vaxart's level of stock trading volume throughout the Class Period supports the conclusion that Vaxart's Common Stock traded in an efficient market throughout the Class Period.

40.     I also note that the average weekly trading volume of Vaxart's Common Stock over the Class Period was 162.6 million shares on the Nasdaq Stock Exchange.[40] According to the

---

[36] *Id.*

[37] Randall S. Thomas and James F. Cotter, 2000, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, at 108.

[38] *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg, § 8.6).

[39] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[40] Vaxart's total trading volume from Friday, June 26, 2020 through Thursday, July 2, 2020 was 447.5 million shares, or 465% of shares outstanding (assuming 96.141 million shares outstanding as of July 2, 2020). Source: Bloomberg, Vaxart SEC filings.

authors in the MRK Study, the median weekly trading volume for the MRK Sample firms was 0.034 million shares while the median for the MRK Covered firms was 0.215 million shares weekly.[41]

41.      Additionally, Vaxart's daily turnover rate of 36.3% during the Class Period placed it above the 95th percentile of all companies listed on the NASDAQ and the NYSE from 2016-2018.[42] In total, Vaxart's Common Stock experienced 1.592 billion shares traded during the Class Period. Vaxart's average weekly trading volume during the Class Period exceeds that of both the median MRK Sample firms and the MRK Covered firms. This further supports the conclusion that Vaxart's Common Stock traded in an efficient market throughout the Class Period.

### B.    *Cammer* Factor 2: Analyst Coverage

42.      An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or industry.  Analysts typically publish reports in which they assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock.[43]

---

[41] MRK Study at 678 (Table 3). The median annual trading volume for MRK sample firms was 1.75 million shares. 1.75 million divided by 52 weeks is approximately 0.034 million shares. The median annual trading volume for MRK covered firms was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

[42] Bhole, Bharat, Sunita Surana, and Frank Torchio, 2020, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Law Review Online* (the "Bhole Study"), at 102. The 95th percentile of daily turnover for the 2016-2018 sample period is 2.95%. I note that the 2016-2018 subsample time period is the most recent period reported in this study.

[43] *See, e.g.,* MRK Study at 670-671.

43.    Analyst coverage can be indicative of market efficiency since research analysts ensure that new important company-specific information is disseminated to investors and thus impounded into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[44]

44.    In **Exhibit 3** I reviewed the analyst coverage of Vaxart over the Class Period. I identified a total of 11 reports issued by analysts at 8 separate firms during that period.[45] The list of analyst reports that I was able to identify includes reports by firms that conducted thorough and detailed research on Vaxart and the industry within which it operated, such as the reports prepared by analysts at H.C. Wainwright & Co. and B. Riley–FBR. Collectively, this is a significant degree of analyst coverage which served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

45.    This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S received no analyst coverage in a given year.[46] Charles M.C. Lee and Eric So documented that, on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.[47] In other words, many firms within the category

---

[44] *Cammer*, 711 F. Supp. at 1286.

[45] These statistics represent a lower bound of the analyst coverage of Vaxart because many analyst reports are provided directly to investors but are not captured by third-party data vendors.

[46] MRK Study at 668.

[47] Charles M.C. Lee and Eric C. So, 2017, "Uncovering Expected Returns: Information in Analyst Coverage Proxies," *Journal of Financial Economics* 124, at 336 (see Table 1, Panel B – "COV").

17

of the least amount of analyst coverage in their sample were covered by only one or two analysts. Vaxart's analyst coverage is consistent with the MRK Covered firms which elicited high investor interest.

46.     Moreover, Vaxart's high level of analyst coverage also placed it above the 50th percentile when compared with all companies listed on the NASDAQ and the NYSE from 2016-2018.[48] The significant analyst coverage of Vaxart during the Class Period supports the conclusion that Vaxart's Common Stock traded in an efficient market throughout the Class Period.

47.     In addition to the analyst coverage documented above, investors could access information about Vaxart from a variety of other sources. For example, I conducted a search of press and news articles about Vaxart using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes *Dow Jones Newswires*, *Reuters News*, *PR Newswire*, *Associated Press Newswires*, *Business Wire*, and numerous other outlets. This search produced over 200 articles throughout the Class Period.[49] Investors can also receive information from online research forums, such as SeekingAlpha, short sellers, and other investor research services, which offer both free and subscription-based research reports.

48.     Moreover, Vaxart produced numerous filings containing Company information which were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period. Individual and institutional investors thus had access to publicly available information about Vaxart from a variety of sources during the Class Period.

---

[48] Bhole Study, at 104: 50th percentile defined as 6.2 analysts.

[49] The articles were identified through a Factiva search, including Vaxart's company tag over all available sources. After excluding potential duplicates, over 100 unique news articles were identified by my search.

49.     As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about Vaxart supports the conclusion that its Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

## C.     *Cammer* Factor 3: Market Makers

50.     The third *Cammer* factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate the buying and selling of shares among investors in a company's stock during trading hours.[50] Market makers are present on major exchanges as well as over-the-counter markets. In particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[51]

51.     In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[52]

---

[50] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[51] Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporate Law* 19, at 291.

[52] *Cammer*, 711 F. Supp. at 1293; *see also Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *6 (N.D. Ca. 2016) ("The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency.").

19

The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting.

52.    Vaxart's Common Stock traded on the NASDAQ throughout the Class Period. Similar to other large, national exchanges, the NASDAQ reports volume, prices, bid-ask spreads, and other trading details which ensure the market for stocks remains well-developed, liquid, and efficient. The *Cammer* court stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[53]

53.    I understand that courts typically view large, established stock exchanges with market makers (such as the NYSE and NASDAQ[54]) as being informationally efficient.[55] Vaxart's

---

[53] *Cammer,* 711 F. Supp. at 1292.

[54] The NYSE Market Model, *NYSE*, available at: https://www.nyse.com/market-model ("The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery."); *see also*: http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess: ("NASDAQ is a unique market organization that provides a competitive trading environment and efficient, low-cost execution of orders. There are multiple market participants, including market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services. Definition of a Market Maker: A market maker is a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades).").

[55] *See, e.g.*, *Todd v. STAAR Surg. Co.*, 2017 WL 821662, at *6 (C.D. Cal. Jan. 5, 2017) (NASDAQ listing "strongly favors a finding of market efficiency"); *Brown v. China Integr. Energy Inc.*, 2015 WL 12720322, at *16 (C.D. Cal. Feb. 17, 2015) (same).

public listings on the NASDAQ, a well-developed and established national exchange, thus satisfies the intent of this *Cammer* factor.

54. Vaxart had at least 60 market makers and brokers providing similar activity over the Class Period.[56]

55. Moreover, I understand that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally efficient and informed trading.[57] Academic research has similarly found that institutional investors can facilitate trading liquidity. As I discuss further in **Section IV.I** below, Vaxart's Common Stock was widely held by institutional investors during the Class Period.[58] In sum, Vaxart easily satisfies this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional

---

[56] *See* Bloomberg "RANK" function ("RANK <GO> provides brokers' advertised trade volume on a post-trade basis, so you can analyze which brokers provide the greatest liquidity, assess how you rank against your peers, and evaluate the greatest liquidity providers in a corporation. RANK generates historical broker ranking reports, comparing broker activity in a single security or across an exchange, index, or portfolio, helping you trade with minimal market impact…RANK provides the equity market share data that is critical to helping buy-side firms identify which brokers potentially are the market makers in a stock in which they are interested, so that trading decisions can be made more accurately. Additionally, sell-side firms can demonstrate their historical ability to source liquidity for clients, while investment bankers can market their ability to manage their corporate finance clients' flow").

[57] *See*, *e.g.*, *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading." (citations omitted)); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market.").

[58] Vaxart Common Stock was held by at least 170 institutional investors at some point during the Class Period (see Exhibit 10). Institutional ownership fluctuated on a quarterly basis throughout the Class Period, from a minimum of 20.6% of shares outstanding on June 30, 2020 to a maximum of 33.7% of shares outstanding on September 30, 2020, according to data from S&P Capital IQ and Vaxart SEC Filings. These figures represent a conservative estimate of institutional holdings as some institutions may not be reflected in S&P Capital IQ's coverage.

investors, further supporting the efficiency of the market for Vaxart Common Stock throughout the Class Period.

**D.  *Cammer* Factor 4: SEC Form S-3 Filing Eligibility**

56.  The fourth *Cammer* factor cited by the court is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[59]

57.  Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.[60] The logic and intuition behind this factor as discussed by the *Cammer* court is that a company which makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer.

58.  To the best of my knowledge, Vaxart made all required filings with the SEC in a timely manner during the Class Period and satisfied the other Form S-3 requirements.[61] Moreover, Vaxart made Form S-3 filings with the SEC before, during, and after the Class Period.[62] As a

---

[59] *Cammer*, 711 F. Supp. at 1287.

[60] *See* SEC Form 3, *available at* https://www.sec.gov/files/forms-3.pdf.

[61] *See*: SEC EDGAR, Vaxart, Inc., *available at* https://www.sec.gov/edgar/browse/? CIK=72444&owner=exclude.

[62] *See Id*.

result, this factor is consistent with the efficiency of the market for Vaxart Common Stock throughout the Class Period.

**E.    *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices**

59.    The fifth *Cammer* factor relates to whether a company's stock price quickly responds to and incorporates new value-relevant information. The *Cammer* court held:

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[63]

60.    Below, I summarize my empirical analysis, which finds that Vaxart's Common Stock exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in *Cammer*.  As part of my analysis, I compared the behavior of Vaxart Common Stock on days when company-specific news was issued with its behavior on days when no such news was issued. This analysis demonstrates that Vaxart's Common Stock price reacted rapidly to company-specific news, and thus further supports the conclusion that Vaxart Common Stock traded in an efficient market throughout the Class Period.

*i.    Event Study Methodology*

61.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I ran empirical tests using the results of an event study.

---

[63] *Cammer,* 711 F. Supp. at 1291.

23

62.     Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.[64]  As Professor Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.
>
> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[65]

63.     To determine whether Vaxart stock price movements on any given date are statistically significant, I performed an event study using generally accepted economic methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices.

64.     Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-

---

[64] *See* A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 13.

[65] Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46, at 1607.

specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movements (*i.e.*, the "abnormal return") is "statistically significant," *i.e.*, sufficiently large compared to the usual volatility in the Company stock price return such that simple random movement can be rejected as the cause.

65. I applied these widely used and generally accepted econometric methodologies to perform my event study here. Specifically, in order to isolate the impact of company-specific news on Vaxart's stock price during the Class Period, I performed regression analyses to measure the relationship between Vaxart's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in Vaxart's industry. By modeling how Vaxart's stock price returns moved relative to an overall market index and an industry index, I was also able to measure the response of Vaxart's Common Stock to announcements of company-specific news.

66. I conducted my regression analysis over the Class Period (June 15, 2020 through August 19, 2020, inclusive). For each trading day, I constructed a regression model using data from the prior two months of trading days (the "Estimation Window").[66]

---

[66] I utilized an Estimation Window of 40 trading days, which equates to approximately two calendar months. This allowed my regression approach to adapt to the rapidly changing volatility of stock returns during the COVID-19 time period at issue in this matter. *See, e.g.,* Mark L. Mitchell and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *Business Lawyer* 49; A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

25

67.    To study the relationship between Vaxart's stock price returns and overall market factors, I used the NASDAQ Composite Total Return Index (the "Market Index"). This Market Index is commonly used by economists as a representation of the overall market.

68.    To study the relationship between Vaxart's stock price returns and changes in industry-wide factors that would be expected to impact all stocks in Vaxart's particular industry, I used the NASDAQ Biotechnology Industry Total Return Index (the "Industry Index").[67] Vaxart itself benchmarked its Common Stock performance against the NASDAQ Composite and NASDAQ Biotechnology indices in its 2020 Annual Report.[68]

69.    I established the relationship between the daily return of Vaxart's Common Stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[69] As shown in **Exhibit 4**, the event study models revealed an evolving relation between the daily returns of Vaxart Common Stock and those of the overall stock market and industry indices throughout the Class Period, including a generally positive correlation between the Company's Common Stock and the Industry Index. In other words, movements of the Market Index and the Industry Index help explain movements in Vaxart's stock price.

70.    Consistent with generally accepted econometric methods, these observed relationships allowed me to construct a model to predict the expected daily return of the Company on any given date within the Class Period that controlled for that day's market and industry returns.

---

[67] According to Bloomberg, this industry index had over 200 constituents during the Class Period, and Vaxart was not a member of the index.

[68] Vaxart, Inc., SEC Form 10-K at 85, filed Feb. 25, 2021, available at: https://www.sec.gov/Archives/edgar/data/72444/000143774921004115/0001437749-21-004115-index.htm.

[69] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35; Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, "Good News, Bad News, Volatility, and Betas," *Journal of Finance* 50, at 1597.

Again, in accordance with standard event-study methodology, I then subtracted this predicted return from the actual return to get the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

71.    Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in Vaxart's Common Stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model. In other words, the standard deviation of errors provides a metric for how much idiosyncratic company-specific volatility (or "randomness") remains in the price movement of Vaxart's common stock after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period.

>   ii.    *Cause and Effect Analysis Comparing Vaxart Common Stock Price Behavior on News Days versus No News Days*

72.    A generally-accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the stock's behavior on news days with its behavior on other days with relatively little or no news.[70]  A showing that a security's price is statistically significantly more volatile on "news days" than on "no news days" is considered powerful evidence that the security responds promptly to news and, therefore, strongly supports a finding of efficiency.[71]

73.    Importantly, research has shown that in an efficient market, a security will exhibit some large price movements despite the absence of news and, conversely, there will be news

---

[70] Paul Ferrillo, Frederick Dunbar, and David Tabak, 2004, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-on-the-Market Cases," *St. John's Law Review* 78, at 120-121; Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57.

[71] *Id.*

without large price movements.[72]   For instance, a company may announce earnings (or a lack thereof) that are in line with investor expectations – and while such an expected announcement is clearly important to investors, it will often not alter the total mix of information significantly enough to elicit a statistically significant stock price movement. Likewise, a disclosure may contain a mix of positive and negative information, which may effectively offset each other, which again would result in no statistically significant price movement. Further, if a company's disclosure conceals important information, the effect of the concealment will generally not result in a significant stock price movement, but will instead simply maintain the price at its then-current level.

74.     Accordingly, a generally accepted, peer-reviewed methodology accepted by numerous courts is to compare (i) a subject company's stock price behavior on a *group* of "news days" to (ii) its stock price behavior on a *group* of "no news days."[73]

75.     Here, I performed such an analysis comparing the behavior of Vaxart Common Stock on news versus no news days.  My analysis demonstrates that the price of Vaxart stock was statistically significantly more volatile on news than on no news days.  This result supports the conclusion that there was a "cause and effect relationship between company disclosures and

---

[72] *See* Boudoukh, Jacob, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, "Information, Trading, and Volatility: Evidence from Firm-Specific News," *Review of Financial Studies* 32, at 1004; Ray Fair, 2002, "Events That Shook the Market," *Journal of Business* 75, at 713, 714.

[73] Paul Ferrillo, Frederick Dunbar, and David Tabak, 2004, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-on-the-Market Cases," *St. John's Law Review* 78, at 120-121; Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57. This approach been repeatedly accepted by courts evaluating market efficiency in the securities class action context. *See, e.g.*: *In re: Under Armour Securities Litigation*, 631 F.Supp.3d 285, 311-12 (D. Md. 2022); *Bond v. Clover Health Investments, Corp., et al.*, 2023 WL 1999859, at *11 (M.D. Tenn. Feb. 14, 2023); *In re: QuantumScape Securities Class Action Litigation*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).

resulting movements in stock price" for Vaxart Common Stock during the Class Period and, thus, further supports a finding of market efficiency.

76. To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I identified those Vaxart press releases that the Company attached to SEC Form 8-Ks during the Class Period (the "News Days"). These types of announcements represent a potential opportunity for the public release of new value-relevant Company information to investors.[74] As shown in **Exhibit 6a**, in total, Vaxart attached five press releases to SEC Form 8-K during the Class Period. I then classified each day on which such press release was first issued as a "news day."[75]

77. I then compared the stock returns and trading volume of Vaxart's Common Stock on these "News Days" versus those metrics on trading days that contained the least news during the Class Period (the "No News Trading Days"). The No News Trading Days provide a benchmark measurement of days in which relatively little or no new Vaxart-specific information was provided to the market. If Vaxart's stock prices tend to move more significantly on News Days than on No News Trading Days, this would support a conclusion of market efficiency. As discussed below, there were 14 No News Trading Days during the Class Period.[76]

---

[74] *See* SEC, "How to Read an 8-K," https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/how-read-8 ("The types of information required to be disclosed on Form 8-K are generally considered to be "material." That means that, in general, there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision.").

[75] If the release were issued after the close of the market, the relevant news day is appropriately deemed to be the next trading day.

[76] I identified "No News Trading Days" as days on which there were no news stories or other media reports identifiable in the Factiva database tagged to Vaxart. As described above, Factiva is a well-known compiler of business news from across a wide range of publications, including Dow Jones Newswire, Reuters News, PR Newswire, Associated Press Newswire, Business Wire, and numerous other outlets. For purposes of considering news to identify No News Trading Days under this methodology, I exclude headlines that merely identify stock price or volume movements on a

78. **Exhibit 6a** reports the list of 5 News Days – *i.e.*, their market impact dates and corresponding disclosure headlines.

79. **Exhibit 6b** reports the results of my event study using Vaxart Common Stock returns. The columns list the market impact dates, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study, the t-statistic, and the p-value corresponding to statistical significance.

80. Overall, 3 out of 5 Vaxart press releases caused stock price movements that were statistically significant at the 95% level or better. I compare this rate with that on the No News Trading Days in the following exhibit.

81. **Exhibit 7** summarizes the statistical comparison of Vaxart's Common Stock returns and trading volume on the 5 News Days versus these metrics as measured on the 14 No News Trading Days.[77]

82. As shown in the **Exhibit 7**, 60% of the News Day disclosures caused stock movements that were statistically significant at the 95% level. This compares to 0% of the No News Trading Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at a level of greater than 99%.

83. These results provide strong evidence of a cause-and-effect relationship between new information and Vaxart Common Stock price movements. Moreover, relative to the No News Trading Days, the News Days had a higher average absolute abnormal return and greater trading volume, with these differences being statistically significant at a level greater than 99%.

---

given date without discussing any other information (however, there were no such days in this sample).

[77] The 5 News Days and 14 No News Trading Days combined cover 40% of the trading days (19 of 47) in the Class Period.

84.    In summary, relative to other trading days contained in each event study's Estimation Window, Vaxart's News Days resulted in a greater proportion of statistically significant stock price movements at the 95% level, higher absolute abnormal returns, and greater trading volumes, and these differences are statistically significant. These results establish a clear cause-and-effect relationship between the release of new company-specific information and Vaxart Common Stock price movements. As a result, this *Cammer* Factor Five analysis supports the conclusion that Vaxart Common Stock traded in an efficient market during the Class Period.

### F.    Additional Factor 1: Market Capitalization

85.    I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization. The *Cammer* court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[78] Similarly, the *Krogman* court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[79]

86.    Conversely, as noted previously, the MRK Study found that companies that lack analyst coverage are also companies that are generally associated with other factors—such as relatively small market capitalization—that indicate that their shares trade in less developed and efficient markets. The median market capitalization of the MRK Sample firms was $27.91 million.[80] By contrast, the MRK Covered firms had a median market capitalization of $243.97

---

[78] *Cammer*, 711 F. Supp. at 1287.

[79] *Krogman,* 202 F.R.D. at 478.

[80] MRK Study at 678 (Table 3).

million.[81] This study thus supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

87.    **Exhibit 8** reports Vaxart's market capitalization throughout the Class Period.[82] This market capitalization averaged $853 million over the Class Period. Vaxart's total market capitalization places it above the 50th percentile of all companies listed on either the NASDAQ and the NYSE from 2016-2018.[83] Vaxart's market capitalization also exceeded the MRK Sample firms and Covered firms on an inflation-adjusted basis.[84] Vaxart's number of shares outstanding ranged from 74.2 million to 109.2 million during the Class Period.

88.    Vaxart's market capitalization, shares outstanding available for trading, and its sizeable float, as discussed below, are consistent with the conclusion that the Common Stock traded in an efficient market during the Class Period.

### G.    Additional Factor 2: Bid-Ask Spread

89.    The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[85]

90.    The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower

---

[81] MRK Study at 678 (Table 3).

[82] Bloomberg daily reported "CURRENT_MARKET_CAP_SHARE_CLASS" variable.

[83] Bhole Study, at 107: 50th percentile of market capitalization defined as $781 million.

[84] Source: U.S. Bureau of Labor Statistics, CPI Inflation Calculator, available at: https://www.bls.gov/data/inflation_calculator.htm.

[85] *Krogman*, 202 F.R.D. at 478.

transaction costs to trade in a given stock and is indicative of a more informationally efficient market. A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

91.     I analyzed the bid-ask spread of Vaxart's Common Stock during the Class Period. **Exhibit 9** reports Vaxart's bid-ask spread as a percentage of the bid-ask midpoint.[86] This spread averaged 0.19% over the Class Period.

92.     By way of comparison, the MRK Study found that the MRK Sample firms had a median bid-ask spread of 4.55%, while the MRK Covered firms had a median bid-ask spread of 1.69%.[87] Vaxart's bid-ask spread was significantly smaller than both of these values, indicating that investors could trade Vaxart's Common Stock at very low relative cost. Additionally, Vaxart's average bid-ask spread over the Class Period places it below the 75th percentile of all companies listed on NASDAQ and the NYSE from 2016-2018.[88]

93.     As a result, Vaxart's bid-ask spread also supports the conclusion that Vaxart Common Stock traded in an efficient market throughout the Class Period.

## H.     Additional Factor 3: Public Float

94.     The *Krogman* court also considered the public float of a company in weighing market efficiency.[89]

95.     The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if

---

[86] Bloomberg daily reported "AVERAGE_BID_ASK_SPREAD_%" variable.

[87] MRK Study at 678 (Table 3).

[88] Bhole Study, at 105, 75th percentile of bid-ask spread defined as 0.75%.

[89] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

the majority of the equity is held by its CEO and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

96.     **Exhibit 10** reports the shares outstanding, public float, and shares held by insiders for Vaxart Common Stock during the Class Period. As shown in that exhibit, Vaxart insiders held 1.1% of the Common Stock during the Class Period. Approximately 23.6% of Vaxart's public float was held by institutions and other large outside investors. Overall, between 101.9 million and 133.0 million shares of Common Stock were available for trading in the public float during the Class Period.

97.     This large degree of public float for Vaxart's Common Stock supports the conclusion that it traded in an efficient market throughout the Class Period.[90]

## I.     Additional Factor 4: Institutional Ownership

98.     Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

99.     I also report the total institutional ownership of Vaxart Common Stock in **Exhibit 10,** which shows that at least 170 institutions held the stock at some point during the Class Period. By comparison, the MRK Study found that the MRK Sample firms had a median of only nine institutional investors while the MRK Covered firms had a median of 40 institutional investors.[91]

---

[90] *Id*.

[91] MRK Study at 678 (Table 3).

Vaxart's institutional ownership base greatly exceeds both of these levels. Moreover, Vaxart's institutional ownership as a percent of shares during the Class Period placed it between the 10th and 25th percentile of NYSE and NASDAQ traded companies.[92]

100.   Thus, the significant institutional ownership base for Vaxart Common Stock supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

### J.   Additional Factor 5: Autocorrelation

101.   Autocorrelation refers to an anomaly by which stock returns over a given time period are able to predict future returns, a potential phenomenon that has been widely studied in the academic literature.[93] The interval over which autocorrelation is examined tends to be on a daily basis. Thus, if the stock return today predicts tomorrow's stock return with a statistically significant correlation, the returns are said to be autocorrelated.

102.   A positive autocorrelation could give rise to "momentum" trading whereby an investor would purchase (sell or short sell) stock when returns are positive (negative) in order to generate profits as the returns continue over subsequent trading days.[94]

103.   A negative autocorrelation could give rise to "reversal" trading whereby an investor would sell or short sell (purchase) stock when returns are positive (negative) in order to capture profits when the returns reverse.[95]

---

[92] Bhole Study, at 106: 10th percentile defined as institutional ownership of 13.48% of shares outstanding; 25th percentile defined as 33.58%.

[93] *See, e.g.*: Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61, at 2367-68; Michael C. Jensen, 1978, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6, at 95-101.

[94] *See, e.g.*: Adem Atmaz, Huseyin Gulen, Stefano Cassella, and Fangcheng Ruan, 2023, "Contrarians, Extrapolators, and Stock Market Momentum and Reversal," *Management Science*, at 1.

[95] *Id.*

104.    Autocorrelation may occur occasionally due to random patterns in aggregate stock return data or due to consecutive news days with different types of new information being publicly released. However, if statistically significant autocorrelation in stock returns persists over a sufficient time period such as several quarters, and if such autocorrelation is large enough in magnitude that a trader could earn riskless profits after trading costs, this would imply market inefficiency because publicly-available information about prior stock price movements would not be fully reflected in current stock prices.

105.    I use an established methodology, *i.e.*, a regression analysis, to test for autocorrelation in Vaxart's Common Stock returns.[96] This evaluates whether, from a statistical perspective, the stock return on a given day can predict the stock return on the following trading day.[97] After performing the regression to test for this pattern over the sample of trading days throughout the Class Period, if the regression produces a statistically significant result, then it becomes necessary to explore whether this pattern is sufficiently large in magnitude, consistent in direction, and persistent over time such that a trading arbitrage opportunity exists. If, however, the regression does not indicate a statistically significant pattern in the stock returns, then no evidence exists of an autocorrelation anomaly.

106.    **Exhibit 11** presents the results from the autocorrelation test for Vaxart's Common Stock during the Class Period. The autocorrelation coefficient over the full Class Period is not statistically significant. Thus, I find no evidence of persistent autocorrelation in Vaxart's Common

---

[96] I evaluate abnormal returns, the calculation of which was described in the *Cammer* factor five analysis section of this report (V.E).

[97] Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61, at 2367-68; Michael C. Jensen, 1978, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6, at 95-101.

Stock returns. This finding supports the conclusion that Vaxart's Common Stock traded in an efficient market throughout the Class Period.

### K.   Additional Factor 6: Active Options Trading

107.   Academic studies have shown that options written on a company's shares of stock help to improve market depth and liquidity, investor interest, and overall market efficiency, as reflected by increases in trading volume, narrower bid-ask spreads, and improvements in transaction sizes and frequencies.[98] Thus, options trading on a company's stock can improve price discovery and support a finding of market efficiency, relative to a company without any options trading.[99]

108.   Vaxart Common Stock had 359,546 call option contracts and 101,976 put option contracts traded during the Class Period.[100] The presence of options trading supports the conclusion that Vaxart Common Stock traded in an efficient market throughout the Class Period.

## VI.   Evaluation of Market Efficiency for Options on Vaxart Common Stock

109.   I have also been asked to determine whether the market for Vaxart Options was efficient during the Class Period.

---

[98] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53. See also: Stephen A. Ross, 1976, "Options and Efficiency," *Quarterly Journal of Economics* 90.

[99] *See, e.g.*, Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41; Mihir Bhattacharya, 1987, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22; Stephen Figlewski and Gwendolyn P. Webb, 1993, "Options, Short Sales, and Market Completeness," *Journal of Finance* 48; Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53.

[100] Source: iVolatility. The first date of option trading indicated within the iVolatility data was July 1, 2020.

A.    **Overview of Option Types and Pricing**

110.    There are two basic types of options: call options and put options. A call option gives the holder of the option the right to buy an asset (in this case, Vaxart Common Stock) by a certain date (the expiration date), and at a certain price (the strike price or exercise price). A put option gives the holder the right to sell an asset (in this case, Vaxart Common Stock) by an expiration date at the strike price. Options can be either American or European, with the distinction being that American options can be exercised at any time up until the expiration date, whereas European options can be exercised only on the expiration date itself.[101]

111.    The price of an option, also referred to as the "premium," depends on a number of factors, including how the current stock price compares to the exercise price, the amount of time to expiration, anticipated dividends, expected volatility of the underlying stock, and interest rates.[102]

B.    **The Academic Literature Strongly Supports the Presumption that Options Quickly Reflect Value-Relevant Information**

112.    A wide body of academic literature has studied options pricing in relation to common stocks. For example, numerous studies have evaluated the potential for arbitrage profits to be earned from persistent mispricing opportunities between common stock and options prices, and have concluded that such opportunities do not persist in general due to the efficiency of option pricing.[103]

---

[101] John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009, at p. 6.

[102] *Id*., at pp. 201-204.

[103] *See, for example*: Dan Galai, 1977, "Tests of Market Efficiency of the Chicago Board Options Exchange," *Journal of Business* 50; Robert C. Klemkosky and Bruce G. Resnick, 1979, "Put-Call Parity and Market Efficiency," *Journal of Finance* 34; Robert C. Klemkosky and Bruce G. Resnick, 1980, "An Ex-Ante Analysis of Put-Call Parity," *Journal of Financial Economics* 8; Robert E. Whaley, 1982, "On the Valuation of American Call Options on Dividend Paying Stocks: Empirical Tests," *Journal of Financial Economics* 19.

113. Many studies have documented that options prices quickly impound and reflect new information.[104] Other studies find that options enhance the overall stock market by making it more informationally efficient.[105] For example, a study by Jennings and Starks finds that stock prices react more quickly to earnings announcements when firms have options traded on the stocks.[106] A study by Kumar, Sarin, and Shastri concludes that: "Overall, our results suggest that option listings improve the market quality of the underlying stocks."[107]

114. From my review and experience, the academic literature strongly supports the presumption that options prices quickly reflect value-relevant information that is also reflected in common stock prices.

115. Moreover, academic studies have concluded that options can enhance market efficiency of the underlying common stocks.[108] Options could not improve common-stock market

---

[104] *See, e.g.*, James M. Patell and Mark A. Wolfson, 1981, "The Ex Ante and Ex Post Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices," *Journal of Accounting Research* 19; Steven Manaster and Richard J. Rendleman, Jr., 1982, "Option Prices as Predictors of Equilibrium Stock Prices," *Journal of Finance* 37; Joseph A. Anthony, 1988, "The Interrelation of Stock and Options Market Trading-Volume Data," *Journal of Finance* 43.

[105] *See, e.g.*, Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41; Mihir Bhattacharya, 1987, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22; Stephen Figlewski and Gwendolyn P. Webb, 1993, "Options, Short Sales, and Market Completeness," *Journal of Finance* 48; Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53.

[106] Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41, at p. 107.

[107] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53, at p. 717.

[108] *See, e.g.*, Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41; Mihir Bhattacharya, 1987, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22; Stephen Figlewski and Gwendolyn P. Webb, 1993, "Options, Short Sales, and Market Completeness," *Journal of Finance* 48; Raman Kumar, Atulya

efficiency if the options themselves were inefficient.[109] As a result, "where the underlying stock trades in an efficient market," academics consider market efficiency of options to be an "essentially settled" matter.[110]

### C. The *Cammer* and *Krogman* Factors are not Relevant for Gauging Market Efficiency of Options Markets

116. While I understand that courts view the *Cammer* and *Krogman* factors as informative of stock market efficiency, these factors are not directly applicable to options as tests of market efficiency.[111] I summarize some of the reasons below:

a. Average Weekly Trading Volume: Stock options can be created, or "written" in unlimited quantities. As a result, the ability for investors to buy or sell options is not limited by the amount of trading volume in a given option series.

b. Analyst Coverage: Option trading counterparties include sophisticated, institutional traders and market makers who have significant financial interest in pricing options based on fundamental valuation techniques, regardless of existing analyst coverage regarding a company.[112]

c. Market Makers: Options trade on liquid national exchanges like the Chicago Board Options Exchange (CBOE), ensuring that investors can buy or sell options any time during normal trading hours. Because options can be created, or written, in unlimited quantities, trading in options differs from trading in stock, which is limited to the available float and thus benefits from the liquidity provision of market makers.

---

Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53.

[109] *Id.*

[110] *See In re Apple Inc. Sec. Litig.*, 2023 WL 2763952 (N.D. Cal. Mar. 28, 2023). *See also* preceding footnote.

[111] *Id.*

[112] *See, e.g.*, John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009, pp. 201-204.

d.    SEC Form S-3 Filing Eligibility: A company's ability to issue stock under the shortened registration requirements of Form S-3 has no bearing on investors' ability to trade options on that company's stock.

e.    Cause and Effect Relationship Between Company Information and Prices: While academic research establishes that option prices quickly impound new value-relevant information, it also explains that other factors affect option prices, sometimes in offsetting directions. For example, a sharp decline in the stock price may lower a call option's value due to the current stock price input to an option valuation formula, yet the option value may also increase if the implied volatility of the stock increases. A similar dynamic can occur in put option valuations when the stock price increases. Moreover, out-of-the-money option prices may not change in response to stock price changes if the options are likely to expire out-of-the-money (worthless), even though this lack of price movement would be expected in an efficient market.

f.    Market Capitalization: Stock options can be created, or "written" in unlimited quantities. As a result, the ability for investors to buy or sell options is not limited by the existing market capitalization of any given option series.

g.    Bid-Ask Spread: Option prices are generally lower than the current trading prices of the underlying stocks, which causes the bid-ask spread to be wider as a percentage of the option prices. Options are traded less frequently, and the trading is facilitated by professional investors and market makers with fixed service provider costs. As a result, the bid-ask spreads of common stocks are not comparable to the bid-ask spreads of options.

h.    Public Float: Stock options can be created, or "written" in unlimited quantities. As a result, the ability for investors to buy or sell options is not limited by the existing public float of any given option series.

### D.    Multiple Additional Relevant Factors Support the Finding That the Market for Vaxart Options Was Efficient

117.    Because neither *Cammer* nor *Krogman* involved options, it is also important to note that there are additional factors supportive of a finding of efficiency in the options context that those courts would not have had cause to consider.  Most significantly, Vaxart's Options benefited from significant trading opportunities on a national, liquid options exchange – the CBOE – during the Class Period. As noted above, over 450,000 Options contracts traded during the Class Period.

41

Each contract covered 100 shares of stock, indicating significant investor interest in trading options on millions of shares of Vaxart Common Stock.

118.   Relevantly here, I also evaluated whether the prices of Vaxart Options tended to move in a directionally consistent manner with the price movements in the underlying Vaxart Common Stock. All else equal, in an efficient market, one would expect call option prices to move in the same direction as underlying stock prices, and put options prices to move in the opposite direction as the underlying stock prices. However, this prediction is stronger for options that are in-the-money, as out-of-the-money options may still expire worthless despite underlying stock price swings. Moreover, if the implied volatility of the underlying stock price changes at the same time as a large stock return, this volatility input to option pricing may result in a movement in the option price that differs from the prediction based only on the underlying stock price input.

119.   In **Exhibit 12**, I report the raw stock returns for any dates from my *Cammer* Factor 5 event studies which are statistically significant at the 95% level or better, as well as the corresponding Option returns.[113] For each trading day, I report three different option series based on options that: a) have strike prices nearest the prior day's closing stock price, and b) are the nearest to expiration. As can be seen in the exhibit, 21 out of 21 call option series and 20 out of 21 put option series experienced price movements that are consistent with the underlying stock price movements. This finding provides further support for the conclusion that the Options traded in an efficient market throughout the Class Period.

---

[113] The Options began trading on July 1, 2020, so the Exhibit 12 dates reported represent any trading days during the Class Period starting on July 1, 2020.

E.    **Market Efficiency in the Market for Vaxart's Common Stock Strongly Reinforces the Conclusion that the Vaxart Options Also Traded in an Efficient Market**

120.    In this case, during the Class Period, the pricing for the Vaxart Options at issue was dependent on the market price of Vaxart Common Stock.[114] Courts have presumed that when a market for common stock is found to be informationally efficient, reliance on misstatements or omissions can be presumed for the options, since their prices are derivative of the market prices for common stock, which in turn reflect any value-related information.[115]

121.    As demonstrated above, Vaxart Common Stock satisfied each of the efficiency factors I evaluated, and thus were informationally efficient. As a result, I have concluded that Vaxart Common Stock was priced efficiently and therefore reflected the value of the alleged misstatements and omissions. Because options pricing is dependent on the stock price, the artificial inflation caused by any misrepresentations and omissions that affects the stock price would quickly translate into the value of derivative instruments such as Options on Vaxart Common Stock.

122.    In other words, because I have concluded that the market for Vaxart Common Stock was efficient, I also conclude -- based on my review and analysis of (i) the academic literature, (ii) Vaxart Options trading during the Class Period, and (iii) price movements in Vaxart Options during the Class Period -- that the Vaxart Options traded in an efficient market.

## VII.    Ability to Calculate Damages on a Class-Wide Basis

123.    I have also been asked to opine on whether per-share damages for traders of Vaxart Securities can be assessed for all Class members based upon a methodology common to all Class members and consistent with Plaintiffs' theories of liability. As discussed below, damages for each

---

[114] Indeed, the most widely used option valuation models, such as the Black-Scholes model, depend directly on the current underlying stock price. *See, e.g.*, John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009, pp. 201, 291.

[115] *See, e.g., In re Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89, 100 (D. Conn. 2006); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F.Supp.2d 1315, 1330 (N.D. Ga. 2007); *In re Fannie Mae Sec. Litig.*, 247 F.R.D. 32, 41-42 (D.D.C. 2008).

43

of Plaintiffs' claims can be calculated on a class-wide basis through one or more common methodologies.

### A. Calculation of Damages for Violation of Sections 10(b) and 20(a) of the Exchange Act

124.   For the §10(b) claims, Plaintiffs allege that the Armistice Defendants carried out a plan, scheme, and course of conduct which deceived the investing public, artificially inflated the market price of Vaxart securities, and caused Class members to purchase Vaxart Common Stock at artificially inflated prices.[116] Plaintiffs also claim certain Defendants are liable as control persons under section 20(a).[117]

125.   The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under §10(b) of the Exchange Act. This approach calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale. If shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Securities Litigation Reform Act of 1995 ("PSLRA").[118] This limit on damages can also be applied class-wide. I understand that this out-of-pocket methodology has been widely accepted for use across §10(b) matters.

---

[116] Complaint ¶ 326.

[117] *Id.* ¶ 360. Section 20(a) provides that control persons shall be "jointly and severally [liable] with and to the same extent" as the controlled person(s) that violated the securities law. See 15 U.S.C. §78t(a). Given §20(a)'s derivative nature, Plaintiffs have instructed me to assume that §20(a) damages can be calculated using the same methodologies for assessing §10(b) damages.

[118] The PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S. Code § 78u–4 (codifying language).

126.    The claims process produces information necessary for the calculation of damages for each Class member, including the purchase and sale information for the security. This information is available from brokerage statements and other documentation of securities transactions. Artificial inflation per share is quantified for each day of the Class period and then damages are calculated using the formula described above. As a result, the methodology for calculating damages in §10(b) matters such as this is well-established and formulaic across all Class members.

127.    The quantification of artificial inflation per share is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and I understand that such analysis often incorporates information produced during discovery. Nonetheless, the method employed to calculate artificial inflation can be applied class-wide.

128.    Event studies are widely employed to calculate artificial inflation. Event studies measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions and/or misrepresentations.[119]

129.    To the extent that reliable evidence is introduced to show that a material portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of Vaxart securities can be determined on a common, class-wide basis using various accepted methodologies.  The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during discovery and will be based on the specific set of facts and circumstances in a given case.

---

[119] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation.

130.    A loss causation analysis also documents how artificial inflation per share evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery.

131.    One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per share inflation equaled a constant dollar amount above the correct share price over the Class Period.

132.    Alternatively, one can measure "constant percentage inflation," which assumes that each share price was inflated by a constant percentage amount above the correct stock price over the Class Period. In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents.

133.    All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual Class member identities or circumstances.

134.    Damages relating to Vaxart's Options can also be calculated in a similar manner and utilizing the same techniques described above. Once artificial inflation is estimated, the embedded inflation contributing to an option's price can change based on a number of factors. [120] These factors include, but are not limited to, the level of the stock price in relation to the strike price, time to maturity, and volatility.

---

[120] Option valuation models, such as the Black-Scholes model, depend directly on the current underlying stock price. *See, e.g.*, John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009, pp. 201, 291.

135.    One can employ various options pricing methodologies, such as the widely utilized Black-Scholes pricing model[121] or the binomial model,[122] to infer the inflation at the time of each Class member's purchase and sale. These models provide a way to value an option as a function of the variables that influence option values: the strike price, time to expiration, risk-free interest rate, volatility of the underlying security, and the current market price of the underlying security.

136.    By changing the underlying price of the security in the equation to reflect the removal of the artificial inflation, one can assess how the value of the option would be impacted. Therefore, Options damages in this matter can be calculating using a standard, well-established methodology and can be applied on a class-wide basis.

**B.    Calculating Damages for Violation of Section 20A of the Exchange Act**

137.    As set forth in the Complaint, Plaintiffs allege that the Armistice Defendants violated Section 20A of the Exchange Act.[123]

138.    Section 20A provides that:

> Any person who violates any provision of this title [15 USCS §§78a et seq.] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.[124]

139.    Section 20A also imposes a limitation on defendants' liability:

---

[121] Fischer Black and Myron Scholes, 1973, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy* 81.

[122] John C. Cox, Stephen A. Ross, and Mark Rubinstein, 1979, "Option Pricing: A Simplified Approach," *Journal of Financial Economics* 7.

[123] Complaint ¶ 341.

[124] 15 U.S.C. §78t-1(a).

140.    The total amount of damages imposed under subsection (a) shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the violation.[125] Given these statutory provisions and related judicial opinions, it is my understanding that there are at least two methods for calculating damages for a violation of Section 20A of the Exchange Act – each of which is common to all Class members and applicable class-wide.

141.    Under the first method, damages are measured as "losses avoided" by the defendants by selling the shares during the Class Period, as opposed to selling the shares following the disclosure of the relevant truth at the end of the Class Period. [126]

142.    Under the second method, damages are measured as "profits gained"[127] in causal connection with defendants' unlawful acts, including prejudgment interest in the losses avoided and profits gained calculation. Both methods are relatively straightforward.[128]

143.    It is my understanding that the court or jury retains discretion regarding which methodology is the appropriate measure of damages in this case.

---

[125] 15 U.S.C. §78t-1(b)(1).

[126] *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 664-65 (E.D. Va. 2000); *Kaplan v. S.A.C. Capital Advisors, L.P.*, 40 F. Supp. 3d 332, 339 (S.D.N.Y. 2014) (in the context of Section 20A, "[p]rofits and losses are measured by determining the difference between the price the insider realizes and the market price of the securities . . . a reasonable time after the inside information ha[s] been disseminated").

[127] *In re Allergan, Inc. Proxy Violation Sec. Litig.*, 2018 WL 3912934, at *41 (C.D. Cal. Aug. 14, 2018).

[128] It is my understanding that courts may instead calculate the Losses Avoided based on the difference in the levels of artificial inflation at the time of sale versus the time after the corrective disclosures. Using artificial inflation rather than prices does not affect the common damages methodology as it simply requires substituting the daily inflation measures for the prices in the mathematical formula.

144.    According to previous court rulings, pre-judgement interest "is necessary to capture the full measure of the defendant's ill-gotten gains" because "a defendant has use of the unlawful profits from the time of the wrongdoing until entry of judgment."[129]

145.    Using any appropriate measure of pre-judgement interest, the Losses Avoided or Profits Gained measures discussed above would be carried forward from the date of sale to the date of the award.  Post-judgement interest would be used from the date of the award to the date of distribution of the award.  This calculation of pre-judgement interest is also computed on a class-wide basis and is subject to a common methodology for all Class members.

## C.    Damage Methodologies are Flexible and Can Incorporate Alternative Findings

146.    The damages methodologies I have laid out above for Section 10(b) and Section 20A are flexible and able to incorporate alternative findings regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period.  The methodologies I have described above to calculate Section 10(b) and Section 20A can be modified based on alternative findings the finder of fact may determine, including, but not limited to any: (1) confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) the first actionable fraudulent conduct.

147.    First, irrespective of what the ultimate finder of fact, *i.e.*, the jury, determines is the appropriate percentage of abnormal return that can be attributed to the release of corrective versus confounding information, this percentage can easily be inserted into the standard damages model that I have already described – the out-of-pocket formula. Regardless of how the jury weighs evidence, whether they find that any such disaggregation analysis I may conduct is the most

---

[129] *S.E.C. v. Universal Express, Inc.,* 646 F. Supp. 2d 552, 566 (S.D.N.Y.2009), aff'd 438 Fed. Appx. 23 (2d Cir. 2011).

appropriate, or they determine that based upon the evidence, a different amount is more appropriate, this finding can simply be incorporated into the damages calculation.

148.    Second, should the jury determine that the true economic inflation evolved over the Class Period, my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a class-wide basis.

149.    Third, should the jury decide that the first actionable misstatement and/or omission or otherwise actionable fraudulent conduct happened at a date later than June 15, 2020, prior to such date, inflation could simply be set to zero.

150.    If the jury determines that a change to inflation would be necessary over the Class Period, any such change can easily be incorporated into the model.

151.    To summarize, I have not been asked to calculate damages in this matter. Such analysis would depend on information produced in discovery and development of the case record. Based on my experience and qualifications and my understanding of the nature of the claims in this matter, I conclude that Common Stock and Options damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

## VIII.   Conclusion

152.    In conclusion, based on the market efficiency factors considered by courts and in academia, upon which I base my analyses, it is my opinion that both Vaxart's Common Stock and Vaxart Options traded in an efficient market throughout the Class Period. Moreover, it is my opinion that Common Stock and Options damages in this matter under Sections 10(b) and 20(a), as well as damages under Section 20A for that subset of the Class that traded contemporaneously with the Armistice Defendants' June2020 sales of Vaxart Common Stock—can both be calculated on a class-wide basis utilizing common methodologies.

I declare under the penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Respectfully Submitted,

Matthew D. Cain

Date: _December 1, 2023_

**Appendix A**

**Matthew D. Cain, Ph.D.**                                          November 2023

---

E-mail: mdcain@outlook.com                                       Homepage
Mobile: 574-485-8065                                                   SSRN

---

## Education

Ph.D., Finance, August 2007                    Purdue University, West Lafayette, IN
B.S., Finance, May 2001                           Grove City College, Grove City, PA

## Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

## Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics*, forthcoming.

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

A-1

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

## **Presentations**

- All Indiana Conference

- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

## Teaching Experience

UC Berkeley School of Law

LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2023

LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business

FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management

MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

MGMT 610: Financial Management I (MBA Core), Fall: 2007

## Expert Witness Experience

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

A-5

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

A-7

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

**Appendix B**

## Documents Considered

**Court Documents:**

- Corrected Second Amended Consolidated Complaint for Violations of the Federal Securities Laws, No. 3:20-cv-05949-VC (Doc. 303).

- Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Re: Dkt. Nos. 138, 139, dated Dec. 22, 2021 (Doc. 182).

- Order re Motion to Dismiss Re: Dkt. No. 261, dated May 25, 2023 (Doc. 293).

- Order and Final Judgment Approving Partial Class Settlement, dated Jan. 25, 2023 (Doc. No. 273)

**Court Decisions and Securities Law:**

- *In re Allergan, Inc. Proxy Violation Sec. Litig.*, WL 3912934, (C.D. Cal. Aug. 14, 2018).

- *In re Apple Inc. Sec. Litig.*, WL 2763952 (N.D. Cal. Mar. 28, 2023).

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

- Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).

- *Bond v. Clover Health Investments, Corp., et al.*, WL 1999859 (M.D. Tenn. Feb. 14, 2023).

- *Brown v. China Integr. Energy Inc.*, WL 12720322 (C.D. Cal. Feb. 17, 2015)

- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

- *In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 119 (E.D. Va. 2012).

- *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009).

- *In re Fannie Mae Sec. Litig.*, No. 04-1639 (RJL).

- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

- *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D.Ca. 2016).

- *In re HealthSouth Corp. Sec. Litig., 257 F.R.D. 260, 281* (N.D. Ala. 2009*).*

- *Kaplan v. S.A.C. Capital Advisors, L.P.*, 40 F. Supp. 3d 332, 339 (S.D.N.Y. 2014).

- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

- *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 664-65 (E.D. Va. 2000).

- *In re Priceline.com Inc. Sec. Litig.*, No. 3:00CV01884(DJS).

- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

- *In re QuantumScape Securities Class Action Litigation*, WL 17974629, (N.D. Cal. Dec. 19, 2022).

- *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F.Supp.2d 1315, 1330 (N.D. Ga. 2007).

- *S.E.C. v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 566 (S.D.N.Y.2009), aff'd 438 Fed. Appx. 23 (2d Cir. 2011).

- *Todd v. STAAR Surg. Co.*, 2017 WL 821662 (C.D. Cal. Jan. 5, 2017)

- *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 312 (D. Md. 2022).

**Academic Literature:**

- Joseph A. Anthony, 1988, "The Interrelation of Stock and Options Market Trading-Volume Data," *Journal of Finance* 43.

- Adem Atmaz, Huseyin Gulen, Stefano Cassella, and Fangcheng Ruan, 2023, "Contrarians, Extrapolators, and Stock Market Momentum and Reversal," *Management Science* (forthcoming).

- Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61.

- Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporate Law* 19.

- Mihir Bhattacharya, 1987, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22.

- Bharat Bhole, Sunita Surana, and Frank Torchio, 2020, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Law Review Online*.

- Fischer Black and Myron Scholes, 1973, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy* 81.

- Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, "Information, Trading, and Volatility: Evidence from Firm-Specific News," *Review of Financial Studies* 32.

- Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, "Good News, Bad News, Volatility, and Betas," *Journal of Finance* 50.

- John C. Cox, Stephen A. Ross, and Mark Rubinstein, 1979, "Option Pricing: A Simplified Approach," *Journal of Financial Economics* 7.

- Ray Fair, 2002, "Events That Shook the Market," *Journal of Business* 75.

- Eugene F. Fama, 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25.

- Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46.

- Paul Ferrillo, Frederick Dunbar, and David Tabak, 2004, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-on-the-Market Cases," *St. John's Law Review* 78.

- Stephen Figlewski and Gwendolyn P. Webb, 1993, "Options, Short Sales, and Market Completeness," *Journal of Finance* 48.

- Dan Galai, 1977, "Tests of Market Efficiency of the Chicago Board Options Exchange," *Journal of Business* 50.

- Kewei Hou, Chen Xue, and Lu Zhang, 2020, "Replicating Anomalies," *Review of Financial Studies* 33.

- John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009.

- Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41.

- Michael C. Jensen, 1978, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6.

- Robert C. Klemkosky and Bruce G. Resnick, 1979, "Put-Call Parity and Market Efficiency," *Journal of Finance* 34.

- Robert C. Klemkosky and Bruce G. Resnick, 1980, "An Ex-Ante Analysis of Put-Call Parity," *Journal of Financial Economics* 8.

- Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53.

- Charles M.C. Lee and Eric C. So, 2017, "Uncovering Expected Returns: Information in Analyst Coverage Proxies," *Journal of Financial Economics* 124.

- A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 13.

- Steven Manaster and Richard J. Rendleman, Jr., 1982, "Option Prices as Predictors of Equilibrium Stock Prices," *Journal of Finance* 37.

- Mark L. Mitchell and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* 49.

- Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, "Is There Life After the Complete Loss of Analyst Coverage?," *Accounting Review* 88.

- James M. Patell and Mark A. Wolfson, 1981, "The Ex Ante and Ex Post Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices," *Journal of Accounting Research* 19.

- Stephen A. Ross, 1976, "Options and Efficiency", *Quarterly Journal of Economics* 90.

- Randall S. Thomas and James F. Cotter, 2000, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63.

- Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57.

- Robert E. Whaley, 1982, "On the Valuation of American Call Options on Dividend Paying Stocks: Empirical Tests," *Journal of Financial Economics* 19.

**Data Sources:**

- Bloomberg Terminal
- Factiva News
- iVolatility
- S&P Capital IQ
- SEC Edgar Online
- Vaxart Press Releases and SEC Filings

**Other:**

- https://www.bls.gov/data/inflation_calculator.htm
- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers
- http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess
- https://www.nyse.com/market-model
- https://www.sec.gov/files/forms-3.pdf
- All data and documents cited throughout this report

**Exhibits**

Exhibit 1. Vaxart Common Stock Closing Stock Price and Daily Volume

Exhibit 2. Vaxart Weekly Trading Volume

Exhibit 3. Analyst Coverage

Exhibit 4. Coefficients from Rolling Event Study Regressions

Exhibit 5. Root Mean Squared Error (RMSE) from Rolling Event Study Regressions

Exhibit 6a. Description of Vaxart News Days

Exhibit 6b. Vaxart News Days and Common Stock Abnormal Returns

Exhibit 7. Comparison of Statistical Significance on Vaxart Common Stock for News Days vs. No News Days During the Class Period

Exhibit 8. Vaxart Common Stock Market Capitalization

Exhibit 9. Vaxart Common Stock Average Bid-Ask Spread

Exhibit 10. Vaxart Common Stock Public Float, Insider Holdings, and Institutional Ownership

Exhibit 11. Test for Autocorrelation During the Class Period

Exhibit 12. Option Price Movements Around Significant Common Stock Price Movements

**Exhibit 1**



**Vaxart Common Stock Closing Stock Price and Daily Volume**
**June 15, 2020 – August 19, 2020**

Data source: Bloomberg.

**Exhibit 2**



### Vaxart Weekly Trading Volume
### June 15, 2020 – August 19, 2020

Class Period: June 15, 2020 - August 19, 2020

Average Weekly Volume: 169%

■ Weekly Volume as % of Shares Outstanding

Data source: Bloomberg. Note: Average weekly trading volume is calculated by analyzing each group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period.

**Exhibit 3**

**Analyst Coverage**
**Class Period: June 15, 2020 - August 19, 2020**

| | Contributor Name | Reports Issued |
|---|---|---|
| [1] | B. Riley - FBR | 2 |
| [2] | BuySellSignals Research | 2 |
| [3] | Sadif Analytics Prime | 2 |
| [4] | Corporate Watchdog Reports | 1 |
| [5] | GlobalData | 1 |
| [6] | H.C. Wainwright & Co. | 1 |
| [7] | Streetwise Reports | 1 |
| [8] | Validea | 1 |
| | **Total** | **11** |

*Sources: Bloomberg, Investext.*

**Exhibit 4**



**Coefficients from Rolling Event Study Regressions**
**June 15, 2020 – August 19, 2020**

Data sources: Bloomberg, SEC filings, Factiva, Complaint. Note: Regression models described in notes below Exhibit 7.

E-5

**Exhibit 5**



**Root Mean Squared Error (RMSE) from Rolling Event Study Regressions**
**June 15, 2020 – August 19, 2020**

Data sources: Bloomberg, SEC filings, Factiva, Complaint. Note: Regression models described in notes below Exhibit 7.

**Exhibit 6a**

### Description of Vaxart News Days

|  | Market Impact Date | Press Release Headline |
|---|---|---|
| [1] | 6/15/2020 | Vaxart, Inc. Appoints New CEO to Accelerate Advancement of COVID-19 and Other Programs |
| [2] | 6/25/2020 | Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP |
| [3] | 6/26/2020 | Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed |
| [4] | 7/13/2020 | Vaxart Raises Approximately $90M in Gross Proceeds Through its At-The-Market-Facility |
| [5] | 8/7/2020 | Vaxart Announces Second Quarter 2020 Results |

Data sources: Bloomberg, SEC filings, Factiva, Complaint.

**Exhibit 6b**

### Vaxart News Days and Common Stock Abnormal Returns

|  | Market Impact Date | Raw Return | Abnormal Return (%) | Abnormal Return ($/share) | t-Statistic | p-Value |
|---|---|---|---|---|---|---|
| [1] | 6/15/2020 | 5.6% | 3.4% | $0.08 | 0.49 | 0.626 |
| [2] | 6/25/2020 | 96.2% | 95.8% | $3.06 | 20.39 | 0.000 |
| [3] | 6/26/2020 | 28.4% | 30.4% | $1.90 | 6.64 | 0.000 |
| [4] | 7/13/2020 | 51.9% | 54.8% | $4.37 | 8.93 | 0.000 |
| [5] | 8/7/2020 | 1.0% | 2.2% | $0.20 | 0.36 | 0.724 |

Data sources: Bloomberg, SEC filings, Factiva, Complaint. Note: Regression models described in notes below Exhibit 7.

**Exhibit 7**

**Comparison of Statistical Significance on Vaxart Common Stock
for News Days vs. No News Days During the Class Period**

| Statistic | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | 5 | 14 | |
| Significant Days at 95% Confidence Level | 3 | 0 | |
| % Significant Days at 95% Confidence Level | 60.0% | 0.0% | 0.010 |
| Average Absolute Abnormal Return | 37.3% | 3.9% | 0.004 |
| Average Volume (Millions) | 104.7 | 9.8 | 0.001 |

Data sources: Bloomberg, SEC filings, Factiva. Notes: The event study estimations are based on rolling regressions of the 40 trading days preceding each date of analysis. The regression models control for the Nasdaq Composite Total Return Index ("Market Index") and the Nasdaq Biotechnology Total Return Index ("Industry Index"). The estimations exclude the alleged Corrective Disclosures, News Days identified in Exhibits 6a and 6b, and the following additional news and corresponding market impact dates: April 21, 2020 (Press Release: "Vaxart Announces Positive Pre-Clinical Data for its Oral COVID-19 Vaccine Program"), April 30, 2020 (Press Release: "Vaxart Announces Additional Positive Pre-Clinical Data for its Oral COVID-19 Vaccine Program"), May 20, 2020 (Press Release: "Vaxart Announces Selection of its Oral COVID-19 Vaccine Lead Candidate", June 24, 2020 (Press Release: "Vaxart, Inc. Set to Join Russell 3000® Index"), July 1, 2020 ("Pfizer Vaccine Rivals Tumble After Early Study Shows Promise"), July 7, 2020 ("Novavax Covid Vaccine Gets $1.6 Billion in U.S. Warp Speed Funds"), July 14, 2020 ("Health Care Up as Moderna Schedules Late-Stage Covid Vaccine Trial"), and July 15, 2020 ("Moderna Vaccine Enthusiasm Tamps Down Covid-19 Therapy Names").

**Exhibit 8**

### Vaxart Common Stock Market Capitalization
### June 15, 2020 – August 19, 2020



Data source: Bloomberg.

E-9

**Exhibit 9**

**Vaxart Common Stock Average Bid-Ask Spread**
**June 15, 2020 – August 19, 2020**



Data source: Bloomberg.

**Exhibit 10**

### Vaxart Common Stock Public Float, Insider Holdings, and Institutional Ownership

| Quarter End | Shares Outstanding (000s) | Institutions (#) | Insider Holdings (000s) | Short Interest (000s) | Public Float (000s) | Insider Holdings % of Shares Outstanding | Inst. Holdings (000s) | Inst. Holdings % of Shares Outstanding | Inst. Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] − [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 30-Jun-20 | 96,141 | 105 | 1,012 | 6,768 | 101,896 | 1.1% | 19,758 | 20.6% | 19.4% |
| 30-Sep-20 | 109,469 | 146 | 1,201 | 24,772 | 133,040 | 1.1% | 36,942 | 33.7% | 27.8% |
| Total Unique Institutions: | | 170 | | Averages Over Class Period: | | 1.1% | | 27.1% | 23.6% |

Data sources: Bloomberg, S&P Capital IQ, SEC filings. Note: Armistice holdings are counted as Insider Holdings in the table above.

**Exhibit 11**

**Test for Autocorrelation During the Class Period**

| | Coefficient | T-Statistic | P-Value |
|---|---|---|---|
| Class Period | 0.22 | 1.50 | 0.141 |

Data sources: Bloomberg, SEC filings, Factiva.

**Exhibit 12**

### Option Price Movements Around Significant Common Stock Price Movements

| Date | Stock Return (Raw%) | Stock Price One Day Prior | Option Series | Call Option Return | Same Direction as Common? | Put Option Return | Opposite Direction as Common? |
|---|---|---|---|---|---|---|---|
| 7/6/2020 | -12.62% | $7.37 | $5.00 Strike, Expiring 7/17/20 | -47.2% | Yes | 26.7% | Yes |
| 7/6/2020 | -12.62% | $7.37 | $7.50 Strike, Expiring 7/17/20 | -39.0% | Yes | 43.6% | Yes |
| 7/6/2020 | -12.62% | $7.37 | $10.00 Strike, Expiring 7/17/20 | -34.8% | Yes | 3.8% | Yes |
| 7/7/2020 | 37.7% | $6.44 | $5.00 Strike, Expiring 7/17/20 | 110.5% | Yes | -42.1% | Yes |
| 7/7/2020 | 37.7% | $6.44 | $7.50 Strike, Expiring 7/17/20 | 188.9% | Yes | -40.5% | Yes |
| 7/7/2020 | 37.7% | $6.44 | $10.00 Strike, Expiring 7/17/20 | 346.7% | Yes | -31.5% | Yes |
| 7/13/2020 | 51.88% | $7.98 | $5.00 Strike, Expiring 7/17/20 | 127.6% | Yes | -80.0% | Yes |
| 7/13/2020 | 51.88% | $7.98 | $7.50 Strike, Expiring 7/17/20 | 312.8% | Yes | -66.7% | Yes |
| 7/13/2020 | 51.88% | $7.98 | $10.00 Strike, Expiring 7/17/20 | 526.3% | Yes | -56.3% | Yes |
| 7/14/2020 | 40.0% | $12.12 | $7.50 Strike, Expiring 7/17/20 | 88.7% | Yes | -70.0% | Yes |
| 7/14/2020 | 40.0% | $12.12 | $10.00 Strike, Expiring 7/17/20 | 121.8% | Yes | -83.3% | Yes |
| 7/14/2020 | 40.0% | $12.12 | $12.50 Strike, Expiring 7/17/20 | 149.3% | Yes | -76.0% | Yes |
| 7/15/2020 | -14.61% | $16.97 | $15.00 Strike, Expiring 7/17/20 | -66.7% | Yes | -4.8% | No |
| 7/15/2020 | -14.61% | $16.97 | $17.50 Strike, Expiring 7/17/20 | -76.5% | Yes | 16.0% | Yes |
| 7/15/2020 | -14.61% | $16.97 | $20.00 Strike, Expiring 7/17/20 | -83.6% | Yes | 18.1% | Yes |
| 7/27/2020 | -9.2% | $12.29 | $10.00 Strike, Expiring 8/21/20 | -6.8% | Yes | 27.8% | Yes |
| 7/27/2020 | -9.2% | $12.29 | $12.50 Strike, Expiring 8/21/20 | -8.9% | Yes | 19.6% | Yes |
| 7/27/2020 | -9.2% | $12.29 | $15.00 Strike, Expiring 8/21/20 | -4.3% | Yes | 12.4% | Yes |
| 8/11/2020 | 14.42% | $9.395 | $9.00 Strike, Expiring 8/21/20 | 59.4% | Yes | -25.0% | Yes |
| 8/11/2020 | 14.42% | $9.395 | $9.50 Strike, Expiring 8/21/20 | 69.1% | Yes | -27.1% | Yes |
| 8/11/2020 | 14.42% | $9.395 | $10.00 Strike, Expiring 8/21/20 | 93.3% | Yes | -21.7% | Yes |

Data sources: iVolatility, Bloomberg, SEC filings, Factiva.