**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAN ANTONIO FIRE AND POLICE PENSION FUND, CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, EL PASO FIREMEN & POLICEMEN'S PENSION FUND, and WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiffs,<br><br>      v.<br><br>DENTSPLY SIRONA INC., DONALD M. CASEY, JR., and JORGE GOMEZ<br><br>               Defendants. | Case No. 22-cv-06339-AS<br><br>CLASS ACTION<br><br>Oral Argument Requested |

**DEFENDANTS' OMNIBUS MEMORANDUM OF LAW IN RESPONSE TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

                                                                                        **Page**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT .......................................................................... 1

FACTUAL BACKGROUND ............................................................................... 3

I.      Dentsply's Business During The Proposed Class Period ..................................... 3

II.     Plaintiffs' Allegations .................................................................................. 4

III.    Plaintiffs' Motion for Class Certification and the Cain Report .............................. 6

LEGAL STANDARD ......................................................................................... 7

ARGUMENT ................................................................................................... 8

I.      Plaintiffs Fail To Satisfy Their Burden To Come Forward With a
        Damages Methodology Consistent with Their Theory of Liability........................ 8

        A.      The Cain Report's Failure to Address Plaintiffs' Theory of
                Liability or the Facts of this Case Leaves Significant Gaps
                in Plaintiffs' Damages Theory. ....................................................... 9

        B.      Plaintiffs' Deficient Damages Methodology Is Properly
                Addressed Now. .......................................................................... 15

CONCLUSION................................................................................................. 18

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bratya SPRL v. Bed Bath & Beyond Corp.*,
2024 WL 4332616 (D.D.C. Sept. 27, 2024) .................................................................. 18

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..................................................................................... 1, 8, 17

*Fernandez v. UBS AG*,
2018 WL 4440498 (S.D.N.Y. Sept. 17, 2018)............................................................... 17

*Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) .................................................................... 16

*Goldman Sachs Grp., Inc. v. Arkansas Teacher Ret. Sys.*,
594 U.S. 113 (2021)..................................................................................... 11

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 6 (S.D.N.Y. 2020) ...................................................................... 9, 16

*In re Barrick Gold Securities Litigation*,
314 F.R.D. 91 (S.D.N.Y. 2016) ..................................................................... 16

*In re Petrobras Securities*,
862 F.3d 250 (2d Cir. 2017)........................................................................... 8

*In re Vale S.A. Sec. Litigation*,
2022 WL 969724 (E.D.N.Y. Mar. 31, 2022).................................................. 17

*In re Vaxart Securities Litigation*,
2024 WL 3269448 (N.D. Cal. July 2, 2024).............................................. 17, 18

*Pearlstein v. BlackBerry Ltd.*,
2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ................................................. 17

*Sykes v. Mel S. Harris and Associates LLC*,
780 F.3d 70 (2d Cir. 2015)............................................................................ 16

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)............................................................................ 17

**Page(s)**

**Rules and Statutes**

Fed. R. Civ. P. 23 ................................................................................................  7, 8, 17

17 C.F.R. § 229.303 ............................................................................................  4

## PRELIMINARY STATEMENT[1]

Under the Supreme Court's decision in *Comcast Corporation v. Behrend*, Plaintiffs "must affirmatively demonstrate" through "evidentiary proof" that damages are measurable on a class-wide basis through a common methodology. 569 U.S. 27, 33 (2013). This requires Plaintiffs to come forward with a damages model that is both capable of measuring damages on a class-wide basis ***and*** consistent with their theory of liability. But Plaintiffs have failed to present such a model, and so class certification should be denied.

Plaintiffs' Motion requests that the Court certify a class made up of purchasers of Dentsply common stock across an eighteen-month period from June 9, 2021 to November 12, 2022. As this Court recognized at the motion to dismiss stage, Plaintiffs' theory of the case is that Dentsply's stock price was artificially inflated by dozens of purportedly false or misleading statements that allegedly concealed risks related to Dentsply's future performance. Plaintiffs allege that they were damaged when such risks "materialized" in the form of disappointing earnings and related disclosures made over the course of 2022, causing Dentsply's stock price to drop.

In support of their Motion, Plaintiffs submit an expert report from Dr. Matthew D. Cain. But Dr. Cain merely states, in purely conclusory terms, that damages can be measured on a class-wide basis based on the "out of pocket" methodology. He does not even attempt to explain ***how***, and does not opine that his proposed methodology is consistent with Plaintiffs' theory of liability in this case. This failure is critical, as this case presents several unique considerations that Dr.

---

[1] "Motion" refers to Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, ECF No. 126. "Cain Report" refers to the Expert Report of Matthew D. Cain, Ph.D., ECF No. 124-15. "Zurek Report" refers to the Expert Report of Paul Zurek, Ph.D., submitted as Exhibit 1 to the Declaration of Roger A. Cooper in Support of Defendants' Memorandum of Law In Response to Plaintiffs' Motion (the "Cooper Decl.").

Cain needed to, but did not, address.  Among other things, Dr. Cain does not account for mismatches between the allegedly concealed, generalized risks and the highly specific earnings reports and other disclosures that Plaintiffs claim constituted the materialization of these risks. Nor does he provide a methodology for quantifying inflation, the impacts of risks that Plaintiffs allege materialized over time, or the impact of confounding information that Plaintiffs concede played a role in the stock drops they allege.

Dr. Cain also leaves unaddressed outright inconsistencies between his opinion and Plaintiffs' theory of liability.  He offers no explanation for Plaintiffs' proposal that the impact of their alleged November 1, 2022 loss-causing event (but not four other alleged events) should be measured by analyzing Dentsply's stock price over a three-day period.  As Defendants' expert Dr. Zurek notes, applying this same methodology to Plaintiffs' alleged May 10, 2022 and November 14, 2022 loss-causing events "would find no statistically significant price declines," Zurek Report ¶ 78, but Dr. Cain does not even attempt to explain why this delayed-reaction theory is inappropriate for *these* events, even though he applies it to other dates.  Dr. Cain also ignores that this delayed-reaction theory is inconsistent with his underlying opinion that Dentsply's shares traded in an efficient market that incorporated new information as it came in. Cain Report ¶ 29.

Rather than address these and numerous other questions, Plaintiffs and their expert propose a "wait-and-see" approach.  They rest on the notion that *some* methodology to parse complex issues like confounding information and the natural evolution of inflation over time likely exists in one form or another, and that this is sufficient for this motion.  But as Dr. Zurek explains, "[e]conomic theory provides no 'off-the-shelf' tools that can be used to compute inflation without taking into account the particular circumstances of a given litigation."  Zurek

2

Report ¶ 39.  And Plaintiffs must put forth evidence at the class certification stage that their damages methodology directly measures the specific harm they allege to have suffered.

For this reason, Plaintiffs have failed to satisfy *Comcast*.  Their motion for class certification should be denied.

### FACTUAL BACKGROUND

### I.    Dentsply's Business During The Proposed Class Period

Dentsply Sirona Inc. ("Dentsply") is the world's largest manufacturer of professional dental products and technologies.  ECF 72 (the "AC") ¶ 30.  Defendant Casey served as Dentsply's CEO and a member of the Dentsply Board of Directors from February 2018 through April 19, 2022.  ECF 112 ¶ 31.  Defendant Gomez served as Dentsply's CFO from August 2019 through May 6, 2022.  *Id.* ¶ 32.

In 2021 and 2022, Dentsply operated its business in two main segments:  Technologies and Equipment ("T&E"), which was responsible for the design, manufacture, sales and distribution of Dentsply's dental technology and equipment products, including its CAD/CAM systems; and Consumables, which was responsible for "value-added dental supplies and small equipment used in dental offices for the treatment of patients."  *See* Cooper Decl. Ex. 2 at 4-5.  Plaintiffs' allegations relate only to the T&E segment.

Dentsply announced disappointing earnings results at the end of 2021 into early 2022 and the departure or termination of several members of senior management from April through September 2022.  *See* AC ¶¶ 30-31.  On November 1, 2022, Dentsply also announced the results of an internal investigation into (1) Dentsply's and its senior managers' use of incentives; (2) separate accounting questions regarding various customer incentive arrangements; and, later, (3) the "increase in returns of products in China during the fourth quarter of 2021" (the "Internal Investigation").  Cooper Decl. Ex. 3 at 1-3.  The Internal Investigation "concluded that there was

no evidence of intentional wrongdoing or fraud," identified no intentional misstatements by the Company or senior management, *id.* at 3, and identified only minor inaccuracies in two of Dentsply's prior SEC filings, which it promptly corrected.

## II.    Plaintiffs' Allegations

Plaintiffs brought this action against Dentsply, Casey, and Gomez for securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, alleging that Defendants engaged in a "channel stuffing" scheme and made intentional misstatements regarding this alleged scheme. *See generally* AC ¶¶ 1-23.

The Court granted in part (ECF 106, the "Order") Defendants' motion to dismiss the AC (ECF 94), dismissing all of Plaintiffs' claims against Dentsply's former Chief Accounting Officer Ranjit Chadha, all claims under U.S. Securities and Exchange Commission Regulation S-K Item 303, 17 C.F.R. § 229.303, and certain of Plaintiffs' claims that Defendants made misstatements regarding supply chain disruptions, the success and drivers of Dentsply's digital sales, dealer inventory levels, Dentsply's growth positioning, and Dentsply's governance policies and ethical commitments as non-actionable opinions or puffery. Order at 6-8, 11, 14.

Plaintiffs' theory of economic harm rests on their allegation that they purchased Dentsply stock at "artificial[ly] inflat[ed]" prices and that the alleged inflation "came out of the stock price over time" as "the relevant truth and its impact on Dentsply's financial results and prospects entered the market through a series of partial disclosures." AC ¶ 262. Plaintiffs assert that this "relevant truth" and its impact entered the market in a series of loss-causing events and related disclosures, each of which was allegedly "tempered by Defendants' ongoing scheme as well as the misleading statements and omissions that continued to conceal the true nature and impact of" the same, such that each purportedly loss-causing event or disclosure "did not on its own fully remove the inflation from Dentsply's stock price." *Id.* ¶ 263. As the Court acknowledged in the

4

Order, "Plaintiffs say the five loss-causing events here fit the materialization category," in contrast to the theory that "the market reacted negatively to a corrective disclosure of the fraud." Order at 15 (citing *Carpenters Pension Tr. Fund v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014)).  That is, Plaintiffs' theory rests on their assertion that "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."  *Id.* (citing *Carpenters Pension Tr. Fund v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014)).

In particular, Plaintiffs allege the following five loss-causing events or disclosures reflected the materialization of allegedly foreseeable risks that led (in part) to drops in Dentsply's stock price:

- Dentsply's **February 28, 2022** announcement of lower-than-expected earnings and growth projections, AC ¶ 265, and a drop in stock price from $58.69 on February 25 to $54.14 on February 28, *id.* ¶ 268;

- Dentsply's **April 19, 2022** announcement of lower-than expected preliminary financial results, which Plaintiffs assert "was due *in substantial part* to lower demand" related to alleged product issues and at-capacity dealer inventories, and that Defendant Casey had been terminated as CEO and Director, *id.* ¶ 270 (emphasis added), with a stock price drop from $48.72 on April 18 to $42.20 on April 19, *id.*;

- Dentsply's **May 10, 2022** filing of a Notification of Late Filing and announcement of the Internal Investigation, *id.* ¶ 272, and of lower-than-expected sales and first quarter earnings, *id.* ¶ 273, followed by a stock price drop from $39.25 on May 9 to $36.38 on May 10, *id.* ¶ 276;

- Dentsply's **November 1, 2022** announcement of the results of the Internal Investigation.  *Id.* ¶ 277.  Unlike the other alleged loss-causing events, Plaintiffs do not allege

5

Dentsply's stock price dropped the same day—nor could they, as Dentsply's stock price experienced a *positive* residual return on November 1.  *See* Zurek Report ¶ 76.  Rather, Plaintiffs allege "the market digested Dentsply's" disclosures "[o]ver the next two days," purportedly resulting in a stock price drop from $31.00 on November 1 to $26.83 on November 3. AC ¶ 278; and

- Dentsply's **November 14, 2022** announcement of its financial results for the third quarter of 2022 and below-expectation guidance, *id.* ¶ 279, followed by a stock price drop from $32.05 on November 11 to $30.35 per share on November 14.  *Id.*

### III.    Plaintiffs' Motion for Class Certification and the Cain Report

On November 15, 2024, Plaintiffs moved for certification of a class consisting of "[a]ll persons and entities who purchased the publicly traded common stock of Dentsply [] between June 9, 2021 and November 13, 2022, inclusive (the 'Class Period'), and were damaged thereby."  Motion at 1.  The Motion summarily asserts that "damages can be calculated using the same methodology – the out-of-pocket measure – for all Proposed Class members."  In support of this conclusion, Plaintiffs submitted the report of Matthew D. Cain, Ph.D.

Dr. Cain was asked to opine on two issues:  (1) whether the market for Dentsply common stock was efficient during the proposed Class Period, Cain Report ¶ 1; and (2) "whether per-share damages for traders of Dentsply Common Stock can be assessed for all Class members based upon a methodology common to all Class members and consistent with Plaintiffs' theories of liability."  *Id.* ¶ 95.  Dr. Cain's Report is primarily focused on the former issue, *see id.* ¶¶ 20-94, and gives short shrift to the second.  *See id.* ¶¶ 95-111.  As to the second issue, Dr. Cain suggests that the "out-of-pocket" method of calculating damages can be applied on a class-wide basis, *id.* ¶ 95, noting that this method requires "quantification of artificial inflation per share" *id.*

¶ 99, and acknowledging that both confounding information and the evolving nature of inflation over time can complicate this "quantification." *Id.* ¶¶ 100-101.

Crucially, however, Dr. Cain does not opine on the second half of the second question Plaintiffs asked him to consider—whether his proposed damages methodology is "***consistent with Plaintiffs' theories of liability***." Instead, he merely "conclude[s] that Common Stock damages in this case can be calculated using a standard and well-established methodology applied on a class-wide basis" without ***any*** reference to Plaintiffs' theory of liability. Cain Report ¶ 111. But in failing to address Plaintiffs' specific theory, Dr. Cain is entirely silent as to how his proposed damages methodology would or could work ***in this case***. For example, Dr. Cain suggests that "various accepted methodologies" could determine the impact of "confounding information" and proffers five different approaches. *Id.* ¶ 100 (suggesting "event study analysis, valuation analysis, analyst reports, principles of finance and valuation analysis, and peer-reviewed academic research" could address "confounding information"). And he lists several "frequent method[s]" for calculating the "evolution of inflation," such as "constant dollar inflation," "constant percentage inflation," or another method such as "valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents." *Id.* ¶¶ 102-104. But Dr. Cain does not opine on which of these approaches (if any) would fit with Plaintiffs' specific theory of liability here—which is premised on the alleged materialization of a purportedly foreseeable risk across five allegedly loss-causing events and disclosures, over a nearly eight-month period. *See* Order at 15.

## **LEGAL STANDARD**

Plaintiffs bear the burden of proving, by a preponderance of the evidence, each of the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of

7

representation—as well as Rule 23(b)(3)'s requirements that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *In re Petrobras Secs.*, 862 F.3d 250, 260 (2d Cir. 2017). Rule 23 is not a "mere pleading standard"; the Court must be satisfied, "after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," and that Rule 23(b)(3)'s predominance criterion—which is "even more demanding than Rule 23(a)"—has been met. *Comcast*, 569 U.S. at 33-34. Plaintiffs must also establish that a damages model "supporting [their] damages case [is] consistent with [their] liability case[.]" *Id.* at 35.

## ARGUMENT

### I.    Plaintiffs Fail To Satisfy Their Burden To Come Forward With a Damages Methodology Consistent with Their Theory of Liability.

Class certification should be denied for failure to satisfy Rule 23(b)(3) because Plaintiffs have not shown that they will be able to calculate the class-wide damages that are allegedly attributable to their theory of liability under *Comcast*. To satisfy Rule 23(b)(3)'s predominance requirement, Plaintiffs must demonstrate that their alleged damages are measurable on a class-wide basis using a common methodology that is consistent with their theory of liability. *Comcast*, 569 U.S. at 35. This means "that a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Id.* "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* *Comcast* and its progeny are clear that, "where an expert's model is the basis for a plaintiff's claim of classwide impact … a court is ***obliged*** to rigorously examine the soundness of that model at the class certification stage" and may only certify a class "where the Court finds the model

8

methodologically sound." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 6, 46 (S.D.N.Y. 2020). The damages model proposed by Plaintiffs' expert Dr. Cain does not satisfy this requirement.

### A. The Cain Report's Failure to Address Plaintiffs' Theory of Liability or the Facts of this Case Leaves Significant Gaps in Plaintiffs' Damages Theory.

Although Dr. Cain acknowledges that he was asked both to "opine on whether pre-share damages for traders of Dentsply Common Stock can be assessed for all Class members based upon a methodology **common** to all Class members and **consistent with Plaintiffs' theories of liability**," Cain Report ¶ 95 (emphasis added), Dr. Cain makes no attempt to address the latter issue. He states that the "out-of-pocket" methodology can be used "formulaically" on a class-wide basis as a general matter but stops short of explaining whether or how such a methodology would work **in this particular case based on Plaintiff's theory of liability**. This failure means the Cain Report does not address several unique concerns that arise here, including how (if at all) "out-of-pocket" damages can be reliably measured in cases, like this one, premised on a "materialization of the risk" theory, particularly where Plaintiffs allege the "risk" "materialized" gradually over time.

**Dr. Cain Does Not Account for Mismatches Between the Alleged Misstatements and the Loss-Causing Disclosures.** Plaintiffs allege that Defendants made misrepresentations concealing, among other things, risks to Dentsply's financial performance related to supply chain disruptions, dealer inventory levels, and corporate governance. AC ¶ 98. Yet many of the events that they allege partially caused drops in Dentsply's stock price constitute highly specific earnings reports and projections that do not relate to these purportedly concealed, unknown risks. *Compare* AC ¶¶ 265-66 (Defendants reported lower-than-expected earnings and projections attributed "primarily to supply chain issues" on February 28, 2022) *with* AC ¶¶ 267-68 (asserting

9

Dentsply's stock price remained inflated due to alleged misstatements regarding dealer inventory and that the February 28 report only "remov[ed] *some of* the artificial inflation") (emphasis added).

This is important because "[a]s an economic matter … this type of mismatch implies that any stock price decline in response to the subsequent disclosures identified by Plaintiffs would not generally be a reliable measure of inflation in the stock price at an earlier time." Zurek Report ¶ 46. As Dr. Zurek explains, "a company-specific price decline due to the resolution of uncertainty," such as the risk materialization Plaintiffs allege here, could reliably measure inflation "when the eventual disclosure is not a true resolution of 'uncertainty' at all but rather the disclosure of a specific outcome that was foreseeable *with certainty*." Zurek Report ¶ 54 (emphasis added). While Plaintiffs allege that Defendants' purported misstatements concealed risks to Dentsply's future financial performance, they do not allege that these risks or the outcomes were *certain* at the time the alleged misstatements were made. Opinion at 16; Zurek Report ¶ 48.

This distinction is important because a "company-specific price decline representing the materialization of a previously undisclosed or under-disclosed risk *does not* measure the amount of inflation removed due to the allegedly insufficient disclosure of that risk earlier in time." Zurek Report ¶ 50 (emphasis added). If, for example, a company were to disclose an adverse development that represented a risk (but not a certainty) of a negative development happening in the future, the market would adjust to address the likelihood and severity of the risk—assessing, in Dr. Zurek's hypothetical, a "50% probability of a $100 million valuation decline (severe case) and a 50% probability of a $20 million valuation decline (moderate case), with an expected value of $60 million." *Id.* ¶ 52. Were the severe case to subsequently occur, the market would then

10

only assess a $40 million decline—because it had already factored in the $60 million risk. *Id.* ¶ 53.  If the company ***hadn't*** disclosed the risks, an expert employing an event study to analyze the "inflation" in the stock would simply look at the $100 million decline and thus overstate the inflation resulting from the failure to disclose by $40 million; this is because if the risk had been appropriately disclosed at the time this hypothetical company knew about it, its value would only have declined by $60 million at that time, representing the potential outcomes adjusted by their probability of occurring.  *Id.* ¶¶ 53-54.

Although this scenario presents itself in this case, and indeed is further complicated by Plaintiffs' series of ***five*** different alleged loss-causing disclosures, Dr. Cain makes no effort to address the mismatches between the alleged misstatements, these disclosures, and the alleged "materialization of the risk" they represent.  And although he states that inflation is often calculated "utilizing an event study," he stops short of promoting an event study's applicability in this case—tellingly, despite having conducted an event study "to assist with [his] evaluation of market efficiency."  Cain Report ¶ 99 n.92.  Dr. Cain's hesitancy makes sense in light of the Supreme Court's warning in *Goldman* that the inference that "the back-end price drop equals front-end inflation"—*e.g.*, what an event study analyzes—"starts to break down when there is a mismatch between the contents of the misrepresentation and the" disclosure.  *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021).  Dr. Cain does not opine that this or any specific method will work in this case.

**Dr. Cain Provides No Method To Quantify Inflation.**  As Dr. Cain notes, "the quantification of artificial inflation per share" is a necessary input to the "out-of-pocket formula."  Cain Report ¶ 99.  But Dr. Cain does not describe a means by which he would quantify artificial inflation, particularly in light of the above complexity in Plaintiff's theory of

11

liability.  He suggests multiple paths to calculating artificial inflation in light of "confounding information" that ***could*** work (*e.g.*, "an event study analysis, valuation analysis, analyst reports, principles of finance and valuation analysis, and peer-reviewed academic research"), but offers no opinion that any of these actually align with Plaintiffs' theory of liability in this case.  *Id.* ¶ 100.  The mere potential that one of these methods could work is not enough.  As Dr. Zurek attests, "[e]conomic theory provides no 'off-the-shelf' tools that can be used to compute inflation without taking into account the particular circumstances of a given litigation."  Zurek Report ¶ 39.  Dr. Cain fails to present a theory that addresses the particular circumstances here.

And the circumstances here are far from straightforward.  As this Court has stated, Defendants ***did*** disclose at least some of the risks that materialized in connection with Plaintiffs' asserted loss-causing disclosures.  Order at 16; *see* Zurek Report ¶¶ 69-73.  Dr. Cain provides no method by which an event study, or indeed, any of his other proposed methods, could separate the materialization of disclosed risks from the materialization of undisclosed risks to arrive at the alleged "artificial inflation."  Nor is it clear that an event study could do this work, as discussed above.  Despite acknowledging that "artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements," Cain Report ¶ 103, Dr. Cain fails to discuss how he would measure such variation in a way that is consistent with the facts and theory in this case.  *See* Zurek Report ¶ 73.

**The Cain Report Provides No Means to Measure the Impact of Risks that Materialized Over Time**.  Nor does Dr. Cain propose a methodology that would address the alleged trickle of information over nearly eight months, from February 2022 through November 2022.  This leaves the finder of fact with no means by which to determine what portion of a given price decline resulted from the "new" materialization of purportedly undisclosed risks

rather than to already-disclosed risks or the continued impact of risks that had already materialized. *See* Zurek Report ¶¶ 57-68. He does not say how, for example, one could separate any portion of Dentsply's November 14, 2022 report regarding third quarter 2022 earnings that reflected "new" information from the lowered earnings projections and guidance that Plaintiffs claim constituted the materialization of risks in earlier loss-causing disclosures. *Id.* ¶ 67. Instead, Dr. Cain broadly alludes to several "frequent method[s]" for calculating the "evolution of inflation," such as "constant dollar inflation," "constant percentage inflation," or another method such as "valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents." Cain Report ¶¶ 102-104. But he stops well short of opining that he could or would employ any of these methods in this case, let alone that any method would be effective here—despite the need created by Plaintiffs' theory of liability to determine this evolution over time.

**Plaintiffs' "Delayed Reaction" Theory Regarding Dentsply's November 1, 2022 Form 8-K is Inconsistent with Dr. Cain's "Market Efficiency" Opinion.** Dr. Cain opines that Dentsply shares traded in an efficient market. Cain Report ¶ 29. However, the Cain Report entirely ignores that Dentsply's residual stock return on November 1, 2022, one of Plaintiffs' five alleged loss-causing disclosure dates, was ***positive***. *See* Zurek Report ¶ 76. This is important, because Dr. Cain's methodology does not appear equipped to reliably measure the inflation removed (if any) from Dentsply's stock price where the stock price increased on the day in question. *Id*.

To the extent Dr. Cain claims, as Plaintiffs do, that inflation should be estimated based on the return over a three-day period following this alleged loss-causing event, Dr. Cain has not explained why such an approach is appropriate for this (but not other) dates at issue. Nor has he

explained how such an approach would square with his opinion that Dentsply shares traded in an efficient market, which Dr. Cain acknowledges implies that "the market price of securities begins to ***respond quickly to publicly available information***." Cain Report ¶ 23 (emphasis added). This opinion is entirely inconsistent with Plaintiffs' "delayed reaction" measure of price impact, and neither Plaintiffs nor Dr. Cain address this disconnect. Dr. Cain "does not propose any methodology for determining the appropriate event window to assess any stock price impact of the other disclosures identified by Plaintiffs as having revealed the alleged truth in this matter," Zurek Report ¶ 78, let alone one capable of grappling with this question consistently across all five alleged loss-causing dates.

The silence of Plaintiffs and Dr. Cain as to the impact of their selective delayed reaction theory leaves essential questions unanswered. Could a share purchase on November 2, 2022 still be made in reliance on the alleged misstatements Plaintiffs claim concealed risks that materialized the day before? How will Dr. Cain's model address inflation across this three-day period? Even if the stock price was trending downwards, Dr. Cain does not say how he would isolate the portion of this movement reflecting inflation, let alone whether or how he would determine how much inflation declined on any given day.

Tellingly, Dr. Cain is silent as to why this delayed reaction theory should apply to the November 1 disclosure but not to other alleged loss-causing events. This highlights the problem with Dr. Cain's report, as application of a similar three-day event window to the May 10, 2022 and November 14, 2022 events "would find no statistically significant price declines" at all. *Id.*; Zurek Report Ex. 2. But Dr. Cain does not address this issue or explain why using a three-day window in one instance is appropriate but not in others. Nor does he address the fact that Dentsply released information related to the restatement and its financial performance on

14

multiple November dates, in addition to the two Plaintiffs identify in the AC, *see* Zurek Report ¶ 79 n. 140, and that the "cumulative abnormal return computed over this two-week period [from November 1, 2022 through November 14, 2022]…is not statistically significant," regardless of whether one limits the analysis to "dates during this period with releases of company-specific information." Zurek Report ¶ 79; *see* Zurek Report Ex. 3. Dr. Cain simply "fails to explain how he would deal with this additional complication when ultimately calculating damages." *Id.* ¶ 79.

Without answers to these essential questions, the Cain Report provides no assurances that damages can be measured across the class in a manner consistent with Plaintiffs' theory of liability.

**Dr. Cain Does Not Address How To Measure Confounding Information.** Plaintiffs concede that confounding information played a role in the stock price drops they allege, *see* AC ¶ 270 (asserting Dentsply's financial performance, announced on April 19, 2022, "was due *in substantial part* to lower demand" concealed by the alleged misstatements), and Dr. Cain acknowledges that the calculation of inflation can be complicated by confounding information. Cain Report ¶ 100. But Dr. Cain has not opined as to whether any methodology would be able to disaggregate the price impact of potentially confounding information in this case. Instead, he makes vague reference to "various accepted methodologies" that he claims *could* work. *Id.* Again, this type of "wait-and-see" approach is entirely inconsistent with *Comcast*'s requirements.

**B. Plaintiffs' Deficient Damages Methodology Is Properly Addressed Now.**

Plaintiffs cannot wait until the end of the case to find out whether their expert's damages methodology will actually align with the theory of liability they seek to prove. "As *Comcast* makes clear, the failure of a model purporting to serve as evidence of impact and damages to measure only those damages attributable to plaintiffs' theory is very much a problem germane to

15

class certification, and not merely a merits issue common to the class." *Aluminum Warehousing*, 336 F.R.D. at 55 (citations omitted). For just this reason, courts in this district have denied class certification where experts would not commit to a particular methodology, *see Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.* 301 F.R.D. 116, 142 (S.D.N.Y. 2014), or failed to provide sufficient damages models, *see Aluminum Warehousing*, 336 F.R.D. at 51 (without a sufficient damages methodology, the plaintiffs "lack classwide proof of injury and causation").

None of the case law cited by Plaintiffs approves of their proposed methodology where, as here, the theory of liability is premised on materialization of risks rather than "the market react[ing] negatively to a corrective disclosure of the [alleged] fraud." Order at 15. *Sykes v. Mel S. Harris and Associates LLC*, which Plaintiffs rely on to support their "wait and see" approach, is inapposite here. 780 F.3d 70, 87-88 (2d Cir. 2015). In *Sykes*, the Second Circuit accepted a liability model that was "uniquely tied to the damages," which were tied to statutory caps under relevant state and federal laws. *Id.* The *Sykes* court expressly distinguished that case from one in which plaintiffs advanced a theory of liability (like Plaintiffs' materialization theory here) that "the plaintiffs' model indisputably 'failed to measure' when determining the damages for that injury." *Id.* at 88. Likewise, the court in *In re Barrick Gold Securities Litigation* expressly entertained "defendants' suggestion that out-of-pocket damages," which Dr. Cain proposes here, "are inappropriate for materialization of the risk claims." 314 F.R.D. 91, 106 (S.D.N.Y. 2016). That court only certified the class because it concluded that the plaintiffs did ***not*** advance a materialization of the risk theory, but rather a "corrective disclosure theory." *Id.* Here, because Plaintiffs expressly advance the former, *see* Order at 15, their proposed out-of-pocket methodology is inapplicable.

Plaintiffs of course do not need to conduct a full damages analysis at this stage of the

16

litigation.  But they must demonstrate **with evidence** how their damages methodology "directly measure[s]" the harm they allege to have suffered.  *Cf Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017) (damages model sufficient for class certification where plaintiffs' approach of "examining the drop in price that occurred when" the alleged harm came to light directly responded to their theory of liability); *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *22 (S.D.N.Y. Jan. 26, 2021) (damages model sufficient where expert used an event study that explicitly "considered any company-specific non-fraud related information disseminated on those dates" and "removed any negative valuation" resulting from the "confounding information" to establish a connection between alleged corrective disclosures and stock price drops); *In re Vale S.A. Sec. Litig.*, 2022 WL 969724, at *6 (E.D.N.Y. Mar. 31, 2022) (accepting expert's "four-step [damages] model" where it "track[ed the plaintiff's] theory of liability").

Unlike in these other cases, neither Plaintiffs nor their expert "even attempt to" isolate the alleged harm attributable to their theory of liability, and thus "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35; *see Fernandez v. UBS AG*, 2018 WL 4440498, at *22 (S.D.N.Y. Sept. 17, 2018) ("because plaintiffs propose no damages model at all that is linked to their theory of liability … the measure of damages is yet another issue subject only to individualized proof") (cleaned up).  Other courts have rejected Dr. Cain's damages opinion and denied class certification for this exact reason.  In *In re Vaxart Securities Litigation*, the court identified "problems with the plaintiffs' damages model" because "the plaintiffs have offered no guidance on how their expert would discern the waning effect of the fraud on the stock price as the level of artificial inflation gradually dissipated."  2024 WL 3269448, at *6 (N.D. Cal. July 2, 2024).  In *Vaxart*, the plaintiffs submitted a substantially similar opinion from Dr. Cain as to the calculation

17

of damages as in this case.  *Compare* Cooper Decl. Ex. 4 at ¶¶ 123-136 *with* Cain Report ¶¶ 96-105.]  The *Vaxart* court held that Dr. Cain's failure to address how he would measure inflation meant that Plaintiffs "failed to show that damages can be measured on a class-wide basis," and denied certification.  2024 WL 3269448 at *6.[2]  Given that Dr. Cain has committed virtually identical failures in this case, class certification is properly denied on this basis.

### CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Class Certification and Appointment of Class Counsel.

---

[2] *See also Bratya SPRL v. Bed Bath & Beyond Corp*, 2024 WL 4332616, at *19-20 (D.D.C. Sept. 27, 2024) (describing Dr. Cain's event study methodology as "suspect" because Dr. Cain "did not use objective criteria" in selecting dates for his event study and used a "malleable definition" in which the court had "little confidence," and concluding that Dr. Cain's methods "cast doubt on the accuracy of his conclusions").

18

Pursuant to section 8.5(b) of the Electronic Case Filing Rules & Instructions for the United States District Court for the Southern District of New York, the use of conformed electronic signatures is with the consent of all signatories to this filing.

Dated: December 20, 2024
      New York, New York

Respectfully submitted,

/s/ Roger A. Cooper
Roger A. Cooper
Mark E. McDonald
Andrew W. Weaver
racooper@cgsh.com
memcdonald@cgsh.com
aweaver@cgsh.com
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: 212-225-2000
F: 212-225-3999

*Counsel for Defendant Dentsply Sirona Inc.*

/s/ Meredith Karp
Bryce L. Friedman
Craig S. Waldman
Meredith Karp
bfriedman@stblaw.com
cwaldman@stblaw.com
meredith.karp@stblaw.com
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017-3954
T: 212-455-2000
F: 212-455-2502

*Counsel for Defendant Donald M. Casey, Jr.*

/s/ Chad P. Albert
Seth L. Levine
Chad P. Albert
Allison S. Markowitz
Adam M. King
slevine@levinelee.com
calbert@levinelee.com
amarkowitz@levinelee.com
aking@levinelee.com
LEVINE LEE LLP
400 Madison Avenue
New York, NY 10017
T: 212-223-4400

*Counsel for Defendant Jorge Gomez*