# EXHIBIT 1
# [Redacted]

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAN ANTONIO FIRE AND POLICE PENSION FUND et al.,<br>Plaintiffs,<br><br>v.<br><br>DENTSPLY SIRONA INC. et al.,<br>Defendants. | Case No. 1:22-cv-06339<br><br><u>CLASS ACTION</u> |

EXPERT REPLY REPORT OF MATTHEW D. CAIN, PH.D.

February 28, 2025

# CONFIDENTIAL

**Table of Contents**

I.      Introduction.................................................................................................................1

II.     Summary of Opinions..................................................................................................2

III.    Background on the Fraud-on-the-Market Theory and Stock Prices...........................5

IV.     The Out-of-Pocket Methodology is Widely Accepted by Courts at the Class
        Certification Stage and Dr. Zurek's Concerns About Specific Levels of Artificial
        Inflation will be Addressed at the Merits Stage .........................................................7

    A.  Dr. Zurek Mischaracterizes Plaintiffs' Theory of Liability, and the Out-of-Pocket
        Methodology is Capable of Addressing Materializations of Risks..............................8

    B.  The Out-of-Pocket Methodology is Capable of Addressing Confounding
        Information.................................................................................................................13

    C.  The Out-of-Pocket Methodology is Capable of Addressing Changes in Artificial
        Inflation Over the Class Period .................................................................................14

V.      Dr. Zurek's Opinion on a Mismatch Between the Alleged Misrepresentations and
        Alleged Corrective Disclosures Lacks Foundation and is Unpersuasive...................15

    A.  Economic Connection Between the Alleged Misrepresentations and Corrective
        Events..........................................................................................................................16

    B.  Analysts Reports Further Demonstrate there is no Mismatch Between the Alleged
        Misrepresentations and Corrective Disclosures.........................................................21

    i.    Analyst References to Alleged Misrepresentations.................................................. 21

    ii.   February 28, 2022 Corrective Disclosure ............................................................... 25

    iii.  April 19, 2022 Corrective Disclosure ..................................................................... 26

    iv.   May 10, 2022 Corrective Disclosure....................................................................... 28

    v.    November 1, 2022 Corrective Disclosure................................................................ 29

    vi.   November 14, 2022 Corrective Disclosure.............................................................. 31

VI.     The Corrective Disclosure Events Were Followed by Statistically Significant
        Declines in Dentsply's Common Stock Prices ...........................................................34

VII.    Conclusion ................................................................................................................38

Appendix A.................................................................................................................................39

Appendix B.................................................................................................................................46

## I.    Introduction

1.    On November 15, 2024, I submitted an expert report in this matter (my "Opening Report"), in which I concluded that the market for Dentsply Common Stock was efficient throughout the Class Period. I also concluded that damages can be calculated on a class-wide basis subject to a common methodology in this matter on Plaintiffs' claims under §10(b) and §20(a).[1]

2.    Following the submission of my Opening Report, Counsel for Plaintiffs provided me with the December 20, 2024 Expert Report of Dr. Paul Zurek ("Zurek Report"). I have been asked to review, evaluate, and respond to the opinions in that report. I have also been asked to respond to certain characterizations of my Opening Report opinions contained within Defendants' Memorandum of Law in Opposition to Plaintiffs' Updated Motion for Class Certification ("Defendants' Opp. Brief").

3.    My qualifications and rate of compensation for work in this matter were identified in my Opening Report and I do not repeat them here. I have attached an updated version of my curriculum vitae as **Appendix A**.

4.    In formulating my opinions set forth in this Expert Reply Report, I have relied upon the analyses already described in my Opening Report, as well as my knowledge, experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts set forth in this matter. All of the materials I have considered in forming my opinions are identified in **Appendix B** to this Reply Report, in addition to those previously identified in Appendix B to my Opening Report.

5.    I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

---

[1] Opening Report, ¶¶ 3, 112, and Sections V and VI. I continue to hold the opinions expressed in my Opening Report and reiterate them here. Capitalized terms in this report have the same meaning as in my Opening Report.

## II.    Summary of Opinions

6.        Nothing in the Zurek Report disturbs the opinions expressed in my Opening Report. There are a number of important opinions I express in my Opening Report that Dr. Zurek does not dispute. First, Dr. Zurek does not dispute my conclusion that Dentsply Common Stock traded in an efficient market throughout the entirety of the Class Period. In my Opening Report, I tested Dentsply Common Stock market efficiency by evaluating the *Cammer* and *Krogman* factors.[2] Dr. Zurek does not dispute my analyses of or my conclusions regarding *any* of these factors.

7.        Second, Dr. Zurek does not offer any criticism of the event study regression specified in my Opening Report. Dr. Zurek does not perform his own event study, nor does he dispute that I performed a valid event study regression that controls for market and industry effects that accurately measures the abnormal returns exhibited by Dentsply's Common Stock during the Class Period and on the alleged corrective disclosure dates.  He also does not dispute that an event study regression, like the one I conducted in my Opening Report, is one of the economically valid methods for conducting a loss causation and damages analysis.

8.        Third, Dr. Zurek does not dispute that the damages methodology (*i.e.*, the out-of-pocket method) that I detail in my Opening Report is standard, reasonable, and relied upon in virtually all securities class action matters alleging fraud claims under Section 10(b) of the Exchange Act.[3] Nor does he articulate any alternative methodology that would be more suitable in this matter.

9.        However, Dr. Zurek claims that I have failed to adequately provide a methodology to measure class wide damages consistent with Plaintiffs' theory of liability. He purports to

---

[2] Opening Report, Section V.

[3] Opening Report, Section VI.

identify several flaws in the damages methodology I have identified. First, he asserts that the out-of-pocket damages methodology does not address Plaintiffs' alleged theory of liability, including any potential materializations of risk, and that my explanation of the methodology fails to adequately explain how to control for potential confounding information. He also speculates that broader market and macroeconomic conditions affecting Dentsply may have evolved throughout the Class Period and that, as a result, artificial inflation related to Plaintiffs' claims could vary over time. He asserts my methodology fails to explain how to control for such changes. Second, he claims there is a "mismatch" between the alleged misrepresentations and the alleged truth revealed by the corrective disclosures. Third, he speculates about how I might measure the dissipation of artificial inflation over several days following the November 1, 2022 alleged corrective disclosure, and he claims that similar multi-day windows following the May 10 and November 14, 2022 alleged corrective disclosures indicate a lack of statistically significant Dentsply Common Stock price declines.

10.    Each of Dr. Zurek's concerns are unpersuasive. As an initial matter, Dr. Zurek speculates about hypothetical examples that have nothing to do with Plaintiffs' theory of liability in this matter. He raises questions about calculations of artificial inflation and confounding information in cases involving misrepresentations as to the degree of risk that some future event might occur. I explain that in this matter, Plaintiffs' theory of liability involves allegations that Defendants misrepresented the state of Dentsply's business that existed at the time Defendants spoke. I also explain that the out-of-pocket damages methodology will reasonably address any potential confounding information or changes in artificial inflation at the loss causation and damages stage, based on a merits-based inquiry.

11.    What Dr. Zurek describes as potential changes over time in broader market and macroeconomic conditions affecting Dentsply have nothing to do with how the out-of-pocket damages framework fits Plaintiffs' liability theory or its uniform applicability to all class members. Rather, his speculative concerns relate to circumstances that may later implicate the precise amount of artificial inflation that a jury or finder of fact attributes to Defendants' misconduct, and thus determines was present in Dentsply Common Stock throughout the Class Period. These concerns are not unique to this case, but rather are common in securities litigation matters and are addressed in a loss causation and damages analysis following merits discovery. As I detail below, parsing out broader market and macroeconomic conditions will be conducted on a class-wide basis with common information at the loss causation and damages stage, and there are well-accepted valuation techniques to address these questions at that stage based on a detailed merits-based inquiry.[4]

12.    Second, I demonstrate that there is not a mismatch between the relevant truth that was allegedly misrepresented at the start of and during the Class Period and the information that was allegedly revealed to investors through the corrective disclosures. The economic connection between the alleged misrepresentations and omissions and the corrective information is further supported by: a) fundamental principles of finance and economic analysis, b) internal case documents, and c) analyst discussions, forecast changes, price target changes, and recommendation changes which explicitly reference the same economic information pertaining to the alleged misrepresentations and the resulting alleged corrective disclosures.

13.    Third, I explain that Dr. Zurek's concerns about how the dissipation of artificial inflation will be measured will appropriately be addressed at the loss causation, damages, and

---

[4] Opening Report, Section VI.

merits stage. I also show that his concerns about the measurement of statistical significance over single days versus multiple days are misguided. I demonstrate through my event study analysis that all five of the alleged corrective disclosures were followed by statistically significant declines in Dentsply's Common Stock prices.

14.     Relatedly, Defendants' Opp. Brief claims that the court in *In re Vaxart Securities Litigation* "rejected Dr. Cain's damages opinion and denied class certification" due to problems with my damages model and that I have "committed virtually identical failures in this case."[5] This is incorrect: in its "Order Granting Motion for Class Certification" filed on December 17, 2024, the court granted class certification in *In re Vaxart, Inc. Securities Litigation* and stated:

> "the defendants' argument still fails because it amounts to an argument that the plaintiffs have failed to establish loss causation, and 'plaintiffs do not need to prove loss causation at the class certification stage.' *Sayce v. Forescout Technologies, Inc.*, 2024 WL 2750003, at *11 (N.D. Cal. May 28, 2024). Here too, if the jury finds that some or all of Vaxart's price declines were not the result of corrective disclosures or leakage of the truth, that finding can be factored into the damages calculation. So whether or not the plaintiffs are right that revelation of the truth caused all of the stock price declines they point to, that issue can be resolved (and damages adjusted accordingly) on a class-wide basis."[6]

15.     As a result, Defendants' Opp. Brief and Dr. Zurek's critiques do not address, much less alter, my opinion that damages in this case can be calculated using a common methodology that is consistent with Plaintiffs' theory of liability.

## III.    Background on the Fraud-on-the-Market Theory and Stock Prices

16.     In my Opening Report, I explained how the fraud-on-the-market theory relates directly to the price of a given security.[7] This theory posits that if a company's stock price reflects

---

[5] Defendants' Opp. Brief, pp. 17-18.

[6] "Order Granting Motion for Class Certification," filed December 17, 2024, *In re Vaxart, Inc. Securities Litigation*, Case No. 20-cv-05949-VC (Doc. 431), at pp. 2-3.

[7] Opening Report, Section IV.

all public widely available information, then all purchasers of that company's stock implicitly rely on any misrepresentations or omissions because those statements or omissions have distorted the value of each investor's purchase price. I further explained how the fraud-on-the-market theory of reliance has been addressed by numerous courts over the years in relation to claims made under Section 10(b) of the Exchange Act and was adopted by the U.S. Supreme Court in *Basic* and reaffirmed in its *Halliburton II* decision.

17. I analyzed the *Cammer* and *Krogman* factors relating to Dentsply Common Stock in my Opening Report, and I ultimately found that these factors support a conclusion of market efficiency.[8] Thus, it follows that purchasers of Dentsply Common Stock implicitly relied on Defendants' alleged misrepresentations and/or omissions because the value of that information was impounded into the price of Dentsply Common Stock at the time those trades were made. Dr. Zurek does not dispute my analyses of any of the efficiency factors or my conclusion that Dentsply Common Stock traded in an efficient market during the entirety of the Class Period.

18. As part of the analysis in my Opening Report, I performed an event study to analyze the stock price movements for Dentsply Common Stock throughout the Class Period. To perform the event study, I used a regression analysis to measure the relationship between Dentsply's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks, and (2) changes in industry-wide factors that would be expected to impact stocks in Dentsply's industry. By modeling how Dentsply's stock price returns moved relative to an overall market index and an industry index, I am able to measure its "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide effects.

---

[8] Opening Report, Section V.

19.     Dr. Zurek offers no criticisms of my event study methodology. Nor does he dispute that it accurately measures the abnormal returns exhibited by Dentsply Common Stock during the Class Period and on the alleged corrective disclosure dates. My event study shows that there were statistically significant price declines in Dentsply Common Stock – after controlling for market and industry effects – following each of the five alleged corrective disclosures.[9]

20.     In the following section, I explain how the out-of-pocket methodology, which routinely incorporates artificial inflation estimates derived from event study analyses, is widely accepted by courts at the Class certification stage.

## IV.     The Out-of-Pocket Methodology is Widely Accepted by Courts at the Class Certification Stage and Dr. Zurek's Concerns About Specific Levels of Artificial Inflation will be Addressed at the Merits Stage

21.     In addition to not challenging my opinions of market efficiency or my event study methodology or analysis, Dr. Zurek does not challenge the opinion in my Opening Report that the out-of-pocket method of calculating damages represents a standard and well-accepted methodology under Section 10(b) of the Exchange Act. As I explain in my Opening Report, the out-of-pocket methodology calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale.[10]

22.     Rather than taking issue with the out-of-pocket methodology, Dr. Zurek expresses concerns that I have not provided the specific approach that I will use to calculate the artificial

---

[9] I note that Dr. Zurek criticizes my damages methodology because I have not yet committed to a specific event study and calculation of artificial inflation and damages (Zurek Report at ¶¶ 31, 75). While it is premature to opine on what a loss causation and damages analysis would demonstrate, I would identify, review, evaluate, and empirically analyze all of the events that are alleged as revealing corrective information (including by conducting an event study analysis). This, along with an analysis of the alleged misstatements and omissions in this matter, would allow me to determine the amount of artificial inflation impounded into the stock on each day of the class period that subsequently dissipated out of the price when the market began to learn of the truth. This amount of artificial inflation would apply to every member of the class who purchased on a given day during the Class Period.

[10] Opening Report, Section VI.A.

inflation per share, which is an input to this methodology. Specifically, Dr. Zurek criticizes the damages methodology described in my Opening Report by claiming that I have not adequately explained how I would a) address materializations of risks, b) deal with any potential confounding information, and c) appropriately account for potential changes throughout the Class Period in broader market and macroeconomic conditions affecting Dentsply, COVID-related restrictions in China, foreign exchange rates, and changes in Dentsply's product segments.[11] As I explain below, such concerns relate to specific calculations of artificial inflation which occur at the merits, loss causation, and damages stage.

23.    At this point, it is important to draw a distinction between two concepts that are part of a damages methodology: the damages methodology itself and the *inputs* to the damages methodology. In my Opening Report, I presented the standard well-accepted damages methodology. Further, I make clear in my Opening Report that quantifying artificial inflation per share for each day in the Class Period and the dissipation of artificial inflation through corrective disclosures – the *inputs* to the damages methodology – are questions separate and apart from whether there is a common, class-wide method for computing damages. As discussed in my Opening Report, there are a number of valuation techniques that can be employed to conduct such an evaluation of inputs ultimately used in the damages methodology.[12]

  **A.**  **Dr. Zurek Mischaracterizes Plaintiffs' Theory of Liability, and the Out-of-Pocket Methodology is Capable of Addressing Materializations of Risks**

24.    Plaintiffs allege that as of the start of the Class Period and throughout it, Defendants engaged in a fraudulent scheme, misled investors, and made materially false and misleading statements and omissions relating to: (1) supply chain disruptions, (2) the success and drivers of

---

[11] Zurek Report ¶¶ 52-56; 81-85.

[12] Opening Report, Section VI.A.

product sales (including undisclosed product defects, quality issues, channel stuffing, and accounting fraud), (3) distributor inventory levels, (4) 2021 financial performance, and (5), a growth profile based on "strong underlying fundamentals."[13] To overcome expected revenue shortfalls and to meet both internal performance benchmarks and analyst expectations, Defendants allegedly leaned on their distribution partners to increase revenues.[14] Defendants allegedly offered their distributors substantial incentives (*e.g.*, direct cash payments, rebates, and extended payment terms) to accept more products than they could sell.[15] Plaintiffs further allege that in order to conceal their channel-stuffing and meet performance targets, Defendants manipulated their accounting, including by not recording offsets to revenue from incentives offered to distributors— a violation of Generally Accepted Accounting Principles (GAAP).[16]

25.    I understand that this is not a case premised upon undisclosed (or under-disclosed) prospective risks that were not fully known to Defendants at the time of the alleged schemes. Rather, Plaintiffs' theory of liability involves allegations that Defendants misrepresented the state of Dentsply's business that existed at the time Defendants spoke. For example, the Complaint alleges: "Because of their positions with the Company and their access to material nonpublic information available to them but not to the public, the Individual Defendants knew of and participated in the fraudulent scheme alleged herein, knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public,

---

[13] Complaint ¶¶ 265-269.

[14] Complaint ¶ 5.

[15] Complaint ¶ 6.

[16] Complaint ¶ 7.

and knew and/or recklessly disregarded that the affirmative representations being made were then materially false and misleading." [17]

26.    Dr. Zurek and Def's Opp. Brief address a different theory of liability: one in which the alleged corrective disclosures pertain to previously undisclosed (or under-disclosed) prospective risks that were not fully known to Defendants at the time of the alleged misrepresentations, omissions, and scheme. [18] Def's Opp. Brief points to a hypothetical example in the Zurek Report: A company's management believes there is a risk of a future adverse outcome worth negative $60 million. [19] But the company conceals this negative expectation and thus there is no immediate price impact. Subsequently, an adverse outcome worth negative $100 million materializes, and the company's value declines by $100 million upon the public disclosure. Def's Opp. Brief and Dr. Zurek are concerned that an event study would incorrectly calculate the entirety of this $100 million decline as dissipation of artificial inflation, when in fact, only $60 million of the $100 million decline would represent the estimate of artificial inflation. [20]

27.    However, in such a scenario, a loss causation and damages analysis would reasonably conclude that 40% of the price decline was due to confounding factors (assuming this portion of the decline was truly non-fraud-related), and therefore would need to be disaggregated. Thus, $60 million of the abnormal price decline (60% of $100 million) could be attributed to the alleged corrective information on that date and one would reasonably conclude that $60 million of artificial inflation dissipated from the company's value on that date. Whether a disaggregation

---

[17] Complaint ¶ 35. *See also* ¶¶ 109-110, 117-118, 125-126, 130-131, 135-136, 145-146, 151, 210, 288.

[18] Def's Opp Brief, at pp. 10-11; Zurek Report ¶¶ 52-56.

[19] In the hypothetical example, there is a 50% risk of a $100 million future decline (expected value = 50% * -$100 million = -$50 million), and a 50% risk of a $20 million future decline (expected value = 50% * -$20 million = -$10 million). The sum of these two possibilities equates to an expected value of negative $60 million (-$50 million + -$10 million).

[20] Def's Opp Brief, at pp. 10-11; Zurek Report ¶¶ 52-56.

analysis at the loss causation and damages stage determines that 0%, 40%, or some other percentage of a price decline is due to confounding factors, the resulting artificial inflation can easily be updated and incorporated into the out-of-pocket methodology.

28.    Moreover, Defendants' Opp. Brief and Dr. Zurek's example ultimately entertain a theory of liability that is fundamentally different from Plaintiffs' theory of liability. Dr. Zurek's hypothetical example involves a risk-based false statement, in which a defendant is unsure about the future outcome and value of the truth. In contrast, the alleged misrepresentations in this matter are not probabilistic statements concerning a future risk, but rather alleged misrepresentations involving facts that Defendants allegedly knew had already occurred.[21]

29.    Dr. Zurek's views ultimately relate to questions about the need to separate fraud-related revelations from non-fraud-related information (*i.e.*, confounding information), an exercise that is conducted at the loss causation and damages stage on a complete record. This dynamic raises questions about isolating corrective information from confounding information, if any, on alleged corrective disclosures and how to measure artificial inflation. In my experience, answering these questions requires an exhaustive loss causation and damages merits-based analysis, which I understand is not required at the class certification stage of litigation. These more nuanced issues regarding loss causation and damages (*i.e.*, disaggregating the impact of confounding information) are present in many certified securities class action matters, are routinely the subject of expert discovery during the merits phase of the litigation, and in any event, such analyses are determined based upon proof that is common to all Class members. In other words, the out-of-pocket methodology – which can rely on an event study (such as the one presented in my Opening Report, and which Dr. Zurek does not dispute is reliable) or other valuation techniques – easily

---

[21] Complaint ¶ 35, 109-110, 117-118, 125-126, 130-131, 135-136, 145-146, 151, 210, 288.

accommodates an artificial inflation calculation that controls for any confounding information (including any materializations of risks). I have not done nor need not conduct a robust analysis of loss causation factors or damages at this stage because such an analysis is not necessary to conclude that there is a common methodology for calculating damages on a class-wide basis.

30.     In summary, the fact that Plaintiffs' theory of liability includes an alleged scheme, misrepresentations, and omissions that were disclosed to the market through a series of corrective disclosure events that may legally be characterized as potential materializations of risk has no impact on the damages methodology's ability to quantify artificial inflation throughout the Class Period and measure damages on a class-wide basis at the merits stage. Whether the alleged relevant truth-revealing alleged disclosures are characterized as corrective disclosures or materializations of the risk does not impact the out-of-pocket damages methodology, its reasonableness, its applicability class-wide, or its reliability. The out-of-pocket methodology has been regularly relied upon at the class certification stage (and beyond) as a method for calculating class-wide damages in matters involving both alleged misrepresentations and multiple alleged corrective disclosure events including materialization of risks. It has also been reasonably relied upon even in cases that allege misrepresentations that *are* probabilistic statements about future risks, such as company risk factor disclosures, and assert that the relevant truth is revealed through subsequent materializations of risk.[22]

---

[22] Memorandum Opinion, Civil Action No. RDB-17-0388 filed September 29, 2022, *In Re Under Armour Securities Litigation*, p. 34; Consolidated Third Amended Complaint for Violations of the Federal Securities Laws, Civil Action No. RDB-17-0388 filed October 14, 2020, *In Re Under Armour Securities Litigation*, at ¶ 377: "The truth was not revealed to the market all at once, but, rather, the truth began to emerge, and the ***risk caused by Defendants' fraud materialized, through partial revelations of truthful information***," and at ¶ 404: "These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very ***risks they sought to warn of began to materialize***" (emphasis added); Memorandum Opinion and Order filed March 29, 2018, in *Washtenaw County Employees' Retirement System v. Walgreen Co., et al.*, No. 15-cv-3187 (N.D. Ill.).

**B.      The Out-of-Pocket Methodology is Capable of Addressing Confounding Information**

31.      Dr. Zurek speculates about sources of potential confounding information that may have affected the price of Dentsply Common Stock on the corrective disclosure dates, such as foreign exchange rates, headwinds in China, and broad macroeconomic factors.[23] Addressing potential confounding information is a loss causation and damages issue that is standard practice in economic analysis. As explained in my Opening Report, there are many potential ways to disaggregate confounding information, to the extent any exists – one can utilize a variety of well-accepted valuation techniques including, but not limited to, event studies, valuation analysis, published academic research studies, analyst research, or other case-specific documents. This is an issue of fact that would need to be considered as part of any loss causation and damages analysis. However, Dr. Zurek, without support, suggests that such an analysis needs to be designed and/or explained without regard to what evidence may become available in discovery. If such a disaggregation analysis becomes necessary, the standard damages methodology readily incorporates such issues and would be dependent on the same analysis conducted on a class-wide basis.[24]

32.      Dr. Zurek has not conducted any analysis, nor put forward any evidence, that confounding information in fact impacted Dentsply's Common Stock price movements on any of the alleged corrective disclosure dates. He simply speculates that some of these factors *might* have impacted Dentsply's stock returns. Moreover, to the extent that any such changes ultimately require disaggregation, such analysis is appropriately conducted during the merits, loss causation,

---

[23] Zurek Report ¶¶ 81-85.

[24] *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011) (holding that securities fraud plaintiffs need not prove loss causation in order to obtain class certification).

and damages stage of a case and will be carried out in a manner that is common across all Class members. I also note that, as explained in my Opening Report, event studies reasonably control for changes in market-wide factors through the market index and industry-wide factors through the industry index,[25] and thus Dr. Zurek's speculative concerns are unfounded.

### C.  The Out-of-Pocket Methodology is Capable of Addressing Changes in Artificial Inflation Over the Class Period

33.    Dr. Zurek speculates that artificial inflation may have varied over time due to changes in customer demand and broader market and macroeconomic conditions affecting Dentsply.[26] He has not conducted any analysis of the evolution of artificial inflation in Dentsply's Common Stock over time; he simply speculates that it may have varied over the Class Period.

34.    Dr. Zurek's speculation concerns whether case-specific adjustments may ultimately be needed at the *merits* stage and not at the class certification stage of litigation. Dr. Zurek fails to provide any foundation for his assertion that such a methodology must be specified at an earlier stage of litigation and he does not suggest that the methodology could not be applied consistently to all class members. His speculative concerns relate to loss causation and damages issues that are addressed in the merits stage of a case – including whether a jury or finder of fact determines that artificial inflation was caused by Defendants' misconduct, and if so, calculating the amount of artificial inflation the misconduct caused in Dentsply's Common Stock throughout the Class Period.

35.    I explained in my Opening Report that a loss causation and damages analysis is capable of assessing how artificial inflation evolved over a Class Period:

> In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these

---

[25] Opening Report ¶¶ 62-69.

[26] Zurek Report ¶¶ 69-73.

approaches, the calculations of artificial inflation and any potential disaggregation of confounding information are based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents.

All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual Class member identities or circumstances.[27]

36.    As I explain in my Opening Report, the out-of-pocket methodology is "flexible and able to incorporate alternative findings of fact regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period…including, but not limited to: (1) the presence and degree of confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) when the first actionable fraudulent conduct or misstatement occurred."[28] As a result, Dr. Zurek's speculative concerns regarding whether case-specific adjustments may ultimately be needed are unfounded at this early, pre-merits stage.

### V.    Dr. Zurek's Opinion on a Mismatch Between the Alleged Misrepresentations and Alleged Corrective Disclosures Lacks Foundation and is Unpersuasive

37.    Defendants' Opp. Brief cites to the *Goldman* decision and asserts that I make no attempt to address a supposed mismatch between the contents of the alleged misrepresentations and the contents of the subsequent alleged corrective disclosures.[29] I understand the *Goldman* case cited by Defendants addressed a mismatch between *generic* alleged misrepresentations and highly *specific* alleged corrective disclosures in the context of challenges to price impact. I understand that Defendants do not challenge price impact.  Nevertheless, relying on the holding in *Goldman*, Dr. Zurek argues that there is a mismatch between the alleged misrepresentations and alleged corrective disclosures identified by Plaintiffs that could render the calculation of damages

---

[27] Opening Report ¶¶ 104-5.

[28] Opening Report ¶ 106.

[29] Defendants' Opp. Brief, at pp. 11.

unreliable.[30] For the reasons explained below, Dr. Zurek's opinions are flawed and unpersuasive, and I document evidence that there is no such mismatch between the alleged misrepresentations and corrective disclosures.

### A. Economic Connection Between the Alleged Misrepresentations and Corrective Events

38. As an initial matter, I understand the *Goldman* case upon which Dr. Zurek bases his opinions involved the price impact of "generic" statements. Examples of the "generic" challenged statements in the *Goldman* case include:

- Our clients' interests always come first. Our experience shows that if we serve our clients well, our own success will follow.

- Integrity and honesty are at the heart of our business.

- Conflicts of interest are increasing and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses.

- Our reputation is one of our most important assets.[31]

39. The Complaint in this matter alleges that Defendants engaged in a fraudulent scheme, misled investors, and made materially false and misleading statements and omissions relating to: (1) supply chain disruptions, (2) the success and drivers of product sales (including undisclosed product defects, quality issues, channel stuffing, and accounting fraud), (3) distributor inventory levels, (4) 2021 financial performance, and (5) a growth profile based on "strong underlying fundamentals."[32] This includes statements such as:

- "So far, I also said this so far for us, *we have not been impacted in terms of our ability to manufacture products or to supply our distributors is something that we are monitoring very closely*."[33]

---

[30] Zurek Report, ¶¶ 42-3.

[31] *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, 77 F.4th 74 (2023).

[32] Complaint ¶ 98; ECF 106 at 18.

[33] Complaint ¶ 103.

- "*So with respect to what we're seeing in the inventory pipeline or channel, we haven't seen any major disruptions. Any changes really of material significance at this point.* … But so far, we – *our financials are not – have not been impacted by the supply chain issues in a material way* other than some elevated costs that we have been able to offset or in some cases, for example, we did a price increase."[34]

- "*We're not seeing huge delays. We're seeing increased costs associated with that.* And that's obviously a headwind as we go forward. The second issue is *are we having problems getting anything, we're basically – what we're learning is we can get stuff.*"[35]

- "*Primescan continues to do well. Selling cameras alone is doing really well. CEREC is also doing well. So that – the momentum in that business has continued… And so I think our digital business – digital dentistry business continues to be strong and we have more things coming down the pike.*"[36]

- "Yes, what we're seeing for T&E going into the fourth quarter is along the lines of what we said in our prepared remarks, which is, *we have great momentum. There is great demand for Primescan*… *And so in our guidance for the fourth quarter, we are including pretty substantial growth for CAD/CAM, for imaging in general. So the performance in that business – that part of the business continues to be strong.*"[37]

- Our clear aligners, implants and *CAD/CAM businesses posted a strong growth in the quarter.* … T&E segment organic sales expansion was led by *double-digit growth* in clear aligners, *CAD/CAM* and implants."[38]

40.     As can be seen from the examples above, the alleged misstatements in this matter were not simply generic claims about the importance of integrity or putting clients' interests first, but rather pertain to specific details of Dentsply's business, including inventory, supply chain, demand, and financials. The Complaint further alleges that the relevant truth was revealed to investors through five corrective disclosure events:

- **February 28, 2022**: "…before the market opened, Dentsply issued a release containing the Company's financial results for 4Q21 and FY21 and financial guidance for 2022. The Company also hosted a conference call for analysts and investors. Dentsply's

---

[34] Complaint ¶ 103.

[35] Complaint ¶ 106.

[36] Complaint ¶ 112.

[37] Complaint ¶ 113.

[38] Complaint ¶ 115.

reported 4Q21 revenue of $1.088 billion and EPS of $0.76 were below analyst expectations. Dentsply's 2022 revenue guidance range of $4.3-$4.4 billion also was below consensus analyst estimates of $4.47 billion, and "heavily weighted to the back half of [2022]." In addition, the Company's anticipated 4%-5% internal sales growth was 10% lower than market consensus had expected and its FY22 adjusted EPS guidance, was $0.06 lower than market consensus had anticipated.

…

During the earnings call, Defendants told investors that the soft results were primarily due to supply chain issues, which management estimated "suppressed" Dentsply's growth by "approximately 2 to 3 points." Gomez also told investors that Dentsply's United States and European "Consumables performance was roughly in line with our expectations." With respect to CAD/CAM, Gomez stated, "[t]he retail demand for Primemill is solid, and our dealer partners in the U.S. have sufficient inventory to meet that demand. In the short term, this tradeoff will reduce our wholesale volume of Primemills but is the right thing to do for our customers.""[39]

- **April 19, 2022**: "…a week after Dentsply announced that defendant Gomez had "resigned" as CFO to assume a CFO role at another company, the Company announced the sudden "terminat[ion]" of defendant Casey as CEO and Director. Dentsply told analysts that the termination was due to performance-related issues. The Company also released certain preliminary financial results for 1Q22, including 1Q22 revenue of 5% below market consensus, sales growth 2.75% below consensus, and adjusted EPS $0.16, or approximately 24%, below market consensus, attributing the shortfalls to "weaker sales performance in the U.S., global supply chain challenges, and foreign exchange headwinds."" [40]

- **May 10, 2022**: "…Dentsply filed a Form 12b-25 Notification of Late Filing with the SEC, announcing that it was unable to file its 1Q22 Form 10-Q on a timely basis due to an ongoing internal investigation "regarding certain financial reporting matters" that had been initiated in March 2022 by the Audit and Finance Committee of the Company's Board following reports of potential misconduct from current and former employees of the Company. Specifically, Dentsply announced that the Audit and Finance Committee was investigating "the Company's use of incentives to sell products to distributors in the third and fourth quarter of 2021" and "whether those incentives were appropriately accounted for" in the Company's financial statements filed with the SEC. The Audit and Finance Committee also stated that it was investigating allegations that "certain former and current members of senior management directed the Company's use of these incentives and other actions to achieve executive compensation targets in 2021." Dentsply explained that it had advised the SEC that an internal investigation was underway and that the Audit and Finance Committee would provide

---

[39] Complaint, ¶¶ 265-266.

[40] Complaint, ¶ 270.

additional information to the SEC as the investigation proceeded. As a result, Dentsply was unable to file its quarterly report for the quarter ended March 31, 2022.

…

While generally refusing to comment because the investigation was pending, Dentsply's Interim CFO Bodem told investors that the Company's sales in the U.S. had declined 13.5% in the first quarter and "[t]he majority of that decline was related to burning of inventory . . . at the dealers" and connected that burning of inventory to the "$50 million of excess . . . inventory at the end of the year." Bodem further disclosed that approximately 80% of the U.S. sales decline was a direct result of the dealer inventory buildup from 2H21, primarily CAD/CAM – in fact, there was so much excess inventory that management did not expect inventory levels to normalize until 3Q22 at the earliest."[41]

- **November 1, 2022:** "Dentsply issued a release and filed a Form 8-K announcing the conclusion of the Company's Internal Investigation and restatements of 3Q21 and FY21 financials. §IV.G. The Form 8-K disclosed that on October 29, 2022 the Company, in consultation with the Audit and Finance Committee, had reached a determination to restate its financial statements for the three and nine months ended September 30, 2021 and for FY21. Defendants also disclosed the Company had "identified one or more material weaknesses in the Company's internal control over financial reporting as of September 30, 2021. The material weaknesses remained in place as of December 31, 2021 and as of the date of" the Form 8-K. §IV.G. In the release, Defendants also disclosed Dentsply's preliminary 3Q22 results and 4Q22 revenue outlook. In particular, Defendants disclosed that on a preliminary basis net sales for 3Q22 were approximately $947 million, a decline in organic sales versus the same quarter the prior year, and that the Company expected sequential net sales would "decline low-single digits in the fourth quarter 2022.""[42]

- **November 14 2022:** "…the Company announced 3Q22 financial results and updated 4Q22 guidance. The Company also hosted a conference call for analysts and investors. The Company's reported 3Q22 results were consistent with the preliminary results announced on November 1, 2022, while the updated guidance was below expectations. Dentsply cited weaker demand, supply chain challenges, and unfavorable currency translation as the reasons for the lower than expected revenue and earnings guidance.

…

During the earnings call, new CFO Glenn Coleman stated that Dentsply's "CAD/CAM business declined in the quarter due to tough year-over-year comps and lower wholesale orders." In its Form 10-Q for 3Q22, also filed on November 14, 2022, the Company elaborated that in the United States:

---

[41] Complaint, ¶¶ 272-273.

[42] Complaint, ¶ 277.

The decrease in organic sales was driven primarily by soft demand for Consumables products, and lower wholesale volumes for CAD/CAM products relative to prior year. Volumes for CAD/CAM products in the third quarter of 2021 benefited from a build in distributor inventory of approximately $35 million, partly as a result of incremental incentives offered during that period which did not recur in 2022, compared to a build of approximately $10 million during the third quarter of 2022 as orders from distributors have weakened in response to a slowdown in retail demand. Sales volumes during the three months ended September 30, 2022, were also negatively impacted by ongoing global supply chain constraints and reduction in volumes due to product availability, particularly for certain Equipment & Instruments products which rely on electronic components. The decline in sales volume was partly offset by overall growth in the Orthodontics business."[43]

41.    As can be seen by the specific details contained within the alleged misrepresentations and alleged corrective disclosures regarding Dentsply's business operations and financial condition, the statements conveyed information about Dentsply's inventory, supply chain, demand, and financials and the corrective disclosures were allegedly causally connected to Dentsply's inventory, supply chain, demand, and financials.  Moreover, these details would be expected to be important to analysts' recommendations and investors' investment decisions. As such, the alleged misrepresentations and corrective disclosures are not generic boilerplate statements, but rather specific and detailed statements that would be value-relevant to analysts and investors. Hence, there is a direct economic connection between the alleged misrepresentations about supply chain disruptions, the success and drivers of product sales, distributor inventory levels, financial performance, and a growth profile based on strong underlying fundamentals, and the alleged corrective disclosures revealing the relevant truth previously concealed by statements and omissions concerning these issues. As such, Dr. Zurek's opinion on a potential mismatch between the alleged misrepresentations and the alleged corrective events is flawed and unpersuasive.

---

[43] Complaint, ¶¶ 279-280.

**B.**      **Analysts Reports Further Demonstrate there is no Mismatch Between the Alleged Misrepresentations and Corrective Disclosures**

42.     As detailed below, analysts clearly referenced and relied upon the same economic information at issue within both the alleged misrepresentations and the five alleged corrective disclosure events. Research analysts increased their price targets, forecasts, and recommendations on Dentsply's Common Stock following multiple alleged misrepresentations, and subsequently reduced their price targets, forecasts, and recommendations following multiple alleged corrective disclosures. This further highlights the flaws in Dr. Zurek's opinions, and demonstrates that there is no mismatch between the alleged misrepresentations and corrective disclosures.

**i.      Analyst References to Alleged Misrepresentations**

43.     Research analysts referenced the alleged misrepresentations and increased their expectations for revenues, growth, and earnings for Dentsply. For example, on August 5, 2021, the Company issued a press release for 2Q 2021 financial results and held a conference call the same day.[44] In the press release, Defendant and Company CEO Casey emphasized the Company's strong fundamentals and that it was well-positioned for growth, which was reiterated during the conference call.[45] On the basis of the information announced this day, analysts revised upward their earnings and revenue estimates, along with related growth forecasts, and updated their models accordingly:

> **Bank of America**: "We are *increasing our FY21E EPS from $2.87 to $2.89 and our FY22E EPS from $3.22 to $3.25 to account for the outperformance in the quarter and ongoing positive outlook.*"[46]

---

[44] Dentsply Sirona Inc., SEC Form 8-K, filed August 5, 2021, available at:
https://www.sec.gov/Archives/edgar/data/818479/000081847921000031/0000818479-21-000031-index.htm.

[45] *Id.*; Dentsply Sirona Q2 2021 Earnings Call, August 5, 2021.

[46] "Reaction to solid beat unwarranted vs. outlook – defending into DS World," Bank of America, August 5, 2021.

**William Blair**: "Following Dentsply Sirona's second-quarter earnings call Thursday morning, August 5, we are updating our model. To summarize our changes, we are *increasing our full year 2021 revenue target by $61 million*… We are *increasing our EPS estimate by 3 cents to $2.90 (up 62%) to reflect this quarter's stronger-than-expected revenue growth and operating margins*… *Technologies & Equipment (58% of revenues) was the key driver of top-line outperformance* relative to our model in the second quarter. Overall *sales were up 85% organically compared to our 70% target*, and beat our dollar estimate by roughly $80 million. … We now estimate technologies and equipment will grow 19% this year, compared to 18% in our prior model."[47]

44.    On November 4, 2021, the Company issued a press release for 3Q 2021 financial results and held a conference call the same day. The 10-Q filed that day stated that the "increase in organic sales" that "resulted from overall higher volumes" was due to "an increase in sales to dealers in the third quarter ahead of annual price increases."[48] This stance regarding the quarter's financial performance was reiterated in the press release, in which Defendant Casey touted the "strong results" pertaining to "organic sales" consequent to "robust demand" and the Company's ability to navigate supply chain dynamics.[49] As a result of the strong results, the Company raised revenue and earnings guidance for fiscal year 2021.[50]

45.    On the conference call, Defendant and Company CFO Gomez touted the strong momentum and demand for the Company's digital products.[51] Specifically, when an analyst asked about the T&E segment, Defendant Gomez responded that there was "great momentum" and "great demand" in regards to the Company's digital products and that "substantial growth" was

---

[47] "Post-Call Model Adjustments; Slightly Increasing Estimates Following Stronger Second Quarter and Largely Unchanged Outlook," William Blair, August 6, 2021.

[48] Dentsply Sirona Inc., SEC Form 10-Q, filed November 4, 2021, available at:
https://www.sec.gov/Archives/edgar/data/818479/000081847921000041/0000818479-21-000041-index.htm.

[49] Dentsply Sirona Inc., SEC Form 8-K, filed November 4, 2021, available at:
https://www.sec.gov/Archives/edgar/data/818479/000081847921000038/0000818479-21-000038-index.htm.

[50] *Id.*

[51] Dentsply Sirona Q3 2021 Earnings Call, November 4, 2021.

expected, an outlook that was reiterated by Defendant Casey on the call.[52] Further, when an analyst asked about the supply chain during a conference call, Defendant Gomez responded that supply chain dynamics had not disrupted the Company's ability to manufacture or materially impacted the bottom line.[53]

46.    In addition, when asked on the call whether inventory levels had changed at distribution partners, Defendant and Company CFO Gomez responded that was not the case, as the Company closely tracked and managed inventory.[54] When asked if the Company's internal inventory levels were expected to increase, Defendant Gomez responded that was not the case because the Company does not want to "move inventory levels too drastically" but rather "keep inventory levels relatively stable."[55]

47.    On the basis of the information released this day, analysts revised upward their earnings and revenue estimates, along with related growth forecasts, and updated their models accordingly, notably in response to the reported global growth in the T&E segment and Defendants' upward revisions to revenue and earnings guidance:

> **Bank of America**: "We are *increasing our FY21E EPS from $2.85 to $2.90* but lowering our FY22E EPS from $3.22 to $3.20 to account for the outperformance in the quarter this year but also increase our investment outlook for next year." When an analyst asked "What is implied in the guidance for DS World in 4Q?," the analyst noted Defendants' response: "*On T&E, have great momentum. Great demand for PrimeScan.*"[56]

---

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] "~3.5% of revenue struggles…but other 96.5% showing solid performance," Bank of America, November 4, 2021.

**William Blair**: "*Technology and equipment easily exceeded our expectation for an 8% organic increase by 17 percentage points, reporting a 25% organic increase.* Management noted *strength across all categories and geographic regions*."[57]

**UBS**: "Management pointed out to *great demand for Primescan, Axeos and image* in general as well as to *growing global trend in dental offices upgrading from 2D to 3D units. They expect that to continue in Q4 with DD growth expected*."[58]

**Evercore ISI**: "*Technologies and Equipment. Organic growth driven by all three regions.* Most notable organic growth contribution from Digital Dentistry and Implants. *Demand is high for digital devices like PrimeScan and imaging equipment*. Practices upgrading from 2D to 3D units – *noted in all geographies*." On the same topic, the analyst noted Defendants' response: "*Guiding some substantial growth for CAD/CAM and imaging in general.*" and "*Most notable organic growth contribution from Digital Dentistry and Implants … Demand is high for digital devices like PrimeScan and imaging equipment.*"[59]

**William Blair**: "*Technology & Equipment (59% of revenues) accounted for the entire top-line outperformance relative to our model in the third quarter. Overall sales were up an impressive 25% organically compared to our 8% target*. Management noted sales growth was seen across all product categories with digital dentistry and implants being the most notable. These are two of management's three key investment areas (the other is clear aligners), and we see both as compelling new growth catalysts for the company in the coming years if management can execute properly. … *We now expect the segment to grow 23.3% organically for the full year, compared to 18.9% in our prior model*, and maintain our 8% target for 2022."[60]

**Barrington Research**: "FY/21 financial guidance: *The company increased its previously provided FY/21 financial non-GAAP profitability guidance to a range of $2.87-2.92 from a previous range of $2.75-2.90.* Top-line guidance was also increased at the lower end and XRAY now expects $4.25-4.30 billion in revenue in FY/21. Previous guidance was $4.1-4.3 billion. *We are currently modeling slightly above the very upper end of the revenue range and within the non-GAAP EPS guidance range*."[61]

---

[57] "First Look at Third-Quarter Results; Small Beat and Guidance Raise Driven by Strong Technology Sales," William Blair, November 4, 2021.

[58] "3Q21: Caliendo's Conference Call Commentary," UBS, November 4, 2021.

[59] "Reaction to 4Q Guide is More Bark than "Byte"," Evercore ISI, November 4, 2021.

[60] "Post-Call Model Adjustments; Slightly Increasing Estimates Given Solid Third-Quarter Results and Largely Unchanged Outlook," William Blair, November 5, 2021.

[61] "Q3 Results Solid; Consumables Revenue Grows 12%; FY/21 Guidance Increased Slightly; Maintain OUTPERFORM; Price Target Remains $79," Barrington Research, November 5, 2021.

**CFRA**: "Though the global supply chain environment continues to be a challenge in terms of cost, availability of components, and labor across industries, *XRAY has been able to meet demand at a normal pace* and continue to work on various operational strategies to minimize the impact to its customers."[62]

**Bank of America**: When asked "What is the company seeing in the supply chain. Are dealers holding inventory?" during the conference call that day, the analyst noted Defendants' responses: "Monitoring very closely. *Have not been impacted regarding ability to manufacture or supply distributors*. Haven't seen any major disruptions."[63]

**H.C. Wainwright & Co.**: "In addition, *management also noted that the supply chain issues have been managed well and the company had been able to meet demand at a normal pace*."[64]

**Evercore ISI**: "Are you seeing anything in the market that would detract from the statement that core equipment and tech are expected to be strong in 4Q? The *company confirmed they are not seeing anything that might detract from core equipment and consumables in 4Q*."[65]

48.     As shown in the subsections below, multiple analysts also referenced the alleged corrective information and lowered their expectations for revenues, growth, and earnings for Dentsply following the alleged corrective disclosure events, demonstrating the match between the same economic information that was allegedly misrepresented to investors and subsequently corrected.

### ii.    February 28, 2022 Corrective Disclosure

49.     On February 28, 2022, the Company issued a press release for 4Q 2021 and fiscal year 2021 financial results and held a conference call the same day.[66] The Company fell short of

---

[62] "Dentsply Sirona Inc. Stock Report," CFRA, November 4, 2021.

[63] "~3.5% of revenue struggles…but other 96.5% showing solid performance," Bank of America, November 4, 2021.

[64] "3Q21 Financial Results Reported; Reiterate Neutral," H.C. Wainwright & Co., November 5, 2021.

[65] "Notes from the Top - Byte, Implants, GMs, and More," Evercore ISI, November 4, 2021.

[66] Dentsply Sirona Inc., SEC Form 8-K, filed February 28, 2022, available at:
https://www.sec.gov/Archives/edgar/data/818479/000081847922000012/0000818479-22-000012-index.htm.

market consensus estimates for FY21 revenue and earnings and also lowered guidance for 2022.[67] During the earnings call, Defendants attributed the Company's financial performance to supply chain issues.[68] On the basis of the information released this day related to the impact of supply chain issues and component shortages on financial performance, analysts revised downward their earnings and revenue estimates. For example:

> **Bank of America**: "Supply chain issues suppressed organic growth by 2-3%. … Following today's results, we are *updating our estimates, lowering our revenue estimates and margin assumptions* slightly as well as modestly increasing our share count assumptions. All in we are decreasing our FY22E EPS from $3.20 to $3.09 and our FY23E EPS from $3.59 to $3.48."[69]

### iii.     April 19, 2022 Corrective Disclosure

50.     On April 19, 2022, the Company issued a press release with preliminary 1Q 2022 financial results.[70] The Company also disclosed that Defendant Casey had been fired the same day.[71] The Company fell short of market consensus estimates for 1Q22 revenue and earnings.[72] Defendants attributed the Company's financial performance to supply chain issues, weak U.S. demand, and foreign currency fluctuations.[73] On the basis of the information released this day, analysts revised downward their earnings and revenue estimates and updated their models accordingly. For example:

---

[67] *See, e.g.*, "Cloudy near-term more macro-impacted, longer-term growth drivers unchanged," Bank of America, February 28, 2022.

[68] Dentsply Sirona Q4 2021 Earnings Call, February 28, 2022.

[69] "Consumables driven miss against soft expects, with EPS guide range including ST," Bank of America, February 28, 2022.

[70] Dentsply Sirona Inc., SEC Form 8-K, filed April 19, 2022, available at: https://www.sec.gov/Archives/edgar/data/818479/000081847922000031/0000818479-22-000031-index.htm.

[71] *Id*.

[72] *See, e.g.*, "Management Shake-Up; Cutting Estimates, Price Target," Morgan Stanley, April 19, 2022.

[73] Dentsply Sirona Inc., SEC Form 8-K, filed April 19, 2022, available at: https://www.sec.gov/Archives/edgar/data/818479/000081847922000031/0000818479-22-000031-index.htm.

**William Blair**: "For the first quarter, *we are lowering our estimates to be in line with management's preliminary commentary from this morning*. We now estimate revenues of $965 million, down $61 million, and adjusted EPS of $0.50, down 20 cents from our prior model. For the full year 2022, we are *lowering our revenue target* by $207 million to $4.16 billion (organic growth of 1.6% compared to 4.7% previously). … And we are *lowering our adjusted EPS target* by 50 cents to $2.65 (down 8% from last year). For 2023, we now assume adjusted EPS of $3.03, down 43 cents from our prior model."

…

"Given the *significant and unexpected leadership changes at the company*, which imply deterioration in execution, and the reduced outlook for the first quarter, we are lowering our rating on Dentsply Sirona to Market Perform from Outperform. While the stock's valuation is now attractive relative to historic averages and its dental industry peers, the *uncertainty around today's leadership changes suggests more earnings risk and therefore greater risk of share price volatility as well*." [74]

**Morgan Stanley**: "We followed up with the company today, and *details on Casey's exit were limited, attributing his termination to company performance during his tenure*. …*a 1.4% decline in organic revenue, well below our +2.9% assumption, attributable to lackluster US sales and continuing supply chain constraints, tied, in part, to equipment component shortages* (chips / sensors)."[75]

**Bank of America**: "*Too much unknown to stick with a Buy. … In short, the loss of both the CEO (terminated) and CFO (going to Moderna) in the same calendar month, combined with a very weak 1Q, leaves too much unknown for us to continue to recommend buying the stock.* … Clearly new management could drive operational improvements and/or unlock potential strategic value. But until we get a sense of what that may be, we see balanced risk/reward with downside protection likely from strategic value while upside is capped by lack of core visibility."[76]

**Piper Sandler**: "…*the size of the 1Q shortfall reported today is greater than many had been anticipating, and the immediate termination of CEO Don Casey suggests the problems at XRAY are rooted deeper than the elements outside of XRAY's control*. When wrestling with what to do with our rating on shares, it's that conclusion – the operational challenges are meaningful and will take both time and investment to fix – that drive our downgrade of shares to Neutral today and our price target to $46. … *Component sourcing and fulfillment delays have persisted and, in some cases, worsened*… We have growing concerns regarding these challenges impacting a key category like DI (Primescan for XRAY) or the company's ability to deliver on potential Primeprint demand. *We've already seen an uncommon approach with milling units (disassembling finished units for service parts)*, a concerning near-term indicator regarding component sourcing, in our opinion.

---

[74] "Downgrading Rating and Lowering Estimates Given Surprising Leadership Changes Announced This Morning," William Blair, April 19, 2022.

[75] "Management Shake-Up; Cutting Estimates, Price Target," Morgan Stanley, April 19, 2022.

[76] "Big negative Pre-A creates unanswerable NT questions; Downgrade to Neutral," Bank of America, April 19, 2022.

Thus far, ***these component shortages seem more pronounced at XRAY than other dental manufacturers, suggesting possible supply chain/sourcing mismanagement***, and which adds a layer of risk for the company delivering on product launch timelines (a dynamic also hinted at by Don Casey during our Dental Day)."[77]

### iv.    May 10, 2022 Corrective Disclosure

51.    On May 10, 2022, the Company filed a Notification of Late Filing with the SEC (Form 12b-25) for its 1Q 2022 10-Q.[78] The Company disclosed an on-going internal investigation by the Audit and Finance Committee of the Company's Board regarding the Company's financial reporting.[79] The Company acknowledged that the investigation was looking into the use of and accounting for dealer sales incentives by current and former senior management and whether those incentives were used to achieve executive compensation targets.[80] Despite the delay, and while generally refusing to discuss the pending investigation, the Company announced preliminary revenues and earnings for 1Q 2022 and held a conference call.[81] On the call, the Company's interim CFO Bodem indicated that the U.S. sales that quarter declined as a result of the inventory backlog created from dealer incentives.[82] Analysts took note, and revised downwards their earnings and revenue estimates along with related growth forecasts, and updated their models accordingly. For example:

> <u>Evercore ISI</u>: "***CAD/CAM declined DD. Higher US dealer inventories at the start of the quarter*** and Primemill spare part allocations. ***~80% of US decline was related to inventory burn (mostly CAD/CAM with a little but on consumables)*** with remaining 20% related to supply chain constraints and slightly lower demand than anticipated. ***Estimated $50MM of***

---

[77] "Downgrade to Neutral; Challenges Aplenty, and No Quick Fix that We See," Piper Sandler, April 19, 2022.

[78] Dentsply Sirona Inc., SEC Form 12b-25, filed May 10, 2022, available at:
https://www.sec.gov/Archives/edgar/data/818479/000081847922000046/0000818479-22-000046-index.htm.

[79] *Id*.

[80] *Id*.

[81] Dentsply Sirona Inc., SEC Form 8-K, filed May 10, 2022, available at:
https://www.sec.gov/Archives/edgar/data/818479/000081847922000047/0000818479-22-000047-index.htm;
Dentsply Sirona Q1 2022 Earnings Call, May 10, 2022.

[82] Dentsply Sirona Q1 2022 Earnings Call, May 10, 2022.

*excess CAD/CAM inventory at the end of the year in their 2021 10-K. Burn of this inventory was reflected in 1Q results for both CAD/CAM and consumables at dealers.* A portion, but not all, was runoff in 1Q (remainder coming in 2Q) – expect to be normalized by 3Q."[83]

**William Blair**: "We are *decreasing our 2022 full-year revenue target by $9 million to $4.15 billion*. … In terms of quarter-over-quarter cadence, we are expecting supply chain pressures and excess channel inventory to continue to dampen sales growth in the second quarter, with the situation incrementally improving in the second half. We are making similar assumptions for margins and are *decreasing our full-year EBIT margin estimate by 130 basis points to 17.9%. Given these changes, we now expect adjusted EPS of $2.44, down 21 cents* compared to our prior model."[84]

**Morgan Stanley**: "Our focus is on its *updated 2022 guidance, calling for 2022 EPS of $2.35-$2.55 (vs. prior $3.05-$3.25), below our estimate ($2.64) and Consensus ($2.78)*, including +2-3% organic growth (previously +4%-5%), encouragingly above our recently lowered estimate (+1%), albeit with a more meaningful cut to its operating margin target to >17%, well below its prior >21% target and our recently revised estimate of 19%. All in, *we are lowering our 2022 EPS to $2.40 (from $2.64) largely on a weaker profit experience. Our price target moves to $48 (from $52*, 13x 2023e EV/EBITDA) on the lower view and less visibility on the implications of its ongoing investigation."[85]

**Bank of America**: "Following Dentsply Sirona's 1Q results, after a negative pre-announcement (that included the termination of the CEO) and a delayed 10-Q filing, *we are placing our rating, price objective and estimates for Denstply Sirona (XRAY) under Review. The 10-Q delay means we are no longer able to assess the company's fundamentals.*"[86]

### v.        November 1, 2022 Corrective Disclosure

52.    On November 1, 2022, the Company issued a press release announcing the conclusion of the Company's investigation.[87] The investigation identified one or more material weaknesses in internal controls over financial reporting for 3Q 2021 and fiscal year 2021.[88] As a

---

[83] "The Kitchen Sink," Evercore ISI, May 10, 2022.

[84] "Post-Call Model Adjustments; Gaining Further Clarity Amidst 10-Q Filing Delay," William Blair, May 10, 2022.

[85] "New '22 Guidance Offers Some NT Visibility, but New Investigation in Focus," Morgan Stanley, May 10, 2022.

[86] "Moving XRAY rating to under Review following 10-Q delay," Bank of America, May 10, 2022.

[87] Dentsply Sirona Inc., SEC Form 8-K, filed November 1, 2022, available at: https://www.sec.gov/Archives/edgar/data/818479/000114036122039283/0001140361-22-039283-index.htm.

[88] *Id*.

result of the investigation, the Company determined that financial reports for 3Q 2021 and fiscal year 2021 could no longer be relied upon and would be restated.[89] In addition, the Company provided preliminary sales results for 3Q 2022 and revised guidance for 4Q 2022, which revealed declines in "organic sales versus the prior year" and sequential net sales, respectively.[90]

53.     After market hours on November 1, 2022, a *Wall Street Journal* article, also reported via the *Dow Jones Institutional News Feed*, noted:

> Additionally, Dentsply said it offered North American distributors incremental incentives, including extended payment terms, to buy products to meet certain internal sales targets in the third and fourth quarters of 2021. It also booked a combined $108 million in related net sales during those quarters.
>
> Those dealings boosted distributor inventories at the end of those periods and reduced sales to the distributors in the first and second quarters of 2022, Dentsply said.
>
> Such behavior is an example of "channel stuffing," a deceptive practice used to inflate sales and earnings by sending more product to distributors than they can reasonably sell, accountants said. "It's a disclosure problem because you're not telling investors the true picture of the trend of sales," said Jeffrey Johanns, an associate professor of accounting at the University of Texas at Austin. "You've recognized too much revenue now, but you haven't told the public to expect decreased sales in the future because of those actions."[91]

54.     Analysts took note of the information released on these days. For example:

> **Bank of America**: "The review concluded that there were ***inappropriate use of incentives to drive products sales in North America, amounting to $38/$70MM of incremental sales for 3Q/4Q of FY21.*** The committee also investigated excess returns/exchanges in China in 4Q'21 that led to ~$4MM in misstated revenue for the quarter. All-in the company believes that net sales and ***net income were overstated by $35MM and $27MM, respectively, for the first nine months of FY21 and $20MM and $10MM, respectively, for all of FY21***. … The more negative update is on the preliminary 3Q/4Q views, with ***3Q revenue of ~$947MM coming out ~6% below consensus while 4Q revenue expected to decline***

---

[89] *Id*.

[90] *Id*.

[91] "Dentsply Sirona Finds Improper Accounting for Incentives, Plans to Restate Earnings – WSJ," *Dow Jones Institutional News Feed*, November 1, 2022.

*sequentially*, with a modest sequential organic uptick, in what is ***typically the strongest quarter of the year***."[92]

**JP Morgan**: "All in, ***this dynamic contributed to higher levels of customer inventory (and lower y/y sales growth) in 1Q22 and 2Q22 (recall, XRAY flagged $50M of excess inventory at YE)***, and XRAY found it had overstated net sales for the 9-month period ending 9/30/21 by $35M and net income by $27M, while overstating net sales for the full year 2021 by $20M and net income by $10M."[93]

**William Blair**: "As part of the press release, management also provided preliminary third quarter 2022 results and fourth-quarter outlook. ***Management expects third-quarter net sales to be approximately $947 million (down 11% year-over-year), $91 million lower than our target…*** We are ***holding off on updating our model*** until we gain further clarity on full third-quarter results (expected to be released on November 9 with an earnings call), but ***expect numbers in our model to come down across the board***."[94]

**Morgan Stanley**: "***We are lowering our 2022 and 2023 EPS to $2.29 and $2.38 (from $2.48 and $2.57, respectively) to reflect lower sales trajectory and lower profitability*** thereon, where there remains several variables as we await further disclosure from its new management in the coming week…"[95]

### vi.    November 14, 2022 Corrective Disclosure

55.    On November 14, 2022, the Company issued a press release for 3Q 2022 and financial results and held a conference call the same day.[96] While financial results were in line with the preliminary results disclosed on November 1, 2022, 4Q22 sales guidance was further lowered.[97] The Company attributed the weak sales results and lower guidance to a build-up in

---

[92] "XRAY announces completion of accounting review and prelim soft 3Q/4Q revenues," Bank of America, November 1, 2022.

[93] "Internal Investigation Concludes with Restated 2021 Financials; 3Q Pre-announced and Prelim 4Q Guide Below Consensus," JP Morgan, November 1, 2022.

[94] "Audit Conclusion Is a Step in the Right Direction, but Recent Results Leave Question on Long-Term Growth Strategies," William Blair, November 1, 2022.

[95] "Investigation Concludes - Restatement Benign, but Questions Linger," Morgan Stanley, November 2, 2022.

[96] Dentsply Sirona Inc., SEC Form 8-K, filed November 14, 2022, available at: https://www.sec.gov/Archives/edgar/data/818479/000081847922000116/0000818479-22-000116-index.htm.

[97] *Id*.

dealer inventories the prior year and parts shortages that affected production.[98] Based on the

information released this day, analysts revised downward their earnings and revenue estimates

along with related growth forecasts, and updated their models accordingly. For example:

> **William Blair**: "***Year-to-date, management has seen roughly $30 million of inventory draw-down by distributors that have not translated to revenue for the company. CAD/CAM is down about 13% year-to-date***, but backing out the $30 million of inventory, it is down about 5% on a reported basis."[99]

> **UBS**: "We had not updated our estimates following the restatements. ***Our new revenue moves ~7-10% lower in 22e-24e, driven by both segments.*** We now anticipate LSD growth in 2023 and 2024 off the lowered 2022 base, excluding Fx. ***Our margins have moved lower***, reflecting more pronounced headwinds, sequentially improving off the 11.4% base in 4Q22 and averaging 16.4% in 2024E, still well below management's 20%+ target. Our ***2022E EPS estimate moves ~19% lower*** to $1.95 (vs. guidance of $1.90- $2.00 and $1.96 consensus). … ***Our new revenue moves ~19%-34% lower in 2022e-24e driven by lower Consumables and T&E estimates and in line with $3.85B-$3.88B 2022 guidance. For 2022e, we now model an 8% decline in Consumables and a ~9% decline in T&E.***"[100]

> **Bank of America**: "Following today's results, we are ***lowering our estimates across the board to reflect the softer quarter*** as well as a full update following the completion of the accounting review, which had not been reflected in our previous estimates. Our new EPS estimates for FY22/FY23/FY24 are $1.94, $1.86, and $2.21, respectively."[101]

> **Morgan Stanley**: "We are ***lowering our 2022 EPS to $1.96 (from prior MSe and Cons of $2.29***) to reflect FX moves, the aforementioned organic growth slowdown, and lower profitability thereon. Our 2023 EPS moves to $2.04 (from $2.38, Consensus $2.44) on FX and likely continuing challenges into 2023. ***Our target price moves to $39 (from $42***, 19.1x 2023 P/E), on the lower view."[102]

---

[98] Dentsply Sirona Inc., SEC Form 10-Q, filed November 14, 2022, available at: https://www.sec.gov/Archives/edgar/data/818479/000081847922000119/0000818479-22-000119-index.htm.

[99] "Post-Call Model Updates; New Leadership Lays Out Positive Strategic Goals, but Looking for More Details on Turnaround in 2023," William Blair, November 14, 2022.

[100] "3Q22 Wrap: How Fast Can Margins Recover?," UBS, November 15, 2022.

[101] "Long-term still appealing but potential bumpy road to get back to LT targets," Bank of America, November 15, 2022.

[102] "New Bars Being Set, but 2023 Visibility Remains Limited," Morgan Stanley, November 14, 2022.

56.    Analysts also noted the continued revenue and earnings misses and lower guidance relative to market expectations, and that continued leadership and operational uncertainty leading into 2023 would weigh on expectations:

**Evercore  ISI**:[103]

**Headline Results:**

| | Result | Actual | Consensus* | EVR ISIe | Δ vs. Cons |
|---|---|---|---|---|---|
| Revenue | MISS | $947 MM | $1,027 MM | $1,004 MM | (8%) |
| Technology & Equipment Revenue | MISS | $556 MM | $606 MM | $587 MM | (8%) |
| Consumables Revenue | MISS | $391 MM | $421 MM | $417 MM | (7%) |
| Organic Growth | MISS | (0.7%) | 1.4% | (0.4%) | (205 bps) |
| Operating Margin | MISS | 14.7% | 17.5% | 17.7% | (280) bps |
| EPS | MISS | $0.41 | $0.59 | $0.57 | ($0.18) |

*Consensus figures reflect ~inconsistent ST model updates during XRAY internal investigation

**Guidance:**

| | Action | New | Prior | Δ/midpoint | Consensus | EVR ISIe | Δ vs. Cons |
|---|---|---|---|---|---|---|---|
| FY'22 Revenue | INITIATED | $3.85 Bn - $3.88 Bn | - - - | – | $4.1 Bn | $4.0 Bn | (5%) |
| FY'22 Internal Sales Growth | LOWERED | (2.0%) | 2.0% - 3.0% | (180.0%) | 0.6% | (0.1%) | (451%) |
| FY'22 Adjusted EPS | LOWERED | $1.90 - $2.00 | $2.35 - $2.55 | ($0.50) | $2.35 | $2.32 | ($0.40) |

**Implied Guidance:**

| | 4Q Implied Guide | ST | EVR ISIe | Δ* vs. Cons |
|---|---|---|---|---|
| Revenues | $911 MM - $941 MM | $1,061 MM | $1,027 MM | (13%) |
| Adjusted EPS | $0.26 - $0.36 | $0.67 | $0.63 | (54%) |

*Implied guidance midpoint

**Morgan Stanley**: "Importantly, *XRAY's revised 2022 guidance is worse than anticipated, calling for 2022 EPS of $1.90-2.00 ($2.35-$2.55 previously) and organic sales growth of -2% for the year, both of which imply a significant deterioration in 4Q* (-MSD cc revenue growth; EPS of $0.26-0.36 vs. MSe/Cons of $0.64/$0.57)."[104]

**Piper Sandler**: "Key Points from the Call. *Management did not provide much in the way of an outlook for 2023, a point that is frustrating from a modeling perspective*…"[105]

**William Blair**: "We think *another period of weak fundamentals seems to suggest there could be some ongoing commercial disruption associated with the recent leadership changes and recently concluded audit*. While encouraged by the progress the company is making in rectifying these issues, *we are looking for more concrete plans for fundamental improvement* followed by execution that could leave us more comfortable with a durably improved growth/profitability profile. *We maintain our Underperform rating on the stock as we wait for more clarity on what happened and what the true outlook is for the business, especially as we head into 2023.* Given recent results we expect 2023 Street EPS expectations will need to be lowered…"[106]

---

[103] "3Q Org Rev Down (0.7%); More Detailed '22 Guide (~In Line w/Expects)," Evercore ISI, November 14, 2022.

[104] "New Bars Being Set, but 2023 Visibility Remains Limited," Morgan Stanley, November 14, 2022.

[105] "Taking the Right Steps to Reposition, but Continue Monitoring from Sidelines," Piper Sadler, November 14, 2022.

[106] "Third-Quarter First Look; Fundamentals Remain Weaker Than Expected, Leaving Some Uncertainty Around 2023 Expectations," William Blair, November 14, 2022.

57.    In summary, in addition to being a premature fact-bound damages argument, Dr. Zurek's opinion regarding a mismatch in the economic information that was allegedly misrepresented and the economic information that was allegedly revealed by corrective disclosures is contradicted by the evidence.

## VI.    The Corrective Disclosure Events Were Followed by Statistically Significant Declines in Dentsply's Common Stock Prices

58.    My event study analysis reveals that Dentsply's Common Stock prices declined by statistically significant amounts following each of the five alleged corrective disclosures, as summarized in **Exhibit 1**. This includes the decline over the three trading days included in November 1-3, 2022, as alleged in the Complaint.[107] While Dr. Zurek does not dispute the validity of my event study methodology, he criticizes the measurement of a multi-day stock price decline.[108] He claims that I fail to explain how an event study methodology can reliably estimate the artificial inflation removed from Dentsply's Common Stock prices resulting from a multi-day decline.[109] He also claims that using a similar two- or three-day window to estimate the declines on the other alleged corrective disclosures results in "no statistically significant price declines following the May 10, 2022 and November 14, 2022 disclosures."[110] Finally, he asserts that the cumulative abnormal return measured over the two week period of November 1 through 14, 2022 is not statistically significant, and that I fail to explain how I "would deal with this additional complication when ultimately calculating damages."[111]

---

[107] Complaint ¶¶ 22, 96, 278.

[108] Zurek Report ¶¶ 12, 74-80.

[109] *Id*.

[110] *Id*., at ¶ 78.

[111] *Id*., at ¶ 78, Exhibit 3.

59.    Dr. Zurek's opinions on statistical significance and the calculation of damages are flawed for several reasons. First, as explained in my Opening Report[112] and throughout this report, the calculation of artificial inflation and damages occurs at the merits, loss causation, and damages phase of a case, and may depend not only on event study analysis, but also on techniques that could include valuation analysis, analyst research, academic research, and internal documents. If I were to determine (or similarly, if a jury were to conclude) that a given alleged corrective disclosure did not dissipate any artificial inflation, such a finding could easily be incorporated into the out-of-pocket damages methodology. In other words, if I were to conclude that $0 of artificial inflation was dissipated by a given corrective disclosure, then this calculation is easily integrated into an inflation ribbon and calculation of damages. For this reason, Dr. Zurek's concerns about potential future (and hypothetical) damages calculations are without merit.

60.    Second, Dr. Zurek fails to appreciate that information may be released over varying time periods, in varying degrees, and/or be incorporated into stock prices over differing intervals. For example, in one case an earnings announcement issued before market hours may be fully impounded into the stock price by the close of trading on that day. Yet in another instance, an announcement may take multiple days to be fully reflected in stock prices. Academic research commonly uses varying time intervals to measure stock price reactions via estimation of abnormal returns in event studies. For example, in one of my peer-reviewed academic publications, I estimated abnormal returns over both three- and five-day windows.[113] Similarly, a publication on event study methodology – relied upon in both my Opening Report and the Zurek Report – explains

---

[112] Opening Report ¶¶ 99-105.

[113] Matthew D. Cain and David J. Denis, 2013, "Information Production by Investment Banks: Evidence from Fairness Opinions," *Journal of Law and Economics* 56.

the use of both single-day and multi-day event windows for measuring abnormal returns over varying time periods.[114]

61.    As noted in **Section V.B.v**, the relevant information from the November 1, 2022 corrective disclosure continued to be reported in days subsequent to the initial disclosure date. Moreover, the Complaint's allegation of a multi-day price impact following the November 1, 2022 corrective disclosure is consistent with internal case documents. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ █ ████████████

████████████████████████████████████████████████████████

████████████████████████████████ █ This evidence is consistent with academic literature, which documents that more complex information can take longer to be fully digested by analysts and investors and be fully reflected in stock prices.[117]

62.    Finally, Dr. Zurek and Def's Opp. Brief claim that multi-day abnormal returns following the May 10, 2022 and November 14, 2022 alleged corrective disclosures are not statistically significant.[118] As an initial matter, I note that the multi-day returns Dr. Zurek calculates

---

[114] Craig A. MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, at p. 15 ("In practice, the period of interest is often expanded to multiple days, including at least the day of the announcement and the day after the announcement."); at p. 21 ("The concept of a cumulative abnormal return is necessary to accommodate a multiple period event window."); at p. 30 ("This case corresponds roughly to either a multi-day event window or to a one-day event window with the event leading to increased variance which is accommodated as part of the null hypothesis.").

[115] DS_SAF_00235020.

[116] DS_SAF_00235021.

[117] *See*, *e.g.*, Feng Gu and Weimin Wang, 2005, "Intangible Assets, Information Complexity, and Analysts' Earnings Forecasts," *Journal of Business Finance & Accounting* 32.

[118] Zurek Report ¶¶ 12, 78-80, Exhibits 2-3; Def's Opp Brief, at pp. 2, 14.

following these disclosures have statistical significance at greater than the 50% level, indicating that it is "more likely than not" that these price declines were caused by the disclosure of company-specific information as opposed to being caused by random chance.[119]

63.      More importantly, Dr. Zurek provides no support for the suggestion that an event study must use identical event window durations for each corrective disclosure, without regard to the nature of the disclosure or the reaction to the disclosure.[120]  Further, the multi-day returns Dr. Zurek calculates include days on which no new company-specific information is alleged to have been disclosed and impounded into stock prices, and in fact could include dates on which confounding information was released, thus biasing Dr. Zurek's calculations.[121] His approach is statistically flawed, which can easily be illustrated by example. Suppose that on day 1, Denstply were to disclose information that caused the Company's stock price to decline by 3% after controlling for market and industry effects. As of the start of the Class Period, such a decline would be statistically significant at the 95% level.[122] However, assuming the price impact occurred entirely on day 1 and no other information caused any price movements on days 2 and 3, then the abnormal returns would be 0% on both days 2 and 3. Dr. Zurek's flawed approach to calculating multi-day statistical significance would indicate that the multi-day return was not statistically

---

[119] Zurek Report, Exhibits 2-3.

[120] *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 392 (N.D. Ga. 2019) (rejecting argument "that one must commit at the outset, before analyzing the data, to investigate *only* one-day or *only* two-day event windows" and noting that "event study analysis is 'an investigation, and the results might compel you to look at a larger window'" following particular corrective disclosures).

[121] For example, in his Exhibit 3, Dr. Zurek measures abnormal returns over the aggregate two-week period of November 1-14, 2022, without giving consideration to any non-fraud-related information released during these two weeks which may have impacted Dentsply's stock prices.

[122] My event study calculates a root mean squared error ("RMSE") of 1.44% on June 9, 2021, the first day of the Class Period. Dividing an abnormal return of -3% by 1.44% produces a t-statistic of -2.08. Based on my event study, this corresponds to statistical significance at better than the 95% level.

significant at the 95% confidence level.[123] Yet this lack of a statistically significant result is caused by Dr. Zurek's flawed approach of deliberately including days without any price impact into his calculations, which reduces the statistical power of the test to detect significant returns and price impact.

64.     As shown in **Exhibit 1**, all five of the alleged corrective disclosures were followed by declines in Dentsply's Common Stock prices, and all of these declines were statistically significant at the 95% level or better, when properly measuring the statistical significance of the declines over the time periods of the price impacts alleged in the Complaint.

## VII.    Conclusion

65.     In summary, Dr. Zurek's opinions are flawed and unpersuasive.  I have provided a reasonable and concrete damages methodology, and I have also explained how the out-of-pocket damages methodology is widely employed in cases like this one precisely because it is capable of reliably calculating damages on a class-wide basis in a manner consistent with Plaintiffs' theory of liability.


        I declare under the penalty of perjury that the foregoing is true and correct.


                                                Matthew D. Cain

---

[123] Dividing a three-day abnormal return of -3% by the square root $(1.44\%^2+1.44\%^2+1.44\%^2)$ produces a t-statistic of 1.20. Based on my event study, this corresponds to statistical significance at below the 80% level.

**Appendix A**

## Matthew D. Cain, Ph.D.                                    February 2025

E-mail: mdcain@outlook.com
Mobile: 574-485-8065

### Education

Ph.D., Finance, August 2007                    Purdue University, West Lafayette, IN
B.S., Finance, May 2001                         Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, New York University School of Law, 2024-Present

*Senior Fellow*, Berkeley Center for Law and Business, 2019-2024

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway

40

- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania; Napa
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies, Journal of Financial and Quantitative Analysis, Journal of Corporate Finance, Journal of Banking and Finance, European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics, Annals of Finance, Journal of Economics and Business*

41

**Teaching Experience**

UC Berkeley School of Law

LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2025

LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023


University of Notre Dame, Mendoza College of Business

FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013


Purdue University, Krannert School of Management

MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

MGMT 610: Financial Management I (MBA Core), Fall: 2007


**Expert Witness Experience**

- *Ali Diabat, et al., v. Credit Suisse Group AG, et al.*, Case No. 1:23-cv-5874 (S.D. N.Y.). Report December 2024. Rebuttal Report January 2025.

- *San Antonio Fire and Police Pension Fund, et al., v. Dentsply Sirona Inc., et al.*, Case No. 1:22-cv-06339 (S.D. N.Y.). Report November 2024.

- *Steven Leventhal, et al. v. Chegg, Inc., et al.*, Case No. 5:21-cv-09953 (N.D. Ca.). Declaration November 2024.

- *Miami Firefighters' Relief & Pension Fund v. Carl C. Icahn et al.*, Index No. 657447/2019 (N.Y. Sup. Ct.). Declaration September 2024. Rebuttal Report October 2024.

- *Securities and Exchange Commission v. American Renal Associates Holdings, Inc., et al.*, Case No. 22-cv-10651-NMG (D. Mass.). Report June 2024. Deposition September 2024.

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv-01491 (S.D. N.Y.). Report June 2024. Declaration November 2024.

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21-cv-02770-WJM-SKC (D. Co.). Report May 2024. Rebuttal Report October 2024.

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024. Deposition April 2024. Rebuttal Report June 2024. Report July 2024. Hearing August 2024. Rebuttal Report October 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024. Deposition April 2024. Rebuttal Report December 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024. Deposition March 2024. Rebuttal Report July 2024. Declaration September 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024. Report February 2025.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024. Rebuttal Report March 2024. Report July 2024. Deposition August 2024. Rebuttal Report September 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023. Report December 2024.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024. Report September 2024. Rebuttal Report November 2024. Deposition January 2025.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021. Rebuttal Report March 2024. Report September 2024. Deposition November 2024. Rebuttal Report January 2025.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

44

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

**Appendix B**

## Documents Considered

**Case Documents:**

- Amended Complaint for Violations of the Federal Securities Laws, No. 1:22-cv-06339 (Doc. 72).

- Defendants' Omnibus Memorandum of Law in Response to Plaintiffs' Motion for Class Certification, dated December 20, 2024, No. 22-cv-06339 (Doc. 137).

- Opinion and Order, dated May 1, 2024, No. 22-cv-6339 (Doc. 106).

- DS_SAF_00235020-1.

- Expert Report of Matthew D. Cain, dated November 15, 2024, No. 1:22-cv-06339.

- Expert Report of Paul Zurek, December 20, 2024, dated December 20, 2024, No. 1:22-cv-06339 (Doc. 136-1).

- Opinion and Order, dated May 1, 2024, No. 22-cv-6339 (Doc. 106).


**Court Decisions and Securities Law:**

- *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, 77 F.4th 74 (2023).

- Consolidated Third Amended Complaint for Violations of the Federal Securities Laws, Civil Action No. RDB-17-0388 filed October 14, 2020, *In Re Under Armour Securities Litigation*.

- *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011).

- Memorandum Opinion, Civil Action No. RDB-17-0388 filed September 29, 2022, *In Re Under Armour Securities Litigation*.

- Memorandum Opinion and Order filed March 29, 2018, in *Washtenaw County Employees' Retirement System v. Walgreen Co., et al.*, No. 15-cv-3187 (N.D. Ill.).

- *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 392 (N.D. Ga. 2019).

- Order Granting Motion for Class Certification, filed December 17, 2024, *In re Vaxart, Inc. Securities Litigation*, Case No. 20-cv-05949-VC (Doc. 431).


**Academic Publications**

- Matthew D. Cain and David J. Denis, 2013, "Information Production by Investment Banks: Evidence from Fairness Opinions," *Journal of Law and Economics* 56.

- Feng Gu and Weimin Wang, 2005, "Intangible Assets, Information Complexity, and Analysts' Earnings Forecasts," *Journal of Business Finance & Accounting* 32.

- Craig A. MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35.

**Dentsply SEC Filings and Call Transcripts**

- Dentsply Sirona Q2 2021 Earnings Call, August 5, 2021.
- Dentsply Sirona Q3 2021 Earnings Call, November 4, 2021.
- Dentsply Sirona Q4 2021 Earnings Call, February 28, 2022.
- Dentsply Sirona Q1 2022 Earnings Call, May 10, 2022.
- SEC Forms 8-K, 10-Q, and 12b-25

**Analyst Reports**

- "~3.5% of revenue struggles…but other 96.5% showing solid performance," Bank of America, November 4, 2021.
- "3Q Org Rev Down (0.7%); More Detailed '22 Guide (~In Line w/Expects)," Evercore ISI, November 14, 2022.
- "3Q21 Financial Results Reported; Reiterate Neutral," H.C. Wainwright & Co., November 5, 2021.
- "3Q21: Caliendo's Conference Call Commentary," UBS, November 4, 2021.
- "3Q22 Wrap: How Fast Can Margins Recover?," UBS, November 15, 2022.
- "Audit Conclusion Is a Step in the Right Direction, but Recent Results Leave Question on Long-Term Growth Strategies," William Blair, November 1, 2022.
- "Big negative Pre-A creates unanswerable NT questions; Downgrade to Neutral," Bank of America, April 19, 2022.
- "Cloudy near-term more macro-impacted, longer-term growth drivers unchanged," Bank of America, February 28, 2022.
- "Consumables driven miss against soft expects, with EPS guide range including ST," Bank of America, February 28, 2022.
- "Dentsply Sirona Inc. Stock Report," CFRA, November 4, 2021.
- "Downgrade to Neutral; Challenges Aplenty, and No Quick Fix that We See," Piper Sandler, April 19, 2022.
- "Downgrading Rating and Lowering Estimates Given Surprising Leadership Changes Announced This Morning," William Blair, April 19, 2022.
- "First Look at Third-Quarter Results; Small Beat and Guidance Raise Driven by Strong Technology Sales," William Blair, November 4, 2021.
- "Internal Investigation Concludes with Restated 2021 Financials; 3Q Pre-announced and Prelim 4Q Guide Below Consensus," JP Morgan, November 1, 2022.

- "Investigation Concludes - Restatement Benign, but Questions Linger," Morgan Stanley, November 2, 2022.

- "Long-term still appealing but potential bumpy road to get back to LT targets," Bank of America, November 15, 2022.

- "Management Shake-Up; Cutting Estimates, Price Target," Morgan Stanley, April 19, 2022.

- "Moving XRAY rating to under Review following 10-Q delay," Bank of America, May 10, 2022.

- "New '22 Guidance Offers Some NT Visibility, but New Investigation in Focus," Morgan Stanley, May 10, 2022.

- "New Bars Being Set, but 2023 Visibility Remains Limited," Morgan Stanley, November 14, 2022.

- "Notes from the Top - Byte, Implants, GMs, and More," Evercore ISI, November 4, 2021.

- "Post-Call Model Adjustments; Gaining Further Clarity Amidst 10-Q Filing Delay," William Blair, May 10, 2022.

- "Post-Call Model Adjustments; Slightly Increasing Estimates Following Stronger Second Quarter and Largely Unchanged Outlook," William Blair, August 6, 2021

- "Post-Call Model Adjustments; Slightly Increasing Estimates Given Solid Third-Quarter Results and Largely Unchanged Outlook," William Blair, November 5, 2021.

- "Post-Call Model Updates; New Leadership Lays Out Positive Strategic Goals, but Looking for More Details on Turnaround in 2023," William Blair, November 14, 2022.

- "Q3 Results Solid; Consumables Revenue Grows 12%; FY/21 Guidance Increased Slightly; Maintain OUTPERFORM; Price Target Remains $79," Barrington Research, November 5, 2021.

- "Reaction to 4Q Guide is More Bark than "Byte"," Evercore ISI, November 4, 2021.

- "Reaction to solid beat unwarranted vs. outlook – defending into DS World," Bank of America, August 5, 2021.

- "Taking the Right Steps to Reposition, but Continue Monitoring from Sidelines," Piper Sadler, November 14, 2022.

- "The Kitchen Sink," Evercore ISI, May 10, 2022.

- "Third-Quarter First Look; Fundamentals Remain Weaker Than Expected, Leaving Some Uncertainty Around 2023 Expectations," William Blair, November 14, 2022.

- "XRAY announces completion of accounting review and prelim soft 3Q/4Q revenues," Bank of America, November 1, 2022.

**Other**

- "Dentsply Sirona Finds Improper Accounting for Incentives, Plans to Restate Earnings – WSJ," *Dow Jones Institutional News Feed*, November 1, 2022.

- All documents cited within this report and Opening Report.

**Exhibit 1**

|  | Event Date | Abnormal Return | T-Statistic | P-Value | Significance |
|---|---|---|---|---|---|
| [1] | 2/28/22 | -7.4% | -6.40 | 0.000 | >99.9% |
| [2] | 4/19/22 | -14.4% | -11.39 | 0.000 | >99.9% |
| [3] | 5/10/22 | -7.5% | -5.81 | 0.000 | >99.9% |
| [4] | 11/1-3, 2022 | -9.3% | -4.25 | 0.000 | >99.9% |
| [5] | 11/14/22 | -4.6% | -3.18 | 0.002 | 99.8% |
| *Total Return (2/28, 4/19, 5/10, 11/1-3, 11/14)* | | *-36.5%* | *-10.80* | *0.000* | *>99.9%* |

*Source: Opening Report event study results.*

E-1