# EXHIBIT C17

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934**

**April 19, 2022 (April 16, 2022)**
Date of Report (Date of earliest event reported)

# DENTSPLY SIRONA Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **0-16211** | **39-1434669** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| **13320 Ballantyne Corporate Place,** | **Charlotte** | **North Carolina** | **28277-3607** |
|---|---|---|---|
| (Address of Principal Executive Offices) | | | (Zip Code) |

**(844) 848-0137**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.01 per share | **XRAY** | **The Nasdaq Stock Market LLC** |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

☐

**Item 2.02 Results of Operations and Financial Condition.**

The following information is furnished pursuant to Item 2.02, "Results of Operations and Financial Condition."

On April 19, 2022, DENTSPLY SIRONA Inc. (the "Company") issued a press release announcing select preliminary financial results, including net sales, U.S. generally accepted accounting principles ("GAAP") diluted earnings per share and adjusted earnings per share for the first quarter ending March 31, 2022. A copy of the Company's press release is attached hereto as Exhibit 99.1 and is hereby incorporated by reference.

The Company has provided certain measures in the press release that are not calculated in accordance with GAAP and therefore represent Non-GAAP measures. These Non-GAAP measures may differ from those used by other companies and should not be considered in isolation from, or as a substitute for, measures of financial performance prepared in accordance with GAAP. These Non-GAAP measures are used by the Company to measure its performance and may differ from those used by other companies.

Management believes that these Non-GAAP measures are helpful as they provide another measure of the results of operations, and are frequently used by investors and analysts to evaluate the Company's performance exclusive of certain items that impact the comparability of results from period to period, and which may not be indicative of past or future performance of the Company.

The Company is not able to reconcile projected adjusted earnings per share (non-GAAP) to first quarter 2022 projected earnings per share (GAAP) without unreasonable efforts because it is not possible to predict with a reasonable degree of certainty the actual impact of the tax rate and related matters for the quarter ended March 31, 2022. The unavailable information could have a significant impact on the Company's first quarter 2022 reported financial results.

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On April 19, 2022, the Company announced that Donald M. Casey Jr. has been terminated as the Company's Chief Executive Officer and has ceased to serve as a member of the Board of Directors of the Company, effective as of April 19, 2022. Mr. Casey has served as the Company's Chief Executive Officer since joining the Company in February 2018. The Company has initiated a search process to identify its next Chief Executive Officer.

Effective immediately, John P. Groetelaars, who serves as a member of the Board of Directors of the Company, has been named Interim Chief Executive Officer and principal executive officer.

Mr. Groetelaars, age 56, served as President, CEO and a Board member at Hillrom from May 2018 until the company's acquisition by Baxter International, Inc. in December 2021. At Hillrom, Mr. Groetelaars led a transformation of the business, successfully articulating and launching a new connected-care strategy and vision, growing the portfolio through seven acquisitions and one divestiture, and driving record financial performance. Prior to Hillrom, Mr. Groetelaars served as Executive Vice President and President of the Interventional Segment at Becton, Dickinson and Company following its acquisition of C.R. Bard Inc. He previously served in a variety of progressive roles at C.R. Bard during his 10-year career there, including as a group president from 2015 to 2017. Prior to joining C.R. Bard, Mr. Groetelaars held various international leadership positions in Canada, Denmark and the United Kingdom at Boston Scientific Corporation from 2001 until 2008. Prior to joining Boston Scientific, Mr. Groetelaars held positions in general management, marketing, business development and sales with Guidant Corporation and with Eli Lilly. Mr. Groetelaars earned a Bachelor of Science in Mechanical Engineering from Kettering University and an MBA from Columbia Business School.

Additionally, effective on the earlier of (i) the effective date of termination of employment of the individual who was serving as the Company's Chief Financial Officer and (ii) the close of business on May 6, 2022, Barbara W. Bodem will become the Company's Interim Chief Financial Officer and principal financial officer.

Ms. Bodem, age 54, most recently served as Senior Vice President and Chief Financial Officer for Hillrom, where she was responsible for both Financial and Information Technology and oversaw portfolio transformation and performance acceleration. She also served as Interim CIO during the pandemic. Prior to her positions at Hillrom, Ms. Bodem served as Senior Vice President of Finance for Mallinckrodt Pharmaceuticals, Vice President of Finance, Global Commercial Operations for Hospira, and at several positions of increasing responsibility at Eli Lilly and Company, culminating in Chief Financial Officer, Lilly

Oncology. Ms. Bodem also has extensive Board experience, and currently serves as Audit Committee Chair for Turning Point Therapeutics, as a Director on Syneos' Board, and as a Director on Enovis Corporation's Board. She has also previously served as a board member for Invacare Corporation. Ms. Bodem earned and a Bachelor of Science in Finance with honors and minors in Economics and East Asian Studies, as well as an MBA from Indiana University.

The Company has entered into interim employment agreements with each of Mr. Groetelaars and Ms. Bodem on April 16, 2022 (the "Agreements").

Mr. Groetelaars' Agreement provides that Mr. Groetelaars will serve as the Company's Interim Chief Executive Officer commencing on April 19, 2022 and will report to the Company's Board of Directors. Mr. Groetelaars will cease to be the Company's Interim Chief Executive Officer on the first day a permanent or successor Chief Executive Officer approved by the Company's Board of Directors commences employment with the Company and, unless otherwise determined by the Company's Board of Directors, Mr. Groetelaars will cease to be employed by the Company on such date. Mr. Groetelaars' employment with the Company is "at-will," such that his employment may be terminated by the Company or by Mr. Groetelaars at any time and for any reason. Pursuant to Mr. Groetelaars' Agreement, Mr. Groetelaars will be granted an award of restricted share units ("RSUs") under the Company's 2016 Omnibus Incentive Plan, as amended and restated (the "Plan") having a grant date fair value of $7 million (the "Interim CEO Initial RSU Grant"). The number of shares subject to the Interim CEO Initial RSU Grant will be calculated by dividing (x) $7 million by (y) the closing price of a Company share as listed on The Nasdaq Global Select Market on the grant date. The Interim CEO Initial RSU Grant will vest monthly in six substantially equal installments, with the first vesting date occurring on the one month anniversary of Mr. Groetelaars' employment commencement date, such that 100% of the shares subject to the Interim CEO Initial RSU Grant will be vested on the sixth month anniversary of Mr. Groetelaars' employment commencement date (the "Interim CEO Final Vesting Date"), subject to Mr. Groetelaars' continued employment with the Company on each applicable vesting date as Interim Chief Executive Officer. However, upon (i) the consummation of a Change in Control (as defined in Mr. Groetelaars' Agreement) of the Company, (ii) Mr. Groetelaars ceasing to serve as the Company's Interim Chief Executive Officer, or (iii) Mr. Groetelaars' termination of employment with the Company, in each case, before the Interim CEO Final Vesting Date for any reason other than (x) a termination by the Company or its affiliates for "Cause" (as defined in Mr. Groetelaars' Agreement) or (y) a voluntary resignation by Mr. Groetelaars (excluding a termination of Mr. Groetelaars' employment with the Company due to Mr. Groetelaars' death or disability), 100% of any then-unvested portion of the Interim CEO Initial RSU Grant will become vested, subject to Mr. Groetelaars' timely execution and non-revocation of a release of claims. Generally, the termination of Mr. Groetelaars' employment or cessation of his service as Interim Chief Executive Officer, in each case, in connection with the appointment of a permanent Chief Executive Officer of the Company will result in the accelerated vesting of 100% of the then-unvested portion of the Interim CEO Initial RSU Grant.

If, following the Interim CEO Final Vesting Date, Mr. Groetelaars continues to be employed by the Company as its Interim Chief Executive Officer under the Agreement, then as consideration for Mr. Groetelaars' continued employment as the Company's Interim Chief Executive Officer through any monthly anniversary of the Interim CEO Final Vesting Date, the Company will grant to Mr. Groetelaars an award of fully vested shares under the Plan on the first day of the calendar month following the applicable monthly anniversary of the Interim CEO Final Vesting Date (each, an "Interim CEO Subsequent Equity Grant"). Each Interim CEO Subsequent Equity Grant will have a grant date fair value of $1,166,667, with the number of shares calculated by dividing (x) $1,166,667 by (y) the closing price of a Company share as listed on The Nasdaq Global Select Market on the grant date (or the immediately preceding trading date, if the grant date is not a trading date). However, Mr. Groetelaars' entitlement to any Interim CEO Subsequent Equity Grants will end, and Mr. Groetelaars will have no further entitlement to any Company equity grants under the Agreement, following the earliest of (i) the appointment of a permanent Chief Executive Officer of the Company prior to an applicable monthly anniversary of the Interim CEO Final Vesting Date; (ii) Mr. Groeteleaars' termination of employment with the Company for any reason prior to an applicable monthly anniversary of the Interim CEO Final Vesting Date and (iii) the first day of the seventh full calendar month following the Interim CEO Final Vesting Date.

To the extent Mr. Groetelaars' employment as the Company's Interim Chief Executive Officer causes him to forfeit certain group health plan insurance coverage for him and his eligible dependents that he would otherwise have been entitled to receive in connection with his separation from a prior employer, the Company and Mr. Groetelaars will make arrangements in good faith to compensate him for such forfeiture or provide him with substantially similar group health plan insurance coverage. The Company will also reimburse Mr. Groetelaars for reasonable travel and business expenses incurred in the performance of his duties, including travel to any of the Company's offices other than Mr. Groetelaars' principal office, provided that, for all business air travel, Mr. Groetelaars will be entitled to travel by first class or business class commercial flights or private air travel. Mr. Groetelaars will not be eligible to receive any compensation for his service on the Company's Board of Directors while he is employed as the Company's Interim Chief Executive Officer.

The foregoing description of Mr. Groeteleaars' employment agreement is qualified in its entirety by reference to the text of the Mr. Groetelaars' Agreement filed as Exhibit 10.1 and incorporated herein by reference.

Mr. Groeteleaars does not have any family relationship with any director or executive officer of the Company, or person nominated or chosen by the Company to become a director or executive officer, and he has no direct or indirect material interest in any transaction required to be disclosed pursuant to Item 404(a) of Regulation S-K.

The Company will also enter into its standard form of indemnification agreement with Mr. Groetelaars, the form of which is filed as Exhibit 10.19(b) to the Company's Form 10-K for the period ended December 31, 2021.

Ms. Bodem's Agreement provides that Ms. Bodem will commence employment with the Company on April 25, 2022 and Ms. Bodem will be appointed as the Company's Interim Chief Financial Officer effective on the earlier of (i) the effective date of termination of employment of the individual who was previously serving as the Company's Chief Financial Officer and (ii) the close of business on May 6, 2022. Ms. Bodem will report to the Company's Interim Chief Executive Officer or Chief Executive Officer (as applicable). Additionally, Ms. Bodem will cease to be the Company's Interim Chief Financial Officer on the first day a permanent or successor Chief Financial Officer approved by the Company's Board of Directors commences employment with the Company and, unless otherwise determined by the Company's Board of Directors, Ms. Bodem will cease to be employed by the Company on such date. Ms. Bodem's employment with the Company is "at-will," such that her employment may be terminated by the Company or by Ms. Bodem at any time and for any reason.

Pursuant to Ms. Bodem's Agreement, Ms. Bodem will receive a cash payment of $100,000, less applicable deductions and withholdings (the "Monthly Payment") for each month she is employed as the Company's Interim Chief Financial Officer for at least one day, provided that she will receive a Monthly Payment for the one month period starting on her employment commencement date regardless of whether she serves as the Company's Interim Chief Financial Officer during such month.

Ms. Bodem will also be granted an award of RSUs under the Plan having a grant date fair value of $2 million (the "Interim CFO Initial RSU Grant"). The number of shares subject to the Interim CFO Initial RSU Grant will be calculated by dividing (x) $2,000,000 by (y) the closing price of a Company share as listed on The Nasdaq Global Select Market on the grant date. The Interim CFO Initial RSU Grant will vest monthly in six substantially equal installments, with the first vesting date occurring on the one month anniversary of Ms. Bodem's employment commencement date, such that 100% of the shares subject to the Interim CFO Initial RSU Grant will be vested on the 6th month anniversary of Ms. Bodem's employment commencement date (the "Interim CFO Final Vesting Date"), subject to Ms. Bodem's continued employment with the Company on each applicable vesting date as Interim Chief Financial Officer. However, upon (i) the consummation of a Change in Control (as defined in Ms. Bodem's Agreement) of the Company, (ii) Ms. Bodem ceasing to serve as the Company's Interim Chief Financial Officer, or (iii) Ms. Bodem's termination of employment with the Company, in each case, before the Interim CFO Final Vesting Date for any reason other than (x) a termination by the Company or its affiliates for "Cause" (as defined in the Agreement) or (y) a voluntary resignation by Ms. Bodem (excluding a termination of Ms. Bodem's employment with the Company due to Ms. Bodem's death or disability), 100% of any then-unvested portion of the Interim CFO Initial RSU Grant will become vested, subject to Ms. Bodem's timely execution and non-revocation of a release of claims. Generally, the termination of Ms. Bodem's employment or cessation of her service as Interim Chief Financial Officer, in each case, in connection with the appointment of a permanent Chief Financial Officer of the Company will result in the accelerated vesting of 100% of the then-unvested portion of the Interim CFO Initial RSU Grant.

If, following the Interim CFO Final Vesting Date, Ms. Bodem continues to be employed by the Company as its Interim Chief Financial Officer under the Agreement, then as consideration for Ms. Bodem's continued employment as the Company's Interim Chief Financial Officer through any monthly anniversary of the Interim CFO Final Vesting Date, the Company will grant to Ms. Bodem an award of fully vested shares under the Plan on the first day of the calendar month following the applicable monthly anniversary of the Interim CFO Final Vesting Date (each, an "Interim CFO Subsequent Equity Grant"). Each Interim CFO Subsequent Equity Grant will have a grant date fair value of $333,333, with the number of shares calculated by dividing (x) $333,333 by (y) the closing price of a Company share as listed on The Nasdaq Global Select Market on the grant date (or the immediately preceding trading date, if the grant date is not a trading date). However, Ms. Bodem's entitlement to any Interim CFO Subsequent Equity Grants will end, and Ms. Bodem will have no further entitlement to any Company equity grants under the Agreement, following the earliest of (i) the appointment of a permanent Chief Financial Officer of the Company prior to an applicable monthly anniversary of the Interim CFO Final Vesting Date; (ii) Ms. Bodem's termination of employment with the Company for any reason prior to an applicable monthly anniversary of the Interim CFO Final Vesting Date and (iii) the first day of the seventh full calendar month following the Interim CFO Final Vesting Date. To the extent Ms. Bodem's employment as the Company's Interim Chief Financial Officer causes her to forfeit certain group

health plan insurance coverage that she would otherwise have been entitled to receive in connection with her separation from a prior employer, the Company and Ms. Bodem will make arrangements in good faith to compensate her for such forfeiture and/or provide her with substantially similar group health plan insurance coverage until January 1, 2024. While Ms. Bodem is the Company's Interim Chief Financial Officer and during the period she is employed by the Company on or prior to May 6, 2022, the Company will generally reimburse or pay Ms. Bodem directly for her temporary housing expenses in Charlotte, North Carolina and reasonable costs of travel incurred by Ms. Bodem commuting between the city of Ms. Bodem's primary residence and her principal office in accordance with the Company's expense reimbursement policy. Ms. Bodem will be solely responsible for any taxable income recognized by her in connection with such temporary housing and commuting expenses and will not be entitled to any tax gross up payments or other reimbursement from the Company in connection therewith. The Company will also reimburse Ms. Bodem for other reasonable travel and business expenses incurred by her in the performance her duties.

The foregoing description of Ms. Bodem's employment agreement is qualified in its entirety by reference to the text of Ms. Bodem's Agreement filed as Exhibit 10.2 and incorporated herein by reference.

Ms. Bodem does not have any family relationship with any director or executive officer of the Company, or person nominated or chosen by the Company to become a director or executive officer, and she has no direct or indirect material interest in any transaction required to be disclosed pursuant to Item 404(a) of Regulation S-K.

The Company will also enter into its standard form of indemnification agreement with Ms. Bodem, the form of which is filed as Exhibit 10.19(b) to the Company's Form 10-K for the period ended December 31, 2021.

**Item 7.01 Regulation FD Disclosure.**

On April 19, 2022, the Company issued a press release announcing that Mr. Casey has been terminated as the Company's Chief Executive Officer and has ceased to serve as a member of the Board of Directors of the Company, effective as of April 19, 2022; provided that Mr. Casey will remain employed by the Company through May 6, 2022. A copy of the press release is attached hereto as Exhibit 99.1 and incorporated herein by reference.

The information furnished in Items 7.01 and 9.01 to this Form 8-K, including Exhibit 99.1, shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference into any other filing under the Securities Act of 1933 or the Exchange Act, except as expressly set forth by specific reference in such a filing.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits:

| Exhibit No. | Description |
| --- | --- |
| 10.1 | Interim Chief Executive Officer Employment Agreement by and between DENTSPLY SIRONA Inc. and John P. Groetelaars, dated April 16, 2022 |
| 10.2 | Interim Chief Financial Officer Employment Agreement by and between DENTSPLY SIRONA Inc. and Barbara W. Bodem, dated April 16, 2022 |
| 99.1 | DENTSPLY SIRONA Inc. press release, dated April 19, 2022 |
| 104 | Cover Page Interactive Date File (embedded within the Inline XBRL Document) |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

DENTSPLY SIRONA Inc.

By:      */s/* Cherée H. Johnson

Cherée H. Johnson
Senior Vice President – Chief Legal
Officer, General Counsel and Secretary

Date: April 19, 2022

## Interim Chief Executive Officer

## Employment Agreement

This Interim Chief Executive Officer Employment Agreement (this "Agreement"), is entered into as of April 16, 2022 (the "Effective Date") by and between DENTSPLY SIRONA Inc., a Delaware corporation (the "Company") and John P. Groetelaars ("Executive") (collectively referred to herein as the "Parties").

**RECITALS**

Executive and the Company mutually desire that Executive provide services to the Company on the terms provided herein.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing and of the respective covenants and agreements set forth below, the Parties hereto agree as follows:

1.    **Employment**.

(a)    General. The Company and Executive desire that Executive be employed as the Company's Interim Chief Executive Officer. Executive's employment with the Company as its Interim Chief Executive Officer shall commence on April 19, 2022 (the "Commencement Date"). Executive shall cease to be the Company's Interim Chief Executive Officer on the first day a permanent or successor Chief Executive Officer approved by the Company's Board of Directors (the "Board") commences employment with the Company, and, unless otherwise determined by the Board, Executive shall cease to be employed by the Company on such date. Notwithstanding the foregoing, at all times Executive's employment with the Company shall be "at-will," such that Executive's employment may be terminated by the Company or Executive at any time and for any reason.

(b)    Position, Reporting and Duties. While serving as the Company's Interim Chief Executive Officer, Executive shall report to the Board, shall have such duties, authority, and responsibilities as are customary for such position in a Delaware corporation (subject to the control of the Board and its committees), and shall perform such other duties as may be reasonably requested by the Board, including without limitation assisting the Board in the hiring of a permanent Chief Executive Officer for the Company. Executive shall devote substantially all of Executive's working time and efforts to the business and affairs of the Company (which shall include service to its "Affiliates" (within the meaning of Rule 12b-2 promulgated under Section 12 of the Exchange Act)), provided that (i) Executive shall be permitted to manage Executive's personal, financial and legal affairs, subject to compliance with this Agreement and (ii) Executive shall be permitted to serve on the board of directors of up to two (2) publicly traded or privately held companies. Executive agrees to observe and comply with the rules and policies of the Company and its Affiliates as adopted by the Company or its Affiliates from time to time, in each case as amended from time to time, as set forth in writing, and as delivered or made available to Executive (each, a "Policy").

(c)    Principal Place of Employment. Executive's principal office shall be the Company's facility in Sarasota, Florida, or such other offices as may be appropriate for the performance of his duties as mutually agreed by the Board and Executive. The Parties understand that given the nature of Executive's duties, Executive may be required to travel and perform services at locations other than his principal office from time to time.

(d)     Certain Executive Representations. Executive represents and warrants that (i) Executive is not subject to any impediment, restriction or restraint that would in any way prohibit, hinder or impair his employment hereunder and his performance as contemplated hereby, and (ii) without limiting the foregoing, Executive's employment hereunder and his performance as contemplated hereby do not and would not in any way conflict with or breach any confidentiality, non-competition or other agreement to which he is a party or to which he may be subject.

2.     **Compensation and Related Matters**.

(a)     Initial RSU Grant. The Company shall grant to Executive an award of Restricted Share Units ("RSUs") under the DENTSPLY SIRONA Inc. 2016 Omnibus Incentive Plan, as amended and restated (the "Plan"), with the number of Company common shares ("shares") subject to such grant having a grant date fair value of seven million dollars ($7,000,000) (the "Initial RSU Grant"). The number of shares subject to the Initial RSU Grant shall be calculated by dividing (x) seven million dollars ($7,000,000) by (y) the closing price of a Company share as listed on The Nasdaq Global Select Market on the Initial RSU Grant's grant date. The Initial RSU Grant's grant date shall be the third (3rd) trading day after the Commencement Date, provided, that, if such grant date is not within the Company's open trading window period, the Initial RSU Grant's grant date shall instead be the third (3rd) trading day after the date of the filing of the next periodic report on Form 10-Q following the Commencement Date. The Initial RSU Grant shall vest monthly with respect to the shares subject thereto in six substantially equal installments, with the first vesting date occurring on the one month anniversary of the Commencement Date, such that one hundred percent (100%) of the shares subject to the Initial RSU Grant shall be vested on the sixth month anniversary of the Commencement Date (the "Final Vesting Date"), subject to Executive's continued employment with the Company on each applicable vesting date as Interim Chief Executive Officer. Notwithstanding the foregoing, upon (i) the consummation of a Change in Control (as defined below) of the Company, (ii) Executive ceasing to serve as the Company's Interim Chief Executive Officer, or (iii) Executive's termination of employment with the Company, in each case, prior to the Final Vesting Date for any reason other than (x) a termination by the Company or its Affiliates for "Cause" (as defined below) or (y) a voluntary resignation by Executive (excluding a termination of Executive's employment with the Company due to Executive's death or disability), subject to Executive (or Executive's estate, if applicable) signing on or before the sixtieth (60th) day following Executive's termination of employment with the Company or cessation of service as Interim Chief Executive Officer (if applicable), and not revoking, a release of claims in the Company's customary form, as it may be updated from time to time, but excluding any restrictive covenants that may otherwise be included in the customary form (the "Release Condition"), one hundred percent (100%) of any then-unvested portion of the Initial RSU Grant shall become vested. For the avoidance of doubt, the termination of Executive's employment or cessation of Executive's service as Interim Chief Executive Officer, in each case, in connection with the appointment of a permanent Chief Executive Officer of the Company shall, subject to Executive's satisfaction of the Release Condition, result in the accelerated vesting of one hundred percent (100%) of the then-unvested portion of the Initial RSU Grant. The Initial RSU Grant shall be subject to and governed by the terms and conditions of the applicable Restricted Share Unit Grant Notice, Restricted Share Unit Agreement and the Plan.

(b)     Subsequent Equity Grants. If, following the Final Vesting Date, Executive continues to be employed by the Company as its Interim Chief Executive Officer under this Agreement, then as consideration for Executive's continued employment as the Company's Interim Chief Executive Officer through any monthly anniversary of the Final Vesting Date, the Company shall grant to Executive an award of fully vested shares under the Plan that shall be issued on the first day of the calendar month following the applicable monthly anniversary of the Final Vesting Date (each, a "Subsequent Equity Grant"). Each Subsequent Equity Grant shall be

2

subject to and governed by the Plan and shall have a grant date fair value of one million one hundred sixty-six thousand six hundred sixty-seven dollars ($1,166,667), with the number of shares calculated by dividing (x) one million one hundred sixty-six thousand six hundred sixty-seven dollars ($1,166,667) by (y) the closing price of a Company share as listed on The Nasdaq Global Select Market on the Subsequent Equity Grant's grant date (or if no such shares are traded on such date, the immediately preceding date on which shares of the Company's common stock were publicly traded on The Nasdaq Global Select Market). Notwithstanding the foregoing, Executive's entitlement to any Subsequent Equity Grants shall end, and Executive shall have no further entitlement to any Company equity grants hereunder, following the earliest of (i) the appointment of a permanent Chief Executive Officer of the Company prior to an applicable monthly anniversary of the Final Vesting Date; (ii) Executive's termination of employment with the Company for any reason prior to an applicable monthly anniversary of the Final Vesting Date and (iii) the first day of the seventh (7th) full calendar month following the Final Vesting Date.

(c) <u>Prior Health Plan Coverage</u>. To the extent Executive's employment with the Company under this Agreement causes Executive to forfeit group health plan insurance coverage for Executive and his eligible dependents that he would otherwise have been entitled to receive in connection with his separation from a prior employer under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("<u>COBRA</u>") and/or under the terms of Executive's contractual severance arrangements with such prior employer, the Parties shall make arrangements in good faith to compensate Executive for such forfeiture and/or provide Executive with substantially similar group health plan insurance coverage at no greater cost to Executive.

(d) <u>Indemnification</u>. Executive shall be entitled to coverage under the Company's directors and officers insurance policy and indemnification pursuant to the Company's By-Laws and certificate of incorporation, in each case in accordance with the terms and conditions thereof and on a basis no less favorable than that applicable to other executive officers of the Company from time to time.

(e) <u>Director Compensation</u>. Executive shall not receive any compensation for his Board service while he is employed by the Company pursuant to this Agreement and shall not be eligible for any equity grant(s) that may be awarded to other members of the Board while he is employed by the Company.

(f) <u>Business Expenses</u>. The Company shall reimburse Executive for all reasonable travel and other business expenses incurred by Executive in the performance of Executive's duties to the Company during his employment with the Company in accordance with the Company's expense reimbursement Policy, provided that the Company agrees that (i) Executive's travel to any of the Company's offices other than his principal office shall be considered business travel and the associated expenses shall be considered business expenses and shall be reimbursed to Executive by the Company and (ii) for all business air travel, Executive shall be entitled to travel by first class or business class commercial flights or private air travel and the associated cost shall be reimbursed to Executive by the Company.

3. **Clawback Provisions**.

Notwithstanding any other provisions in this Agreement to the contrary, any incentive-based compensation, or any other compensation, paid to Executive pursuant to this Agreement or any other agreement or arrangement with the Company which is subject to recovery under any Policy approved by the Board that is generally applicable to executive officers of the Company, applicable law, government regulation or stock exchange listing requirement, will be subject to such deductions and clawback as are required to be made pursuant to such Policy, law, government regulation or stock exchange listing requirement.

4.    **Assignment and Successors**.

The Company may assign its rights and obligations under this Agreement to a United States subsidiary of the Company that is the main operating company of the Company (or the principal employer of employees of the Company and its subsidiaries) in the United States or to any successor to all or substantially all of the business or the assets of the Company (by merger or otherwise). This Agreement shall be binding upon and inure to the benefit of the Company, Executive and the Company's successors, assigns, personnel and legal representatives, executors, administrators, heirs, distributees, devisees, and legatees, as applicable.

5.    **Certain Definitions**.

(a)    <u>Cause</u>. The Company shall have "Cause" to terminate Executive's employment hereunder upon:

(i)    a majority of the members of the Board, excluding Executive as applicable, determining that (a) Executive has committed an act of fraud in the course of his employment against the Company, or (b) Executive has committed an act of willful misconduct or gross negligence against the Company that is materially injurious to the Company or its customers;

(ii)    a majority of the members of the Board, excluding Executive as applicable, determining that Executive has willfully failed to adequately perform material duties or obligations under this Agreement;

(iii)    Executive's indictment for, or conviction of, or pleading no contest to, a felony or a crime involving Executive's moral turpitude, relating to Executive's job position, or that causes substantial damage to the Company's public image or reputation, or causes substantial harm to the Company's operations or financial performance; or

(iv)    a material breach of any of the representations and warranties set forth in Section 1(d).

The determination as to whether Executive is being terminated for Cause shall be made after a reasonable and good faith investigation by the Board (excluding Executive as applicable); provided, however, that Cause shall not exist under this Agreement unless the Company gives written notice to Executive where such notice describes with particularity the alleged act(s) at issue and has given Executive an opportunity to be heard at a meeting of the Board at his sole discretion with or without counsel and the Board provides Executive a summary of its findings.

(b)    <u>Change in Control</u>. "Change in Control" shall have the meaning set forth in the Plan as in effect on the Commencement Date.

(c)    <u>Exchange Act</u>. "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time.

6.    **Miscellaneous Provisions**.

(a)    <u>Governing Law</u>. This Agreement shall be governed, construed, interpreted and enforced in accordance with its express terms, and otherwise in accordance with the substantive laws of the Commonwealth of Pennsylvania without reference to the principles of conflicts of law of the Commonwealth of Pennsylvania or any other jurisdiction, and where applicable, the laws of the United States. The Company and Executive agree that any and all disputes relating to or arising out of this Agreement will first be submitted to mediation pursuant

4

to a written demand for mediation which either Party may serve on the other which shall be before a mediator selected by the Parties in accordance with mediation procedures of the American Arbitration Association ("AAA"). In the event the Parties are unable to agree to a mediator within ten (10) days of receipt of the written demand for mediation, the mediator will be appointed by the office of AAA in Philadelphia, Pennsylvania. The cost of the mediator and fees imposed by AAA shall be split equally by the Parties.

(b)    Survival. Notwithstanding anything to the contrary in this Agreement, the provisions of Sections 3 through 4 and this Section 6 will survive the termination of Executive's employment.

(c)    Notices. Any notice, request, claim, demand, document and other communication hereunder to any Party shall be effective upon receipt (or refusal of receipt) and shall be in writing and delivered personally or sent by facsimile or certified or registered mail, postage prepaid, as follows:

(i)    If to the Company, to the attention of the General Counsel at its headquarters,

(ii)    If to Executive, at the last address that the Company has in its personnel records for Executive, or

(iii)    At any other address as any Party shall have specified by notice in writing to the other Party.

(d)    Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement. Signatures delivered by facsimile or by electronic PDF shall be deemed effective for all purposes.

(e)    Entire Agreement. The terms of this Agreement are intended by the Parties to be the final expression of their agreement with respect to the subject matter hereof and supersede all prior understandings and agreements, whether written or oral. The Parties further intend that this Agreement shall constitute the complete and exclusive statement of their terms and that no extrinsic evidence whatsoever may be introduced in any judicial, administrative, or other legal proceeding to vary the terms of this Agreement.

(f)    Amendments; Waivers. This Agreement may not be modified, amended, or terminated except by an instrument in writing, signed by Executive and a duly authorized officer of the Company (other than Executive). By an instrument in writing similarly executed, Executive or a duly authorized officer of the Company (other than Executive) may waive compliance by the other Party with any specifically identified provision of this Agreement that such other Party was or is obligated to comply with or perform; *provided, however,* that such waiver shall not operate as a waiver of, or estoppel with respect to, any other or subsequent failure. No failure to exercise and no delay in exercising any right, remedy, or power hereunder preclude any other or further exercise of any other right, remedy, or power provided herein or by law or in equity.

(g)    Construction. This Agreement shall be deemed drafted equally by both the Parties. Its language shall be construed as a whole and according to its fair meaning. Any presumption or principle that the language is to be construed against any Party shall not apply. The headings in this Agreement are only for convenience and are not intended to affect construction or interpretation. Any references to sections or subsections are to those parts of this Agreement, unless the context clearly indicates to the contrary. Also, unless the context clearly

5

indicates to the contrary, (i) the plural includes the singular and the singular includes the plural; (ii) "and" and "or" are each used both conjunctively and disjunctively; (iii) "any," "all," "each," or "every" means "any and all," and "each and every"; (iv) "includes" and "including" are each "without limitation"; (v) "herein," "hereof," "hereunder" and other similar compounds of the word "here" refer to the entire Agreement and not to any particular section or subsection; and (vi) all pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the entities or persons referred to may require.

(h)    Enforcement. If any provision of this Agreement is held to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a portion of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

(i)    Withholding. The Company shall be entitled to withhold from any amounts payable under this Agreement any federal, state, local or foreign withholding or other taxes or charges which the Company is legally required to withhold. The Company shall be entitled to rely on an opinion of counsel if any questions as to the amount or requirement of withholding shall arise.

(j)    Section 409A.

(i)    General. This Agreement and the payments and benefits thereunder are intended to be exempt from, or to the extent subject thereto, comply with Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder (collectively, "Section 409A") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith. The Company makes no representation that any or all of the payments or benefits described in this Agreement will be exempt from or comply with Section 409A and makes no undertaking to preclude Section 409A from applying to any such payment. Executive shall be solely responsible for the payment of any taxes and penalties incurred under Section 409A.

(ii)    Specified Employee. Notwithstanding anything in this Agreement to or any other agreement providing compensatory payments to Executive to the contrary, if Executive is deemed by the Company at the time of Executive's "separation from service" with the Company within the meaning of Section 409A (a "Separation from Service") to be a "specified employee" for purposes of Section 409A, any payment of compensation or benefits to which Executive is entitled under this Agreement or any other compensatory plan or agreement that is considered nonqualified deferred compensation under Section 409A payable as a result of Executive's Separation from Service shall be delayed to the extent required in order to avoid a prohibited distribution under Section 409A until the earlier of (i) the expiration of the six-month period measured from the date of Executive's Separation from Service with the Company or (ii) the date of Executive's death. Upon the first business day following the expiration of the applicable Section 409A period, all payments deferred pursuant to the preceding sentence shall be paid in a lump sum to Executive (or Executive's estate or beneficiaries), and any remaining payments due to Executive under this Agreement or any other compensatory plan or agreement shall be paid as otherwise provided herein or therein.

6

(iii)   *Expense Reimbursements.* To the extent that any reimbursements under this Agreement are subject to Section 409A, any such reimbursements payable to Executive shall be paid to Executive no later than December 31 of the year following the year in which the expense was incurred; provided, that Executive submits Executive's reimbursement request promptly following the date the expense is incurred, the amount of expenses reimbursed in one year shall not affect the amount eligible for reimbursement in any subsequent year, and Executive's right to reimbursement under this Agreement will not be subject to liquidation or exchange for another benefit.

(iv)   *Separate Identified Payments.* For purposes of Section 409A, each amount to be paid or benefit to be provided under the Agreement shall be construed as a separate identified payment for purposes of Section 409A.

7.   **Executive Acknowledgement**.

Executive acknowledges that Executive has read and understands this Agreement, is fully aware of its legal effect, has not acted in reliance upon any representations or promises made by the Company other than those contained in writing herein, and has entered into this Agreement freely based on Executive's own judgment.

[Signature Page Follows]

7

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the date and year first above written.

**DENTSPLY SIRONA Inc.**

By:   /s/ Eric K. Brandt
   Eric K. Brandt
     Title: Non-Executive Chairman of the Board of Directors

**EXECUTIVE**

By:   /s/ John P. Groetelaars
   John P. Groetelaars

[Signature Page to Employment Agreement]

**Interim Chief Financial Officer**

**Employment Agreement**

This Interim Chief Financial Officer Employment Agreement (this "Agreement"), is entered into as of April 16, 2022 by and between DENTSPLY SIRONA Inc., a Delaware corporation (the "Company") and Barbara W. Bodem ("Executive") (collectively referred to herein as the "Parties").

**RECITALS**

Executive and the Company mutually desire that Executive provide services to the Company on the terms provided herein.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing and of the respective covenants and agreements set forth below, the Parties hereto agree as follows:

1.  **Employment**.

    (a)     General. The Company and Executive desire that Executive be employed by the Company as the Company's Interim Chief Financial Officer. Executive's employment with the Company shall commence on April 25, 2022 (the "Commencement Date") and Executive shall be appointed as the Company's Interim Chief Financial Officer effective on or after the Commencement Date upon the earlier of (i) the effective date of termination of employment from the Company of the individual who was serving as the Company's Chief Financial Officer on or immediately prior to the Commencement Date and (ii) close of business on May 6, 2022. Executive shall cease to be or cease to be entitled to become the Company's Interim Chief Financial Officer on the first day a permanent or successor Chief Financial Officer approved by the Company's Board of Directors (the "Board") commences employment with the Company, and, unless otherwise determined by the Board, Executive shall cease to be employed by the Company on such date. Notwithstanding the foregoing, at all times Executive's employment with the Company shall be "at-will," such that Executive's employment may be terminated by the Company or Executive at any time and for any reason.

    (b)     Position, Reporting and Duties. While employed by the Company on or prior to May 6, 2022 or serving as the Company's Interim Chief Financial Officer, Executive shall report to the Interim Chief Executive Officer or Chief Executive Officer (as applicable), shall have such duties, authority, and responsibilities as are customary for Executive's position in a Delaware corporation (subject to the control of the Board and its committees), and shall perform such other duties as may be reasonably requested by the Board. Executive shall devote substantially all of Executive's working time and efforts to the business and affairs of the Company (which shall include service to its "Affiliates" (within the meaning of Rule 12b-2 promulgated under Section 12 of the Exchange Act)), provided that Executive shall be permitted to manage Executive's personal, financial and legal affairs, subject to compliance with this Agreement and provided that such activities do not materially interfere with Executive's performance of Executive's duties and responsibilities hereunder. Executive agrees to observe and comply with the rules and policies of the Company and its Affiliates as adopted by the Company or its Affiliates from time to time, in each case as amended from time to time, as set forth in writing, and as delivered or made available to Executive (each, a "Policy").

    (c)     Principal Place of Employment. Executive's principal office shall be the Company's commercial headquarters in Charlotte, North Carolina, or such other offices as may

1

be appropriate for the performance of her duties as determined in consultation with the Board. The Parties understand that given the nature of Executive's duties, Executive may be required to travel and perform services at locations other than her principal office from time to time.

(d)    Certain Executive Representations. Executive represents and warrants that (i) Executive is not subject to any impediment, restriction or restraint that would in any way prohibit, hinder or impair her employment hereunder and her performance as contemplated hereby, (ii) without limiting the foregoing, Executive's employment hereunder and her performance as contemplated hereby do not and would not in any way conflict with or breach any confidentiality, non-competition or other agreement to which she is a party or to which she may be subject and (iii) Executive has not been the subject of any allegation and, to her knowledge, she has not, (A) breached any law, regulation or code of conduct applicable to her in the course of employment or (B) engaged in any act of workplace misconduct or impropriety, including any act of discrimination or harassment.

2.    **Compensation and Related Matters**.

(a)    Monthly Base Salary. Executive shall be entitled to receive a cash payment of one hundred thousand dollars ($100,000) less applicable deductions and withholdings (the "Monthly Payment") for each Applicable Month (as defined below), which shall generally be paid in accordance with the Company's customary payroll practices and in any event no later than thirty (30) days following the Applicable Month. "Applicable Month" shall mean any one month period for which Executive remained employed with the Company as its Interim Chief Financial Officer for at least one day, with such month measured beginning from the Commencement Date or a monthly anniversary of the Commencement Date, provided that, in any event, the one month period commencing on the Commencement Date shall be an Applicable Month subject to Executive's employment with the Company for at least one day during such month.

(b)    Initial RSU Grant. Subject to the Board's approval, the Company shall grant to Executive an award of Restricted Share Units ("RSUs") under the DENTSPLY SIRONA Inc. 2016 Omnibus Incentive Plan, as amended and restated (the "Plan"), with the number of Company common shares ("shares") subject to such grant having a grant date fair value of two million dollars ($2,000,000) (the "Initial RSU Grant"). The number of shares subject to the Initial RSU Grant shall be calculated by dividing (x) two million dollars ($2,000,000) by (y) the closing price of a Company share as listed on The Nasdaq Global Select Market on the Initial RSU Grant's grant date. The Initial RSU Grant's grant date shall be the third (3rd) trading day after the Commencement Date, provided, that, if such grant date is not within the Company's open trading window period, the Initial RSU Grant's grant date shall instead be the third (3rd) trading day after the date of the filing of the next periodic report on Form 10-Q or 10-K following the Commencement Date. The Initial RSU Grant shall vest monthly with respect to the shares subject thereto in six substantially equal installments, with the first vesting date occurring on the one month anniversary of the Commencement Date, such that one hundred percent (100%) of the shares subject to the Initial RSU Grant shall be vested on the sixth month anniversary of the Commencement Date (the "Final Vesting Date"), subject to Executive's continued employment with the Company on each applicable vesting date as Interim Chief Financial Officer. Notwithstanding the foregoing, upon (i) the consummation of a Change in Control (as defined below) of the Company, (ii) Executive ceasing to serve as the Company's Interim Chief Financial Officer, or (iii) Executive's termination of employment with the Company, in each case, prior to the Final Vesting Date for any reason other than (x) a termination by the Company or its Affiliates for "Cause" (as defined below) or (y) a voluntary resignation by Executive (excluding a termination of Executive's employment with the Company due to Executive's death or disability), subject to Executive signing on or before the sixtieth (60th) day following Executive's termination of employment with the Company or cessation of

2

service as Interim Chief Financial Officer (if applicable), and not revoking, a release of claims in the Company's customary form, as it may be updated from time to time (the "Release Condition"), one hundred percent (100%) of any then-unvested portion of the Initial RSU Grant shall become vested. For the avoidance of doubt, the termination of Executive's employment in connection with the appointment of a permanent Chief Financial Officer of the Company shall, subject to Executive's satisfaction of the Release Condition, result in the accelerated vesting of one hundred percent (100%) of the then-unvested portion of the Initial RSU Grant. The Initial RSU Grant shall be subject to and governed by the terms and conditions of the applicable Restricted Share Unit Grant Notice, Restricted Share Unit Agreement and the Plan.

(c)    Subsequent Equity Grants. If, following the Final Vesting Date, Executive continues to be employed by the Company as its Interim Chief Financial Officer under this Agreement, then as consideration for Executive's continued employment as the Company's Interim Chief Financial Officer through any monthly anniversary of the Final Vesting Date, the Company shall grant to Executive an award of fully vested shares under the Plan that shall be issued on the first day of the calendar month following the applicable monthly anniversary of the Final Vesting Date, in each case, subject to the Board's approval (each, a "Subsequent Equity Grant"). Each Subsequent Equity Grant shall be subject to and governed by the Plan and shall have a grant date fair value of three hundred thirty-three thousand three hundred thirty-three dollars ($333,333), with the number of shares calculated by dividing (x) three hundred thirty-three thousand three hundred thirty-three dollars ($333,333) by (y) the closing price of a Company share as listed on The Nasdaq Global Select Market on the Subsequent Equity Grant's grant date (or if no such shares are traded on such date, the immediately preceding date on which shares of the Company's common stock were publicly traded on The Nasdaq Global Select Market). Notwithstanding the foregoing, Executive's entitlement to any Subsequent Equity Grants shall end, and Executive shall have no further entitlement to any Company equity grants hereunder, following the earliest of (i) the appointment of a permanent Chief Financial Officer of the Company prior to an applicable monthly anniversary of the Final Vesting Date; (ii) Executive's termination of employment with the Company for any reason prior to an applicable monthly anniversary of the Final Vesting Date and (iii) the first day of the seventh (7th) full calendar month following the Final Vesting Date.

(d)    Prior COBRA Coverage. To the extent Executive's employment with the Company under this Agreement causes her to forfeit group health plan insurance coverage for Executive under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") that she would otherwise have been entitled to receive in connection with her separation from a prior employer, the Parties shall make arrangements in good faith to compensate Executive for such forfeiture and/or provide Executive with substantially similar group health plan insurance coverage until January 1, 2024.

(e)    Indemnification. Executive shall be entitled to indemnification pursuant to the Company's By-Laws in accordance with the terms and conditions thereof, subject to Executive's appointment as the Company's Interim Chief Financial Officer.

(f)    Temporary Residence; Commuting Expenses. During the period that Executive serves as the Company's Interim Chief Financial Officer under this Agreement and during the period that Executive is employed by the Company on or prior to May 6, 2022, to the extent that Executive's principal residence is more than one hundred (100) miles from her principal office, the Company shall reimburse or pay directly Executive for (i) her temporary housing expenses in Charlotte, North Carolina on a basis no less favorable than that otherwise provided under the Company's Relocation Program for Vice Presidents and more senior employees (as such Relocation Program may be amended from time to time) and (ii) reasonable costs travel incurred in commuting on a regular basis between the city of Executive's primary residence and her principal office in accordance with the Company's expense reimbursement

3

Policy. Executive shall be solely responsible for any taxable income recognized by her in connection with such temporary housing expenses and commuting expenses and shall not be entitled to any tax gross up payments or other reimbursement from the Company in connection therewith.

(g)      Business Expenses. The Company shall reimburse Executive for all reasonable travel and other business expenses incurred by Executive in the performance of Executive's duties to the Company during her employment with the Company in accordance with the Company's expense reimbursement Policy.

3.      **Clawback Provisions**.

Notwithstanding any other provisions in this Agreement to the contrary, any incentive-based compensation, or any other compensation, paid to Executive pursuant to this Agreement or any other agreement or arrangement with the Company which is subject to recovery under any Policy approved by the Board that is generally available to senior management of the Company, applicable law, government regulation or stock exchange listing requirement, will be subject to such deductions and clawback as may be required to be made pursuant to such Policy, law, government regulation or stock exchange listing requirement.

4.      **Assignment and Successors**.

The Company may assign its rights and obligations under this Agreement to a United States subsidiary of the Company that is the main operating company of the Company (or the principal employer of employees of the Company and its subsidiaries) in the United States or to any successor to all or substantially all of the business or the assets of the Company (by merger or otherwise). This Agreement shall be binding upon and inure to the benefit of the Company, Executive and the Company's successors, assigns, personnel and legal representatives, executors, administrators, heirs, distributees, devisees, and legatees, as applicable.

5.      **Certain Definitions**.

(a)      Cause. The Company shall have "Cause" to terminate Executive's employment hereunder upon:

(i)      a majority of the members of the Board determining that (a) Executive has committed an act of fraud in the course of her employment against the Company, or (b) Executive has committed an act of willful misconduct or gross negligence against the Company that is materially injurious to the Company or its customers;

(ii)      a majority of the members of the Board determining that Executive has willfully failed to adequately perform material duties or obligations under this Agreement;

(iii)      Executive's indictment for, or conviction of, or pleading no contest to, a felony or a crime involving Executive's moral turpitude, relating to Executive's job position, or that causes substantial damage to the Company's public image or reputation, or causes substantial harm to the Company's operations or financial performance; or

(iv)      a material breach of any of the representations and warranties set forth in Section 1(d).

The determination as to whether Executive is being terminated for Cause shall be made after a reasonable and good faith investigation by the Board; provided, however, that Cause shall not

4

exist under this Agreement unless the Company gives written notice to Executive where such notice describes with particularity the alleged act(s) at issue and has given Executive an opportunity to be heard at a meeting of the Board at her sole discretion with or without counsel and the Board provides Executive a summary of its findings.

(b)    <u>Change in Control</u>. "Change in Control" shall have the meaning set forth in the Plan.

(c)    <u>Exchange Act</u>. "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time.

6.    **Miscellaneous Provisions**.

(a)    <u>Governing Law</u>. This Agreement shall be governed, construed, interpreted and enforced in accordance with its express terms, and otherwise in accordance with the substantive laws of the Commonwealth of Pennsylvania without reference to the principles of conflicts of law of the Commonwealth of Pennsylvania or any other jurisdiction, and where applicable, the laws of the United States. The Company and Executive agree that any and all disputes relating to or arising out of this Agreement will first be submitted to mediation pursuant to a written demand for mediation which either Party may serve on the other which shall be before a mediator selected by the Parties in accordance with mediation procedures of the American Arbitration Association ("<u>AAA</u>"). In the event the Parties are unable to agree to a mediator within ten (10) days of receipt of the written demand for mediation, the mediator will be appointed by the office of AAA in Philadelphia, Pennsylvania. The cost of the mediator and fees imposed by AAA shall be split equally by the Parties.

(b)    <u>Survival</u>. Notwithstanding anything to the contrary in this Agreement, the provisions of Sections 3 through 4 and this Section 6 will survive the termination of Executive's employment.

(c)    <u>Notices</u>. Any notice, request, claim, demand, document and other communication hereunder to any Party shall be effective upon receipt (or refusal of receipt) and shall be in writing and delivered personally or sent by facsimile or certified or registered mail, postage prepaid, as follows:

(i)    If to the Company, to the attention of the General Counsel at its headquarters,

(ii)    If to Executive, at the last address that the Company has in its personnel records for Executive, or

(iii)    At any other address as any Party shall have specified by notice in writing to the other Party.

(d)    <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement. Signatures delivered by facsimile or by electronic PDF shall be deemed effective for all purposes.

(e)    <u>Entire Agreement</u>. The terms of this Agreement are intended by the Parties to be the final expression of their agreement with respect to the subject matter hereof and supersede all prior understandings and agreements, whether written or oral. The Parties further intend that this Agreement shall constitute the complete and exclusive statement of their terms

5

and that no extrinsic evidence whatsoever may be introduced in any judicial, administrative, or other legal proceeding to vary the terms of this Agreement.

(f)    Amendments; Waivers. This Agreement may not be modified, amended, or terminated except by an instrument in writing, signed by Executive and a duly authorized officer of the Company (other than Executive). By an instrument in writing similarly executed, Executive or a duly authorized officer of the Company (other than Executive) may waive compliance by the other Party with any specifically identified provision of this Agreement that such other Party was or is obligated to comply with or perform; *provided, however,* that such waiver shall not operate as a waiver of, or estoppel with respect to, any other or subsequent failure. No failure to exercise and no delay in exercising any right, remedy, or power hereunder preclude any other or further exercise of any other right, remedy, or power provided herein or by law or in equity.

(g)    Construction. This Agreement shall be deemed drafted equally by both the Parties. Its language shall be construed as a whole and according to its fair meaning. Any presumption or principle that the language is to be construed against any Party shall not apply. The headings in this Agreement are only for convenience and are not intended to affect construction or interpretation. Any references to sections or subsections are to those parts of this Agreement, unless the context clearly indicates to the contrary. Also, unless the context clearly indicates to the contrary, (i) the plural includes the singular and the singular includes the plural; (ii) "and" and "or" are each used both conjunctively and disjunctively; (iii) "any," "all," "each," or "every" means "any and all," and "each and every"; (iv) "includes" and "including" are each "without limitation"; (v) "herein," "hereof," "hereunder" and other similar compounds of the word "here" refer to the entire Agreement and not to any particular section or subsection; and (vi) all pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the entities or persons referred to may require.

(h)    Enforcement. If any provision of this Agreement is held to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a portion of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

(i)    Withholding. The Company shall be entitled to withhold from any amounts payable under this Agreement any federal, state, local or foreign withholding or other taxes or charges which the Company is required to withhold or by its Policies it customarily withholds. The Company shall be entitled to rely on an opinion of counsel if any questions as to the amount or requirement of withholding shall arise.

(j)    Section 409A.

*(i)    General.* This Agreement and the payments and benefits thereunder are intended to be exempt from, or to the extent subject thereto, comply with Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder (collectively, "Section 409A") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith. The Company makes no representation that any or all of the payments or benefits described in this Agreement will be exempt from or comply with Section 409A and makes no undertaking to preclude Section 409A from applying to any such payment. Executive

6

shall be solely responsible for the payment of any taxes and penalties incurred under Section 409A.

(ii)   *Specified Employee.* Notwithstanding anything in this Agreement to or any other agreement providing compensatory payments to Executive to the contrary, if Executive is deemed by the Company at the time of Executive's "separation from service" with the Company within the meaning of Section 409A (a "<u>Separation from Service</u>") to be a "specified employee" for purposes of Section 409A, any payment of compensation or benefits to which Executive is entitled under this Agreement or any other compensatory plan or agreement that is considered nonqualified deferred compensation under Section 409A payable as a result of Executive's Separation from Service shall be delayed to the extent required in order to avoid a prohibited distribution under Section 409A until the earlier of (i) the expiration of the six-month period measured from the date of Executive's Separation from Service with the Company or (ii) the date of Executive's death. Upon the first business day following the expiration of the applicable Section 409A period, all payments deferred pursuant to the preceding sentence shall be paid in a lump sum to Executive (or Executive's estate or beneficiaries), and any remaining payments due to Executive under this Agreement or any other compensatory plan or agreement shall be paid as otherwise provided herein or therein.

(iii)   *Expense Reimbursements.* To the extent that any reimbursements under this Agreement are subject to Section 409A, any such reimbursements payable to Executive shall be paid to Executive no later than December 31 of the year following the year in which the expense was incurred; provided, that Executive submits Executive's reimbursement request promptly following the date the expense is incurred, the amount of expenses reimbursed in one year shall not affect the amount eligible for reimbursement in any subsequent year, and Executive's right to reimbursement under this Agreement will not be subject to liquidation or exchange for another benefit.

(iv)   *Separate Identified Payments.* For purposes of Section 409A, each amount to be paid or benefit to be provided under the Agreement shall be construed as a separate identified payment for purposes of Section 409A.

7.   **Executive Acknowledgement**.

Executive acknowledges that Executive has read and understands this Agreement, is fully aware of its legal effect, has not acted in reliance upon any representations or promises made by the Company other than those contained in writing herein, and has entered into this Agreement freely based on Executive's own judgment.

[Signature Page Follows]

7

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the date and year first above written.

**DENTSPLY SIRONA Inc.**

By:    /s/ Eric K. Brandt
   Eric K. Brandt
    Title: Non-Executive Chairman of the Board of Directors

**EXECUTIVE**

By:    /s/ Barbara W. Bodem
   Barbara W. Bodem

[Signature Page to Employment Agreement]



THE DENTAL
SOLUTIONS
COMPANY™

**Dentsply Sirona Provides Corporate Update**

*John Groetelaars Named Interim Chief Executive Officer*

*Barbara Bodem Named Interim Chief Financial Officer*

*Company Provides Update on Anticipated First Quarter Financial Results*

**CHARLOTTE, N.C., April 19, 2022 (GLOBE NEWSWIRE) --** DENTSPLY SIRONA Inc. ("Dentsply Sirona" or "the Company") (Nasdaq: XRAY) today announced the appointment of John Groetelaars, who serves on Dentsply Sirona's Board of Directors, as Interim Chief Executive Officer. He succeeds Don Casey, who has been terminated as CEO and will cease to serve as a member of the Company's Board, effective immediately. The Board has initiated a search to identify the Company's next CEO and has retained a leading executive search firm to support the process.

Eric Brandt, Non-Executive Chairman of the Board stated, "We are pleased to welcome John as Dentsply Sirona's Interim CEO. John has a strong track record of driving innovative business strategies, and as a seasoned executive with more than 30 years of industry experience, he is uniquely positioned to lead our company during this transition period. John is the right leader to bring continuity and guide Dentsply Sirona's execution of its key strategic initiatives to create sustainable value for our shareholders. As the Board conducts its search for a permanent CEO, we are focused on finding a candidate with a track record of world-class execution and operational expertise who can position the Company for the future."

Mr. Groetelaars commented, "I look forward to serving as Interim CEO during this important time for the Company. I joined the Company's Board because of my deep appreciation for our mission and unwavering commitment to innovation, operational excellence and providing positive outcomes for patients and customers. Dentsply Sirona is situated in attractive, growing dental categories and has a strong foundation in place, built on its portfolio of leading products and differentiated position across key markets. The Board is confident that renewing the Company's focus on execution will stabilize the business and deliver strong performance despite ongoing macroeconomic challenges. This will be my focus from day one, and I am prepared to leverage my prior executive leadership experience as I work with the rest of the Board and management team to drive the Company's strategy and advance its vision to transform dentistry and improve oral health globally."

Mr. Brandt continued, "On behalf of the Board, I would like to thank Don for his many contributions to our company. Don has played a key role in strengthening our foundation and advancing our mission to create innovative solutions for healthy smiles. We wish him all the best in his future endeavors."

**Appointment of Interim CFO**

Dentsply Sirona also today announced the appointment of Barbara Bodem as Interim Chief Financial Officer, effective upon Jorge Gomez's previously announced departure on May 6, 2022. Ms. Bodem will join the Company on April 25, 2022, and work closely with Mr. Gomez to ensure a seamless transition.

Ms. Bodem is an accomplished executive with over two decades of financial leadership experience in the healthcare industry, most recently serving as Senior Vice President and CFO of Hillrom. Previously, Barbara served in senior leadership roles at Mallinckrodt Pharmaceuticals, Hospira and Eli Lilly and Company.

Mr. Brandt said, "We are fortunate to welcome Barbara, a proven finance executive, as our interim CFO during this transition period. Barbara brings extensive expertise in healthcare with an international perspective, having served in multiple leadership roles across finance organizations at global companies. As we continue our search for a permanent CFO, we believe that Barbara and our talented financial team will continue to deliver value for our patients, business partners and shareholders."

**Select Preliminary Financial Results for the First Quarter of 2022**

Dentsply Sirona today also provided an update on its anticipated financial results for the first quarter ending March 31, 2022.

On a preliminary basis, the Company expects that net sales will be approximately $965 million (representing an organic sales decline of approximately 1.4% versus prior year). Additionally, GAAP diluted earnings per share will be in the range of $0.26 - $0.30 and adjusted earnings per share will be in the range of $0.48 - $0.52. Relative to last year, these results reflect weaker sales performance in the U.S., global supply chain challenges, and foreign exchange headwinds.

The Company will provide further information on its results and 2022 outlook when it releases its earnings as scheduled on May 5, 2022.

The amounts set forth above are preliminary estimates. The Company is in the process of finalizing its results of operations for the first quarter ended March 31, 2022 and therefore final results are not yet available. These preliminary estimates are based solely upon information available to management as of the date of this press release. The Company's actual results may differ from these estimates due to the completion of its quarter-end closing procedures, final adjustments and developments that may arise or information that may become available between now and the time the Company's financial results for the first quarter ended March 31, 2022 are finalized. The Company's unaudited consolidated financial statements for the first quarter ended March 31, 2022 should be consulted once they become available.

**About John Groetelaars**
John Groetelaars served as President, CEO and a Board member at Hillrom from May 2018 until the company's acquisition by Baxter International, Inc., in December 2021. At Hillrom, Mr. Groetelaars led a transformation of the business, successfully articulating and launching a new connected-care strategy and vision, growing the portfolio through seven acquisitions and one divestiture, and driving record financial performance. Prior to Hillrom, Mr. Groetelaars served as Executive Vice President and President of the Interventional Segment at Becton, Dickinson and Company following its acquisition of C.R. Bard Inc. He previously served in a variety of progressive roles at C.R. Bard during his 10-year career there, including as a group president from 2015 to 2017. Prior to joining C.R. Bard, Mr. Groetelaars held various international leadership positions in Canada, Denmark and the United Kingdom at Boston Scientific Corporation from 2001 until 2008. Prior to joining Boston Scientific, Mr. Groetelaars held positions in general management, marketing, business development and sales with Guidant Corporation and with Eli Lilly.

Mr. Groetelaars earned a Bachelor of Science in Mechanical Engineering from Kettering University and an MBA from Columbia Business School.

**About Barbara Bodem**
Barbara Bodem most recently served as Senior Vice President and Chief Financial Officer for Hillrom, where she was responsible for both Financial and Information Technology and oversaw portfolio transformation and performance acceleration. She also served as Interim CIO during the pandemic. Prior to her positions at Hillrom, Ms. Bodem served as Senior Vice President of Finance for Mallinckrodt Pharmaceuticals, Vice President of Finance, Global Commercial Operations for Hospira, and at several positions of increasing responsibility at Eli Lilly and Company, culminating in Chief Financial Officer, Lilly Oncology. Ms. Bodem also has extensive Board experience, and currently serves as Audit Committee Chair for Turning Point Therapeutics, as a Director on Syneos' Board, and as a Director on Enovis Corporation's Board. She has also previously served as a board member for Invacare Corporation.

Ms. Bodem earned and a Bachelor of Science in Finance with honors and minors in Economics and East Asian Studies, as well as an MBA from Indiana University.

**About Dentsply Sirona**

Dentsply Sirona is the world's largest manufacturer of professional dental products and technologies, with a 135-year history of innovation and service to the dental industry and patients worldwide. Dentsply Sirona develops, manufactures, and markets a comprehensive solutions offering including dental and oral health products as well as other consumable medical devices under a strong portfolio of world class brands. As The Dental Solutions Company, Dentsply Sirona's products provide innovative, high-quality and effective solutions to advance patient care and deliver better, safer and faster dentistry. The Company's shares of common stock are listed in the United States on Nasdaq under the symbol XRAY. Visit www.dentsplysirona.com for more information about Dentsply Sirona and its products.

**Non-GAAP Financial Measures**
The Company has provided certain measures in this press release that are not calculated in accordance with US GAAP and therefore represent Non-GAAP measures. These Non-GAAP measures may differ from those used by other companies and should not be considered in isolation from, or as a substitute for, measures of financial performance prepared in accordance with US GAAP. These Non-GAAP measures are used by the Company to measure its performance and may differ from those used by other companies.
Management believes that these Non-GAAP measures are helpful as they provide another measure of the results of operations, and are frequently used by investors and analysts to evaluate the Company's performance exclusive of certain items that impact the comparability of results from period to period, and which may not be indicative of past or future performance of the Company.
The Company is not able to reconcile projected adjusted earnings per share (non-GAAP) to first quarter 2022 projected earnings per share (GAAP) without unreasonable efforts because it is not possible to predict with a reasonable degree of certainty the actual impact of the tax rate and related matters for the quarter ended March 31, 2022. The unavailable information could have a significant impact on the Company's first quarter 2022 reported financial results.

**Forward-Looking Statements**

All statements in this press release that do not directly and exclusively relate to historical facts constitute "forward-looking statements." These statements represent current expectations and beliefs, including statements regarding preliminary financial information for the first quarter ending March 31, 2022, and no assurance can be given that the results described in such statements will be achieved. Such statements are subject to numerous assumptions, risks, uncertainties and other factors that could cause actual results to differ materially from those

described in such statements, many of which are outside of our control. Furthermore, many of these risks and uncertainties are currently amplified by and may continue to be amplified by or may, in the future, be amplified by, the novel coronavirus ("COVID-19") pandemic and the impact of varying private and governmental responses that affect our customers, employees, vendors and the economies and communities where they operate. For a written description of these factors, see the section titled "Risk Factors" in Dentsply Sirona's Annual Report on Form 10-K for the most recent fiscal year. No assurance can be given that any expectation, belief, goal or plan set forth in any forward-looking statement can or will be achieved, and readers are cautioned not to place undue reliance on such statements which speak only as of the date they are made. We do not undertake any obligation to update or release any revisions to any forward-looking statement or to report any events or circumstances after the date of press release or to reflect the occurrence of unanticipated events.

**Contact Information**

Investors:
Andrea Daley
VP, Investor Relations
+1-704-805-1293
InvestorRelations@dentsplysirona.com

Press:
Marion Par-Weixlberger
VP, Corporate Communications and PR
+43 676 848414588
marion.parweixlberger@dentsplysirona.com