# EXHIBIT 5

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/228257552

# Reputational Damages in Securities Litigation

**Article** · August 2009

CITATIONS
2

READS
244

**1 author:**

Barbara Black
University of Cincinnati
**26** PUBLICATIONS   **151** CITATIONS

SEE PROFILE

All content following this page was uploaded by Barbara Black on 31 December 2013.

The user has requested enhancement of the downloaded file.

Black Ready for CEC | Do Not Delete | 11/16/2009 7:21 PM

# Reputational Damages in Securities Litigation

## Barbara Black*

I.  THE PRICE–VALUE DIFFERENTIAL AND THE ISSUE OF OVER-RECOVERY .............. 172

II.  ONE MISSTATEMENT OR TWO? ................................................................ 175

III.  OVER-RECOVERY AND THE RELEVANCE OF SECTION 21D(E) .............................. 180

IV.  BLUE CHIP STAMPS DOES NOT BAR RECOVERY OF REPUTATIONAL DAMAGES ..... 181

V.  CONCLUSION ...................................................................................... 182

In the typical secondary market securities fraud class action, purchasers allege that the corporation and its managers intentionally disseminated misstatements into the marketplace that artificially inflated the corporation's stock price.[1] The plaintiffs consist of those who purchased after the misstatement and before revelation of the truth[2] who seek to recover the difference between the artificially inflated purchase price and the actual value of the stock had the truth been known at the time of the purchase ("fraud inflation"). An event study—an econometric tool that measures the effect of new information on the market price of publicly available securities[3]—is generally prepared to eliminate the impact on the stock price of events and information unrelated to the fraud, so as to determine the fraud inflation as measured by the stock price change caused by the revelation of the truth.[4]

When federal courts first implied the Rule 10b-5 remedy, of necessity they borrowed from common law to establish the elements of the claim, which include materiality, scienter, reliance ("transaction causation"), and causation ("loss causation"), and the measure of damages, generally out-of-pocket.[5] With the Private Securities

* Charles Hartsock, Professor of Law and Director, Corporate Law Center, University of Cincinnati College of Law. Jerrod Kuhn, UC Law '10, provided valuable research assistance.

1. The situation in which the corporation makes misstatements that depress the stock price and result in sellers during the period of the fraud receiving less than they otherwise would have is far less common, although it was the fact pattern in *Basic Inc. v. Levinson*, 485 U.S. 224 (1987).

2. The truth can enter the market either through corrective disclosure, through "leakage" (for example, *In re Williams Sec. Litig.—WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009)), or through "materialization of the risk" (see, for example, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)).

3. *See* Sanjai Bhagat & Roberta Romano, *Empirical Studies of Corporate Law*, *in* 2 HANDBOOK OF LAW AND ECONOMICS 945 (A. Mitchell Polinsky & Steven Shavell eds., 2005) (describing event study methodology).

4. For a brief description of the use of event studies to determine damages in securities fraud litigation, see Jay W. Eisenhofer, Geoffrey C. Jarvis & James R. Banko, *Securities Fraud, Stock Price Valuation, and Loss Causation: Toward a Corporate Finance-Based Theory of Loss Causation*, 59 BUS. LAW. 1419, 1424–28 (2004).

5. *See* 15 U.S.C. § 78j(b) (2006); 17 C.F.R. § 240.10b-5 (2009); Dura Pharms., Inc. v. Broudo, 554 U.S. 336, 341 (2005).

Black Post-Macro                              Do Not Delete                         11/16/2009 7:21 PM

Litigation Reform Act of 1995 (PSLRA),[6] Congress assumed leadership in fashioning the claim and the remedy. Since then, the Supreme Court has come to view its role largely as implementing congressional intent.[7] In the PSLRA, Congress did not eliminate the fraud-on-the-market (FOTM) presumption of reliance created by the Supreme Court in *Basic Inc. v. Levinson*,[8] as many had urged.[9] If it had done so, Congress would have effectively ended the securities fraud class action because of individual issues of reliance. Instead, Congress sought to reform the securities fraud class action by weeding out claims of dubious merit. Accordingly, the PSLRA imposes a number of obstacles on plaintiffs. Among them, the statute (1) requires plaintiffs to plead with particularity facts giving rise to a "strong inference" that defendants acted with scienter[10] and (2) explicitly states that plaintiffs have the burden of proving that the violation caused the loss for which they seek to recover damages.[11] In addition, the PSLRA limits recoverable damages by capping the amount at the difference between the price paid and the mean trading price during a 90-day period beginning on the date of the corrective disclosure.[12]

In its 2005 opinion *Dura Pharmaceuticals, Inc. v. Broudo*,[13] the Supreme Court addressed the loss causation requirement. *Dura* held, in the context of reviewing a district court's denial of a motion to dismiss, that the plaintiff does not adequately plead loss causation if he alleges only that he purchased stock at a price that was artificially inflated by defendant's fraud, because, according to the Court, the plaintiff has not yet suffered an economic loss.[14] The Court's holding is very narrow: the plaintiff must plead a causal connection between the fraud and the loss.[15] The Court, however, did not view this requirement as burdensome.[16]

The Court explained the significance of the loss causation requirement, which it equated with proximate cause. To allow plaintiffs to recover for losses that are not proximately caused by the fraud would convert the federal securities laws into an impermissible insurance policy against market risks.[17] Beyond this, the Court did not provide much guidance on proving loss causation. Ominously, however, the opinion contains language portending a heavy burden on plaintiffs to establish both loss causation and damages. Specifically, the Court suggests that a corrective disclosure followed by a drop in stock price may not always be sufficient to recover damages: the lower price after corrective disclosure

---

6. Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified at 15 U.S.C. § 78u-4 (2006)).

7. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 128 S. Ct. 761, 773 (2008).

8. Basic Inc. v. Levinson, 485 U.S. 224, 241–47 (1988) (holding that plaintiffs do not have to prove reliance so long as the stock was traded in an efficient market, but instead can take advantage of a rebuttable FOTM presumption of reliance).

9. *See* JOEL SELIGMAN, THE TRANSFORMATION OF WALL STREET 664–65 (3d ed. 2003) (discussing bipartisan agreement to modify FOTM charges that would require plaintiffs to show actual reliance).

10. 15 U.S.C. § 78u-4(b)(2) (2006).

11. *Id.* § 78u-4(b)(4).

12. *Id.* § 78u-4(e).

13. Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005).

14. *Id.* at 342–43.

15. *Id.* at 343.

16. *Id.* at 347. *See also* LOUIS LOSS, JOEL SELIGMAN & TROY PAREDES, FUNDAMENTALS OF SECURITIES REGULATION 1285 (2009 Supp.) (stating that *Dura* is largely a case about pleading).

17. *Dura*, 544 U.S. at 345.

Black Post-Macro                    Do Not Delete                    11/16/2009 7:21 PM

may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. . . . [T]he longer the time between purchase and sale, the more likely that . . . other factors caused the loss.[18]

As a result, despite its narrow holding, *Dura* is proving to be equally as important as *Basic* in the evolution of the securities fraud class action. While *Basic* expanded the use of the securities fraud class action, courts are using *Dura* to restrict the class action by emphasizing the loss causation element beyond what PSLRA requires.[19] The loss causation requirement is a formidable obstacle to plaintiffs at three key stages of litigation: (1) the motion to dismiss,[20] (2) the class action certification,[21] and (3) the motion for summary judgment.[22] At the motion to dismiss stage, courts focus on the substance of the corrective disclosure to determine if it sufficiently reveals the fraud to be deemed "corrective." This presents a difficulty for plaintiffs since it is not in the defendants' interest to expose past misdeeds. At the class certification and summary

18. *Id.* at 343. The relevant event is the time of corrective disclosure and not the date of any subsequent sale, which is not required to establish a loss.

19. The statute states that the plaintiff has the burden of proving that the defendant's violation "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4) (2006). Thus, so long as plaintiffs can prove that the fraudulent disclosure caused some loss and can quantify that loss, they should be able to recover that amount. Nevertheless, some courts require a decline in stock price following corrective disclosure. *See, e.g.*, Magruder v. Halliburton Co., 2009 WL 854656, at *11 (N.D. Tex. Mar. 31, 2009). In addition, circuit courts have held that the misrepresentation must account for a significant portion of the stock price decline. S*ee, e.g.*, McCabe v. Ernst & Young, LLP, 494 F.3d 418, 438 (3d Cir. 2007); Oscar Private Equity Invs. v. Allegiance Telecom, 487 F.3d 261, 265 (5th Cir. 2007); *In re* Daou Sys. Inc., 411 F.3d 1006, 1025–26 (9th Cir. 2005). These interpretations of *Dura* encourage corporate management to mask the impact of corrective disclosure on the stock price by strategic timing of non-fraud-related, company-specific information. *See* Frank Partnoy, *Dura* Fraud 2 (Apr. 24, 2009) (unpublished manuscript presented at the 15th Annual Institute for Law and Economic Policy Conference: Compensation of Plaintiffs in Mass Securities Litigation, on file with the Journal of Corporation Law).

20. See, for example, *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008), in which defendant allegedly engaged in fraudulent practices to maximize the federal funding that was the major source of the company's revenue. The appellate court affirmed the district court's dismissal of the complaint because it did not think that the defendant's corrective disclosures actually disclosed manipulation of student enrollment figures. *Id.* at 1072. While it is understandable that management would want to cloak the fraud, the court, nevertheless, ruled out pleading loss causation through "euphemism." *Id.* at 1064. In contrast, in *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009), the plaintiff was able to adequately plead loss causation with respect to positive statements about a phone company's subprime subscriber program in large part because of internal memoranda in which management stated its belief that the program would be disastrous for the company. *Id.* at 232–38.

21. The Fifth Circuit, in *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007), radically restricted class certification in securities fraud actions by requiring plaintiffs to make a sufficient showing of loss causation in order to trigger the FOTM presumption. *Id.* at 265. The Fifth Circuit held that at this stage the court must "peek at the plaintiff's damages model" and find "some empirically-based showing" linking the original misstatement and the corrective disclosure. *Id.* at 270–71.

22*. See, e.g.*, *In re* Williams Sec. Litig., 558 F.3d 1130, 1143 (10th Cir. 2009) (affirming the district court's grant of summary judgment for the defendant on the issue of loss causation); Ray v. Citigroup Global Mkts., Inc., 482 F.3d 991, 996–97 (7th Cir. 2007) (affirming the district court's grant of summary judgment to the defendant because there was no evidence in the record from which a jury could conclude that the stock price drop was attributable to the brokers' misrepresentations).

Black Post-Macro                          Do Not Delete                          11/16/2009 7:21 PM

judgment stages, courts engage in an additional level of analysis. The court critically reviews the expert's testimony and report and terminates the litigation if they do not provide, in the court's estimation, sufficient showing of loss causation to support a jury verdict in favor of plaintiffs. Thus, the event study must at a minimum eliminate, to the court's satisfaction, the effect on the stock price of other new information, both more general market and industry-related as well as non-fraud-related, company-specific ("confounding") information.[23] Here again, this presents difficulties for the plaintiffs, since corporate managers have the ability to time the release of confounding information to obfuscate the impact of the fraud.[24]

Because much good scholarship has already been written about the impact of *Dura* on pleading and proving loss causation,[25] the remainder of this Comment will address a different issue that has surfaced post-*Dura*: can plaintiffs recover damages resulting from declines in the stock price attributable to the market's reassessment of the integrity of management or the corporation's internal controls?

## I. THE PRICE–VALUE DIFFERENTIAL AND THE ISSUE OF OVER-RECOVERY

Let us assume that plaintiffs have a strong Rule 10b-5 case. They can establish (1) a misstatement made with scienter that inflated the price of a stock traded in an efficient market, (2) a subsequent corrective disclosure, followed by a drop in the stock price, and (3) an event study that eliminates the impact of non-fraud-related events and information on the stock price. Even in this scenario, it is recognized that the resulting difference between the inflated purchase price and the reconstructed stock value (the price–value differential) may not, in all instances, constitute recoverable fraud inflation, and that unless other factors are taken into account, the damages may be too high.[26] Defendants in particular assert that the event study is only the first step in calculating damages.[27]

Scholars have described two situations in which the price–value differential may arguably produce an inflated damages amount. First, the market may overreact initially to

---

23.  *See generally* Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. REV. 883 (1990) [hereinafter *Using Finance Theory*].

24.  Partnoy, *supra* note 19.

25.  *See, e.g.*, Jill E. Fisch, *Cause for Concern: Causation and Federal Securities Fraud*, 94 IOWA L. REV. 811 (2009) (examining both common law causation principles and their applicability to federal securities fraud); Allen Ferrell & Atanu Saha, *The Loss Causation Requirement for Rule 10b-5 Causes of Action: The Implications of* Dura Pharmaceuticals v. Broudo, 63 BUS. LAW. 163, 163 (2007) [hereinafter *The Loss Causation Requirement*] ("address[ing] . . . a number of loss causation issues in light of *Dura*"); James C. Spindler, *Why Shareholders Want Their CEOs to Lie More After* Dura Pharmaceuticals, 95 GEO. L.J. 653 (2007) (discussing the ex post loss rule and its implications upon corporate securities operations); Merritt B. Fox, *Understanding* Dura, 60 BUS. LAW. 1547, 1554–66 (2005) (analyzing the variables influencing sufficiency of pleadings and loss causation).

26.  Bradford Cornell & James C. Rutten, *Market Efficiency, Crashes, and Securities Litigation*, 81 TUL. L. REV. 443, 450 (2006) [hereinafter *Market Efficiency*] (arguing that stock price analysis should not rely solely upon the efficient market hypothesis).

27.  *Compare* Frank Torchio, *Proper Event Study Analysis in Securities Litigation*, 35 J. CORP. L. 159, 163 (2009) (noting that the event study is considered the best estimate of the artificial inflation caused by the fraud), *with* Frederick C. Dunbar & Arun Sen, *Counterfactual Keys to Causation and Damages in Shareholder Class Actions*, 2009 WIS. L. REV. 199, 227 [hereinafter *Counterfactual Keys*] (stating that an event study is the starting point in showing loss causation due to untimely disclosure).

2009]            *Reputational Damages in Securities Litigation*            173

the corrective disclosure, and the stock price will "crash."[28] Crashes can result from the inability of many investors to assess the implications of the negative information, leading to panicked selling following the initial stock decline.[29] In addition, extraneous factors can result in a disproportionate reaction to the bad news.[30] Thus, scholars argue that the stock price immediately following revelation of the truth may not be an accurate reflection of the stock's fundamental value. While the phenomenon of crashes is recognized, financial experts dispute the frequency of their occurrence.[31]

Second, the corrective disclosure may be "over-disclosure," because it conveys more information than the original disclosure misstated and, accordingly, has a greater impact on the stock price than an initial truthful disclosure would have had.[32] The facts in *Basic* are frequently used to illustrate over-disclosure. In that case, management's misstatements were denials about the existence of merger talks; the corrective disclosure was the corporation's announcement of a merger agreement.[33] Since corrective disclosures are rarely mirror images of the misstatements, the problem of over-disclosure, as well as under-disclosure, is a common difficulty that requires construction of an equivalent disclosure price—the price at which the security would have traded if only the omitted and misrepresented information were accurately disclosed.[34] This requires an estimate of "how disclosure of the omitted or misrepresented information would affect investor beliefs regarding the magnitude of future cash payouts on the security and the likelihood of receiving those payments."[35]

The phenomenon of crashes and over-disclosure has been generally acknowledged[36] and illustrates the complexity of the task of determining damages with the resulting "battle of the experts."[37] More recently, some scholars have argued that there is a third category of non-recoverable damages that they have labeled "collateral damage," but

28.  Baruch Lev & Meiring de Villiers, *Stock Price Crashes and 10b-5 Damages: A Legal, Economic, and Policy Analysis*, 47 STAN. L. REV. 7, 7 (1994) (arguing that a "crash price" is an "unsound measure of damages"); *Market Efficiency*, *supra* note 26, at 459–61 (noting that the September 2000 Intel stock crash and the mid-1990s Bristol-Meyers stock crash were the result of market overreaction).

29.  Lev & de Villiers, *supra* note 28, at 14 (discussing the effect of uninformed investors acting on a perceived lack of information).

30*.  Market Efficiency*, *supra* note 26, at 464–69 (discussing the impact of changing perceptions about a corporation or its management and the fear of possible litigation).

31.  *E.g.*, Jonathan C. Dickey & Marcia Kramer Mayer, *Effect on Rule 10b-5 Damages of the 1995 Private Securities Litigation Reform Act: A Forward-Looking Assessment*, 51 BUS. LAW. 1203, 1216–18 (1996) (analyzing stocks with one-day drop of at least 15%).

32*.  Using Finance Theory*, *supra* note 23, at 889–97 (discussing the *Basic* hypothetical and the problem of "over-disclosure"); *see also* Bradford Cornell & James C. Rutten, *Collateral Damage and Securities Litigation* 3–4, *available at* http://ssrn.com/abstract=1342660 [hereinafter *Collateral Damage*] (examining the effect of corrective disclosures and their recoverability under section 10(b) of the Securities Exchange Act of 1934).

33.  *See* Basic Inc. v. Levinson, 485 U.S. 224, 226–28 (presenting the facts of the case).

34*.  Using Finance Theory*, *supra* note 23, at 894–95 (illustrating the complexity involved in determining equivalent disclosures).

35.  *Id.* at 895.

36.  *See supra* notes 26–34.

37.  A district court found that defendants' motion for summary judgment was not the appropriate time to resolve complex damages issues. It specifically noted the absence of case law to support defendants' argument that was essentially a variation of over-disclosure—that plaintiffs must disaggregate damages caused by the risk from damages caused by the materialization of the risk. *In re* Vivendi Universal, S.A. Sec. Litig., 2009 WL 1066254, at *17 (S.D.N.Y. Apr. 21, 2009).

Black Post-Macro                    Do Not Delete                    11/16/2009 7:21 PM

which can be more accurately described as "reputational damages."[38]

Ferrell and Saha apparently originated the phrase "collateral damage"[39] and defined it generally as a decline in the stock price caused by the corrective disclosure in excess of the original inflation.[40] While this definition describes both the crash and over-disclosure difficulties, in fact Ferrell and Saha mean something different. Their discussion is somewhat confusing, however, because they first draw a distinction between misstatements that impact the corporation's current and future cash flows or the rate at which those cash flows will be discounted and those that do not.[41] As an example of the latter, they give an accounting statement that overstates the corporation's cash by $100 and understates its U.S. Treasury holdings by $100.[42] This misstatement, they assert, should not give rise to recoverable damages. They are likely correct in this assertion, but liability will fail because of lack of materiality and (probably) scienter; we do not reach the issue of damages. Accordingly, this hypothetical is something of a non sequitur; material misstatements that do not affect cash flow analysis or investors' assessments of profitability are the securities law equivalent of snakes in Ireland.[43]

Ferrell and Saha then proceed to the core of their argument: corrective disclosures can result in a drop in stock price that should not be attributed to the original misstatement.[44] They give as an example a corrective disclosure, such as an accounting restatement, that results in a stock price drop that includes the market's negative reassessment of the company's management or its internal controls, or the likelihood of disruptive litigation.[45] Subsequent commentators have followed the latter approach. Cornell and Rutten use the phrase "collateral damage" to describe "the valuation impact of a corrective disclosure that does not correspond to the original inflation,"[46] and Dunbar and Sen call it the "ancillary effects arising from the [corrective] disclosure."[47] Notice, however, that these definitions are conclusory labels and thus beg the central post-*Dura* question: how to determine the damages that are proximately caused by the fraudulent misstatement.

Rather than using the loaded phrase "collateral damage," this Comment uses "reputational damages" to describe those damages flowing from a material misstatement in excess of the stock price decline that would have occurred had there been timely disclosure of the accurate negative information and resulting from the market's

---

38.  I am grateful to Marc Gross for suggesting this phrase.

39.  *The Loss Causation Requirement*, *supra* note 25, at 179–85. Cornell and Rutten state that, to their knowledge, Ferrell and Saha coined the phrase. *Collateral Damage*, *supra* note 32, at 4. In their earlier paper, Cornell and Rutten briefly addressed the issue of market loss relating to reassessment of management and discounted it without using the phrase collateral damage. *Market Efficiency*, *supra* note 26, at 463.

40.  *The Loss Causation Requirement*, *supra* note 25, at 181.

41.  *Id.* at 179–80.

42.  *Id.*

43.  Lies about a key executive's background or credentials are material if the truth would cause investors to reassess the corporation's likelihood for success. In *Suez Equity Investors LP v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001), the Second Circuit, reversing the district court, found loss causation. *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198–99 (2d Cir. 2003), clarified that the plaintiffs in *Suez Equity* alleged that the management's incompetence caused the business failure.

44.  *The Loss Causation Requirement*, *supra* note 25, at 180–81.

45.  *Id.*

46.  *Collateral Damage*, *supra* note 32, at 4–5.

47.  *Counterfactual Keys*, *supra* note 27, at 231.

Black Post-Macro                    Do Not Delete                    11/16/2009 7:21 PM

reassessment of the integrity of management or its internal controls.[48] In their later paper, Ferrell and Saha make explicit that they are referring to reputational harm caused by a corrective disclosure.[49] Take this example: a company, realizing that it will not meet its earnings expectations, deliberately misstates its financials in order to meet those expectations. If the accurate negative information had been timely disclosed, the stock price would have dropped $5. When the company subsequently issues a corrective disclosure, the stock price (after accounting for non-fraud-related factors) falls by $15.[50] The additional $10 loss is reputational damages.

No one disputes that the integrity of management and internal controls can have a profound effect on future cash flows. Thus, damages resulting from a negative assessment of management and internal controls are real and cannot be attributed to a "crash" or the market's irrational response to extraneous factors. Indeed, as stated by Cornell and Rutten, "[i]n many situations, collateral damage can have a larger impact on a company's stock price than the original misstatement or omission with which it is associated."[51] Remember that, under my assumptions, plaintiffs can establish that the misstatements were made with scienter. Scienter is not easy to plead or prove.[52] Under my assumptions, plaintiffs have established that management deliberately lied about, or at the very least was recklessly indifferent to, the corporation's financial condition. In addition, under my assumptions, plaintiffs' event study has already accounted for general market and industry conditions and non-fraud-related company-specific information in determining the inflation attributable to the fraud. Given the materiality of the fraud and the resulting harm, I submit that there is no basis in law or policy for denying plaintiffs recovery for reputational damages.

## II.  One Misstatement or Two?

Let us return to the hypothetical involving management's intentional misstatement of financials in order to meet earnings expectations. Those who argue for excluding recovery of the $10 loss attributable to the market's reassessment of the integrity of management or the corporation's internal controls conceptualize the original misstatement as (1) a misstatement of the financials and (2) no statement about the integrity of management or the corporation's internal controls. Building on this characterization of the misstatement, they make two arguments. First, the subsequent price decline attributable to reassessment of management and internal controls is

---

48. A drop in stock price because of the fear of disruptive litigation is less likely. *See Market Efficiency*, *supra* note 26, at 468–69.

49. Allen Ferrell & Atanu Saha, *Securities Litigation and the Housing Market Downturn*, 35 J. Corp. L. 97, 105 (2009) [hereinafter *Housing Market Downturn*].

50. This hypothetical comes from *Collateral Damage*, *supra* note 32, at 6–7.

51. *Id.* at 6.

52. Plaintiffs' complaint must state with particularity facts giving rise to a "strong inference" that defendant acted with scienter. 15 U.S.C. § 78u-4(b)(2) (2006). In determining whether a securities fraud complaint gives rise to a "strong inference" of scienter, the court must consider competing inferences, and plaintiffs must plead facts rendering inference of scienter at least as likely as any plausible opposing inference. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). In the absence of a smoking gun, scienter must be proven by circumstantial evidence; for a list of relevant factors, see *Greebel v. FTP Software*, 194 F.3d 185, 196 (1st Cir. 1999).

Black Post-Macro                    Do Not Delete                    11/16/2009 7:21 PM

176                        *The Journal of Corporation Law*                        [Vol. 35:1

unrelated to the original misstatement and instead results from what *Dura* described as "new firm-specific facts,"[53] not from the correction of the financials.[54] Under this approach, the misstatement of the financials did not cause the $10 price decline. This argument is essentially a specific application of the over-disclosure issue; the revelation of the fraud discloses more truthful information than the original misstatement.[55] A related second argument is that since corporate managers are not required under federal securities law to disclose their own failings,[56] damages cannot result from their failure to do so. Both these assertions are grounded in the characterization of the original misstatement as devoid of any statement or representation apart from the financial information set forth in the communication.

Another view of management's intentional misstatement of the financials that is better grounded in reality is that the misstatement contains both (1) a misstatement of the financial information and (2) a misstatement about the integrity of management and the corporation's internal controls. Securities law has long recognized that investors reasonably expect that financial information released by management is the product of good faith efforts by management to prepare accurate information.[57] Unless investors can rely on the integrity of the financials, they have to engage in wasteful attempts to investigate, discount the stock price to allow for undetected fraud, or opt out of the market altogether. Thus, investor confidence in the integrity of management and its internal controls is paramount to fair and efficient trading markets. As *Basic* put it, "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price."[58] If, on the contrary, the financials are the product of management fraud or reckless disregard for their accuracy, the corporation has made a material misstatement as to the integrity of management and internal controls.[59]

*Virginia Bankshares, Inc. v. Sandberg*[60] established that statements of opinion may be actionable if the speaker does not believe the opinion and the opinion is not well-

---

53.  *See supra* note 18 and accompanying text.

54.  *Housing Market Downturn*, *supra* note 49, at 105; *see also The Loss Causation Requirement*, *supra* note 25, at 182–83.

55.  *See supra* notes 32–40 and accompanying text.

56.  *The Loss Causation Requirement*, *supra* note 25, at 182.

57.  *See* SEC, Audit Committee Disclosure, Rel. No. 34-41987, 1999 WL 955908, at *9 (Oct. 7, 1999) (stating that "[w]hen the public sees a corporate official's signature on a document, it understands that the official is thereby stating that he believes that the statements in the document are true") (quoting Brief for Securities and Exchange Commission as Amicus Curiae at 7, Howard v. Everex Sys., Inc., 228 F.3d 1057 (9th Cir. 2000) (No. 98-17324)).

58.  Basic Inc. v. Levinson, 485 U.S. 224, 247 (1987). *See also* Donald C. Langevoort, Basic *at Twenty: Rethinking Fraud on the Market*, 2009 WIS. L. REV. 151, 160–61 (stating that "a declaration that investors *should* be able to rely on stock-price integrity" is "the only persuasive, coherent interpretation of *Basic*'s presumption" (emphasis added)).

59.  Gebhardt v. ConAgra Foods, Inc., 335 F.3d 824, 829 (8th Cir. 2003); *see also In re* Monster Worldwide, Inc. Sec. Litig., 251 F.R.D. 132, 139 (S.D.N.Y. 2008) (stating that managers' personal certifications of false statements are material to investors); Takara Trust v. Molex Inc., 429 F. Supp. 2d 960, 978 (N.D. Ill. 2006) (stating that "[i]f a company's leaders knowingly misrepresent their earnings, investors may reasonably question the integrity of the company's management, and thus cause an alleged misstatement or omission to be material").

60.  Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083 (1991).

2009]            *Reputational Damages in Securities Litigation*            177

grounded.[61] The Court explained that directors' (and more broadly, managers') statements of opinion are factual in two senses and include two types of statements: first, about the subject matter of the stated reasons or stated beliefs, and second, that the directors acted for the stated reasons or held the stated beliefs.[62] The second statement is important to investors because it gives greater credence to the first statement; investors reasonably rely on the director's or manager's opinion because of his greater knowledge about the corporation and his obligation to act in the best interests of the corporation.[63] Accordingly, if the market subsequently learns that management in fact knew that the underlying statement was false or was reckless about its truth, the decline in the stock price is attributable both to the subject matter of the misrepresentation and the market's reassessment of the integrity of management or the corporation's internal controls.

This principle is applicable most pertinently where the misstatements are contained in a document for which the SEC requires the signatures of corporate officers or directors.[64] This long-established principle (that the misstatement of financial information necessarily includes a misrepresentation about management and internal controls) was reaffirmed in the Sarbanes-Oxley Act of 2002 (SOX).[65] Congress enacted SOX in the aftermath of the financial accounting scandals epitomized by Enron and Worldcom in order to strengthen accounting controls and restore investor confidence.[66] A key provision is the section 302 certification requirement.[67] Both the CEO and CFO of reporting companies must certify that: (1) they have reviewed the annual report on Form 10-K and the quarterly financial reports on Form 10-Q; (2) based on their knowledge, the reports do not contain any materially misleading statements; and (3) based on their knowledge, the financial information in the report fairly presents the company's financial condition, results of operations, and cash flows.[68] In addition, they must certify that they are responsible for establishing and maintaining disclosure controls and procedures and internal controls over financial reporting and that they have disclosed any significant

61. *See* Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1131 (2d Cir. 1994) (explaining that statement of reasons can be actionable "if the person who makes the statement is reasonably presumed to have expertise, to have access to internal corporate information, to owe an obligation to exercise judgment in the interest of stockholders . . . and if the speaker knows the statement to be false"); *see also* Mayer v. Mylod, 988 F.2d 635, 639 (6th Cir. 1993) (holding that "material statements which contain the speaker's opinion are actionable . . . if the speaker does not believe the opinion and the opinion is not factually well-grounded"); Hanon v. Dataproducts Corp., 976 F.2d 497, 507 (9th Cir. 1992) (finding that a company's optimistic statements about its flawed product are actionable if the company, through its responsible employees, knew that the statements were false).

62. *Sandberg*, 501 U.S. at 1092.

63. *Id.* at 1091. *See also* Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281 (3d Cir. 1992) (stating that a reasonable investor would be influenced significantly by knowledge that a bank has knowingly or recklessly hidden its true financial condition).

64. *See* Audit Committee Disclosure, *supra* note 57, at *9; *see also* notes 58–62 and accompanying text.

65. Pub. L. No. 107-204, 116 Stat. 745 (2002) (codified at 18 U.S.C. §§ 1341, 1343 (2006)).

66. "These provisions reflect the Committee's concern regarding the reliability of companies' audited financial statements. In his testimony before the Committee, former SEC Chairman Breeden recognized that there is 'growing doubt about whether audited financial statements are believable.'" Selected Portions of SEN. REP. NO. 107-205 (July 3, 2002) (report of U.S. Senate Committee on Banking, Housing & Urban Affairs, to accompany S. 2673 (July 3, 2002)), *in* CCH, SARBANES-OXLEY ACT OF 2002 LAW AND EXPLANATION 176 (2002).

67. 18 U.S.C. § 1350 (2006).

68. 17 C.F.R. § 240.13a-14 (2009); 17 C.F.R. § 240.15d-14 (2009).

Black Post-Macro                     Do Not Delete                     11/16/2009 7:21 PM

deficiencies and material weaknesses in the controls to the company's auditors and audit committee.[69] Since it is difficult to imagine that a misstatement of the financial statements done for the purpose of disguising a failure to meet earnings expectations could occur without the active involvement, or at least the reckless indifference, of the CEO or CFO, the officers' certification is itself a lie. The SEC confirmed this understanding in the release adopting the final rule, stating that the CEO and CFO were already responsible as signatories for the company's disclosures and that "an officer providing a false certification potentially could be subject to . . . both Commission and private actions for violating § 10(b) and Rule 10b-5."[70] Thus, an intentional misstatement of the financials necessarily contains a misrepresentation about the integrity of management and controls. If the market had understood that management was corrupt or the controls seriously deficient, it would have discounted the stock price; thus, the drop in stock price attributable to its reassessment of management and internal controls is, in the phrase of the Second Circuit, the "materialization of the risk"[71] that links the resulting damage to the previous misstatement. Accordingly, the loss attributable to the market's reassessment of the integrity of management and controls results from the fraudulent misstatements and not "new, firm-specific" facts unrelated to the fraud.

To date, none of the circuit courts has specifically addressed whether a false SOX certification, made with the requisite scienter, is an independent basis for Rule 10b-5 liability. Instead, they focus on the relationship between the SOX certification and the heightened pleading requirement for scienter[72] and acknowledge that an officer's false SOX certification is probative of scienter if he acts intentionally or recklessly.[73] Although it seems obvious that a certification is a statement for purposes of Rule 10b-5 liability,[74] there are a few district court opinions summarily dismissing certifications as

---

69. *Id.*

70. SEC, Certification of Disclosure in Companies' Quarterly and Annual Reports, Rel. No. 33-8124, 78 SEC Docket 875, 2002 WL 31720215, at *9 (Aug. 28, 2002) [hereinafter Certification of Disclosure].

71. Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173–74 (2d Cir. 2005).

72. Case law to date has taken an unfortunately crimped view of the section 302 certification requirement. *See, e.g.*, Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1003–04 (9th Cir. 2009) (referring to the section 302 certification as "boilerplate language"); *see also* Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc., 537 F.3d 527, 544–45 (5th Cir. 2008) (citing the Eleventh Circuit's conclusion that "Sarbanes-Oxley certification, standing alone, is not indicative of scienter"); Ley v. Visteon Corp., 543 F.3d 801 (6th Cir. 2008) (agreeing with the Eleventh Circuit's statement that a "Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements"); *In re* Ceridian Corp. Sec. Litig., 542 F.3d 240, 248 (8th Cir. 2008) (maintaining that the plaintiff must allege specific facts that officers knew their statements were false to negate the strong "opposing inferences of inadvertent mistake or mere negligence"); Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006) (stating that to accept a lesser interpretation would be to establish scienter "in every case where there was an accounting error or auditing mistake").

73. Glazer Capital Mgmt., LP v. Magistri, 549 F.3d 736, 747 (9th Cir. 2008) (referring to "severely reckless" conduct); *Garfield*, 466 F.3d at 1266 (same); *Ley*, 543 F.3d at 812 (referring to presence of "red flags" at time of signing).

74. *See* Certification of Disclosure, *supra* note 70 and accompanying text; *see also In re* Ramp Corp. Sec. Litig., 2006 WL 2037913, at *13 (S.D.N.Y. July 21, 2006) (holding that plaintiff sufficiently alleged that a 302 certification that the 10-K Report did not contain any material untrue statement was a misstatement because it implied that signing officer complied with the company's code of ethics attached as an exhibit). In addition, several opinions assume that certifications are statements. *See, e.g.*, Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 (9th Cir. 2000) (holding that an officer who signs an SEC filing "makes" a statement and can be

Black Post-Macro                    Do Not Delete                    11/16/2009 7:21 PM

2009]                    *Reputational Damages in Securities Litigation*                    179

an independent basis of liability principally because, in the courts' view, they are merely confirmations of the financial statements.[75] However, this view fails entirely to take into account the importance that Congress attached to the certification requirement to improve the quality of financial reporting and to bolster investor confidence.[76] In fact, summary dismissal of SOX certifications as an independent basis of Rule 10b-5 liability supports the argument for recovery of reputational damages. The judicial lack of analysis of this point likely reflects an inability to discern any reason to distinguish misstatements about the financials from misstatements about the integrity of management and internal controls. Accordingly, if courts view the two misstatements as so interrelated that there is no logic to treat them separately, it supports the argument that reputational damages result directly from the misstatement about the financials.

The second argument against allowing reputational damages, also based on the view that the misstatement contains no representation about the integrity of management and internal controls, relies on case law that states that corporate managers are not required to accuse themselves of wrongdoing. Courts initially proclaimed this "no duty" in two instances: when, relying on *Santa Fe Industries, Inc. v. Green*,[77] they dismissed claims that they viewed as transparent attempts to expand Rule 10b-5 into mismanagement, breach of fiduciary duty, or other state law claims,[78] or when, relying on *Basic*,[79] they limited an expansive view of materiality for fear it would confuse investors with too much information of marginal utility.[80] More recently, district courts have employed the "no-duty" doctrine more aggressively to dismiss securities fraud claims they view as lacking merit.[81] Whatever the merits of the "no duty" principle, it has no relevance in the situation in which the defendants made an intentional or reckless false certification, or statement, about the integrity of management and internal controls.

---

liable as a primary violator); Middlesex Ret. Sys. v. Quest Software, Inc., 527 F. Supp. 2d 1164, 1190 (C.D. Cal. 2007) (stating that SOX certifications are "statements" and therefore COX signers could be held primarily liable).

75.  *In re* Huffy Corp. Sec. Litig., 577 F. Supp. 2d 968, 1020 (S.D. Ohio 2008) (following a previous district court opinion "in the absence of a reasoned argument to the contrary"); *In re* Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 336–37 (D.N.J. 2007) (expressing doubt that a SOX certification operates as a misrepresentation of the existence of effective internal controls that could cause an inflated stock price); *In re* Silicon Storage Tech., Inc. Sec. Litig., 2007 WL 760535, at *17 (N.D. Cal. Mar. 9, 2007) (citing lack of caselaw holding that a COX certification is independently actionable); *In re* Watchguard Sec. Litig., 2006 WL 2038656, at *10 (W.D. Wash. Apr. 21, 2006) (finding plaintiff's argument "circular"); *In re* Kindred Healthcare, Inc. Sec. Litig., 299 F. Supp. 2d 724, 732 n.8 (W.D. Ky. 2004).

76.  *See supra* note 66 and accompanying text.

77.  Santa Fe Indus., Inc. v. Green, 430 U.S. 462 (1977).

78.  *See, e.g.*, Biesenbach v. Guenther, 588 F.2d 400, 400 (3d Cir. 1978).

79.  Basic Inc. v. Levinson, 485 U.S. 224, 240–41 (1988). In addition to establishing the FOTM presumption, the Supreme Court also refined the definition of materiality set forth in *TSC Industries, Inc. v. Northway*, 426 U.S. 438 (1976).

80.  GAF v. Heyman, 724 F.2d 727, 740 (2d Cir. 1983).

81.  *See, e.g.*, *In re* Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004).

Black Post-Macro                         Do Not Delete                         11/16/2009 7:21 PM

### III. OVER-RECOVERY AND THE RELEVANCE OF SECTION 21D(E)

The final argument against recovery of reputational damages is, frankly, to limit plaintiffs' recovery. Those who argue against their recovery assert the familiar refrain— because of the speculative and open-ended nature of damages in private securities litigation, to allow recovery would lead to excessive awards and put too much pressure on defendants to settle lawsuits of even questionable merit.[82] It is true that the Supreme Court has consistently expressed concern about the impact on corporate defendants of expanding the private Rule 10b-5 remedy.[83] More generally, common law tort principles traditionally employ proximate cause as a limitation on damages in accordance with society's prevailing values.[84]

Congress addressed explicitly the issue of excessive and uncertain damages in PSLRA.[85] In contrast to section 11(e) of the Securities Act,[86] Congress did not set forth in the statute either a principle or a formula for determining Rule 10b-5 damages, despite its recognition of the complexity of the issue and the "substantial variations" frequently found in plaintiffs' and defendants' calculations.[87] Rather, Congress apparently assumed that, at least in the typical case, damages will be calculated as the difference between the price paid for the security and the price of the security on the date of corrective disclosure,[88] and working with this assumption, set forth a cap on recoverable damages.[89] Thus, whenever plaintiffs seek to establish damages based on market price, the amount of damages cannot exceed the difference between the purchase price and the mean trading price of the security during a 90-day period beginning on the date of the corrective disclosure.[90] By requiring an extended period to calculate the value of the stock untainted by fraud, this provision is best designed to deal with the problem of stock crashes,[91] and the legislative history cites a law review article specifically addressing this

---

82. *See, e.g.*, *Collateral Damage*, *supra* note 32, at 16.

83. *See, e.g.*, Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 160 (2008).

84. *See* Fisch, *supra* note 25, at 849–50 (explaining that courts utilize the doctrine of proximate cause when determining defendant's liability as to loss incurred).

85. H.R. REP. NO. 104-369, at 42 (1995) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 730, 741 ("Calculating damages based on the date corrective information is disclosed may end up substantially overestimating plaintiff's damages. The Conference Committee intends to rectify the uncertainty in calculating damages . . . ." (citation omitted)).

86. 15 U.S.C. § 77k(e) (2006).

87. *See supra* note 85.

88. *See supra* note 85.

89. It is true that the legislative history describes the provision as setting forth a method of calculating damages. H.R. REP. NO. 104-369, at 42 ("This provision requires that plaintiff's damages be calculated . . . [by] tak[ing] into account the value of the security on the date plaintiff originally bought or sold the security and the [mean market] value of the security during the 90-day period after dissemination of any information correcting the misleading statement or omission."). However, this description is contrary to the express statutory language. 15 U.S.C. § 78u-4(e)(1) (2006).

90. 15 U.S.C § 78u-4(e)(1) (2006). If plaintiff sells within the 90-day period, the sale date marks the end of the cap period. *Id.* § 78u-4(e)(2).

91. As described by one commentator, "the mean 90-day figure discounts the over-reaction of the market price in immediate response to the disclosure of any fraud, allowing the market time to absorb the fraud and reach a cooler judgment about the security's true value." MICHAEL J. KAUFMAN, SECURITIES LITIGATION: DAMAGES § 3.13, at 3-96 (1989). *See also* Robert B. Thompson, *"Simplicity and Certainty" in the Measure of Recovery under Rule 10b-5*, 51 BUS. LAW. 1177, 1193 (1996) (stating that "[t]he premise, more implied than

Black Post-Macro                              Do Not Delete                              11/16/2009 7:21 PM

problem.[92] Neither the statutory language nor the legislative history, however, expresses any intention to limit the applicability of the cap. Quite to the contrary, the legislative history twice states that the purpose of the provision is to limit damages to "those losses caused by the fraud and not by other market conditions."[93] The cap is poorly designed to address this issue; rather, the event study is the accepted method for weeding out the effect of market conditions.[94] Nevertheless, however muddled the congressional explanation, two things are plain: (1) Congress contemplated that damages would be calculated based on the price–value differential, and (2) the statutory language provides a generally applicable limitation on recoverable damages to prevent "windfall" damages.[95] Accordingly, courts should not create additional limitations on recoverable damages that go beyond congressional policy. Such judicial activism would be contrary to the *Stoneridge* principle that the role of the judiciary post-PSLRA is to implement congressional intent.[96]

## IV. *Blue Chip Stamps* Does Not Bar Recovery of Reputational Damages

A final argument against recovery of reputational damages is based on the observation that all shareholders suffer loss in value of their investments resulting from the market's reassessment of the integrity of management and internal controls. Accordingly, it is argued, since *Blue Chip Stamps v. Manor Drug Stores*[97] limits standing to purchasers and sellers, it follows that if holders cannot bring a Rule 10b-5 claim to recover their losses, then purchasers should not be able to recover that portion of their losses resulting from reputational damages.[98] This argument, whatever its superficial "equal-treatment" logic, proves too much. *Blue Chip Stamps* itself acknowledged that the purchaser-seller requirement is an arbitrary rule that excludes some plaintiffs that have been damaged by defendants' Rule 10b-5 violations[99] and recognized this disadvantage. The Court, however, determined to adopt the requirement largely because of a perceived need to thwart fabricated claims.[100] Extending *Blue Chip Stamps* to limit recovery of purchasers' damages in instances in which plaintiffs have survived the obstacles of PSLRA would be unwarranted judicial activism.

express, appears to be that the market price after correction of the fraud will not produce a true market price free of fraud, but rather will overcompensate because of a 'crash' effect that carries the price past where it otherwise should be").

  92. *See supra* note 85.

  93. *See supra* note 85, at 707, 741. The title of the subsection of the Conference Report, "*Limitation on 'windfall' damages*," also expresses the congressional concern.

  94. *See supra* notes 3–4.

  95. *See* Dickey & Mayer, *supra* note 31, at 1212 (stating that "perhaps notions of fairness[] may be the real explanation for the Reform Act's limitation on damages"); Kaufman, *supra* note 91, § 3.13 (stating that "[t]he cap is a crude rule of thumb designed to limit otherwise appropriate damages").

  96. *See supra* note 7 and accompanying text.

  97. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975).

  98. *Housing Market Downturn*, *supra* note 49, at 106; *Collateral Damage*, *supra* note 32, at 35.

  99. *Blue Chip Stamps*, 421 U.S. at 743.

  100. *Id.* at 747; *see also* Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 84 (2006) (explaining that *Blue Chip Stamps* was decided on the basis of congressional policy, not on the text).

| Black Post-Macro | Do Not Delete | 11/16/2009 7:21 PM |

## V.  CONCLUSION

Since *Dura*, scholars have advanced arguments to limit recovery of damages that result from material misstatements on loss causation grounds. This Comment addresses arguments to exclude as "collateral damage" reputational damages, that is, losses resulting from the market's negative assessment of the integrity of management and the corporation's internal controls. Arguments to exclude reputational damages stem from a persistent distrust of securities fraud class actions and the specter of open-ended damages for claims of dubious merit. Congress, however, sought to weed out weak claims in a number of ways, including the heightened pleading requirement for scienter and the requirement that plaintiffs bear the burden of proving that the fraud caused the loss for which they seek to recover damages. As a practical matter, an event study is required to show loss causation and to quantify damages. In addition, PSLRA provides a cap on recoverable damages. It would be unwarranted judicial activism to impose more stringent loss causation and damage burdens on plaintiffs than Congress provided.

Moreover, allowing recovery for reputational damages furthers the policy set forth in *Basic*, and reinforced by Congress in SOX, that investors should be able to rely on the corporation's financial statements and can reasonably expect that financial information released by management is the product of good faith efforts by management to prepare accurate information.

View publication stats