# EXHIBIT 9



heinonline.org | holsupport@wshein.com

**CITATIONS:**

**Bluebook 21st ed.**
Janet Cooper Alexander, The Value of Bad News in Securities Class Actions, 41 UCLA L. REV. 1421 (August 1994).

**ALWD 7th ed.**
Janet Cooper Alexander, The Value of Bad News in Securities Class Actions, 41 UCLA L. Rev. 1421 (1994).

**APA 7th ed.**
Alexander, Janet Cooper. (1994). The value of bad news in securities class actions. UCLA Law Review, 41(6), 1421-1470.

**Chicago 17th ed.**
Janet Cooper Alexander, "The Value of Bad News in Securities Class Actions," UCLA Law Review 41, no. 6 (August 1994): 1421-1470

**McGill Guide 10th ed.**
Janet Cooper Alexander, "The Value of Bad News in Securities Class Actions" (1994) 41:6 UCLA L Rev 1421.

**AGLC 4th ed.**
Janet Cooper Alexander, 'The Value of Bad News in Securities Class Actions' (1994) 41(6) UCLA Law Review 1421

**MLA 9th ed.**
Alexander, Janet Cooper. "The Value of Bad News in Securities Class Actions." UCLA Law Review, vol. 41, no. 6, August 1994, pp. 1421-1470. HeinOnline.

**OSCOLA 4th ed.**
Janet Cooper Alexander, 'The Value of Bad News in Securities Class Actions' (1994) 41 UCLA L Rev 1421

**Date Downloaded:**    Mon Nov 10 14:16:12 2025

**Source:**    https://heinonline.org/HOL/Page?handle=hein.journals/uclalr41&id=1445

**Terms, Conditions & Use of PDF Document:**
Please note, citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper formatting. Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at: https://heinonline.org/HOL/License. The search text of this PDF is generated from uncorrected OCR text. To obtain permission to use this article beyond the scope of your license, please use: https://www.copyright.com.

*HeinOnline is a product of William S. Hein & Co., Inc. | 2350 North Forest Road, Getzville, NY 14068*



heinonline.org | holsupport@wshein.com

**AI SUMMARY:**

**The Value of Bad News in Securities Class Actions**
*UCLA Law Review, Vol. 41, Issue 6 (August 1994), pp. 1421-1470*
Alexander, Janet Cooper (Cited 1149 times)
41 UCLA L. Rev. 1421 (1993-1994)

**Central Thesis:**
The article critically examines the methodologies used to calculate damages in
securities class actions, arguing that current approaches are flawed and lead to
overestimation of damages. It highlights the uncertainty and complexity in
determining per-share damages and the number of shares in the class, which can result
in significant financial swings. The analysis suggests that the event-study
methodology fails to isolate the market's reaction to alleged misrepresentations from
other factors, leading to inaccurate damage assessments. The author advocates for a
reevaluation of the remedial approach, proposing a shift from compensatory damages to
a regulatory sanction system, such as civil penalties, to better align with the
deterrent and enforcement goals of securities laws.

**Legal/Academic Issues Addressed:**
- Challenges in calculating per-share damages and determining the number of shares in
securities class actions.
- Uncertainty in distinguishing the market's reaction to alleged misrepresentations
from other factors.
- Overstatement of class damages due to flawed methodologies.
- Impact of damage calculation uncertainties on the effectiveness of securities class
actions in enforcing the law.
- The need for a reevaluation of remedial approaches in private securities
litigation.

**Methodologies/Data Sources:**
- Analysis of expert testimony and damage calculations in specific cases, such as the
Apple case.
- Examination of the event-study methodology and its limitations.
- Review of data on institutional investors' role in securities class actions.

**Findings/Analysis:**
- The event-study methodology cannot effectively isolate the impact of alleged
misrepresentations on stock prices.
- Current damage calculation methods systematically overstate the class's aggregate
damages.
- The uncertainty in damages calculations hinders the assessment of the effectiveness
of securities class actions.
- The prevailing methods for calculating damages are analytically flawed and biased
toward overestimation.

**Recommendations/Implications:**
- Replace compensatory damages with a regulatory sanction system, such as civil
penalties.

**Disclaimer:** This summary was automatically generated on September 23, 2025, using HeinOnline's proprietary AI technology. It is
intended to provide a general overview of the article's content and may not fully reflect its nuances or arguments. We
welcome your feedback to help us continue improving this feature.

**HEINONLINE**

heinonline.org | holsupport@wshein.com

- Model private enforcement procedures on qui tam actions to encourage institutional investors' active role in enforcement suits.
- Align the remedial approach with the broader regulatory goals of securities laws, focusing on deterrence and market integrity.

**Disclaimer:**  This summary was automatically generated on September 23, 2025, using HeinOnline's proprietary AI technology. It is intended to provide a general overview of the article's content and may not fully reflect its nuances or arguments. We welcome your feedback to help us continue improving this feature.

# THE VALUE OF BAD NEWS IN SECURITIES CLASS ACTIONS

Janet Cooper Alexander[*]

INTRODUCTION .......................................... 1421
I.  MEASURING THE VALUE OF BAD NEWS ........................... 1428
    A.  The Legal Standard ...................................... 1428
    B.  The Price Effect of Anticipated Litigation .................... 1435
    C.  Initial Public Offerings and the "Litigation Put" Option .......... 1440
        1.  The Content of the "Litigation Put" Option ............... 1440
        2.  Does the Market Value the Litigation Put? ................ 1443
        3.  Pricing the Litigation Put ............................. 1444
        4.  Disproportionate Returns to Large Investors ............... 1448
    D.  Valuing the Litigation Put in Secondary-Market Cases ........... 1451
    E.  Implications for the Computation of Damages ................. 1452
II.  OTHER SOURCES OF UNCERTAINTY ............................ 1453
    A.  Uncertainty About Per-Share Damages ...................... 1453
    B.  Uncertainty About the Number of Shares in the Class ........... 1458
III.  ASSESSING THE EFFECTIVENESS OF SECURITIES CLASS ACTION LITIGATION  1462
CONCLUSION .......................................... 1468

## INTRODUCTION

There has been a vigorous debate in recent years about whether securities litigation is broke, and if it is, how to fix it.[1]  In this debate, the issue of the calculation of damages has received little consideration.

*    Professor of Law, Stanford Law School.  This research was supported by a grant from the George Roberts Foundation.  I am grateful to Ian Ayres, Richard Craswell, Philip Drake, Ronald Gilson, Margaret Jane Radin, and the participants in a Stanford Law School faculty seminar for their comments on previous drafts, and to Valerie Schulthies and Mara Kapelovitz for invaluable research assistance.

1.    See, e.g., Private Litigation Under the Federal Securities Laws: Hearings Before the Subcomm. on Securities of the Senate Comm. on Banking, Housing, and Urban Affairs, 103d Cong., 1st Sess. 141–49, 399–411 (1993) (hearings on S. 1976); Janet Cooper Alexander, Do the Merits Matter? A Study of Settlements in Securities Class Actions, 43 STAN. L. REV. 497 (1991) [hereinafter Alexander, Do the Merits Matter]; John C. Coffee, Jr., Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter Is Not Working, 42 MD. L. REV. 215 (1983) [hereinafter Coffee, Rescuing the Private Attorney General]; John C. Coffee, Jr., Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions, 86 COLUM. L. REV. 669 (1986) [hereinafter Coffee, Understanding the Plaintiff's Attorney]; Jonathan R. Macey & Geoffrey P. Miller, The Plaintiffs' Attorney's Role in Class Action

41 UCLA LAW REVIEW 1421 (1994)

From a practical perspective, however, the determination of damages is one of the most significant and difficult legal issues in class action securities litigation. In cases involving publicly-traded companies with millions of outstanding shares, even small differences in the calculation of per-share damages or the number of shares in the class can result in swings of millions of dollars in the damages column. Yet the determination of both of these critical facts is fraught with uncertainty. This Article describes several sources of uncertainty and systematic overstatement in the calculation of damages in securities class actions, and considers some implications of these issues for proposals for reform.

In securities cases, as in any economic litigation, damages is an important issue at trial. The vast majority of securities class actions do not go to trial, however, but are resolved by settlement.[2] The issue of damages may be more significant when a case is settled—for while trials usually focus on what happened (the liability case), settlement negotiations focus primarily on dollars. If it is true that the strength of the plaintiff's liability case plays only a small role in determining the amount of the settlement in securities

---

and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 U. CHI. L. REV. 1 (1991); Roberta Romano, The Shareholder Suit: Litigation Without Foundation?, 7 J.L. ECON. & ORGANIZATION 55 (1991); Nicholas E. Chimicles & Kathleen P. Balon, Assessing the Need for Class Action Reform, N.Y. L.J., Aug. 26, 1993, at 5; Vincent E. O'Brien, The Class-Action Shakedown Racket, WALL ST. J., Sept. 10, 1991, at A20.

2. Very few securities class actions are disposed of on motions to dismiss or for summary judgment, and almost none are tried. Barbara A. Banoff & Benjamin S. DuVal, Jr., The Class Action as a Mechanism for Enforcing the Federal Securities Laws: An Empirical Study of the Burdens Imposed, 31 WAYNE L. REV. 1, 57–59, 75, 77 (1984) (data including derivative, class action, and individual suits); Frederick C. Dunbar & Vinita M. Juneja, RECENT TRENDS II: WHAT EXPLAINS SETTLEMENTS IN SHAREHOLDER CLASS ACTIONS? tbl. 1 (Nat'l Econ. Res. Associates, Inc. 1993) (of 334 cases resolved from July 1991 through June 1993, only 8 resulted in judgments; 45 were resolved by dismissal, including voluntary dismissals by plaintiffs); Thomas M. Jones, An Empirical Examination of the Resolution of Shareholder Derivative and Class Action Lawsuits, 60 B.U. L. REV. 542, 544–46 (1980) (data including derivative suits and class actions); John E. Kennedy, Securities Class and Derivative Actions in the United States District Court for the Northern District of Texas: An Empirical Study, 14 HOUS. L. REV. 769, 811 (1977) (of 35 class and derivative securities actions, all but four were disposed of by settlement); Roberta Romano, supra note 1, at 60 (data including derivative suits and class actions); Vincent E. O'Brien & Richard W. Hodges, A Study of Class Action Securities Fraud Cases 1988–1993, at I-5 (June 1993) (unpublished study, on file with the author) (of 381 suits for which information was available, none were tried, 33 were "dismissed," 4 were "withdrawn," and 344 were settled); Communication from Philip D. Drake to author (Dec. 1992) regarding Philip D. Drake & Michael R. Vetsuypens, IPO Underpricing and Insurance Against Legal Liability, FIN. MGMT., Spring 1993 (of 93 cases involving initial public offerings, only two went to trial, both resulting in defense verdicts).

class actions,[3] the damages calculation would assume even greater impor-
tance than in other types of cases.[4]

When the amount of damages is uncertain, settlement negotiations
may be impeded or distorted. If the parties have divergent estimates of the
potential damages, there may not be a "zone of agreement" within which
settlement can take place.[5] Widely differing damage estimates may lead to
different views of whether a particular offer is reasonable and thus to mis-
trust of the other side's sincerity. These differences will exacerbate the
psychological barriers to efficient settlement that exist in every negotia-
tion.[6] On the other hand, when the amount of damages is both uncertain
and very large, risk-aversion may make parties unwilling to go to trial under
any circumstances, merely distorting the settlement process. Anecdotally,
practicing lawyers often cite uncertainty over damages as a prime reason
why cases do not go to trial.

These principles are strikingly illustrated in securities class actions.
Although there is agreement, at a high level of generality, on the measure
of damages, the parties' calculations of damages typically are far apart, even
(or perhaps especially) in well-lawyered cases.[7] The plaintiffs and defen-

---

3. *See* Alexander, *Do the Merits Matter*, *supra* note 1, at 499–500. A recent study of 91
securities class action settlements seems to lend support to this hypothesis, finding that in the 55
cases with identifiable class periods and known dispositions, settlements can be expressed as
including a fixed component ranging from about $4.4 million to $6.2 million (depending on
whether cases that were dismissed are included in the sample as zero settlements) plus approxi-
mately 1.76 cents per dollar of estimated damages using the "conventional proportional decay
model" for computing damages which is discussed in Part II of this Article. Jennifer Francis et
al., Determinants and Outcomes in Class Action Securities Litigation, 31–33, 51 tbl. 11 (revised
Sept. 1993) (unpublished manuscript, on file with author).

4. The traditional economic model of settlement holds that settlement decisions are made
by comparing the settlement offer with the present expected value of taking the case to trial.
*See, e.g.*, George L. Priest & Benjamin Klein, *The Selection of Disputes for Litigation*, 13 J. LEGAL
STUD. 1, 4 (1984). The "bargaining in the shadow of the law" model, which holds that settle-
ment negotiations are about dividing the gains produced by settling rather than litigating the
case, is also based on the assumption that the expected outcome at trial is a primary determinant
of settlements. *See* Robert Cooter et al., *Bargaining in the Shadow of the Law: A Testable Model of
Strategic Behavior*, 11 J. LEGAL STUD. 225, 225–26 (1982).

5. *See* Priest & Klein, *supra* note 4, at 15–16.

6. *See, e.g.*, George Loewenstein et al., *Self-Serving Assessments of Fairness and Pretrial Bar-
gaining*, 22 J. LEGAL STUD. 135 (1993); Robert H. Mnookin, *Why Negotiations Fail: An Exploration
of Barriers to the Resolutions of "Conflict,"* 8 OHIO ST. J. ON DISP. RESOL. 235 (1993); Lee Ross &
Constance Stillinger, *Barriers to Conflict Resolution*, 7 NEGOTIATION J. 389 (1991); Amos Tversky
& Daniel Kahneman, *Judgment Under Uncertainty: Heuristics and Biases*, 185 SCI. 1124 (1974).

7. This aspect of securities class action litigation is at odds both with the conventional
economic models of settlement, which predict that rational parties represented by competent
lawyers with full access to the relevant facts—all of which characteristics are typically present in
securities class actions—will arrive at similar estimates of the expected value of the case, *see* Priest
& Klein, *supra* note 4, at 4, 11–13, and with the philosophy underlying the Federal Rules of Civil

1424                                    41 UCLA LAW REVIEW 1421 (1994)

dants may not even agree on the methodology for making the calculation, let alone the factors to be taken into account and the weight to be given to each.[8] Because the cases hardly ever go to trial and the amount of damages is not usually an appropriate subject for summary judgment, damages are seldom adjudicated in securities class actions.[9] Accordingly, courts have not often addressed the calculation of damages, at least in reported decisions. When they do so, it is usually only in general terms, or at a preliminary and abstract stage. This scarcity of adjudication leaves the parties largely in the dark about how to implement the general standards for measuring damages, and thus free to construct approaches favorable to their positions.

The cases are characterized by expert testimony that is inconsistent and partisan. An illustrative example is the well-publicized 1991 trial involving Apple Computer.[10] The plaintiffs' complaint originally alleged

---

Procedure that discovery facilitates a "just, speedy and efficient" resolution of cases by providing a level playing field in which all parties have equal access to information. *See* FED. R. CIV. P. 1.

8.  *See, e.g., In re* Pizza Time Theatre Sec. Litig., No. 84-20048(A) (N.D. Cal. May 26, 1988), (parties argued about what industry the defendant was a part of and the inclusion of companies in the comparable stock indices); *In re* Activision Sec. Litig., No. C-83-4639 (A) (N.D. Cal. Mar. 8, 1988) (parties disagreed about the appropriate statistical methodology, the comparability of companies included in each other's industry control groups, and the appropriate criteria for assessing comparability); Declaration of Randolph Westerfield in Support of the Motion by Activision Defendants for Summary Judgment (Oct. 3, 1986), *Activision* (No. C-83-4639(A)); Declaration of Daniel R. Fischel in Support of the Motion by Activision Defendants for Summary Judgment (Oct. 3, 1986), *Activision* (No. C-83-4639(A)); Declaration of John Torkelsen in Support of Plaintiffs' Memorandum in Opposition to Defendants' Motions for Partial Summary Judgment (Oct. 20, 1986), *Activision* (No. C-83-4639(A)); Plaintiffs' Memorandum in Opposition to Defendants' Motions for Partial Summary Judgment (Oct. 20, 1986), *Activision* (No. C-83-4639(A)); Reply Memorandum of the Activision Defendants in Support of their Motion for Summary Judgment (Oct. 27, 1986), *Activision* (No. C-83-4639(A)); Reply Declaration of Daniel R. Fischel in Support of the Activision Defendants' Motion for Summary Judgment (Oct. 27, 1986), *Activision* (No. C-83-4639(A)); Reply Declaration of Randolph Westerfield in Support of the Activision Defendants' Motion for Summary Judgment (Oct. 27, 1986), *Activision* (No. C-83-4639(A)); Rebuttal Declaration of John Torkelsen in Opposition to Underwriter Defendants' Motion for Summary Judgment (Nov. 6, 1986), *Activision* (No. C-83-4639(A)).

9.  *See* Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. REV. 883, 884 & nn.5-6 (1990). Adjudication, both of liability and of damages, is more common in individual (non-class) actions; moreover, the damages issues that create such uncertainty in class actions, *see* discussion *infra* Parts I & II, do not usually pose a significant problem in non-class cases.

10.  *In re* Apple Computer Sec. Litig., No. C-84-20148 (N.D. Cal. May 13, 1991). This Article makes reference to *Apple* at various parts throughout, as a convenient way of illustrating both the application of the current damages methodology and the difficulties and uncertainties of that methodology. This is not to imply that *Apple* was a representative case. *Apple* was unusual in several respects: it was one of the handful of cases that have gone to trial; it went to trial on only 3 of the 16 statements alleged in the original complaint; and the liability case that went to the jury was widely regarded as weak. *See infra* Part III. I use *Apple* because the case went to trial and thus there is a complete public record of both sides' damages case, including cross-examina-

*The Value of Bad News*                                             1425

that the defendants had made a number of misrepresentations about the Lisa computer, which had been a spectacular market failure. After several years of pretrial skirmishing, the district court granted summary judgment for defendants on all of the alleged misrepresentations.[11] The Ninth Circuit upheld the summary judgment as to most of the case, but held that there was a factual issue for trial as to two statements in which the defendants allegedly failed to disclose technical problems with the development of the "Twiggy" disk drive, which was designed for use in the Lisa.[12]

At the trial on these claims, the plaintiffs' expert on damages, John Torkelsen, testified that the class's damages were $120 million.[13] He began with the fact that Apple's stock price dropped $8.25 per share following a press release in which Apple announced both that its forecasts of revenues and earnings for the fourth quarter were sharply down and that it had decided to discontinue its efforts to manufacture its own disk drives. He concluded that $3.25 of this $8.25 price decline was attributable to the disk-drive announcement,[14] and that the stock price had been inflated by a constant value of $3.25 per share throughout the class period because of the alleged misrepresentations about the disk drive. Applying this figure to the number of shares that he calculated were in the class, he testified that total class damages were "just shy of $120 million."[15]

---

tion of both expert witnesses. *Apple* thus provides a complete picture of the methodology of determining damages in a real, factual context. In settled cases, by contrast, the parties' damage calculations become public only incompletely (for example, through declarations filed in support of summary judgment motions), if at all, because even the depositions of expert witnesses are customarily covered by a confidentiality agreement.

11. *In re* Apple Computer Sec. Litig., 690 F. Supp. 872 (N.D. Cal. 1987); *In re* Apple Computer Sec. Litig., 672 F. Supp. 1552 (N.D. Cal. 1987); *In re* Apple Computer Sec. Litig., 696 F. Supp. 490 (N.D. Cal. 1987).

12. *In re* Apple Computer Sec. Litig., 886 F.2d 1109 (9th Cir. 1989), *cert. denied*, 110 S. Ct. 3229 (1990).

13. *See* Transcript of Trial Proceedings [hereinafter *Apple Trial Transcript*] at 1435, *In re* Apple Computer Sec. Litig., No. C-84-20148 (N.D. Cal. May 13, 1991) (testimony of John M. Torkelsen).

14. Torkelsen first determined that no more than $5.00 of the price decline could be attributed to the earnings announcement. Eliminating this amount from the total price drop left $3.25, which he concluded was caused by the disk-drive announcement. *Id.* at 1405, 1435.

15. *Id.* at 1435. In addition, the plaintiffs requested prejudgment interest, to be awarded by the court rather than the jury. Prejudgment interest would have nearly doubled the award. *See* Memorandum of Points and Authorities in Support of Motion for Entry of Judgment in an Aggregate Amount and for Award of Pre-Judgment Interest at 13–15, *In re* Apple Computer Sec. Litig., No. C-84-20148 (N.D. Cal. Aug. 29, 1991) (requesting judgment for $98,764,431, on basis of jury's finding that per-share damages were $2.90, plus prejudgment interest of $74,792,092).

The defendants' expert, Daniel Fischel, testified that the class had suffered no damages at all.[16] He concluded that the disclosure of the decision to terminate the disk-drive project had either a neutral or a positive effect on the stock price—that the market either didn't care about the disk drive, or thought Apple would make more money by buying its disk drives from external sources. In his opinion, all of the $8.25 price drop was caused by other factors, primarily the effects of IBM's increasing dominance of the desktop computer industry on Apple's profitability, which lowered investors' expectations of Apple's future earnings.

This pattern—plaintiffs' expert testifying that damages amount to many millions of dollars, while defendants' expert testifies that damages are nonexistent or nearly so—may be the norm rather than the exception in securities class actions.[17] If extreme divergence in damage estimates is not simply a trial tactic, but represents a fundamental lack of common ground as to how much is at stake if plaintiffs prevail on liability, it may have important implications for evaluating the effectiveness of class action litigation for enforcing the securities laws.

In view of the practical significance of the damages calculation to the resolution of actual cases, further attention to this issue may shed light on the possibilities for reform. This Article is an effort to begin thinking about, and rethinking, damages.

Part I discusses the calculation of damages in securities class actions, showing that under current legal doctrine and using currently-available methodologies, these calculations systematically overestimate the class's damages. Broadly speaking, if a securities violation is proven, investors are legally entitled to recover the difference between the price they paid and the "true value" of the security (what the market price would have been if the correct information had been known at the time).[18] The most widely

---

16.  See Apple Trial Transcript, supra note 13, at 1742–44, 1806–26, 1847 (testimony of Daniel R. Fischel). This opinion is to be distinguished from the defendants' argument that there was no liability. In their damages case, the defendants argued that the class suffered no damages as a result of the statements even if they were false and misleading.

17.  See, e.g., In re Activision Sec. Litig., No. C-83-4639(A) (N.D. Cal. May 26, 1988), in which the plaintiffs claimed approximately $23 million in damages and the defendants argued that damages were zero, because the entire price decline was attributable to investors' reassessment of the industry as a whole, rather than the firm-specific information alleged in the complaint. Underwriter Defendants' Pretrial Statement at 5 (Nov. 7, 1986), Activision (No. C-83-4639(A)) (plaintiffs claimed $23 million); Memorandum of the Activision Defendants In Support of Their Motion for Summary Judgment at 10–17 (Oct. 3, 1986), Activision (No. C-83-4639(A)) (entire price decline caused by industry-wide factors).

18.  The textual statement is a simplified formulation of the generally-accepted rule for damages in cases brought under Rule 10b-5. Damages for violations of the 1933 Act, which has a different measure of damages, are discussed infra Part I.A.

used methodology for proving damages is, first, to establish per-share damages by using event studies to isolate the price effect on the stock when the corrective information was eventually disclosed, and then, working backward by one of several techniques, to construct a hypothetical market price absent the fraud for each trading day in the class period. Statistical methods are then used to estimate the number of shares that became entitled to recover damages on each day of the class period. The results of the two steps are combined and aggregated to give the total damages for the class period.[19]

Event-study methodology is quite sophisticated in its ability to isolate the price effects of a particular disclosure. Nevertheless, this approach as applied in actual cases is analytically flawed because it assumes that measuring the price effect of the *disclosure* of previously-concealed information is the same as measuring the market value of the *information itself*. But investors are willing to pay less for the stock after the disclosure for three distinct reasons: (1) they expect the firm's future cash flows to be lower because of the corrective information about the firm's prospects; (2) they expect the firm to incur direct and indirect costs as a result of litigation over the announcement; and (3) purchasers after the announcement, unlike previous purchasers, will not have the right to share in the proceeds of a lawsuit over the failure to disclose. Thus, the effect on the stock price of a disclosure of seriously bad news has three components: (1) the market value of the new information itself; (2) the anticipated costs of litigation over the disclosure; and (3) the value of the termination of subsequent purchasers' right to sue over the information. Plaintiffs are entitled to recover under the securities laws for only the first of these components. Event-study methodology does not, and perhaps cannot, disaggregate the market's reaction to the effect of the information itself on the firm's value from the litigation-related components of the reaction to the disclosure. Thus, the current methodology systematically overstates the class's damages.

Part II discusses additional factors that produce uncertainty in damage calculations in securities class actions. Most prominent among these is the fact that current methods grossly overestimate the number of shares in the class. Part III shows that the uncertainties associated with damages calculations make it difficult to assess the effectiveness of securities class actions as a means of enforcing the securities laws. In the conclusion, I suggest that the approach to remedies for private securities class actions is ripe for reconsideration.

---

19. This methodology is discussed *infra* Parts I and II.

41 UCLA LAW REVIEW 1421 (1994)

## I. MEASURING THE VALUE OF BAD NEWS

### A. The Legal Standard

The general contours of damages determinations in securities class actions are well-established. Two statutory provisions are relevant: the Securities Act of 1933 (the "1933 Act"), particularly Section 11 of the Act,[20] and the Securities Exchange Act of 1934 (the "1934 Act"), specifically Section 10(b) and Rule 10b-5 promulgated thereunder.[21] The 1933 Act applies to public offerings of securities, the 1934 Act to all purchases and sales of securities.

In Rule 10b-5 cases, the generally accepted rule is that plaintiffs are entitled to an out-of-pocket, fraud measure of damages.[22] That is, each purchaser is entitled to the difference between the price she paid for the shares and their "value" at the time of the purchase,[23] had the violation not occurred.[24] In adopting the fraud-on-the-market theory of liability,[25]

---

20. 15 U.S.C. § 77k (1988). Section 12, which applies to underwriters and others who actively participate in the selling effort, gives investors a right to rescission. 15 U.S.C. § 77l (1988). Whether § 12 applies to aftermarket purchasers is still an open question. *See, e.g.,* Gustafson v. Alloyd Co., No. 93-404 (7th Cir.), *cert. granted,* 62 U.S.L.W. 3198 (1994); Pacific Dunlop Holdings, Inc. v. Allen & Co., 993 F.2d 578, 595 (7th Cir. 1993) (§ 12(2) applies to secondary market transactions), *solicitor general's views invited,* 114 S. Ct. 52 (1993), *cert. granted,* 114 S. Ct. 907 (1994), *cert. dismissed,* 1994 U.S. LEXIS 2041 (1994); Ballay v. Legg Mason Wood Walker, Inc., 925 F.2d 682, 695 (3d Cir.) (§ 12(2) applies only to initial distributions), *cert. denied,* 112 S. Ct. 79 (1991); Louis Loss, *Securities Act Section 12(2): A Rebuttal,* 48 BUS. LAW. 47 (1992); Elliott J. Weiss, *The Courts Have It Right: Securities Act Section 12(2) Applies Only to Public Offerings,* 48 BUS. LAW. 1 (1992).

21. See 15 U.S.C. § 78j(b) (1988); 17 C.F.R. § 240.10b-5 (1992).

22. *See, e.g.,* Randall v. Loftsgaarden, 478 U.S. 647, 661–62 (1986) (quoting Affiliated Ute Citizens v. United States, 406 U.S. 128, 155 (1972)); Blackie v. Barrack, 524 F.2d 891, 909 (9th Cir. 1975) ("[O]ut of pocket loss is the ordinary standard in a 10b-5 suit."), *cert. denied,* 429 U.S. 816 (1976); RICHARD W. JENNINGS ET AL., SECURITIES REGULATION 1341–49 (7th ed. 1992). As Jennings et al. observe, however:

> The recent cases . . . seem to have adopted whatever measure of damages produces the largest recovery for the plaintiff . . . without giving any decisive effect to the reference in Section 28(a) of the 1934 Act to 'actual damages', which some of the earlier cases thought restricted any recovery to the out-of-pocket loss by the plaintiff.

*Id.* at 1344.

23. A securities violation can consist of the nondisclosure of bad news, which would cause the price to be artificially inflated, or good news, which would cause the price to be artificially low. Although some cases have involved the concealment of good news, *see* SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968), *cert. denied,* 394 U.S. 976 (1969), the great majority of cases today involve allegations that bad news was concealed. *See* Jennifer Francis et al., Shareholder Litigation and Corporate Disclosure Strategies, 12 n.11 (Sept. 1993) (unpublished manuscript, on file with author). To simplify the discussion, I assume in this Article that the plaintiffs claim the stock price was artificially inflated by concealing bad news.

24. *See* Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436–38 (9th Cir. 1987).

the Supreme Court has implicitly endorsed the semi-strong version of the efficient capital market hypothesis, which posits that share prices reflect all publicly available information about the firm.[26] Thus, the "true value" or "intrinsic value" of the stock is taken to mean the price at which the shares would have traded if the market had not been distorted by the presence of misleading information.[27]

In the classic formulation of the Rule 10b-5 measure, damages can be represented on a chart that contains a "price line," tracking the price of the shares for every day of the class period, and a "value line," representing the price at which the shares would have traded in the absence of the fraud.[28] For any particular trade, the amount of damages is the difference between the price paid and the value line on that particular day (the per-share loss), multiplied by the number of shares purchased. In the aggregate, damages are the difference between the price line and the value line, multiplied by

---

25.    *See* Basic, Inc. v. Levinson, 485 U.S. 224 (1988). Under the fraud-on-the-market theory, traders in an open and developed securities market do not have to show that they relied on the defendant's statements:

> An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.

*Id.* at 247.

26.    *See* 485 U.S. at 241–42, 246. The Court stopped short of explicitly embracing the hypothesis. *See id.* at 248 n.28. For a general discussion of the efficient capital markets hypothesis, see RICHARD A. BREALEY & STEWART C. MYERS, PRINCIPLES OF CORPORATE FINANCE 287–310 (4th ed. 1991).

Where an informationally efficient market does not exist, other methods of proving damages must be used. *See, e.g.,* Elizabeth J. Cabraser, *Measuring Damages in Securities Class Actions: Plaintiffs' Methodologies and Strategies, in* SECURITIES LITIGATION 1991: STRATEGIES AND CURRENT DEVELOPMENTS 819 (Bruce G. Vanyo & Edward J. Yodowitz eds., 1991) (*Practicing Law Institute*).

27.    For present purposes, we need not consider the debate as to whether the stock market is "efficient," or whether there is a difference between market value and "intrinsic" value. It is the difference between prices in the presence and absence of material information, not the absolute level of the stock price, that is significant for purposes of calculating damages. *Cf.* Jonathan R. Macey et al., *Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of* Basic v. Levinson, 77 VA. L. REV. 1017, 1021–28 (1991) (for purposes of determining materiality, it is not necessary that the market be efficient, but only that it react quickly to new information).

28.    This formulation was first articulated in Judge Sneed's concurring opinion in Green v. Occidental Petroleum Corp., 541 F.2d 1335, 1341, 1344 (9th Cir. 1976) (Sneed, J., concurring); *see also In re* LTV Sec. Litig., 88 F.R.D. 134, 149 (N.D. Tex. 1980); Huddleston v. Herman & MacLean, 640 F.2d 534, 555–56 (5th Cir. 1981), *aff'd in part and rev'd in part,* 459 U.S. 375 (1983). *See generally* Frank H. Easterbrook & Daniel R. Fischel, *Optimal Damages in Securities Cases,* 52 U. CHI. L. REV. 611 (1985).

1430                    41 UCLA LAW REVIEW 1421 (1994)

the volume of shares traded.[29]  If the value of the shares remained constant throughout the class period, the value line would be a straight line.

Figure 1.



Figure 1 represents a value line chart for a hypothetical case in which the defendants concealed bad news which, if known, would have caused the stock price to drop from $100 to $50.  The shaded area represents the per-share damages to class members.

In fact, both the actual market price and the hypothetical "true value" are affected by many other factors during the class period, such as information about the firm, the industry, and general economic conditions.  Figure 2 illustrates a common method dealing with such price fluctuations.  In this figure, the value of the undisclosed information remains constant throughout the class period, and the value line tracks the price line at a uniformly lower level.  If the value of the undisclosed information also varied during the class period, the value line could move independently of the price line.

---

29.  *See generally* Cornell & Morgan, *supra* note 9; Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 BUS. LAW. 1 (1982); Macey et al., *supra* note 27; Jared T. Finkelstein, Note, *Rule 10b-5 Damage Computation: Application of Financial Theory to Determine Net Economic Loss*, 51 FORDHAM L. REV. 838 (1983).

Figure 2.



In cases brought under Section 11 of the 1933 Act, the plaintiff is entitled to recover the difference between the price paid (up to the original offering price) and the value (or price) when the suit is filed, minus any amount that the defendants prove was not attributable to the fraud.[30] The loss-causation requirement, which excludes losses attributable to market factors or other information unrelated to the fraud,[31] makes the Section 11 damages case look much like a Rule 10b-5 case, except that the offering price serves as an upper limit on the amount recoverable.

Investors (sometimes known as "ins-and-outs") who both purchased and sold within the class period must receive special treatment, for both their purchase price and their selling price were inflated because of the misrepresentation or omission. The amount these in-and-out investors lost as purchasers (the difference between the price line and value line on the

---

30.   15 U.S.C. § 77k(e) (1988); *see also* JENNINGS ET AL., *supra* note 22, at 1386–88.

31.   15 U.S.C. § 77k(e) (1988) (If the defendant proves that "any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement . . . such portion of or all such damages shall not be recoverable."); *see also* Feit v. Leasco Data Processing Equip. Corp., 332 F. Supp. 544, 586 (E.D.N.Y. 1971).

date of purchase) must be offset by the amount they gained as sellers (the difference between the price line and the value line on the date of sale). To calculate the aggregate damages for the class, then, one would construct a price line and a value line, multiply the daily per-share losses by the number of shares purchased on that day, and make appropriate adjustments for the shares that were bought and sold within the class period.

The case law does not go into further detail about how such calculations are to be carried out, but the opinions appear to anticipate that a rather straightforward mathematical exercise will yield precise and objective determinations. As the Ninth Circuit optimistically stated in *Blackie v. Barrack*, "[W]e are confident that should the class prevail . . . the process of computing individual damages will be virtually a mechanical task."[32]

Using the tools of financial economics, the legal model has been translated into a methodology for calculating damages. The first step is to determine the per-share damages for each day of the class period. The second step is to determine the number of shares entitled to recover damages and the appropriate adjustments for "ins-and-outs." These results are combined to determine the aggregate damages for the class.

In calculating per-share damages, the task is to determine what the price of the stock would have been on each trading day, if the withheld information had been disclosed. The starting point for this analysis is what happened to the price when the information actually was disclosed. For example, when Apple announced that it was terminating the disk-drive project, the stock price dropped by $8.25 per share. One cannot simply assume that the amount by which the stock price decreased following the announcement equals the per-share damages, however, because the stock price may have been affected by factors other than the securities violation. These factors could include both non-firm-specific events, such as interest rate changes or new-product announcements by competitors, and firm-specific events not related to the securities violation, such as Apple's announcement of revised earnings and revenue forecasts in the same press release as the announcement that the disk-drive project had been discontinued. These unrelated contributors to the price change must first be eliminated, yielding the price change attributable to the disclosure itself. This amount, in turn, must be translated into the price change that would have

---

32.   524 F.2d 891, 905 (9th Cir. 1975). Judge Sneed appeared to have a more sophisticated understanding of the subtleties that might be involved, but even he has stated that "establishing the required value line is practicable." Green v. Occidental Petroleum Corp., 541 F.2d 1335, 1344 (9th Cir. 1976) (Sneed, J., concurring). Judge Sneed's views are discussed in Cornell & Morgan, *supra* note 9, at 885.

occurred if the information had been available on each trading day during the class period.

Event studies are commonly used to isolate the effects on the stock price of the disclosure of the withheld information.[33]   An event-study is an empirical analysis that assesses the effect of the announcement on the stock's price by comparing the actual return (the percentage change in the stock price) during the period of disclosure[34] with the predicted return if the information had not been disclosed.   By comparing the stock under consideration to a benchmark index of comparable stocks (which may be a market index, an industry index, or another comparable set of stocks such as companies that went public contemporaneously with the defendant firm) during a control period, one can, using regression analysis, eliminate the effects of non-firm-specific events and calculate the stock's predicted return during the period under investigation if there had been no new, material firm-specific information.   The difference between the actual return and the predicted return is the amount that is attributed to the disclosure.[35]

Using this determination of the value of the bad news and working backward in time from the disclosure date, the expert witness on damages determines a predicted price for each day of the class period if the information had been disclosed.   These values determine the value line.[36]   The simplest (and most common) method is to assume that the value of the

---

33.   A capital asset pricing model might be used, *see* Wool v. Tandem Computers, Inc., 818 F.2d 1433 (9th Cir. 1987); *Blackie*, 524 F.2d at 909 n.25, but the number of factors that would have to be determined and considered make it less attractive as a practical matter.

For a basic introduction to event studies, see BREALEY & MYERS, *supra* note 26, at 303–05; RONALD J. GILSON & BERNARD S. BLACK, THE LAW AND FINANCE OF CORPORATE ACQUISITIONS 103–42 (Supp. 1993). For a discussion of event-study methodology as applied to the calculation of damages in securities class actions, see Cornell & Morgan, *supra* note 9; Fischel, *supra* note 29; Finkelstein, *supra* note 29; Jon Koslow, Note, *Estimating Aggregate Damages in Class-Action Litigation Under Rule 10b-5 for Purposes of Settlement*, 59 FORDHAM L. REV. 811, 826–42 (1991); Philip J. Leas, Note, *The Measure of Damages in Rule 10b-5 Cases Involving Actively Traded Securities*, 26 STAN. L. REV. 371, 385–96 (1974). The event-study methodology is also discussed, in the context of determining materiality, in Macey et al., *supra* note 27. For a technical discussion of event studies in securities litigation, see M. Laurentius Marais & Katherine Schipper, *Applications of Event Study Methods in Litigation Support, in* LITIGATION SERVICES HANDBOOK 193 (Peter B. Frank et al., eds., Cum. Supp. 1993).

34.   Usually the event study covers a two-day period to allow the market to assimilate the disclosure. *See* Macey et al., *supra* note 27, at 1031; Marais & Schipper, *supra* note 33, at 214 (noting that when disclosures are not reported in newspapers, "event windows" as long as nine trading days have been used).

35.   The difference between the "comparable index method" and the "event-study method" is not material to the present analysis. *See* Cornell & Morgan, *supra* note 9, at 897–911; Koslow, *supra* note 33, at 821–22.

36.   For a more detailed discussion of the approaches to constructing the value line, see Cornell & Morgan, *supra* note 9, at 900–11.

information remains constant throughout the class period as illustrated in Figure 2. This "ribbon method" was used by the plaintiffs' expert in *Apple*. An alternative method, also suggested by the *Apple* plaintiffs, would be to assume that the amount attributable to the fraud is a constant percentage of the stock price, rather than a constant dollar amount, throughout the class period.[37] A third method, envisioned by Judge Sneed's concurrence in *Green*, would attempt to determine the actual value of the information on each day of the class period. Applying this method would likely require some heroic assumptions about the effects of both the information at issue and other information that might have affected the price at different times during the class period.

After adjusting the actual daily trading volume figures through a mathematical model to reflect "in-and-out" traders,[38] one can—at least in theory—determine the total losses attributable to the fraud for each day of trading during the class period, and cumulate these figures to obtain the total damages.

Event-study methodology is well-developed in separating out the reaction of the market to a particular disclosure. But the use of event studies in securities litigation is based on the assumption that the price change attributable *to the disclosure*, is equivalent to the market value of *the information in the disclosure* and thus is the "amount attributable to the fraud." In fact, the price change associated with the disclosure has three components: the market value of the previously undisclosed information; the expected future costs of litigation over the disclosure; and the termination of subsequent purchasers' right to sue over the nondisclosure of the information. Only the first component is properly recoverable as damages under the securities laws.[39]

---

37. *Apple Trial Transcript*, *supra* note 13, at 1422 (testimony of John B. Torkelsen); *see also* Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1437–38 (9th Cir. 1987) (plaintiff, who bought and sold during class period, argued that he sustained damages because stock price was inflated by a constant percentage during the class period); Sirota v. Solitron Devices, Inc., 673 F.2d 566 (2d Cir.), *cert. denied*, 459 U.S. 838 (1982) (upholding jury finding that stock was overvalued by 33% during one part of the class period and by 54% during another part).

38. There is substantial controversy over this portion of the calculation as well. *See infra* Part II.B.

39. In a forthcoming article, de Villiers and Lev argue that the market reaction to the disclosure often includes a "crash component" in which the price becomes temporarily disconnected from fundametnals and decreases by more than the value of the information. The authors conclude that the "crash component" is not properly recoverable as damages and should be excluded from the calculation of per-share damages. Baruch Lev & Meiring de Villiers, *Stock Price Crashes and 10b-5 Damages: A Legal, Economic and Policy Analysis*, 47 STAN. L. REV. (forthcoming Nov. 1994).

B.   The Price Effect of Anticipated Litigation

The existence of a securities class action lawsuit can itself affect the value of the firm's shares. Litigation causes the firm to incur direct and indirect costs. These costs include not only the amounts eventually paid to settle the case, but also the monetary costs of defending the suit, the time and attention that company managers and employees will have to expend on the suit and the extent to which they will be distracted from their other duties, possible damage to the firm's reputation and its relationships with customers and suppliers, and the effect of a large contingent liability on the firm's ability to obtain financing, enter into business combinations, and pursue other strategic options. It is not easy to avoid or deflect these cash-flow consequences of anticipated litigation because it is difficult to get securities class actions dismissed at an early stage.[40] Once the suit is filed, substantial economic consequences are virtually certain.

To the extent that investors predict that litigation will follow an adverse disclosure, the market's reaction to the disclosure will include not only its valuation of the information disclosed, but also the anticipated direct and indirect costs of litigation over the disclosure. Event studies typically span the two-day period following the disclosure. In some cases, lawsuits are actually filed within that time. In others, the very nature of the disclosure makes litigation probable, and the market will react to that probability as well as to the bad news itself.

The price effect of the litigation component of a stock's drop in price can be substantial. In the *Apple* lawsuit, for example, the settlement payment was $16 million. Assuming that the defendants' legal fees and costs were the same as the plaintiffs', these would have added an additional $9.8 million to defendants' costs.[41] With 57.5 million shares outstanding, Ap-

---

40.   Empirical studies have shown a low rate of disposition by pre-trial adjudication in securities class actions. *See supra* note 2. Recently, courts have been somewhat more willing to grant motions to dismiss and for summary judgment, but such dispositions are still the exception, and often do not occur until substantial litigation costs have been expended.

41.   The plaintiffs' lodestar attorneys' fees (the hours actually worked times the respective lawyers' hourly rates) were $6.3 million and their expenses were almost $3.5 million. (In accordance with the settlement agreement, however, the plaintiffs sought only a total of $8.9 million in fees and costs.) Memorandum in Support of Plaintiffs' Counsel's Application for Attorney's Fees and Reimbursement of Costs & Expenses at 1, *In re* Apple Computer Sec. Litig., No. C-84-20148 (N.D. Cal. Mar. 26, 1992). In general, it is reasonable to assume that the defendants' fees and costs are likely to be at least as great as plaintiffs', because it is considerably more expensive to defend a complex case than to prosecute it. *See* Coffee, *Understanding the Plaintiff's Attorney*, *supra* note 1, at 701–02.

ple's direct litigation costs thus amounted to about 45 cents per share, or 13.8 percent of the $3.25 per share damages claimed by plaintiffs.[42]

*Apple* was not a typical case.  Most securities class actions are not litigated as intensively as *Apple*, which was finally resolved eight years after filing, following the completion of full discovery, several summary judgment motions that were ultimately reviewed by the Ninth Circuit, and a trial on the merits.  Litigation costs for both sides may have totalled $20 million.  A more reasonable estimate of total litigation costs at the outset might have been $10 million to $15 million.

On the other hand, when the case was originally filed, the plaintiffs were seeking to recover the entire price drop of $8.25 per share, not just $3.25.[43]  The total claimed class damages would thus have been about $300 million, and investors would logically have expected a larger settlement than $16 million.  If, as investors might have expected, the case had settled for 15% of the market losses, or $45 million,[44] plus defense costs of $10 million, the anticipated costs of litigating would have been 95.6 cents per share.[45]  These amounts are not trivial.  If the market actually valued the costs of the anticipated litigation at 95.8 cents per share and decreased the price of Apple stock by that amount when the disclosure was made, then 29 percent of the damages plaintiffs claimed at trial were caused by the anticipated costs of litigation rather than by the value of the bad news itself.[46]  Using the *Apple* plaintiffs' figures on the number of shares in the class, $35.3 million of the class's damages claim would be attributable to the market's reaction to the anticipated costs of litigation.[47]

---

42.  In this discussion, present-value adjustments and the market's expectations regarding insurance payments are not taken into account.

43.  Summary judgment motions disposed of most of the allegations of the original complaint.  *See supra* text accompanying notes 11–12.

44.  Of the 20 cases, other than *Apple*, in which over $100 million in market losses were claimed, settlements averaged 14.9% of the claims, according to figures supplied by two of the principal claims administrators for securities class actions.  See *infra* note 88.  The *Apple* settlement was only 6.2% of the claimants' market losses.  If the market had expected a settlement of 6% of the market losses, *see* O'Brien & Hodges, *supra* note 2, the expected cost of litigation would have been around 45–50 cents per share.

45.  If the company paid only half of these costs directly, with insurance, whose premiums were already paid, funding the other half, the anticipated out-of-pocket cost would have been 47.8 cents per share.

46.  If the market assumed that only half of the costs would be borne directly by the company, 15% of the damages would be attributable to this factor.

47.  The price effect of anticipated litigation may be greater than the present value of the actual direct litigation costs.  Studies of the massive litigation between Pennzoil and Texaco, for example, suggest that the market did not view the litigation simply as a wealth transfer between the two parties, but believed that litigation actually consumed value.  *See* David M. Cutler & Lawrence H. Summers, *The Costs of Conflict Resolution and Financial Distress: Evidence from the*

It seems reasonable, then, to conclude that the price effect of the anticipated costs of litigation over the disclosure is not negligible. Is this amount properly recoverable as damages?

If the defendants had told the truth, one might argue, the plaintiffs would not have sued and the costs would have been avoided. Thus the decrease in value that is due to the anticipated costs of litigation is a foreseeable consequence of the defendants' actions and should be recoverable as damages. This argument is a variant of the more general argument against the "American rule" that the costs of litigation are not recoverable as damages, in the absence of a statutory provision to that effect.

As a general proposition, the proponents of including litigation costs in the definition of damages have the better of the argument.[48] Litigation costs are a reasonably foreseeable consequence of the defendant's wrongful conduct. If litigation costs are not included in recoverable damages, plaintiffs will not be made whole and defendants will not have been required to internalize the full costs of their wrongdoing. Thus, excluding litigation costs from damages seems to make neither doctrinal nor economic sense.[49]

---

*Texaco-Pennzoil Litigation*, 19 RAND J. ECON. 157, 160 (1988) (finding that for every dollar Texaco shares lost in value, Pennzoil shares gained only 17 cents); Kathleen Engelmann & Bradford Cornell, *Measuring the Cost of Corporate Litigation: Five Case Studies*, 17 J. LEGAL STUD. 377 (1988) (including a case study of *Pennzoil v. Texaco* and concluding that the result was a net loss in wealth). A recent large-scale study of litigation between corporations finds that upon the filing of the lawsuit, the defendant's stock declines about 1% in value, while the average plaintiff experiences no significant gains; much, but not all, of the combined loss is regained upon settlement. Sanjai Bhagat et al., The Wealth Effects of Interfirm Lawsuits (Mar. 30, 1992) (unpublished manuscript, on file with the author). The authors suggest that the results are explained, to a certain extent, by the "financial distress" large lawsuits impose on defendants (e.g., diversion of management attention, inability to refinance debt). Sanjai Bhagat et al., The Costs of Inefficient Bargaining and Financial Distress: Evidence from Corporate Lawsuits (Nov. 6, 1992) (unpublished manuscript, on file with the author); *see also* John M. Bizjak & Jeffrey L. Coles, An Empirical Analysis of Interfirm Antitrust Legal Disputes (Aug. 1992) (unpublished manuscript, on file with the author).

48.    *See* John Leubsdorf, *Recovering Attorney Fees as Damages*, 38 RUTGERS L. REV. 439, 443–44 (1986); A. Mitchell Polinsky & Steven Shavell, *Enforcement Costs and the Optimal Magnitude and Probability of Fines*, 35 J.L. & ECON. 133 (1992) (recommending that damages include litigation costs so that the wrongdoer will be forced to internalize the full social cost of its actions); John A. Sebert, Jr., *Punitive and Nonpecuniary Damages in Actions Based upon Contract: Toward Achieving the Objective of Full Compensation*, 33 UCLA L. REV. 1565, 1662 (1986) (arguing that common-law doctrines, such as punitive damages, that augment damages above the usual compensatory measure could be justifiable as making up for the exclusion of litigation costs). *Cf.* Keith N. Hylton, *Costly Litigation and Legal Error Under Negligence*, 6 J.L. ECON. & ORGANIZATION 433, 445 (1990) (arguing that the substantive standard of care for liability should be set at a higher level to recognize that the social cost of a violation includes litigation costs).

49.    Many statutes permit a successful plaintiff to recover litigation costs. The question whether a successful plaintiff should be able to recover litigation costs as damages is analytically distinct from the question whether a *defendant* should be able to recover its litigation costs from

Nevertheless, the general rule in the American legal system is that litigation costs are not recoverable as damages. In the absence of a change in the general American rule, the question is whether we should continue to depart from it in securities class actions by allowing the sub rosa recovery of litigation costs. This is a complex issue, but on balance the argument favoring an exception is not compelling.

To begin with, the costs of litigation we are now considering, which are impounded in the stock price, are not the class's expected costs, but the firm's. The argument that plaintiffs should be able to recover their own litigation costs does not strictly apply. One might argue that in shareholder litigation, the principle of making the plaintiff whole for the foreseeable consequences of the defendant's actions supports allowing plaintiffs to recover the defendant's litigation costs. This argument, however, is inconsistent with the standard "out of pocket" definition of damages.[50] Damages in securities class actions have not been defined, as in tort or contract cases, as the reasonably foreseeable consequences of the violation (which might include a decrease in share value as a result of litigation made necessary by defendants' wrongful actions), but as the difference between the price the plaintiff paid and the price the market would have set at that time if the true information had been known.[51] This formulation turns entirely on how the market would have reacted to the information itself. The market's subsequent reaction to the possibility of litigation and its anticipated effect on the firm's profitability is extraneous to this measure of damages. Of course, the general objection to the American rule remains that unless litigation costs are recoverable, the plaintiff will not be made whole for the statutory measure of damages. Nevertheless, in this context a legislative intent to make the plaintiff whole is not fully evident. The "value-line" approach developed in the case law parallels the express statutory remedy of Section 11,[52] and the securities laws, unlike many other federal statutes, do not provide for fee-shifting even with respect to express remedies.

Moreover, the expected litigation costs that are reflected in the stock price are not limited to direct fees and expenses, as they would be under a fee-shifting rule. Rather, the market reaction to anticipated litigation includes the amount the firm is expected to pay *to the class* to settle the case

---

an unsuccessful plaintiff. *Cf.* FED. R. CIV. P. 68.

50. *See supra* notes 22–27 and accompanying text.

51. *See supra* notes 22–24 and accompanying text.

52. The express cause of action in § 12 defines its remedy in similar fashion. *See supra* note 20.

or satisfy a judgment. This class is thus permitted to augment its primary damages by the present value of the financial impact on the firm of a future payment of those very damages—a classic case of bootstrapping. The stock price effect also includes indirect litigation costs, such as "financial distress" caused by an inability to obtain financing, lost business opportunities, and the distraction of management by the litigation.[53] These indirect costs are not normally recoverable either under the English rule or statutory fee-shifting provisions. Including the per-share anticipated litigation costs in the damage recovery would thus augment the customary measure of damages by far more than the usual meaning of the term "litigation costs."

Finally, all of the shareholders are harmed when the firm has to pay litigation costs. Allowing the plaintiff class—but no other shareholders—to be compensated for such losses by a direct cash payment whose cost is borne by all the shareholders discriminates unfairly in favor of class members.

The case for including the price effects of anticipated litigation in recoverable damages arguably is weak for policy reasons as well. I have argued elsewhere that nonmeritorious securities class action lawsuits are not effectively screened out by pretrial motion procedures and that the combination of large stakes, asymmetries in insurance coverage, high costs of litigation, and the content of the applicable substantive law creates a situation in which all suits that survive an initial motion to dismiss and a challenge to class certification are settled for substantial sums, regardless of the strength of the liability case.[54] If this hypothesis is true, then including the per-share present value of the attorneys fees, settlement payments, and indirect "financial distress" costs in recoverable damages would only increase the incentives to sue, thereby exacerbating the failure of the present system to respond to claims on the basis of their merit. This failure, in turn, undermines both the compensatory and the deterrent purposes of the securities laws.

On balance, these are not compelling reasons for allowing recovery of the stock price effect of anticipated litigation costs. This conclusion may

---

53. *See* Bhagat et al., The Costs of Inefficient Bargaining and Financial Distress, *supra* note 47, at 2.

54. *See generally* Alexander, *Do the Merits Matter*, *supra* note 1.

well hold even if one disagrees with the American rule that litigation costs are generally not recoverable as damages.

### C. Initial Public Offerings and the "Litigation Put" Option

The third potential component of the price effect of the disclosure of bad news is the termination of subsequent purchasers' right to sue over the nondisclosure. Although the theoretical interest of this component may be greater than its practical significance, it is nevertheless worth discussing. To understand the price effect of this component, it is helpful to consider first the special case of litigation involving initial public offerings (IPOs).

### 1. The Content of the "Litigation Put" Option

With respect to the issuer, the 1933 Act is essentially a strict liability statute. Plaintiffs who prove that the offering materials contained a material misstatement or omission are entitled to rescission (or, if they have already sold the shares, to a rescissory measure of damages) from the issuer, up to the full amount of the offering price, regardless of whether the defendants knew or should have known of the misstatement.[55] Thus, the 1933 Act gives investors a right to recover their subsequent losses from the issuer whenever it turns out that the offering materials were materially wrong, even if innocently so.[56]

Lawsuits over IPOs invariably allege violation of the 1934 Act as well as the 1933 Act.[57] This is because damages under the 1934 Act, computed according to the out-of-pocket measure discussed earlier, are usually higher than 1933 Act damages, under which the price line is capped at the initial offering price.[58] For example, in *In re Diasonics Securities Litigation*,

---

55. *See supra* note 30 and accompanying text.
56. Statutory defendants other than the issuer are entitled to a "due diligence" defense. *See* 15 U.S.C. § 77k (1988).
57. In their study of over 90 IPO suits, Drake and Vetsuypens found only four suits brought under § 11 but not § 10(b), and only three § 10(b) but not § 11. The researchers could not determine whether 31 firms were sued under § 11, § 10(b), or both. Communication from Philip D. Drake to author (Dec. 1992).
58. *See* Janet Cooper Alexander, *The Lawsuit Avoidance Theory of Why Initial Public Offerings Are Underpriced*, 41 UCLA L. REV. 17, 33–34 (1993) [hereinafter Alexander, *Lawsuit Avoidance Theory*] (discussing plaintiffs' ability to maximize damages by alleging Rule 10b-5 claims). Additionally, D&O insurance policies typicallly exclude coverage for 1933 Act claims. *See* Alexander, *Do the Merits Matter*, *supra* note 1, at 551 n.52.

the plaintiffs' expert testified that damages under Section 11 were $74 million, but that damages under Section 10 were at least $201 million.[59]

One way of looking at the situation is that whenever investors buy shares of an IPO, they also acquire, by automatic operation of the securities laws, a "partial put" option giving them the right to recover a portion of certain potential future market losses from the statutory defendants.[60] The "litigation put" option is transferable with the shares so long as the information remains undisclosed.[61] The option becomes non-transferable when the bad news is disclosed, because only those investors who purchased during the period of nondisclosure are entitled to recover under the securities laws.[62]

Using the metaphor of an option to describe the right to sue under the securities laws leads to the question whether the option has a market value—or, more precisely, whether the termination of the option (the right to sue) by the disclosure of the wrongfully-concealed information diminishes the market price of the stock.

Under the semi-strong version of the efficient capital markets hypothesis, the price of the stock in an efficient market reflects the value of all publicly available information. The information available to investors includes the facts that (1) if the firm or certain insiders make material misrepresentations or omissions regarding the firm's condition or prospects, a class action lawsuit can be filed to recover any market losses attributable to the misrepresentation or omission, (2) such suits are almost always settled for a portion of the market losses,[63] and (3) persons who purchased after the information was disclosed are not eligible to participate in the litigation

---

59. Deposition of John B. Torkelsen at 87, *In re* Diasonics Sec. Litig., No. C-83-4584 (N.D. Cal. Apr. 15, 1987, filed June 29, 1987).

60. I am grateful to my colleague Ron Gilson for suggesting this useful metaphor. The mere occurrence of large market losses is not, by itself, sufficient to trigger a lawsuit. *See* Francis et al., *supra* note 23. The recovery is partial because (1) damages caused by the nondisclosure are usually less than market losses during the class period (due to the "loss causation" requirement), (2) cases are almost invariably settled, and the settlements are for less than the full amount of the plaintiffs' claim, (3) attorneys' fees, which typically equal 25% to 30% of the settlement, are deducted from the settlement before it is distributed to the class, and (4) distributions are made several years after the losses occur.

61. More precisely, the option is also retained by the initial purchaser to the extent that the difference between the price paid by the initial purchaser and the value of the shares on that date is greater than the difference between the value of the shares and the price received when the shares were sold.

62. After the bad news is disclosed, the price is no longer distorted and subsequent investors are not harmed. *See* Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975) (holding that plaintiffs in rule 10b-5 cases must be purchasers or sellers during the class period).

63. One study of 381 completed cases found that 90% resulted in settlement, for a mean settlement value of $7.25 million. O'Brien & Hodges, *supra* note 2, at I-5.

recovery. If the market values the litigation option, the price of the stock should cease to reflect the value of the litigation put as soon as the bad news is disclosed,[64] as though the stock had gone ex dividend.[65] Thus, the price decline upon disclosure of the bad news should include an amount attributable to the termination of that option.

Figure 3 illustrates this concept. Assume that the market values the stock at $100 on the publicly-available information, but only at $50 after the bad news is disclosed and that investors view the right to sue over material non-disclosures as a partial put option attached to the share, and value this option at $5. On these assumptions the stock will trade originally at $105. The price change after the disclosure will consist of $50 attributable to the information itself and $5 attributable to the termination of the litigation put.

---

64. Once litigation is filed alleging misrepresentations in a prospectus, the lawsuit is likely to resolve all potential claims based on that document. The complaint will be framed to allege as many misstatements or omissions as possible. To the extent that other theories surface through discovery, claims can easily be added. See FED. R. CIV. P. 15 (leave to amend is to be freely granted, and claims against the same parties that arise from the same transaction or occurrence as the original complaint relate back to the filing of the original complaint for purposes of the statute of limitations). Furthermore, settlement agreements commonly release the defendants from future claims by the class; a judgment after trial would have similar preclusive effect. Because it is unlikely that a second suit could be filed against the same company over the IPO, the entire value of the litigation put should be wrung out of the shares as soon as it is reasonably clear that a suit will be filed. Shareholders would continue to have the right to sue over different nondisclosures, but such suits would be an example of the litigation put in secondary market cases, as discussed *infra* in Part I.D.

65. The price effect of the right to bring suit might help to account for the observation that, over the long run, IPOs underperform the market. The reasoning would be as follows: Initial investors in IPOs incorporate the value of the litigation put into the price they are willing to pay. At the outset, investors are willing to pay a higher price for IPOs because the securities' risk is dampened by the opportunity to recover a portion of subsequent losses through litigation. As time goes by, the likelihood that a material misrepresentation will be discovered decreases, and so does the value of the litigation put. The litigation put expires (its value is zero) on the running of the statute of limitations (currently no more than three years after the offering for a § 11 claim). One would thus observe a decline in the aftermarket price even if fundamental values remained constant and were perceived to remain constant. See generally V. Defeo & B. Sarath, The Pricing of Litigation Risk in the Market for Initial Public Offerings (Aug. 9, 1993) (unpublished manuscript, on file with author). This hypothesis, however, probably assumes a greater value for the litigation put than is likely. See *infra* notes 82–86 and accompanying text.

For evidence of long-run IPO underperformance, see Jay R. Ritter, *The Long-Run Performance of Initial Public Offerings*, 46 J. FIN. 3 (1991) (showing underperformance over the three-year period following the offering); Tim Loughran & Jay R. Ritter, The Timing and Subsequent Performance of IPOs: The U.S. and International Evidence (Dec. 9, 1992) (unpublished manuscript, on file with the author) (demonstrating underperformance over a five-year period following the initial offering).

Figure 3.



## 2. Does the Market Value the Litigation Put?

By providing a possibility that investors may recover a portion of their market losses if the stock suffers a substantial price decline, the litigation put reduces some of the risk associated with the securities. In particular, the litigation put protects investors from losses resulting from the firm's failure to disclose private information they would consider important (the legal definition of materiality).[66] One might expect, therefore, that investors would be willing to pay more for the stock because of the availability of a potential recovery under the securities laws, and there is some empirical evidence that may support this view.[67] Even if investors would not voluntarily purchase a litigation put (perhaps because firms internalize the costs of litigation payments, because investors can diversify against the risk of

---

66. *See* Basic, Inc. v. Levinson, 485 U.S. 224, 231–32 (1988); TSC Indus., Inc. v. Northway Inc., 426 U.S. 438, 439 (1976).

67. *See* DeFeo & Sarath, *supra* note 65 (concluding that the observed behavior of IPO prices is consistent with a model in which the initial offering price reflects the possibility that investors may recover a fraction of the gross proceeds through litigation when the realized value of the firm is sufficiently bad).

wrongful failure to disclose, or because high transaction costs make litigation a net loss for diversified investors), they still may be willing to pay *less* for shares once the right to participate in a litigation recovery is terminated. In either event, the termination of the litigation put upon disclosure of bad news should cause a decrease in the price of the stock.

### 3. Pricing the Litigation Put

If the source of the payment were external to the company—as if investors received a ticket for the Irish Sweepstakes with their purchase— then the existence of the option should raise the price of the shares. If the issuer makes the payment, however, it is in effect a dividend.[68] Making the future payment would depress the firm's expected future cash flow, offsetting the value of the present payment to the investors. It's a wash, in other words, except for the transaction costs of litigation, which should give the litigation put a negative value. The same would be true if the issuer meets its obligation by purchasing an insurance policy priced at the expected value of the potential liability.

The most common defendants in IPO litigation are the issuer, its officers and directors, and the underwriters. Less commonly, plaintiffs may also sue accountants, lawyers, and venture capital investors.[69] Underwriters, accountants, lawyers, and venture capitalists represent sources of funds that are independent of the firm.[70] Directors and officers may be covered by directors' and officers' liability (D&O) insurance, which pays a substantial share of the typical settlement. It has been reported that D&O insurance accounts for about fifty percent to eighty percent of such payments,[71] that underwriters typically pay about ten percent,[72] and that officers and directors almost never contribute personally to settlements. This leaves a

---

68. This terminology is used in Patricia J. Hughes & Anjan V. Thakor, *Litigation Risk, Intermediation and the Underpricing of Initial Public Offerings*, 5 Rev. Fin. Stud. 709 (1992).

69. Venture capital investors are sued under the theory that they are statutory controlling persons of the issuer or directors. *See* 15 U.S.C. §§ 77k, 77l (1988).

70. The underwriting agreement typically contains an agreement by the issuer to indemnify the underwriters for any liability arising from information provided by the firm to the underwriters. The existence of the indemnification agreement probably is largely responsible for the low percentage of settlements typically paid by underwriters. The amounts that underwriters actually do contribute to the settlement, however, are normally not reimbursed by the issuer. Of course, the fees charged by underwriters, accountants, and lawyers may reflect the risk of litigation.

71. *See* Nancy Rutter, *Securities Class Action Scandal*, Upside, Apr. 1990, at 18, 33–34.

72. This estimate is based on an analysis of publicly available information about underwriters' contributions in a number of recent high-technology cases, and on conversations with lawyers familiar with the allocation of settlement contributions. *See generally* Alexander, *Lawsuit Avoidance Theory, supra* note 58.

broad range of about one-quarter to one-half as the issuer's likely contribution.[73] The issuer also typically pays about one-half of the legal fees.

The critical question seems to be whether insurance proceeds should be regarded as an external source of funds. Normally, one would expect premiums to be set to cover the expected value of the potential liability. On average, the payments to investors as a result of litigation would be offset by the premiums paid by the firm. Diversified investors would not value such insurance. Indeed, because securities litigation involves high transaction costs, firms would end up paying more than investors would receive and the value of the litigation option would be negative. On the other hand, if premiums did not fully reflect the expected payouts,[74] insurance would be an external source of funds and the litigation put would have a positive value.

Whether the right to sue adds value to the shares depends, of course, on investors' beliefs about the source and magnitude of settlement payments. Does the market think the settlement is basically a dividend, or does it believe the money comes from an independent source? It is not clear that investors have much information about the source of settlement payments. The accounting and finance literature on the effect of litigation on IPO pricing tends to assume that whichever actor is under investigation,

---

73. Such figures, of course, amount only to informed guessing. Although the amount of the settlement must be publicly disclosed in class action lawsuits, there is no requirement that the source(s) of the payment be identified. Indeed, this information is closely guarded. The statement of the contributions of the various defendants and their insurers is filed with the court under seal, if at all, and the allocation is usually not even disclosed to the plaintiffs.

Because insurers are repeat players in securities class action litigation, they want to keep their contributions secret to avoid giving a bargaining advantage to plaintiffs' lawyers and insureds in other cases. The defendants as a group have an interest in keeping the allocation of payments from the plaintiffs to prevent whipsawing. An interesting example of this possibility was furnished by the 1993 settlement of securities litigation against Sun Microsystems. After the class action was settled for $30 million, half to be paid by the issuer and half by the D&O insurer, another prominent plaintiffs' lawyer filed a derivative suit claiming that the settlement was unfair to the company, and that the insurer or the individual defendants should have paid a larger share. (The derivative suit was settled two months later by a change in company policy regarding employee stock sales and the payment—by Sun—of $1.45 million in fees to the lawyer who brought the derivative suit. Susan Orenstein, *Milberg, Others Get $1.45M for 2-Month-Old Suit*, THE RECORDER, June 11, 1993, at 1.

74. This might occur if the costs of securities litigation were simply spread over all companies purchasing D&O insurance, rather than being assessed on those actually at risk, or if information asymmetries result in a partial market failure (*e.g.*, insiders have better information about the risks of suit than insurers, but not so much so as to cause insurance to become unavailable).

whether the underwriter or the issuer, pays the settlement[75]—even though this assumption is not supported by available evidence. A recent study of the price effects of the litigation option suggests that the market believes that there is at least a partial external source.[76]

Even if insurance payouts are fully internalized and virtually the entire litigation recovery must therefore be regarded as, in effect, a forced dividend, the termination of the right to participate in a litigation recovery might still cause the stock price to decline. This is so for two reasons.

First, the argument that the potential benefits are fully internalized disregards the fact that the group of shareholders eligible to receive those benefits is different from the group that bears the costs. To illustrate this point, assume that the firm starts out with four million shares and issues another million shares in an IPO at a price of $10, for a total of five million shares outstanding. Assume also that the company buys an insurance policy with a face value of $10 million, for a premium of $1 million, to cover potential litigation over the IPO. If the premium accurately reflects the present value of the risk, and if the firm had only one (rational-actor or diversified) shareholder, it would be indifferent whether to buy this insurance. But the purchasers of the IPO are not indifferent. Paying the $1 million premium will lower the firm's price by $.20 when spread over the 5 million shares outstanding, so that the shares will trade for $9.80. But if there is litigation, the $10 million recovery (assuming the stock becomes worthless and insurance pays the entire loss) will be shared only among the 1 million shares sold on the offering. Each share thus receives $10. If only those eligible to collect on the insurance had paid the premium, the insurance would have cost (and would have been worth) $1 per share. However, the IPO investors got the insurance for $.20, because the non-eligible shares subsidized the purchase.[77]

---

75. *See* Hughes & Thakor, *supra* note 68 (assuming that the underwriter "bears the costs of litigation dissipatively"); Douglas A. Hensler, Litigation Costs and the Underpricing of Initial Public Offerings (Feb. 1992) (unpublished manuscript, on file with the author) (assumes that the issuer pays costs of litigation because of its contractual obligation to indemnify the underwriters); Seha M. Tinic, *Anatomy of Initial Public Offerings of Common Stock*, 43 J. FIN. 789 (1988) (assuming underwriter pays cost of litigation); *see also* Defeo & Sarath, *supra* note 65 (assuming, in study of pricing of litigation risk, that litigation involves transfers from issuers to investors).

76. *See* Defeo & Sarath, *supra* note 65 (finding empirical support for hypothesis that IPO pricing reflects value of litigation put). As shown above, such price effects implicitly require that investors believe that the payments to investors in connection with litigation are not simply forced dividends.

77. The same would be true if the company were completely self-insured. The costs of litigation would be borne by the five million outstanding shares, but the recovery would be paid only to the one million shares purchased during the class period. The case is not as clear for secondary market lawsuits, but the result should be the same. Purchasers are entitled to share in

Second, even if investors would not be willing to pay for insurance of this form, they do not have this choice. The right to sue is mandatory under the securities laws and investors are not permitted to decline it. Investors cannot choose whether to incur the costs of litigation either, for the decision to sue is made by entrepreneurial plaintiffs' lawyers.[78] The decision whether to pursue litigation is not within investors' control.[79] Even if investors would not purchase such an option voluntarily, therefore, the relevant inquiry is whether they would pay less for the stock once the "option" is stripped from it.[80] The termination of the right to sue might make the stock less valuable to investors even if they would not have paid more for that right if they had been able to decline it.[81]

Despite the theoretical plausibility of the litigation put story, this factor may have negligible value to an investor as a practical matter. The incidence of lawsuits may be about two to three percent of all firm commitment IPOs.[82] Settlements average around 20 to 30 percent of gross market losses,[83] or about $5 million to $6 million.[84] Assuming that attorneys fees take about 30 percent of the settlement,[85] and that the incidence of suit is three percent, the expected value of the litigation recovery for any

---

a future litigation recovery over undisclosed information, along with other "contemporaneous" traders. The cost will be borne by all the shares, even though most did not trade. Indeed, large blocks of shares do not trade at all or have a greatly reduced probability of trading. When the purchaser sells the shares and no nondisclosure has been revealed, the purchaser acquires the same right to share in litigation over all undisclosed information, including information that arose after the seller acquired the shares. The new purchaser should therefore be willing to pay a similar premium.

78. *See* Coffee, *Understanding the Plaintiff's Lawyer, supra* note 1, at 680–84.

79. A suit can be brought by a shareholder who bought a single share during the class period. Although class members ultimately have the right to opt out of the class, doing so only deprives them of their share of the settlement. It does not affect the maintenance of the class action, the certification of the class, the cost of defending the case, or the approval of the settlement (unless a large proportion of the shares opt out). Further, because most cases are settled on terms in which the claimants share pro rata in a fund that is significantly smaller than their aggregate claims, opting out will not even decrease the amount of money paid out to the class.

80. Richard Craswell has suggested an analogy to an implied warranty, which would be worth less if a defect has been disclosed or if the warranty has already paid off against a particular risk.

81. *See* Alexander, *Do the Merits Matter, supra* note 1, at 536 & n.155.

82. Letter from Philip D. Drake to author, Mar. 7, 1994 (on file with author).

83. The most comprehensive study of IPO litigation reports that settlements average 31.7% of gross market losses over the class period (median: 23.8%). Drake & Vetsuypens, *supra* note 2, at 69 exh. 2, 71. Gross market losses, it should be noted, will usually be greater than legally-recoverable damages. *See infra* notes 91–93 and accompanying text.

84. *See* Drake & Vetsuypens, *supra* note 2, at 69 exh. 2; O'Brien & Hodges, *supra* note 2, at 1-5 (finding a mean settlement value of $7.25 million; the median settlement, however, was between $2.5 million and $5 million).

85. *See infra* text accompanying note 166.

　　　　　　　　　　　　41 UCLA LAW REVIEW 1421 (1994)

given IPO is about $125,000. As the average IPO raises about $40 million, the value of the litigation put would be only about 3/10ths of one percent of the offering, not enough to affect the price.[86]

On the other hand, what is important in the pricing decision is what the market thinks about the value of the litigation put, and there is considerable evidence, at least in the form of op-ed columns and proposed legislation, that people may think IPO litigation is more prevalent and more costly (and thus of more potential value to investors) than the back-of-the-envelope calculations above suggest. Moreover, there is reason to believe that the returns from litigation put are not distributed equally among investors. Rather, large institutional investors, who play a primary role in setting the market price, may receive disproportionately large returns from the litigation put.

### 4. Disproportionate Returns to Large Investors

Another reason why the litigation put may be reflected in the stock price is that the return from litigation, and thus the value of the right to share in a litigation recovery, may be greater for institutional investors, who play a primary role in setting the market price, than it is for the "average share."[87] Investors must file a claim in order to receive payment from the settlement fund. Those who file claims receive pro rata distributions from the fund. Sophisticated investors with large holdings will be more likely to file claim forms than will individual investors and thus will recover a higher percentage of their losses than the ratio of the settlement to total class damages.

There is little reliable information available on the proportion of eligible shares that file claims.[88] In litigation over the Victor Technolo-

---

86. I am grateful to Philip Drake for suggesting this point.

87. *See* Ronald J. Gilson & Reinier H. Kraakman, *The Mechanisms of Market Efficiency*, 70 VA. L. REV. 549, 569–72 (1984).

88. Information about settlements and claims, including the total market losses reported by persons filing claims in approximately 175 cases, is contained in reports submitted to Congress by the two principal claims administrators for securities class action settlements. *Private Litigation Under the Federal Securities Laws: Hearings Before the Subcom. on Securities of the Senate Comm. on Banking, Housing and Urban Affairs*, 103rd Cong., 1st Sess. 783–92 (1993) (letter from Dennis A. Gilardi, Gilardi & Co., to Christopher J. Dodd, U.S. Senator, June 15, 1993) [hereinafter "Gilardi Report"]; *id.* at 75–86, 172–82 (testimony of Edward J. Radetich, Jr., Heffler & Co.) [hereinafter "Heffler Report"]. In connection with the same legislative hearings, a prominent plaintiffs' damage expert, John Torkelsen, submitted a report on 20 "representative" cases in which he had prepared a damage estimate. *Id.* at 141–52, exh. 1 (testimony of William S. Lerach before Milberg Weiss Bershad Hynes & Lerach, June 17, 1993, before the Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs (Letter to William S.

gies IPO, total market losses for the class were at least $48.4 million.[89] The total market losses of those who filed claims, however, were only $25.38 million.[90] That is to say, only 52.4% of eligible shares filed claims. In *Apple*, the total market losses reported by all claimants amounted to only 39.7% of the total market losses for the class as calculated by the plaintiffs' damage expert.[91] In three other cases in which the relevant information has recently become available, the total market losses reported by those who filed claims were only 44.4% to 65% of the total market losses as calculated by the plaintiffs' damage expert.[92] These figures suggest that a substantial number of shares—perhaps 40% or more—do not file claims.[93]

The data also suggest that because only a portion of the eligible shares file claims, those who do claim recover a larger proportion of their losses. In *Apple*, the amount actually distributed to the class was only 1.2% of total market losses and 8.2% of class damages as calculated by the plaintiffs' expert, Mr. Torkelsen. Those who did file claims, however, received 20.7% of their damages. In the other cases, the results were similarly dramatic: In *Ask Computer*, the amount distributed was 58.8% of total class damages, but claimants received 90.5% of their damages; in *Intermec*, distributions were 34.4% of total class damages, but 77.5% of claimants' damages; in *Raychem*, distributions were 11.2% of class damages, but claimants received 17.4% of their damages.

---

Lerach, Esq., from John B. Torkelsen, June 15, 1993) [hereinafter "Torkelsen Report"]). The Torkelsen Report gives the total market losses and the total damages which Mr. Torkelsen calculated for the class in each of the 20 cases.

Unfortunately, there are only four cases in which the relevant data is available in both the claims administrators' reports and the Torkelsen Report. These cases involved Apple Computer, Ask Computer, Intermec, and Raychem. The small area of overlap is puzzling, particularly as Mr. Torkelsen testified as to damage estimates in several other cases filed in the Northern District of California during 1983–85 that were included in the Gilardi Report, but were not included in the Torkelsen Report. *See infra* note 157.

89.  *See* Alexander, *Do the Merits Matter, supra* note 1, at 517 tbl. 4. This measure of market losses is based on the difference between the offering price and the price at the close of the class period, multiplied by the number of shares in the class (which is precisely known to be the number of shares sold in the IPO). This measure excludes any § 10(b) damages that might have been based on a market price during the class period that was higher than the offering price.

90.  Gilardi Report, *supra* note 88.

91.  *See id.* at 784 (total claims filed were $312.8 million); Torkelsen Report, *supra* note 88, at 150–52 (calculating total market losses for the class at $787 million).

92.  The percentage of total market losses was 65.0% for Ask Computer, 44.4% for Intermec Corp., and 64.3% for Raychem. These percentages were calculated from the figures in the Gilardi, Heffler, and Torkelsen Reports, *supra* note 88.

93.  *See also* Stuart J. Logan & Beverly C. Moore, Jr., *In Camera*, 16 CLASS ACTION REP. 1, 254 (1993) (at least 25% of class members do not file claims). This publication, edited by Mr. Moore, is generally supportive of the plaintiffs' bar.

Moreover, settlement agreements customarily provide that the "allowable claim"[94] consists of the claimant's total market losses during the class period. It has been reported that one purpose of defining allowable claims in terms of market losses rather than legally recoverable damages is to avoid having a portion of the recovery go unclaimed.[95] Those who actually file claims receive a higher recovery not only because many eligible shares do not file claims, but also because those that file may recover pro rata up to the full amount of their market losses—not just their legal damages. Conceivably, claimants could recover more than their legally recoverable damages even after attorneys fees are deducted. One analysis of ten cases, in fact, reports that in three of the cases, claimants received more than 100% of their legally recoverable damages.[96] In one case, claimants received 334% of their damages.[97]

The data also indicate that institutional investors receive a large share of recoveries. In 83 cases reported by a major claims administrator, the institutional investors among the fifty largest claimants filed an average of 45.9% of the total claims.[98] These institutional investors thus received 45.9% of the distributions to the class. Because data are not available showing what percentage of the shares in the class were held by institutional investors, one cannot determine directly whether institutional investors file a disproportionate number of claims. The data do show, however, that institutional investors receive a substantial portion of the recoveries.[99]

---

94. The "allowable claim" is the basis for determining the amount to which each claimant is entitled. Each claimant shares in the amount to be distributed to the class, in proportion to the ratio of her allowable claim to the total allowable claims filed.

95. Logan & Moore, *supra* note 93, *id.* at 255.

96. *Id.* at 260 tbl. 5.

97. *Id.*

98. Gilardi Report, *supra* note 88, at 783–92. The figure in the text was calculated by taking the mean of the percentages in each case. The Gilardi report does not give the total amount paid to all institutional investors. It reports the amount claimed by the 50 largest claimants, and separately reports the amount claimed by the institutional investors among the top 50.

99. Lev and de Villiers report that after an overreaction to a negative announcement—a "crash," in their terms—large (and presumably better informed) investors step in to buy shares. These investors thus reap the difference between the "crash" price and the higher, corrected price to which the stock soon returns. Lev & de Villiers, *supra* note 39, 111. If this is true, institutional investors may recover even more of their losses through arbitraging the crash component following the disclosure.

It is not necessary to sell one's stock in order to participate in the class, and damages are not offset by any subsequent rise in the price of shares that are retained by class members. To the extent that there is a correction rise in the stock price, class members who retained their stock would recover a higher proportion of their legal damages.

*The Value of Bad News* 1451

This conclusion is borne out by the pattern of distributions in litigated cases. The Alexander study examined distributions in two cases.[100] In one, twenty-three institutional investors (one percent of the approved claims) received 54% of the recovery. In a second, the top ten claimants (out of over 5000 claims filed)—all institutional investors—received 23.5% of the recovery. The top eighty-six institutional claimants received over 50% of the total claims.[101] O'Brien and Hodges examined the distributions in six cases and found that the top 1% of claims received an average of 41.46% of the settlements—indeed, the 10 largest claimants received 37.2% of the money distributed to the entire class.[102]

### D. Valuing the Litigation Put in Secondary-Market Cases

As in IPO cases, investors in the secondary market can sue under Rule 10b-5 for material misrepresentations or omissions,[103] to recover the difference between the price they paid and the securities' true value if the truth had been known. In secondary market cases, however, there is no obvious starting or ending point for pricing the litigation put. Investors in IPOs know that they are purchasing the shares on or shortly after an initial public offering, that they may rely on a large package of disclosures in the form of the registration statement, and that other than the registration statement, publicly available information about the firm is sparse compared to more established firms. The registration statement thus is a likely source of possible legal claims.

By contrast, established firms operate in a comparatively disclosure-rich environment. Because the firm has made many disclosures, there are many potential sources of liability. Moreover in secondary market cases, even though a particular disclosure terminates the right to sue over that particular information, investors may still sue over other, thus far undiscovered, nondislcosures related to other statements. This contrasts with the single ready source of potential liability in IPO cases.[104]

---

100. Alexander, *Do the Merits Matter*, *supra* note 1, at 574–77.

101. The Gilardi Report indicates that in a third case reported in the Alexander study, *Victor Technologies*, institutional investors among the top 50 claimants received 42.9% of the settlement.

102. O'Brien & Hodges, *supra* note 2, at III-3.

103. Strictly speaking, an omission is only actionable if there was a duty to disclose the information. For publicly-traded companies, however, there is a continuing duty to update previous disclosures if the failure to do so would render the previous disclosure misleading. This would almost always be the case for material factual information other than internal forecasts and predictions.

104. *See supra* note 64.

The litigation put model is thus less persuasive in secondary market cases. It might apply, however, when a firm, particularly one with high variance, has made a specific, material disclosure, such as an announcement of a new product, a new technology, a new contract, a statement about the possibility of a merger, or even a quarterly or annual statement.

E.   Implications for the Computation of Damages

The current method of calculating per-share damages attributes the entire price effect of the disclosure to recoverable damages. To the extent that the anticipated costs of litigation and the termination of the litigation put affect the share price, the event-study method systematically overstates the amount of damages.

This error cannot be disregarded as negligible, because the large volume of trades in class-action litigation rapidly multiplies even a small per-share amount into millions of dollars. Data submitted to Congress indicate that one-quarter of securities class action settlements involve over $50 million in claims filed.[105] If even a small percentage of market losses were attributed to litigation-related components, large sums would be involved.

Whether current methods could be refined to exclude these components is uncertain. Because all three components of the market reaction derive from a single event—the disclosure—it is difficult for the event-study method to separate them. Such efforts must necessarily be based on assumptions or chains of deductions about the market value of particular items of information that cannot be independently verified because they occurred together. A similar approach is used in cases where the corrective disclosure is made simultaneously with other material disclosures which are not the subject of the litigation.[106] Notably, such efforts are among the least persuasive aspects of the expert testimony in litigated cases.[107]

One might attempt to use an option-pricing model to value the litigation put, using information such as the variance of the stock, the incidence of securities litigation generally and by industry, the average payment to settle such suits, and the average amount of such payments distributed to

---

105. Gilardi Report, *supra* note 88, at 783–92; Heffler Report, *supra* note 88, at 173–77.

106. *See, e.g., Apple Trial Transcript, supra* note 13, at 1405–08, 1417–19 (where a press release contained both corrective information and a negative earnings report, plaintiff's expert attributed $3.25 of the $8.25 price decrease to the fraud by assuming that the portion attributable to the negative earnings announcement was no greater than the largest percentage decline that had followed earlier such announcements); Cornell & Morgan, *supra* note 9, at 889–94.

107. *See infra* text accompanying notes 110–117.

class members. Similarly, one could try to approximate the price effect of anticipated litigation by using publicly-available information about the costs of securities litigation and settlements. In either event, one would have to take account of the difference between how an economist would value these factors in light of the available empirical information, and how the market actually reacts, based on investors' beliefs, which may not correspond to the findings of rigorous empirical research.[108]

Even if such refinements in the methodology are possible, they would significantly complicate a process that is already difficult for lay juries (and judges) to understand. And because compensating for these factors could only be done by a process of construction based on debatable factual assumptions about hypothetical investor behavior, a process that would be carried out by experts employed by adversary parties, it seems unlikely that any method could be developed whose application would be accepted by both parties.[109]

## II. Other Sources of Uncertainty

The observation that the effect of a disclosure of serious bad news on a stock's price reflects not simply the value of the bad news itself, but also the value of litigation-related components that should not be recoverable as damages, points out an interesting anomoly in the current methodology. The actual portion of the price effect of the disclosure that is attributable to the litigation-related components may be relatively small. As other observers have pointed out, however, there are other sources of uncertainty whose effect may be quite significant.

### A. Uncertainty About Per-Share Damages

The event-study approach depends on having an event to study. That is, the aim of this method is to measure the market's reaction to the infor-

---

108. For example, among the business and securities community the belief is often expressed that lawsuits are filed solely on the basis of stock price movements—that is, if there is a sufficiently large drop in the stock price, litigation is inevitable. Research indicates that this belief is not accurate. *See* Francis et al., *supra* note 3, at 16–17, 21. But if investors hold this belief, they will act on it rather than on the true state of affairs.

Moreover, if the law were changed to exclude the litigation-related components from recoverable damages, the potential return from such litigation would be decreased. This fact should in turn lower the price of both components. Working out a pricing model that would take into account these interrelated effects would be a complex task, but it should be feasible—that is, the feedback effect should not cause the entire structure to unravel.

109. *See infra* note 131 and accompanying text.

mation when it is eventually disclosed, and from that information to construct the market's hypothetical reaction to the information if it had been known during the class period. This exercise depends on the assumption that there is a point at which "the information" that was allegedly concealed is disclosed.[110] This simple assumption is rarely true. More often, the disclosure involves different (and usually more) information than that alleged in the complaint.

As Cornell and Morgan point out, this point is neatly illustrated in the very case in which the Supreme Court endorsed the fraud-on-the-market theory and its efficient-market underpinning.[111] In *Basic, Inc. v. Levinson*,[112] the plaintiffs alleged that the defendants violated the securities laws by failing to disclose that the firm was engaged in merger negotiations. Subsequently, the firm announced that it had reached agreement on a merger and disclosed the merger terms.[113] This announcement, obviously, did much more than simply correct the earlier misinformation. The value of information that merger negotiations are taking place is quite different from the value of a completed merger agreement on disclosed terms. One could not use the market's reaction to the announcement of the merger on specified terms as a measure of the damages from the concealment of the fact that negotiations were taking place—at least not without substantial fine-tuning. One suspects that in most cases when information is disclosed later it will not be the same information, and its significance will also have changed.[114]

Similarly, the allegedly concealed information is often disclosed together with other information that is also material. In *Apple*, for example, the news that Apple was discontinuing its efforts to manufacture a proprietary disk drive was combined with news of drastically reduced forecasts of revenues and profits.

Sometimes the information is not disclosed in one discrete event. Rather, it leaks out over a period of time, perhaps through a variety of sources and media.[115] Determining which events should be included in the study and constructing a single price effect from many disclosure events are not simple matters, particularly when, as is usually the case, other infor-

---

110. Cornell & Morgan, *supra* note 9, at 889–90.
111. *Id.*
112. 485 U.S. 224 (1988).
113. *Basic*, 485 U.S. at 226–28.
114. For additional examples from the case law, see Cornell & Morgan, *supra* note 9, at 890–94.
115. *See* Koslow, *supra* note 33, at 823; Cornell & Morgan, *supra* note 9, at 891–92.

mation is also being disclosed during the time period and even in the same statements.

Sometimes it is difficult to identify when disclosure should have occurred. Information may have become known to the defendants over time; when did it become material? Similarly, the significance of the undisclosed information may change over time, so that the value line cannot simply be extrapolated from a later disclosure.[116] In *Apple*, for example, the defendants argued that by the time they announced that they would not be manufacturing their own proprietary 5-1/4 inch floppy disk drive, technological innovation had made the project irrelevant. Even if the Twiggy drive had been developed exactly on schedule, it would have been inferior to the drives that had become available from external sources. Thus, the information that Apple was having technical problems in developing the disk drive might have been valuable at the beginning of the class period when the technology was expected to be state-of-the-art, but worthless by the end of the class period when it had been superseded by the 3-1/2 inch drive.

Such confounding factors are frequently present in actual cases. Indeed, the model of a single piece of information that becomes known to the firm at a precisely identifiable time and is publicly disclosed in the same form on a single, identifiable occasion is found only rarely in the real world.[117] Together, these sources of uncertainty make determining per-share damages extremely difficult.

In real cases, in order to calculate damages one must construct an "equivalent disclosure price"—the price at which the security would have traded if the omitted and misrepresented information—and *only* that information—were accurately disclosed at the start of the class period.[118] This exercise will rely on hypothetical factual assumptions about why investors acted as they did and how they would have acted if the facts had been different.[119] In high-stakes litigation, any important issue that depends on such hypothetical factual inferences will be a contested matter, and the experts' assumptions will reflect the adversarial positions of the parties employing them.

---

116. Koslow, *supra* note 33, at 823–26.
117. *See* Cornell & Morgan, *supra* note 9, at 889; Koslow *supra* note 33, at 819–26.
118. *See* Cornell & Morgan, *supra* note 9, at 894–95 (to calculate the equivalent disclosure price, one must determine what information was omitted or misrepresented and then estimate the impact on security prices of the information that was disclosed).
119. *Id.* at 895–97 (discussing the financial analysis used to price securities and estimate investors' responses).

For example, the price of Apple stock dropped by $8.25 per share following the combined disclosure of the termination of the disk-drive project and the reduced earnings forcast. The plaintiffs' expert worked from the assumption that the portion of the price decline attributable to the earnings disclosure was no greater than the largest previous percentage price decline of Apple stock in response to a negative earnings announcement. Based on this assumption, he concluded that Apple stock lost 10% of its value, or $3.25, as the result of the disk drive announcement.[120]

He then assumed that the difference between the price line and the value line remained constant at $3.25 per share throughout the class period[121]—though he invited the jury to conclude that the value of the undisclosed information was 10% of the market price throughout the class period, which would have led to damages of as much as $6.00 per share on some trading days.[122]  Finally, he testified that at a constant value of $3.25 throughout the class period, the aggregate class damages were "just shy of $120 million."[123]

The expert witness for the defendants, not surprisingly, relied on quite different assumptions.  He testified that plaintiffs' expert had used the wrong date to measure the effect of the disclosure, that the price movements could not be attributed to the press release because Apple issued four other press releases on the relevant day, and that the hour-by-hour behavior of Apple stock demonstrated that a $3.60 price increase at the beginning of the class period was part of a general late-afternoon market rise in high-technology stocks.[124]  With respect to the announcement that Apple was discontinuing the manufacture of disk drives, the defense expert concluded that (a) the announcement was not news because it had effectively become known to the marketplace several months before[125] and (b) it was regarded by the market as good news, not bad news.[126]  He attributed the entire decline in Apple's price to the announcement of lower profits[127] and "the continuing shake out in the desktop computer industry," in particular, the increasing dominance of IBM in the market.[128]  In support of this conclusion, he constructed a comparable stock price index of desktop computer

---

120.  *Apple Trial Transcript, supra* note 13, at 1416–18.
121.  *Id.* at 1421–23.
122.  *Id.* at 1422.
123.  *Id.* at 1435.
124.  *Id.* at 1794.
125.  *Id.* at 1806–12.
126.  *Id.* at 1806, 1813–20.
127.  *Id.* at 1831.
128.  *Id.* at 1826–33.

companies which, he testified, showed that Apple was actually one of the better-performing firms in the industry.[129]   Apple's performance, he concluded, was inconsistent with the theory that its value declined by 10% because of firm-specific nondisclosures concerning the Twiggy drive.

The defense expert concluded that none of the $8.25 price decline was due to the disk-drive announcement and therefore the class had suffered no damages at all.  Each step in his testimony was supported by facts and inferences different from those relied on by the plaintiffs' expert.

The dispute over damages in the *Apple* case was actually less complex than it might have been.  The plaintiffs' theory of damages was that the damages had remained constant at $3.25 over the class period.  This considerably simplified the jury's task in finding per-share damages and, in addition, would have simplified the task of calculating aggregate damages for the class.[130]  But the plaintiffs' expert testified that it would have been equally plausible to assume that the value of the information was not a constant dollar value of $3.25, but 10% of the stock price.  This would have led to varying amounts of damages during the class period.

The defense expert, on the other hand, suggested that the information that Apple was considering a switch to external disk-drive sources became available during the class period, so that the information was no longer undisclosed, and that during the class period investors came to view the switch as a desirable, profit-enhancing move.  He also testified that investors' perception of the impact of IBM's increasing dominance of the desktop computer market on the profitability of competitors such as Apple changed during the class period.  If the defendants had not contended that the disk-drive announcement had no value at all, one might have expected them to argue that the alleged misrepresentation was worth more at the beginning of the class period, when analysts expected disk-drive manufacturing to be profitable and when Apple had a larger share of the market, than at the end of the period.  Thus, the battle of the experts in *Apple*, complicated as it was, may in fact have involved a relatively simple set of plausible assumptions.

---

129.   *Id.* at 1834–35.

130.   If per-share damages are constant throughout the class period, in-and-out traders are entitled to no damages because their injury on the purchase is exactly offset by their gain on the sale.  If the distance between the value-line and the price-line is not constant throughout the class period, however, in-and-out traders may be entitled to damages.  *See* Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1437 (9th Cir. 1987).  In *Apple*, the court did not submit the issue of aggregate class damages to the jury; instead, the total amount to be paid to the class would have depended on the claims actually filed.  *See infra* notes 146–147 and accompanying text.

41 UCLA LAW REVIEW 1421 (1994)

As this example illustrates, when there is no single disclosure that contains only the necessary corrective information, it is necessary to construct "price equivalents." This technique depends on factual assumptions that are not simple and that are unlikely to be agreed on by parties contesting stakes of the magnitude involved in securities class actions.[131] Because the relevant facts will seldom be undisputed or even readily accessible, the apparent precision of the financial models will almost always be anchored on shifting sands. Indeed, the results sometimes seem almost indefinitely manipulable. In *Diasonics*, for example, the plaintiffs' expert (the same one who testified in *Apple*) testified that based on certain assumptions the class's Rule 10b-5 damages were $201 million; that he had done another analysis that produced damages of $297 million; and that still other assumptions would produce damages of $350–400 million.[132]

Uncertainty about damages affects not only trial testimony, which might be expected to be adversarial, but also the parties' private estimates of the case's value and their ability to predict what a jury would do at trial.

These difficulties in applying the financial model do not mean that finance theory should be rejected in securities cases. If the recovery in securities class actions is to be based on the class's total out-of-pocket market losses caused by the nondisclosure, then finance theory is essential in calculating that amount—it "provides a common terminology which serves to focus the debate and organize the facts."[133] Not to use some form of economic model would lead to chaos. The question, rather, is whether even the best economic model we can devise will provide sufficient certainty and reliability to justify continuing with the compensatory damages remedy.

B.   Uncertainty About the Number of Shares in the Class

An even greater source of uncertainty is the calculation of the number of shares in the class. Recall that investors who both bought and sold during the class period are not entitled to the full difference between the price they paid and the value line on the purchase date, because they received a windfall when they sold at a price that was still inflated by the

---

131.   *See* Cornell & Morgan, *supra* note 9, at 897 ("Although financial economic theory provides detailed procedures for calculating prices *given* investor assessments, it is of little aid in determining how investor beliefs will respond to specific disclosures. Estimating investor assessments requires a detailed investigation of the facts. . . .").

132.   Deposition of John B. Torkelsen at 87, In re Diasonics Sec. Litig., No. C-83-4584 (N.D. Cal. Apr. 15, 1987).

133.   Cornell & Morgan, *supra* note 9, at 912.

nondisclosure. Thus, one cannot determine the number of shares in the class simply by adding together the trading volume on each day of the class period and multiplying by the per-share damages. That method would greatly overstate the class's total damages. In *Apple*, for example, the company had a total of 57.5 million shares outstanding, but trading volume during the class period was over 150 million shares—nearly three times the number of outstanding shares.[134]

To find the number of shares in the class, one must determine how many of the shares that were traded on any given day had already been traded earlier in the class period. If the per-share damages were constant during the class period, these shares are simply eliminated from the total because the investor's loss on the purchase is completely offset by the gain on the sale. If the per-share damages fluctuated during the class period, it is necessary to know on which day each share traded, so the proper adjustments can be made.

It is not currently possible to trace the trading patterns of particular shares directly. Most shares are held in street name and are bought and sold by broker-dealers or other large-volume traders. Such trades are accounted for in the aggregate rather than by assigning particular certificates to particular trades. Accordingly, the trades of "ins-and-outs" must be estimated through a statistical model. Building such a model depends on an assumption about the statistical probability that any particular share will trade on a given day. The method used most commonly by plaintiffs' experts[135] can be sketched as follows.[136]

At the outset, we know the number of shares that were traded on each day of the class period, and the number of shares outstanding.[137] The first step is to determine the "float," the number of shares outstanding that are *likely to trade*, by eliminating certain shares that have almost no probability of trading. From SEC filings, one can determine the number of shares held by insiders before and after the class period. Beneficial owners

---

134. *Apple Trial Transcript*, *supra* note 13, at 1434.

135. The plaintiffs' model is the basis for analysis because defendants typically do not offer a competing set of damages calculations of their own, but rather attempt to discredit the plaintiffs' damages case.

136. The following discussion relies heavily on Koslow, *supra* note 33, at 826–40. The methodology is also described in Mr. Torkelsen's testimony in *Apple*.

137. Trading volume as reported on NASDAQ must be adjusted because the NASDAQ figures report trades between dealers twice, thus overstating the actual number of shares traded by about one-third. *See* Declaration of John B. Torkelsen in Support of Plaintiffs' Motion for Entry of Judgment in an Aggregate Amount at paras. 12, 13, *In re* Apple Computer Sec. Litig., No. C-84-20148 (N.D. Cal. May 13, 1991); Anne Newman, *Market's Volume Is Often Overstated in Double and Triple Counting of Trades*, WALL ST. J., Apr. 9, 1990, at C6.

of over 5% of a firm's shares are required to file whenever they trade; if such holders have not filed an amendment to their Form 13D filing for the class period, one can assume that those shares did not trade. Similarly, by comparing quarterly reports of institutional investors' holdings before and after the class period, some large blocks of stock can be eliminated from the float.

In this fashion, the plaintiffs' expert in *Apple* testified that of the 57.5 million shares outstanding during the class period, only 38.5 million shares were in the float.[138] The determination of the float is itself uncertain: in a post-trial declaration, the same expert testified that there were 41.7 mil-lion shares in the float.[139]

The next step is to determine how many of the shares in the float (shares that potentially could have been traded) actually were traded. This is done through a mathematical model based on assumptions about the trading pattern in the shares. In the "proportional trading" or "proportional decay" model used by plaintiffs' experts (which has also been adopted in several studies),[140] each share is assumed to be equally likely to trade.

Thus, if there are one million shares outstanding and 100,000 shares trade on each day of a five-day class period—and assuming that per-share damages are constant throughout the class period—the number of shares in the class is calculated as follows. On each day, 100,000 shares, or 10% of the float, is traded. Each share has a 10% probability of being traded, so these 100,000 shares will consist of 10% of the shares that have already traded during the class period plus 10% of the shares that have never been traded. Only the "new" shares are added to the class.[141] The calculation is represented in Table 1.

---

138.  *Apple Trial Transcript, supra* note 13, at 1434.
139.  Declaration of John B. Torkelsen in Support of Plaintiffs' Motion for Entry of Judgment in an Aggregate Amount (Aug. 28, 1991) at paragraph 7, *In re* Apple Computer Sec. Litig., No. C-84-20148 (N.D. Cal. May 13, 1991).
140.  *See* Dunbar & Juneja, *supra* note 2, at 2; Francis et al., *supra* note 3; O'Brien & Hodges, *supra* note 2, at II-2.
141.  The shares that were previously traded are ins-and-outs. Since the example assumes that damages were constant during the period, in-and-out traders have no damages. If the per-share damages are not constant during the class period, the calculation can be expanded to account for how many shares from day one are traded on day three, and so on.

TABLE 1

|       | Shares Traded | Previously Traded in Class Period | Not Previously Traded | Total Shares in Class | Retained Shares (Never Traded) |
|-------|---------------|-----------------------------------|-----------------------|-----------------------|--------------------------------|
| **Day 1** | 100,000 | 0 | 100,000 | 100,000 | 900,000 |
| **Day 2** | 100,000 | 10,000 | 90,000 | 190,000 | 810,000 |
| **Day 3** | 100,000 | 19,000 | 81,000 | 271,000 | 729,000 |
| **Day 4** | 100,000 | 27,100 | 72,900 | 343,900 | 656,100 |
| **Day 5** | 100,000 | 34,390 | 65,610 | 409,510 | 590,490 |

The total number of shares in the class at the end of the five-day period is 409,510—even though the total trading volume during that time was 500,000 shares.

Using a similar analysis, the plaintiffs' expert in *Apple* testified that 36.5 million of the 38.5 million shares in the float were traded during the class period.[142]

But the assumption that all shares are equally likely to trade is almost certainly wrong. Shares that have already been traded are more likely to be traded again—in some views perhaps four or five times as likely.[143] In the previous example, if shares that had already traded were five times as likely to trade, the total shares traded during the class period would be only about 294,000, rather than the 409,500 that would result from an assumption that all shares were equally likely to trade. In a longer class period, the effect of the proportional trading assumption would be even greater.[144] Class periods in securities cases typically are measured in months rather

---

142. *Apple Trial Transcript*, *supra* note 13, at 1435. In post-trial briefs, the plaintiffs' expert testified that 34 million shares traded during the class period. Declaration of John B. Torkelsen in Support of Motion for Entry of Judgment in an Aggregate Amount, *In re* Apple Computer Sec. Litig., No. C-84-20148 (N.D. Cal. May 13, 1991). The plaintiffs' methodology is described at paras. 10–19 and exhs. A–C.

143. Koslow, *supra* note 33, at 834 n.106 (citing William Beaver & James K. Malernee, Estimating Damages in Securities Fraud Cases (Cornerstone Research, Cambridge, MA)) (private publication, on file with author).

144. Koslow gives a hypothetical example using a 10-day trading period. Assuming that ins-and-outs have no damages, the total damages for the class, if traded shares are five times as likely to trade, is less than half the amount that would result under the proportional trading assumption. *Id.*, at 831–34.

than days: The class period in *Apple*, for example, was approximately ten months long.[145]  The use of the proportional trading assumption in calculating aggregate class damages accordingly may inflate the total class damages by 100% or more.

Because the proportional trading model greatly overstates the amount of damages, courts plainly should not award aggregate damages based on this method.[146]  If trading probabilities can be ascertained, it would not be difficult to adapt the model to reflect those probabilities.  Otherwise, damage awards should be based on proof of individual claims.[147]

### III.  ASSESSING THE EFFECTIVENESS OF SECURITIES CLASS ACTION LITIGATION

The pervasive uncertainty about damages makes it difficult to assess the effectiveness of class action litigation as a mechanism for enforcing the securities laws.  Much ink has been spilled in arguing whether securities class actions produce substantial returns to the class.  It is virtually impossible to answer this vitally important question, however, because of lack of agreement as to the baseline.

One way of gauging the effectiveness of class actions would be to compare the amount recovered for the class to the amount potentially recoverable at trial, and then to compare this return to returns achieved in other types of litigation.[148]  Unfortunately for this endeavor, information about the parties' damages contentions is not readily available.  The amount of damages is not alleged in complaints or answers.  Most cases are

---

145.  Additionally, long class periods render the calculation of per-share damages through event studies less reliable because the longer the class period, the more likely that information unrelated to the litigation may have affected the share price.  *See* Marais & Schipper, *supra* note 33, at 214.  Plaintiffs seek long class periods because they increase aggregate damages.  Defendants, anticipating a settlement, may not oppose long class periods because a settlement will foreclose future litigation for all trades during the class period.

146.  *Cf.* Jaroslawicz v. Engelhard Corp., 724 F. Supp. 294, 298–302 (D.N.J. 1989) (holding that it is inappropriate to award "lump sum" damages for the entire class because defendants may rebut the presumption of reliance with respect to individual class members).

147.  So long as there is a provision in the judgment that any unclaimed portion of the award reverts to the defendants, it might seem that this issue is not very important.  As so often in securities class action litigation, however, the significance of the issue is in its effect on attorneys' fees.  The court decides the fee award when the settlement is approved (or after the judgment is entered), relying on what it is told about the value of the recovery.  There is no provision for adjusting the fee award based on the number of shares that actually file claims.  A larger recovery for the class will support a larger fee application.

148.  The other pieces of the puzzle are what proportion of violations are litigated, how often litigation results in payments by defendants who did not actually violate the law, and how many violations are deterred by the possibility of litigation.

settled before trial, and the expert witnesses' calculations either are not part of the record or are filed under seal. In some cases conclusory, un-cross-examined estimates of damages figures are given in declarations and briefs urging approval of the settlement or the fee application—at a time when both sides have an incentive to minimize the potential trial damages to facilitate court approval of the settlement. The parties' contentions about damages only become public record while the case is still contested if a summary judgment motion is filed that requires disclosure of the damages position of one or both sides (not a very frequent occurrence) or if the case actually goes to trial or is settled so close to trial that trial briefs, statements of expected testimony, and relevant deposition testimony must be filed. Even in these cases, it is difficult, time-consuming, and expensive to discover whether such information is available and then to obtain it.

Commentators seeking to evaluate the efficiency of securities class actions in statistically valid samples of cases have, accordingly, attempted to estimate potential damages by applying mathematical models to publicly-available information. At least two studies, applying the proportional trading model, have concluded that recoveries average less than 10% of the potential damages.[149]

As we have seen, the proportional trading model systematically over-states damages by assuming that all shares are equally likely to trade, when in fact shares that have already traded are more likely to trade. These studies thus understate the effectiveness of securities litigation. The bias caused by the proportional trading assumption was evidently compounded in the studies by applying the model to all outstanding shares, without first determining the number of shares in the float. This error would lead to a greatly overstated number of shares in the class. For example, in *Apple*, the number of outstanding shares was 57.5 million, but according to the plaintiffs' expert, the float (the number of shares available to be traded) was only 38.5 million—or about two-thirds of the outstanding shares.[150] This error

---

149. Dunbar & Juneja, *supra* note 2, at 3–4 & tbl. 3 (average settlement in cases settled between July 1991 and June 1993 was 7% of investor losses and the median was 5%); O'Brien & Hodges, *supra* note 2, at II-3 (analysis of 20 randomly selected suits, finding settlements had a mean value of 5.9% of the estimated shareholder losses and a median value of 4.1%). The O'Brien study is vigorously criticized in Logan & Moore, *supra* note 93, at 244–50.

150. For examples of how such errors can lead to vastly overstated damages, see Koslow, *supra* note 33, at 830–40.

41 UCLA LAW REVIEW 1421 (1994)

may be especially troubling in the case of IPO litigation, where the float would normally be small.[151]

Other commentators, in contrast, have substantially overstated the proportion of losses recovered through litigation. John Torkelsen, the plaintiffs' expert in *Apple*, has stated that claimants recover, on average, 59.76% of their potential legal damages.[152] This figure was achieved by piling one dubious conclusion upon another. First, Torkelsen selected—without disclosing the selection criteria—twenty cases in which he performed a damages analysis.[153] He stated that in these twenty cases, his calculation of damages averaged 27.7% of his calculation of market losses.[154] He then applied this 27.7% figure to the market losses reported by claimants in the Gilardi and Heffler reports to obtain an amount for the class's total damages. Finally, he divided the total settlements by the total of his hypothetical class damages to arrive at a recovery rate of nearly 60%.

This analysis is highly misleading. To begin with, the 27.7% figure for the percentage of market losses claimed as damages was reached by adding together the total dollar amounts of market losses and damages in all twenty cases, and dividing the total damages by the total market losses.[155] Three huge cases accounted for over 60% of the total market losses, however, and in each of these cases, the damages were less than 15% of market losses. The *median* for all twenty cases was 64%, not 27.7%. The mean percentage (that is, adding the *percentages* and dividing by the number of cases) was 57.4%. Torkelsen's own sample shows that the median amount plaintiffs actually claim as damages is about 60% of their market losses, not 27.7%.

Torkelsen then added up the total market losses reported by claimants in the Gilardi and Heffler Reports and took 27.7% of that amount to obtain the total class damages for all twenty cases. If instead of the artificially

---

151. Because an IPO firm's stock has not previously been publicly traded, only the shares sold on the offering are initially eligible to be in the class. The shares sold on the offering commonly amount to a minority of the total outstanding shares after the offering, in order that the initial investors may retain control. Most or all of the remaining shares are typically restricted from public sale, either by SEC rules or by the registration agreement. Only if restricted shares are able to and do come on the market during the class period can the number of shares in the class be increased from the number that were sold on the offering. If no restricted shares come on the market during the class period, the entire trading volume consists of the same shares being bought and sold over and over.

152. Torkelsen Report, *supra* note 88, at 150–52.

153. Mr. Torkelsen has been retained to estimate damages in more than 40 cases. *Apple Trial Transcript, supra* note 13.

154. Torkelsen Report, *supra* note 88, at 153.

155. This error has also been pointed out in Dunbar & Juneja, *supra* note 2, at 4, 6–7.

low figure of 27.7%, however, Torkelsen had used the more accurate median percentage of 57.4% to calculate the claimants' market losses, he would have found that claimants received only 28.8% of their recoverable damages.

Even this figure is too high, because it assumes that every person who was a member of the class filed a claim. As we have seen, the number of shares that file claims is substantially smaller than the number of shares that, according to, plaintiffs' experts, are eligible to claim. If only 40% to 65% of eligible shares file claims, as indicated by the same data on which Mr. Torkelsen relied,[156] litigation recovered, on average, only 11% to 18% of the class's damages—before the deduction of attorneys' fees.

The reliability of the Torkelsen analysis is subject to further doubt as it is based on twenty "representative" cases which do not include several cases listed in the Gilardi Report in which Mr. Torkelsen testified or provided a declaration on damages.[157] The failure to include these cases makes it difficult to do independent analysis on both sets of data.

Similarly, the Gilardi and Heffler Reports purport to state the percentage of market losses recovered in each lawsuit.[158] In both reports, the percentages are based on the market losses reported by those filing claims, not the total market losses of the class. Because the number of shares that file claims can be substantially smaller than the number of shares in the class, this method significantly overstates the percentage of class members' losses that are recovered through litigation.

It is difficult to make an independent analysis of how settlements stack up against the damage figures developed by plaintiffs and defendants, because very few cases get as far as trial or the filing of trial briefs and narrative statements of expert witnesses' testimony. Efforts to do so only demonstrate the unreliability of current methods. O'Brien and Hodges applied the proportional trading model to twenty "randomly selected" cases and concluded that plaintiffs recover only 5.9% of their estimated damages.[159] The editors of Class Action Reports published a response to the O'Brien

---

156. *See supra* text accompanying note 142.

157. Deposition of John B. Torkelsen, at 115-16 & exhs. 2207, 2008, *In re* Diasonics Sec. Litig., No. C-83-4584 (N.D. Cal. Apr. 15, 1987); Deposition of John B. Torkelsen at 10-11, Mancino v. McMahan, No. C-84-0407 (N.D. Cal. 1986); Declaration of John B. Torkelsen in Opposition to Defendants' Motion for Summary Judgment, *In re* Pizza Time Theater Sec. Litig., No. C-84-20048 (N.D. Cal. July 15, 1988). This list may not be exhaustive, as I have not received the court files for all of the cases listed by the claims administrators, but only those filed in the Northern District of California from 1983 to 1985.

158. *See* Gilardi Report, *supra* note 88, at 783–92; Heffler Report, *supra* note 88, at 172–77.

159. O'Brien & Hodges, *supra* note 2, at II-3.

1466                                41 UCLA LAW REVIEW 1421 (1994)

study based on information provided to them by plaintiffs' lawyers about their actual damage estimates in eighteen of those cases.[160] Based on this information, Class Action Reports concluded that the "real recovery" was 23% of the classes' "real losses."[161] Even this figure, of course, is far less than Torkelsen's 59% claim, and the Class Action Reports' analysis itself is questionable.[162] Such wide variations in analyses that purport to use the same methodology do not inspire confidence in either side's claims.

One simple reform that would be helpful both for evaluating the effectiveness of securities class actions in compensating class members and for allowing members of the class to make informed decisions whether to object to the settlement would be to require plaintiffs (and possibly defendants) to state their preliminary damages estimates on the record early in the case—perhaps at the time of class certification motions are filed. It should be relatively easy to give at least a preliminary estimate early in the case, as the experts for both sides have extensive databases of securities prices, trading volumes, and indices of comparable stocks. This preliminary estimate (and any revisions from later developments) should be included in the settlement notice to the class. The notice could also include an explanation if later-discovered information indicated that the preliminary estimate was too high or too low.

To be of greatest usefulness, this disclosure should take place well before the settlement is reached. This would discourage self-serving low estimates designed to make the settlement look more attractive. If the parties were required to disclose their preliminary estimates at an early stage, they would have to balance the need for an estimate that would support their bargaining position during settlement negotiations with the need to avoid extreme statements that might make an eventual settlement

---

160. *See generally* Logan & Moore, *supra* note 93.

161. *Id.*

162. The information about "real losses" was dervied from trial briefs or affidavits in only seven of the eighteen cases. Indeed, in at least two cases the plaintiffs did not even prepare an analysis of legally recoverable damages. (The failure to even do a damages analysis would be inconceivable, of course, if settlement decisions were really made by comparing offers to expected trial outcomes.) In one case, the editors disregarded the plaintiffs' own damage figure of $26.2 million because they considered a figure of $1.83 million "more realistic." In several other cases, the editors adjusted the amount of the settlement to reflect non-cash components of the settlement. In at least one such case, this adjustment is plainly unbelievable. The settlement in *Westwood One* was $2.5 million in cash plus 3 million warrants, good for seven years, to purchase the stock at $17.25 per share. Class Action Reports accepted Mr. Torkelsen's view that these warrants were worth $18 million at the time of the settlement. This valuation seems highly implausible, as the warrants would have value only to the extent that the market price of the shares exceeded $17.25. Throughout 1993 and 1994, the stock traded between $1.81 and $9.13 per share (average monthly closing prices).

look disadvantageous.[163]   Extreme positions would thus be discouraged, which might facilitate settlements.  Combining this disclosure requirement with a fee-setting mechanism that would award the plaintiffs' attorneys' fees based on how successful they were in recovering the class's losses[164] would make an excellent contribution toward solving the dilemma of finding a way to use attorneys' fee awards to align the interests of the class lawyers with those of the class.

It is important to stress two additional points.  First, in judging the effectiveness of a particular lawsuit in obtaining a recovery for the class, one must consider not only what a jury might have awarded, but also what could realistically be collected.  Settlements, unlike judgments, are agreements on amounts that will actually be paid.  If defendants do not have the assets to satisfy a judgment, it is not a fair criticism of the settlement that it is less than a potential judgment.[165]   Indeed, settlement for a lower amount may be in the class's interest by preserving assets for payment to the class that would otherwise have been expended in litigating the case. At present, I know of no objective way of taking into account the defendants' ability to pay in evaluating the effectiveness of settlements.  Occasionally, plaintiffs' briefs in support of the motion to approve the settlement recount that the only defendants who could realistically have been found liable were insolvent or would have become so if a judgment had been obtained.[166]   Such statements are suspect, however, because of their self-serving nature in the context of an argument that the court should approve the settlement.

Second—and most crucial—in judging the effectiveness of securities class action litigation generally, one should not base the judgment solely on

---

163.  Class Action Reports has advocated making such a disclosure in the class notice of settlement.  *See* Logan & Moore, *supra* note 93, at 266.  The basic idea is correct, but the class notice stage is too late to avoid self-servingly low damage figures.

164.  Brief for Appellant Reilly at 38, *In re* Tuscon Elec. Power Co. Sec. Litig., No. 92-15557 (9th Cir. Aug. 3, 1992).

165.  The prevalent economic models of settlement thus are incomplete in that they take into account the amount of a potential judgment and the probability that the plaintiff will prevail at trial, but do not include the amount of the potential judgment that can actually be collected.

166.  *Eagle Computer* was such a case.  *See* Declaration of Paul F. Bennett Re: History and Nature of this Litigation at 6–7, *In re* Eagle Computer Sec. Litig., No. C-84-20382(A) (N.D. Cal. Jan. 9, 1989).  Sometimes there are other defendants (frequently underwriters) who are unquestionably solvent.  In such cases, the brief in support of the settlement may explain that a judgment probably could not have been obtained against these defendants.  *See* Memorandum in Support of Motion for an Award of Attorneys' Fees, Costs and Expenses at 12, *In re* Eagle Computer Sec. Litig., No. C-84-20382(A) (N.D. Cal. Jan. 9, 1989).  It is difficult to tell from the publicly-available information whether a judgment against these defendants would indeed have been unlikely, or simply difficult, contingent, and expensive.

41 UCLA LAW REVIEW 1421 (1994)

the efficiency of the recovery on behalf of individual investors in cases where lawsuits are filed. The prospect of litigation undoubtedly deters harmful conduct, and that deterrent effect should also be taken into account. Litigation that appears grossly inefficient in providing compensation in particular cases might be seen to be efficient if its deterrent effect could be reliably measured. The temptation to lie, exaggerate, conceal, and be unreasonably optimistic are still powerful ones in the capital markets. Unquestionably, the prospect of litigation deters a certain amount of misconduct and evokes a certain amount of supervision by top mangement that would not otherwise be present. Any proposal to reform securities litigation must take into account the deterrent effect of private enforcement as well as its efficiency in delivering compensation in litigated cases. The issue for discussion is, what proposal provides the best enforcement of the securities laws?

## CONCLUSION

The current approach to remedies in private securities class actions is to treat the securities laws as a species of tort law designed to compensate particular investors for market losses with respect to particular transactions. The twin goals of this approach are to compensate victims of securities fraud and, through the threat of the compensatory sanction, to deter violations. The compensatory damages approach is based on the assumption that it is possible, at an acceptable cost and with an acceptable degree of accuracy, to determine the amount by which investors have been damaged by a particular misrepresentation or nondisclosure.

The calculation of class damages under current law is analytically flawed, however, because it sweeps in elements of the market's reaction to bad news that are not within the legal definition of damages. Even more importantly, the determination of damages is subject to enormous uncertainties, and the prevailing methods are systematically biased toward overstating the class's aggregate damages. The size and uncertainty of potential damage awards probably have negative effects on bargaining behavior, making the parties unduly averse to trial and driving settlements away from the expected value of the case after trial.

How should we respond to the evidence that the determination of damages in securities class actions is not the simple, objective, unproblematic mathematical exercise envisioned by case law? One possible response is to recognize the pitfalls of calculating damages in these cases, and to strive either to eliminate the uncertainties or to devise ways of minimizing or compensating for them. Future technological advances in communi-

cations and recordkeeping by exchanges, the over-the-counter systems, and brokerage houses may make it possible to track a larger proportion of transactions. Research into trading patterns may lead to the development of new mathematical models for accounting for the trades of "ins-and-outs." Refinements of statistical methodology and theoretical models in finance theory, coupled with technological innovations, may make it possible to identify the separate price effects of information that cannot presently be disaggregated. Methods of compensating for uncertainties that are inherent may be devised and, with the aid of active judicial supervision, a consensus may develop as to the most accurate and acceptable methodology.

Even if one believes that left to itself the present system will improve, however, such improvements will not produce a truly satisfactory enforcement regime. At a basic level, the present approach to sanctions does a poor job of achieving either compensation or deterrence. It is time to reconsider the entire approach.

The securities laws have moved very far from the common-law torts of fraud and misrepresentation. They are, instead, a regulatory regime whose purpose is to protect the broad public interest in the integrity of the capital markets. The sanction for violations of the statute should be set from the perspective of that regulatory system, and should be aimed primarily toward deterrence, while carefully preserving incentives for the vigorous private enforcement which is essential to policing the integrity of the capital markets.

In a future article, I will argue that the sanction of compensatory damages, enforced through class action litigation, should be replaced with a regulatory sanction—a schedule of civil penalties—also enforced by private litigation through an attorneys-fee provision and procedures modeled on the *qui tam* action designed to induce institutional investors to play an active role in private enforcement suits. Such an approach could, I believe, provide superior deterrence at lower cost. By reducing the cost, complexity and uncertainty of litigation and thereby making trial a realistic alternative, it could also lead to settlements that more accurately reflect the strength of the liability case. And, by doing away with the lockstep relationship between attorneys' fees and a tort-based monetary recovery for a class of traders, a regulatory remedy could offer a way to address the widely-recognized agency costs problems of securities class action litigation.

Regardless of the merits of any particular proposal, focusing on the regulatory goals of the securities laws could lead to remedies that would better effectuate those goals and would permit courts to take account of the interests of a broader segment of the firm's shareholders and the investing public than the small (and often relatively arbitrary) subset of those who purchased during the class period.