# EXHIBIT 10

GRAY – EIC EDITS (DO NOT DELETE)                                    1/20/23 7:04 PM

# COUNTERFACTUALS IN SECURITIES CLASS ACTIONS – AN ILLUSTRATION USING THIRD-PARTY CORRECTIVE DISCLOSURES[+]

*By: Andrew R. Gray[*], Ryan A. Walsh[**], Spencer L. Chatellier[***], Nguyet Nguyen, Ph.D[****], and Torben Voetmann, Ph.D[*****]*

| | | |
|---|---|---|
| I. | INTRODUCTION | 104 |
| I. | THIRD-PARTY "CORRECTIVE" DISCLOSURES | 106 |
| II. | EXISTING GUIDANCE FROM THE COURTS | 107 |
| III. | FRAMEWORK TO ESTABLISH LOSS CAUSATION IN SECURITIES CLASS ACTIONS | 108 |
| IV. | IMPLICATION FOR ECONOMIC ANALYSIS ON LOSS CAUSATION | 110 |
| V. | TIMING OF LOSS CAUSATION ANALYSIS | 112 |

## I. INTRODUCTION

In 2020, U.S. corporate directors and officers were exposed to $438 billion in potential damages from securities class action cases.[1]  In the

---

[+]    The views and opinions expressed in this article are strictly those of the authors writing in their individual capacities only, and do not necessarily represent the views or opinions of Latham & Watkins LLP or The Brattle Group Inc. or any of either's other employees or clients. Readers should not rely on this article for legal advice and should seek independent expert or legal advice regarding any conclusions that could be drawn from this article.

[*]    Andrew R. Gray, Chair of the Litigation & Trial Department in Orange County, represents companies, financial institutions, boards of directors, and individuals in complex commercial litigation including securities class action lawsuits, corporate control and merger disputes, and other complex matters.

[**]    Ryan A. Walsh is an associate in the Orange County office of Latham & Watkins and a member of the Litigation & Trial Department.  Mr. Walsh advises clients on complex corporate litigation, with a focus on securities litigation.

[***]    Spencer L. Chatellier is an associate in the Orange County office of Latham & Watkins and a member of the Litigation & Trial Department.  Mr. Chatellier advises clients on complex corporate litigation, with a focus on securities litigation.

[****]    Nguyet Nguyen, Ph.D. is a senior associate at The Brattle Group.  Dr. Nguyen is a financial economist with expertise in securities and derivatives pricing, financial markets, financial investigations, and asset valuation.

[*****]    Torben Voetmann, Ph.D. is a principal in The Brattle Group's San Francisco office.  Dr. Voetmann focuses on cases that involve complex economic and financial issues across a range of industries and capital markets.  He works with clients and experts on issues related to securities cases and valuation disputes.

1.    *Global Corporate Exposure to Stock Drop Securities Class Actions Amounts to $177.1 billion in 4Q and $438.5 billion in 2020*, MKTS. INSIDER (Jan. 8, 2021, 1:08 AM),

(3) GRAY - FINAL FORM.docx (DO NOT DELETE)                                                1/20/23 7:04 PM

2022]         *COUNTERFACTUALS IN SECURITIES CLASS ACTIONS*         105

typical securities lawsuit, an investor claims that a company (or its directors and officers) misrepresented or omitted material facts to the market and that, once those misrepresentations or omissions were revealed (or "corrected") in the market, the company's stock price dropped and caused the investor's economic loss. Not all stock drops following the correction of a misstatement or omission may actually be caused by its disclosure. As a matter of both law and economics, the aggrieved investor must prove the causal link between the alleged misrepresentation or omission and any economic loss. This is usually established through a counterfactual in which the alleged truth could have been disclosed earlier.

The importance of employing an appropriate counterfactual in a securities class action was highlighted in an October 2019 decision by the Federal Court of Australia in *TPT Patrol Pty. Ltd. v. Myer Holdings Ltd.*[2] There, the court held that, although the defendant engaged in misleading conduct, the counterfactual that the plaintiffs' expert relied on was such that no share price inflation related to the misleading conduct could be established.[3] A properly constructed counterfactual must take into account not only the content of what could have and should have been disclosed, but also how observable losses following corrective disclosures in the real world translate to losses in the counterfactual world. When a corrective disclosure itself contains additional information not directly related to correcting the misstatement or omission (i.e., "confounding" information), the impact of information not associated with the corrective disclosure is often the subject of heated debates among lawyers and experts. Using the examples of securities class actions stemming from third-party corrective disclosures, this article illustrates how answering the causation question through a properly constructed counterfactual is a complex and multi-faceted inquiry that requires the consideration of not only the substance of confounding information, but also the manner in which such information is communicated to the market.

We first provide a brief description of "short reports"—a type of third-party disclosure that has been used by plaintiffs to substantiate fraud-on-the-market claims in several securities class actions in recent years. We then draw from legal and economic precedents to highlight the complexity of establishing loss causation in these cases. Last, we propose some thoughts on when courts might want to entertain expert evidence related to loss causation.

---

https://markets.businessinsider.com/news/stocks/global-corporate-exposure-to-stock-drop-securities-class-actions-amounts-to-177-1-billion-in-4q-and-438-5-billion-in-2020-1029942581.

2.    *TPT Patrol Pty Ltd v Myer Holdings Ltd* [2019] FCA 1747 (24 October 2019) 376 (Austl.).

3.    *Id. at* 373.

(3) GRAY - FINAL FORM.docx (DO NOT DELETE)                                          1/20/23 7:04 PM

106         *HOUSTON BUSINESS AND TAX LAW JOURNAL*      [Vol. XXIII

### I. THIRD-PARTY "CORRECTIVE" DISCLOSURES

The emergence of social media and other easily accessible forums for creating and posting content has implications for the role that individual investors' opinions and statements by corporate representatives have in financial markets.[4] For example, approximately 20 million unique users visit *Seeking Alpha* each month, making it one of the largest investment-related forums on the internet.[5] The popularity of *Seeking Alpha* (and similar platforms) allows individuals to share with millions of sophisticated and unsophisticated investors their investment theses, including those claiming that a stock is overvalued and advocating a short position in that stock (a "short report").[6] Academic studies show that publicity is a key feature of short reports that precipitate large price declines in the companies they target.[7] In addition to posting their articles on well-trafficked websites like *Seeking Alpha*, authors of short reports often use catchy titles, harsh tones, and other attention-grabbing methods (e.g., photos and videos) to bring eyeballs to their analyses.[8] Although some short reports reveal new information to the market, many are deemed to simply re-interpret known facts, offer only opinions, or are written by anonymous authors who do not satisfy the requirements to be deemed reliable under applicable law.[9] In these instances, short reports do not constitute a "corrective" factual disclosure under the federal securities laws.[10] Nonetheless, securities class action plaintiffs are sometimes found to have adequately pleaded loss causation on the basis of a short report, creating additional issues with respect to loss causation and damages.[11]

---

4. Kevin LaCroix, *Upbeat Social Media Post Draws Securities Suit*, THE D&O DIARY (Mar. 1, 2022),
https://www.dandodiary.com/2022/03/articles/subprime-litigation/upbeat-social-media-post-draws-securities-suit/.

5. *About Us*, SEEKING ALPHA, https://about.seekingalpha.com/?source=footer (last visited Oct. 21, 2022)*.

6. Joshua Mitts, *Short and Distort*, 49 J. LEGAL STUD. 287, 297 (2020).

7. Alexander Ljungqvist & Wenlan Qian, *How Constraining Are limits to Arbitrage?*, 29 REV. FIN. STUD. 1975, 1981 (2016).

8. *Id.* at 1989.

9. *Id.* at 2014-15. For example, courts in the Ninth Circuit apply a rigorous two-part test, requiring sufficient particularity and deliberate recklessness, to statements attributed to confidential witnesses in order to determine whether those witnesses have personal knowledge and are reliable. *See, e.g.*, Zucco Partners, LLC., v. Digimarc Corp., 552 F.2d 981, 995, 998 (9th Cir. 2009).

10. Grigsby v. BofI Holding, Inc., 979 F.3d 1198, 1203 (9th Cir. 2020) (holding the short seller report at issue "did not constitute a corrective disclosure in part because it was written by an anonymous short-seller with no expertise beyond that of a typical market participant who based the article solely on information found in public sources.").

11. See e.g., In re Gilead Scis. Secs. Litig., 536 F.3d 1049, 1058 (9th Cir. 2008) (holding the individual investors' claim of a "drop in stock price was plausibly caused by the Warning Letter.").

(3) GRAY - FINAL FORM.docx (DO NOT DELETE)                                         1/20/23 7:04 PM

2022]        *COUNTERFACTUALS IN SECURITIES CLASS ACTIONS*        107

## II. EXISTING GUIDANCE FROM THE COURTS

Some U.S. courts have, in the past, credited short reports when analyzing loss causation.[12] However, litigants often dispute whether such reports actually reveal new information that truly corrects a prior omission or misrepresentation in the marketplace (i.e., a "corrective" disclosure).[13] Circuit courts ("circuits") generally require that corrective disclosures reveal new information and principally follow two approaches.[14] The first demands that the disclosure includes some entirely new information not already known to the public.[15] Circuits adhering to this approach generally hold that "the mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure."[16] The second approach credits as "corrective" those disclosures that republish previously known information, provided the disclosures themselves do real work to unpack complex public material (e.g., financial or scientific data) that would not otherwise be understood by investors.[17] Circuits following this second approach accept that third-party publications, including news articles and blog posts, can constitute corrective disclosures at the pleading stage.[18]

Notwithstanding, what happens when the corrective disclosure contains both new and old information? In those cases, it is necessary to differentiate the new from the old in order to establish that the "corrective" impact was caused by the new information and not by potentially confounding information, such as a new opinion based on old (i.e., already known) facts. Take, for example, *Meyer v. Greene*. There, the United States Court of Appeals for the Eleventh Circuit held that, "if the information relied upon in forming an opinion was

---

12.    *See* Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc., 769 F.3d 313, 322 (5th Cir. 2014) ("A corrective disclosure can come from any source, and can take any form from which the market can absorb the information and react. . . ") (alteration omitted).

13.    Meyer v. Greene, 710 F.3d 1189, 1199 (11th Cir. 2013).

14.    *See id.* at 1197-98.

15.    *Id.* at 1198 ("Because a corrective disclosure obviously must disclose new information, the fact that the sources used in [the presentation] were already public is fatal to the [plaintiffs'] claim of loss causation.") (citations and internal quotation marks omitted).

16.    *Id.* at 1199.

17.    For example, in *Pub. Emps.' Ret. Sys. of Miss.*, 769 F.3d at 323, the court found that "complex economic data understandable only through expert analysis may not be readily digestible" by the market and therefore might upend the efficient market theory, and concluded that it is possible, at the pleading stage, that the public might not be aware of "the hidden meaning" of public data such that later analysis and publication by an expert would constitute a corrective disclosure.

18.    For example, the Ninth Circuit has found that a third-party disclosure is corrective when, among other things, it provides "more authoritative . . . information" or helps the market better "appreciate [the existing public information's] significance," even if the disclosure does not do expert-level work to unpack that information. In re Apollo Grp., Inc. Sec. Litig., No. 08-16971, 2010 WL 5927988, at *2 (9th Cir. June 23, 2010); In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1058 (9th Cir. 2008).

(3) GRAY - FINAL FORM.DOCX (DO NOT DELETE)                                                    1/20/23 7:04 PM

108        *HOUSTON BUSINESS AND TAX LAW JOURNAL*     [Vol. XXIII

previously known to the market, the only thing actually disclosed to the market when the opinion is released is the opinion itself, and such an opinion, standing alone, cannot reveal to the market the falsity of a company's prior factual representations."[19] The court further explained that, "such opinions are exactly the type of confounding information, including changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, that do not qualify as corrective disclosures for purposes of loss causation."[20] In the presence of confounding factors, courts place the burden on the plaintiffs to distinguish the impact of the corrective disclosures from confounding information and establish the causal link between any estimated losses and alleged frauds.[21]

III.  FRAMEWORK TO ESTABLISH LOSS CAUSATION IN SECURITIES CLASS
       ACTIONS

The following diagram reflects an impactful framework for differentiating potentially confounding information by evaluating whether an alleged corrective disclosure (event A) did in fact cause an observed stock price decline (event B). In order to cause an observed price drop, event A must have preceded event B. However, a mere temporal relationship is insufficient to conclude for purposes of loss causation that event A caused event B. Instead, to establish loss causation, the plaintiff must prove that had it not been for the alleged corrective disclosure, the stock price would not have declined. This "but for" analysis typically requires the construction of a counterfactual, in which the alleged corrective disclosure did not take place. Because this counterfactual often involves unobservable events, an expert often examines what actually happened in the marketplace (observable) following the alleged corrective disclosure to determine whether, and to what extent, its revelation *caused* the stock price to decline (*see* Figure 1: Causality Framework).

---

19.    *Meyer*, 710 F.3d at 1199 (alteration in original) (emphasis and internal quotation marks omitted).

20.    *Id.* (internal quotation marks omitted).

21.    Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345-46 (2005) (holding a plaintiff must prove the causal connection between the material misrepresentation and the loss and may recover only those economic losses actually caused by the misrepresentation).

(3) GRAY - FINAL FORM.docx (DO NOT DELETE)                                    1/20/23 7:04 PM



Figure 1: Casuality Framework

The event study is an econometric framework that can be used as part of an analysis of loss causation. Quantifying investors' losses using an event study assumes that, in the counterfactual, if the same (i.e., economically equivalent) information were disclosed by the subject company on an earlier date, the stock price would decline by a similar magnitude (as observed in the actual world) or its increase would be lessened.[22] But what happens if a third party, and not the company, made the actual alleged corrective disclosure? Those circumstances may call into question the assumption that in the counterfactual, the *company* made an economically equivalent disclosure earlier.[23] In other words, even in the absence of other potentially confounding information, this counterfactual and analysis of the events as they actually unfolded could deviate and be called into question if someone other than the company disclosed the alleged corrective information.[24]

Academic research shows that the method of disseminating news can have an independent impact on stock price movements. It is not coincidental that short-sellers often design their short reports in a way that aims to draw maximum publicity, allowing the media to play a role in influencing the market.[25] One commonly cited example of the impact of financial media is the case of biotechnology company EntreMed. EntreMed's stock price tripled in early May 1998 following the publication of a front-page *New York Times* article, which reported a breakthrough in

---

22.    Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. REV. 883, 894 (1990) ("To calculate the equivalent disclosure price, one must precisely determine the information that was omitted or misrepresented. Second, one must estimate the impact on security prices of the disclosure of that information and only that information.").

23.    This "equivalent disclosure" principle is well understood in academic literature and by courts, and it is a critical part of the analysis of materiality and damages. A fundamentally sound and reliable method must be employed to account for this principle. *See, e.g.*, Allen Ferrell & Atanu Saha, *The Loss Causation Requirement for Rule 10b-5 Causes of Action: The Implications of* Dura Pharmaceuticals v. Broudo, 63 BUS. L. 163, 166 (2007).

24.    *See Cornell*, *supra* note 23, at 894 ("The equivalent disclosure price is the price at which the security would have traded if the omitted and misrepresented information – and *only* that information – were accurately disclosed at the start of the class period.").

25.    Note that short sellers have a financial position that would see them benefiting from  a decline in the stock price.

110        *HOUSTON BUSINESS AND TAX LAW JOURNAL*     [Vol. XXIII

cancer research, and mentioned EntreMed's licensing rights to the breakthrough proteins developed by the researchers.[26]  The *New York Times* article, however, presented "virtually the same information" as what was published five months prior in the science journal *Nature* and which had been immediately re-broadcast by CNN, CNBC, even the *Times* itself, and EntreMed.  The difference, perhaps, was that the May article was more "prominent and exceptionally optimistic," giving EntreMed "tremendous publicity" and ultimately resulted in the substantial price response (from $12 to $85 at open the next day and $52 at market close on the same day).[27]

With the power to disseminate information to a broad audience, media can shape the public narrative and perceptions of companies through both the way it packages its stories and the tone with which it tells them.  For example, in his 2007 study of the media's interactions with the stock market, Paul Tetlock finds that "media pessimism induce[s] downward pressure on market prices."[28]  A more recent study concludes that "it is the *recombination* of old information from multiple sources that prompts market reactions to stale news.  While direct duplication of previous articles is relatively straightforward to discard, news articles that draw content from multiple prior sources are more difficult to identify as stale."[29]  And, according to at least one academic, the "role of financial media is to transmit stale news to a subset of investors who unwittingly make prices less efficient in the short run."[30]  Academic evidence thus suggests that media tone and packaging have an independent impact on the market.  Although the media can transmit information quickly to a large number of investors, it might also give rise to confounding price impact.  It is often challenging to disentangle "the causal impact of media reporting from the impact of the events being reported."[31]

IV.  IMPLICATION FOR ECONOMIC ANALYSIS ON LOSS CAUSATION

It is important for lawyers and experts to ensure consistency between the counterfactual constructed for purposes of loss causation and the economic assumptions underlying the loss analysis.  Securities class actions arising from third-party disclosures present interesting questions about how counterfactuals should address the impact of the media.  As discussed above, academic literature strongly indicates that, in some cases, the media creates

---

26.    *See* Gur Huberman & Tomer Regev, *Contagious Speculation and a Cure for Cancer: A Nonevent That Made Stock Prices Soar*, 56 J. FIN. 387, 387 (2002).

27.    *Id.* at 390-91, 396.

28.    Paul C. Tetlock, *Giving Content to Investor Sentiment: The Role of Media in the Stock Market*, 62  J. FIN. 1139, 1166 (2011).

29.    Anastassia Fedyk & James Hodson, *When Can the Market Identify Old News?* (July 8, 2017) (emphasis added) (working paper) (on file with Harvard University Department of Economics).

30.    Paul C. Tetlock, *All the News That's Fit to Reprint: Do Investors React to Stale Information?*, 24 REV. FIN. STUD. 1481, 1508 (2011).

31.    Joseph E. Engelberg & Christopher A. Parsons, *The Causal Impact of Media in Financial Markets*, 66 J. FIN. 67, 67 (2011).

2022]        *COUNTERFACTUALS IN SECURITIES CLASS ACTIONS*        111

a temporary price impact that ultimately reverses.  For instance, investors in EntreMed shares may have "overreacted to the great publicity of the May 3, 1998 *Times* article," causing a dramatic stock price movement.[32]  Of course, the corollary is that the market sometimes underreacts to news, as likely occurred when the "hard news" about EntreMed was first released in November 1997.[33]  Indeed, several academic studies demonstrate that investors have limited attention, which in turn can lead to neglect of information that, once revealed, can lead to large price swings.[34]

As previously noted, in connection with analyzing loss causation, courts require isolation of potentially confounding factors in order to distill the actual impact of the corrective information on market price.  In fact, the plaintiff has the burden to "isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors."[35]  Despite the plaintiff bearing the burden to establish loss causation, a defendant's experts can also play an important role in this analysis by highlighting the confounding factors, including those related to the impact of media, present in an alleged corrective disclosure.

In *Meyer*, for example, the court deemed not corrective a disclosure that merely restated information already in the market because any resulting price impact was simply caused by the opinion expressed in the article and therefore did nothing to correct any prior false factual representations.[36]  Recently, courts have extended the *Meyer* holding even further.  For example, in *In re Omnicom*, the District Court held that the plaintiffs' expert's event study failed to demonstrate loss causation in part because "the event study does not isolate [the corrective disclosure's] effect on Omnicom's stock price from that of the negative reporting [and highly negative tone], which dwarfed any shreds of new information. . ."[37]  The Second Circuit agreed finding that "[a] negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions[,]" which the court found "failed to show a price decline due to a corrective disclosure."[38]

In the context of a shareholder class action, it is also possible that in

---

32.    *Huberman*, *supra* note 27, at 388.

33.    *Id.*

34.    Azi Ben-Rephael et al., *It Depends on Where You Search: Institutional Investor Attention and Underreaction to News*, 30 REV. FIN. STUD. 3009, 3009-10 (2017).

35.    Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 408, 421–23 (7th Cir. 2015); *see also* Fener v. Operating Eng'rs Constr. Indus. & Miscellaneous Pension Fund (Local 66), 579 F.3d 401, 410 (5th Cir. 2009) (noting some circuits reject "any event study that shows only how a stock reacted to the entire bundle of negative information, rather than examining the evidence linking the culpable disclosure to the stock-price movement.") (emphasis, internal quotation marks and citation omitted); In re Omnicom Grp., Inc. Sec. Litig., 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (rejecting expert's event study which did not isolate effects of alleged corrective disclosures from other factors), *aff'd*, 597 F.3d 501 (2d Cir. 2010).

36.    Meyer v. Greene, 710 F.3d 1189, 1199 (11th Cir. 2013).

37.    *In re Omnicom*, 541 F. Supp. 2d at 554.

38.    In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 512-13 (2d Cir. 2010).

(3) GRAY - FINAL FORM.docx (DO NOT DELETE)                                                                    1/20/23 7:04 PM

112        *HOUSTON BUSINESS AND TAX LAW JOURNAL*     [Vol. XXIII

the counterfactual, the stock price would not have fully responded to information existing in the market until the media subsequently brought the information to investors' attention. In fact, in the context of short reports, it is entirely feasible that the market's reaction is driven by investors' emotional response to the publications (e.g., short reports) themselves rather than any information in those publications. What implications do these issues have for the definition of economic loss and the corresponding analysis of confounding versus corrective information? This is an important question that courts, lawyers, and experts should consider carefully when analyzing loss causation.

## V.   TIMING OF LOSS CAUSATION ANALYSIS

When should courts entertain expert evidence related to loss causation? Currently, U.S. courts prefer to reserve a full analysis of loss causation until trial, a point few securities class actions ever reach.[39] However, expert analysis of issues related to loss causation becomes vital as early as the class certification stage of a case.

For example, at class certification, defendants can rebut a plaintiff's reliance on the fraud on the market presumption by severing the link between the alleged misrepresentations and the price plaintiffs paid or received for their shares. In other words, a defendant may rebut the presumption with evidence (including expert testimony) that the alleged misrepresentations did not actually impact the price of the stock or that the corrective disclosure did not actually correct the alleged misrepresentation.[40] The extent to which an alleged corrective disclosure contains confounding information should be an important factor in the analysis.[41]

---

[39]   In re Gilead Scis. Sec. Litig., 536 F.3d, 1049,1057 (2008) (finding as "long as the plaintiff pleads facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds."); *see also* McCabe v. Ernst & Young, LLP., 494 F.3d 418, 427 n.4 (3d Cir. 2007) (emphasizing that loss causation "becomes most critical at the proof stage.") (quoting EP Medsystems, Inc. v. Echocath, Inc., 235 F.3d 865, 884); Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 197 (2d Cir. 2003) (concluding that loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.").

[40]   In re Chicago Bridge & Iron Co. N.V. Sec. Litig., No. 17 Civ. 1580 (LGS), 2020 WL 1329354, at *5 (S.D.N.Y. Mar. 23, 2020).

[41]   Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 283 (2014); *see also* Di Donato v. Insys Therapeutics, Inc., 333 F.R.D. 427, 442–44 (D. Ariz. 2019) (holding it insufficient to present evidence that plaintiff failed to prove the alleged misrepresentations caused a price change without providing expert evidence that the market in fact did not respond to the alleged misrepresentations); Pirnik v. Fiat Chrysler Autos., N.V., 327 F.R.D. 38, 45 (S.D.N.Y. 2018) (finding the Basic, Inc. v. Levinson, 485 U.S. 224 (1988), presumption was not rebutted when "[the] [d]efendant did not conduct, or submit, their own event study to show the absence of price impact" and instead critiqued plaintiffs' expert); In re Signet Jewelers Ltd. Sec. Litig., No. 16 Civ. 6728 (CM) (RWL), 2019 WL 3001084, at *13 (S.D.N.Y. July 10, 2019) ("Defendants' failure to broaden the scope of [the expert's] assignment or supplement his report with an event study showing the absence of price impact is, on its own, a basis for rejecting Defendants' argument."), *appeal withdrawn sub nom.,* Pub. Emps. Ret. Sys. of Miss. v. Signet Jewelers Ltd., No. 19-3837, 2020 WL 773018 (2d Cir. Jan. 16, 2020).

(3) GRAY - FINAL FORM.docx (DO NOT DELETE)                                    1/20/23 7:04 PM

2022]        *COUNTERFACTUALS IN SECURITIES CLASS ACTIONS*        113

The long-running litigation in *Arkansas Teachers Retirement System v. Goldman Sachs Group, Inc.*, is instructive.[42]   There, the defendants produced evidence that prior to the corrective disclosures cited by plaintiffs, similar corrective information was revealed to the public on thirty-four occasions without causing a decline in the price of Goldman's shares, and thus the alleged misstatements and omissions cited by plaintiffs could not have impacted the price the plaintiffs paid or received for their shares.[43]  The district court held that "this evidence [was] 'an inappropriate truth on the market defense,' or [was] evidence of the statements' lack of materiality, neither of which the court thought it could consider at the certification stage."[44]   Reversing, the Second Circuit held that although evidence presented touched on materiality, price impact "differs from materiality in a crucial respect" – "[i]f a defendant shows that an 'alleged misrepresentation did not, for whatever reason, actually affect the market price' of defendant's stock, 'there is no grounding for any contention that the investor indirectly relied on the misrepresentation through his reliance on the integrity of the market price."[45]  On remand, the district court certified the class, finding that defendants failed to rebut the presumption of reliance by a preponderance of the evidence.[46]  A divided Second Circuit panel affirmed the district court.[47]

Goldman subsequently petitioned the Supreme Court arguing that the Second Circuit erred "by concluding that the generic nature of alleged misrepresentations is irrelevant to the price impact question."[48]  On June 21, 2021, the Supreme Court vacated the Second Circuit's decision and remanded the case, directing the Second Circuit to consider "all record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issues."[49]   The Second Circuit subsequently remanded the case to the district court, holding that it was for the district court to determine in the first instance whether the defendants produced sufficient evidence to overcome the presumption of reliance.[50]

On December 8, 2021, the district court granted plaintiffs' motion for class certification, holding that defendants "failed to establish a lack of price impact by a preponderance of the evidence."[51]  The district court again "declined to credit" defendants' evidence "that the lack of abnormal [stock price movement] on any of the [thirty-six previous disclosure] dates showed

---

42.    879 F.3d 474, 484 (2d Cir. 2018).

43.    *Id.* at 485.

44.    *Id.*

45.    *Id.* at 486.

46.    *In re* Goldman Sachs Grp., Inc. Sec. Litig., No. 10 Civ. 3461 (PAC), 2018 WL 3854757, at *6 (Aug. 14, 2018).

47.    Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc., 955 F.3d 254, 274 (2d Cir. 2020).

48.    Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys., 141 S. Ct. 1951, 1960 (2021).

49.    *Id.* at 1961 (emphasis omitted).

50.    Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp*., Inc.*, 11 F.4th 138, 143-44 (2d Cir. 2021).

51.    In re Goldman Sachs Grp., Inc. Sec. Litig., No. 10 Civ. 3461 (PAC), 2021 WL 5826285, at *15 (S.D.N.Y. Dec. 8, 2021).

(3) GRAY - FINAL FORM.docx (DO NOT DELETE)                                                    1/20/23 7:04 PM

114          *HOUSTON BUSINESS AND TAX LAW JOURNAL*      [Vol. XXIII

a lack of price impact attributable to the alleged misstatement."[52]  The district court reasoned that "the updated direction from the Supreme Court and Second Circuit ha[d] no bearing on these factual findings," and reiterated its position that (1) unlike the prior reports, "the first alleged corrective disclosure was the first public account to detail and document [the conflicts at issue] with hard evidence"; (2) the source of the corrective disclosure "lent extra credibility and gravitas unequaled in the prior reports"; and (3) the corrective disclosure "was unencumbered by any of the denials or mitigating commentary that had rendered the prior reports less jarring."[53]

Given the importance of loss causation in determining whether and to what extent a plaintiff is entitled to damages in a securities class action, courts should consider more intensely scrutinizing the issue earlier in the litigation, potentially saving time and money for both the litigants and the judicial system.  One potential approach is to hold an initial hearing to address and tease out the confounding factors, similar to the process of claim construction found in patent law.  Under any circumstance, however, experts on both sides are crucial to determining what, if any, impact the revelation of actually corrective information had on the company's market price and the extent to which any market changes were caused by the confounding effects of the publication itself.

Looking forward, short-seller reports and other third-party publications will continue to grow in importance as key sources of news and financial information about companies.  Indeed, plaintiffs in securities litigation are increasingly relying on such reports to establish loss causation.  But, as discussed above, short seller reports and other third-party disclosures are often replete with confounding information which must be disentangled from any revelation of corrective disclosure to determine if there is a viable claim.  Plaintiffs and defendants may therefore benefit from engaging experts earlier to address the merits of litigation following third-party disclosures.  Until courts or the legislature develop a model that scrutinizes the scope of potential loss at an earlier stage in the case, however, companies will continue to face significant costs and uncertainty from litigation which proceeds into discovery only to fail later when the court more closely analyzes loss causation. [54]

---

52.    *Id.* at *9.

53.    *Id.*

54.    Jurisdictions around the world have recognized the problem caused by the rise in shareholder litigation and continue to take steps to minimize its impact on corporations.  *See* Treasury Laws Amendment (2021 Measures No. 1) Act 2021, No. 82,2021 § 674A  (Austl.) On June 21, 2022, the Australian government permanently changed its continuous disclosure requirement for corporations by moving from a strict liability standard to a standard requiring proof that a company and its officers acted with knowledge, recklessness or negligence when failing to provide material information. *Id.*